**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| MARY HITCHCOCK MEMORIAL HOSPITAL; <br><br> *Plaintiff,* <br><br> v. <br><br> ELI LILLY AND COMPANY; <br><br> *Defendant*. | Civil Case No. |

## **COMPLAINT**

Plaintiff Mary Hitchcock Memorial Hospital ("**Plaintiff**" or "**MHMH**") seeks injunctive and other relief against Defendant Eli Lilly and Company ("**Defendant**" or "**Lilly**") for engaging in unlawful, unfair, unjust, and deceptive conduct by imposing illegal terms and conditions on discounted drug pricing that it is statutorily required to offer to MHMH pursuant to the 340B Drug Pricing Program, 42 U.S.C. § 256b (the "**340B Program**"). Lilly has abused its market power through the institution of an illegal policy with non-negotiable terms, false representations, and retaliatory pricing penalties in order to extract commercially valuable data from MHMH (at MHMH's own expense) and to line its own pockets with ill-gotten gains from drug sales to MHMH at a substantially inflated price. The result is a massive and unjust transfer of wealth from non-profit safety-net hospitals like MHMH that serve both underprivileged and otherwise underserved patients in rural communities, to Lilly, a trillion-dollar pharmaceutical company. In further support of its Complaint, MHMH states and alleges the following.

1

**INTRODUCTION**

1.      Congress established the 340B Program in 1992 pursuant to the Veterans Health Care Act, 42 U.S.C. § 256b. The 340B Program's primary purpose is to allow certain approved safety-net providers like MHMH (each, a "**Covered Entity**") "to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. 102-384, pt. 2, at 12 (1992). The 340B Program accomplishes this goal by requiring pharmaceutical manufacturers—like Lilly—to sell covered outpatient drugs at discounts to qualifying healthcare organizations as a condition of the manufacturers' participation in the Medicare Part B and Medicaid programs. The premise is simple: manufacturers realize significant financial benefits when their drugs are included in these large programs' formularies and, in turn, they must offer discounted pricing (the "**Ceiling Price**") for covered outpatient drugs to Covered Entities like MHMH. The program allows safety-net providers to furnish critical medical care and access to their community members, including those who are uninsured and underinsured.

2.      MHMH is a rural acute care hospital in northern New Hampshire servicing patients in the rural northern New England region, including New Hampshire and Vermont. MHMH cares for all patients regardless of their ability to pay.

3.      MHMH qualifies as a disproportionate share hospital ("**DSH**") under Section 1886(d)(1)(B) of the Social Security Act because it serves a significant number of low-income and uninsured patients.

4.      MHMH qualifies and is registered as a Covered Entity under the 340B Program. It is therefore entitled to purchase covered outpatient drugs from manufacturers like Lilly at the 340B Ceiling Price.

5.      As intended by Congress, MHMH subsidizes much of its community support—including, but not limited to, charity care, community health services, and providing necessary comprehensive clinical services to rural populations—through its participation in the 340B Program. MHMH reinvests 340B savings to expand access to healthcare and improve and subsidize services for its otherwise medically underserved community members, including uninsured and underinsured patients.

6.      Lilly is the largest drug manufacturer in the world, a publicly traded Fortune 100 company with over $65 billion in annual revenues, and the first drug manufacturer in history with a market capitalization of over one trillion dollars.

7.      In January 2026, Lilly instituted an unprecedented policy requiring Covered Entities like MHMH to submit detailed claims-level data as a condition of continuing to purchase covered outpatient drugs at the 340B Ceiling Price—a price to which MHMH and other Covered Entities are statutorily entitled (the "**Policy**").[1] Under the Policy, the data must be submitted through a third-party web platform ("**340B ESP**") unilaterally chosen by Lilly. Use of 340B ESP requires MHMH to agree to 340B ESP's owners' and their affiliates' non-negotiable and unconscionable terms of use (the "**Terms**"), with Lilly as a third-party beneficiary to the Terms.

8.      The Policy is unlawful and operationally burdensome. It coercively conditions access to the 340B Ceiling Price on the surrender of data that Lilly, according to 340B ESP's unilaterally imposed Terms and Lilly's own status as a third-party beneficiary of the same, may then improperly monetize for commercial purposes. Such commercial purposes include, but are not limited to: (a) avoiding the standard expense of purchasing certain of the same data from third-party data vendors; and (b) utilizing the data to identify duplicate commercial discounts, which

---

[1] Update to Lilly's 340B Distribution Program for In-House Pharmacies January 15, 2026, available at https://340besp.com/resources (last accessed July 27, 2026).

3

goes beyond Lilly's stated purpose of identifying Medicaid duplicate discounts ("**Duplicate Discounts**").[2] Lilly's justification for the Policy is blatantly pretextual in light of Lilly's pre-existing statutory audit rights, the breadth and scope of the information required by the Policy, and the Terms that provide Lilly and other parties with unfettered commercial use of the claims data.

9.      The conditions required by the Policy also place significant administrative and operational burdens on MHMH by requiring it to devote resources toward collecting, validating, and transmitting claims information. MHMH estimates that it would need to hire new staff, including at least one additional employee, solely to comply with the Policy—a significant burden in an already-challenging financial climate. The time and resources required to comply with the Policy would otherwise be allocated to supporting operations and patient care.

10.     No law, rule or regulation authorizes Lilly to unilaterally impose these reporting mandates or data-sharing requirements as a prerequisite to purchasing covered outpatient drugs at the discounted 340B Ceiling Price.

11.     The Policy is a transparent attempt by Lilly to boost its bottom line at the expense of MHMH and the vulnerable patients it serves by extracting valuable commercial data from, and imposing inordinate costs and burdens on, MHMH.

12.     Lilly has intentionally abused its market power to set up an untenable "Sophie's choice": an already financially vulnerable MHMH must either absorb substantially higher upfront drug costs and forgo its 340B savings associated with Lilly's drugs, or capitulate to the demands of a trillion-dollar corporation, absorb higher operational costs, and surrender claims data on Lilly's Terms.

---

[2] Under 42 U.S.C. § 256b, a Covered Entity may not request payment under Medicaid FFS for a drug purchased at the 340B Ceiling Price such that a manufacturer would be offering a "duplicate discount" in the form of extending the 340B discount to the Covered Entity, as well as paying a rebate to the Medicaid program.

13. MHMH has rightfully refused to comply with Lilly's unlawful Policy.

14. Because of MHMH's refusal to submit data to Lilly through 340B ESP, on or about July 2, 2026, Lilly retaliated by unlawfully terminating MHMH's access to the 340B Ceiling Price for all of its covered outpatient drugs by directing all wholesalers through which MHMH makes 340B purchases to cease offering the 340B Ceiling Price to MHMH.

15. Lilly's conduct has forced MHMH to purchase drugs at exorbitant and unlawfully high prices—to the detriment of its patients and the communities it serves—while Lilly has been unjustly enriched.

16. Lilly ceased honoring the 340B Ceiling Price for MHMH just one day after the Medicare GLP-1 Bridge program went live, which is expected to significantly drive up demand for certain drugs manufactured by Lilly—a set of circumstances that appears to be intentionally anticompetitive.

17. Lilly's denial of MHMH's access to the 340B Program is causing ongoing and irreparable harm to MHMH and the patients it serves. Lilly's actions result in dramatically higher upfront drug prices <u>and</u> a loss of 340B savings, doubly harming both MHMH and its vulnerable patient population.

18. By way of example, for the period between July 7, 2026, and July 16, 2026, MHMH was forced to purchase covered outpatient drugs from Lilly at costs significantly above the Ceiling Price. As a result of the significant difference between the acquisition price and Ceiling Price, MHMH overpaid by nearly $130,000 at the point-of-sale during that ten-day period alone. Annualized, MHMH faces overpaying by at least $4.7 million for Lilly's covered outpatient drugs. One drug, Taltz Auto Injector 80 MG 2, was purchased on July 10, 2026, for more than $6,000.00 over the July 10, 2026 340B Ceiling Price. Not only did MHMH absorb the additional upfront

cost, but the savings MHMH would otherwise have used to improve health outcomes and expand healthcare services for New Hampshire and Vermont residents, as Congress expressly intended, have been effectively redirected to Lilly and used to bolster Lilly's profits.

19.    MHMH relies on statutorily mandated 340B pricing to support uncompensated care, rural health services, oncology programs, behavioral health treatment, pediatric services, pharmacy services, and other essential programs that would otherwise be difficult or impossible to sustain. Lilly's refusal to provide 340B pricing may impact MHMH's ability to continue to offer various services to patients.

20.    Disruption to MHMH's access to 340B pricing threatens its already tenuous financial stability as a DSH and undermines access to care for underserved rural communities in New Hampshire and Vermont.

21.    The conditions imposed by the Policy are expressly prohibited under Vermont law, which applies to this dispute because MHMH is a "340B covered entity" under Vermont law, services Vermont patients, and contracts with Vermont-licensed pharmacies to service its patients. 18 Vt. Stat. Ann. § 4681 *et seq*.

22.    In addition, New Hampshire law, RSA chapter 358-A, protects its residents from unfair competition and the deceptive acts and practices engaged in by Lilly.

23.    Lilly's conduct is unconscionable, unfair, and deceptive because Lilly puts its own profits over the health interests of New Hampshire and Vermont residents. The direct and inevitable result of Lilly's actions is increased healthcare costs for New Hampshire's and Vermont's citizens.

24.    MHMH seeks immediate injunctive relief to enjoin Lilly from enforcing its illegal Policy against MHMH.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

26.     Plaintiff MHMH is a citizen of the State of New Hampshire. MHMH is a New Hampshire not-for-profit corporation with its principal place of business located at One Medical Center Drive, Lebanon, New Hampshire 03766.

