**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| MARY HITCHCOCK MEMORIAL HOSPITAL;<br><br>*Plaintiff*,<br><br>v.<br><br>ELI LILLY AND COMPANY;<br><br>*Defendant*. | Civil Case No. 1:26-cv-00616 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT ....................1

II. STATEMENT OF FACTS AND STATUTORY BACKGROUND ....................4

A The Parties ....................4

B Congress Created The 340B Program To Support Covered Entities Like MHMH and Expand Access to Healthcare for the Needy, Not To Benefit a Trillion-Dollar Drug Corporation ....................5

C For Years, MHMH Has Accepted Lilly's Offer Without Additional Conditions ....................8

D In January 2026, Lilly Announces The Unlawful Policy ....................9

E Lilly's Policy is an Unfair and Deceptive Pretext to Deny 340B Pricing, Extract Valuable Commercial Data, and Increase its Profits At MHMH's Expense ....................11

F Lilly's Enforcement of the Policy Against MHMH ....................14

G Lilly's Policy Creates Unlawful and Unreasonable Burdens for MHMH ....................16

H MHMH Suffers Irreparable Harm From Lilly's Conduct ....................17

III. STANDARD OF REVIEW FOR PRELIMINARY INJUNCTION. ....................19

IV. LEGAL ARGUMENT ....................19

A Plaintiff Is Likely To Succeed On The Merits For Counts I Through V ....................19

i. Plaintiff Will Prevail On Count I For Violation Of Vermont Law ....................19

ii. Plaintiff Will Prevail On Count II For Violation of New Hampshire's Consumer Protection Act ....................21

a) Plaintiff Satisfies The First And Third Elements of the CPA ....................21

b) Plaintiff Satisfies The Second Element Because Lilly's Policy and Conduct are Unfair, Deceptive, and Unconscionable ....................21

1. Lilly's Conduct Satisfies The Rascality Test ....................22

2. Lilly's Conduct Falls Under Two Enumerated Categories ....................25

Table of Contents (continued)

Page

iii. Plaintiff Will Prevail On Count III For Breach of Contract ......................26

iv. Plaintiff Will Prevail On Count IV For Breach Of The Implied Covenant ..........................................................................................29

v. Plaintiff Will Prevail On Count V For Unjust Enrichment........................30

vi. Plaintiff Has Standing For Each Count.....................................................33

B Lillys' Illegal Conduct Is Causing MHMH Irreparable Harm..............................34

C The Balance Of The Equities and Public Interest Favors Entry of an Injunction ..............................................................................................................36

D No Bond Is Required ..........................................................................................37

V. CONCLUSION.........................................................................................................37

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*U. S. ex rel. Adventist Health Sys. of W. v. AbbVie Inc.*,
169 F.4th 1137 (9th Cir. 2026) ....................33

*Bates v. JPMorgan Chase Bank, NA*,
768 F.3d 1126 (11th Cir. 2014) ....................28

*Bible v. United Student Aid Funds, Inc.*,
799 F.3d 633 (7th Cir. 2015) ....................28

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*,
443 F.3d 112 (1st Cir. 2006) ....................19

*Crowley v. Local No. 82, Furniture & Piano Movers*,
679 F.2d 978 (1st Cir. 1982) ....................37

*Derry & Webster, LLC v. Bayview Loan Servicing, LLC*,
No. 14-CV-211-PB, 2014 WL 7381600 (D.N.H. Dec. 29, 2014) ....................23

*Eli Lilly and Co. v. Robert F. Kennedy Jr.*,
No. 1:24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025) ....................13

*Eli Lilly and Co. v. U.S. Dep't of Health and Hum. Servs.*,
No. 1:21-cv-00081, 2021 WL 5039566 (S.D. Ind. Oct. 29, 2021) ....................13

*Gonzalez v. Wright*,
No. CIV. 09-CV-234-JD, 2009 WL 2982792 (D.N.H. Sept. 10, 2009) ....................34

*Gonzalez-Droz v. Gonzalez-Colon*,
573 F.3d 75 (1st Cir. 2009) ....................19, 36

*HCC Specialty Underwriters, Inc. v. Woodbury*,
289 F. Supp. 3d 303 (D.N.H. 2018) ....................37

*Hybritech Inc. v. Abbott Labs.*,
849 F.2d 1446 (Fed. Cir. 1988) ....................36

*Itek Corp. v. First Nat'l Bank of Boston*,
730 F.2d 19 (1st Cir. 1984) ....................34

*Novartis Pharmaceuticals Corp., v. Kennedy*,
No. 25-5117, ___ F. 4th ___, 2026 WL 2093947, (D.C. Cir. July 21, 2026) ....................36

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024)....................26

*Pharm. Soc'y of the State of New York, Inc. v. N.Y. State Dep't of Social Servs.*,
50 F.3d 1168 (2d Cir. 1995)....................37

*Rosario-Urdaz v. Rivera-Hernandez*,
350 F.3d 219 (1st Cir. 2003)....................34

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996)....................34

*The Foxboro Co. v. Arabian Am. Oil Co.*,
805 F.2d 34 (1st Cir. 1986)....................34

*Wigod v. Wells Fargo Bank, N.A.*,
673 F.3d 547 (7th Cir. 2012)....................28

**State Cases**

*Barrows v. Boles*,
141 N.H. 382 (1996)....................22

*Birch Broad., Inc. v. Capitol Broad. Corp.*,
161 N.H. 192 (2010)....................29

*Centronics Corp. v. Genicom Corp.*,
132 N.H. 133 (1989)....................30

*Hughes v. DiSalvo*,
143 N.H. 576 (N.H. 1999)....................22

*Kowalski v. Cedars of Portsmouth Condo. Ass'n*,
146 N.H. 130 (2001)....................31, 34

*LaChance v. U.S. Smokeless Tobacco Co.*,
156 N.H. 88 (2007)....................22

*Lassonde v. Stanton*,
157 N.H. 582 (2008)....................26

*Livingston v. 18 Mile Point Drive, Ltd.*,
158 N.H. 619 (2009)....................29

*Milford Lumber Co. v. RCB Realty, Inc.*,
147 N.H. 15 (2001)....................21, 22, 23

*State v. Moran*,
151 N.H. 450 (2004)....................22, 23, 24

*Petrie-Clemons v. Butterfield*,
122 N.H. 120 (1982) ....................31

*Pittsfield Weaving Co. v. Grove Textiles, Inc.*,
121 N.H. 344 (1981) ....................27

*PK's Landscaping, Inc. v. New England Tel & Tel Co.*,
128 N.H. 753 (1986) ....................27

*Renovator's Supply, Inc. v. Sovereign Bank*,
892 N.E.2d 777 (Mass. App. Ct. 2008) ....................23, 25

*Tsiatsios v. Tsiatsios*,
140 N.H. 173 (1995) ....................26

*Village Green Condo. Ass'n v. Hodges*,
167 N.H. 497 (2015) ....................26

**Federal Statutes**

42 U.S.C. § 256b.................... *passim*

42 U.S.C. § 1320d *et seq*....................32

42 U.S.C. § 1396r-8 ....................9

Veterans Health Care Act of 1992 ....................5, 12

**State Statutes**

Ark. Code Ann. § 23-92-604 ....................23

Colo. Rev. Stat. § 10-16-1505 ....................23

Haw. Rev. Stat. § 2 ....................23

La. Stat. Ann. § 40:2884 ....................23

Mass. Gen. Laws. c. 93A ....................24

Md. Code Ann., Health Occ. § 12-6C-09.1 ....................23

Minn. Stat. § 62J.96 ....................23

Miss. Code Ann. § 41-149-5....................23

Mo. Rev. Stat. § 376.414 ....................23

N.D. Cent. Code § 43-15.3-08 ....................23

Neb. Rev. Stat. LB 168 § 3 ....................23

N.M. Stat. Ann. § 26-1-27 ....................23

N.H. RSA chapter 331–A ....................34

N.H. RSA chapter 358-A .................... *passim*

N.H. RSA 382-A:2-302 ....................27, 30

Or. Rev. Stat. § 743A.062 ....................23

S.D. Codified Laws § 58-29G-2 ....................23

Tenn. Code Ann. § 47-18-136 ....................23

Utah Code Ann. § 31A-46-311 ....................23

Vt. Stat. Ann. § 4682 .................... *passim*

Vt. Stat. Ann. § 4684 ....................2, 20, 33

W. Va. Code § 60A-8-6a ....................23

**Regulations**

42 C.F.R. § 10.10(b) ....................9

42 C.F.R. §10.11(a)....................9

45 C.F.R. § 164.502 ....................32

45 C.F.R. § 164.504(e)....................32

59 Fed. Reg. 25,110 (May 13, 1994) ....................12

61 Fed. Reg. 43,551 (Aug. 23, 1996)....................7

61 Fed. Reg. 65,406 (Dec. 12, 1996) ....................13, 29, 32

62 Fed. Reg. 45,823 (Aug. 29, 1997)....................36

75 Fed. Reg. 10,272 (Mar. 5, 2010)....................7, 33

**Other Authorities**

H.R. Rep. 102-384, pt. 2 (1992) ....................5, 24

Restatement (Second) of Contracts (1981) ....................26, 27

Plaintiff, through its attorneys, respectfully submits this Memorandum of Law in support of its Motion for Preliminary Injunction on Counts I through V of the Complaint.

## I. PRELIMINARY STATEMENT

Plaintiff Mary Hitchcock Memorial Hospital ("**MHMH**") requires immediate judicial intervention to stop a trillion-dollar drug manufacturer from abusing its market power to extract unlawful and unreasonable concessions from one of New Hampshire's most essential safety-net hospitals.

