**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| MARY HITCHCOCK MEMORIAL HOSPITAL;<br><br>*Plaintiff,*<br><br>v.<br><br>ELI LILLY AND COMPANY;<br><br>*Defendant.* | Civil Case No. |

**DECLARATION OF KEITH B. THOMASSET IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

I, Keith B. Thomasset, declare as follows:

1. I am over the age of 18 and make this declaration on personal knowledge.

2. I am the Dartmouth Health Chief Pharmacy Officer and the Mary Hitchcock Memorial Hospital ("**MHMH**") 340B Authorizing Official. I have been employed with MHMH for nearly two years (since August 2024), and in my current position for that same period of time.

3. In the regular exercise of my job duties I have personal knowledge regarding MHMH's participation in the federal 340B Drug Pricing Program ("**340B Program**") as a registered "Covered Entity." In connection with performing my job duties I also have personal knowledge regarding MHMH's purchase of drugs from manufacturers at the "Ceiling Price" set by the 340B Program. I have personal knowledge regarding MHMH's interactions with the defendant in this matter, Eli Lilly and Company ("**Lilly**" or "**Defendant**").

**Plaintiff Mary Hitchcock Memorial Hospital**

4. MHMH is a New Hampshire not-for-profit corporation and healthcare charitable trust with a principal place of business located at One Medical Center Drive, Lebanon, New Hampshire.

5. MHMH serves as a major tertiary referral site for northern New England, including New Hampshire and Vermont, and is designated as a rural referral center and a sole community hospital.

6. MHMH services Vermont residents and holds Contract Pharmacy agreements with Vermont-licensed pharmacies.

7. MHMH cares for all patients regardless of their ability to pay.

8. MHMH qualifies as a disproportionate share hospital ("**DSH**") under Section 1886(d)(1)(B) of the Social Security Act.

9. MHMH is also a state-of-the-art accredited children's hospital, known as Dartmouth Health Children's. MHMH operates the Dartmouth Cancer Center, which is one of only 58 National Cancer Institute-designated comprehensive cancer centers in the United States and the only one in New Hampshire.

10. MHMH is the teaching hospital at Dartmouth-Hitchcock Medical Center, New Hampshire's only academic medical center and the most rural in the United States. MHMH also operates New Hampshire's only Level 1 trauma center.

11. In fiscal year 2025 alone, MHMH provided a net community benefit worth at least $339.9 million, including, but not limited to, $16.6 million in charity care, $30.2 million in subsidized health services, $204.8 million in absorbed Medicaid losses, and $8.3 million in community benefit programs and services.

**MHMH is a Registered Covered Entity**

12. MHMH is a Covered Entity that participates in the 340B Program. In order to become and remain a Covered Entity, MHMH meets specific eligibility criteria and registers with the Health Resources Services Administration ("**HRSA**").

13. As a Covered Entity, MHMH is subject to audit by HRSA. MHMH also submits annual Medicare cost reports and IRS forms that detail the community benefits and charity care that it provides to patients.

14. MHMH reinvests savings realized from the 340B Program to expand access to healthcare and improve and subsidize services for its otherwise medically underserved community members, including uninsured and underinsured patients. Through its participation in the 340B Program, MHMH subsidizes much of its community support including, but not limited to, charity care, community health services, and providing necessary comprehensive clinical services to rural populations. MHMH also uses 340B savings in support of specialized treatment, to translate research, to train future clinicians, to subsidize services for which it is reimbursed less than cost, like addiction treatment services, and to expand access to essential services for uninsured and under-insured patients.

15. MHMH maintains the only neonatal intensive care unit in New Hampshire, providing care for babies born with complex health risks due to prematurity and other health conditions. Without participation in the 340B Program and corresponding savings, MHMH would need to scale back these services.

16. Moreover, recently it was publicly reported that the Dartmouth Health system, of which MHMH is the primary revenue engine, reported a $63.5 million deficit.

17. One of the cited reasons for this deficit was rising medication costs.

18. Without participation in the 340B Program, MHMH's financial distress would worsen, and it would need to close several services like its neonatal intensive care unit.[1]

**<u>The Contractual Relationship and Course of Dealing Between MHMH and Lilly</u>**

19. For years, Lilly has extended, and MHMH has accepted, offers to purchase covered outpatient drugs at or below the applicable 340B Ceiling Price. Consistent with standard industry practice, MHMH has purchased those drugs through wholesalers, but it is MHMH's understanding that the true seller is Lilly, which manufactures the drugs and sets the prices.