27.     Defendant Eli Lilly and Company is a citizen of the State of Indiana. Defendant is incorporated under the laws of the State of Indiana and maintains its principal place of business and headquarters at 893 S. Delaware Street, Indianapolis, Indiana 46225.

28.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

29.     Venue lies in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

30.     MHMH is a New Hampshire not-for-profit corporation and healthcare charitable trust with a principal place of business located at One Medical Center Drive, Lebanon, New Hampshire. MHMH serves as a major tertiary referral site for northern New England, including New Hampshire and Vermont. MHMH is designated as a rural referral center and a sole community hospital. MHMH is also a state-of-the-art accredited children's hospital, known as Dartmouth Health Children's. MHMH operates the Dartmouth Cancer Center, which is one of only 58 National Cancer Institute-designated comprehensive cancer centers in the United States and the only one in New Hampshire.

31.     MHMH is the teaching hospital at Dartmouth-Hitchcock Medical Center, New Hampshire's only academic medical center and the most rural academic medical center in the United States. MHMH also operates New Hampshire's only Level 1 trauma center.

32.     Lilly is the largest drug manufacturer in the world with its principal place of business located in Indianapolis, Indiana and its headquarters located at 893 S. Delaware St, Indianapolis, Indiana 46225.

## FACTUAL ALLEGATIONS

### THE 340B DRUG PROGRAM

33.     The 340B Program was established by Section 602 of the Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967–71, classified at 42 U.S.C. § 256b.

34.     Congress designed the 340B Program to assist certain healthcare facilities serving low-income, uninsured or otherwise vulnerable populations. *See* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602 (codified as amended at 42 U.S.C. § 256(b)). The 340B Program aims to improve access to medical care in vulnerable communities without requiring additional federal resources and provides a vital source of financing for hospitals and other facilities that are required to treat low-income and uninsured patients regardless of ability to pay.

35.     The 340B Program reflects a longstanding policy judgment: manufacturers that benefit from participation in taxpayer-funded healthcare programs must, in turn, help support providers that care for low-income, uninsured, and underserved populations.

36.     Covered Entities include not only DSHs like MHMH, but also children's hospitals, cancer hospitals, critical access hospitals, federally qualified health centers, and other safety-net providers. *See* 42 U.S.C. § 256b(a)(4).

37.     The 340B Program enables Covered Entities to purchase covered drugs administered or prescribed in outpatient settings at a discount from pharmaceutical manufacturers.

8

This pricing program only applies if the prescribed drug is administered in an outpatient setting and filled at the Covered Entity's pharmacy or at an external pharmacy with which the Covered Entity has a 340B contract ("**Contract Pharmacy**"). In such cases, the Covered Entity receives the usual payment from the patient and/or their insurer. The Covered Entity then purchases a replacement drug for its own stock or the pharmacy's stock at the discounted 340B price, giving the Covered Entity the financial benefit of the difference.

38.    This discounted price is essential to the functioning of the 340B Program because Covered Entities like MHMH operate on thin or negative margins, and cannot be compelled to wait for drug manufacturers to grant pricing based on their own unilaterally imposed requirements. The discount recognizes the economic reality that for-profit pharmaceutical companies such as Lilly are better situated to absorb the cost of paying a discount rather than introducing burdensome, extra-statutory conditions that put vulnerable Covered Entities in the position of initially paying additional money and delaying receipt of needed savings. In the event of alleged overpayments, drug manufacturers like Lilly have a remedy—the right to seek an audit pursuant to the manufacturer audit guidelines the Secretary of the Department for Health and Human Services ("**HHS**") has implemented.

39.    To incentivize voluntary participation, the 340B Program offers drug manufacturers like Lilly a deal: in exchange for Medicaid and Medicare Part B's inclusion of covered outpatient drugs on their formularies, a manufacturer must sell the drugs at the 340B Ceiling Price to Covered Entities. *See* 42 U.S.C. § 256b(a)(1), (4).

40.    In other words, Congress has conditioned the coverage of manufacturers' covered outpatient drugs by the Medicaid and Medicare Part B programs; the cost of entry is participation in the 340B Program. Lilly willingly accepted that cost of entry, but now seeks to reduce it while

9

continuing to reap the full financial benefit of Medicaid's and Medicare Part B's coverage of its drugs.

41. Manufacturers like Lilly obtain significant financial benefits through their participation in Medicaid and Medicare including, but not limited to, inclusion of their covered outpatient drugs on participating insurance plan formulary lists.

42. The 340B Program requires participating pharmaceutical manufacturers to enter into a pharmaceutical pricing agreement ("**PPA**") with the Secretary of HHS. Under the PPA, and pursuant to applicable law, manufacturers "shall . . . offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1).

43. When a drug manufacturer like Lilly signs a PPA, it opts into the 340B Program and agrees to the statutory requirement that the prices charged for covered outpatient drugs to Covered Entities will not exceed the defined 340B Ceiling Price.

44. As described in more detail below, there is a statutory calculation for the 340B Ceiling Price that typically yields discounts significantly below the wholesale acquisition cost. For safety-net hospitals like MHMH, these discounts generate savings that fund patient care programs, charity care, and community health services.

45. 340B providers like MHMH use the difference between their acquisition cost at the 340B Ceiling Price and the amount they are reimbursed by payors to benefit their patients and communities and subsidize clinical operations.

46. The statutory and contractual requirement that manufacturers offer drugs for purchase at the 340B Ceiling Price is not qualified, restricted, or dependent on the receipt of detailed claims data as required by the Policy.

10

47.     Nothing in the 340B statute grants a manufacturer the right to place conditions, such as those mandated in the Policy, on its fulfillment of its statutory obligation to offer the 340B Ceiling Price for covered outpatient drugs purchased by Covered Entities like MHMH.

48.     The Health Resources and Services Administration ("**HRSA**")—an agency of HHS—is tasked with administering the 340B Drug Pricing Program.

49.     In order to become a Covered Entity, MHMH was required, and continues to be required, to meet specific eligibility criteria and register with HRSA. The registration requirement allows HRSA to verify that a Covered Entity meets all the statutory requirements before participation. As a Covered Entity, MHMH is subject to audit by HRSA. In addition, MHMH submits annual Medicare cost reports and IRS forms that detail the community benefits and charity care that it provides to patients.

50.     HRSA has affirmed that Covered Entities like MHMH may use the "savings" obtained by retaining the difference between the "actual acquisition cost" of the 340B-discounted drugs and the usual market reimbursement "to reach more eligible patients and provide more comprehensive services." HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,551 (Aug. 23, 1996).

51.     HRSA has further stated that the primary intent of the 340B Program is to "enable[] covered entities to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. 102-384, pt. 2, at 12 (1992).

52.     In 2010, HRSA reaffirmed that "the benefit of the program was intended to accrue to the covered entities." 75 Fed. Reg. 10,272, 10,277 (Mar. 5, 2010 Final Notice).

## APPLICABLE REGULATORY GUIDANCE

53.     In 1994, HRSA issued its Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992. 59 Fed. Reg. 25,110–114 (May 13, 1994 Final Notice).

11

54. The 1994 guidance states that a manufacturer "may not single out covered entities from their other customers for restrictive conditions that would undermine the statutory objective." *Id.* at 25,111–112.

55. The 1994 guidance includes a narrow exception for contract provisions that "address customary business practice, request standard information, or include other appropriate contract provisions." *Id.* at 25,114. The phrase "standard information" was used in reference to "routine information necessary to set up and maintain an account." *Id*. at 25,112. The 1994 guidance explicitly barred manufacturer demands for "drug acquisition" and "purchase" information—the exact kind of information demanded by the Policy. *Id*. at 25,113–114.

56. The 1994 guidance also expressly prohibits manufacturers from requiring a Covered Entity to provide assurances that it will comply with 340B provisions as a condition of receiving 340B pricing. *Id*. In other words, Lilly may not require MHMH to submit detailed claims data in order to assure Lilly of MHMH's compliance with the 340B program.

57. In 1996, HRSA issued Manufacturer Audit Guidelines, 61 Fed. Reg. 65,406 (the **"Guidelines"**). The Guidelines establish exclusive procedural mechanisms for manufacturer-initiated audits.

58. Under the 2010 Contract Pharmacy Guidance, 75 Fed. Reg. 10,272, HRSA reinforced that manufacturer access to Covered Entity dispensing records is limited to the formal audit process. HRSA declined to require the automatic submission of compliance data to anyone, including HRSA itself.

59. When manufacturers specifically asked that audit results be made available to manufacturers, HRSA refused. 75 Fed. Reg. at 10,274.

12

60.    HRSA also rejected manufacturer requests to audit Covered Entities with multiple Contract Pharmacies without cause, stating that utilization of more than one Contract Pharmacy does not create automatic cause to suspect diversion. *Id.*

61.    On January 5, 2017, HRSA issued a Final Rule entitled "340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation." 82 Fed. Reg. 1210 (2017). In the Final Rule, HRSA rejected manufacturer requests to charge a Covered Entity a price above the 340B Ceiling Price "when a manufacturer acted on credible evidence that a covered entity is engaged in diversion of 340B drugs." *Id.* at 1223. The Final Rule states: "Manufacturers cannot condition the sale of a 340B drug at the 340B ceiling price because they have concerns or specific evidence of possible non-compliance by a covered entity." *Id.* "Manufacturers that suspect diversion are encouraged to work in good faith with the covered entity, conduct an audit per the current audit guidelines, or contact HHS directly." *Id.*

62.    On April 19, 2024, HRSA issued a final rule establishing an Administrative Dispute Resolution process to resolve claims by Covered Entities that they have been overcharged by manufacturers, and claims by manufacturers, after conducting an approved audit, that a Covered Entity has violated the statutory prohibition on diversion[3] ("**Diversion**") or Duplicate Discounts. *See* 89 Fed. Reg. 28,643 (2024). The ADR process addresses the very issues Lilly has asserted its Policy and data demands are designed to identify—Diversion or Duplicate Discounts—rendering Lilly's self-help measures unnecessary.