On July 2, 2026, Eli Lilly and Company ("**Defendant**" or "**Lilly**") cut off MHMH's access to the "**Ceiling Price**" set by the federal 340B Drug Pricing Program ("**340B Program**") in retaliation for MHMH's refusal to capitulate to Lilly's unlawful demand for confidential claim-level data. In January 2026, Lilly instituted an unprecedented policy (the "**Policy**") requiring Covered Entities like MHMH to submit detailed claim-level data for all of their 340B purchases of Lilly's drug products through a third-party web platform unilaterally chosen by Lilly ("**340B ESP**"). Use of 340B ESP requires MHMH to agree to 340B ESP's owners' and their affiliates' non-negotiable and unconscionable terms of use (the "**Terms**"). The Policy coercively conditions access to the statutorily guaranteed Ceiling Price on the surrender of data to Lilly who then may, according to 340B ESP's unilaterally imposed Terms and Lilly's own status as a third-party beneficiary of the same, improperly monetize the data for commercial purposes at MHMH's expense.

Every day this continues, MHMH is forced to pay full commercial price for medications it has no choice but to dispense, and the millions of dollars wrongfully diverted to Lilly's pockets are now unavailable for New Hampshire's only Level 1 trauma center, its only accredited children's hospital, and one of only 58 NCI-designated comprehensive cancer centers in the

country. Indeed, between July 7, 2026, and July 16, 2026, Lilly forced MHMH to purchase covered outpatient drugs at the non-340B price resulting in an overpayment by nearly $130,000 at the point-of-sale during that ten-day period alone. This harm is ongoing and such wrongful diversion of resources could result in the secession of service lines that will have a detrimental impact on MHMH's patient population and local community. That is precisely the type of harm a preliminary injunction is meant to stop.

MHMH is likely to succeed on the merits of each of the counts numerated below. *First*, Lilly's conduct is a *per se* violation of Vermont law (18 Vt. Stat. Ann. § 4681 *et seq.*) which expressly prohibits a manufacturer from conditioning access to 340B pricing on the submission of claims data. 18 Vt. Stat. Ann. § 4684. As a registered Covered Entity on the border of Vermont that services Vermont citizens and contracts with Vermont licensed pharmacies to dispense drugs to its patients, MHMH is statutorily entitled to injunctive relief. *Id*. Despite knowledge of this law as well as its application to MHMH, Lilly continues to knowingly and unlawfully deny MHMH's access to the statutory Ceiling Price.

*Second*, Lilly is engaged in unfair and deceptive conduct in violation of New Hampshire's Consumer Protection Act, RSA chapter 358-A (the "**CPA**"). Lilly's *per se* violation of Vermont law is compelling evidence of unfair or deceptive conduct. In addition, Lilly is the single source or monopoly supplier of numerous critical medicines for which there is significant consumer demand and no alternatives. By exploiting its market power and denying MHMH access to promised discounts, Lilly has unlawfully increased the price of its products. Lilly's justification that it needs the Policy to prevent drug diversion is plainly a pretext given that Lilly possesses a statutory audit right which is subject to numerous prerequisites it has unilaterally side-stepped. The stand-alone commercial value of the data indicates Lilly has ulterior motives for its demand.

In short, the Policy is a scheme to avoid having to offer MHMH discounted prices (creating millions of dollars in profit for Lilly) and/or extract confidential and commercially valuable data that Lilly reserves the right to monetize without paying any consideration to MHMH.[1]

Lilly's "offer" places MHMH in an untenable position: comply with the "take-it-or-leave-it" Policy or refuse and pay extortionate pricing. Lilly stands to gain in either scenario. If MHMH refuses to comply, Lilly obtains an extraordinary windfall by forcing MHMH to pay higher prices for its drugs. If MHMH capitulates, Lilly secures access to commercially valuable data that can be improperly used to further boost its bottom line at MHMH's expense. The CPA was designed to remedy this exact type of unfair conduct.

*Third*, Lilly has materially breached its contractual obligations to MHMH by breaching the express promises it made in its 340B offer to comply with the law. Lilly has also breached the implied covenant of good faith and fair dealing by failing to negotiate with MHMH in good faith, and by wielding its monopoly power to impose take-it-or-leave-it terms that gut the benefit of the parties' bargain; namely, MHMH's right to improve services for its patients through reinvestment of 340B savings.

*Fourth*, and as a result of the foregoing, Lilly has been unjustly enriched in several ways. Lilly's conduct has forced MHMH to purchase drugs at exorbitant and unlawfully high prices to the benefit of Lilly and to the detriment of MHMH and New England's most vulnerable patients. And, Lilly retains access to a market of millions of patients to which it can sell its products through the inclusion of covered outpatient drugs on Medicaid and Medicare Part B formularies, yet it is refusing to provide the statutorily required price to MHMH. The result is a massive wealth transfer

[1] MHMH would not sell claims data to Lilly at any price, but, nevertheless, Lilly's attempt to extract commercially valuable data from MHMH at MHMH's own expense is unlawful and unconscionable.

from a nonprofit safety-net hospital servicing rural New Hampshire communities to a global trillion-dollar pharmaceutical company. It would be unjust and against public policy to allow Lilly to use the Policy to increase profits at the expense of Covered Entities like MHMH who the 340B Program was designed to benefit.

The remaining preliminary injunction factors are easily satisfied because the harm to MHMH and New Hampshire and Vermont residents is irreparable. Not only is MHMH suffering ongoing and significant economic injury that cannot be remedied by end-of-case relief, MHMH needs 340B savings to offer numerous services to patients in New Hampshire, Vermont, and around New England. Without the promised 340B savings, programs and services will need to be either scaled back significantly or cut completely and, by the time the parties reach a trial, those programs and services may not exist at all. Thus, Lilly's conduct irreparably harms not only MHMH, but its patients and the local community it serves. The balance of equities tips overwhelmingly in MHMH's favor, as Lilly loses nothing through an injunction and still retains statutory audit rights to protect its alleged interest in preventing purported drug diversion. For these reasons, and those stated herein, MHMH respectfully requests that this Court grant the Motion in its entirety.

## II. <u>STATEMENT OF FACTS AND STATUTORY BACKGROUND</u>

### A <u>The Parties.</u>

MHMH is a rural New Hampshire not-for-profit corporation and healthcare charitable trust that provides medical care across New England. Declaration of Keith B. Thomasset ("Thomasset Decl.") ¶¶ 4–5. It is the teaching hospital at Dartmouth-Hitchcock Medical Center, New Hampshire's only academic medical center and the most rural in the United States. *Id.* ¶ 10. In connection with providing excellent healthcare across the region, MHMH operates a state-of-the-art accredited children's hospital, known as the Dartmouth Health Children's, the Dartmouth

Cancer Center (one of only 58 National Cancer Institute-designated comprehensive cancer centers in the United States and the only one in New Hampshire), and New Hampshire's only Level 1 trauma center. *Id.* ¶¶ 9–10. MHMH is a registered "Covered Entity" as defined under 42 U.S.C. § 256b(a)(4). *Id.* ¶ 12.

In addition to providing services within the state of New Hampshire, because MHMH is located on the border of Vermont and New Hampshire, MHMH services Vermont residents. *Id.* ¶¶ 5–6. To further that service, MHMH holds contract pharmacy agreements with Vermont-licensed pharmacies who dispense drugs to MHMH's patients in Vermont. *Id.* ¶ 6.

Lilly, on the other hand, is the largest drug manufacturer in the world, a publicly traded Fortune 100 company with over $65 billion in annual revenues, and the first drug manufacturer in history with a market capitalization of over one trillion dollars. *Id.* Ex. 1 (Lilly February 12, 2026, 10-K filing). As a large drug manufacturer, Lilly holds exclusive patents to several drugs that MHMH can only buy from Lilly to dispense to its patients in connection with their treatment. *Id.* ¶¶ 21–22.

### B Congress Created the 340B Program to Support Covered Entities like MHMH and Expand Access to Healthcare for the Needy, not to Benefit a Trillion-Dollar Drug Corporation.

Congress established the 340B Program in Section 602 of the Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967–71, classified at 42 U.S.C. § 256b. Congress designed the 340B Program to assist healthcare facilities serving low-income, uninsured or otherwise vulnerable populations. *Id.* The 340B Program aims to improve access to medical care in vulnerable communities without requiring additional federal resources and provides a vital source of financing for facilities that treat low-income and uninsured patients regardless of ability to pay. The 340B Program reflects a longstanding policy judgment: manufacturers that benefit from participation in taxpayer-funded healthcare programs must, in turn, help support providers

that care for low-income, uninsured, and underserved populations.

The 340B Program accomplishes this by enabling Covered Entities like MHMH to purchase covered outpatient drugs administered or prescribed in outpatient settings at a discount from pharmaceutical manufacturers.[2] This only applies if the prescribed drug is administered in an outpatient setting, filled at the Covered Entity's pharmacy or filled at an external pharmacy with which the Covered Entity has a 340B contract. In such cases, the Covered Entity receives the usual payment from the patient and/or their insurer but the Covered Entity then purchases a replacement drug at the discounted 340B price, giving the Covered Entity the financial benefit of the difference.

The 340B Program requires participating pharmaceutical manufacturers to enter into a pharmaceutical pricing agreement ("**PPA**") with the Secretary of HHS. Under the PPA, and pursuant to applicable law, manufacturers "shall … offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1). When a drug manufacturer signs a PPA, it is opting into the 340B Program and it agrees to the statutory requirement that the prices charged for covered outpatient drugs to Covered Entities will not exceed the defined Ceiling Price.

HRSA, which administers the 340B Program, has confirmed that Covered Entities like MHMH may use the "savings" obtained by retaining the difference between the "actual acquisition cost" of the 340B-discounted drugs and the usual market reimbursement, "to reach more eligible

[2] Eligible "Covered Entities" include disproportionate share hospitals ("DSH"), children's hospitals, cancer hospitals, critical access hospitals, federally qualified health centers, and other safety-net providers. 42 U.S.C. § 256b(a)(4). MHMH is registered as a Covered Entity. Thomasset Decl. ¶ 12. In order to become a Covered Entity, MHMH meets specific eligibility criteria and registers with the Health Resources and Services Administration ("**HRSA**"). 42 U.S.C. § 256b(a)(4), (5) & (7). The certification requirement allows HRSA to verify that the applicant meets all the statutory requirements before participation and once approved, the Covered Entity receives a 340B ID number. *Id.* ¶¶ 12–13.

patients and provide more comprehensive services." HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services*, 61 Fed. Reg. 43,551 (Aug. 23, 1996). Indeed, HRSA has repeatedly expressed that "*the benefit of the program was intended to accrue to the covered entities*." 75 Fed. Reg. 10,272, 10,277 (Mar. 5, 2010) (emphasis added).