20. As a part of that offer and acceptance, MHMH reasonably understood that Lilly would comply with all applicable laws, and specifically those laws surrounding 340B pricing.

21. Lilly is a manufacturer of top selling drugs like Mounjaro for type 2 diabetes, Zepbound for obesity, Verzenio for certain types of advanced breast cancer, and Retevmo for the treatment of certain types of cancers. Lilly is also the single source or monopoly supplier of numerous drugs for which there is significant demand. This is also because Lilly's drugs are in some instances the only drugs, or one of only a few drugs, in a certain category that would be covered by a particular patient's health plan, whether a commercial or government plan. Zepbound and Foundayo are key examples.

22. Because Lilly is the only supplier for certain drugs, when Lilly refuses to offer the drugs for purchase at the Ceiling Price, MHMH has no choice but to purchase Lilly's drugs at a price above the Ceiling Price or turn the patient away. MHMH has no choice but to be Lilly's customer to adequately service its patient population.

---

[1] *See Dartmouth Health reports $63.5 million deficit over 6 months*, VT Digger, (June 22, 2026), https://vtdigger.org/2026/06/22/dartmouth-health-reports-63-5-million-deficit-over-6-months/ (last accessed July 27, 2026)

23. As a result of Lilly's large market share, MHMH spends millions of dollars annually to purchase drugs from Lilly, which comprises a significant portion of MHMH's overall annual drug spend.

24. Lilly has regularly communicated to the market that it offers discounts to Covered Entities for their 340B purchases by confirming its participation in the 340B Program, which mandates such discounts.[2] MHMH reasonably expected to receive 340B discounts for its eligible drug purchases from Lilly in light of these repeated representations.

25. For instance, in Lilly's February, 2026, 10-K filing filed February 12, 2026, Lilly represents "[i]n the U.S., we are required to provide... reduced prices to private entities who treat patients in certain types of healthcare facilities intended to serve low-income and uninsured patients (known as 340B covered entities)." On July 27, 2026, I reviewed a copy of Lilly's February 12, 2026 10-K accessed from Lilly's website at https://investor.lilly.com/static-files/0d64699c-0cc7-490e-9152-b2ba1de08634, which is attached hereto as **Exhibit 1**.

**Lilly's New Policy Places Significant Burdens on MHMH**

26. In January 2026, Lilly instituted a new policy requiring Covered Entities like MHMH to submit detailed claim-level data as a condition to continuing to purchase covered outpatient drugs at the 340B Ceiling Price (the "**Policy**"). A true and correct copy of that January 15, 2026, announcement is attached hereto as **Exhibit 2**.

27. The Policy states that it is intended "to help identify the full universe of duplicate discounts and other program abuses, preserve our ability to initiate audits, and expand transparency[.]" The Policy further states: "Lilly is committed to compliance with the 340B statute

[2] *See Lilly's in-house claims data requirement-upcoming action*, (June 1, 2026), https://www.lilly.com/news/stories/lilly-in-house-claims-data-requirement-upcoming-action (last accessed July 27, 2026).

and to responsible distribution of its products. Lilly will continue to offer all covered entities its 340B medicines at or below the 340B ceiling price, consistent with the 340B statute, as long as the covered entity provides the minimal, standard business information outlined in this notice. Lilly will also continue to work with all stakeholders to improve program integrity and ensure that the 340B program can be properly and fairly administered going forward." Ex. 2.

28. The Policy dictates that the data submission must occur through a third-party web platform unilaterally chosen by Lilly ("**340B ESP**"). 340B ESP is owned by Berkeley Research Group ("**BRG**"), a for-profit consulting company that supports pharmaceutical manufacturers. BRG owns 340B ESP's immediate owner, a for-profit entity called Second Sight Solutions LLC (**"Second Sight"**).

29. BRG has conducted several studies funded by the Pharmaceutical Research and Manufacturers of America (PhRMA), the main pharmaceutical industry trade group.[3] 340B ESP's Founder and Business Development Lead, Aaron Vandervelde, who is also a Managing Director at BRG, has authored studies about the 340B program on behalf of PhRMA.[4]

30. Use of 340B ESP requires MHMH to agree to 340B ESP's owners' and their affiliates' terms of use (the "**Terms**"). On July 27, 2026, I reviewed a copy of the Terms on 340B ESP's website, at https://investor.lilly.com/static-files/0d64699c-0cc7-490e-9152-b2ba1de08634, which is attached hereto as **Exhibit 3**.