63.    The existence of the audit and ADR processes demonstrates that manufacturer self-help, in the form of denying Covered Entities the 340B Ceiling Price unless and until they provide

---

[3] Under 42 U.S.C. § 256b, a Covered Entity may not resell or otherwise transfer (e.g. "divert") a covered outpatient drug to a person who is not a patient of the entity.

13

burdensome and voluminous data, is neither contemplated nor authorized by the 340B statute or any implementing rule.

## MHMH'S RELATIONSHIP WITH LILLY

64.    For years, Lilly has extended, and MHMH has accepted, offers to purchase covered outpatient drugs at or below the applicable 340B Ceiling Price. Consistent with standard industry practice, MHMH has purchased those drugs through wholesalers, but the true seller is Lilly, which manufactures the drugs, sets the prices, and is the entity legally obligated to make the offer under 42 U.S.C. § 256b.

65.    MHMH's acceptance of Lilly's offers, and its purchase of Lilly's drugs at the 340B Ceiling Price over a period of years, constitutes valid consideration and gave rise to an enforceable contract, or a series of enforceable contracts, between MHMH and Lilly.

66.    As a part of that offer and acceptance, Lilly has represented (and MHMH reasonably understood) that Lilly promised to comply with all applicable laws, and specifically those laws surrounding 340B pricing.

67.    As evidenced by the ten-day example provided in Paragraph 18, MHMH purchases millions of dollars of drugs from Lilly annually.

68.    Lilly is a manufacturer of top selling drugs like Mounjaro for type 2 diabetes, Zepbound for obesity, Verzenio for certain types of advanced breast cancer, and Retevmo for the treatment of certain types of cancers.

69.    Lilly is a single source or monopoly supplier of numerous drugs for which there is significant demand. For many drugs, MHMH has no choice but to purchase them from Lilly to serve its patient population.

70.    Notably, Lilly manufactures Foundayo and Zepbound, two of the three GLP-1 drugs included in the Medicare GLP-1 Bridge program, which is "a short-term demonstration run

14

by CMS that will provide eligible Medicare Part D beneficiaries with access to certain GLP-1 drugs between July 1, 2026, and December 31, 2027."[4]

71.     Demand for the GLP-1 products covered under the Medicare GLP-1 Bridge program is expected to increase significantly, and the timing of Lilly's illegal withdrawal of the 340B Ceiling Price from MHMH on or about July 2, 2026—just one day after the program went live—causes additional concern. At base, it represents an example of the impossible dilemma MHMH faces: purchase the drugs at the undiscounted acquisition cost or be unable to serve its patients who are prescribed the drugs.

72.     Consistent with Congress's intent, MHMH historically has used savings from its purchase of 340B priced drugs from Lilly to subsidize certain of its operations that otherwise would not be possible. For instance, MHMH maintains the only neonatal intensive care unit in New Hampshire—providing care for babies born with complex health risks due to prematurity and other health conditions. Without participation in the 340B drug program and corresponding savings, MHMH would need to reduce these services.

73.     Moreover, the Dartmouth Health system, of which MHMH is the primary revenue engine, recently reported a $63.5 million deficit.[5]

74.     One of the cited reasons for this deficit was rising medication costs. That stated rise predated Lilly's illegal withdrawal of the 340B Ceiling Price—firmly worsening and directly contributing to MHMH's financial position.

---

[4] https://www.cms.gov/medicare/coverage/prescription-drug-coverage/medicare-glp-1-bridge/information-providers (last accessed July 27, 2026).

[5] *See Dartmouth Health reports $63.5 million deficit over 6 months*, VT Digger, June 22, 2026 https://vtdigger.org/2026/06/22/dartmouth-health-reports-63-5-million-deficit-over-6-months/ (last accessed July 27, 2026).

75.     Without participation in the 340B Program, MHMH's financial distress would worsen, and it would need to close several services like its neonatal intensive care unit.

## LILLY'S UNLAWFUL POLICY

76.     Under the 340B Program, manufacturers that increase drug prices faster than inflation must provide correspondingly larger discounts to Covered Entities via the 340B Ceiling Price. Repeated price increases can drive the 340B Ceiling Price close to or at zero.

77.     More specifically, the 340B Ceiling Price is calculated as the drug's average manufacturer price ("**AMP**") minus the Medicaid unit rebate amount ("**URA**"). By law, the URA increases when manufacturers increase drug prices above the rate of inflation. 42 U.S.C. § 1396r-8(c)(2). As the URA increases, the 340B Ceiling Price drops. Therefore, the 340B Ceiling Price could reach zero if the URA is equal to the AMP. In this case, manufacturers are required to charge no more than one penny as the 340B Ceiling Price ("**Penny Pricing**"). 42 C.F.R. § 10.10(b). Penny Pricing provides a check and balance to significant drug price increases by manufacturers, and manufacturers' failure to comply with Penny Pricing carries penalties. Manufacturers who knowingly and intentionally do not honor Penny Pricing "may be subject to a civil monetary penalty not to exceed $5,000 for each instance of overcharging." 42 C.F.R. § 10.11(a).

78.     In recent years, Lilly made the deliberate business decision to raise the prices of many of its drugs at rates that far exceeded inflation. For example, between 1996 and 2019, Lilly increased the list price of Humalog, its top-selling insulin product, by approximately 1,200 percent.[6]

79.     Rather than accept the consequences of its own pricing decisions, Lilly sought to implement a series of extra-statutory conditions designed to restrict Covered Entities' access to the

---

[6] Maureen Testoni, *Pursuit of Profits is Driving Drug Companies to Break the 340B Law*, STAT News, (June 10, 2022) https://www.statnews.com/2022/06/10/pursuit-of-profits-is-driving-drug-companies-to-break-the-340b-law/ (last accessed July 27, 2026).

340B Ceiling Price. For example, Lilly restricted the use of Contract Pharmacies, demanded claims and medical data, and created a constantly shifting patchwork of requirements that was not authorized by any law, rule or regulation. These changes were a fundamental departure from decades of industry practice.

80.     On January 15, 2026, Lilly announced an unprecedented new Policy requiring the submission of detailed, proprietary, confidential information for each and every claim in order for a Covered Entity to obtain 340B pricing.

81.     The Policy amounts to a new illegal condition on Lilly's written offer of 340B pricing to MHMH.

82.     In connection with the Policy, Lilly memorialized the mutual understanding that Lilly expressly agreed to comply with all laws surrounding 340B pricing.

83.     The Policy states: "Lilly is committed to compliance with the 340B statute and to responsible distribution of its products. Lilly will continue to offer all covered entities its 340B medicines at or below the 340B ceiling price, consistent with the 340B statute, as long as the covered entity provides the minimal, standard business information outlined in this notice. Lilly will also continue to work with all stakeholders to improve program integrity and ensure that the 340B program can be properly and fairly administered going forward."

84.     Lilly's characterization of its data demands as "minimal, standard business information" is deceptive and unfair. The data the Policy purports to require from Covered Entities like MHMH is not only voluminous and operationally and financially burdensome, but also subject to broad commercially and—competitively—valuable use by Lilly and its vendor.

85.     Lilly's Policy requires that claims data submission occur through the 340B ESP third-party web platform that is ultimately owned by Berkeley Research Group ("**BRG**"), a for-

17

profit consulting company that supports pharmaceutical manufacturers. BRG owns 340B ESP's immediate owner, another for-profit entity called Second Sight Solutions LLC (**"Second Sight"**).

86.    Through Second Sight, the 340B ESP has non-negotiable Terms that are unconscionable and unfair. They enable Second Sight and Lilly to use the submitted data for broad purposes that extend beyond confirming compliance with the statutory Diversion and Duplicate Discount prohibitions (a function which is not Lilly's right to unilaterally take on through mandatory data collection in any case). For example, the Terms: [7]

- Require MHMH to grant Second Sight a "worldwide, sublicensable, non-exclusive, royalty-free, perpetual, irrevocable license to collect, process, disclose, create derivative works of and otherwise use the Covered Entity Claims Data ("Data License") for the purposes set forth herein. … This Data License survives after termination of the Agreement and shall survive as to any Covered Entity Claims Data that you have submitted on behalf of the Covered Entity or that a TPA (as defined herein) has submitted on behalf of the Covered Entity after such respective dates of submission."

- Require MHMH to agree that "Second Sight may enable Covered Entity Claims Data to be combined with rebate data remitted to Participating Pharmaceutical Manufacturers by payers (including Medicaid, Medicare, TRICARE and commercial payers) ("Rebate Data") in order to identify Ineligible Rebates and evaluate compliance with Participating Pharmaceutical Manufacturers' policies." Critically, "Ineligible Rebates" are defined as "…duplicate Medicaid, Medicare, TriCare and commercial payer rebates that are not eligible for reimbursement by Participating Pharmaceutical Manufacturers…"—a definition that far exceeds the statutorily-prohibited Duplicate Discounts.

- Shift all risk associated with data security and data privacy to MHMH;

- Establish Lilly as a third-party beneficiary to enforce the Terms against MHMH (while granting no parallel enforcement rights to MHMH against Lilly);

- Permit 340B ESP to unilaterally and even retroactively modify the Terms as it sees fit—a condition that is particularly concerning given Covered Entities are saddled with simply relying upon the data security and HIPAA compliance assurances Second Sight provides;

---

[7] 340B ESP Covered Entity Portal Terms of Use (last updated October 4, 2024) (last accessed July 27, 2026), available at: https://340besp.com/terms-of-use.