To incentivize voluntary participation, the 340B Program offers drug manufacturers a deal: in exchange for the benefit of having covered outpatient drugs included on Medicaid and Medicare Part B formularies, a manufacturer must sell those drugs at a discounted "Ceiling Price" to registered "Covered Entities." *See* 42 U.S.C. § 256b(a)(1), (4). Under the 340B Program, if a drug manufacturer like Lilly wishes to have its drugs covered by the Medicaid and Medicare Part B programs (which provides substantial financial benefits to Lilly), it is required to offer Covered Entities no more than a significantly discounted Ceiling Price on certain covered outpatient prescription drugs purchased by these entities for their eligible patients. *See* 42 U.S.C. § 256b(a)(1), (4). In other words, Congress has conditioned the coverage of manufacturers' outpatient drugs covered by the Medicaid and Medicare Part B programs; the cost of entry is participation in the 340B Program.

MHMH uses 340B savings to subsidize clinical operations and thereby benefit its patients and community. Thomasset Decl. ¶ 14. Consistent with Congress's purpose in establishing the 340B Program, MHMH reinvests 340B savings to expand access to healthcare and improve services for its otherwise medically underserved community members, including uninsured and underinsured patients. *Id.* As intended, MHMH uses 340B savings in support of specialized treatment, to translate research, to train future clinicians, to subsidize services for which it is reimbursed less than cost, like addiction treatment services, and to expand access to essential services for uninsured and underinsured patients. *Id.* For instance, MHMH maintains the only

neonatal intensive care unit in New Hampshire—providing care for babies born with complex health risks due to prematurity and other health conditions. *Id.* ¶ 15. Without participation in the 340B drug program and corresponding savings MHMH would need to scale back these services. *Id.* In fiscal year 2025 alone, MHMH provided a net community benefit worth $339.9 million, including, but not limited to, $16.6 million in charity care, $30.2 million in subsidized health services, $204.8 million in absorbed losses on Medicaid reimbursement, and $8.3 million in community benefit programs and services. *Id.* ¶ 11.

### C For Years, MHMH Has Accepted Lilly's Offers Without Additional Conditions.

For years, Lilly has extended, and MHMH has accepted, offers to purchase covered outpatient drugs at or below the Ceiling Price. *Id.* ¶ 19. As a part of that offer and acceptance, Lilly has represented (and MHMH reasonably understood) that Lilly promised to comply with all applicable laws,[3] and specifically those laws surrounding 340B pricing. *Id.* ¶ 20. Lilly is the exclusive, single-source, or monopoly supplier of top selling drugs for which there is significant demand like Mounjaro for type 2 diabetes, Zepbound for obesity, and Verzenio and Retevmo for the treatment of certain types of cancers. *Id.* ¶ 21. Lilly manufactures Foundayo and Zepbound, two of the just three GLP-1 drugs included in the Medicare GLP-1 Bridge program. *Id.* ¶¶ 21, 59. It is no coincidence that Lilly ceased honoring the Ceiling Price for MHMH just one day after the Medicare GLP-1 Bridge program went live, which is expected to drive up demand for Foundayo

[3] For instance, in Lilly's 10-K filings, Lilly represents "[i]n the U.S., we are required to provide... reduced prices to private entities who treat patients in certain types of healthcare facilities intended to serve low-income and uninsured patients (known as 340B covered entities)." *Id.* ¶ 25, Ex. 1. In addition, Lilly has regularly communicated to the market that it offers discounts to covered entities for their 340B purchases by confirming its participation in the 340B Program, which requires such discounts. *Id.* ¶ 24. Every time Lilly confirms it participates in the 340B Program, it represents to the market that it offers discounts on eligible products to covered entities. *See id.* MHMH and other covered entities reasonably expected to receive 340B discounts for their eligible purchases from Lilly. *See id.* ¶¶ 19–20.

and Zepbound. *Id.* ¶ 59. For many drugs like these, MHMH has no choice but to purchase them from Lilly to serve its patients. *Id.* ¶ 22.

Moreover, recently it was publicly reported that the Dartmouth Health system, of which MHMH is the primary revenue engine, reported a $63.5 million deficit. *Id.* ¶ 16. One of the cited reasons for this deficit was rising medication costs. *Id.* ¶ 17. That stated rise predated Lilly's illegal withdrawal of the Ceiling Price—firmly worsening and directly contributing to MHMH's financial position. *Id.* ¶ 18. Without participation in the 340B Program, MHMH's financial distress will continue to worsen, and MHMH would need to close several services such as its neonatal intensive care unit in order to maintain its overall operations. *Id.*

**D** **<u>In January 2026, Lilly Announces the Unlawful Policy.</u>**

Lilly's unlawful Policy is the latest in a series of attempts to boost its profits and protect its bottom line. Under the 340B Program, manufacturers that increase drug prices faster than inflation must provide correspondingly larger discounts to Covered Entities. Repeated price increases can drive discounts close to 100 percent of the drug's selling price.

More specifically, the Ceiling Price is calculated as the drug's Average Manufacturer Price ("**AMP**") minus the Medicaid Unit Rebate Amount ("**URA**"). By law, the URA increases when manufacturers increase drug prices above the rate of inflation. 42 U.S.C. § 1396r-8(c)(2). As the URA increases, the Ceiling Price drops. Therefore, the Ceiling Price could reach zero if the URA is equal to the AMP. When that occurs, manufacturers are required to charge no more than one penny as the Ceiling Price ("**Penny Pricing**"). 42 C.F.R. § 10.10(b). Penny Pricing provides a check and balance to significant drug price increases, and manufacturers' failure to comply with Penny Pricing carries penalties. Manufacturers who knowingly and intentionally do not honor Penny Pricing "may be subject to a civil monetary penalty not to exceed $5,000 for each instance of overcharging." 42 C.F.R. § 10.11(a). In recent years, Lilly made the deliberate business decision

to raise the prices of many of its drugs at rates that far exceeded inflation. For example, between 1996 and 2019, Lilly increased the list price of Humalog, its top-selling insulin product, by approximately 1,200 percent.[4]

On January 15, 2026, Lilly announced an unprecedented new Policy requiring the submission of detailed, proprietary, confidential information for each and every claim in order for a Covered Entity to obtain the Ceiling Price. Thomasset Decl. ¶ 26, Ex. 2 (January 15, 2026 announcement). Lilly's Policy requires that claims data submission occur through the 340B ESP third-party web platform that is owned by Berkeley Research Group ("**BRG**"), a for-profit consulting company that supports pharmaceutical manufacturers. *Id.* ¶ 28. BRG also owns (through affiliates) a for-profit entity called Second Sight Solutions LLC[5] ("**Second Sight**"). *Id.* Through Second Sight, Lilly requires MHMH to agree to unconscionable and non-negotiable Terms (the "**Terms**"). *Id.* ¶ 30, Ex. 3 (340B ESP Terms of Use). The Terms authorize Second Sight *and Lilly* to use the submitted data for broad purposes that extend far beyond Lilly's pretextual justification of curbing drug diversion. For example, the Terms:

- Require MHMH to grant Second Sight a "worldwide, sublicensable, non-exclusive, royalty-free, perpetual, irrevocable license to collect, process, disclose, create derivative works of and otherwise use the Covered Entity Claims Data ("Data License") for the purposes set forth herein…This Data License survives after termination of the Agreement;"
- Require MHMH to agree that "Second Sight may enable Covered Entity Claims Data to be combined with rebate data remitted to Participating Pharmaceutical Manufacturers by payers (including Medicaid, Medicare, TRICARE and commercial

---

[4] *See* Maureen Testoni, *Pursuit of Profits is Driving Drug Companies to Break the 340B Law*, STAT News, (June 10, 2022) https://www.statnews.com/2022/06/10/pursuit-of-profits-is-driving-drug-companies-to-break-the-340b-law/.

[5] Second Sight's owner, BRG, has conducted several studies funded by the Pharmaceutical Research and Manufacturers of America (PhRMA), the main pharmaceutical industry trade group. 340B ESP's Founder and Business Development Lead, Aaron Vandervelde, who is also a Managing Director at BRG, has authored studies about the 340B program on behalf of PhRMA. Lilly's unilateral choice of a third-party platform owned by a manufacturer-aligned consultant creates a clear conflict of interest and is patently unfair to MHMH.

payers) ("Rebate Data") in order to identify Ineligible Rebates and evaluate compliance with Participating Pharmaceutical Manufacturers' policies." Critically, "Ineligible Rebates" are defined as "duplicate Medicaid, Medicare, TriCare and commercial payer rebates that are not eligible for reimbursement by Participating Pharmaceutical Manufacturers." This far exceeds the statutorily prohibited Duplicate Discounts;

- Shift all risk associated with data security and data privacy to MHMH;
- Establish Lilly as a third-party beneficiary to enforce the Terms against MHMH (while granting no parallel rights to MHMH);
- Permit 340B ESP to unilaterally and even retroactively modify the Terms as it sees fit—a concerning condition given Covered Entities are saddled with relying upon the data security and HIPAA compliance assurances Second Sight provides;
- Require MHMH to agree to "monitoring," including but not limited to, "grant[ing] [Second Sight] the right to…report any activity that we suspect may violate any law or regulation to regulators, law enforcement officials or other persons or entities that we deem appropriate." In essence, Second Sight is requiring MHMH to acknowledge a non-existent authority for it (and Lilly) to audit claims and report findings to regulators like HRSA, all while circumventing the Secretary's established audit process;
- Limit the direct liability for damages under the Terms of Second Sight and its affiliates to the unconscionable <u>aggregate</u> amount of $100;
- Shift liability to MHMH in the event that it is subsequently determined that 340B ESP's data sharing model violates privacy laws.