31. MHMH was not provided with any opportunity to negotiate the Terms.

32. The Terms provide, in part, the following:

---

[3] *See e.g.*, "Site of Care Shift for Physician-Administered Drug Therapies: 2026 Update" (January 20, 2026), *Site-of-Care Shift for Physician-Administered Drug Therapies: 2026 Update | Insights | BRG* (last accessed July 27, 2026).

[4] *See e.g.*, "The Pharmaceutical Supply Chain: Gross Drug Expenditures Realized by Stakeholders" (2017), 863_Vandervelde_PhRMA-January-2017_WEB-FINAL.pdf (last accessed July 27, 2026).

a. Require MHMH to grant Second Sight a "worldwide, sublicensable, non-exclusive, royalty-free, perpetual, irrevocable license to collect, process, disclose, create derivative works of and otherwise use the Covered Entity Claims Data ("Data License") for the purposes set forth herein…This Data License survives after termination of the Agreement and shall survive as to any Covered Entity Claims Data that you have submitted on behalf of the Covered Entity or that a TPA (as defined herein) has submitted on behalf of the Covered Entity after such respective dates of submission."

b. Require MHMH to agree that "Second Sight may enable Covered Entity Claims Data to be combined with rebate data remitted to Participating Pharmaceutical Manufacturers by payers (including Medicaid, Medicare, TRICARE and commercial payers) ("Rebate Data") in order to identify Ineligible Rebates and evaluate compliance with Participating Pharmaceutical Manufacturers' policies." "Ineligible Rebates" are defined as "…duplicate Medicaid, Medicare, TriCare and commercial payer rebates that are not eligible for reimbursement by Participating Pharmaceutical Manufacturers[.]".

c. Shift all risk associated with data security and data privacy to MHMH;

d. Establish Lilly as a third-party beneficiary to enforce the Terms against MHMH (while granting no parallel enforcement rights to MHMH against Lilly);

e. Permit 340B ESP to unilaterally and even retroactively modify the Terms as it sees fit;

f. Require MHMH to agree to "monitoring," including but not limited to, "grant[ing] [Second Sight] the right to…report any activity that we suspect may violate any law or regulation to regulators, law enforcement officials or other persons or entities that we deem appropriate.";

g. Limit the direct liability for damages under the Terms of Second Sight and its affiliates to the aggregate amount of $100;

h. Shift liability to MHMH in the event that it is subsequently determined that 340B ESP's data sharing model violates privacy laws.

33. The Terms are unacceptable to MHMH in part because the Terms expose MHMH to risk and liability for data privacy and security issues associated with the claims data provided to 340B ESP.

34. MHMH would also incur additional administrative and operational expenses if it were required to comply with the Policy and the Terms.

35. For instance, MHMH would need to manually upload data to 340B ESP, a process which would require significant coordination across multiple data sources. Data relative to in-house dispensing and outpatient administrations, in particular, are spread across multiple recordkeeping systems, and reconciling those systems adds significant complexity and cost. MHMH does not currently provide medical claims data to vendors like Second Sight and doing so would require direct interface with its electronic medical record system. This also carries serious data security and privacy risks which would further require MHMH to monitor for data security and privacy issues, the costs of which MHMH cannot absorb.

36. In order to comply with the Policy, MHMH would need to divert resources that would otherwise support operations and patient care.

37. If MHMH complied with Lilly's Policy by submitting the required claims data, the cost of compliance (including, but not limited to, hiring at least one additional salaried and benefit-eligible employee) would be a burden to MHMH.

38. The submission of claims data required by the Policy is not standard practice in the industry.

**The Claims Data Lilly Demands has Commercial Value to Lilly**

39. The requested claims data contains information such as diagnosis information, encounter information, prescriber information, the drug prescribed, dosage, and other similar medical information.

40. The data is also proprietary and has independent economic value to Lilly. The data includes detail-level elements that facilitate manufacturers' marketing practices and for which a manufacturer like Lilly typically would have to pay a third-party data vendor.

41. Lilly could use this data to avoid paying valid claims, develop derivative data products for lobbying purposes, target and influence health care providers, and sell licenses to the data. Lilly could also use the data to improperly identify commercial "duplicate discounts" that are not Duplicate Discounts—*i.e.* identifying claims it may carve out from payment under commercial rebate agreements it has freely negotiated with other third parties.