- Require MHMH to agree to "monitoring," including but not limited to, "grant[ing] [Second Sight] the right to…report any activity that we suspect may violate any law or regulation to regulators, law enforcement officials or other persons or entities that we deem appropriate." In essence, Second Sight is requiring MHMH to acknowledge a non-existent authority for it (and Lilly) to audit claims and report findings to regulators like HRSA, all while circumventing the Guidelines;

- Limit the direct liability for damages under the Terms of Second Sight and its affiliates to the unconscionable aggregate amount of $100;

- Shift liability to MHMH in the event that it is subsequently determined that 340B ESP's data sharing model violates privacy laws.

87.    The Terms expose MHMH to substantial financial and operational risk and raise serious data integrity concerns that Lilly has refused to address.

88.    By unilaterally choosing 340B ESP and requiring MHMH to agree to the Terms under the threat of the loss of the 340B Ceiling Price, the Policy compels MHMH to agree to a contract of adhesion.

89.    Second Site's owner, BRG, has conducted several studies funded by the Pharmaceutical Research and Manufacturers of America (PhRMA), the main pharmaceutical industry trade group.[8] 340B ESP's Founder and Business Development, Lead, Aaron Vandervelde, who is also a Managing Director at BRG, has authored studies about the 340B program on behalf of PhRMA.[9]

90.    Lilly's unilateral choice of a third-party platform owned by a pharmaceutical manufacturer-aligned company creates a clear conflict of interest and is patently unfair to MHMH.

---

[8] *See e.g.*, *Site of Care Shift for Physician-Administered Drug Therapies: 2026 Update*, January 20, 2026, https://www.thinkbrg.com/insights/publications/site-of-care-shift-for-physician-administered-drug-therapies-2026-update/ (last accessed July 27, 2026).

[9] *See e.g.*, *The Pharmaceutical Supply Chain: Gross Drug Expenditures Realized by Stakeholders*, Berkeley Research Group (2017), https://www.pacificresearch.org/wp-content/uploads/2017/03/863_Vandervelde_PhRMA-January-2017_WEB-FINAL.pdf (last accessed July 27, 2026).

91.     Congress did not authorize manufacturers to unilaterally impose additional reporting mandates or data-sharing requirements as a prerequisite for obtaining 340B discounts.

92.     Lilly's actions effectively condition participation in the 340B program on compliance with manufacturer-imposed requirements that extend beyond the statutory framework established by Congress.

93.     Upon information and belief, Lilly is acting in concert with other large manufacturers. At least twelve other pharmaceutical manufacturers have announced similar claims-data policies. Absent intervention, the Policy will become the industry standard, further eroding the protections Congress intended to provide to safety-net hospitals and the vulnerable patient populations they serve.

**LILLY'S POLICY IS A PRETEXT TO DENY 340B PRICING, EXTRACT VALUABLE COMMERCIAL DATA, AND INCREASE ITS PROFITS**

94.     Lilly's justifications for its data demands and unilateral termination of MHMH's access to 340B pricing are a pretext to avoid providing the discounted 340B Ceiling Price. The Policy further allows Lilly improper access to an unprecedented volume of claims data to which it is not otherwise entitled—and with virtually no restrictions on the use of those data.

95.     In the Policy, Lilly has asserted its demands are necessary to "identify the full universe of duplicate discounts and other program abuses, preserve our ability to initiate audits, and expand transparency even further…."

96.     For example, Lilly claims that the Policy is necessary to avoid Medicaid Duplicate Discounts. However, the Policy is much broader and seeks data for all payors, not just Medicaid and Medicare—hence the Policy's description of "the full universe of duplicate discounts."

97.     As discussed previously, HRSA has already established a comprehensive system to address instances of Diversion or Duplicate Discounts through the audit process and ADR

program, rendering Lilly's demands unnecessary. Specifically, manufacturers like Lilly may: (1) conduct an approved audit; and (2) submit a claim through the Administrative Dispute Resolution process as described in section 340B(d)(3)(A).

98.     Guidance published by HRSA in 1994 makes clear that "[i]f a manufacturer believes that a covered entity is involved in drug diversion, it has the statutory authority to audit the entity records that directly relate to drugs of that manufacturer purchased at [340B] pricing." 59 Fed. Reg. at 25,111.

99.     Under 42 U.S.C. § 256b(a)(5)(C), manufacturers participating in the 340B program have the right to audit Covered Entities regarding their compliance with the program's two key prohibitions: (1) Duplicate Discounts (*e.g.*, receiving 340B pricing on a drug paid for by Medicaid FFS), and (2) Diversion (*e.g*., reselling or transferring 340B discounted drugs to anyone who is not a "patient" of the Covered Entity).

100.     HRSA has implemented audit guidelines originally published at 61 Fed. Reg. 65,406 (Dec. 12, 1996), which establish the procedures manufacturers must follow.

101.     This audit right is not at the manufacturer's unilateral and unfettered discretion. Rather, the manufacturer must have reasonable cause to initiate an audit.

102.     As HRSA has stated, "In accordance with the intent of the statute, the audits should be performed only when there is reasonable cause for their performance. Further, the statute also states that the audits should be conducted at the expense of the Government or the manufacturer. We believe that the party which demonstrates a reasonable cause for the audit should commission the audit." 61 Fed. Reg. 65,407.

103.     "Reasonable Cause" is defined as "a reasonable person could believe that a covered entity may have violated a requirement of section 340B(a)(5) (A) or (B) of the PHS Act (*i.e*.,

21

accepting a 340B discount on a covered outpatient drug at a time when the covered entity has not submitted its Medicaid billing status to the Department or transferring or otherwise reselling section 340B discounted covered drugs to ineligible recipients). Consistent with Government auditing standards, the organization performing the audit shall coordinate with other auditors, when appropriate, to avoid duplicating work already completed or that may be planned. Only one audit of a covered entity will be permitted at any one time. When specific allegations involving the drugs of more than one manufacturer have been made concerning an entity's compliance with section 340B(a)(5) (A) and (B), the Department will determine whether an audit should be performed by the (1) Government or (2) the manufacturer." 61 Fed. Reg. 65,409.

104.    Before initiating an audit, the manufacturer must submit an audit plan to HRSA who reviews it prior to implementation, and "[i]f after this review the Department has concerns regarding the audit plan it will work with the manufacturer to incorporate mutually agreed-upon revisions to the plan." *Id*. at 65,410.

105.    The manufacturer must also pay for any expenses associated with the audit. *Id*. at 65,411.

106.    The manufacturer must provide the Covered Entity 30 days' notice to attempt to resolve the issue in good faith. 61 Fed. Reg. 65,410.

107.    These reasonable cause-based audits would necessarily include the submission of the very claims data on which Lilly purports to condition MHMH's continued receipt of the 340B Ceiling Price to which it is entitled.

108.    On information and belief, Lilly has not established the requisite reasonable cause for an audit of MHMH, submitted an audit plan to HRSA for approval, or obtained HRSA's approval of Lilly's effective audit of MHMH.

22

109.    By seeking detailed claims data for each claim that is eligible for 340B pricing, Lilly is in effect subjecting MHMH to perpetual audit without meeting the statutory audit requirements.

110.    Lilly admits that it intends to use the Policy as a means to audit Covered Entities. In the Policy's introduction, Lilly plainly stated it has demanded data from Covered Entities associated with 340B Contract Pharmacies under a separate policy since 2021 "…to produce the evidence required by HRSA to initiate audits." Lilly went on to state the Policy will "preserve [its] ability to continue to initiate audits." On June 1, 2026, Lilly outright stated to HRSA that the data was necessary to "audit covered entities."[10]

111.    The pretextual nature of Lilly's actions is further underscored by the fact that its data demands followed closely on the heels of setbacks to Lilly's legal and regulatory efforts against the expansion of 340B eligibility and the rejection of its rebate model. *See, e.g.*, *Eli Lilly & Co. v. U.S. Dep't of Health and Hum. Servs*., No. 1:21-cv-00081, 2021 WL 5039566 (S.D. Ind. Oct. 29, 2021); *Eli Lilly & Co. v. Kennedy*, No. 1:24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025).

112.    Having failed to dismantle the 340B Program through litigation and regulatory advocacy, Lilly turned to unilateral data demands as an alternative mechanism to withhold the discounts it is legally required to provide and realize the full acquisition price.

113.    Upon information and belief, the extensive claims data demanded by Lilly through its Policy has undisclosed and unacknowledged commercial sources of value to Lilly.

---

[10] Letter to Hon. Thomas J. Engels from John O'Harra, Senior Vice President, Deputy General Counsel and Head of Global Public Policy, Eli Lilly & Co. dated June 1, 2026.  ("…[the] data is necessary to…audit covered entities[.]").

114.    Upon information and belief, Lilly intends to use the claims data demanded in its Policy to, *inter alia*, avoid paying valid claims, develop derivative data products for lobbying purposes, target and influence health care providers, and sell licenses to data.

115.    For example, upon information and belief, Lilly intends to use the claims data mandated by its Policy to avoid paying valid claims by either outright denial or the creation of administrative burdens that will deter submission of claims in the first place or cause MHMH to abandon pursuit of payment for valid claims.

116.    Lilly intends to use the claims data mandated by its Policy for purposes of identifying commercial "duplicate discounts" that are not Duplicate Discounts—*i.e.*, identifying claims it may carve out from payment under commercial rebate agreements it has freely negotiated with other third parties.[11] Utilizing MHMH's data to enforce exclusions under a completely unrelated commercial agreement provides enormous value to Lilly, while MHMH bears the cost of Policy compliance — creating a patently unfair transfer of wealth.