*Id.* ¶ 32, Ex. 3.

In connection with the Policy, Lilly memorialized the mutual understanding that Lilly expressly agreed to comply with all laws surrounding 340B pricing. The Policy states: "Lilly is committed to compliance with the 340B statute and to responsible distribution of its products. Lilly will continue to offer all covered entities its 340B medicines at or below the 340B ceiling price, consistent with the 340B statute, as long as the covered entity provides the minimal, standard business information outlined in this notice." *Id.* ¶ 27, Ex. 3.

### E **<u>Lilly's Policy is an Unfair and Deceptive Pretext to Deny 340B Pricing, Extract Valuable Commercial Data, and Increase its Profits at MHMH's Expense.</u>**

Lilly's justifications for its data demands and unilateral termination of MHMH's access to the Ceiling Price are an unfair and deceptive pretext to avoid providing the required discounts while still participating in Medicare Part B and Medicaid formularies. The Policy further extracts

an unprecedented and significant amount of data to which Lilly is not otherwise entitled—and with virtually no restrictions Lilly's use of the same. *Id.* ¶ 32, Ex. 3.

Lilly asserts the Policy is necessary to "identify the full universe of duplicate discounts and other program abuses, preserve our ability to initiate audits, and expand transparency." *Id.* ¶ 27, Ex. 2. However, the Policy reaches beyond this representation, and seeks data for all payors (not just Medicaid and Medicare). *Id.* ¶¶ 26, 32, Exs. 2, 3. Moreover, HRSA has already established a comprehensive system to address these precise concerns, rendering Lilly's demands unnecessary.[6]

Manufacturers like Lilly may (1) conduct an approved audit and (2) submit a claim through the Administrative Dispute Resolution process as described in section 340B(d)(3)(A). Guidance published by HRSA in 1994 makes clear that "[i]f a manufacturer believes that a covered entity is involved in drug diversion, it has the statutory authority to audit the entity records that directly relate to drugs of that manufacturer purchased at [340B] pricing." Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992, 59 Fed. Reg. 25,110, 25, 111 (May 13, 1994 Final Notice).

This audit right is not at the manufacturer's unilateral and unfettered discretion. Rather, the manufacturer must have reasonable cause to initiate an audit.[7] Manufacturer Audit Guidelines, 61

[6] Under 42 U.S.C. § 256b(a)(5)(C), manufacturers participating in the 340B program have the right to audit Covered Entities regarding their compliance with the program's two key prohibitions: (1) Duplicate Discounts (e.g. receiving 340B pricing on a drug paid for by Medicaid FFS) and (2) Diversion (e.g. reselling or transferring a 340B discounted drug to anyone who is not a "patient" of the Covered Entity).

[7] "Reasonable Cause" is defined as "a reasonable person could believe that a covered entity may have violated a requirement of section 340B(a)(5) (A) or (B) of the PHS Act (i.e., accepting a 340B discount on a covered outpatient drug at a time when the covered entity has not submitted its Medicaid billing status to the Department or transferring or otherwise reselling section 340B discounted covered drugs to ineligible recipients). Consistent with Government auditing standards, the organization performing the audit shall coordinate with other auditors, when appropriate, to avoid duplicating work already completed or that may be planned. Only one audit of a covered entity will be permitted at any one time. When specific allegations involving the drugs of more

Fed. Reg. 65,406 (Dec. 12, 1996). As HRSA has stated, "[i]n accordance with the intent of the statute, the audits should be performed only when there is reasonable cause." *Id.* at 65,407. The statute also states that audits should be conducted at the expense of the Government or the manufacturer, and, in the case of a manufacturer audit, pursuant to an audit plan submitted to HRSA. *Id*. The manufacturer must provide the Covered Entity with 30 days' notice to try to resolve the issue in good faith. *Id.* at 65,410. These audits would necessarily include the submission of the very claims data on which Lilly purports to condition MHMH's continued receipt of the Ceiling Price, which MHMH is entitled to.

As relevant here, Lilly has not established, let alone even attempted to establish, the requisite reasonable cause for an audit of MHMH, submitted an audit plan to HRSA for approval, or obtained HRSA's approval. However, by seeking detailed data for each claim Lilly is in effect subjecting MHMH to ongoing, permanent audit without satisfying the statutory requirements.[8]

Moreover, the commercial value of the demanded data is worth billions of dollars to Lilly. Thomasset Decl. ¶ 40. This is because the Policy would force MHMH to produce claims detail-level elements that facilitate manufacturers' marketing practices and for which a manufacturer like Lilly typically would have to pay a third-party data vendor. *Id*. On the backs of Covered Entities' increased cost of complying with Lilly's Policy, Lilly would enjoy an avoided business expense.

---

than one manufacturer have been made concerning an entity's compliance with section 340B(a)(5)(A) and (B), the Department will determine whether an audit should be performed by the (1) Government or (2) the manufacturer." 61 Fed. Reg. at 65,409.

[8] The pretextual nature of Lilly's actions is further underscored by the fact that its data demands followed closely on the heels of setbacks to Lilly's legal and regulatory efforts against the expansion of 340B eligibility and the rejection of its rebate model. *See, e.g.*, *Eli Lilly and Co. v. U.S. Dep't of Health and Hum. Servs*., No. 1:21-cv-00081, 2021 WL 5039566 (S.D. Ind. Oct. 29, 2021); *Eli Lilly and Co. v. Robert F. Kennedy Jr*., No. 1:24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025). Having failed to dismantle the 340B Program through litigation and regulatory advocacy, Lilly created the Policy.

With the data it collects, Lilly could also avoid paying valid claims, develop derivative data products for lobbying purposes, target and influence health care providers, and sell licenses to the data. *Id.* ¶ 41. Lilly could also use the data to improperly identify commercial "duplicate discounts" that are not Duplicate Discounts—*i.e.*, identifying claims it may carve out from payment under commercial rebate agreements it has freely negotiated with other third parties. *Id.*

### F Lilly's Enforcement of the Policy Against MHMH.

On April 28, 2026, Lilly sent a form letter claiming that MHMH was out of compliance with its new unlawful Policy because MHMH had rightfully refused to send the data. *Id.* ¶ 42, Ex. 4 (April 28, 2026, Lilly letter to MHMH). In the letter, Lilly stated that compliance with its Policy "is a condition of Lilly's offer of its products at 340B ceiling prices." *Id.* ¶ 43, Ex. 4. The letter evidences the full force of Lilly's known economic and monopoly market power and threatens MHMH "[t]o accept Lilly's offer and maintain access to 340B pricing, your organization must fulfill this requirement without further delay … We strongly urge you to take the following actions immediately to accept Lilly's offer and purchase Lilly products at the 340B ceiling price … upload all outstanding claims level data." *Id.*, Ex. 4.

On May 5, 2026, Lilly sent an email threatening that "adhering to the terms of Lilly's offer is important … if you do not respond, Lilly may assume that you have decided to reject its 340B offer." *Id.* ¶ 44, Ex. 5 (May 2026 email chain between MHMH and Lilly). Three days later, on May 8, 2026, MHMH responded requesting further clarification. *Id.* ¶ 45, Ex. 5. In that email MHMH requested two crucial pieces of information: (1) whether outpatient administrations were in-scope for the demand; and (2) what specific data elements were being demanded separated by encounter type. *Id.* ¶ 46, Ex. 5. On May 11, 2026, Lilly replied with a skeleton agenda for a call, a list of invitees, and suggested dates and times for meetings but it did not provide the requested

information from May 8, 2026. *Id.* ¶ 47, Ex. 5. MHMH reiterated that request again on May 12, 2026. *Id.* ¶ 48, Ex. 5.

On May 13, 2026, Lilly responded with: (1) confirmation that outpatient administrations were in-scope, featuring a link to its January 15, 2026, notice as support; and (2) a broken link to its vendor's generalized FAQs for information about the required data fields. *Id.* ¶ 49, Ex. 5. MHMH again emailed Lilly on May 15, 2026, to flag that the links were broken and emphasized that it needed more information to independently vet the data demand and to prepare for a discussion with Lilly. *Id.* ¶ 50, Ex. 5. Without the requested information, MHMH could not meaningfully vet HIPAA-specific and general data use and security concerns, nor could it adequately understand Lilly's "offer." *Id.* ¶ 51. Lilly failed and refused to provide the requested information, and instead simply "forwarded to our team to review and respond." *Id.* ¶ 52, Ex. 5.

On June 1, 2026, under the guise of seeking to curb "fraud waste and abuse," Lilly sent a letter to HRSA's Administrator, wherein it reiterated its new Policy and intention to "instruct its wholesalers that those entities are no longer eligible for 340B pricing until they submit the outstanding data." *Id.* ¶ 53, Ex. 6 (June 1, 2026, Lilly letter to HRSA). On June 17, 2026, Lilly sent MHMH a "final notice" instructing MHMH to comply or else it would cut off access to the Ceiling Price (the "**Final Notice**"). *Id.* ¶ 54, Ex. 7 (June 17, 2026, Final Notice). On June 24, 2026, MHMH sent Lilly a letter wherein it explained that it was still waiting for requested information and that it had not heard back from Lilly since Lilly represented that it would escalate the request. *Id.* ¶ 55, Ex. 8 (June 24, 2026, MHMH response to Final Notice). To date MHMH is still waiting for Lilly's response. *Id.* ¶ 56.

On July 2, 2026, in retaliation for MHMH's refusal to comply with the unlawful Policy and the Terms, Lilly ceased offering MHMH the Ceiling Price. *Id.* ¶ 57. On July 10, 2026, one of

the nation's largest wholesalers confirmed in writing that Lilly had instructed it to deny MHMH access to the Ceiling Price. *Id.* ¶ 63, Ex. 10 (July 9–10 email chain between MHMH and wholesaler). For the period between July 7, 2026, and July 16, 2026, MHMH was forced to purchase covered outpatient drugs from Lilly at the non-340B price. *Id.* ¶ 66. As a result of the significant difference between the acquisition price and Ceiling Price, MHMH overpaid by nearly $130,000 during that ten-day period alone. *Id.* For instance, one drug, Taltz Auto Injector 80 MG 2, was purchased on July 10, 2026, for more than $6,000.00 over the July 10, 2026 Ceiling Price. *Id.* Annualized, MHMH faces overpaying Lilly at least $4.7 million. *Id.* ¶ 67.