**Lilly Refuses to Respond to MHMH's Reasonable Requests for Further Information**

42. On April 28, 2026, Lilly sent a form letter to MHMH claiming that MHMH was out of compliance with its new Policy because MHMH had rightfully refrained from submitting the requested claims data. A true and correct copy of that April 28, 2026, Letter is attached hereto as **Exhibit 4**.

43. In the letter, Lilly stated that compliance with its Policy "is a condition of Lilly's offer of its products at 340B ceiling prices." Lilly told MHMH "[t]o accept Lilly's offer and maintain access to 340B pricing, your organization must fulfill this requirement without further delay… We strongly urge you to take the following actions immediately to accept Lilly's offer and purchase Lilly products at the 340B ceiling price… upload all outstanding claims level data."

44. On May 5, 2026, Lilly sent an email to MHMH wherein it reiterated its position and stated that "adhering to the terms of Lilly's offer is important… if you do not respond, Lilly may assume that you have decided to reject its 340B offer." A true and correct copy of the May 2026 email thread between Lilly and MHMH is attached hereto as **Exhibit 5**.

45. Three days later, on May 8, 2026, MHMH responded via email requesting further clarification. Ex. 5.

46. In that email MHMH requested two crucial pieces of information: (1) whether outpatient administrations were in-scope for the demand; and (2) what specific data elements were being demanded by Lilly, separated by encounter type. Ex. 5.

47. On May 11, 2026, Lilly replied with a skeleton agenda for a call, a list of invitees, and suggested dates and times for meetings. Lilly did not provide the information that MHMH requested on May 8, 2026. Ex. 5.

48. MHMH requested the same information again on May 12, 2026. Ex. 5.

49. On May 13, 2026, Lilly responded with: (1) confirmation that outpatient administrations were in-scope, featuring a link to its January 15 notice as support; and (2) a broken link to 340B ESP's generalized FAQs for information about the required data fields. Ex. 5.

50. MHMH again emailed Lilly on May 15, 2026, to flag that the links were dead and emphasized that it needed more information to independently vet the data demand and to prepare for a discussion with Lilly. Ex. 5.

51. Without the requested information, MHMH cannot meaningfully vet HIPAA-specific and general data use and security concerns, nor could it adequately understand the "offer."

52. Lilly failed and refused to provide the requested information, and instead simply stated in an email dated May 18, 2026, "I have forwarded to our team to review and respond." Ex. 5.

53. On June 1, 2026, Lilly sent a letter to HRSA's Administrator, wherein it reiterated its new Policy and intention to "instruct its wholesalers that those entities are no longer eligible for 340B pricing until they submit the outstanding data." A true and correct copy of that June 1, 2026, letter is attached hereto as **Exhibit 6**.

54. On June 17, 2026, Lilly sent MHMH a "final notice" instructing MHMH to comply or else it would cut off access to 340B pricing (the "**Final Notice**"). A true and correct copy of that June 17, 2026 Final Notice is attached hereto as **Exhibit 7**.

55. On June 24, 2026, and in response to the Final Notice, MHMH sent Lilly a letter wherein it explained that it was still waiting for the requested information and that it had not heard back from Lilly since Lilly represented that it would escalate MHMH's requests for information. A true and correct copy of that June 24, 2026 letter is attached hereto as **Exhibit 8**.

56. To date, Lilly has not responded to MHMH's repeated requests for information and clarification.

**On July 2, 2026, Lilly Cut off MHMH's Access to the Ceiling Price, Causing Serious Harm to MHMH**

57. On July 2, 2026, Lilly ceased offering MHMH the 340B Ceiling Price.

58. Lilly ceased offering MHMH the 340B Ceiling Price for all of MHMH's Contract Pharmacies.

59. Lilly ceased honoring the 340B Ceiling Price for MHMH just one day after the Medicare GLP-1 Bridge program, which increases demand for Foundayo and Zepbound, went live.

60. On July 2, 2026, MHMH preliminarily notified HRSA through its dedicated administrative process email (340Bpricing@hrsa.gov) that Lilly was not providing the 340B Ceiling Price through at least one wholesaler and that MHMH would follow up with a full and formal notice.