117.    Upon information and belief, Lilly intends to use the claims data mandated by its Policy for the purpose of lobbying policymakers without making all of those same data available to MHMH and other covered entities to respond.

118.    Upon information and belief, Lilly intends to use the claims data mandated by its Policy to sell licenses to the data to other businesses and researchers. The Terms all but say so, and that financial gain to Lilly and/or its chosen vendor comes at significant financial loss to Covered Entities like MHMH.

---

[11] Proposed Brief of 340B Expert Aaron Vandervelde as Amicus Curiae in Support of Neither Party, No. 3:21-cv-00634-FLW-LGH (D. N.J. ECF 99 Sept. 28, 2021).

119.    Upon information and belief, the value of these undisclosed commercial uses is billions of dollars annually.[12]

120.    Accordingly, through its Policy, Lilly is attempting to extract valuable information from MHMH. For example, the claims data requested includes detail-level elements that facilitate manufacturers' marketing practices and for which a manufacturer like Lilly typically would have to pay a third-party data vendor. On the backs of Covered Entities' increased cost of complying with the Policy, Lilly seeks to enjoy an avoided business expense.

121.    To be clear, MHMH would not sell claims data to Lilly for any price. However, by demanding claims data from MHMH for no compensation or consideration, Lilly is unjustly enriching itself by extracting a benefit to which it is not entitled and by unlawfully burdening MHMH.

## LILLY REPEATEDLY REPRESENTED THAT IT OFFERS DISCOUNTED PRICING TO COVERED ENTITIES AND PROMISED TO COMPLY WITH 340B PRICING LAWS

122.    Lilly has executed a PPA with the Secretary of HHS.

123.    Under the PPA, Lilly agreed to charge covered entities a price for each unit of the drug that does not exceed the Ceiling Price.

124.    A PPA Addendum provides that Lilly shall offer each Covered Entity covered outpatient drugs for purchase at or below the applicable Ceiling Price if such drug is made available to any other purchaser at any price. Neither the PPA nor the Addendum conditions the pricing obligation on the Covered Entity's submission of claims-level data.

125.    PPA Section IV(d) provides that a Covered Entity's failure to comply with audit requirements will not relieve the manufacturer from its obligation to conform to the pricing

---

[12] *See e.g.*, Charles J. Courtemanche, *340B Data from the ESP and Beacon Platforms Hold Considerable Value for Drug Manufacturers*, INST. STUD. FREE ENTER. April 2026.

requirements. In other words, even actual noncompliance with a lawful audit does not relieve the pricing obligation. Pursuant to the PPA, a manufacturer may not suspend 340B pricing for a Covered Entity based on that entity's refusal to submit data through a manufacturer-designated third-party platform.

126. The PPA provides a dispute resolution process that Lilly has not followed. The manufacturer must first attempt good-faith resolution, then may notify the Secretary, and the Secretary determines whether a violation occurred. Lilly did not use this process. Instead, Lilly bypassed the PPA's framework entirely to further its own goal—blanket data extraction through a third-party platform—that the PPA does not authorize.

127. Lilly has regularly communicated to the market that it offers discounts to Covered Entities for their 340B purchases by confirming its participation in the 340B Program, which mandates such discounts.[13] Each time Lilly confirms it participates in the 340B Program, it represents to the market that it offers discounts on eligible drug products to Covered Entities. MHMH and other Covered Entities reasonably expected to receive 340B discounts for their eligible purchases from Lilly in light of these repeated representations.

128. In addition, in Lilly's 10-K filings, Lilly represents "[i]n the U.S., we are required to provide ... reduced prices to private entities who treat patients in certain types of healthcare facilities intended to serve low-income and uninsured patients (known as 340B covered entities)."

129. Contrary to Lilly's representations, Lilly does not offer its products at the requisite 340B Ceiling Price to all Covered Entities now that it has denied access to Covered Entities that refuse to comply with its extra-statutory demands.

---

[13] *See, e.g.*, *Lilly's in-house claims data requirement-upcoming action*, June 1, 2026, https://www.lilly.com/news/stories/lilly-in-house-claims-data-requirement-upcoming-action (last accessed July 27, 2026).

130.     Lilly's misrepresentations about the availability of discount pricing for Covered Entities are material because Lilly claims to facilitate Covered Entities' participation in the 340B Program when, in fact, the Policy is denying Covered Entities' access to the pricing to which they are entitled.

131.     Accordingly, Lilly's representations regarding the availability of discount pricing for Covered Entities are false and/or misleading.

132.     Lilly's material misrepresentations have caused injury to MHMH because it has been forced to purchase Lilly's covered outpatient products at a price that exceeds the statutory Ceiling Price, contrary to Lilly's representations.

### LILLY'S ATTEMPTS TO ENFORCE ITS UNLAWFUL POLICY AGAINST MHMH

133.     On April 28, 2026, Lilly sent a form letter to MHMH claiming that MHMH was out of compliance with its new unlawful Policy because MHMH had rightfully refrained from sending the requested claims data.

134.     In the letter, Lilly stated that compliance with its Policy "is a condition of Lilly's offer of its products at 340B ceiling prices."

135.     Lilly threatened: "To accept Lilly's offer and maintain access to 340B pricing, your organization must fulfill this requirement without further delay … We strongly urge you to take the following actions immediately to accept Lilly's offer and purchase Lilly products at the 340B ceiling price … upload all outstanding claims level data."

136.     On May 5, 2026, Lilly sent an email to MHMH wherein it reiterated its position and threatened that "adhering to the terms of Lilly's offer is important … if you do not respond, Lilly may assume that you have decided to reject its 340B offer."

137.     Three days later, on May 8th, MHMH responded requesting further clarification.

27

138.    In that email MHMH requested two crucial pieces of information: (1) whether outpatient administrations were in-scope for the demand; and (2) what specific data elements were being demanded by Lilly, separated by encounter type.

139.    On May 11, Lilly replied with a skeleton agenda for a call, a list of invitees, and suggested dates and times for meetings. Lilly did not provide the information that MHMH requested on May 8.

140.    MHMH requested the same information again on May 12.

141.    On May 13, Lilly responded with: (1) confirmation that outpatient administrations were in-scope, featuring a link to its January 15 notice as support; and (2) a broken link to 340B ESP's generalized FAQs for information about the required data fields.

142.    MHMH again emailed Lilly on May 15 to flag that the links were inactive and emphasized that it needed more information to independently vet the data demand and to prepare for a discussion with Lilly.

143.    Without the requested information, MHMH could not meaningfully vet HIPAA-specific and general data use and security concerns, nor could it adequately understand the "offer."

144.    Lilly failed and refused to provide the requested information, and instead simply stated in an email dated May 18, 2026 "I have forwarded to our team to review and respond."

145.    Lilly's failure to respond to MHMH's reasonable requests for information about its offer, and failure to even meet with MHMH to discuss the offer, indicates that Lilly's offer was not *bona fide*.

146.    Lilly's refusal to respond to MHMH's reasonable requests for information about its offer, and failure to even meet with MHMH to discuss the offer, demonstrates that Lilly did not negotiate with MHMH in good faith.

147.    On June 1, 2026, under the guise of seeking to curb "fraud waste and abuse," Lilly sent a letter to HRSA's Administrator, wherein it reiterated its new unilaterally imposed unlawful Policy and its intention to "instruct its wholesalers that those entities are no longer eligible for 340B pricing until they submit the outstanding data."

148.    On June 17, 2026, Lilly sent MHMH a "final notice" instructing MHMH to comply or else it would cut off access to 340B pricing (the "**Final Notice**").

149.    On June 24, 2026, and in response to the Final Notice, MHMH sent Lilly a letter wherein it explained that it was still waiting for the requested information and that it had not heard back from Lilly since Lilly represented that it would escalate MHMH's requests for information.

150.    To date MHMH is still waiting for Lilly's response to its repeated requests for information and clarification.

151.    On July 2, 2026, Lilly ceased offering MHMH the 340B Ceiling Price in violation of the law and the terms of the offer.

152.    That same day, on July 2, 2026, MHMH preliminarily notified HRSA through its dedicated administrative process email (340Bpricing@hrsa.gov) that Lilly was not providing the 340B Ceiling Price through at least one wholesaler and that MHMH would follow up with a full and formal notice.

153.    On July 2, MHMH again wrote to Lilly advising that it had lost the 340B Ceiling Price and requesting a response by the end of the day July 6, otherwise MHMH would "have no choice but to assume Lilly has knowingly and intentionally made 340B pricing of its covered outpatient drugs unavailable to MHMH and is declining to engage meaningfully on MHMH's legitimate questions regarding the terms of Lilly's 'offer.'"

154.    Lilly has not responded to MHMH's July 3 letter.

155.    On July 27, 2026, MHMH submitted a full Combined 340B Ceiling Price Unavailable/Incorrect 340B Ceiling Price Notification to HRSA through its administrative process signed by MHMH's 340B Authorizing Official on July 24, 2026 and covering both the general unavailability of the 340B Ceiling Price through all of its wholesalers since July 2, 2026, as well as each instance of incorrect 340B pricing (a/k/a overcharges) through July 23, 2026.

156.    Lilly knows that MHMH lacks the financial resources, bargaining power, staff, or infrastructure necessary to comply with the Policy.

157.    Lilly also knows that the Terms required by the Policy are unconscionable and MHMH refused to comply with them.

158.    Lilly knows that if MHMH refuses to comply with the Policy and the Terms, MHMH will lose access to 340B discounts, which would reduce the amount of 340B drugs Lilly was required to deliver and force MHMH to purchase drugs from Lilly at full price.