In response, MHMH sent Lilly a letter enumerating the issues laid out in this Motion and Memorandum, and expressly informed Lilly that its actions constitute a *per se* violation of Vermont Law, but Lilly did not respond. *Id.* ¶ 61, Ex. 9 (July 2, 2026, MHMH letter to Lilly). Despite this, MHMH has had no choice but to accept Lilly's offer to purchase drugs for its patients but has refused to comply with Lilly's unilaterally imposed claims data submission requirement as it is unlawful. *Id.* ¶ 66.[9] In short, MHMH is currently purchasing full-price drugs from Lilly since July 2, 2026 through the present and has accepted Lilly's offer— albeit objecting to unlawful terms and reserving its rights. *Id.*

**G <u>Lilly's Policy Creates Unlawful and Unreasonable Burdens for MHMH.</u>**

While Lilly breezily characterizes the requested data as "minimal" it is anything but, and Lilly's assertion that the Policy is "standard business practice across the industry" is false. *Id.* ¶ 38, Ex. 2. If MHMH capitulated and submitted this information the cost (including, but not limited to, hiring at least one additional salaried and benefit-eligible employee) would be a burden to MHMH and would effectively increase the cost of 340B drugs beyond the Ceiling Price. *Id.* ¶ 37.

[9] On July 2, 2026, and July 27, 2026, MHMH formally complained to HRSA that Lilly was not providing the Ceiling Price. *Id.* ¶¶ 60, 65.

For example, manually uploading data to 340B ESP to comply with the Policy would require significant coordination across multiple data sources. *Id.* ¶ 35. Data relative to in-house dispensing and outpatient administrations, in particular, are spread across multiple recordkeeping systems, and reconciling those systems adds significant complexity and cost. *Id*. MHMH does not currently provide medical claims data to vendors like Second Sight and doing so would require direct interface with its electronic medical record system. *Id*. This also carries serious data security and privacy risks which would further require MHMH to monitor for data security and privacy issues, the costs of which MHMH cannot absorb. *Id*. Compliance with the Policy would cause MHMH to divert significant staff time and resources from supporting operations and patient care, cause MHMH to reduce or altogether eliminate services supported by the 340B Program, and allocate more funds toward costly administrative compliance. *Id*. ¶ 36.

In retaliation for MHMH's refusal to comply with the Policy, Lilly is charging MHMH prices well above the Ceiling Price. If this continues, this could cause MHMH's days-cash-on-hand to drop low enough to risk violating bond covenants, with consequences including mandatory consultant call-in, credit-rating downgrade and/or negative outlook, increased borrowing costs, and potential facility closures. *Id*. ¶ 71. In addition, and as explained above, the requested data contains confidential and proprietary information without any proper assurances from Lilly. *See Infra* at 32.

**H <u>MHMH Suffers Irreparable Harm from Lilly's Conduct.</u>**

Lilly is the largest drug manufacturer in the world and, as explained above, MHMH's expenditures for Lilly's products are counted in the millions of dollars annually. *Id.* ¶¶ 23, 70. MHMH does not have an option to choose other manufacturers. *Supra* at 5. In addition, Lilly's drugs are in some instances the only drugs, or one of only a few drugs, in a certain category that would be covered by a particular patient's health plan, whether a commercial or government plan.

*Id.* ¶¶ 21–22. Consequently, MHMH has no choice but to purchase Lilly's drugs at a cost above the Ceiling Price or turn the patient away. *Id.* ¶ 22.

As explained above, MHMH has already suffered substantial economic damages from Lilly's conduct. *Id.* ¶¶ 66–67. Every dollar wrongfully diverted to Lilly is unavailable to support the numerous patient care programs that MHMH offers as a result of its participation in the 340B Program. As MHMH's costs increase, fewer resources remain available to expand access to care, maintain existing clinical services, and provide medications to financially vulnerable patients. *Id.* ¶ 73. MHMH uses 340B savings in support of specialized treatment, to translate research, and to train future clinicians. *Id.* ¶ 14. MHMH also reinvests the millions of dollars of savings in 340B discounts to subsidize services for which it is reimbursed less than cost, like addiction treatment services, and to expand access to essential services for uninsured and underinsured patients. *Id.*

Lilly is interfering with MHMH's ability to fulfill its mission and serve the community. *Id.* ¶ 69. The elimination of 340B savings for Lilly's covered outpatient drugs will directly impair MHMH's ability to provide comprehensive care to underserved and uninsured patients, a role at the heart of its mission. *Id.* For instance, 340B savings are used to fund programs that improve medication access, increase adherence, reduce hospital re-admissions, provide clinical pharmacist interventions, and ensure continuity of care for patients with chronic and complex diseases. *Id.* ¶ 72. Reduced 340B savings impair MHMH's ability to provide financial assistance for essential medications, bridge therapy while insurance coverage is obtained, and furnish medications at reduced or no cost when patients otherwise would be unable to afford treatment. *Id.* The resulting reduction in medication access is likely to increase medication nonadherence, disease progression, avoidable emergency department utilization, preventable hospitalizations, and poorer clinical outcomes among MHMH's most vulnerable patient populations. *Id.* Such developments are likely

to lead to an increase in emergencies and in overall health care costs. *Id.*

## III. STANDARD OF REVIEW FOR PRELIMINARY INJUNCTION.

"In considering a motion for preliminary injunction, a district court must consider: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the Lillys less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009). "The cynosure of this four-part test is more often than not the movant's likelihood of success on the merits." *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006). Plaintiff meets its burden here.

## IV. LEGAL ARGUMENT

### A Plaintiff Is Likely to Succeed on the Merits for Counts I Through V.

#### i. Plaintiff Will Prevail on Count I for Violation of Vermont Law.

Lilly's Policy is a clear-cut violation of Vermont law, which expressly entitles MHMH to injunctive relief. Vermont law provides Covered Entities like MHMH statutory recourse to prevent and penalize Lilly from engaging in the exact conduct it employs here. 18 Vt. Stat. Ann. § 4682 ("Discrimination against 340B entities prohibited"). The Vermont legislature has made plain that drug manufacturers may not impose claims data submission requirements as a condition to obtain 340B pricing. 18 Vt. Stat. Ann. § 4682(b). As a Covered Entity doing business in Vermont and servicing Vermont citizens through its Contract Pharmacy operations in that state, MHMH has standing to assert claims under that statute and in this Court. *See* Thomasset Decl. ¶ 6.

It is illegal for "[a] manufacturer or its agent [to] deny, restrict, prohibit, or otherwise interfere with, directly or indirectly, the acquisition of a 340B drug by or delivery of a 340B drug to a 340B contract pharmacy on behalf of a 340B covered entity." 18 Vt. Stat. Ann. § 4682(a). The prohibition explains that "[a] manufacturer or its agent shall not directly or indirectly require a

340B covered entity to submit any claims, utilization, encounter, purchase, or other data as a condition for allowing the acquisition of a 340B drug by or delivery of a 340B drug to a 340B contract pharmacy unless the claims or utilization data sharing is required by the U.S. Department of Health and Human Services." 18 Vt. Stat. Ann. § 4682(b).

The statute further provides for a private right of action for injured Covered Entities as well as a statutory right to injunctive relief, damages, punitive damages, attorneys' fees and costs. 18 Vt. Stat. Ann. § 4684(a) ("A 340B covered entity, 340B contract pharmacy, or other person injured by a manufacturer's or its agent's violation of this subchapter may bring an action in Superior Court for injunctive relief, compensatory and punitive damages, costs and reasonable attorney's fees.").

Lilly's Policy is a *per se* violation of 18 Vt. Stat. Ann. § 4682. Leading up to July 2, 2026, Lilly repeatedly threatened to cut off MHMH's access to 340B pricing unless it capitulated to the Policy. Thomasset Decl. ¶¶ 42–56, Exs. 4–5. On July 2, 2026, Lilly made good on these threats in retaliation for MHMH's refusal to comply. *Id.* ¶ 57. Indeed, on July 10, 2026, one of the largest drug wholesalers in the country confirmed that Lilly had instructed it to unlawfully cut off MHMH's access to the Ceiling Price. *Id.* ¶ 63.

On July 2, 2026, MHMH notified Lilly that it was in violation of the Vermont statute. *Id.* ¶ 61. Lilly refused to respond to that letter and, as of the date of this filing, its knowing and willful violations of the law continue. *Id.* ¶ 62. Each individual instance where Lilly denies MHMH access to the Ceiling Price constitutes a violation. 18 Vt. Stat. Ann. § 4684(b). Accordingly, MHMH is likely to succeed on this claim and is entitled to an injunction thereunder. 18 Vt. Stat. Ann. § 4684(a).

### ii. Plaintiff Will Prevail on Count II for Violation of New Hampshire's Consumer Protection Act.

The New Hampshire Consumer Protection Act (the "CPA") declares it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2. "Any person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper." RSA 358-A:10. To prevail on a claim under the CPA, "the plaintiff must prove that: 1) the defendant is a person; 2) the defendant used an unfair method of competition or a deceptive act or practice; and 3) the act occurred in trade or commerce." *Milford Lumber Co. v. RCB Realty, Inc.*, 147 N.H. 15, 20 (2001). All elements are present here.

#### a) Plaintiff Satisfies the First and Third Elements of the CPA.

The first and third elements are easily met here. Lilly is a publicly traded corporation and a "person" as contemplated under RSA 358-A:1. The statute further defines "trade" and "commerce" to include "the advertising, offering for sale, sale, or distribution of any services and any property … and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state." RSA 358-A:1, II. Here, Lilly manufactures, markets, distributes, and sells prescription drugs throughout the United States including New Hampshire and so squarely within broad definitions of "person" and "trade or commerce." RSA 358-A:1, I–II.