61. On July 2, 2026, MHMH again wrote to Lilly advising that it had lost the 340B Ceiling Price and requesting a response by the end of the day July 6, 2026, otherwise MHMH would "have no choice but to assume [Lilly] has knowingly and intentionally made 340B pricing

of its covered outpatient drugs unavailable to MHMH and is declining to engage meaningfully on MHMH's legitimate questions regarding the terms of [Lilly]'s 'offer.'" A true and correct copy of that July 2, 2026, letter is attached hereto as **Exhibit 9**.

62. Lilly has not responded to MHMH's July 3, 2026, letter.

63. On July 10, 2026, one of the nation's largest wholesalers confirmed in writing that Lilly had instructed it to deny MHMH access to the Ceiling Price. A true and correct copy of the email chain between MHMH and the wholesaler is attached hereto as **Exhibit 10**.

64. In that email, the wholesaler explained: "As of February 1, 2026, Lilly requires all covered entities to submit claims data for all 340B dispenses, including in-house dispenses and medical claims, as a condition of Lilly's offer to sell products at the 340B discount price. To the extent a covered entity has been informed that access to 340B prices will be restricted, it will be promptly restored once the necessary outstanding claims data is submitted to 340B ESP and verified. Please contact 340B@lilly.com with any questions." Ex. 10.

65. On July 27, 2026, MHMH submitted a full Combined 340B Ceiling Price Unavailable/Incorrect 340B Ceiling Price Notification to HRSA through its administrative process signed by MHMH's 340B Authorizing Official on July 24, 2026 and covering both the general unavailability of the 340B Ceiling Price through all of its wholesalers since July 2, 2026, as well as each instance of incorrect 340B pricing (a/k/a overcharges) through July 23, 2026.

66. Since July 2, 2026, Lilly has forced MHMH to purchase drugs at full price. By way of example, for the period between July 7, 2026 and July 16, 2026, MHMH was forced to purchase covered outpatient drugs from Lilly above the 340B Ceiling Price. As a result of the significant difference between the acquisition price and 340B Ceiling Price, MHMH overpaid by nearly

$130,000 at the point-of-sale during that ten-day period alone. Annualized, MHMH faces overpaying by at least $4.7 million for Lilly's covered outpatient drugs.

67. One drug, Taltz Auto Injector 80 MG 2, was purchased on July 10, 2026, for more than $6,000.00 over the July 10, 2026 340B Ceiling Price.

68. MHMH relies on statutorily mandated 340B pricing to support uncompensated care, rural health services, oncology programs, behavioral health treatment, pediatrics services, pharmacy services, and other essential programs that would otherwise be difficult or impossible to sustain. Lilly's refusal to provide 340B pricing may impact MHMH's ability to continue to offer various services to patients.

69. Disruption to MHMH's access to 340B pricing threatens its already tenuous financial stability as a DSH and undermines access to care for underserved rural communities in New Hampshire and Vermont. By denying MHMH access to the 340B Ceiling Price, Lilly is interfering with MHMH's ability to fulfill its mission and serve the community. The elimination of 340B savings for Lilly's covered outpatient drugs will directly impair MHMH's ability to provide comprehensive care to underserved and uninsured patients, a role at the heart of its mission. MHMH cannot decline to purchase drugs from Lilly and at the same time fulfill its mission.

70. MHMH will lose millions of dollars annually because of Lilly's conduct.

71. Lilly's refusal to honor the 340B Ceiling Price could cause MHMH's days-cash-on-hand to drop low enough to risk violating bond covenants, with consequences including mandatory consultant call-in, credit-rating downgrade and/or negative outlook, increased borrowing costs, and potential facility closures.

72. Reduced 340B savings impair MHMH's ability to provide financial assistance for essential medications, bridge therapy while insurance coverage is obtained, and furnish medications at reduced or no cost when patients otherwise would be unable to afford treatment. The resulting reduction in medication access is likely to increase medication nonadherence, disease progression, avoidable emergency department utilization, preventable hospitalizations, and poorer clinical outcomes among MHMH's most vulnerable patient populations. Such developments are likely to lead to an increase in emergencies and in overall health care costs.

73. Every dollar wrongfully diverted to Lilly is unavailable to support the numerous patient care programs that MHMH offers as a result of its participation in the 340B Program. As MHMH's costs increase, fewer resources remain available to expand access to care, maintain existing clinical services, and provide medications to financially vulnerable patients.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct, executed on the date referenced below.

Dated: July 27, 2026

Signed by:
F515B4506FC1410...
Keith B. Thomasset
7/27/2026