159.    Lilly exploited its superior market and economic power to force MHMH to pay full price for Lilly's drugs in order to reap the financial benefits.

## THE POLICY CREATES UNLAWFUL AND UNREASONABLE BURDENS FOR MHMH

160.    The Policy creates expensive administrative and operational burdens for MHMH.

161.    While Lilly breezily characterizes the requested claims data submission as "minimal" it is anything but, and Lilly's assertion that the submission of detailed claims data is "standard business practice across the industry" is false.

162.    For example, manually uploading data to 340B ESP would require significant coordination across multiple data sources. Data relative to in-house dispensing and outpatient administrations, in particular, are spread across multiple recordkeeping systems, and reconciling those systems adds significant complexity and cost. MHMH does not currently provide medical

claims data to vendors like Second Sight and doing so would require direct interface with its electronic medical record system. This also carries serious data security and privacy risks, which would further require extensive and costly data monitoring—particularly because, per the Terms of 340B ESP, MHMH bears all risk associated with data security and data privacy—the costs of which MHMH cannot absorb.

163.    Compliance with the Policy would cause MHMH to divert significant staff time and resources from supporting patient care.

164.    Compliance with the Policy could force MHMH to reduce or altogether eliminate services supported by the 340B Program and allocate more funds toward costly and unnecessary administrative compliance.

165.    Because the Policy applies to all of Lilly's covered outpatient drugs (many of which are used to treat cancer and other chronic conditions), patients will be at risk of losing access to life-saving medication.

166.    The requested claims data may contain information such as diagnosis information, encounter information, prescriber information, the drug prescribed, dosage, and other similar medical information. Second Sight's "assurances" in its Terms that 340B ESP enables Covered Entities to reliably de-identify their data prior to final upload and that Second Sight will not attempt to re-identify or de-anonymize the data are hardly comforting when the Terms are subject to change at any time based on Second Sight's unilateral discretion. Further, on information and belief, Second Sight's HIPAA Expert Determination only represents that 340B ESP ensures medical benefits-related claims data it receives remains fully de-identified while within Second Sight's control.

167. The data is also proprietary and has independent economic value. Indeed, Lilly could and would be expected to use this data to improperly identify commercial "duplicate discounts" that are not Duplicate Discounts—*i.e.*, identifying claims it may carve out from payment under commercial rebate agreements it has freely negotiated with other third parties. Utilizing MHMH's data to enforce exclusions under a completely unrelated commercial agreement provides enormous value to Lilly.

168. Because MHMH has refused to comply with the burdensome Policy, Lilly retaliated against it by refusing to offer the Ceiling Price and forcing it to pay substantially higher costs for Lilly's drugs.

169. Lilly's refusal to offer the Ceiling Price could cause MHMH's days-cash-on-hand to drop low enough to risk violating bond covenants, with consequences including mandatory consultant call-in, credit-rating downgrade and/or negative outlook, increased borrowing costs, and potential facility closures.

170. In short, Lilly stands to gain and MHMH stands to lose in either scenario: either MHMH refuses to comply with unlawful conditions and Lilly obtains a significant windfall by not having to offer MHMH the Ceiling Price and charging MHMH full price for its drugs. Or, MHMH capitulates because it has no choice, in which case Lilly would gain access to commercially sensitive information that can be improperly used to further boost its bottom line at MHMH's expense.

171. If MHMH capitulated and submitted this information the cost would be a burden to MHMH and, on information and belief, would have the illegal effect of increasing the cost of acquiring 340B drugs beyond the 340B Ceiling Price.

172.    The 340B statute requires Lilly to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1).

173.    The United States Court of Appeals for the District of Columbia Circuit has held that "some conditions may be onerous enough to effectively increase the contract 'price,' thus perhaps nudging it above the statutory ceiling." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 462 (D.C. Cir. 2024).

174.    Here, for the reasons stated, compliance with the Policy would increase the contract price for drugs, driving it above the 340B Ceiling Price.

## LILLY'S CONDUCT IS UNCONSCIONABLE, UNFAIR, AND DECEPTIVE

175.    The 340B Drug Pricing Program exists to help vulnerable patients acquire healthcare and to assist nonprofit entities like MHMH that provide significant amounts of free care, services, and medicines.

176.    As a condition of participating in Medicaid and Medicare, Lilly promised to extend 340B pricing to Covered Entities in exchange for access to an enormous population of patients.

177.    Through its self-help measures, Lilly still sells drugs to Medicaid and Medicare Part B patients, but it is no longer offering the required 340B Ceiling Price. Lilly is reaping the benefits of the 340B Program relative to MHMH's patients without paying any of the costs.

178.    Lilly, with a market capitalization of approximately one trillion dollars, has devoted itself to extracting additional profits at the expense of safety-net hospitals like MHMH and their most vulnerable patients.

179.    Lilly's patents provide it with significant market power in several pharmaceutical markets.

180.    Lilly is the single source or monopoly supplier of numerous critical medicines for which there is significant consumer demand and no generic or biosimilar equivalents. The absence of competitive alternatives, presence of high demand, and Lilly's intellectual property rights provide it with significant pricing power and the ability to make this "take it or leave it" offer.

181.    Lilly's non-negotiable offers of the 340B Ceiling Price and denial of access to the entire marketplace if the conditions in its Policy are not met is clear evidence of market power.

182.    MHMH cannot decline to do business with Lilly and still abide by its obligations to its patients and communities.

183.    By denying MHMH access to promised discounts, Lilly has unlawfully raised the price of its products to MHMH.

184.    Lilly has abused its market power by raising costs for safety-net hospitals such as MHMH and depriving them of resources to expand access to healthcare and improve health outcomes.

185.    Lilly's conduct was carried out entirely and intentionally to protect and/or increase its extraordinary profits to the detriment of New Hampshire and Vermont residents and their healthcare systems.

186.    Lilly agreed to provide 340B drugs to MHMH and other Covered Entities at the 340B Ceiling Price while simultaneously implementing the Policy to circumvent its obligations under the 340B Program and hurting MHMH, patients, and New Hampshire and Vermont citizens.

187.    Lilly knew that its conduct would hurt, rather than improve, healthcare in rural and underserved New Hampshire and Vermont communities.

188.    Upon information and belief, Lilly is enforcing its Policy in an arbitrary, capricious, and unfair manner by singling out select hospitals such as MHMH. Lilly is not enforcing its Policy uniformly against all Covered Entities with which it does business.

189.    There are no procompetitive benefits to Lilly's conduct. A wealth transfer from a nonprofit safety-net hospital to a trillion-dollar pharmaceutical company does not benefit competition or consumers.

190.    Lilly ceased honoring the 340B Ceiling Price for MHMH just one day after the Medicare GLP-1 Bridge program went live, driving up demand for Foundayo and Zepbound—a set of circumstances that appears to be intentionally anticompetitive.

191.    In short, Lilly's conduct is unconscionable, unfair, and deceptive because it puts its own profits over the health interests of New Hampshire and Vermont residents. The direct and inevitable result of Lilly's actions is increased healthcare costs for New Hampshire's and Vermont's citizens.

192.    Notwithstanding HRSA's jurisdiction to regulate the 340B Program through its administrative process, Lilly's conduct violates state law, and this Court retains jurisdiction to remedy Lilly's unlawful behavior.

## MHMH HAS SUFFERED AND CONTINUES TO SUFFER IRREPARABLE HARM

193.    As a direct result of Lilly's refusal to offer the discounted Ceiling Price, MHMH suffers and continues to suffer substantial and irreparable harm in addition to obvious monetary damages.

194.    Lilly is the largest drug manufacturer in the world and, as explained above, MHMH's expenditures for Lilly's products is counted in the millions of dollars annually, comprising a significant portion of MHMH's overall annual drug spend.

35

195. Consistent with Congress's purpose in establishing the 340B Program, MHMH reinvests 340B savings to expand access to healthcare and improve services for medically underserved, uninsured, and underinsured patients. MHMH uses 340B savings in support of specialized treatment, to translate research, and to train future clinicians. MHMH also reinvests the millions of dollars of savings in 340B discounts to subsidize services for which it is reimbursed less than cost, like addiction treatment services, and to expand access to essential services for uninsured and underinsured patients. In fiscal year 2025 alone, MHMH provided a net community benefit worth $339.9 million, including, but not limited to, $16.6 million in charity care, $30.2 million in subsidized health services, $204.8 million in absorbed Medicaid losses, and $8.3 million in community benefit programs and services.

196. Critically, MHMH does not have an option to choose other manufacturers to source its medications to serve its patient population. This is because Lilly's drugs are in some instances the only drugs or one of only a few drugs in a certain category that would be covered by a particular patient's health plan, whether a commercial or government plan. Zepbound and Foundayo are key examples. Consequently, MHMH has no choice but to purchase Lilly's drugs at a cost above the Ceiling Price or turn the patient away.

197. MHMH has no choice but to be Lilly's customer to adequately service its patient population.

198. By denying MHMH access to the 340B Ceiling Price, Lilly is interfering with MHMH's ability to fulfill its mission and serve the community. The elimination of 340B savings for Lilly's covered outpatient drugs will directly impair MHMH's ability to provide comprehensive care to underserved and uninsured patients, a role at the heart of its mission. MHMH cannot decline to purchase drugs from Lilly and at the same time fulfill its mission.

199.   As a direct and proximate result of Lilly's use of unfair methods of competition, unfair and deceptive acts, and unconscionable conduct, MHMH will lose millions of dollars annually—ultimately harming the New Hampshire patients it serves.