#### b) Plaintiff Satisfies the Second Element Because Lilly's Policy and Conduct are Unfair, Deceptive, and Unconscionable.

Conduct is unfair or deceptive under RSA 358-A:2 if it either (a) falls within one of the specific categories enumerated in RSA 358-A:2, I–XIV, or (b) satisfies the "rascality" test articulated by the New Hampshire Supreme Court, under which conduct is actionable if it "attain[s]

a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *State v. Moran*, 151 N.H. 450, 452 (2004); *see also Barrows v. Boles*, 141 N.H. 382, 390 (1996). MHMH satisfies both here.

*1. Lilly's Conduct Satisfies the Rascality Test.*

The CPA is an equitable and remedial statute designed to address the exact kind of unfair and deceptive conduct employed by Lilly. *See, e.g., Hughes v. DiSalvo*, 143 N.H. 576, 578 (N.H. 1999) (describing CPA as a comprehensive statute that is interpreted broadly); *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 95 (2007) (RSA 358-A:2, XIV should be interpreted broadly "since our CPA generally is given broad sweep, and since 'or otherwise harm competition' is, on its face, broad[.]"). Under the rascality test "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Moran*, 151 N.H. at 452. In applying this test, this Court should consider the following factors: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common-law statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen). *Milford Lumber Co.*, 147 N.H. at 19; *see also Moran*, 151 N.H. at 452–53 (incorporating FTC standards).

These factors cut in favor of Plaintiff and against Lilly. With respect to the first factor, Lilly's pressure tactics and knowing disregard for Vermont law demonstrate that Lilly's conduct not only offends public policy but also violates principles established by statute. *See* 18 Vt. Stat. Ann. § 4682(a). Lilly's *per se* violations of Vermont's laws indicate that its conduct is "within at least the penumbra of some common-law, statutory or other established concept of unfairness" for

purposes of RSA 358-A:2, even if New Hampshire lacks a similar prohibition. *See Milford Lumber Co.*, 147 N.H. at 19; *see also Renovator's Supply, Inc. v. Sovereign Bank*, 892 N.E.2d 777, 787 (Mass. App. Ct. 2008) ("Unfairness acquires its character from the circumstances of each case. The statute works from its own bottom. Actionable unfairness does not require an established common-law wrong or breach of equitable standards" (citations omitted)). Indeed, at least eleven other states have enacted similar laws, demonstrating the extent to which Lilly's conduct violates public policy.[10]

With regard to the remaining factors, Lilly has made false and/or misleading representations to MHMH that are oppressive, unscrupulous, and cause substantial injury. In *Moran*, the New Hampshire Supreme Court found that making representations that a company never intended to honor to induce the other party to enter into a contract constitutes rascality. 151 N.H. at 454. The court explained that "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice." *Id*. at 453. Similarly, making fraudulent misrepresentations in connection with a contract would justify a finding of "rascality." *Id*. at 453-54. "The New Hampshire Supreme Court has consistently held that inducing another to enter a contract based on a knowing misrepresentation of the promisor's intent to perform under the contract violates the CPA." *Derry & Webster, LLC v. Bayview Loan Servicing, LLC*, No. 14-CV-211-PB, 2014 WL 7381600, at *6 (D.N.H. Dec. 29, 2014).

Lilly has misrepresented that it "is committed to compliance with the 340B statute and to responsible distribution of its products." Thomasset Decl. ¶ 27, Ex. 2. Lilly has used its significant

[10] *See* N.M. Stat. Ann. § 26-1-27; Utah Code Ann. § 31A-46-311; Colo. Rev. Stat. § 10-16-1505; N.D. Cent. Code § 43-15.3-08; Or. Rev. Stat. § 743A.062; S.D. Codified Laws § 58-29G-2; Tenn. Code Ann. § 47-18-136; W. Va. Code § 60A-8-6a; Ark. Code Ann. § 23-92-604; Haw. Rev. Stat. § 2; La. Stat. Ann. § 40:2884; Md. Code Ann., Health Occ. § 12-6C-09.1; Mo. Rev. Stat. § 376.414; Minn. Stat. § 62J.96; Miss. Code Ann. § 41-149-5; Neb. Rev. Stat. LB 168 § 3.

market share to impose a "take-it-or-leave-it" offer that contains both misrepresentations and unlawful terms. In addition, and as explained above, the non-negotiable Terms violate the 340B statute which does not permit Lilly to impose burdensome claims data submission requirements. Moreover, at MHMH's expense, the Terms provide Lilly with access to data that Lilly may monetize for commercial purposes without sufficient privacy and security guarantees.

The Policy and Lilly's use of it to extract financial concessions are unfair and deceptive under the CPA. Lilly is using the Policy to avoid selling its drugs at the statutorily required discount while still maintaining the significant financial benefits of placement on the Medicaid and Medicare Part B formulary lists. It is patently "immoral, unethical, oppressive, [and] unscrupulous" for Lilly to impose unlawful Terms on its 340B offers that violate the law, use those terms to extract data for its own commercial gain leaving MHMH exposed to potential liability and shouldering substantial costs, and take money out of the hands of a DSH safety-net hospital and into the coffers of a Fortune 100 global pharmaceutical company. H.R. Rep. 102-384, pt. 2, at 12 (1992) (explaining that the 340B Program was intended to enable certain hospitals and clinics "to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.").

Massachusetts case law interpreting Mass. Gen. Laws. c. 93A (the Massachusetts corollary to the CPA), which New Hampshire courts frequently look to for guidance, further supports MHMH's CPA claim. *See, e.g.*, *Moran*, 151 N.H. at 453 (citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806 (Mass. 1991) ("conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice") (internal quotations omitted)). In *Anthony's Pier Four*, the Massachusetts Supreme Judicial Court concluded that the defendant's use of pressure and pretext to "force financial concessions,"

knowing that defendant possessed strong leverage in the negotiation constituted breach of the implied covenant of good faith and fair dealing and violated Chapter 93A. *See* 583 N.E.2d at 820–21. Just as the court in *Anthony's Pier Four* found the use of pressure and pretext to force concessions was unfair and deceptive, so too should this Court find that Lilly's conduct violates the CPA. *See also Renovator's Supply, Inc.*, 892 N.E.2d at 787 (finding it unlawful to use "coercive or extortionate tactics designed to extract undeserved concessions").

*2. Lilly's Conduct Falls Under Two Enumerated Categories.*

Lilly's conduct falls into two of the enumerated categories of section 358-A:2. *First*, RSA 358-A:2, XIV prohibits "[p]ricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, including the pricing of generic prescription drugs" as a prohibited "unfair or deceptive act or practice." While the conduct at issue in this case extends beyond the pricing of *generic* prescription drugs as is expressly mentioned in RSA 358-A:2, XIV, unfair or deceptive drug pricing in general is certainly conduct "of the same type as that proscribed" in RSA 358-A:2, XIV and thus falls within the scope of the CPA.

By depriving MHMH of the Ceiling Price, Lilly is "pricing … goods or services … in a manner that tends to create or maintain a monopoly or otherwise harm competition." As explained, Lilly's data requirements are simply a pretext. By side-stepping 340B's pricing requirement, Lilly maintains access to a massive market of patients through Medicaid and Medicare while avoiding the costs. This boosts Lilly's profits at the expense of MHMH and the services it offers to its patients. And because MHMH has no other choice but to buy Lilly's drugs, MHMH has an impossible choice: either submit to unlawful demands, or purchase drugs at full price.

*Second*, RSA 358-A:2, V prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Lilly has represented to the market and to MHMH that it complies with 340B pricing laws. Indeed, in its

10-K filings, Lilly represents "[i]n the U.S., we are required to provide ... reduced prices to private entities who treat patients in certain types of healthcare facilities intended to serve low-income and uninsured patients (known as 340B covered entities)." Thomasset Decl. ¶ 25, Ex. 1. Contrary to Lilly's representations, Lilly does not offer its products at the requisite Ceiling Price to all Covered Entities. Accordingly, Lilly's representations are false and/or misleading.

**iii. Plaintiff Will Prevail on Count III for Breach of Contract.**

A breach of contract claim contains four elements: (1) the existence of a valid and enforceable contract; (2) the plaintiff's performance of its own obligations under the contract, or a valid excuse for non-performance; (3) the defendant's breach of one or more of its contractual obligations; and (4) damages resulting from the breach. Restatement (Second) of Contracts § 235 (1981)*; see Lassonde v. Stanton*, 157 N.H. 582, 588 (2008) (describing elements). All four elements are satisfied here.

*First*, an oral contract exists between the parties. "Offer, acceptance, and consideration are essential to contract formation … A promisee may accept such an offer by commencing performance." *Tsiatsios v. Tsiatsios*, 140 N.H. 173, 178 (1995). In the context of 340B, Congress specifically used the term "offer" when proscribing that manufacturers must "offer each covered entity outpatient drugs for purchase at or below the applicable ceiling price." 42 U.S.C. § 256b. In analyzing this statute, the Court should examine the "ordinary meaning" of the term and conclude that "offer" as used here references the legal contractual concept of "offer" and "acceptance." *See e.g.*, *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024) (interpreting the 340B statute). So while there is no written contract, for years Lilly has offered and MHMH has accepted an offer to purchase drugs from Lilly at the Ceiling Price. Thomasset Decl. ¶ 19. The parties' historical course of dealings confirms the terms of the contract. *See Village Green Condo. Ass'n v. Hodges*, 167 N.H. 497, 506 (2015) ("A course of dealing is a sequence of previous conduct

between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.") (quoting Restatement (Second) of Contracts, § 223, at 157-58 (1981)).

*Second*, MHMH has continually performed its obligations under the contract and always paid for all drugs Lilly sold to it. Thomasset Decl. ¶¶ 19, 23. However, MHMH cannot comply with Lilly's unilaterally imposed data requirements for the reasons stated herein. Despite this, and because of the necessity to service its patients, MHMH has continued to purchase drugs from Lilly at full price since July 2, 2026. *Id.* ¶ 66. Accordingly, MHMH has accepted Lilly's offer, and bought drugs pursuant thereto, but objected to and has refused to comply with the unlawful terms and conditions.