200.   Lilly's actions also harm MHMH directly by placing more strain on its patients and providers. 340B savings are used to fund programs that improve medication access, increase adherence, reduce hospital readmissions, provide clinical pharmacist interventions, and ensure continuity of care for patients with chronic and complex diseases. Reduced 340B savings impair MHMH's ability to provide financial assistance for essential medications, bridge therapy while insurance coverage is obtained, and furnish medications at reduced or no cost when patients otherwise would be unable to afford treatment. The resulting reduction in medication access is likely to increase medication nonadherence, disease progression, avoidable emergency department utilization, preventable hospitalizations, and poorer clinical outcomes among MHMH's most vulnerable patient populations. Such developments are likely to lead to an increase in emergencies and in overall health care costs.

201.   Every dollar wrongfully diverted to Lilly is unavailable to support the numerous patient care programs that MHMH offers because of its participation in the 340B program. As MHMH's costs increase, fewer resources remain available to expand access to care, maintain existing clinical services, and provide medications to financially vulnerable patients.

## COUNT I
### Violation of 18 Vt. Stat. Ann. § 4682

202.   MHMH repeats and realleges all the preceding paragraphs as if they were fully set forth herein and with the same full force and effect.

203.   MHMH services Vermont residents and holds Contract Pharmacy agreements with Vermont-licensed pharmacies.

204.   Under Vermont law, "[a] manufacturer or its agent shall not deny, restrict, prohibit, or otherwise interfere with, directly or indirectly, the acquisition of a 340B drug by or delivery of a 340B drug to a 340B contract pharmacy on behalf of a 340B covered entity unless receipt by the 340B contract pharmacy is prohibited by the U.S. Department of Health and Human Services." 18 Vt. Stat. Ann. § 4682(a).

205.   The same statute prohibits manufacturers or their agents from "directly or indirectly requir[ing] a 340B covered entity to submit any claims, utilization, encounter, purchase, or other data as a condition for allowing the acquisition of a 340B drug by or delivery of a 340B drug to a 340B contract pharmacy unless the claims or utilization data sharing is required by the U.S. Department of Health and Human Services." 18 Vt. Stat. Ann. § 4682(b).

206.   Lilly is prohibited from "interfer[ing] with the ability of a pharmacy contracted with a 340B covered entity to dispense 340B drugs to eligible patients of the 340B covered entity." 18 Vt. Stat. Ann. § 4682(c).

207.   The statute contains the following relevant definitions contained in 18 Vt. Stat. Ann. § 4681:

208.   "'340B contract pharmacy' means a pharmacy that has a contract with a 340B covered entity to receive and dispense 340B drugs to the 340B covered entity's patients on the covered entity's behalf." 18 Vt. Stat. Ann. § 4681(1).

209.   "'340B covered entity' means an entity participating or authorized to participate in the federal 340B drug pricing program, as described in 42 U.S.C. § 256b. The term includes a 340B covered entity's pharmacy." 18 Vt. Stat. Ann. § 4681(2).

210.  "'340B drug' means a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. § 256b and is purchased by a 340B covered entity." 18 Vt. Stat. Ann. § 4681(3).

211.  "'Manufacturer' has the same meaning as in 26 V.S.A. § 2022," which "means a person, regardless of form, engaged in the manufacturing of drugs or devices." 18 Vt. Stat. Ann. § 4681(5); 26 Vt. Stat. Ann. § 2022.

212.  "'Pharmacy' means a place *licensed by* the Vermont Board of Pharmacy at which drugs, chemicals, medicines, prescriptions, and poisons are compounded, dispensed, or sold at retail." (emphasis added). 18 Vt. Stat. Ann. § 4681(6).

213.  The Vermont statute further provides "[a] 340B covered entity, 340B contract pharmacy, or other person injured by a manufacturer's or its agent's violation of this subchapter may bring an action in Superior Court for injunctive relief, compensatory and punitive damages, costs and reasonable attorney's fees, and other appropriate relief… A violation occurs each time a prohibited act is committed. For purposes of section 4682 of this subchapter, a prohibited act is defined as each package of 340B drugs that is subject to a discriminatory action by a manufacturer or its agent." 18 Vt. Stat. Ann. § 4684.

214.  Under these definitions, Lilly is a Manufacturer.

215.  Under these definitions, MHMH is a Covered Entity.

216.  Under these definitions, any of MHMH's Contract Pharmacies that hold a license in Vermont are a "Pharmacy" for purposes of the statute regardless of location.

217.  MHMH contracts with Vermont-licensed pharmacies to service its patients.

218.  Lilly's actions violate Vermont law and have caused MHMH damages to which it is statutorily entitled.

219.    On July 3, 2026, MHMH notified Lilly in writing that Lilly is in violation of this law. Despite this, Lilly still refuses to offer MHMH the Ceiling Price.

220.    Lilly's actions are intentional and warrant an award of punitive damages as provided for under the statute.

## COUNT II
### Violation of NH RSA 358-A

221.    MHMH repeats and realleges all the preceding paragraphs as if they were fully set forth herein and with the same full force and effect.

222.    The New Hampshire Consumer Protection Act, RSA chapter 358-A, provides that "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2.

223.    Lilly is a "person" within the meaning of RSA 358-A:1, I.

224.    Lilly is engaged in "trade" and "commerce" within the meaning of RSA 358-A:1, II, by manufacturing, marketing, distributing, and selling prescription pharmaceutical products to Covered Entities, wholesalers, pharmacies, and other purchasers including MHMH.

225.    A substantial part of Lilly's conduct giving rise to this action occurred within New Hampshire, including Lilly's sale and unlawful refusal to offer the 340B Ceiling Price to MHMH with respect to its covered outpatient drugs.

226.    While Lilly's actions arise in connection with the 340B program, they involve conduct that the State of New Hampshire has long independently prohibited: unfair methods of competition, unfair trade practices, and unconscionable conduct.

227.    Numerous state laws, including those of Arkansas, Mississippi, Louisiana and Vermont, prohibit a manufacturer from restricting contract pharmacy delivery and/or conditioning 340B discounts on claims-data submission as Lilly has done in its Policy. The existence of these

40

laws confirms a widely recognized public policy that manufacturers may not use conditions like the Policy's data demands as a mechanism to circumvent statutory pricing obligations.

228.    As a condition of participation, Lilly promised to extend the 340B Ceiling Price to covered entities like MHMH in exchange for access to an enormous population of patients. Through self-help, it still has access to those patients, but it is no longer offering the requisite pricing discounts. In so doing, it has breached its agreement with the federal government, reneged on its representations made to the market, and justified its conduct through pretext, all in service of its goal to deny MHMH and other safety-net hospitals the resources they rely on to serve the underprivileged. Such conduct is immoral, unethical, and unfair.

229.    Lilly has engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade and commerce in New Hampshire, including, without limitation:

- Exploiting its monopoly and market power to raise prices and injure consumers;

- Unilaterally imposing unlawful conditions on MHMH's access to 340B Ceiling Price in contravention of 42 U.S.C. § 256b and HRSA guidance;

- Circumventing the statutory and regulatory audit framework set forth in 42 U.S.C. § 256b(a)(5)(C) and 61 Fed. Reg. 65,406 by subjecting MHMH to what is, in effect, a permanent and unregulated audit of every 340B-eligible claim, without reasonable cause, without HRSA approval, and without the procedural protections Congress and HRSA prescribed through the Guidelines;

- Representing to MHMH that Lilly is "committed to compliance with the 340B statute" and that its offer is consistent with the 340B statute, while simultaneously imposing conditions that are unlawful under that same statute;

- Leveraging Lilly's dominant market position and the fact that its drugs not only appear on Medicare, Medicaid, and commercial plan formularies, but also are in scope for the lucrative Medicare GLP-1 Bridge program, thereby making MHMH a captive purchaser with no alternative supplier to extract valuable and confidential data and impose conditions to which MHMH would not otherwise agree;

- Terminating MHMH's access to the 340B Ceiling Price in retaliation for MHMH's lawful refusal to comply with Lilly's unlawful Policy; and

41

- Charging MHMH prices above the statutory 340B Ceiling Price for covered outpatient drugs to which MHMH is entitled.

230. Lilly, the largest pharmaceutical manufacturer in the world with a market capitalization exceeding one trillion dollars, has knowingly exploited its market power and MHMH's status as a captive purchaser to impose unlawful terms on a not-for-profit safety-net hospital that serves low-income, uninsured, and rural patients across New Hampshire and northern New England. Lilly did so knowing that MHMH could not simply refuse to purchase Lilly's products without turning away its most vulnerable patients.

231. Lilly's conduct falls within one or more of the enumerated categories of unlawful conduct set forth in RSA 358-A:2, including but not limited to representing that goods or services have characteristics, uses, or benefits that they do not have, and representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve.

232. Lilly's conduct falls within one or more of the enumerated categories of unlawful conduct set forth in RSA 358-A:2, including but not limited to pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, including the pricing of generic prescription drugs.

233. Lilly's conduct is otherwise unfair or deceptive within the meaning of RSA 358-A:2, including because Lilly's conduct is a *per se* violation of 18 Vt. Stat. Ann. § 4682. Lilly's conduct is also unethical, unfair, oppressive, unscrupulous, and substantially injures New Hampshire consumers.

234. As a direct and proximate result of Lilly's unfair methods of competition and unfair and deceptive acts and practices, MHMH has suffered and continues to suffer substantial injury, including but not limited to millions of dollars in overcharges above the statutory Ceiling Price and lost 340B savings that would otherwise be reinvested in patient care.

235. Both MHMH and New Hampshire consumers are harmed by Lilly's greed-motivated conduct that goes far beyond the bounds of acceptable business conduct and common decency.

236. Lilly's violations of RSA 358-A were willful and knowing within the meaning of RSA 358-A:10, entitling MHMH to an award of not less than double, and up to treble, damages, together with costs and reasonable attorneys' fees.