Lilly's unlawful conditions are void. RSA 382-A:2-302 ("If the court … finds the contract or any clause of the contract to have been unconscionable … the court may … enforce the remainder of the contract without the unconscionable clause.") The New Hampshire Supreme Court has recognized that unconscionability generally includes "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Pittsfield Weaving Co. v. Grove Textiles, Inc.*, 121 N.H. 344, 346 (1981). The existence of a gross inequality of bargaining power, the absence of negotiation, and other facts of coercion or unfair surprise all militate in finding a contract to be unconscionable, and therefore, unenforceable. *See id.* at 347-48; *accord PK's Landscaping, Inc. v. New England Tel & Tel Co.*, 128 N.H. 753, 755 (1986) ("We have held that contracts may be declared void because they are unconscionable and oppressive." (cleaned up)).

*Third*, Lilly has breached its promise to comply with the laws and regulations surrounding the 340B Program. Courts recognize that a party can create a contractual obligation to comply with

a statute or regulation when it creates contractual promises or expectation around that statutory framework. For instance, as the Eighth Circuit explained in *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, a plaintiff can base its breach of contract claim on alleged HIPAA violations when the contract in question *expressly cited* HIPAA and created contractual obligations around that statutory framework. 974 F.3d 845, 850 (8th Cir. 2020). The court explained that the contract created promissory obligations around a cited and itemized statutory framework and thus created a contractual remedy for violations of the same. *Id.*; *see also Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 661 (7th Cir. 2015) ("The absence of a private right of action under the HEA itself does not preclude Bible's RICO claim."); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 565 (7th Cir. 2012) ("Wigod's complaint alleges that Wells Fargo breached its promise to provide her with a permanent modification once she fulfilled the TPP's conditions."); *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1133 (11th Cir. 2014) ("[W]e recognize that HUD regulations are enforceable terms of the contract.").

Just as the defendant in *Trone* (and the other cases noted above), Lilly's offer to MHMH contained an express promise to comply with the 340B pricing laws, and therefore provides for a contractual remedy in the event that Lilly violates the same. These representations include:

- On January 15, 2026, Lilly promised: "**Lilly is committed to compliance with the 340B statute and to responsible distribution of its products**. Lilly will continue to offer all covered entities its 340B medicines at or below the 340B ceiling price, **consistent with the 340B statute**;"
- On January 15, 2026, Lilly promised that "Covered entities located in Colorado, Maine, Nebraska, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, **Vermont** or West Virginia, are exempted from the CLD requirement;"
- In Lilly's 10-K filings, Lilly represents "[i]n the U.S., we are required to provide ... reduced prices to private entities … (known as 340B covered entities);"
- Throughout MHMH's contractual relationship with Lilly, it reasonably understood and expected that Lilly promised to comply with all applicable laws surrounding the 340B Program. Thomasset Decl. ¶ 20.

Through these representations, Lilly has created a contractual obligation to comply with 42 U.S.C. § 256b, including the "reasonable cause" requirement in its statutory 340B audit rights (*see* 42 U.S.C. § 256b(a)(5)(C), & 61 Fed. Reg. 65,406), and Vermont law, 18 Vt. Stat. Ann. § 4682. Lilly has violated these statutes and regulations by refusing to offer MHMH the Ceiling Price, and unilaterally imposing unlawful requirements on the same that run afoul of regulations it promised to abide by. *Supra* at 11-12. Through this conduct Lilly has breached its contractual promises.

*Finally*, MHMH has and continues to suffer significant monetary and non-monetary damages as Lilly continues to deny it the Ceiling Price. *Infra* at 34-36.

**iv. Plaintiff Will Prevail on Count IV for Breach of the Implied Covenant.**

"In every agreement, there is an implied covenant that the parties will act in good faith and fairly with one another. … In New Hampshire, there is not merely one rule of implied good-faith duty, but a series of doctrines, each of which serves different functions. … The various implied good-faith obligations fall into three general categories: (1) contract formation; (2) termination of at-will employment agreements; and (3) limitation of discretion in contractual performance." *Livingston v. 18 Mile Point Drive, Ltd.*, 158 N.H. 619, 624 (2009) (internal citations omitted).

For instance, in *Birch Broadcasting*, the court upheld a finding that a party breached the implied covenant when the defendants "behaved inconsistently with" expectations under the contract and "abandoned their obligations … thereby disrupting the plaintiffs' justified expectations and depriving them of the benefit of the parties bargain." *Birch Broad., Inc. v. Capitol Broad. Corp.*, 161 N.H. 192, 198-99 (2010). That is precisely the case here.

Lilly has entirely prevented MHMH from obtaining the benefit of Lilly's "offer" by imposing unilateral, unlawful, and unreasonable terms and conditions to obtain the Ceiling Price.

Indeed, as explained above, the claims data submission requirement runs afoul numerous laws and public policy. Because the contractual requirement that MHMH comply with the Policy was imposed through unequal bargaining power and in violation of law, it violates the covenant and is void and unenforceable. *See* RSA 382-A:2-302.

Moreover, the untenable "Sophie's choice" imposed by Lilly violates the covenant. An already financially-vulnerable MHMH either must absorb substantially higher upfront drug costs and forgo its 340B savings or capitulate to the demands of a trillion-dollar corporation that can easily withstand the costs of litigation—costs that pale in comparison to the increased revenues it enjoys from charging Covered Entities like MHMH full price for expensive drug products.

In addition, Lilly has breached the implied covenant by failing to negotiate with MHMH in good faith. As the New Hampshire Supreme Court has stated, "[i]n our decisions setting standards of conduct in contract formation, the implied good faith obligations of a contracting party are tantamount to the traditional duties of care to refrain from misrepresentation and to correct subsequently discovered error, insofar as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance upon it." *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 139 (1989). Here, in response to Lilly's "offer" and imposition of the conditions in its Policy, MHMH asked for a meeting and reasonable clarification and follow up information so that it could properly understand and determine if the offer was *bona fide*. Thomasset Decl. ¶¶ 50–51, Ex. 5. But Lilly refused to respond to MHMH's reasonable requests. *Id*. ¶ 52. Thereafter, Lilly imposed unlawful terms without discussion or negotiation.

**v. Plaintiff Will Prevail on Count V for Unjust Enrichment.**

Lilly's demand thus places MHMH in an untenable position: comply with the "take-it-or-leave-it" Policy or refuse and pay extortion pricing. Lilly stands to gain in either scenario: either

MHMH refuses to comply and Lilly obtains a significant monetary windfall. Or, MHMH capitulates because it has no choice, in which case Lilly would access commercially valuable data that can be improperly used to further boost its bottom line at MHMH's expense. It would be unjust and against public policy to allow Lilly to use the Policy to increase profits at the expense of covered entities like MHMH who the 340B Program was designed to benefit.

Under New Hampshire law, the doctrine of unjust enrichment exists to remedy the exact conduct on display here where "an individual receives a benefit as a result of his wrongful acts." *See Petrie-Clemons v. Butterfield*, 122 N.H. 120, 127 (1982); *Kowalski v. Cedars of Portsmouth Condo. Ass'n*, 146 N.H. 130, 133 (2001) ("To entitle one to restitution, it must be shown that there was unjust enrichment either through wrongful acts or passive acceptance of a benefit that would be unconscionable to retain.").

For instance, in *Kowalski* the Supreme Court of New Hampshire affirmed a finding of unjust enrichment where the defendant engaged in illegal conduct to its benefit. Specifically, the court found that because defendant sold real estate without a license (which is illegal) it would be unconscionable to allow it to retain commissions it earned through unlawful conduct that "violat[ed] public policy." *Id*. Similarly here, the Court should find that Lilly should not be allowed to retain the benefit of increased profits and access to proprietary data through imposition of unlawful terms and conditions.

As explained, the claims data submission requirements in the Policy unjustly enrich Lilly in at least four ways. *First*, the requested data includes detail-level elements that benefit Lilly by facilitating its lobbying and marketing efforts. Thomasset Decl. ¶¶ 40–41. Lilly would ordinarily have to pay a third-party vendor for such data, but the Policy would allow it to extract such data for MHMH without the associated expense, all while foisting additional costs onto MHMH . *Id.* ¶

41. Lilly would expectedly use this data to improperly identify commercial discounts and improperly enforce exclusions under a completely unrelated commercial agreement. *Id.*

*Second*, the Policy does not provide meaningful safeguards to protect confidentiality. The Policy requires MHMH to produce patient names, diagnoses, prescribed medications, dosages, and other protected health information ("**PHI**"). *See* 42 U.S.C. § 1320d *et seq*. HIPAA strictly limits PHI disclosure and generally requires either patient authorization or detailed safeguards. 45 C.F.R. §§ 164.502, 164.504(e). Lilly has provided none of these protections.[11]

*Third*, the Policy subjects MHMH to a perpetual audit which swallows the reasonable cause standard. *See* 42 U.S.C. § 256b(a)(5)(C); 61 Fed. Reg. at 65,406-407. The reasonable cause prerequisite exists to "ensure that the audits are performed where there are valid business concerns and are conducted with the least possible disruption to the covered entity." *Id*. These audits would necessarily include submission and review of the same data Lilly demands in the Policy. But Lilly has not attempted to comply with the audit requirements, much less make any showing of reasonable cause. Lilly is unjustly enriched by avoiding the audit requirement and the associated expense while still maintaining the substantial financial benefits of having its outpatient drugs covered on Medicaid and Medicare Part B formularies.