### COUNT III
### Breach of Contract

237. MHMH repeats and realleges all the preceding paragraphs as if they were fully set forth herein and with the same full force and effect.

238. Under the 340B Program, if a drug manufacturer like Lilly wishes to participate in the Medicaid and Medicare programs, it is required to "offer" Covered Entities like MHMH no more than the 340B Ceiling Price on certain outpatient prescription drugs purchased by these entities for their patients. 42 U.S.C. § 256b(a)(1), (4).

239. The 340B statute requires that a manufacturer make a *bona fide* offer to a Covered Entity. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 462 (D.C. Cir. 2024) ("[S]ection 340B does require drug manufacturers to make an 'offer,' and even the manufacturers concede that this means at least a bona fide offer.").

240. Lilly's offer unlawfully requires MHMH to disclose detailed claims data subject to Lilly's non-negotiable Terms.

241. Because the offer requires MHMH to violate the law it cannot be a *bona fide* offer.

242. In addition, for years, Lilly has extended, and MHMH has accepted, offers to purchase covered outpatient drugs at or below the applicable 340B Ceiling Price. Consistent with standard industry practice, MHMH has purchased those drugs through wholesalers, but the true

seller is Lilly, which manufactures the drugs, sets the prices, and is the entity legally obligated to make the offer under 42 U.S.C. § 256b.

243.    MHMH's acceptance of Lilly's statutorily mandated offers, and its purchase of Lilly's drugs at the 340B Ceiling Price over a period of years, constitutes valid consideration and gave rise to an enforceable contract, or a series of enforceable contracts, between MHMH and Lilly.

244.    As a part of that offer and acceptance, Lilly has represented (and MHMH reasonably understood) that Lilly promised to comply with all applicable laws, and specifically those laws surrounding 340B pricing.

245.    On January 15, 2026, through its new Policy, Lilly added a new unlawful condition in its written offer; namely, that MHMH provide claims data to obtain the 340B Ceiling Price. In connection with that offer, Lilly memorialized the mutual understanding that Lilly expressly agreed to comply with all laws surrounding 340B pricing. Lilly wrote: "Lilly is committed to compliance with the 340B statute and to responsible distribution of its products. Lilly will continue to offer all covered entities its 340B medicines at or below the 340B ceiling price, consistent with the 340B statute, as long as the covered entity provides the minimal, standard business information outlined in this notice. Lilly will also continue to work with all stakeholders to improve program integrity and ensure that the 340B program can be properly and fairly administered going forward."

246.    Despite its promise to comply with the law, Lilly has not done so and its failure to do so has caused harm to MHMH.

247.    Lilly has materially breached its contractual obligations to MHMH in the following respects, among others:

44

A.  Lilly has failed to offer and provide 340B ceiling pricing "consistent with the 340B statute," as expressly promised, by imposing conditions on MHMH's access to ceiling pricing that are not authorized by 42 U.S.C. § 256b or HRSA guidance;

B.  Lilly has failed to comply with the 340B statute, as expressly promised, by circumventing the statutory audit procedures set forth in 42 U.S.C. § 256b(a)(5)(C) and 61 Fed. Reg. 65,406, which require, among other things, a showing of reasonable cause, submission of an audit plan to HRSA, HRSA approval, manufacturer payment of audit costs, and thirty days' notice to attempt good-faith resolution;

C.  Lilly has improperly and unlawfully demanded detailed, claims-level information—including medical claims data and proprietary information with independent economic value to Lilly and its vendor—for each and every 340B-eligible claim; and

D.   On or about July 2, 2026, Lilly ceased offering MHMH the 340B Ceiling Price altogether, in direct breach of its contractual obligation to offer MHMH covered outpatient drugs at or below the applicable Ceiling Price.

248.    MHMH has performed all conditions, covenants, and obligations required of it under the parties' contract, except to the extent that such performance has been prevented, excused, or made impossible by Lilly's breaches.

249.    As a direct and proximate result of Lilly's breaches, MHMH has suffered and continues to suffer substantial damages, including but not limited to overcharges above the statutory 340B Ceiling Price on Lilly's drugs, lost 340B savings that would otherwise be reinvested

in patient care and charitable services, and the operational and financial harms more fully described above, in an amount to be proven at trial.

## COUNT IV

### Breach Of The Implied Covenant Of Good Faith and Fair Dealing

250.    MHMH repeats and realleges all the preceding paragraphs as if they were fully set forth herein and with the same full force and effect.

251.     Under New Hampshire law, every contract contains an implied covenant of good faith and fair dealing, which prohibits a party from engaging in conduct that destroys or injures the right of the other party to receive the fruits of the contract.

252.    As described above, MHMH and Lilly are parties to a contract, or series of contracts, under which Lilly is obligated to offer, and MHMH is entitled to purchase, covered outpatient drugs at or below the applicable 340B Ceiling Price, consistent with 42 U.S.C. § 256b and HRSA guidance.

253.    Lilly's unlawful conditions prevent MHMH from obtaining the benefit of its bargain.

254.    Lilly has refused to negotiate with MHMH in good faith.

255.    Lilly's conduct has caused MHMH damages.

## COUNT V

### Unjust Enrichment

256.    MHMH repeats and realleges all the preceding paragraphs as if they were fully set forth herein and with the same full force and effect.

257.    Lilly obtains a substantial monetary benefit from its participation in the Medicare Part B and Medicaid programs, and as a result must participate in the 340B program.

258.    Despite this, Lilly has imposed unlawful conditions on its offer for 340B drugs, and as a result is now selling drugs to MHMH well above the Ceiling Price.

259.    By purchasing Lilly's covered outpatient drugs at full price, MHMH conferred a financial benefit on Lilly under duress and without meaningful choice, as MHMH cannot substitute Lilly's drugs with those of another manufacturer for many of its patients whose insurance plans cover only Lilly's products in certain therapeutic categories.

260.    Under these circumstances, it would be inequitable and unconscionable to allow Lilly to retain the benefit of MHMH's overpayments.

261.    It would be inequitable and unconscionable to allow Lilly to retain additional profits from selling drugs to MHMH above the 340B Ceiling Price.

262.    In addition, through its Policy, Lilly is attempting to extract valuable claims data from MHMH that Lilly and its vendor retain the right to monetize for various commercial purposes through Terms that leave in doubt any privacy and security guarantees and at MHMH's expense.

263.    MHMH's compliance with the Policy would result in unjust enrichment to Lilly because the Policy would provide Lilly with MHMH patient and claims data that Lilly reserves the right to monetize for commercial purposes through Terms that leave in doubt any meaningful or sufficient privacy and security guarantees all while imposing a financial burden upon MHMH.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Mary Hitchcock Memorial Hospital respectfully requests that this Court enter judgment in its favor and against Defendant Eli Lilly and Company, and grant the following relief:

A. Preliminary and Permanent Injunctive Relief enjoining Defendant, its officers, agents, employees, and all persons acting in concert with Defendant, from:

    i. Continuing to deny, restrict, or otherwise interfere with MHMH's access to the 340B Ceiling Price for covered outpatient drugs;

47

ii. Imposing claims-level data submission requirements or other conditions on MHMH's access to the 340B Ceiling Price that are not authorized by 42 U.S.C. § 256b, HRSA guidance, or 18 Vt. Stat. Ann. §§ 4681–4684;

iii. Denying, restricting, prohibiting, or otherwise interfering with the acquisition and delivery of 340B drugs to MHMH's contract pharmacies on MHMH's behalf; and

iv. Interfering with the ability of MHMH's contract pharmacies to dispense 340B drugs to MHMH's eligible patients;

B. Mandatory Injunctive Relief requiring Defendant to offer MHMH covered outpatient drugs at or below the applicable 340B Ceiling Price without the unlawful conditions described herein;

C. Compensatory Damages in an amount to be proven at trial, including but not limited to the overcharges MHMH has paid to Defendant above the applicable 340B Ceiling Price, lost 340B savings, and other consequential damages;

D. Statutory Damages under 18 Vt. Stat. Ann. § 4684, with each package of 340B drugs subject to Defendant's discriminatory conduct constituting a separate violation;

E. Punitive Damages under 18 Vt. Stat. Ann. § 4684 based on Defendant's willful, knowing, and intentional violations of Vermont law, and such other punitive or enhanced damages as may be permitted by law based on Defendant's willful and intentional tortious conduct;

48

F.  Multiple Damages under RSA 358-A:10, in an amount not less than two times and up to three times the actual damages sustained by MHMH, based on Defendant's willful and knowing violations of the New Hampshire Consumer Protection Act;

G.  Restitution and Disgorgement of all benefits unjustly retained by Defendant, including the difference between the prices MHMH has paid for Defendant's drugs and the applicable 340B Ceiling Prices;

H.  Attorneys' Fees and Costs pursuant to RSA 358-A:10, 18 Vt. Stat. Ann. § 4684, and any other applicable law;

I.  Pre-Judgment and Post-Judgment Interest at the maximum rate permitted by law; and

J.  Such Other and Further Relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Mary Hitchcock Memorial Hospital hereby demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

**MARY HITCHCOCK MEMORIAL HOSPITAL**

By its attorneys,

Dated: July 27, 2026

By: */s/ Morgan C. Nighan*

Morgan C. Nighan (Bar No. 21196)
NIXON PEABODY LLP
Exchange Place, 53 State Street
Boston, MA 02109
(617) 345-1031
mnighan@nixonpeabody.com

Nathan P. Warecki (Bar No. 20503)
Jonathan D. O'Neil (Bar No. 276336)
NIXON PEABODY LLP

49

900 Elm Street, 14th Floor
Manchester, NH 03101
(603) 628-4000
nwarecki@nixonpeabody.com
joneil@nixonpeabody.com