*Fourth*, absent an injunction, MHMH will continue to pay above the Ceiling Price which unjustly enriches Lilly. Indeed, just over a ten-day period, Lilly has already obtained more than $100,000 in additional revenue from MHMH to which it is not entitled. Thomasset Decl. ¶ 66. It would defy equity to allow Lilly to retain these monies paid by MHMH, a rural safety-net non-profit hospital, while also still allowing Lilly to participate in the Medicare and Medicaid

[11] Second Sight's "assurances" in its Terms that the data will be anonymized are hardly comforting when the Terms are subject to change at any time based on Second Sight's unilateral discretion. Thomasset Decl. ¶ 32, Ex 3.

programs. Even if MHMH complied with the Policy, the increased burden on MHMH would unlawfully and effectively inflate the cost of acquisition above the Ceiling Price. *Id.* ¶ 37; 75 Fed. Reg. 10,272, 10,277.

**vi. Plaintiff has Standing for Each Count.**

MHMH's causes of action arise under state law. Thus, MHMH has standing to bring each of its claims, notwithstanding the fact that 42 U.S.C. § 256b does not contain a private right of action. For instance, the Ninth Circuit recently allowed claims under the False Claims Act ("**FCA**") to proceed where the plaintiff alleged that drug manufacturers fraudulently inflated drug prices through "longtime and systemic noncompliance with the [340B] statutory ceiling price formula 'to the detriment of government programs.'" *U. S. ex rel. Adventist Health Sys. of W. v. AbbVie Inc.*, 169 F.4th 1137, 1141 (9th Cir. 2026). Defendant drug manufacturers argued that the Plaintiff's claims failed because they arose under Section 340B, which contains no private right of action. *Id.* At 1140. The court held that Plaintiff "brings claims under the FCA, which are free-standing and independent of Section 340B." *Id.* at 1143. Thus, "it is of no import that Section 340B does not provide covered entities like [Plaintiff] a mechanism to bring suit." *Id.* Here, all of Plaintiff's claims provide an independent basis for relief.

Under Count I, the Vermont statue provides a free-standing private right of action and expressly provides that a "340B covered entity, 340B contract pharmacy, or other person injured by a manufacturer's or its agent's violation of this subchapter may bring an action in Superior Court." 18 Vt. Stat. Ann. § 4684(a). Likewise, Count II (under the CPA) provides for a remedy separate and apart from 42 U.S.C. § 256b. *See* RSA 358-A:10. Counts III and IV rest on Lilly's breach of express promises to comply with 340B laws. For Count V (unjust enrichment), New Hampshire courts hold that the lack of a private right of action does not interfere with this Court's ability to administer equitable remedies under the unjust enrichment doctrine for underlying

unlawful conduct. *See Kowalski*, 146 N.H. at 134 ("Given the equitable nature of the doctrine of unjust enrichment [] we need not address whether RSA chapter 331-A provides a private right of action.").

**B** **<u>Lilly's Illegal Conduct is Causing MHMH Irreparable Harm.</u>**

As this Court has noted, the purpose of a preliminary injunction is "to protect the moving party from irreparable harm, so that he may obtain a meaningful resolution of the dispute after full adjudication of the underlying action." *Gonzalez v. Wright*, No. CIV. 09-CV-234-JD, 2009 WL 2982792, at *1 (D.N.H. Sept. 10, 2009), *report and recommendation adopted sub nom. Gonzalez v. Rockingham Cnty. Dep't of Corr., Superintendent*, No. CIV. 09-CV-234-JD, 2009 WL 3319676 (D.N.H. Oct. 14, 2009). "Such a situation arises when some harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial." *Id.* at *4 (citing, *inter alia*, *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate)). As explained below, such circumstances exist here.

Economic harm is irreparable where no adequate remedy at law exists to recover alleged damages. *See, e.g.*, *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) ("Where a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages, irreparable harm exists.") (citing *Ross-Simons*, 102 F.3d at 19); *Itek Corp. v. First Nat'l Bank of Boston*, 730 F.2d 19, 22 (1st Cir. 1984) (same); *see also The Foxboro Co. v. Arabian Am. Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986) (same).

For instance, in *Ross-Simons*, the First Circuit affirmed a finding of irreparable harm on the grounds that "absent a restraining order, [plaintiff] would lose incalculable revenues and sustain harm to its goodwill. … First, due to the uniqueness of [defendant's product], [plaintiff] could not simply replace the [that product] with some other brand, and, without the availability

[its] business would suffer. The resultant damage … would defy accurate quantification." 102 F.3d at 19. This Court should reach the same conclusion here.

Lilly holds the exclusive patent for several drugs MHMH dispenses to its patients. Thomasset Decl. ¶ 21. As such, just like the plaintiff in *Ross-Simmons*, MHMH has no alternative to purchase these medications and must buy them from Lilly. *Id*. ¶¶ 21–22. Lilly's market dominance puts MHMH in a position where it has no choice but to purchase the drugs at full price or turn patients away. *Id*. ¶ 22. All the while, MHMH would be deprived of the Ceiling Price to which it is entitled under law.

In addition, because MHMH is facing economic strain, it needs savings from the 340B program to fund its operations. Lilly's actions place more strain on MHMH's ability to upkeep its facilities because 340B savings are used to fund programs that improve medication access, increase adherence, reduce hospital readmissions, provide clinical pharmacist interventions, and ensure continuity of care for patients with chronic and complex diseases. *Id.* ¶ 72. Reduced 340B savings impair MHMH's ability to provide financial assistance for essential medications, bridge therapy while insurance coverage is obtained, and furnish medications at reduced or no cost when patients otherwise would be unable to afford treatment. *Id*. The resulting reduction in medication access is likely to increase medication nonadherence, disease progression, avoidable emergency department utilization, preventable hospitalizations, and poorer clinical outcomes among MHMH's most vulnerable patient populations. *Id*. Such developments are likely to lead to an increase in emergencies and in overall health care costs. *Id*. ¶¶ 72–73.

Moreover, money damages will not make MHMH whole. The 340B Program is structured in a way that recognizes the extreme financial disparity between drug manufacturers and Covered Entities by requiring manufacturers to provide the 340B discounted pricing at the point of sale.

Indeed, HHS and HRSA have routinely rebuffed manufacturer's attempts to provide discounts after the fact through a rebate model. *See generally, Novartis Pharmaceuticals Corp., v. Kennedy*, No. 25-5117, ___ F. 4th ___, 2026 WL 2093947, at *5 (D.C. Cir. July 21, 2026) ("Manufacturers may not unilaterally impose a rebate or discount mechanism unless the Secretary 'provided' for it."). As HRSA explained, an upfront discount system requires "less initial outlay of drug purchasing money." 62 Fed. Reg. 45,823-824 (Aug. 29, 1997). If MHMH were required to pay full price for Lilly's drugs for the entirety of the case and only receive restitution at the case's conclusion, Lilly may be forced to scale back or eliminate services that may never be brought back. This harms not only MHMH, but also its patients and the community it serves.

### C The Balance of the Equities and Public Interest Favors Entry of an Injunction.

In balancing the equities, the Court must consider whether issuing a preliminary injunction will burden Lilly less than denying an injunction would burden MHMH. *See Gonzalez-Droz,* 573 F.3d at 79. In evaluating the impact on the public interest, the Court must consider whether some critical public interest exists that would be injured by granting preliminary relief. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988).

In this case, the balance of the equities tips decidedly in MHMH's favor. As explained above, MHMH is a DSH serving the nation's most vulnerable patient populations. As Congress intended, MHMH uses savings from the 340B Program to benefit its patient population and offer them medical services. Because it already faces financial uncertainty, the addition of restricting access to 340B pricing from Lilly poses a serious threat to its financial stability.

Conversely, there will be no impact on Lilly if the Court grants this motion. Lilly proffers that it has imposed this new claims data requirement to ensure "transparency" and help "identify the full universe of duplicate discounts and other program abuses." Thomasset Decl. ¶ 27, Ex. 2.

But Lilly maintains statutory audit rights for this exact purpose. *Supra* 12-13. Therefore, it cannot reasonably be said that Lilly will be deprived of any right it does not already possess under the law. If granted, Lilly will simply have to comply with its obligation to offer the Ceiling Price.

**D** **<u>No Bond Is Required.</u>**

Federal Rule of Civil Procedure 65(c) provides in part that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper." "Although the rule speaks in mandatory terms, an exception to the bond requirement has been crafted for, *inter alia*, cases involving the enforcement of 'public interests' arising out of 'comprehensive federal health and welfare statutes.'" *Pharm. Soc'y of the State of New York, Inc. v. N.Y. State Dep't of Social Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995); *see Crowley v. Local No. 82, Furniture & Piano Movers*, 679 F.2d 978, 1000 (1st Cir. 1982) (recognizing that no bond is required in suits to enforce important federal rights or public interests and citing cases), *rev'd on other grounds*, 467 U.S. 526 (1984). In this case, MHMH seeks to enforce public interests arising out of Lilly's unfair and deceptive conduct and misrepresentations regarding compliance with the federal Veterans Health Care Act, Medicaid and Medicare statutes. Thus, MHMH is not required to post a bond. *See, e.g.*, *HCC Specialty Underwriters, Inc. v. Woodbury*, 289 F. Supp. 3d 303, 333 (D.N.H. 2018) (no bond required for preliminary injunction on breach of contract claim).

## V. <u>CONCLUSION</u>

For the foregoing reasons, MHMH is likely to succeed on the merits of Counts I-V of its Complaint. MHMH has also demonstrated significant irreparable harm, that the balance of the equities tips in its favor, and that the public interest favors the entry of preliminary injunctive relief. Accordingly, the Court should grant this Motion to enjoin Lilly from imposing its Policy against MHMH.

Respectfully submitted,

**MARY HITCHCOCK MEMORIAL HOSPITAL**

By its attorneys,

Dated: July 27, 2026

By: */s/ Morgan C. Nighan*

Morgan C. Nighan (Bar No. 21196)
NIXON PEABODY LLP
Exchange Place, 53 State Street
Boston, MA 02109
(617) 345-1031
mnighan@nixonpeabody.com

Nathan P. Warecki (Bar No. 20503)
Jonathan D. O'Neil (Bar No. 276336)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
(603) 628-4000
nwarecki@nixonpeabody.com
joneil@nixonpeabody.com