# EXHIBIT 1

**United States**
**Securities and Exchange Commission**
**Washington, D.C. 20549**

# Form 10-K

**Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**for the fiscal year ended December 31, 2025**

**Commission file number 001-06351**

# ELI LILLY AND COMPANY

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| Indiana<br>(State or other jurisdiction of incorporation or organization) | 35-0470950<br>(I.R.S. Employer Identification No.) |

Lilly Corporate Center, Indianapolis, Indiana 46285
(Address and zip code of principal executive offices)

Registrant's telephone number, including area code (317) 276-2000

**Securities registered pursuant to Section 12(b) of the Exchange Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange On Which Registered |
|---|---|---|
| Common Stock (no par value) | LLY | New York Stock Exchange |
| 1.625% Notes due 2026 | LLY26 | New York Stock Exchange |
| 2.125% Notes due 2030 | LLY30 | New York Stock Exchange |
| 0.625% Notes due 2031 | LLY31 | New York Stock Exchange |
| 0.500% Notes due 2033 | LLY33 | New York Stock Exchange |
| 6.77% Notes due 2036 | LLY36 | New York Stock Exchange |
| 1.625% Notes due 2043 | LLY43 | New York Stock Exchange |
| 1.700% Notes due 2049 | LLY49A | New York Stock Exchange |
| 1.125% Notes due 2051 | LLY51 | New York Stock Exchange |
| 1.375% Notes due 2061 | LLY61 | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Exchange Act:** None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).

Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act): Yes ☐ No ☒

Aggregate market value of the common equity held by non-affiliates computed by reference to the price at which the common equity was last sold as of the last business day of the Registrant's most recently completed second fiscal quarter: approximately $807,887,000,000.

Number of shares of common stock outstanding as of February 9, 2026: 943,357,420

Portions of the Registrant's Proxy Statement for the 2026 Annual Meeting of Shareholders have been incorporated by reference into Part III of this Annual Report on Form 10-K.

**Eli Lilly and Company**

**Form 10-K**
**For the Year Ended December 31, 2025**

**Table of Contents**


| | | Page |
|---|---|---|
| Part I | | |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 25 |
| Item 1B. | Unresolved Staff Comments | 38 |
| Item 1C. | Cybersecurity | 39 |
| Item 2. | Properties | 40 |
| Item 3. | Legal Proceedings | 40 |
| Item 4. | Mine Safety Disclosures | 40 |
| Part II | | |
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 41 |
| Item 6. | [Reserved] | 43 |
| Item 7. | Management's Discussion and Analysis of Results of Operations and Financial Condition | 43 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 56 |
| Item 8. | Financial Statements and Supplementary Data | 57 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 98 |
| Item 9A. | Controls and Procedures | 98 |
| Item 9B. | Other Information | 98 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 98 |
| Part III | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance | 99 |
| Item 11. | Executive Compensation | 99 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 100 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 100 |
| Item 14. | Principal Accountant Fees and Services | 100 |
| Item 15. | Exhibits and Financial Statement Schedules | 101 |
| Item 16. | Form 10-K Summary | 102 |

## *Forward-Looking Statements*

This Annual Report on Form 10-K and our other publicly available documents include forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 (Exchange Act), and are subject to the safe harbor created thereby under the Private Securities Litigation Reform Act of 1995. Forward-looking statements include all statements that do not relate solely to historical or current facts, and generally can be identified by the use of words such as "may," "could," "aim," "seek," "believe," "will," "expect," "project," "estimate," "intend," "target," "anticipate," "plan," "continue," or similar expressions or future or conditional verbs.

Forward-looking statements inherently involve many risks and uncertainties that could cause actual results to differ from those expressed in forward-looking statements. Forward-looking statements are based on management's current plans and expectations, expressed in good faith and believed to have a reasonable basis. However, we can give no assurance that any expectation or belief will result or will be achieved or accomplished. Investors therefore should not place undue reliance on forward-looking statements. The following include some but not all of the factors that could cause actual results or events to differ from those anticipated:

- the significant costs and uncertainties in the pharmaceutical research and development process, including with respect to the timing and process of obtaining regulatory approvals and the ability of the company's clinical trials to meet expectations;
- the impact and uncertain outcome of acquisitions and business development transactions and related costs;
- intense competition affecting our products, pipeline, or industry;
- market uptake of launched products and indications;
- continued pricing pressures and the impact of actions of governmental and private actors affecting pricing of, reimbursement for, and patient access to pharmaceuticals, or reporting obligations related thereto;
- negotiation and implementation of our voluntary agreement with the U.S. government related to drug pricing and access;
- developments or uncertainties related to our or competitive products, including as may relate to safety or efficacy concerns;
- dependence on relatively few products or product classes for a significant percentage of our total revenue and a consolidated supply chain;
- the expiration of intellectual property protection for certain of our products and competition from generic and biosimilar products;
- our ability to protect and enforce patents and other intellectual property and changes in patent law or regulations related to data package exclusivity;
- information technology system inadequacies, inadequate controls or procedures, security breaches, or operating failures;
- unauthorized access, disclosure, misappropriation, or compromise of confidential information or other data stored in our information technology systems, networks, and facilities, or those of third parties with whom we share our data and violations of data protection laws or regulations;
- issues with product supply, regulatory approvals, or other negative outcomes stemming from manufacturing difficulties, disruptions, or shortages, including as a result of unpredictability and variability in demand, labor shortages, third-party performance, quality, cyber-attacks, or regulatory actions related to our and third-party facilities;
- reliance on third-party relationships and outsourcing arrangements;
- the use of artificial intelligence or other emerging technologies in various facets of our operations, including partnerships related to the use of, or the sharing of, such technologies with third parties, which may exacerbate competitive, regulatory, litigation, cybersecurity, and other risks;
- the impact of global macroeconomic conditions, including uneven economic growth or downturns or uncertainty, trade and other global disputes and interruptions, including related to tariffs, trade protection measures, and similar restrictions, international tension, conflicts, regional dependencies, or other costs, uncertainties, and risks related to engaging in business globally;
- fluctuations in foreign currency exchange rates, changes in interest rates, and inflation or deflation;

- significant and sudden declines or volatility in the trading price of our common stock and market capitalization;
- litigation, investigations, or other similar proceedings involving past, current, or future products, activities, or intellectual property;
- changes in tax law and regulation, tax rates, or events that differ from our assumptions related to tax positions;
- regulatory changes, developments, and uncertainty;
- regulatory oversight and actions regarding our operations and products;
- regulatory compliance problems or government investigations;
- risks from the proliferation of counterfeit, misbranded, adulterated, or illegally compounded products;
- actual or perceived deviation from environmental-, social-, or governance-related requirements or expectations;
- asset impairments and restructuring charges; and
- changes in accounting and reporting standards.

Investors should also carefully read the factors described under Item 1A, "Risk Factors" in this Annual Report on Form 10-K for a description of certain risks that could, among other things, cause our actual results to differ from those expressed in forward-looking statements. Investors should understand that it is not possible to predict or identify all such factors and should not consider the risks described above and under Item 1A, "Risk Factors" to be a complete statement of all potential risks and uncertainties.

All forward-looking statements speak only as of the date of this Annual Report and are expressly qualified in their entirety by the risk factors and cautionary statements included in this Annual Report. Except as is required by law, we expressly disclaim any obligation to publicly release any revisions to forward-looking statements to reflect events after the date of this Annual Report.

**Trademarks and Trade Names**

All trademarks or trade names referred to in this Annual Report on Form 10-K are the property of the company, or, to the extent trademarks or trade names belonging to other companies are referenced in this Annual Report on Form 10-K, the property of their respective owners. Solely for convenience, the trademarks and trade names in this Annual Report on Form 10-K are referred to without the ® and ™ symbols, but such references should not be construed as any indicator that the company or, to the extent applicable, their respective owners will not assert, to the fullest extent under applicable law, the company’s or their rights thereto. We do not intend the use or display of other companies’ trademarks and trade names to imply a relationship with, or endorsement or sponsorship of us by, any other companies.

# Part I

***Item 1. Business***

Eli Lilly and Company (referred to as the company, Lilly, we, or us) was incorporated in 1901 in Indiana to succeed to the drug manufacturing business founded in Indianapolis, Indiana, in 1876 by Colonel Eli Lilly. We discover, develop, manufacture, and market products in a single business segment—human pharmaceutical products.

Our purpose is to unite caring with discovery to create medicines that make life better for people around the world. Our long-term success depends on our ability to continually discover or acquire, develop, and commercialize innovative medicines.

We manufacture and distribute our products through facilities in the United States (U.S.), including Puerto Rico, and in Europe and Asia. Our products are sold in approximately 90 countries.

**Products**

Our products include:

| Therapeutic area | Products | Certain Indications |
|---|---|---|
| Cardiometabolic Health products | *Basaglar* | In collaboration with Boehringer Ingelheim, a long-acting human insulin analog for the treatment of diabetes. |
| | *Humalog, Humalog Mix 75/25, Humalog U-100, Humalog U-200, Humalog Mix 50/50, insulin lispro, insulin lispro protamine, and insulin lispro mix 75/25* | Human insulin analogs for the treatment of diabetes. |
| | *Humulin*, *Humulin 70/30, Humulin N, Humulin R,* and *Humulin U-500* | Human insulins of recombinant DNA origin for the treatment of diabetes. |
| | *Jardiance* | In collaboration with Boehringer Ingelheim, for the treatment of type 2 diabetes; to reduce the risk of cardiovascular death in adult patients with type 2 diabetes and established cardiovascular disease; to reduce the risk of cardiovascular death and hospitalizations for heart failure in adults; and to reduce the risk of sustained decline in estimated glomerular filtration rate (eGFR), end-stage kidney disease, cardiovascular death and hospitalization in adults with chronic kidney disease (CKD) at risk of progression. |
| | *Mounjaro* | A glucose-dependent insulinotropic polypeptide and glucagon-like peptide-1 receptor agonist, for the treatment of adults with type 2 diabetes in combination with diet and exercise to improve glycemic control. |
| | *Trulicity* | For the treatment of type 2 diabetes in adults and pediatric patients 10 years of age and older; and to reduce the risk of major adverse cardiovascular events in adult patients with type 2 diabetes and established cardiovascular disease or multiple cardiovascular risk factors. |
| | *Zepbound* | For the treatment of adults with obesity or overweight with at least one weight-related comorbid condition in combination with a reduced-calorie diet and increased physical activity; and for the treatment of moderate to severe obstructive sleep apnea in adults with obesity in combination with a reduced-calorie diet and increased physical activity (relevant indications marketed under Mounjaro in various markets outside the U.S.). |

| Therapeutic area | Products | Certain Indications |
|---|---|---|
| Oncology products | *Cyramza* | For use as monotherapy or in combination with another agent as a second-line treatment of advanced or metastatic gastric cancer or gastro-esophageal junction adenocarcinoma; in combination with another agent as a second-line treatment of metastatic non-small cell lung cancer (NSCLC); in combination with another agent as a second-line treatment of metastatic colorectal cancer; as a monotherapy as a second-line treatment of hepatocellular carcinoma; and in combination with another agent as a first-line treatment of adult patients with metastatic NSCLC with activating epidermal growth factor receptor (EGFR) mutations. |
| | *Erbitux* | Indicated both as monotherapy and in combination with another agent for the treatment of certain types of colorectal cancers; and as monotherapy, in combination with chemotherapy, or in combination with radiation therapy for the treatment of certain types of head and neck cancers. |
| | *Inluriyo* | For the treatment of adults with ER-positive HER2-negative, ESR1-mutated advanced or metastatic breast cancer whose disease progressed after at least one line of endocrine therapy. |
| | *Jaypirca* | For the treatment of adult patients with relapsed or refractory chronic lymphocytic leukemia or small lymphocytic lymphoma (CLL/SLL) who have previously been treated with a covalent BTK inhibitor; and for the treatment of adult patients with relapsed or refractory mantle cell lymphoma (MCL) after at least two lines of systemic therapy, including a BTK inhibitor. |
| | *Retevmo* | For the treatment of metastatic NSCLC with a rearranged during transfection (RET) gene fusion in adult patients; for the treatment of advanced metastatic medullary thyroid cancer with a RET mutation who require systemic therapy in adult and pediatric patients; for the treatment of advanced or metastatic thyroid cancer with a RET gene fusion in adult and pediatric patients who require systemic therapy and are radioactive iodine-refractory; and for the treatment of adult patients with locally advanced or metastatic solid tumors with a RET gene fusion who have progressed on or following prior systemic treatment or who have no satisfactory alternative treatment options. |
| | *Tyvyt* | In collaboration with Innovent Biologics, Inc., for the treatment of relapsed or refractory classic Hodgkin's lymphoma; for the first-line treatment of non-squamous NSCLC in combination with Alimta and another agent; for the first-line treatment of squamous NSCLC in combination with two other agents; for the first-line treatment of hepatocellular carcinoma in combination with another agent; for the first-line treatment of esophageal squamous cell carcinoma in combination with certain other agents; for the first-line treatment of gastric cancer in combination with two other agents; and, in combination with two other agents, for patients with EGFR-mutated non-squamous NSCLC that progressed after EGFR-tyrosine kinase inhibitor therapy, each in China. |
| | *Verzenio* | For use as monotherapy or in combination with endocrine therapy for the treatment of HR+, HER2- metastatic breast cancer, and in combination with endocrine therapy for treatment of HR+, HER2-, node positive, early breast cancer at high risk of recurrence. |

| Therapeutic area | Products | Certain Indications |
|---|---|---|
| Immunology products | *Ebglyss* | For the treatment of adult and adolescent patients 12 years or older with moderate to severe atopic dermatitis (in Europe, in collaboration with Almirall S.A.). |
| | *Olumiant* | In collaboration with Incyte Corporation, for the treatment of adults with moderately to severely active rheumatoid arthritis after treatment with one or more tumor necrosis factor (TNF) blockers that did not work well enough or could not be tolerated; moderate to severe atopic dermatitis; severe alopecia areata; and for the treatment of hospitalized adults with COVID-19 who require supplemental oxygen, mechanical ventilation, or extracorporeal membrane oxygenation. |
| | *Omvoh* | For the treatment of moderately to severely active ulcerative colitis in adults and for the treatment of moderately to severely active Crohn's disease in adults. |
| | *Taltz* | For the treatment of adults and pediatric patients aged 6 years or older with moderate to severe plaque psoriasis; adults with active psoriatic arthritis; adults with ankylosing spondylitis; and adults with active non-radiographic axial spondyloarthritis. |
| Neuroscience products | *Emgality* | For migraine prevention and the treatment of episodic cluster headache in adults. |
| | *Kisunla* | For adults with early symptomatic Alzheimer's disease with confirmed amyloid pathology and with mild cognitive impairment or mild dementia stage of disease. |

**Marketing and Distribution**

We sell most of our products worldwide. We adapt our marketing methods and product emphasis in various countries to meet local customer needs and comply with local regulations.

The products we market and their distribution vary from country to country depending on the market and applicable regulations. As applicable, we educate healthcare providers about our products in various ways, including via promotion in online and other channels, distributing information and samples of certain products to physicians, and exhibiting at medical meetings. In addition, we advertise certain products directly to consumers in the U.S., and we maintain websites and other media channels (e.g., social media) with information about our major products. Promotion of our major products in the U.S. includes engagement by employee or contracted sales representatives with physicians and other healthcare professionals.

Our account managers service wholesalers, pharmacy benefit managers, insurers, plan sponsors, employers, managed care organizations, group purchasing organizations, government and long-term care institutions, hospitals, and certain retail pharmacies. Our arrangements with these organizations often include discounts or rebates on our products.

In the U.S., most of our products are distributed through wholesalers that serve pharmacies, physicians and other healthcare professionals, and hospitals. In 2025, 2024, and 2023, three wholesale distributors in the U.S.—McKesson Corporation, Cencora, Inc., and Cardinal Health, Inc.—each accounted for a significant percentage of our consolidated revenue. No other customer accounted for more than 10 percent of our consolidated revenue in any of these years. For additional information, see Item 8, "Financial Statements and Supplementary Data—Note 2: Revenue."

In certain jurisdictions, we utilize LillyDirect, our direct-to-patient digital health care platform, to provide delivery of select Lilly medicines dispensed by third-party pharmacies to patients. Tools to help patients access care from independent healthcare providers and programs to assist patients in adhering to treatment plans are also available on the platform where applicable. Sales through LillyDirect represented a growing portion of our business in 2025 and we have launched, and continue to explore, new partnerships and tools, including through LillyDirect, to further expand access to our medicines. New initiatives may expose us to new risks or exacerbate existing risks. See, for examples, Item 1A, "Risk Factors—Risks Related to Our Operations—Failure, inadequacy, breach of, or unauthorized access to, our IT systems or those of our third-party service providers, unauthorized access to our confidential information, or violations of data protection laws, could result in material harm to our business and reputation" and "Risk Factors—Risks Related to Litigation and Government Regulation—Regulatory compliance problems could be damaging to the company."

Outside the U.S., we promote our products to healthcare providers through sales representatives and other channels. We maintain our own sales organizations in many countries. We also often utilize third parties for commercial sales operations, some of which are engaged through distribution and promotion arrangements. We provide disease-state information directly to consumers via websites, social channels, and local activations.

Certain of our products are marketed in arrangements with other pharmaceutical companies.

For additional information, see Item 8, "Financial Statements and Supplementary Data—Note 3: Collaborations and Other Arrangements."

**Competition**

Our products compete globally with many other pharmaceutical products in highly competitive markets.
Important competitive factors include effectiveness, safety, availability, ease of use, patient preference, and overall experience; formulary placement, price, payer coverage and reimbursement rates, and demonstrated cost-effectiveness; regulatory approvals; marketing effectiveness; and research and development of new products, processes, modalities, indications, and uses. Early market entry and rapid patient access can also be important to achieve product acceptance and success. Barriers to reimbursable patient access in some cases include default payer coverage restrictions for our medicines. For example, in the U.S. self-insured employers must generally opt in for coverage of anti-obesity medicines. Payers in various international markets also do not cover anti-obesity medicines for weight loss. Our anti-obesity medicines comprise a significant portion of our revenues, and barriers to reimbursable patient access impact our sales volumes, business, and results of operations.

Most new products or uses that we introduce must compete with other branded, biosimilar, or generic products already on the market or that are later developed. When new products, uses, or delivery systems with therapeutic, convenience, or cost advantages are introduced, including by developing new modalities, our existing products become subject to decreased sales volumes, progressive price reductions, or both.
We believe our long-term competitive success depends on discovering and developing or acquiring and further developing innovative, cost-effective products that provide improved outcomes for patients and deliver value to payers, and continuously improving the productivity of our operations in a highly competitive and global environment. We face intensifying competition worldwide, including from China and other markets that have significantly expanded and accelerated research and development capabilities. Companies in these markets are increasingly licensing products to multinational pharmaceutical companies, entering into strategic partnerships, and competing directly in major markets. Our ability to compete effectively depends on our capacity to innovate at the pace of global scientific advancement, to access innovation through strategic partnerships and licensing arrangements across geographies, and to efficiently bring differentiated products to market. There can be no assurance that our efforts will result in commercially successful products, and it is possible that our products or indications will be, or will become, uncompetitive from time to time. See also "—Competition—U.S. Private Sector Dynamics."

**Generic Pharmaceuticals and Biosimilars**

Generic pharmaceuticals and biosimilars can pose major competitive challenges to our business. In most major jurisdictions, the regulatory approval process for pharmaceuticals (other than biological products (biologics)) exempts generics from costly and time-consuming clinical trials to demonstrate their safety and efficacy, allowing generic manufacturers to rely on the safety and efficacy of the innovator product. As a result, generic manufacturers generally invest far fewer resources in research and development than we do for our branded products and can price their products significantly lower than branded products. Accordingly, when a branded non-biologic pharmaceutical loses its market exclusivity, it normally faces intense price competition from generic forms of the product, which can result in the loss of a significant portion of the branded product's revenue in a very short period of time. Loss of market exclusivity for competitive products may also shift market conditions for other branded products in the same therapeutic class. Moreover, governments in some countries leverage generic entrants to drive price concessions through the utilization of volume-based procurement bidding and other measures.

Further, public and private payers typically encourage the use of generics as alternatives to branded products. Laws in the U.S. generally allow, and in many cases require, pharmacists to substitute generics that have been rated under government procedures to be essentially equivalent to a branded product. Where substitution is mandatory, it must be made unless the prescribing physician expressly forbids it. In certain countries, intellectual property protection is weak, and we must compete with generic versions of our products at or relatively shortly after launch.

In addition, competition for our biologics, which constitute a substantial portion of our products and pipeline, may be affected by the approval of follow-on biologics, also known as biosimilars. A biosimilar is a subsequent version of an approved innovator biologic that, due to its analytical and clinical similarity to the innovator biologic, may be approved based on an abbreviated data package that relies in part on the full testing required of the innovator biologic.

Globally, most governments have developed abbreviated regulatory pathways to approve biosimilars as follow-ons to innovator biologics, including the Biologics Price Competition and Innovation Act of 2009 (the BPCIA) in the U.S. A number of biosimilars have been licensed under the BPCIA, as well as in Europe and Japan. Regulatory interpretation of important aspects of the laws regulating biosimilars continues to evolve. In the U.S., for example, the U.S. Food and Drug Administration (FDA) has proposed changes in policy that could streamline the process of, and accelerate the timeline for, biosimilar development, including potentially minimizing the requirement for comparative clinical efficacy studies. The impact of these laws and guidance on our business remains subject to substantial uncertainty.

**Compounding**

We continue to see the production, marketing, and sale of counterfeit, misbranded, adulterated, and mass-compounded incretins in the U.S. and other markets. These practices may impact patient safety, undermine regulatory drug approval processes, and present market risks. If inadequately regulated, these practices could materially impact our business and reputation, including by creating consumer confusion or misperceptions about the safety and efficacy of our genuine products, diversion of potential sales, and potential net price erosion for our products. See "—Government Regulation of Our Operations and Products," for additional information on market risks related to counterfeit, misbranded, adulterated, and mass-compounded medicines.

**U.S. Private Sector Dynamics**

In the U.S. private sector, consolidated and integrated healthcare organizations significantly affect the competitive marketplace for pharmaceuticals. Health plans, managed care organizations, pharmacy benefit managers, wholesalers, pharmacies, and other supply chain entities have consolidated into fewer, larger entities, thus enhancing their market power and importance. Private third-party insurers, as well as governments, typically maintain formularies that specify coverage (the conditions under which drugs are included on a plan's formulary) and reimbursement (the associated out-of-pocket cost to the consumer) to control costs by negotiating discounts or rebates in exchange for formulary inclusion and placement.

Unfavorable formulary placement can lead to reduced usage of a product for the relevant patient population due to coverage restrictions, such as prior authorizations and formulary exclusions, or due to reimbursement limitations that result in higher consumer out-of-pocket cost, such as non-preferred co-pay tiers, increased co-insurance levels, and higher deductibles. Consequently, pharmaceutical companies face increased pressure in negotiations, and compete fiercely for formulary placement, not only on the basis of product attributes such as efficacy, safety profile, or patient ease of use, but also by providing rebates or other concessions. As payers and pharmaceutical companies continue to negotiate formulary placement and rebates, value-based agreements, where rebates may be based on achievement (or not) of specified outcomes, are another prevalent tool. Rebates and net cost are important factors in formulary decisions, particularly in treatment areas in which the payer has taken the position that multiple branded products are therapeutically comparable. These pressures have negatively affected, and could continue to negatively affect, our consolidated results of operations. In addition to formulary placement, changes in insurance designs continue to drive greater consumer cost-sharing through high deductible plans, higher co-insurance, or co-pays, including increased utilization of co-pay accumulator adjustment or maximization programs. Supply chain entities have also increasingly imposed utilization management tools to favor the use of generic products or otherwise limit access to our products. In response to these issues, we are developing and deploying alternative product access strategies, including through direct-to-patient channels (such as LillyDirect) and direct-to-employer channels. These strategies may not adequately mitigate unfavorable private sector dynamics. For additional information on pricing and reimbursement for our pharmaceutical products, see "—Regulations and Private Payer Actions Affecting Pharmaceutical Pricing, Reimbursement, and Access—U.S."

**Patents, Trademarks, and Other Intellectual Property Rights**

**Overview**

Intellectual property protection is critical to our ability to successfully commercialize our life sciences innovations and invest in the search for new medicines and uses. Loss of effective patent protection for pharmaceuticals can result in the loss of effective market exclusivity for the product, often leading to a severe and rapid decline in revenues for the product. We own, have applied for, or are licensed under, a large number of patents in the U.S. and many other countries relating to products, product uses, formulations, and manufacturing processes. In addition, for some products we have effective intellectual property protection in the form of data protection under pharmaceutical regulatory laws.

The patent protection generally anticipated to be of most relevance to pharmaceuticals is provided by patents claiming the active ingredient (the compound patent) for our products, particularly those in major markets such as the U.S., major European countries, and Japan. In general, patents in each relevant country last for a period of 20 years from their filing date, which is often years prior to the launch of a commercial product. Further patent term adjustments and restorations may extend the original patent term:

- Patent term adjustment is available to all U.S. patent applicants to provide relief in the event that a patent grant is delayed during examination by the U.S. Patent and Trademark Office (USPTO).
- Patent term extension for a single patent for a pharmaceutical product is provided to U.S. patent holders to compensate for a portion of the time invested in clinical trials and the FDA review process. There is a five-year cap on any restoration, and no patent's expiration date may be extended beyond 14 years from initial FDA approval. Some countries outside the U.S. similarly offer forms of patent term restoration. For example, Supplementary Protection Certificates are available to extend the life of a European patent up to an additional five years (subject to a 15-year cap from European Medicines Agency (EMA) approval) and in Japan patent terms can be extended up to five years.

In some cases, the innovator company may retain exclusivity despite approval of the generic, biosimilar, or other follow-on versions of a new medicine beyond the expiration of the compound patent through market dynamics and challenges, later-expiring patents on, for example, manufacturing processes, methods of use or formulations, or data protection that may be available under pharmaceutical regulatory laws. The primary forms of data protection are as follows:

- Data package protection generally prohibits regulatory approval of other manufacturers' applications for marketing approval if they rely on the innovator company's regulatory submission data for the drug. The base period is generally five years in the U.S. (12 years for new biologics under the BPCIA, subject to certain conditions), effectively 10 years in Europe, and eight years in Japan, which can be extended to 10 years with qualifying pediatric studies. The period begins on the date of product approval and runs concurrently with the patent term for any relevant patents. An agreement-in-principle, announced in December 2025 between the European Commission, Council, and Parliament, would set a base level of 8 years of data protection, with additional incentives conditional on certain requirements, while overall reducing the maximum protection available by one year.
- In the U.S., the FDA has the authority to grant additional data protection for approved drugs where the sponsor conducts specified testing in pediatric populations within a specified time period. If granted, this "pediatric exclusivity" provides an additional six months of exclusivity, which is added to the end of any other unexpired exclusivity and, for products other than biologics, to the end of certain unexpired patents.
- A specific use of a drug or biologic can receive "orphan" designation in the U.S. if it is intended to treat a disease or condition affecting fewer than 200,000 people in the U.S., or where it is not reasonably expected to recover development and marketing costs through U.S. sales. Orphan designation entitles a particular use of the drug to seven years of market exclusivity, which runs in parallel with any applicable patents.

Outside the major markets, the adequacy and effectiveness of intellectual property protection for pharmaceuticals vary widely. International and U.S. free trade agreements like the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPs Agreement) administered by the World Trade Organization provide global protection of certain intellectual property rights. But in a number of markets we are unable to patent our products or to enforce the patents that we receive for our products. Further, many developing countries, and some developed countries, do not provide effective data package protection even though it is specified in the TRIPs Agreement. For more information on risks to the adequacy and effectiveness of our intellectual property, see Item 1A, "Risk Factors—Risks Related to Our Intellectual Property—Our long-term success depends on intellectual property protection; if our intellectual property rights are invalidated, circumvented, or weakened, our business will be adversely affected."

**Our Intellectual Property Portfolio**

We consider intellectual property protection for certain products, processes, uses, and formulations to be important to our business. In addition to the patents and data protection identified below, we may hold patents on manufacturing processes, formulations, devices, or uses that provide protection beyond the estimated dates shown below. For approved products, estimated dates include, where applicable, pending or granted patent term extensions. Where granted, estimated dates for approved products also reflect pediatric or orphan drug exclusivity. The length of market exclusivity for our products can be difficult to predict with certainty because of the complex interaction between patent and regulatory forms of exclusivity and the inherent uncertainties regarding patent litigation. There can be no assurance that a particular product will maintain market exclusivity for the duration of the estimated expiry or that exclusivity will be limited to that time frame.

The relevant patent protection or data protection and associated expiry dates for our major or recently launched patent-protected marketed products are as follows:

| Therapeutic Area | Product | Protection | Territory | Estimated Expiry Date |
|---|---|---|---|---|
| Cardiometabolic Health products | Jardiance* | compound patent | U.S. | 2029 |
| | | | major European countries | 2029 |
| | | | Japan | 2030 |
| | Mounjaro/Zepbound | compound patent | U.S. | 2036 |
| | | | major European countries | 2037 |
| | | | Japan | 2040 |
| | | data protection | U.S. | 2027 |
| | | | major European countries | 2033 |
| | | | Japan | 2030 |
| | Trulicity | compound patent | U.S. | 2027 |
| | | | major European countries | 2029 |
| | | | Japan | 2029 |
| | | biologics data protection | U.S. | 2027 |
| Oncology products | Cyramza | compound patent | U.S. | 2026 |
| | | | major European countries | 2028 |
| | | | Japan | 2026 |
| | | biologics data protection | U.S. | 2026 |
| | Inluriyo | compound patent | U.S. | 2039 |
| | | | major European countries | 2039 |
| | | | Japan | 2039 |
| | | data protection | U.S. | 2030 |
| | | | major European countries | 2036 |
| | | | Japan | 2033 |
| | Jaypirca | compound patent | U.S. | 2037 |
| | | | major European countries | 2038 |
| | | | Japan | 2040 |
| | | data protection | U.S. | 2028 |
| | | | major European countries | 2033 |
| | | | Japan | 2032 |

| Therapeutic Area | Product | Protection | Territory | Estimated Expiry Date |
|---|---|---|---|---|
| Oncology products | Retevmo | compound patent | U.S. | 2038 |
| | | | major European countries | 2037 |
| | | | Japan | 2038 |
| | | data protection | U.S. | 2025 |
| | | | major European countries | 2031 |
| | | | Japan | 2031 |
| | Verzenio | compound patent | U.S. | 2031 |
| | | | major European countries | 2033 |
| | | | Japan | 2034 |
| | | data protection | major European countries | 2028 |
| | | | Japan | 2026 |
| Immunology products | Ebglyss | compound patent | U.S. | 2026 |
| | | | Japan | 2029 |
| | | biologics data protection | U.S. | 2036 |
| | | data protection | major European countries | 2033 |
| | | | Japan | 2034 |
| | Olumiant | compound patent | U.S. | 2032 |
| | | | major European countries | 2032 |
| | | | Japan | 2033 |
| | | data protection | major European countries | 2027 |
| | | | Japan | 2025 |
| | Omvoh | compound patent | U.S. | 2037 |
| | | | major European countries | 2038 |
| | | | Japan | 2039 |
| | | biologics data protection | U.S. | 2035 |
| | | data protection | major European countries | 2033 |
| | | | Japan | 2033 |
| | Taltz | compound patent | U.S. | 2030 |
| | | | major European countries | 2031 |
| | | | Japan | 2030 |
| | | biologics data protection | U.S. | 2028 |
| | | data protection | major European countries | 2027 |

| Therapeutic Area | Product | Protection | Territory | Estimated Expiry Date |
|---|---|---|---|---|
| Neuroscience products | Emgality | compound patent | U.S. | 2033 |
| | | | major European countries | 2033 |
| | | | Japan | 2035 |
| | | biologics data protection | U.S. | 2030 |
| | | data protection | major European countries | 2028 |
| | | | Japan | 2029 |
| | Kisunla | compound patent | U.S. | 2036 |
| | | | major European countries | 2036 |
| | | | Japan | 2036 |
| | | biologics data protection | U.S. | 2036 |
| | | data protection | major European countries | 2035 |
| | | | Japan | 2032 |

* Jardiance is part of our Boehringer Ingelheim collaboration. In the U.S., Jardiance includes the related combination product, Glyxambi. See Item 8, "Financial Statements and Supplementary Data—Note 3: Collaborations and Other Arrangements".

The following product candidates are the most relevant that are currently under regulatory review. Upon approval, we expect relevant compound patent and data protections to apply:

- Insulin efsitora alfa has been submitted for regulatory review in the U.S., the EU, and Japan for the treatment of type 2 diabetes.
- Orforglipron has been submitted for regulatory review in the U.S., the EU, and Japan for the treatment of obesity or overweight with at least one weight-related medical problem and in the EU for the treatment of type 2 diabetes. Orforglipron was granted a Commissioner's National Priority Voucher from the FDA, which could accelerate potential U.S. approval timing.

Worldwide, we sell all of our major products under trademarks consisting of our product names, logos, and unique product appearances that we consider in the aggregate to be important to our operations. Trademark protection varies throughout the world. Trademark protection typically extends beyond the patent and data protection for a product.

We also rely in some circumstances on trade secrets and other unpatented know-how. We seek to protect our confidential information in part through confidentiality agreements with our employees, corporate partners, collaborators, and vendors. These agreements may be breached, and we cannot be certain that we have adequate remedies. If our trade secrets or confidential information become known or are independently discovered by competitors, or if we enter into disputes over ownership of inventions, our business and results of operations could be adversely affected.

**Patent Licenses and Collaborations**

Some of our products are subject to significant license and collaboration agreements. For information on our license and collaboration agreements, see Item 8, "Financial Statements and Supplementary Data—Note 3: Collaborations and Other Arrangements."

**Patent Challenges**

In the U.S., the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Act, authorizes the FDA to approve generic versions of innovative pharmaceuticals (other than biologics) when the generic manufacturer files an Abbreviated New Drug Application (ANDA).

Absent a patent challenge, the FDA cannot approve an ANDA until after certain of the innovator's patents expire. However, after the innovator has marketed its product for four years, a generic manufacturer may file an ANDA alleging that the patent(s) listed in the innovator's New Drug Application (NDA) are invalid, unenforceable, or not infringed.

Generic manufacturers use this process extensively to challenge patents on innovative pharmaceuticals. In addition, generic companies have shown willingness to launch "at risk" (i.e., after receiving ANDA approval) but before final resolution of their patent challenge.

Under the BPCIA, the FDA cannot approve an application for a biosimilar product until data protection expires, 12 years after initial marketing approval of the innovator biologic, and an application may not be submitted until four years following the date the innovator biologic was first approved. However, the BPCIA does provide a mechanism for a prospective biosimilar competitor to challenge the validity of an innovator's patents as early as four years after initial marketing approval of the innovator biologic.

The patent litigation scheme under the BPCIA, and the BPCIA itself, is complex and continues to be interpreted and implemented by the FDA, as well as by courts. Courts have held that biosimilar applicants are not required to engage in the BPCIA patent litigation scheme and patent holders retain the right to bring suit under normal patent law procedures if a biosimilar applicant attempts to commercialize a product prior to patent expiration. In addition, there is a procedure in U.S. patent law, known as inter partes review (IPR), which allows any member of the public to file a petition with the USPTO seeking the review of any issued U.S. patent for validity. IPRs are conducted before Administrative Patent Judges in the USPTO using a lower standard of proof than used in federal district court and challenged patents are not accorded the presumption of validity. Generic drug companies and even some investment firms have engaged in the IPR process in attempts to invalidate our patents. In recent years, U.S. government officials have proposed the exercise of "march-in-rights" and various other measures that, if enacted, could have a negative impact on our patent rights. We cannot predict the likelihood that these or similar proposals will be adopted, but, if adopted, our business and results of operations could be adversely affected.

Outside the U.S., the legal doctrines and processes by which pharmaceutical patents can be challenged vary widely. In recent years, we have experienced an increase in patent challenges from generic manufacturers in many countries outside the U.S.

For more information on patent challenges and litigation involving our intellectual property rights, see Item 1A, "Risk Factors—Risks Related to Our Intellectual Property—Our long-term success depends on intellectual property protection; if our intellectual property rights are invalidated, circumvented, or weakened, our business will be adversely affected" and Item 8, "Financial Statements and Supplementary Data—Note 16: Contingencies."

**Government Regulation of Our Operations and Products**

Our operations are regulated extensively by numerous government agencies. The lengthy process of laboratory and clinical testing, data analysis, manufacturing development, and regulatory review necessary for governmental approvals of our products is extremely costly and can significantly delay product introductions and revenue generation. In addition, our operations are subject to complex federal, state, local, and foreign laws and regulations concerning relationships with healthcare providers and suppliers, pricing and reimbursement for our products, the environment, occupational health and safety, data privacy and security, and other matters. Evolving regulatory priorities have intensified governmental scrutiny of our operations and those of other healthcare intermediaries, including with respect to current Good Manufacturing Practices (cGMP), quality assurance, marketing, and similar regulations. U.S. and other authorities are actively proposing, enacting, and pursuing numerous policy, regulatory, and enforcement changes that impact our business. These changes create additional uncertainty for our business, while in some cases presenting new opportunities for our business. Regulatory oversight of the pharmaceutical industry entails judgment and interpretation, which can result in varying interpretations of laws and regulations by health and other authorities. Compliance with the laws and regulations affecting the manufacture and sale of our current products and the discovery, development, and introduction of new products and uses has and will continue to require substantial effort, expense, and capital investment.

Of particular importance to our business is regulation by the FDA in the U.S. Pursuant to laws and regulations that include the Federal Food, Drug, and Cosmetic Act (FDCA) and the Public Health Service Act (PHSA), the FDA exercises jurisdiction over all of our products and devices in the U.S. and administers requirements covering the testing, safety, effectiveness, manufacturing, quality control, distribution, labeling, marketing, promotion, advertising, dissemination of information, and post-marketing surveillance of those products and devices. The FDA holds broad discretion under the FDCA to interpret the conditions and evidence necessary for timely approval of and ability to market our products and devices as well as those of our competitors. The centrality to our business of the FDA and corresponding international regulators exposes us to risks of oversight, administrative, and enforcement changes, delays, inconsistencies, lapses, or failures, including as may derive from inadequate agency staffing levels, expertise, or resources.

Following approval, our products must meet, and must continue to comply with, regulation by various government and regulatory agencies in connection with labeling, import, export, sale, storage, recordkeeping, advertising, promotion, and safety reporting. We conduct extensive post-marketing surveillance of the safety of the products we sell and comply with notification requirements related to safety and efficacy, product supply, and other aspects of our products and operations. The FDA may withdraw approval of a product if compliance with regulatory requirements and standards is not maintained or if problems occur after a product reaches the market, including as may be identified through market surveillance or third-party studies involving our products. The FDA may also mandate labeling changes, post-marketing studies, or risk management programs at any point in a product's life cycle based on new safety information or as part of a labeling change to a particular class of products. In addition, the FDA strictly regulates marketing, labeling, advertising, and promotion of products to prescribers and patients. Pharmaceutical products may be promoted only for approved indications and in accordance with the provisions of the approved label. The FDA and other agencies enforce the laws and regulations prohibiting the promotion of off-label uses.

Outside the U.S., our products and operations are subject to similar regulatory requirements, notably by the EMA in the EU, the Ministry of Health, Labor and Welfare in Japan, and the National Medical Products Administration in China. Specific regulatory requirements vary from country to country. Regulatory and compliance requirements, as well as approval processes outside the U.S., differ from those in the U.S. and may involve additional costs, uncertainties, and risks.

The FDA and other regulatory agencies outside the U.S. extensively regulate all aspects of manufacturing quality for pharmaceuticals under their cGMP regulations. Regulators assess compliance with these regulations by inspecting the equipment, facilities, laboratories, and processes used in the manufacturing and testing of our products prior to marketing approval with periodic reinspection thereafter; this may include inspection of our third-party business partners. We make substantial investments of capital and operating expenses to implement comprehensive, company-wide quality systems and controls in our manufacturing, product development, and process development operations in an effort to maintain sustained compliance with cGMP and other regulations. Nonetheless, manufacturing quality and other aspects of pharmaceutical regulatory compliance are heavily scrutinized and result in government investigations, regulatory and legal actions, product recalls and seizures, fines and penalties, interruption of production leading to product shortages, import bans or denials of import certifications, delays or denials in new product approvals, line extensions or supplemental approvals of current products pending resolution of any issues, any of which have and could in the future adversely affect our business and reputation. Certain of our products, devices and components are manufactured by third parties, and their failure to comply with these regulations has affected and could in the future adversely affect us, including through failure to supply product to us or delays in approvals of new products or indications. Any determination by the FDA or other regulatory authority of manufacturing or other deficiencies could adversely affect our business and reputation. For more information on product regulation challenges, see Item 1A, "Risk Factors—Risks Related to Our Operations—Reliance on third-party relationships and outsourcing arrangements could adversely affect our business."

We rely on the FDA and other regulatory bodies for appropriate oversight, administration, and enforcement of our industry, anyone marketing or purporting to market medicines, and public health. We continue to see the production, marketing, and sale of counterfeit, misbranded, adulterated, and mass-compounded incretins in the U.S. and other markets. In the U.S., these activities include mass compounding based on asserted reliance on regulatory exceptions that permit limited compounding in certain circumstances by certain entities. In contrast to the strict regulation of our facilities and manufacturing practices, these actors have experienced low barriers to entry and a relative lack of regulatory oversight and enforcement. These practices may impact patient safety and undermine regulatory drug approval processes. If inadequately regulated, these practices could materially impact our business and reputation, including by creating consumer confusion or misperceptions about the safety and efficacy of our genuine products, diversion of potential sales and potential net price erosion for our products.

**Other Laws and Regulations**

The marketing, promotional, and pricing practices of pharmaceutical manufacturers, as well as the manner in which manufacturers interact with purchasers, prescribers, and patients, are subject to various other U.S. federal and state laws, as well as analogous foreign laws and regulations, including the federal anti-kickback statute, the False Claims Act, antitrust laws, and state laws governing kickbacks, false claims, unfair trade practices, and consumer protection. These laws are administered by, among others, the Department of Justice, the Office of Inspector General of the U.S. Department of Health and Human Services (HHS), the Federal Trade Commission, the Office of Personnel Management, and state attorneys general. State, federal, and foreign governments, agencies, and other regulatory bodies are active in their oversight, enforcement activities, and coordination with respect to pharmaceutical companies, which has resulted in scrutiny, litigation costs, corporate criminal sanctions, and substantial civil settlements in the pharmaceutical industry.

The U.S. Foreign Corrupt Practices Act of 1977 (FCPA) prohibits certain individuals and entities, including U.S. publicly traded companies, from promising, offering, or giving anything of value to foreign officials with the corrupt intent of influencing the foreign official for the purpose of helping the company obtain or retain business or gain any improper advantage. The FCPA also imposes specific recordkeeping and internal controls requirements on U.S. publicly traded companies. As noted above, our business is heavily regulated and therefore involves significant interaction with officials outside the U.S. Additionally, in many countries outside the U.S., healthcare providers who prescribe pharmaceuticals may be employed by the government and purchasers of pharmaceuticals are government entities; therefore, our interactions with these prescribers and purchasers are subject to regulation under the FCPA.

Various other jurisdictions in which we operate and supply our products have laws and regulations aimed at preventing and penalizing corrupt and anticompetitive behavior, including the proposed EU Anti-Corruption Directive, which is expected to be adopted in 2026.

We are, and could in the future become, subject to administrative and legal proceedings and actions, which could include claims for civil damages and penalties (including treble damages), criminal sanctions, and administrative remedies, including exclusion from participation in government healthcare programs. It is possible that an adverse outcome in future actions could have a material adverse impact on our consolidated results of operations, liquidity, and financial position in any given period.

We are also subject to a variety of federal, state, local, and foreign environmental, health and safety, and other laws and regulations that may affect our research, development, or production efforts.

**Regulations and Private Payer Actions Affecting Pharmaceutical Pricing, Reimbursement, and Access**

**U.S.**

There continues to be considerable public and government scrutiny of pharmaceutical pricing, reimbursement, and access. In addition, U.S. government actions to reduce federal spending on entitlement programs, including Medicare and Medicaid, affects reimbursement for our products or services associated with the provision of our products.

In November 2025, we announced preliminary voluntary agreements with the U.S. government in which, among other arrangements, we agreed to implement measures to lower Medicaid and certain other drug prices for U.S. patients and to launch new medicines with a more balanced pricing approach across developed nations. As part of these agreements, we expect Medicare beneficiaries will have access to discounted Lilly obesity medicines by July 1, 2026, and States will have the option to expand access to these discounted medicines through Medicaid. We will also participate in a government direct-to-patient purchasing platform that will direct people in the U.S. to offerings to purchase certain medicines from us at significant discounts to current list prices. The preliminary agreements also provide a three-year grace period during which time our products under a Section 232 investigation will not face tariffs, provided that we meet U.S. manufacturing investment commitments. We are currently in the process of negotiating definitive agreements to implement these arrangements.

In 2022, the U.S. government enacted the Inflation Reduction Act of 2022 (IRA). Among other measures, the IRA requires HHS to effectively set prices for certain single-source drugs and biologics reimbursed under Medicare Part B and Part D. Currently, these government prices generally apply beginning at nine years (for medicines approved under a New Drug Application) or thirteen years (for medicines approved under a Biologics License Application) following FDA approval or licensure for the molecule and are set at a price that generally represents a significant discount from existing list prices to wholesalers and direct purchasers. While the law specifies a maximum price that HHS can set, it does not set a minimum price. The Medicare price HHS determines may impact the product’s best price determination under the Medicaid Drug Rebate Program and the ceiling price

under the 340B Drug Pricing Program, potentially leading to a negative impact on both Medicaid and 340B prices. In August 2023, HHS selected Jardiance, which is part of our collaboration with Boehringer Ingelheim, as one of the first ten medicines subject to government-set prices effective in 2026. In August 2024, HHS announced the government-set prices for these medicines with Jardiance subject to a 66 percent discount compared to the 2023 U.S. calendar year list price for a 30-day supply. In January 2026, HHS selected Trulicity and Verzenio as additional medicines subject to government-set prices to be effective in 2028. Given our product portfolio, we expect additional of our significant products will be selected in future years, which would have the effect of accelerating revenue erosion prior to expiry of exclusivities. The effect of reducing prices and reimbursement for certain of our products impacts our business and consolidated results of operations.

Other IRA provisions require drug manufacturers to provide rebates for Medicare Part B and Part D medicines under certain circumstances and implemented Part D benefit redesign.

The IRA has, and will continue to, meaningfully influence our business strategies and those of our competitors. In particular, the nine-year timeline to set prices for medicines approved under a New Drug Application reduces the attractiveness of investment in small molecule innovation. The IRA can cause changes to development approach and timing and investments at-risk. The full impact of the IRA on our business and the pharmaceutical industry, including the implications to us of a competitor's product being selected for price setting, remains uncertain.

Heightened governmental scrutiny over the manner in which drug manufacturers price their marketed products and the practices of pharmacy benefit managers and other supply chain entities has also resulted in several U.S. Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to product pricing, review the relationship between pricing and manufacturer patient programs, require advance notice of list price increases, establish upper payment limits or other restrictions by drug affordability review boards, allow the importation of drugs from other countries, implement reference pricing, address pharmacy benefit manager practices, and reform government program reimbursement methodologies for drug products. Restrictive or unfavorable pricing, coverage, or reimbursement determinations for our medicines or product candidates by governments, regulatory agencies, courts, or private actors have and may continue to adversely impact our business and financial results. Additional policies, regulations, legislation, determinations, or enforcement, including those proposed or pursued by the U.S. Congress, the U.S. executive branch, state attorneys general, and regulatory authorities worldwide, could adversely impact our business and consolidated results of operations.

In the U.S., we are required to provide rebates to the federal government and state governments on their purchases of our pharmaceuticals under various federal and state healthcare programs, including the Medicaid and Medicaid Managed Care programs (a minimum of 23.1 percent plus adjustments for price increases above the consumer price index over time) and reduced prices to private entities who treat patients in certain types of healthcare facilities intended to serve low-income and uninsured patients (known as 340B covered entities). Additionally, an annual fee is imposed on pharmaceutical manufacturers and importers that sell branded prescription drugs to specified government programs, such as Medicare Part B and Part D, and Medicaid.

Changes to the 340B program or the Medicaid programs could have a material adverse impact on our business. For example, continued expansion of the 340B program and growth of entities claiming entitlement to 340B pricing, including in ways that may be inconsistent with the statutory scheme and through state laws that purport to mandate 340B sales to contract pharmacies, impacts our revenue on an increasing percentage of sales. Changes to the calculation of rebates under the Medicaid program could also increase our Medicaid rebate obligations and decrease the prices charged to 340B covered entities.

We have implemented a Contract Pharmacy Limited Distribution System applicable to sales through the 340B program, which generally limits distribution of 340B-priced product to: (i) covered entities and their child sites; or (ii) if a covered entity lacks an in-house outpatient pharmacy, a single contract pharmacy designated by a covered entity to establish a 340B bill to/ship to arrangement. Claims-level data is ordinarily required for any contract pharmacy. Our Contract Pharmacy Limited Distribution System contains certain exceptions that permit broader contract pharmacy usage, including for "penny priced" insulin products, provided that the covered entity passes through all discounts to eligible patients at the point of sale and meets other conditions. We believe our Contract Pharmacy Limited Distribution System complies with the 340B statute, but it remains subject to ongoing inquiries and litigation that could have a material impact on our business, as discussed in Item 8, "Financial Statements and Supplementary Data—Note 16: Contingencies."

Other aspects of the 340B program, including the manner in which manufacturers can offer 340B pricing, and proper definitions of "patient" and "child site" under the 340B statute, are subject to inquiries and ongoing litigation by Lilly and/or other parties, the resolution of which could impact the growth and scope of the 340B program. For example, in November 2024, Lilly sued the Health Resources and Services Administration (HRSA) over its purported rejection of Lilly’s plan to implement a cash replenishment model to make 340B pricing available to 340B covered entities, in place of the current product replenishment model. The U.S. District Court for the District of Columbia agreed with HRSA in May 2025 that the government must preapprove Lilly’s cash replenishment model, which HRSA has not done. Lilly appealed that decision to the U.S. Court of Appeals for the District of Columbia.

Furthermore, states continue to adopt laws that, among other things, expand the 340B program by purporting to compel manufacturers to sell their medicines at 340B prices to an unlimited number of contract pharmacies. Other manufacturers and trade associations continue to litigate the constitutionality of these laws in various federal courts. Some courts have concluded that such laws are unconstitutional and have preliminarily enjoined them while others have rejected those challenges.

Rebates are also negotiated in the private sector. We pay rebates to private payers that provide prescription drug benefits to seniors covered by Medicare and to private payers that provide prescription drug benefits to their customers. These rebates are affected by the introduction of competitive products and generics in the same class and ongoing competitive dynamics.

For a discussion of risks related to how we price our products, see Item 1A, "Risk Factors—Risks Related to Litigation and Government Regulation—We are party to litigation and investigations, which could adversely affect our business."

**Outside the U.S.**

Globally, public and private payers restrict access to pharmaceuticals based on assessments of comparative effectiveness and value, including through the establishment of formal health technology assessment processes. In addition, third-party organizations, including professional associations, academic institutions, and non-profit entities associated with payers, conduct and publish comparative effectiveness and cost/benefit analyses on medicines, the impact of which can influence pharmaceutical access and pricing.

In most international markets, we operate in an environment of government-mandated cost-containment programs, which may include price controls, international reference pricing, discounts and rebates, therapeutic reference pricing (to other, often generic, pharmaceutical choices), health technology assessments, regulatory hurdles, restrictions on physician prescription levels, and mandatory generic substitution. In these markets, healthcare services and the determination of pricing and reimbursement for pharmaceutical products are impacted by government control at the point of care or as the primary payer.

In December 2025 the European Commission, Council, and Parliament reached an agreement-in-principle on EU Pharmaceutical Legislation. The implementation timeline and eventual impact on patients and the overall market is currently uncertain. Budget pressures and associated cost containment measures remain a focus in the EU, among other jurisdictions. The impact of the U.S. government’s efforts to use trade or other measures to increase spending by developed countries on innovative medicines to reduce U.S. prices remains unclear. Most countries in the EU attempt to contain drug costs by engaging in some form of reference pricing in which authorities examine pre-determined internal or external markets for published prices of a product or national class of drugs. Member states also employ mandatory rebates, clawbacks, market caps, and other mechanisms to limit spending. Other measures include restricting or delaying access to pharmaceutical product reimbursement under national health insurance, and member states may condition access on the basis of a reimbursement price or completion of cost-effectiveness or other gating studies.

In Japan, our products can be subject to government-mandated annual price reductions. The government may also apply re-pricings for specific products or classes of products if certain criteria are met, including exceeding product use thresholds.

State-owned hospitals and the state insurance program account for the vast majority of drug purchases in China, impacting access-price negotiations that have intensified in recent years. China's healthcare policies aim to balance accelerating patient access to innovative medicines with cost containment objectives. To facilitate patient access in China, we seek and have secured inclusion of Mounjaro and other of our branded products on China's National Reimbursement Drug List, a list of drugs fully or partially reimbursed by China’s national basic health insurance. In exchange for broad access, these products are generally subject to negotiation of significant price concessions. China is also working to broaden its commercial health insurance offerings which have the potential

to increase patient access. China utilizes a value-based procurement program process for products that have generic substitutes. As a general matter, products that we choose to tender through this process are similarly subject to price reductions. Our business in China may be significantly impacted by the country's evolving pharmaceutical regulatory environment, including access, intellectual property protection, regulatory enforcement and compliance, and trade policies.

Governments in many emerging markets are also focused on limiting health care costs and have enacted price controls and measures impacting intellectual property. Reforms, initiatives, and other actions in our product markets, including those that may stem from political initiatives, periods of uneven economic growth or downturns or uncertainty, or as a result of inflation or deflation, trade and other global disputes and interruptions including related to tariffs, trade protection measures, and similar restrictions, the emergence, or escalation of, and responses to, international tension and conflicts, or government budgeting priorities, are expected to continue to result in added pressure on pricing, access, and reimbursement for our products.

The outcome of our preliminary agreements with the U.S. government and broader U.S. policy efforts to align domestic pharmaceutical pricing with international benchmarks from countries with competing healthcare cost containment priorities is uncertain and could impact our pricing strategies, product demand or access, or competitive positioning across global markets, and may result in reduced revenue in certain markets.

Moreover, we cannot predict the extent to which our business may be affected by current or potential future legislative, regulatory, or private actor developments. However, in general we expect to see continued focus on regulating pricing, resulting in additional state, federal, and international legislative and regulatory developments that could have negative effects on pricing, access, and reimbursement for our products as well as overall operations.

See Item 7, "Management's Discussion and Analysis—Executive Overview—Other Matters—Trends Affecting Pharmaceutical Pricing, Reimbursement, and Access and Certain Other Regulatory Developments," for additional information regarding recent legislative, administrative, and other pricing initiatives and their impact on our results.

**Research and Development**

Our commitment to research and development dates back nearly 150 years. We invest heavily in research and development because we believe it is critical to our long-term competitiveness. At the end of 2025, we employed approximately 12,000 people in pharmaceutical research and development activities, including a substantial number of physicians, scientists holding graduate or postgraduate degrees, and highly skilled technical personnel.

Our internal pharmaceutical research focuses primarily on the areas of cardiometabolic health, immunology, neuroscience, and oncology. In addition to discovering and developing new medicines, we seek to expand the value of existing products through new uses, formulations, and therapeutic approaches, including complementary delivery devices or diagnostic tools, that can provide additional value to patients.

To supplement our internal efforts, we collaborate with others, including academic institutions and research-based pharmaceutical and biotechnology companies. We use the services of physicians, hospitals, medical schools, and other organizations worldwide to conduct clinical trials to establish the safety and effectiveness of our medicines. We also invest in external research and technologies that we believe complement and strengthen our own efforts. These investments can take many forms, including, among others, licensing arrangements, co-development agreements, co-promotion arrangements, joint ventures, acquisitions, and equity investments.

Pharmaceutical development is time-consuming, expensive, and risky. Very few of the candidates discovered by researchers ultimately become approved medicines. The process from discovery to regulatory approval can take over a decade. Candidates can fail at any stage of the process, and even late-stage candidates sometimes fail to receive regulatory approval or achieve commercial success. In addition, novel modalities can present more challenging or lengthy development timelines. The following describes in more detail the research and development process for pharmaceutical products:

**Phases of New Drug Development**

- **Discovery Phase**

  In the discovery phase, scientists identify, design, and synthesize promising candidates by analyzing their effect on biological targets considered to play a role in disease. Targets are often unproven and only candidates that are expected to have the desired effect on the target and meet other design criteria move to the next phase of development, which includes the initiation of studies in animals to support regulatory and safety requirements for clinical research in humans. The discovery phase can take years and the probability of any one candidate becoming a medicine is extremely low.

- **Early Development Phase**

  Early development includes initial testing for safety and efficacy and early analyses of manufacturing requirements. Safety testing is initially performed in laboratory tests and animals, as necessary. In general, the first human tests (often referred to as Phase 1) are conducted in small groups of participants to assess safety and evaluate the potential dosing range. Subsequently, larger populations of patients are studied (Phase 2) to identify signs of efficacy while continuing to assess safety. In parallel, scientists work to identify safe, effective, and economical manufacturing processes. Long-term animal studies may continue to test for potential safety issues. Of the candidates that enter the early development phase, only a fraction move to the late development phase. The early development phase varies but can take several years to complete.

- **Late Development Phase**

  Late phase development projects (typically Phase 3) have met initial safety requirements and shown initial evidence of efficacy in earlier studies. As a result, these candidates generally have a higher likelihood of success as compared to earlier stage candidates, and trials include larger patient populations to demonstrate safety and efficacy of the candidate in treating the disease. These studies are designed to demonstrate the benefit and risk of the potential new medicine and may be compared to competitive therapies, placebo, or both. Phase 3 studies are generally conducted globally, are costly, and are designed to support regulatory filings for marketing approval. The duration of Phase 3 testing varies by disease and may take years.

- **Submission Phase**

  Once a potential new medicine is submitted to regulatory agencies, the time to final marketing approval can vary from months to several years, depending on the disease state, the strength and complexity of available data, the degree of unmet need, and the time required for the regulatory agency(ies) to evaluate the submission, which can depend on prioritization by regulators and other factors. There is no guarantee that a potential medicine will receive marketing approval, or that decisions on marketing approvals or indications will be consistent across geographic areas.

See Item 7, "Management's Discussion and Analysis—Executive Overview—Clinical Development Pipeline," for more details about our current product pipeline.

**Raw Materials and Product Supply**

Most of the principal materials we use in our manufacturing operations are available from more than one source. However, certain materials are procured from a single source. We seek to maintain sufficient inventory to provide reliability of production and manage unforeseen supply variability. However, various developments have led, and may in the future lead, to interruption or shortages in supply until we establish new sources, implement alternative processes, bring new manufacturing facilities online, or pause or discontinue product sales in one or more markets.

Our active ingredient manufacturing and finishing operations, including formulation, filling, assembling, delivery device manufacturing, and packaging, take place at sites in the U.S., including Puerto Rico, Ireland and a number of other sites throughout the world. To support anticipated demand for our current and prospective products, we have undertaken significant manufacturing expansion initiatives. Investments to increase our manufacturing capacity include new sites in North Carolina, Wisconsin, Indiana, Virginia, Texas, Alabama, Pennsylvania, Ireland, Germany, and the Netherlands. We also utilize third parties for certain active ingredient manufacturing, filling, finishing operations, and for device or component production and assembly. Among other third-party providers, we, and the pharmaceutical industry generally, depend on China-based suppliers for portions of our supply chain. U.S. officials have enacted and continue to consider legislation or other actions that are intended to limit supply chain reliance on China, including the BIOSECURE Act. In addition, historically, geopolitical tensions between the U.S. and China have led to the imposition of tariffs, sanctions, and certain

other business restrictions between the U.S. and China. In 2025, the U.S. government imposed new tariffs on Chinese goods, and China responded with tariffs on select U.S. goods. If new legislation or additional trade restrictions are adopted or geopolitical tensions were to increase and disrupt our operations in or related to China, such disruption could significantly impact our business and results of operations. See Item 1A, "Risk Factors—Risks Related to Our Operations—Reliance on third-party relationships and outsourcing arrangements could adversely affect our business" and "Risk Factors—Risks Related to Doing Business Internationally—Our global operations subject us to risks, including as related to uneven economic growth or downturns, international trade, and other global disruptions, geopolitical tensions, or disputes" for additional information.

We manage our supply chain (including our own facilities, contracted arrangements, and inventory) in a way that is intended to allow us to meet product demand while maintaining flexibility to reallocate manufacturing capacity to improve efficiency and respond to changes in supply and demand. To maintain supply of our products, we use a variety of techniques, including comprehensive quality systems, inventory management, and back-up sites.

However, pharmaceutical production processes are complex, highly regulated, and vary widely from product to product. Shifting or adding manufacturing capacity is a very lengthy process requiring significant capital expenditures, process modifications, and regulatory approvals. Accordingly, developments such as unanticipated demand, unplanned plant shutdowns, manufacturing or quality assurance difficulties at one of our facilities or contracted facilities, failure or refusal of a supplier or contract manufacturer to supply contracted quantities in a timely manner or at all, increases in demand on a supplier, or difficulties in predicting or variability in demand for or supply of our products or those of our competitors have led, and may in the future lead, to interruption or higher costs in the supply of certain products, product shortages, or pauses or discontinuations of product sales in one or more markets. Supply and channel dynamics in some cases also contribute to variability in financial results for our products from period to period. Further, cost and wage inflation, availability of adequate capacity in global transportation, supply chain complexities, including consolidation therein, labor market issues, international tension and conflicts, uneven economic growth or downturns, an increase in overall demand in our industry for certain products and materials, and public health outbreaks, epidemics, or pandemics, have caused, and in the future may cause, delays or disruptions in and/or increased costs related to distribution of our medicines, the construction or acquisition of manufacturing capacity, procurement activity, and supplier or contract manufacturer arrangements, as well as other general business impacts. For more information on the additional risks we face in connection with any difficulties, disruptions, and shortages in the manufacturing, distribution, and sale of our products, see Item 1A, "Risk Factors—Risks Related to Our Operations—Manufacturing, quality, or supply chain difficulties, disruptions, or shortages could lead to product supply problems or other negative outcomes."

**Quality Assurance**

Our success depends in great measure on customer confidence in the quality of our products and in the integrity of the data that support their safety and effectiveness. Product quality requires a total commitment to quality in all parts of our operations, including research and development, purchasing, facilities planning, manufacturing, distribution, and dissemination of information about our medicines.

Quality of production processes involves strict control of ingredients, equipment, facilities, manufacturing methods, packaging materials, and labeling. We perform tests at various stages of production processes and on the final product in an effort to ensure that the product meets all applicable regulatory requirements and our internal standards. Additional testing for stability over the life of the product is also performed. These tests may involve chemical and physical chemical analyses, microbiological testing, testing in animals, or a combination thereof. Additional assurance of quality is provided by quality assurance groups that audit and monitor all aspects of quality related to pharmaceutical manufacturing procedures and systems in company and third-party operations.

**Executive Officers of the Company**

The following table sets forth certain information regarding our current executive officers.

The term of office for each executive officer expires on the date of the annual meeting of the board of directors, to be held on May 4, 2026 in connection with the company's annual meeting of shareholders, or on the date his or her successor is chosen and qualified. No director or executive officer has a "family relationship" with any other director or executive officer of the company, as that term is defined for purposes of this disclosure requirement. There is no understanding between any executive officer or director and any other person pursuant to which the executive officer was selected.

| Name | Age | Titles and Business Experience |
|---|---|---|
| David Ricks | 58 | Chair, President, and Chief Executive Officer (CEO) (since 2017). Previously, Mr. Ricks held various leadership roles with Lilly, including senior vice president and president, Lilly Bio-Medicines. Mr. Ricks has 29 years of service with Lilly. |
| Adrienne Brown | 46 | Executive Vice President and President, Lilly Immunology (since 2025). Previously, Ms. Brown held various leadership roles at Lilly, including group vice president of corporate business development from 2023 to 2025, group vice president, U.S. Diabetes and Obesity from 2020 to 2023, and senior director Diabetes/GHD Business Unit from 2018 to 2020. Ms. Brown has 22 years of service with Lilly. |
| Kenneth Custer, Ph.D. | 47 | Executive Vice President and President, Lilly Cardiometabolic Health (since 2025). Dr. Custer has held various leadership roles with Lilly, including most recently, as president and general manager of Lilly Canada. Previously, he served as senior vice president and head of corporate business development. Dr. Custer has 17 years of service with Lilly. |
| Eric Dozier | 59 | Executive Vice President, Chief People Officer (since 2022). Previously, Mr. Dozier held various leadership roles with Lilly, including senior vice president, chief commercial officer for Loxo@Lilly, and vice president, global ethics and compliance officer. Mr. Dozier has 28 years of service with Lilly. |
| Anat Hakim | 56 | Executive Vice President, General Counsel and Secretary (since 2020). Prior to joining Lilly, Ms. Hakim was senior vice president, general counsel and secretary of WellCare Health Plans, Inc. (WellCare) from 2016 to 2018, and executive vice president, general counsel and secretary of WellCare from 2018 to 2020. Prior to joining WellCare, she served as divisional vice president and associate general counsel of intellectual property litigation at Abbott Laboratories from 2010 to 2013 and divisional vice president and associate general counsel of litigation from 2013 to 2016. Ms. Hakim has six years of service with Lilly. |
| Edgardo Hernandez | 51 | Executive Vice President and President, Manufacturing Operations (since 2021). Previously, Mr. Hernandez held various leadership roles with Lilly, including senior vice president, global parenteral drug product, delivery devices and regional manufacturing, and vice president, Fegersheim operations. Mr. Hernandez has 21 years of service with Lilly. |
| Carole Ho | 53 | Executive Vice President and President, Lilly Neuroscience (since 2025). Prior to joining Lilly, Ms. Ho served as chief medical officer and head of development at Denali Therapeutics Inc. from 2015 to 2025. Her biopharmaceutical experience includes leadership roles at Genentech, Inc. |
| Patrik Jonsson | 59 | Executive Vice President and President, Lilly International (since 2025). Mr. Jonsson has held various leadership roles with Lilly, including, most recently, as Executive Vice President and President, Lilly Cardiometabolic Health and Lilly USA. Previously, he served as Executive Vice President and President, Lilly Immunology and Lilly USA, and Chief Customer Officer, senior vice president and president, Lilly Bio-Medicines and president and general manager, Lilly Japan. Mr. Jonsson has 35 years of service with Lilly. |
| Lucas Montarce | 48 | Executive Vice President and Chief Financial Officer (since 2024). Most recently, Mr. Montarce served as the president and general manager of Lilly's Spain, Portugal, and Greece hub, a position he assumed in 2024. Previously Mr. Montarce was group vice president, controller and chief financial officer of Lilly Research Laboratories, vice president, finance and chief financial officer, Lilly International, and vice president, finance and global chief financial officer, Elanco Health. Mr. Montarce has 24 years of service with Lilly. |
| Diogo Rau | 51 | Executive Vice President and Chief Information and Digital Officer (since 2021). Prior to joining Lilly, Mr. Rau was senior director of information systems and technology for retail and online stores of Apple Inc. from 2011 to 2021. Prior to his tenure at Apple, he served as a partner at McKinsey & Company. Mr. Rau has five years of service with Lilly. |
| Melissa Seymour | 56 | Executive Vice President, Global Quality (since 2024). Prior to joining Lilly, Ms. Seymour was the chief quality officer for Bristol Myers Squibb from 2022 to 2024. Before joining Bristol Myers Squibb, Ms. Seymour was also the chief quality officer at Biogen. Ms. Seymour has two years of service with Lilly. |
| Daniel Skovronsky, M.D., Ph.D. | 52 | Executive Vice President, Chief Scientific and Product Officer and President, Lilly Research Laboratories (since 2025). Prior to assuming his current role, Dr. Skovronsky served as Executive Vice President, Chief Scientific Officer, and President, Lilly Research Laboratories and Lilly Immunology since 2024. Dr. Skovronsky has held other leadership roles with Lilly, including as chief medical officer, senior vice president, clinical and product development and vice president, diabetes research. Dr. Skovronsky has 15 years of service with Lilly. |
| Jacob Van Naarden | 41 | Executive Vice President, President, Lilly Oncology and Head of Corporate Business Development (since 2025). Prior to assuming his expanded role, Mr. Van Naarden served as Executive Vice President and President, Lilly Oncology since 2021. Previously, he served as chief executive officer-Loxo Oncology at Lilly, and chief operating officer-Loxo Oncology at Lilly. Mr. Van Naarden joined Lilly in 2019 when the company acquired Loxo Oncology, Inc., where he was the chief operating officer. In previous roles, Mr. Van Naarden worked in various biotechnology investing, operating, and advisory capacities, including positions with HealthCor Management, Aisling Capital, and Goldman Sachs. Mr. Van Naarden has seven years of service with Lilly. |
| Ilya Yuffa | 51 | Executive Vice President and President, Lilly USA and Global Customer Capabilities (since 2025). Mr. Yuffa has held various leadership roles with Lilly, including, most recently, as Executive Vice President and President, Lilly International. Previously, he served as senior vice president and president, Lilly Bio-Medicines, vice president of U.S. Diabetes, general manager of Italy Hub, and vice president, global ethics and compliance officer. Mr. Yuffa has 29 years of service with Lilly. |

**Human Capital Management**

Our core values—integrity, excellence, and respect for people—shape our approach to attracting, retaining, engaging, and developing a highly skilled workforce. Our long-term success depends on our ability to continually discover or acquire, develop, and commercialize innovative medicines. We believe fostering a positive, inclusive culture that values the contributions of our talented colleagues helps drive our success.

We are committed to creating a safe, supportive, ethical, and rewarding work environment through intentional focus on our human capital management process, fairness and nondiscrimination in our employment practices, robust training and development opportunities, and competitive pay and benefits. Our focus on inclusion strengthens innovation at Lilly, and we always aim to hire the most qualified candidates.

We regularly conduct confidential employee surveys to seek feedback from our workforce on a variety of topics. These results are analyzed by our leaders to identify opportunities to adjust our practices and benefits to improve our employees' experience. As a result of our efforts, we believe that we have a highly performing and cohesive workforce.

At the end of 2025, we employed approximately 50,000 people, including approximately 27,000 employees outside the U.S. Our employees include approximately 12,000 people engaged in research and development activities.

**Information Available on Our Website**

Our company website is **www.lilly.com**. None of the information accessible on or through our website is incorporated into this Annual Report on Form 10-K. We make available through the website, free of charge, our company filings with the Securities and Exchange Commission (SEC) as soon as reasonably practicable after we electronically file them with, or furnish them to, the SEC. These include our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, proxy statements, registration statements, and any amendments to those documents. The link to our SEC filings is **investor.lilly.com/financial-information/sec-filings**.

Paper copies of the company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q that are filed with the SEC are available without charge upon written request to:

ELI LILLY AND COMPANY
c/o General Counsel and Secretary
Lilly Corporate Center
Indianapolis, Indiana 46285

In addition, the "Governance" section of our website includes our corporate governance guidelines, board of directors and committee information (including committee charters), and our articles of incorporation and bylaws. The link to our corporate governance information is **lilly.com/leadership/governance**.

We routinely post important information for investors in the “Investors” section of our website, **www.lilly.com**. We may use our website as a means of disclosing material, non-public information and for complying with our disclosure obligations under Regulation FD. Accordingly, investors should monitor the “Investors” section of our website, in addition to following our press releases, filings with the SEC, public conference calls, presentations, and webcasts. We and our executive officers may also use social media channels to communicate with investors and the public about our business, products and other matters, and those communications could be deemed to be material information. The information contained on, or that may be accessed through, our website or our or our executive officers' social media channels, is not incorporated by reference into, and is not a part of, this Annual Report on Form 10-K.

### *Item 1A. Risk Factors*

In addition to the other information contained in this Annual Report on Form 10-K, the following risk factors should be considered carefully in evaluating our company. It is possible that our business, financial condition, liquidity, cash flows, results of operations, reputation, and prospects could be materially adversely affected by any of these risks. Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial could also adversely affect our business, financial condition, liquidity, cash flows, results of operations, reputation, and prospects.

**Risks Related to Our Business and Industry**

**Pharmaceutical research and development is very costly and highly uncertain; we may not succeed in developing, licensing, or acquiring commercially successful products sufficient in number or value to replace revenues of products that have lost or will lose intellectual property protection or are displaced by competing products or therapies.**

There are many difficulties and uncertainties inherent in pharmaceutical research and development, the introduction of new products and indications, business development activities to enhance or refine our product pipeline, and commercialization of our products.

There is a high rate of failure inherent in drug discovery and development. To bring a product from the discovery phase to market takes considerable time and entails significant cost. Failure or results that misalign with expectations can occur at any point in the process, including in later stages after substantial investment, following meaningful cost for manufacturing capabilities and inventory to prepare for launch, and after we and others may have attributed significant value for these potential products. As a result, a significant portion of funds invested in research and development programs will not generate direct financial returns. New product candidates that appear promising in development or prior to being acquired may fail to reach the market or may have only limited commercial success because of efficacy or safety concerns, inability to obtain or maintain necessary regulatory approvals or payer reimbursement or coverage, failure to obtain placement on guidelines or recommendations published by third-party organizations, the application of pricing controls, limited scope of approved uses, label changes, changes in the relevant treatment standards or the availability of newer, better, or more cost-effective competitive products, difficulty or excessive costs to manufacture, insufficient infrastructure to support detection, diagnostic or other requisites for treatment, ineffectiveness in connecting with healthcare professionals, including digitally through virtual engagements, or infringement of the patents or intellectual property rights of others. We may also fail to allocate research and development resources efficiently, fail to pursue or invest sufficiently in product candidates or indications that may have been successful, or fail to optimally balance trial design, conduct, and speed to accomplish desired outcomes.

We regularly submit new product candidates and indications to regulatory agencies for approval, including highly anticipated candidates such as orforglipron. Regulatory agencies establish high hurdles for the efficacy and safety of new products and indications. Delay, uncertainty, unpredictability, and inconsistency in drug approval processes across markets and agencies can result in delays in product launches, lost market opportunities, impairment of inventories, and other negative impacts. In addition, it can be very difficult to predict revenue growth rates of, or variability in demand for, new or future products and indications, which in some cases leads to difficulty meeting product demand or, on the other hand, lower volume growth, excess inventory, and related financial charges.

We cannot state with certainty when or whether our products and indications now under development will be approved or launched; whether, if initially granted, such approval will be maintained; whether we will be able to develop, license, or otherwise acquire additional product candidates, indications, or products; or whether our products and indications, once launched, will be commercially successful.

Through internal innovation and business development we must maintain a flow of successful products and indications or line extensions sufficient both to cover our substantial research and development costs and investments and to replace revenues that are lost as profitable products become subject to pricing controls, lose intellectual property exclusivity, are displaced by competing products, or therapies, or experience a reduction in patient access. Failure to replenish our product portfolio and pipeline in a timely manner would have a material adverse effect on our business, results of operations, cash flows, and financial position. Our dependence on, or focus in, one or more key products or product classes exacerbates this risk. In addition, the growth of our business and revenue base increases the risk that products developed or acquired by us may not provide adequate value to sustain further long-term growth.

We engage in various forms of business development activities to enhance or refine our product pipeline and development capabilities, including licensing arrangements, co-development agreements, co-promotion arrangements, distribution and promotion agreements, joint ventures, acquisitions, equity investments, and divestitures. There are substantial risks associated with identifying and competing for successful business development targets and consummating related transactions. Continued regulatory focus on business combinations in our industry, including by the Federal Trade Commission and competition authorities in Europe and other jurisdictions, and heightened competition for attractive targets has and could continue to delay, jeopardize, or increase the costs or risks of our business development activities. In addition, failures or difficulties in integrating or retaining new personnel or the operations of the businesses, products, or assets we acquire (including related technology, commercial operations, compliance programs, information security, manufacturing, distribution, and general business operations and procedures) may affect our ability to realize the potential benefits of business development transactions and may result in our incurrence of substantial asset impairment or restructuring charges. We also may fail to generate the expected revenue and pipeline enhancement from business development activities due to diligence that fails to identify risks or adequately anticipate their magnitude, unsuccessful clinical trials, issues related to the quality, integrity, or broad applicability of data, regulatory impediments, and manufacturing or commercialization challenges. Additionally, business development activity focused on new modalities may entail additional risks and costs given the high levels of scientific uncertainty inherent in novel technologies. Business development transactions may not be completed in a timely manner (if at all), may not result in successful development outcomes or successful commercialization of any product, may require additional unanticipated investments to achieve potential benefits, may give rise to legal proceedings or regulatory scrutiny, and may result in charges that negatively impact our financial position or results of operations in any given period.

See Item 1, "Business—Research and Development—Phases of New Drug Development," Item 7, "Management's Discussion and Analysis—Executive Overview—Clinical Development Pipeline" and Item 8, "Financial Statements and Supplementary Data—Note 6: Inventories," for more details about our current product pipeline.

**We and our products face intense competition, and such competition could have a material adverse effect on our business.**

We compete with a large number of multinational pharmaceutical companies, biotechnology companies, and generic pharmaceutical companies and face intensifying competition worldwide, including from China and other markets where research and development capabilities have expanded and accelerated significantly. In many cases, our products compete against the leading products of one or more of our competitors. To compete successfully in a highly competitive and increasingly fast-paced global environment, we must deliver innovative, cost-effective products through internal innovation or business development that meet important medical needs, provide improved outcomes and a positive consumer experience for patients, and deliver value to payers. Our product revenues and prospects are adversely affected by patient access issues, the introduction by competitors of branded products that are first to market, have better marketplace access, have greater brand recognition, or are perceived as superior by the marketplace, by price competition, by generic or biosimilar versions of our branded products, and by generic or biosimilar versions of other products in the same therapeutic class as our branded products. Our revenues are also adversely affected by treatment innovations, including new or superior modalities, that eliminate or minimize the need for treatment with our existing products, and our existing products could be subject to decreased sales volumes, realized price reductions, or both. In some cases, the introduction of our own innovative products results in these adverse impacts for our preexisting products. Technological innovation has amplified and we expect will continue to amplify competitive aspects of our business, including by enabling additional participation in and breadth of drug discovery and new healthcare delivery models. Business practices or commercial capabilities that we deploy in light of these or other market dynamics may not prove sufficient.

Regulation of generic and biosimilar products varies around the world and such regulation is complex and subject to ongoing interpretation and implementation by regulatory agencies and courts. Particularly for biosimilars, health authority guidelines and legislative actions could continue to make it less burdensome for competitor products to enter the market and further incentivize uptake of biosimilars. Given the importance to us of marketed biologic products and those in our clinical-stage pipeline, such regulation could have a material adverse effect on our business. See Item 1, "Business—Competition" and "Business—Research and Development," for more details. Alternatively, actual or perceived failure of robust generic and biosimilar competition could propel governments to adopt additional policies and legislation that threaten our intellectual property, pricing of our products, or other aspects of our business.

Our success depends on a market that is observant of intellectual property rights and regulatory requirements. Developments that undermine that landscape can significantly impact our business and reputation. For example, we continue to see the production, marketing, and sale of counterfeit, misbranded, adulterated, and mass-compounded incretins in the U.S. and other markets that could materially impact us. In addition to patient safety concerns, improper commercialization and dispensation practices by these actors may inappropriately condition consumer expectations or otherwise disadvantage compliant market participants. Our actions intended to stop or prevent illegal sales of such medicines are costly and may be ineffective. See Item 1, "Business—Government Regulation of Our Operations and Products," for additional information on market risks related to counterfeit, misbranded, adulterated, and mass-compounded medicines. If inadequately regulated, e-commerce may increase the prevalence of dangerous counterfeit or mass-compounded products and scams, potentially exposing patients to significant risks. Our reputation and business could suffer harm as a result of counterfeit or mass-compounded drugs sold under our brand name, which may also impact our business and financial results.

In addition, we rely on our ability to attract and retain highly qualified and skilled scientific, technical, management, and other personnel in order to compete effectively. To capitalize on the rapid development of next-generation technologies and otherwise effectively compete, we must continue to enhance skill sets and develop our workforce, both in and outside the U.S. We face intense competition for qualified individuals from numerous multinational companies, academic and other research institutions, as well as employers near our manufacturing and other facilities, which has increased and may continue to increase our labor costs. Our failure to compete effectively for talent could negatively affect our ability to discover, develop, manufacture, and sell our medicines, resulting in material financial, legal, commercial, or reputational harm to our business.

**Our business is subject to government price controls and other public and private restrictions on pricing, reimbursement, and access for our drugs, which could have a material adverse effect on our results of operations, reputation, or business.**

Public and private actors continue to take aggressive steps to control expenditures for pharmaceuticals by placing restrictions on pricing and reimbursement for, and patient access to, our medicines. These pressures have negatively affected and we expect will continue to negatively affect our consolidated results of operations. Governments and private actors worldwide are demanding greater commercial and clinical value from pharmaceutical companies in the form of strong product differentiation and demonstrated value. We continue to experience scrutiny on the pricing of current and potential products due to, among other factors, payer concern over projected growth in demand and, for certain of these drugs, the anticipated duration of treatment. We have also observed scrutiny of pricing and access disparities across jurisdictions.

In November 2025, we announced preliminary voluntary agreements with the U.S. government in which, among other arrangements, we agreed to implement measures to lower Medicaid and certain other drug prices for U.S. patients and to launch new medicines with a more balanced pricing approach across developed nations. We face risks and uncertainty associated with these arrangements and negotiating the definitive agreements, including potential delays and the possibility of unfavorable terms related to pricing, access, and other key objectives. Among other risks, we may fail to adequately capitalize on the additional U.S. access to our obesity medicines resulting from these agreements, particularly if the revenues generated from such expanded access are insufficient to offset pricing concessions. Moreover, the outcome of these arrangements and broader U.S. policy efforts to align domestic pharmaceutical pricing with international benchmarks from countries with competing healthcare cost containment priorities is uncertain and could negatively impact our pricing strategies, product demand or access, or competitive positioning across global markets, and may result in reduced revenue in certain markets.

In general, securing and growing access for our obesity medicines is an important factor in the success of our business. Among other considerations, payers in various international markets do not currently provide coverage for obesity medicines for weight loss indications, requiring patient self-pay. In addition, patient self-pay sales through LillyDirect represented a growing portion of our business in 2025, and we have launched, and continue to explore, new partnerships and tools, including through LillyDirect, to further expand access to our medicines. Our financial results and prospects are subject to risks related to the level and pace of patient participation in cash-pay markets, which may be influenced by pricing, economic conditions, and competitive offerings, as well as regulatory or other actions that could restrict our ability to benefit from such markets, and uncertainty regarding our ability to secure reimbursement coverage in such markets over time.

Additional policies, regulations, legislation, or enforcement, including because of the regulatory priorities of the U.S. executive branch, state attorneys general, and regulatory authorities worldwide, could adversely impact our business and consolidated results of operations. For example, in August 2023, HHS selected Jardiance, which is part of our collaboration with Boehringer Ingelheim, as one of the first ten medicines subject to government-set prices in Medicare (effective beginning in 2026) at a significant discount compared to the list price. In January 2026, HHS selected Trulicity and Verzenio as additional medicines subject to government-set prices to be effective in 2028. Given our product portfolio, we expect additional products will be selected in future years, which would have the effect of accelerating revenue erosion. The effect of reducing prices and reimbursement for certain of our products impacts our business and consolidated results of operations. Within the U.S., state level transparency initiatives, importation rules, reporting requirements, and mandated programs, including the establishment of drug affordability boards with the power to set upper payment limits on certain drugs, have also increased administrative costs, in some cases, compromised confidential business practices and otherwise detrimentally impacted our business. Continued expansion of the 340B program and growth of entities claiming entitlement to 340B pricing, including in ways that may be inconsistent with the statutory scheme and through state laws that purport to mandate 340B sales to contract pharmacies, impact our revenue on an increasing percentage of sales. Changes to the calculation of rebates under the Medicaid program could also increase our Medicaid rebate obligations and decrease the prices charged to 340B covered entities, which could have a significant impact on our business. For more details, see Item 1, "Business—Regulations and Private Payer Actions Affecting Pharmaceutical Pricing, Reimbursement, and Access."

Further, restrictive or unfavorable pricing, coverage, or reimbursement determinations for our medicines or product candidates by governments, regulatory agencies, courts, or private actors, including in relation to the IRA, reference pricing, or compulsory licensing, may adversely impact our business and financial results. We continue to experience additional pricing pressures, rebates, clawbacks, and other changes in reimbursement policies and programs resulting from periods of uneven economic growth or downturns or uncertainty, and the emergence or escalation of, and responses to, international tension and conflicts.

In addition, government price reporting and payment regulations are complex, and require ongoing assessment of the methods by which we calculate and report pricing. Calculation methodologies are inherently subjective and subject to review and challenge by government agencies and, in some cases, by private actors. If there is disagreement with our calculations, or the methodologies and assumptions underlying them, we may need to restate previously reported data and could be subject to financial and legal liability, which may be significant. In addition, changes to calculation methodologies could adversely affect our financial position or consolidated results of operations in any given period.

For more details, see Item 1, "Business—Regulations and Private Payer Actions Affecting Pharmaceutical Pricing, Reimbursement, and Access," Item 7, "Management's Discussion and Analysis—Executive Overview—Other Matters—Trends Affecting Pharmaceutical Pricing, Reimbursement, and Access and Certain Other Regulatory Developments," and Item 8, "Financial Statements and Supplementary Data—Note 16: Contingencies."

**Pharmaceutical products can develop safety or efficacy concerns, which could have a material adverse effect on our revenues, income, and reputation.**

Pharmaceutical products receive regulatory approval based on data obtained in controlled clinical trials of fixed duration and defined populations. After approval and launch, the products are used for longer periods of time by much larger numbers of patients, which may lead to identifying new or expanded safety or efficacy concerns. We and others (including regulatory agencies and private payers) collect extensive information on the efficacy and safety of our marketed products by continuously monitoring the use of our products in the marketplace. In addition, we or others (including our competitors, in some cases) may conduct post-marketing clinical studies on efficacy and safety of our marketed products. New safety or efficacy data may result in product label changes, or other measures that could reduce the product's market acceptance and result in declining sales. Relatedly, safety or efficacy concerns raised about a product in the same class, compounded or counterfeit versions of our products, or products with the same mechanism of action as one of our products or product candidates could be imputed and have an adverse impact on the availability or commercial viability of our products or approval of product candidates. Serious safety or efficacy issues that arise after product approval have resulted and could in the future result in voluntary or mandatory product recalls or withdrawals from the market. Safety issues have resulted and could in the future result in costly product liability claims. Any of these outcomes could result in material financial, legal, commercial, or reputational harm to our business.

**We derive a significant percentage of our total revenue from relatively few products and sell our products through consolidated supply chain entities, which subjects us to various risks.**

We derived direct product and/or collaboration and other revenues of more than $3 billion for each of Mounjaro, Zepbound, Verzenio, Trulicity, Taltz, and Jardiance (including Glyxambi, Synjardy, and Trijardy XR) that collectively accounted for 82 percent of our total revenues in 2025. In particular, Mounjaro and Zepbound accounted for 56 percent of our total revenues in 2025, and we expect cardiometabolic health products will continue to represent a significant and growing portion of our business, revenues, and prospects. Factors such as loss of patent protection, changes in prescription rates, material product liability or pricing claims or litigation, unexpected side effects or safety concerns, significant changes or fluctuations in demand, channel dynamics, regulatory proceedings and investigations, negative publicity affecting doctor or patient confidence, pressure from existing or new competitive products, pipeline developments by us or our competitors, counterfeit and illegally compounded drugs, changes in labeling, pricing, and insufficient access, or reimbursement, or actual or perceived supply shortages, imbalances, or disruptions for these products or any of our other major products could materially impact our results of operations or result in significant and sudden declines or volatility in the trading price of our common stock and market capitalization.

In addition, in the U.S., most of our products are distributed through a limited number of wholesalers. If one of these significant wholesalers encounters financial or other difficulties or otherwise is unable or unwilling to support distribution of our products, it could cause disruption to our supply chain or we might be unable to timely collect the amounts that the wholesaler owes us, which could negatively impact our results of operations. See Item 1, "Business—Marketing and Distribution," for more details. Challenges to U.S. retail pharmacies due to pharmacy benefit manager reimbursement pressures, among other things, have resulted and may result in financial difficulties for some pharmacies that impact patient experiences, lead to determinations by certain pharmacies to not carry one or more of our significant products or threaten the viability of these pharmacies, which could negatively impact our business and results of operations.

Moreover, the negotiating power of health plans, managed care organizations, pharmacy benefit managers, and other supply chain entities has increased, and they, along with governments, employ formularies and other methods to control costs and encourage utilization of certain drugs, including through the use of formulary inclusion or favorable formulary placement. Such stakeholders have also increasingly imposed utilization management and other tools to limit access to our products. These practices in some cases create difficulty in obtaining or maintaining timely or adequate pricing or formulary placement of our products. For example, in July 2025, CVS Caremark, the pharmacy benefit management division of CVS Health, stopped covering Zepbound as a preferred obesity management medicine on some insurance plans, which has negatively impacted access for patients covered under these plans. We expect supply chain entities will continue to exert competitive and pricing pressures on pharmaceutical manufacturers.

Pharmacy benefit manager practices have come under increased scrutiny from U.S. policymakers at the federal and state levels who have proposed and enacted legislation or administrative rules, or undertaken enforcement actions intended to address concerns regarding the impact these intermediaries have on drug pricing and patients’ out of pocket costs. Such legislation, rules, or enforcement could have implications, costs, or consequences for our business and how we interact with these entities. For additional information on pricing and reimbursement for our pharmaceutical products, see Item 1, "Business—U.S. Private Sector Dynamics" and "Regulations and Private Payer Actions Affecting Pharmaceutical Pricing, Reimbursement, and Access—U.S."

**Risks Related to Our Intellectual Property**

**We depend on products with intellectual property protection for most of our revenues, cash flows, and earnings; the loss of effective intellectual property protection for certain of our products has resulted, and in the future is likely to continue to result, in rapid and severe declines in revenues for those products.**

In the ordinary course of their lifecycles, our products lose significant patent protection and/or data protection after a specified period of time. For example, Trulicity will lose significant patent and remaining data protections in the next few years. Some products also lose patent protection as a result of successful third-party challenges. We have faced, and remain exposed to, generic or biosimilar competition following the expiration or loss of such intellectual property protection. Patent expirations of competitive products may also shift market conditions for our products by contracting the market for branded products, impacting product access, or otherwise intensifying pricing pressures across similar treatments.

For non-biologic products, loss of exclusivity typically results in the entry of one or more generic competitors, leading to a rapid and severe decline in revenues, especially in the U.S. Generic pharmaceutical companies have in some cases introduced a generic product before resolution of any related patent litigation. For biologics, loss of exclusivity may also result in the near-term entry of competitor versions (i.e., biosimilars).

Our success depends in part on our ability to obtain and defend patent rights and other intellectual property rights that are important to the commercialization of our products and product candidates. The patent positions of pharmaceutical and biotechnology companies can be highly uncertain and often involve complex legal, scientific, and factual questions. There is no assurance that the patents we are seeking will be granted or that the patents we hold will be found valid and enforceable if challenged. Third parties have and may challenge, invalidate, or circumvent our patents and patent applications relating to our products, product candidates, and technologies. In addition, our patent positions might not protect us against competitors with similar products or technologies because competing products or technologies may not be deemed to infringe our patents. Moreover, patents relating to particular products, uses, formulations, or processes may not preclude other manufacturers from employing alternative processes or marketing alternative products or formulations that compete with our patented products. Patents held by third parties have also contributed, and may in the future contribute, to a decision by us to not pursue all potential indications for a product candidate. In addition, competitors or other third parties may assert claims that our activities infringe patents or other intellectual property rights held by them, or allege a third-party right of ownership in our existing intellectual property. See Item 1, "Business—Patents, Trademarks, and Other Intellectual Property Rights" and Item 8, "Financial Statements and Supplementary Data—Note 16: Contingencies," for more details.

Patents relating to pharmaceutical products are often obtained early in the development process. Given the limited duration of patent and data protections, the speed with which we develop products, complete clinical testing, receive regulatory approvals, supply commercial products to the market, and obtain public and private payer access are important factors in recouping our development costs and generating financial returns, particularly given regulatory and market dynamics that have and may continue to put pressure on pricing, exclusivity periods, and competition. Delays in achieving these milestones in some cases may limit our ability to capitalize on the innovative medicines that we develop or acquire.

**Our long-term success depends on intellectual property protection; if our intellectual property rights are invalidated, circumvented, or weakened, our business will be adversely affected.**

Our long-term success depends on our ability to continually discover or acquire, develop, and commercialize innovative medicines. Without strong intellectual property protection, we would be unable to generate the returns necessary to support our significant investments in research and development, as well as the other expenditures required to bring new medicines and indications to the market. Intellectual property protection varies throughout the world and is subject to change over time, depending on local laws and regulations. Changes to such laws, regulations, and enforcement practices could reduce protections for our innovative products and indications. For example, an agreement-in-principle announced in December 2025 between the European Commission, Council and Parliament to revise the EU's general pharmaceutical legislation would make conditional the length of certain pharmaceutical intellectual property incentives, including by reductions in maximum data protection periods. Changes proposed by the USPTO and by certain bills in Congress to limit the number of, and differences between, patents obtained could also affect the scope of patent protection for our products in the U.S.

In recent years, U.S. government officials have proposed the exercise of "march-in-rights" and various other measures that, if enacted, could have a negative impact on our patent rights. If any such proposals are adopted, our business and results of operations could be adversely affected.

Also in the U.S., in addition to the process for challenging patents set forth in the BPCIA, which applies to biological products, the Hatch-Waxman Act provides generic companies substantial incentives to seek to invalidate our patents covering small molecule pharmaceutical products. As a result, we expect that our U.S. patents on major pharmaceutical products, including biologics, will continue to be routinely challenged in litigation and may not be upheld. In addition, a separate IPR process currently allows competitors or others to seek invalidation of patents at the USPTO without the protections of the BPCIA or Hatch-Waxman Act. The use of IPR proceedings after the institution of litigation pursuant to the BPCIA or Hatch-Waxman Act is currently a topic of debate among legislators and the future ability of our competitors to use IPR proceedings as an alternative to Hatch-Waxman Act or BPCIA litigation procedures to challenge our patents remains uncertain. The USPTO issued procedures regarding the discretionary denial by the Director of institution of IPR proceedings based on the agency's workload and priorities. The USPTO's ability to apply these

procedures is being challenged, and it is not clear how these procedures will affect the ability of our competitors to institute IPR proceedings. If our patents are challenged through this expedited review process, even if we prevail in demonstrating the validity of our patent, our win may not preclude future challenges at the Patent Trial and Appeal Board and would not be binding on federal district courts, meaning the same patent can be challenged by other competitors.

We face many generic manufacturer challenges to our patents outside the U.S. as well. The entry of generic competitors typically results in rapid and severe declines in revenues. In addition, competitors or other third parties may claim that our activities infringe patents or other intellectual property rights held by them. If successful, such claims could result in our being unable to market a product in a particular territory or require payment of significant damages for past infringement or royalties on future sales. Intellectual property threats across international markets include policies which favor domestic competitors or are otherwise disadvantageous to our products, challenges to our patents' validity in foreign courts, and government policies that force technology transfer or undermine or nullify patent protections under the guise of health emergencies or other public interests. Furthermore, intellectual property protection in certain jurisdictions is weak and we face heightened risks to our intellectual property rights in these jurisdictions, including competition with generic or counterfeit versions of our products at or relatively shortly after launch as well as the risk of diversion of generic or counterfeit products from these jurisdictions into others. See Item 1, "Business—Patents, Trademarks, and Other Intellectual Property Rights," and Item 8, "Financial Statements and Supplementary Data—Note 16: Contingencies," for more details.

**Risks Related to Our Operations**

**Failure, inadequacy, breach of, or unauthorized access to, our IT systems or those of our third-party service providers, unauthorized access to our confidential information, or violations of data protection laws, could result in material harm to our business and reputation.**

Important confidential information owned by us, our business partners, or other third parties is stored in our information systems, networks, and facilities or those of third parties. This includes valuable trade secrets and intellectual property, clinical trial information, corporate strategic plans, marketing plans, customer information, and personal information, such as employee and patient information (collectively, confidential information). We also rely, to a large extent, on the efficient and uninterrupted operation of complex information technology systems, infrastructure, cloud technologies, and hardware (together, IT systems), some of which are within our control and some of which are within the control of third parties, to accumulate, process, store, and transmit large amounts of confidential information and other data. We are subject to a variety of evolving and developing laws and regulations around the world related to privacy, data protection, and data security. Maintaining the security, confidentiality, integrity, and availability of our IT systems and confidential information is vital to our business. A failure in the protection or maintenance of the security, confidentiality, integrity, and availability of our (or our third-party service providers') IT systems and confidential information and other data could significantly harm our reputation as well as result in significant costs, including those related to fines, penalties, litigation, and obligations to comply with applicable data breach laws. A cybersecurity incident could also impose business costs through lost productivity, disruption to manufacturing, and costs to remediate and recover from the incident.

IT systems are inherently vulnerable to system inadequacies, inadequate controls or procedures, operating failures, unauthorized access, service interruptions or failures, security breaches, malicious intrusions, theft, exfiltration, ransomware, or cyber-attacks from a variety of sources, which may remain undetected for significant periods of time. From time to time, we update, transition, acquire, or expand use of our and third-party IT systems, which may result in heightened vulnerability. Some third-party IT systems that are necessary for the operation of our business processes are maintained outside of our control but would impact business operations if compromised as a result of a cyber-attack. Vulnerabilities, inadequacies, or failures are in many cases more acute for IT systems associated with recently acquired businesses, and we may be unable to entirely address such vulnerabilities, inadequacies, or failures immediately after acquiring a business or ever. As a result, our newly acquired businesses are in some cases more vulnerable to failures, interruptions, breaches, intrusions, theft, exfiltration, or attacks.

Cyber-attacks are growing in their frequency, sophistication, and intensity, and are becoming increasingly difficult to detect, mitigate, or prevent. Cyber-attacks come in many forms, including the deployment of harmful malware, exploitation of vulnerabilities (including those of third-party software or systems), denial-of-service attacks, the use of social engineering (including phishing), and other means to compromise the confidentiality, integrity, and availability of IT systems, confidential information, and other data. Breaches

resulting in the compromise, disruption, degradation, manipulation, loss, theft, exfiltration, destruction, or unauthorized disclosure or use of confidential information, or the unauthorized access to, disruption of, interference with, or attack of, our IT systems, products and services, can occur in a variety of ways, including negligent or wrongful conduct by employees or others with permitted access to our systems and information, or wrongful conduct by hackers, competitors, organized criminal groups, nation-states, state-sponsored or affiliated groups, current or former company personnel, and other actors. Our third-party partners, including third-party providers of data hosting or cloud services, as well as suppliers, distributors, alliances, and other third parties with whom we may share data, face similar risks, which could affect us directly or indirectly. Third-party access to our proprietary data may also enable such party's development of competing products or enhancement of services sold to competitors, thereby eroding our competitive advantage. Unassociated third parties present further risks, including by propagating and amplifying misinformation related to our products, business, and industry, including through social media. We and others in the healthcare industry have been and continue to be targets for cyber-attacks, and the number of threats has increased over time. Numerous government agencies that monitor and regulate internet and cyber-crime have issued guidance, alerts and directives warning of software vulnerabilities that require immediate patching, malicious actors targeting healthcare-related systems, and nation-state sponsored hacking designed to steal valuable information.

The failure, inadequacy, or breach of our IT systems or business processes or controls or procedures, the compromise, disruption, degradation, manipulation, loss, theft, exfiltration, destruction, or unauthorized access to, disclosure of, or use of confidential information, or the unauthorized access to, disruption of, or interference with our products and services that rely on IT systems or business processes, could impair our ability to secure and maintain intellectual property rights; result in a product manufacturing interruption or failure, or in the interruption or failure of products or services that rely on IT systems or business processes; damage our operations, patient and other relationships, or reputation; undermine integration activities or otherwise delay or prevent the launch of products; result in unfavorable clinical trial results by virtue of incorrect or unreliable data; expose us to ransom payment, other demands, or paralyze our operations; give rise to legal liability and regulatory action under data protection and privacy laws; require disclosure to government authorities and/or regulators; expose us to civil and criminal investigations; and/or cause us to lose trade secrets or other competitive advantages, any of which effects could endure for a long period of time. Unauthorized disclosure of personally identifiable information could further expose us to significant sanctions for violations of data privacy laws and regulations around the world, subject us to litigation, or damage public trust in our company. In addition, IT system security in jurisdictions outside the U.S. is in many cases weaker and may result in additional costs, uncertainties, and risks.

We are subject to various laws and regulations globally regarding privacy and data protection, including laws and regulations relating to the collection, storage, handling, use, disclosure, transfer, and security of personal information. The legislative and regulatory environment regarding privacy and data protection is continuously evolving and the subject of significant attention by regulators and private parties globally. Regulators are imposing new data privacy and security requirements, including new and greater monetary fines or penalties for privacy violations, and jurisdictions where we operate have passed, and continue to propose, privacy and data protection legislation and/or regulations. For example, we are subject to existing laws in the EU, United Kingdom, China, and U.S., all of which provide for substantial penalties for noncompliance. Other jurisdictions where we operate have passed, or continue to propose, similar legislation and regulations. Many jurisdictions, including the U.S., the EU, and China have passed, or expect to pass, restrictions on international data transfers and local access requirements. Compliance with current and future laws and regulations requires implementing costly new controls and processes, may restrict certain core activities, including impacting our ability to carry out research and clinical studies across multiple geographies, and creates the potential for data misuse or espionage. Failure to comply with current and future laws and regulations could result in significant penalties and reputational harm and could have a material adverse effect on our business and results of operations.

To date, system inadequacies, inadequate controls or procedures, operating failures, unauthorized access, service interruptions or failures, security breaches, malicious intrusions, theft, exfiltration, ransomware, cyber-attacks, and the compromise, disruption, degradation, manipulation, loss, theft, exfiltration, destruction, or unauthorized disclosure or use of confidential information, or the unauthorized access to, disruption of, interference with, or attack of, our IT systems, products and services that we have encountered have not had a material impact on our business strategy, results of operations or financial condition. We maintain cyber liability insurance; however, this insurance may not be sufficient to cover the financial, operational, legal, business, or reputational losses that may result from an interruption or breach of our IT systems. We continue to implement measures in an effort to protect, detect, respond to, remediate, and minimize or prevent these

risks and to enhance the resiliency of our IT systems; however, these measures may not be successful, and we may fail to detect or remediate system inadequacies, inadequate controls or procedures, operating failures, unauthorized access, service interruptions or failures, security breaches, malicious intrusions, theft, exfiltration, ransomware, cyber-attacks, or other compromises of our systems. Any of these events could result in material financial, operational, legal, business, or reputational harm to our business. For a discussion of our management of cybersecurity risks, see Item 1C, "Cybersecurity—Risk Management and Strategy" and "Cybersecurity—Governance."

**Manufacturing, quality, or supply chain difficulties, disruptions, or shortages could lead to product supply problems or other negative outcomes.**

We are continuing the significant expansion of our manufacturing capabilities and substantial investment in long-term supply agreements to fortify our supply and support our ability to meet anticipated demand for our products. Pharmaceutical manufacturing is complex and highly regulated. Supply chain difficulties, disruptions or shortages may arise from our or contracted supply chain activity as well as from external environmental factors. Variability in demand and supply for our products can also challenge supply capacity and resiliency. Supply and channel dynamics in some cases contribute to variability in financial results for our products from period to period.

Difficulties related to supply chain activities have resulted and may in the future result in delays and disruptions in the manufacturing, distribution, and sale of our products and/or product shortages, leading to lost revenue, increased costs, reduced market opportunities, and the possibility of additional market entrants. In select cases, supply constraints may also lead to pauses, discontinuations, or other product availability issues in one or more markets, which could have a material adverse effect on our consolidated results of operations, cash flows, and reputation. Challenges and disruptions may include (i) actual or perceived quality, oversight, or regulatory compliance problems; (ii) equipment, mechanical, data, or IT system vulnerabilities, such as system inadequacies, inadequate controls or procedures, operating failures, unauthorized access, service interruptions or failures, security breaches, malicious intrusions, theft, exfiltration, ransomware or other cyber-attacks from a variety of sources; (iii) labor deficiencies; (iv) inability to obtain single-source or other raw or intermediate materials; or (v) issues related to contractors and suppliers, including the failure, inability, or refusal of a supplier or contract manufacturer to supply contracted quantities in a timely or compliant manner or at all, increases in demand on a supplier with constrained capacity, contractual disputes with our suppliers and contract manufacturers, and vertical integration by competitors within our supply chain.

Regional or single-source dependencies may in some cases accentuate risks and costs (e.g., tariffs) related to manufacturing and supply. For example, we, and the pharmaceutical industry generally, depend on China-based suppliers for portions of our supply chain, including integral chemical synthesis, reagents, starting materials, and ingredients. Finding alternative suppliers if and as necessary due to geopolitical developments or otherwise may not be feasible or could require significant time and expense due to the nature of our products and the need to obtain regulatory approvals, which would cause disruptions to patients and detrimentally impact our business. See, Item 1A, "Risk Factors—Risks Related to Our Operations—Reliance on third-party relationships and outsourcing arrangements could adversely affect our business," and "Risk Factors—Risks Related to Doing Business Internationally—Our global operations subject us to risks, including as related to uneven economic growth or downturns, international trade, and other global disruptions, geopolitical tensions, or disputes" for more details.

External environmental factors have also caused, and in the future may cause, delays in, and/or increase costs related to, distribution of our medicines, the construction or other acquisition of additional manufacturing capacity, procurement activity, and supplier or contract manufacturer arrangements. Relevant external environmental factors include (i) tariffs, (ii) cost inflation and global transportation and logistics challenges; (iii) labor market dynamics; (iv) natural disasters (including increased instances or severity of natural disasters or other events that may be due to climate change); (v) public health outbreaks, epidemics, or pandemics; (vi) periods of uneven economic growth or downturns; and (vii) the emergence or escalation of, or responses to international tension and conflicts.

Difficulties in predicting or variability in demand and supply for our products and those of our competitors and the very long lead times necessary for the expansion and regulatory qualification of pharmaceutical manufacturing capacity have resulted, and in the future may result, in difficulty meeting demand, causing disruptions, shortages, or higher costs in the supply of our products. Despite our ongoing efforts to meet projected worldwide demand for our products by obtaining additional internal and contracted manufacturing capacity, there can be no assurances that such capacity increases that we expect will be needed to meet

future demand will be realized as expected or that we will meet demand in launched markets in the future. Delays or challenges in operationalizing additional manufacturing capacity could limit our ability to capitalize on demand for our products. Conversely, overestimation of demand or events that limit demand for our products or anticipated demand for product candidates would undermine our ability to realize the full benefit of significant capital expenditures that we have incurred, and expect to continue to incur, to augment manufacturing capacity, may render built or in process manufacturing capacity unnecessary, may result in supply imbalances, or may subject us to contractual payment obligations, which may be significant. The foregoing risks and uncertainties could negatively impact our consolidated results of operations and reputation. See Item 1, "Business—Raw Materials and Product Supply," and Item 7, "Management's Discussion and Analysis—Financial Condition and Liquidity," for more details.

**Reliance on third-party relationships and outsourcing arrangements could adversely affect our business.**

We rely on third parties, including suppliers, distributors, alliances and collaborations with other pharmaceutical and biotechnology companies, and third-party service providers, for selected aspects of product and clinical development, manufacturing, commercialization, hosting of and support for IT systems, product distribution, and certain financial transactional processes. As examples, we outsource the day-to-day management and oversight of some of our clinical trials to contract research organizations, some product testing to contract laboratories, certain active ingredient manufacturing, finishing operations, device or component production and assembly, and packaging to contract manufacturing organizations, and the distribution of our products through logistics providers. To support anticipated demand for our current and prospective products and further other business initiatives, we have expanded relationships with contract manufacturing organizations, entities supporting consumer directed access channels, artificial intelligence vendors, and other third parties in recent periods.

Outsourcing involves many risks, including the risk that third parties may not perform to our standards or legal requirements; may not produce reliable results; may not perform in a timely manner; may misuse or not maintain the confidentiality, integrity, and availability of confidential and proprietary information relating to us, our clinical trial subjects, or patients; may experience disruption or fail to perform due to IT system vulnerabilities, such as inadequacies, inadequate controls or procedures, operating failures, unauthorized access, service interruptions or failures, security breaches, malicious intrusions, fraud, theft, exfiltration, ransomware or other cyber-attacks; may be unable to satisfy their commitments to us in which case we may not be able to achieve acceptable alternative sourcing; or may fail to perform at all. The foregoing risks may be heightened in jurisdictions outside the U.S., where we may have fewer alternative providers as well as face additional costs, uncertainties, and risks. Among other third-party providers, we, and the pharmaceutical industry generally, depend on China-based suppliers for portions of our supply chain. U.S. officials have enacted and continue to consider legislation or other actions that are intended to limit supply chain reliance on China, including the BIOSECURE Act. In addition, historically, geopolitical tensions between the U.S. and China have led to the imposition of tariffs, sanctions, and certain other business restrictions between the U.S. and China. In 2025, the U.S. government imposed new tariffs on Chinese goods and China responded with tariffs on select U.S. goods. Tariffs have been imposed or proposed on a variety of other geographies in which we have third-party suppliers. If enacted, additional measures could result in supply disruptions or delays, increase costs more significantly, or invite further retaliatory measures, any of which could negatively impact our business and results of operations. See Item 1A, "Risk Factors—Risks Related to Doing Business Internationally—Our global operations subject us to risks, including as related to uneven economic growth or downturns, international trade, and other global disruptions, geopolitical tensions, or disputes" for additional information. In some cases, product or indication approvals depend on the outcome of regulatory inspections of third parties on which we rely. Third-party inspection outcomes have and may in the future delay or prevent product launches and otherwise negatively affect our business. Failure of third parties to meet their contractual, regulatory, confidentiality, privacy, security, or other obligations to us, our clinical trial subjects, and patients could have a material adverse effect on our business and could also result in non-compliance with legal or regulatory requirements or industry standards or subject us to reputational harm.

**Our use of artificial intelligence (AI) or other emerging technologies could adversely impact us.**

We deploy AI and other emerging technologies in various facets of our operations and we continue to explore the development and use of AI technologies. We have also entered into, and may continue to enter into, partnerships and collaborations relating to the use of AI technology to aid in drug discovery and other efforts. The rapid advancement of these technologies presents opportunities for us in research, manufacturing, commercialization, and other business endeavors but also entails risks, including that AI-generated content,

analyses, or recommendations we utilize could be inadequate, or that our competitors may more quickly or effectively adopt AI capabilities. There are significant risks involved in developing and deploying AI, and there can be no assurance that our usage of AI or our significant investments in AI will enhance our products or services or be beneficial to our business, including our efficiency or profitability. Our use of AI or other emerging technologies could also exacerbate regulatory, cybersecurity, and other significant risks.

Effective development, management, and use of AI technologies is novel and complex, and there are technical challenges associated with achieving desired levels of accuracy, efficiency, and reliability. The algorithms and models utilized in AI systems may have limitations, including biases, errors, insufficient or erroneous training data, or inability to handle certain data types or scenarios or to render explainable or effective outputs. Furthermore, there are risks associated with the fact that the platforms providing AI models are in some cases owned and operated by emerging companies with less contractual, business, and compliance sophistication. These factors may undermine our ability to effectively utilize AI or create competitive disadvantages should our competitors more skillfully make use of AI capabilities. Further, if we are unable to effectively manage the use of AI technologies by our employees, our confidential information, intellectual property, or reputation could be put at risk.

The emergence and continued expansion of AI and other technologies may exacerbate other risks, including those related to competition, regulation, litigation, compliance issues, ethical concerns, confidentiality, and data privacy or security. AI may enable new competitors in drug discovery and enhance the capabilities of existing competitors, thereby broadening and intensifying competitive dynamics. In addition, developing laws and regulations related to AI or other emerging technologies create uncertainty, may require significant resources to adjust business practices for compliance, and in some cases, may limit our ability to use AI-based software. Several governmental authorities have already proposed or enacted laws and other guidance governing AI, such as the EU Artificial Intelligence Act. These and other developing obligations create uncertainty and may prevent or make it harder for us to conduct or enhance our business using AI, or lead to regulatory fines, penalties, or other liability. Further, use of AI technologies could lead to unintended consequences, such as data leakage, healthcare fraud and abuse, cybersecurity incidents, intellectual property infringement, or unintended biases.

**Risks Related to Doing Business Internationally**

**Our global operations subject us to risks, including as related to uneven economic growth or downturns, international trade, and other global disruptions, geopolitical tensions, or disputes.**

Economic slowdowns could lead to decreased utilization of our products globally or in specific markets, affecting our sales. Declining tax revenues and increased government spending on other programs attributable to uneven economic growth or downturns may increase the pressure on governments to reduce healthcare spending, leading to increased control of drug prices or lower utilization. Additionally, some customers, including governments or other entities reliant upon government funding and cash-pay patients, may be unable to pay for our products fully or in a timely manner. Also, if our customers, suppliers, or collaboration partners experience financial difficulties, we could experience slower customer collections, greater bad debt expense, or performance defaults by suppliers or collaboration partners. Similarly, uneven economic growth or downturns could limit our ability to access capital markets.

Significant portions of our business are conducted in Europe, Asia, and other international geographies. Our global operations and complex supply chain expose us to legislation and regulatory action in or regarding foreign jurisdictions as well as geopolitical and other cross-border risks. Trade and other global disputes, interruptions, and developments, including those related to tariffs, trade protection measures, import or export licensing requirements or disagreements with authorities regarding tariff classifications, transfer pricing, or valuations, the imposition of trade sanctions or similar restrictions by the U.S. or other governments, international tension and conflicts, as well as economic stagnation, cost inflation, strains on global transportation, manufacturing, and labor markets, and public health outbreaks, epidemics, or pandemics affect our ability to do business and, in some cases, result in financial, operational, legal, business, or reputational harm. Among other risks, the use of tariffs and other trade restrictions may increase costs, impact clinical trials or sales of our products, result in supply disruptions or delays, or otherwise complicate aspects of our business. In 2025, the U.S. and other countries imposed or reached alignment on new tariffs. In some cases, imposed tariffs have been paused but may come into effect quickly and unpredictably. While pharmaceuticals are exempt from certain of these tariffs, such exemptions may be terminated or may not apply to any future tariffs.

Moreover, tensions between the U.S. and China, which have already led to a series of tariffs and sanctions, as well as other business restrictions, could further escalate based on additional trade restrictions, retaliation thereto, or otherwise, which could significantly impact our business, including by increasing scrutiny of, or restrictions on, market access, operations, and business development transactions. See Item 1A, "Risk Factors—Risks Related to Our Operations—Reliance on third-party relationships and outsourcing arrangements could adversely affect our business," for additional information. The precise impact of tariffs, trade protection measures, and other restrictions may depend on their ultimate scope, timing, and other factors. If enacted, additional restrictions could result in supply disruptions or delays, further increase costs, or otherwise have a negative impact on our business. Given the nature of pharmaceutical regulation and commercialization, we may not be able to offset the burden of increased costs from tariffs and related impacts to any meaningful degree.

In most international markets, we operate in an environment of government-mandated cost-containment programs. In some markets, including the EU, Japan, and China, governments have significant power as large single payors to regulate prices and access criteria or impose other means of cost control. Geopolitical and economic factors have in various cases exacerbated financial pressures on governments with single-payer or government funded healthcare systems, leading to increases in rebates, clawbacks, and other reforms to reimbursement systems, policies and programs. These and similar events have adversely affected, and may continue to adversely affect, us, our business partners, and our customers. For more details, see Item 1, "Business—Regulations and Private Payer Actions Affecting Pharmaceutical Pricing, Reimbursement, and Access." Our arrangements with the U.S. government and broader U.S. policy efforts to align domestic pharmaceutical pricing with international benchmarks may further pressure international payers, and the outcome of competing U.S. and international pricing objectives is uncertain. See Item 1A, "Risk Factors—Risks Related to Our Business and Industry—Our business is subject to government price controls and other public and private restrictions on pricing, reimbursement, and access for our drugs, which could have a material adverse effect on our results of operations, reputation, or business."

In addition to developments related to our business or financial results, or those of our competitors, uneven economic growth, downturns, or other negative global developments could undermine our growth or result in significant and sudden declines in the trading price of our common stock and market capitalization.

**Changes in foreign currency rates, interest rate risks, and inflation or deflation affect our results of operations.**

As a global company, we face foreign currency risk exposure from fluctuating currency exchange rates, interest rate risk from our exposure to floating and variable interest rates, and existing and expected rates of inflation or deflation in the U.S. and other jurisdictions, each of which impacts our results of operations. We are a net receiver of most foreign currencies, and our results of operations are adversely impacted when the U.S. dollar is strong compared to foreign currencies. Rapid growth in our international business and changes in the global supply chain for our products have impacted and may continue to impact our foreign currency exposure. Further, in the event of an extreme devaluation of local currency in a particular market in which we operate, the price of our products could become unsustainable in the relevant market. Inflationary pressures in recent periods have negatively impacted us and may continue to negatively impact us in various ways, including cost inflation, higher labor costs, and other higher expenses. See Item 7, "Management's Discussion and Analysis—Financial Condition and Liquidity" and Item 8, "Financial Statements and Supplementary Data—Note 1: Summary of Significant Accounting Policies and Implementation of New Financial Accounting Standards," for more details.

**Risks Related to Litigation and Government Regulation**

**We are party to litigation and investigations, which could adversely affect our business.**

We are subject to a substantial number of claims, litigation, and investigations involving various current and historical products and practices. These claims relate to how we commercialize and/or price our products, product safety, our operations, intellectual property disputes and protection, as well as contractual matters and other disputes. We have also filed lawsuits and taken other legal actions to protect our intellectual property and address unlawful practices. See Item 8, "Financial Statements and Supplementary Data—Note 16: Contingencies," for more information on certain matters. Like many companies in our industry, from time to time investigations into aspects of our business include inquiries, subpoenas, and other types of information demands from government and regulatory authorities. There continues to be a significant volume of government and regulatory investigations and litigation against companies operating in our industry, as well as robust regulatory enforcement. Additionally, government and regulatory authorities have considered and

initiated enforcement or other actions across industries to seek alignment with policy initiatives. Because of the nature of pharmaceutical products and our evolving business, we are, and could increasingly become, subject to large numbers of product liability claims for our previous, current, or future products, or to further litigation or investigations, including related to product safety, marketing, pricing, or other commercial practices. Some of these matters involve or may involve numerous plaintiffs and parties seeking large or indeterminate financial claims and may remain unresolved for several years. Such matters could negatively impact our reputation, affect our results of operations, or require us to recognize substantial charges to resolve and, if involving marketed products, could adversely affect sales of the product and our consolidated results of operations in any given period. We may also be unsuccessful in protecting our intellectual property or mitigating harm to us from unlawful practices. The ability to insure against such exposures is limited, and due to a very restrictive market for liability insurance we are predominately self-insured for litigation liability losses for all our currently and previously marketed products.

**We are subject to evolving and complex tax laws, which may result in additional liabilities.**

We are subject to income taxes in the U.S. and numerous other jurisdictions, and in the course of our business, we make judgments about the expected tax treatment of various transactions and events. Inherent uncertainties exist in estimates of many tax positions due to the complexity of tax laws. Changes in tax laws, regulations, administrative practices, principles, disclosure obligations, and interpretations, as well as events that differ from our expectations, have affected and may adversely affect our effective tax rates, cash flows, and/or results of operations. In addition, tax authorities in the U.S. and other jurisdictions in which we do business routinely examine our tax returns and are expected to increase their scrutiny and examinations of cross-border tax issues, which could unfavorably impact our results of operations and cash flows. Given the uncertainty of positions that could be taken by taxing authorities during the examinations of our tax returns, the ultimate outcome of any tax matters may result in liabilities that are greater than amounts accrued in our estimates for uncertain tax positions and could affect our results of operations in any given period. Further, actions taken with respect to tax-related matters by associations such as the Organisation for Economic Co-operation and Development (OECD) and the European Commission could influence tax laws in countries in which we operate, such as the enactments by both EU and non-EU countries of a global minimum tax. Modifications to key elements of the U.S. or international tax framework could have a significant impact on our effective tax rate, results of operations, and cash flows. See Item 7, "Management's Discussion and Analysis—Executive Overview—Other Matters—Tax Matters" and Item 8, "Financial Statements and Supplementary Data—Note 14: Income Taxes," for more details.

**Regulatory compliance problems could be damaging to the company.**

The marketing, promotional, and pricing practices of pharmaceutical manufacturers, as well as the manner in which manufacturers interact with purchasers, prescribers, and patients, are subject to extensive scrutiny and regulation. New or ongoing business practices or commercial capabilities may subject us to additional scrutiny over compliance with applicable regulatory schemes and compliance obligations or expose us to new regulatory schemes and compliance obligations entirely. Many companies, including us, are and have been subject to investigations, litigation, and claims related to these practices asserted by governmental authorities and other parties. Such investigations, litigation, and claims result in substantial expense and other significant consequences, including in some cases criminal charges and fines, criminal and civil penalties, damages, and other monetary or non-monetary remedies, including exclusion from U.S. federal and other healthcare programs. Evolving U.S. and foreign regulatory priorities may result in an increase in such investigations, litigation, and claims. In addition, regulatory issues and evolving standards concerning compliance with cGMP and quality assurance, including increased scrutiny around excipients, potential impurities such as nitrosamines, and chemicals important to pharmaceutical manufacturing, in some cases lead to regulatory and legal actions, product recalls and seizures, fines and penalties, interruption of production leading to product shortages, import bans, or denials of import certifications, delays or denials in new product approvals or line extensions or supplemental approvals of current products pending resolution of the issues, and reputational harm, any of which adversely affects our business. Regulatory oversight of the pharmaceutical industry entails judgment and interpretation, which can result in varying interpretations of laws and regulations by health and other authorities.

U.S. and other authorities are regularly and actively proposing, enacting, and pursuing numerous policy, regulatory, and enforcement changes that impact many aspects of our operations. These changes are in some cases advanced with short notice. Such changes may undermine our ability to achieve business objectives, may be costly to implement, may provide only limited time for compliance, may change accounting and reporting standards, may carry significant penalties for non-compliance, or may otherwise create

uncertainty. See Item 1, "Business—Government Regulation of Our Operations and Products," for more details. For example, U.S. government authorities have taken and may continue to take actions intended to restrict direct-to-patient advertising and promotion of prescription drugs and biologics. These or other initiatives may influence the ways in which we can market our products, which could negatively affect our business. Moreover, novel regulatory or policy programs such as the FDA Commissioner's National Priority Voucher Pilot Program may attract scrutiny and criticism from various stakeholders. Our participation in such programs, notwithstanding the review processes involved and our adherence to applicable requirements and procedures, may expose us to legal, regulatory, political, and reputational risks.

We rely on the FDA and other global regulatory bodies for appropriate oversight, administration and enforcement across our industry, anyone marketing or purporting to market medicines, and public health. Oversight, administrative, and enforcement changes, delays, inconsistencies, lapses, and failures could materially impact our business and reputation. See Item 1, "Business—Government Regulation of Our Operations and Products," for additional information on regulatory risks, including as related to counterfeit, misbranded, adulterated, and mass-compounded drugs. Regulatory oversight and compliance processes in jurisdictions outside the U.S. may be particularly unpredictable and result in additional costs, uncertainties, and risks.

Furthermore, there is a sustained focus by foreign, federal, state, and local regulatory and legislative bodies on legislation and policies relating to climate change, greenhouse gas emissions, carbon taxes, emissions trading schemes, sustainability, human rights and related due diligence, workforce matters, and disclosures regarding the foregoing, many of which may be ambiguous, inconsistent, dynamic or conflicting. We have experienced increased compliance costs, legal costs, and expenses related to such new or changing legal or regulatory requirements. Moreover, compliance with any such legal or regulatory requirements requires us to devote time and attention, which may be substantial, to these matters. In addition, we may still be subject to penalties or potential litigation if such laws and regulations are interpreted or applied in a manner inconsistent with our practices.

Additionally, there is attention from the media, stockholders, activists, political leadership, regulatory authorities, and other stakeholders on climate, social, and other sustainability matters. The perception that we or others in our industry or supply chain have failed to act in an appropriate manner, whether or not valid, results in publicity that can negatively affect our business, brand, and reputation, as well as result in increased scrutiny from political leadership, legislators and regulatory authorities. For example, negative perception of inclusion initiatives, whether due to a perceived over- or under-pursuit of such initiatives, may result in issues hiring or retaining employees, as well as potential investigations, enforcement actions, litigation, reputational harm, or other adverse impacts. Moreover, from time to time we voluntarily establish and publicly announce goals, initiatives, and commitments, including on climate (including greenhouse gas emission reduction goals), social, and other sustainability matters. Our ability to achieve any of these stated goals, targets or objectives is subject to numerous factors and conditions, many of which are outside our control. Examples of such factors include evolving regulatory requirements affecting sustainability standards or disclosures or imposing different requirements, and the availability of suppliers that can meet our sustainability and other goals. If we fail to achieve, are perceived to have failed or been delayed in achieving, or improperly report our progress toward achieving these goals, initiatives, and commitments, it could negatively affect our reputation, brand, or investor confidence, and expose us to investigations, enforcement actions and litigation. Conversely, our pursuit or achievement of such goals, initiatives, and commitments may not be viewed favorably by certain stakeholders and could increase scrutiny of our business, negatively affect our reputation, or expose us to investigations, enforcement actions, and litigation.

## *Item 1B. Unresolved Staff Comments*

None.

***Item 1C. Cybersecurity***

**Risk Management and Strategy**

We manage cybersecurity threats as part of our oversight, evaluation, and mitigation of enterprise-level risks. We have based our cybersecurity program on industry frameworks, including, among others, the U.S. National Institute of Standards and Technology Cybersecurity Framework, with the goal of building enterprise resilience against an evolving landscape of cybersecurity threats and responding to cybersecurity threats as they materialize. Our program includes monitoring, identification, assessment, and management components, as well as information sharing and escalation components designed to inform management and the board of directors of prospective risks and developments.

Our information security program encompasses functions dedicated to both proactive and reactive management of cybersecurity threats. We implement our cybersecurity program internally through established policies, standards, reference architectures, and the use of enterprise security services that focus on emerging and ongoing cybersecurity risks. Our proactive management of cybersecurity risks entails many actions, including the maintenance of system access restrictions, utilization of data security technology, employee education and training initiatives, and retention of cyber liability insurance, among other measures. We regularly engage third-party auditors and consultants and leverage our internal audit function to assess various facets of our cybersecurity program. These engagements include completion of industry-standard assessments or certifications, maturity model reviews, threat simulations, as well as internal reviews to assess the effectiveness of our cybersecurity processes. We also maintain enterprise-wide processes to oversee and identify risks from cybersecurity threats associated with our use of third-party service providers. As examples, we generally review current and prospective third-party service providers for unacceptable cybersecurity risks, negotiate contractual provisions that require the establishment of third-party cybersecurity controls, and deploy security measures to protect third-party communications. For companies we acquire, the integration process includes plans for alignment with relevant information security policies and procedures.

We assess cybersecurity contingencies within our overall business continuity risk management planning process. Our Information Security team utilizes various tools to prevent, detect, monitor, and react to cybersecurity threats. Our Incident Response Playbook outlines processes, roles, responsibilities, engagements, escalations, notifications, and other communications applicable to the assessment, mitigation, and remediation of realized cybersecurity events. The nature and assessed risk of a realized cybersecurity event dictates the pace and extent of relevant processes, escalations, and communications, including an evaluation of any necessary or required disclosure. Roles and escalation paths range from within the Information Security team up to the Executive Committee, and the board of directors and its committees, as appropriate.

We describe certain risks faced by us from identified cybersecurity threats in Item 1A, "Risk Factors—Risks Related to Our Operations—Failure, inadequacy, breach of, or unauthorized access to, our IT systems or those of our third-party service providers, unauthorized access to our confidential information, or violations of data protection laws, could result in material harm to our business and reputation", "Risk Factors—Risks Related to Our Operations—Manufacturing, quality, or supply chain difficulties, disruptions, or shortages could lead to product supply problems or other negative outcomes", "Risk Factors—Risks Related to Our Operations—Reliance on third-party relationships and outsourcing arrangements could adversely affect our business", and "Risk Factors—Risks Related to Our Operations—Our use of artificial intelligence (AI) or other emerging technologies could adversely impact us."

**Governance**

Management, under the supervision of our Chief Information Security Officer (CISO), is directly responsible for assessing and managing cybersecurity risks and otherwise implementing our cybersecurity program, which includes our Incident Response Playbook. The CISO reports directly to our Chief Information and Digital Officer (CIDO), who is a member of our Executive Committee and leads our information technology, cybersecurity, digital health, and advanced analytics and data science functions. Our CIDO in turn regularly updates our Executive Committee on cybersecurity matters. Our CISO and CIDO have significant experience managing global cybersecurity threats across the pharmaceutical, technology, entertainment, and defense industries. In addition to providing regular updates to the CIDO and his staff, the CISO is a member of our Executive Information Security Governance function (EISG), which meets regularly and is composed of executive and senior leadership from a variety of functions, including information security, legal, finance, audit, and ethics and compliance to assess and manage cybersecurity developments and risks and our internal programs. Each of the CIDO, the CISO and the EISG may call upon business and legal stakeholders across our company to manage cybersecurity threats and incidents.

Our board of directors monitors cybersecurity risks and regularly participates in presentations on cybersecurity and information technology. The audit committee of our board of directors is responsible for oversight of our programs, policies, procedures, and risk management activities related to information security, cybersecurity and data protection. The audit committee meets regularly with our CIDO, CISO, and Chief Privacy Officer to discuss threats, risks, and ongoing efforts to enhance cyber resiliency, as well as changes to the broader cybersecurity landscape. In addition, the ethics and compliance committee supports the audit committee and board in oversight of legal and regulatory compliance. In addition to regular presentations, management promptly updates our board of directors regarding significant threats and incidents as they arise.

## *Item 2. Properties*

Our principal domestic and international executive offices are located in Indianapolis. We own several production, distribution, and corporate administrative sites in the U.S., including Puerto Rico. Major production sites include facilities in Indiana, North Carolina, Puerto Rico, and Wisconsin. We own several production and distribution sites in Europe and Asia. Major production sites include facilities in Ireland, France, Spain, Italy, China, and Japan. Additional U.S. and international production facilities and expansions of production facilities are expected to come online in future periods.

Our research and development facilities are primarily located in the U.S. and consist of owned facilities in Indiana and leased sites in California, Massachusetts, Colorado, and New York.

We believe that none of our properties is subject to any encumbrance, easement, or other restriction that would detract materially from its value or impair its use in the operation of the business. The buildings we own are of varying ages and in good condition.

## *Item 3. Legal Proceedings*

We are a party to various currently pending legal actions, government investigations, and environmental proceedings. Information pertaining to legal proceedings is described in Item 8, "Financial Statements and Supplementary Data—Note 16: Contingencies," and incorporated by reference herein.

## *Item 4. Mine Safety Disclosures*

Not applicable.

# Part II

***Item 5. Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities***

Our common stock is listed under the ticker symbol LLY on the New York Stock Exchange (NYSE). As of February 9, 2026, there were approximately 16,886 holders of record of our common stock based on information provided by EQ Shareowner Services, our transfer agent.

Information relating to our dividends and related stockholder matters is described in Item 7, "Management's Discussion and Analysis of Results of Operations and Financial Condition" and Item 12, "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters." This information is incorporated herein by reference.

The following table summarizes the activity related to repurchases of our equity securities during the three months ended December 31, 2025:

| Period | Total Number of Shares Purchased (in thousands) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (in thousands) | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs (dollars in millions) |
|---|---|---|---|---|
| October 2025 | 472 | $ 933.79 | 472 | $ 11,960 |
| November 2025 | 877 | 1,033.47 | 877 | 11,053 |
| December 2025 | 130 | 1,032.42 | 130 | 10,919 |
| Total | 1,479 | 1,001.60 | 1,479 | |

During the three months ended December 31, 2025, we repurchased $1.5 billion of shares under our $15.0 billion share repurchase program that our board authorized in December 2024.

**PERFORMANCE GRAPH**

The following graph compares the return on Lilly stock with that of the Standard & Poor's (S&P) 500 Stock Index and our peer groups for the years 2021 through 2025. The graph assumes that, on the last business day of 2020, a person invested $100 each in Lilly stock, the S&P 500 Stock Index, and each of the peer groups' collective common stock. The graph measures total shareholder return, which takes into account both stock price and dividends. It assumes that dividends paid by a company are immediately reinvested in that company's stock.

**Comparison of Five-Year Cumulative Total Shareholder Return**




| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Lilly | $ 100.00 | $ 166.08 | $ 222.94 | $ 358.72 | $ 478.17 | $ 670.56 |
| Current Peer Group[1] | 100.00 | 116.73 | 124.87 | 118.45 | 123.43 | 154.11 |
| Prior Peer Group[2] | 100.00 | 120.85 | 134.50 | 132.73 | 134.53 | 157.61 |
| S&P 500 | 100.00 | 128.71 | 105.40 | 133.10 | 166.40 | 196.16 |

(1) In 2025, we revised the peer group used as the industry index for this graph to align with the peer group used for executive compensation purposes for 2025. The 2025 peer group is comprised of the following companies in the pharmaceutical and biotechnology industries: AbbVie Inc.; Amgen Inc.; AstraZeneca PLC; Bristol-Myers Squibb Company; Gilead Sciences Inc.; GlaxoSmithKline plc; Johnson & Johnson; Medtronic plc; Merck & Co., Inc.; Novartis AG; Pfizer Inc.; Roche Holding AG; Sanofi S.A.; and Stryker Corporation.

(2) Prior to 2025, the peer group we used as the industry index for this graph was comprised of the following companies in the pharmaceutical and biotechnology industries: AbbVie Inc.; Amgen Inc.; AstraZeneca PLC; Biogen Inc.; Bristol-Myers Squibb Company; Gilead Sciences Inc.; GlaxoSmithKline plc; Johnson & Johnson; Merck & Co., Inc.; Novartis AG; Novo Nordisk A/S; Pfizer Inc.; Roche Holding AG; Sanofi S.A.; and Takeda Pharmaceutical Company Limited.

***Item 6. [Reserved]***

***Item 7. Management's Discussion and Analysis of Results of Operations and Financial Condition***

(Tables present dollars in millions, except per-share data, and numbers may not add due to rounding)

**General**

Management's discussion and analysis of results of operations and financial condition is intended to assist the reader in understanding and assessing significant changes and trends related to our results of operations and financial position. This discussion and analysis should be read in conjunction with Item 8, "Financial Statements and Supplementary Data." Certain statements in this Item 7 constitute forward-looking statements. Various risks and uncertainties, including those discussed in "Forward-Looking Statements" and Item 1A, "Risk Factors," may cause our actual results, financial position, and cash generated from operations to differ from these forward-looking statements.

**EXECUTIVE OVERVIEW**

This section provides an overview of our financial results, our clinical development pipeline, and other matters affecting our company and industry.

**Financial Results**

The following table summarizes certain financial information:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2025 | 2024 | Percent Change |
| Revenue | **$ 65,179** | $ 45,043 | 45 |
| Net income | **20,640** | 10,590 | 95 |
| Earnings per share - diluted | **22.95** | 11.71 | 96 |

Revenue increased in 2025 driven primarily by increased volume, partially offset by lower realized prices. The increased volume and lower realized prices in 2025 were primarily driven by Mounjaro and Zepbound.

Net income and earnings per share increased in 2025, primarily due to higher gross margin, partially offset by increased marketing, selling, and administrative expenses and research and development expenses.

See "Results of Operations" for additional information.

**Clinical Development Pipeline**

Our long-term success depends on our ability to continually discover or acquire, develop, and commercialize innovative medicines.

The following select new molecular entities (NMEs) and new indication line extension (NILEX) products are currently in clinical trials or have been submitted for regulatory review or have recently received regulatory approval in the U.S., European Union (EU), or Japan. The table reflects the status of these NMEs and NILEX products, up to the time of the filing of this Annual Report on Form 10-K:

| Compound | Indication/Study | Status | Developments |
|---|---|---|---|
| **Cardiometabolic Health** | | | |
| Tirzepatide (Mounjaro, Zepbound) | Heart failure with preserved ejection fraction | Approved | Approved in the EU. |
| | Pediatric and adolescent type 2 diabetes | Approved | Approved in the U.S. and the EU. |
| | Cardiovascular outcomes in type 2 diabetes | Submitted | Submitted in the U.S. |
| | Metabolic dysfunction-associated steatotic liver disease | Phase 3 | Phase 3 trial was initiated. |
| | Morbidity and mortality in obesity | Phase 3 | Phase 3 trial is ongoing. |
| | Type 1 diabetes | Phase 3 | Phase 3 trials were initiated. |
| Insulin efsitora alfa | Type 2 diabetes | Submitted | Submitted in the U.S., the EU, and Japan. |
| Orforglipron | Obesity(1) | Submitted | Submitted in the U.S., the EU, and Japan. |
| | Type 2 diabetes | Submitted | Submitted in the EU. Phase 3 trials are ongoing. |
| | Cardiovascular outcomes | Phase 3 | Phase 3 trial was initiated. |
| | Hypertension | Phase 3 | Phase 3 trial was initiated. |
| | Obstructive Sleep Apnea (OSA) | Phase 3 | Phase 3 trials are ongoing. |
| | Osteoarthritis pain | Phase 3 | Phase 3 trial was initiated. |
| | Peripheral artery disease | Phase 3 | Phase 3 trial was initiated. |
| | Stress urinary incontinence | Phase 3 | Phase 3 trial was initiated. |
| Eloralintide | Obesity | Phase 3 | Phase 3 trial was initiated. |
| Lepodisiran | Atherosclerotic cardiovascular disease | Phase 3 | Phase 3 trial is ongoing. |
| Muvalaplin | Atherosclerotic cardiovascular disease | Phase 3 | Phase 3 trial was initiated. |
| Retatrutide | Cardiovascular / renal outcomes | Phase 3 | Phase 3 trials are ongoing. |
| | Chronic low back pain | Phase 3 | Phase 3 trial was initiated. |
| | Metabolic dysfunction-associated steatotic liver disease | Phase 3 | Phase 3 trial was initiated. |
| | Obesity, osteoarthritis, OSA | Phase 3 | Phase 3 trial met all primary and key secondary endpoints. Phase 3 trials are ongoing. |
| | Type 2 diabetes | Phase 3 | Phase 3 trials are ongoing. |

| Compound | Indication/Study | Status | Developments |
|---|---|---|---|
| **Immunology** | | | |
| Mirikizumab (Omvoh) | Crohn's disease | Approved | Approved in the U.S., the EU, and Japan. |
| Lebrikizumab[(2)] | AR (perennial allergens) | Phase 3 | Phase 3 trial is ongoing. |
| | CRSwNP | Phase 3 | Phase 3 trial is ongoing. |
| **Neuroscience** | | | |
| Donanemab (Kisunla) | Early Alzheimer's disease | Approved | Approved in the U.S., the EU, and Japan. |
| | Pre-clinical Alzheimer's disease | Phase 3 | Phase 3 trial is ongoing. |
| Brenipatide | Alcohol use disorder | Phase 3 | Phase 3 trial was initiated. |
| Ixo-vec | Wet age-related macular degeneration | Phase 3 | Acquired in the acquisition of Adverum Biotechnologies, Inc. Phase 3 trial is ongoing. |
| Remternetug | Pre-clinical/MCI Alzheimer's disease | Phase 3 | Phase 3 trials are ongoing. |
| **Oncology** | | | |
| Imlunestrant (Inluriyo) | ER+, HER2-, ESR1-mutated advanced or metastatic breast cancer | Approved | Approved in the U.S., the EU, and Japan. |
| | Adjuvant breast cancer | Phase 3 | Phase 3 trial is ongoing. |
| Pirtobrutinib (Jaypirca) | Chronic lymphocytic leukemia | Approved | Full approval in the U.S., the EU, and Japan. |
| Olomorasib[(3)] | 1L KRAS G12C+ NSCLC | Phase 3 | Phase 3 trial is ongoing. |
| | Resected adjuvant NSCLC | Phase 3 | Phase 3 trial was initiated. |
| | Unresected adjuvant NSCLC | Phase 3 | Phase 3 trial was initiated. |
| Sofetabart mipitecan (FRα ADC)[(3)] | Platinum-resistant ovarian cancer | Phase 3 | Phase 3 trial was initiated. |

[(1)] Granted a Commissioner's National Priority Voucher from the FDA.
[(2)] In collaboration with Almirall, S.A. in Europe.
[(3)] The FDA granted Breakthrough Therapy designation for olomorasib for the treatment of certain newly diagnosed metastatic KRAS G12C-mutant lung cancers and for sofetabart mipitecan for the treatment of certain patients with platinum-resistant ovarian cancer. Breakthrough Therapy designation is designed to expedite the development and review of potential medicines that are intended to treat a serious condition when preliminary clinical evidence indicates that the treatment may demonstrate substantial improvement on a clinically significant endpoint(s) over already available therapies.

There are many difficulties and uncertainties inherent in pharmaceutical research and development, the introduction of new products and indications, business development activities to enhance or refine our product pipeline, and commercialization of our products. There is a high rate of failure inherent in drug discovery and development. To bring a product from the discovery phase to market takes considerable time and entails significant cost. See Item 1A, "Risk Factors—Risks Related to Our Business and Industry—Pharmaceutical research and development is very costly and highly uncertain; we may not succeed in developing, licensing, or acquiring commercially successful products sufficient in number or value to replace revenues of products that have lost or will lose intellectual property protection or are displaced by competing products or therapies," for additional information.

We manage research and development spending across our portfolio of potential new medicines and indications. A delay in, or termination of, any one project will not necessarily cause a significant change in our total research and development spending. Due to the risks and uncertainties involved in the research and development process, we cannot reliably estimate the nature, timing, and costs of the efforts necessary to complete the development of our research and development projects, nor can we reliably estimate the future potential revenue that will be generated from any successful research and development project. Each project represents only a portion of the overall pipeline, and none is individually material to our consolidated research and development expense. While we do accumulate certain research and development costs on a project level for internal reporting purposes, we must make significant cost estimations and allocations, some of which rely on data that are neither reproducible nor validated through accepted control mechanisms. Therefore, we do not have sufficiently reliable data to report on total research and development costs by project, by pre-clinical versus clinical spend, or by therapeutic category.

**Other Matters**

*Trends Affecting Pharmaceutical Pricing, Reimbursement, and Access and Certain Other Regulatory Developments*

Global concern over access to, and affordability of, pharmaceutical products continues to drive debate and action, as well as cost containment efforts by governmental authorities and scrutiny of pricing and access disparities. Cost containment measures include the use of mandated discounts, price reporting requirements, mandated reference prices, restrictive formularies, changes to available intellectual property protections, as well as other efforts.

Reforms, initiatives, and other actions, including those that may stem from political initiatives, periods of uneven economic growth or downturns, or as a result of inflation or deflation, trade and other global disputes and interruptions including related to tariffs, trade protection measures, and similar restrictions, the emergence or escalation of, and responses to, international tension and conflicts, or government budgeting priorities, are expected to continue to result in added pressure on cost, pricing, reimbursement, and access for our products.

In November 2025, we announced preliminary voluntary agreements with the U.S. government in which, among other arrangements, we agreed to lower Medicaid and certain other drug prices for U.S. patients and to launch new medicines with a more balanced pricing approach across developed nations. We face risks and uncertainty associated with these arrangements and negotiating the definitive agreements, including potential delays and the possibility of unfavorable terms related to pricing, access, and other key objectives. Among other risks, we may fail to adequately capitalize on the additional U.S. access to our obesity medicines resulting from these agreements, particularly if the revenues generated from such expanded access are insufficient to offset pricing concessions. Moreover, the outcome of these arrangements and broader U.S. policy efforts to align domestic pharmaceutical pricing with international benchmarks from countries with competing healthcare cost containment priorities is uncertain and could negatively impact our pricing strategies, product demand or access, or competitive positioning across global markets, and may result in reduced revenue in certain markets.

Other policies, regulations, legislation, or enforcement, including those proposed or pursued by lawmakers, regulators, and other authorities in the U.S. and worldwide, have and may continue to adversely impact our business and consolidated results of operations.

The IRA requires HHS to effectively set prices for certain single-source drugs and biologics reimbursed under Medicare Part B and Part D. Currently, these government prices generally apply beginning at nine years (for medicines approved under a New Drug Application) or thirteen years (for medicines approved under a Biologics License Application) following FDA approval or licensure for the molecule. In August 2023, HHS selected Jardiance, which is part of our collaboration with Boehringer Ingelheim, as one of the first ten medicines subject to government-set prices effective in 2026. In January 2026, HHS selected Trulicity and Verzenio as additional medicines subject to government-set prices to be effective in 2028. Given our product portfolio, we expect other significant products will be selected in future years. The IRA has, and will continue to, meaningfully influence our business strategies and those of our competitors and could significantly impact our business and consolidated results of operations.

The U.S. and other countries have recently imposed or reached alignment on new tariffs. In some cases, imposed tariffs have been paused but may come into effect quickly and unpredictably. While pharmaceuticals are exempt from certain of these tariffs, such exemptions may be terminated or may not apply to any future tariffs. The precise impact of tariffs, trade protection measures, and other restrictions depend on their ultimate scope, timing, and other factors. If enacted, additional restrictions could result in supply disruptions or delays, further increase costs, or otherwise have a negative impact on our business. Given the nature of pharmaceutical regulation and commercialization, we may not be able to share the burden of increased costs from tariffs and related impacts to any meaningful degree.

Private payers and pharmacy benefit managers in the U.S. continue to significantly impact the market for pharmaceuticals through negotiation of access, manufacturer price or rebate concessions and pharmacy reimbursement rates. Restrictive or unfavorable pricing, coverage, or reimbursement determinations for our medicines or product candidates by governments, regulatory agencies, courts, or private actors have and may continue to adversely impact our business and consolidated results of operations. In addition, we are engaged in litigation and investigations related to the 340B program, access to insulin, pricing, product safety, and other matters that, if resolved adversely to us, could negatively impact our business and consolidated results of operations. It is not currently possible to predict the overall potential adverse impact to us or the general pharmaceutical industry of continued cost containment efforts worldwide.

In addition, regulatory issues concerning compliance with current Good Manufacturing Practices, quality assurance, safety signals, evolving standards, and increased scrutiny around excipients and potential impurities such as nitrosamines, and similar regulations and standards (and comparable foreign regulations and standards) for our products in some cases lead to regulatory and legal actions, product recalls and seizures, fines and penalties, interruption of production leading to product shortages, import bans or denials of import certifications, inability to realize the benefit of capital expenditures, or delays or denials in new product approvals, line extensions or supplemental approvals of current products pending resolution of the issues, or other negative impacts, any of which result in reputational harm or adversely affect our business.

*Incretin Medicines*

Mounjaro and Zepbound accounted for 56 percent of our total revenues in 2025 and we expect cardiometabolic health products will continue to represent a significant and growing portion of our business, revenues, and prospects. In 2025, we reached preliminary drug pricing agreements with the U.S. government. As part of these agreements, Medicare beneficiaries will have access to discounted Lilly obesity medicines by July 1, 2026 and individual state Medicaid programs will have the option to expand access to these medicines. Also in 2025, we received a U.S. Commissioner's National Priority Voucher for our product candidate orforglipron for the treatment of obesity, and we submitted to the FDA under that expedited review pathway. Internationally, we launched Mounjaro in all major markets. To support anticipated demand for our current and prospective products, we have undertaken significant manufacturing expansion initiatives. Additional capacity is expected to become operational over the next several years.

We expect our near-term financial performance will be impacted by, among other factors, the timing of potential regulatory approvals for orforglipron and U.S. Medicare access for Zepbound (and, if approved, orforglipron), as well as the demand and pace of uptake in new incretin channels and markets. More generally, incretin volume fluctuations due to channel dynamics or demand can have a disproportionate impact on our results of operations in any given period. Longer term, the durability of our cardiometabolic health product offerings and sustainability of our growth and prospects will depend on our ability to maintain or strengthen our competitive position as the therapeutic landscape evolves and to deliver further innovations that provide sufficient value to sustain our growth momentum.

We continue to see the production, marketing, and sale of counterfeit, misbranded, adulterated, and mass-compounded incretins. These practices may impact patient safety and undermine regulatory drug approval processes. While the FDA confirmed in late 2024 that the previous shortage of tirzepatide had ended and that compounding pharmacies are required to cease mass production, we cannot guarantee adequate regulation or compliance. Lilly will continue to consider all options, including filing lawsuits where appropriate, to address unlawful practices and the patient safety risks of unapproved, untested, and manipulated drugs.

*Tax Matters*

We are subject to income taxes and various other taxes in the U.S. and in many foreign jurisdictions; therefore, changes in both domestic and international tax laws or regulations have affected and may affect our effective tax rate, results of operations, and cash flows. The U.S. and countries around the world are actively proposing and enacting tax law changes. Further, actions taken with respect to tax-related matters by associations such as the OECD and the European Commission could influence tax laws in countries in which we operate. Tax authorities in the U.S. and other jurisdictions in which we do business routinely examine our tax returns and are expected to increase their scrutiny of cross-border tax issues. Changes to existing U.S. and foreign tax laws and increased scrutiny by tax authorities in the U.S. and other jurisdictions could have a material adverse impact on our future consolidated results of operations and cash flows.

In July 2025, the One Big Beautiful Bill Act (OBBBA), which implemented certain U.S. tax law changes, was enacted into law. The OBBBA modified and made permanent several provisions of the Tax Cuts and Jobs Act, including reductions in scheduled increases for the rate of taxation of foreign income, immediate deductibility of U.S. research and development expenses, and reinstatement of 100 percent bonus depreciation for capital assets.

*Acquisitions*

We invest in external research and technologies and manufacturing capabilities that we believe complement and strengthen our own efforts. These investments can take many forms, including acquisitions, collaborations, investments, and licensing arrangements. We view our business development activity as a way to enhance or refine our pipeline and strengthen our business.

Continued regulatory focus on business combinations in our industry, including by the Federal Trade Commission and competition authorities in Europe and other jurisdictions, could continue to delay, jeopardize, or increase the costs of our business development activities and may negatively impact our consolidated financial position or results of operations.

*Foreign Currency Exchange Rates*

As a global company, we face foreign currency risk exposure from fluctuating currency exchange rates, primarily the U.S. dollar against the euro, Japanese yen, Chinese yuan, and British pound sterling. While we seek to manage a portion of these exposures through hedging and other risk management techniques, significant fluctuations in currency rates can have a material impact, either positive or negative, on our consolidated results of operations in any given period. There is uncertainty in the future movements in foreign currency exchange rates, and fluctuations in these rates have and could adversely impact our consolidated results of operations and cash flows.

*Other Factors*

Other factors have had, and may continue to have, an impact on our consolidated results of operations. These factors include cost and wage inflation, supply chain and labor market complexities, international tension and conflicts, uneven economic growth, downturns or uncertainty, risks related to engaging in business globally, including legislation and regulatory action in or regarding foreign jurisdictions, and fluctuations due to channel dynamics or demand for certain products.

See Item 1, "Business" and Item 1A, "Risk Factors," and Notes 4, 14, and 16 to the consolidated financial statements for additional information and risks and uncertainties that could impact our business and operations, including the matters described within this Executive Overview.

## RESULTS OF OPERATIONS

### Operating Results—2025

*Revenue*

The following table summarizes our revenue activity by region:

| | Year Ended December 31, 2025 | Year Ended December 31, 2024 | Percent Change |
|---|---|---|---|
| U.S. | **$ 43,481** | $ 30,375 | 43 |
| Outside U.S. | **21,698** | 14,668 | 48 |
| Revenue | **$ 65,179** | $ 45,043 | 45 |

The following are components of the change in revenue compared with the prior year:

| | 2025 vs. 2024 U.S. | 2025 vs. 2024 Outside U.S. | 2025 vs. 2024 Consolidated |
|---|---|---|---|
| Volume | 53 % | 46 % | 50 % |
| Price | (10)% | — % | (6)% |
| Foreign exchange rates | — % | 2 % | 1 % |
| Percent change | 43 % | 48 % | 45 % |

In the U.S., the volume increase and the lower realized prices in 2025 were primarily driven by Mounjaro and Zepbound.

Outside the U.S., the volume increase in 2025 was primarily driven by Mounjaro.

The following table summarizes our revenue, including net product revenue and collaboration and other revenue, by product in 2025 compared with 2024:

| | Year Ended December 31, 2025 | | | 2024 | |
|---|---|---|---|---|---|
| | U.S. | Outside U.S. | Total | Total | Percent Change |
| Mounjaro | **$ 13,651** | **$ 9,315** | **$ 22,965** | $ 11,540 | 99 |
| Zepbound[(1)] | **13,484** | **58** | **13,542** | 4,926 | 175 |
| Verzenio | **3,464** | **2,259** | **5,723** | 5,307 | 8 |
| Other products | **12,882** | **10,066** | **22,949** | 23,270 | (1) |
| Revenue | **$ 43,481** | **$ 21,698** | **$ 65,179** | $ 45,043 | 45 |

(1) Tirzepatide is marketed for obesity under the brand name Zepbound in Canada, Japan, and the U.S.

Revenue of Mounjaro increased 53 percent in the U.S., driven by strong demand, partially offset by lower realized prices. Revenue outside of the U.S. was $9.3 billion in 2025 compared to $2.6 billion in 2024, primarily driven by volume growth.

Revenue of Zepbound increased 174 percent in the U.S., driven by increased demand, partially offset by lower realized prices.

Revenue of Verzenio increased 1 percent in the U.S. Revenue outside the U.S. increased 20 percent, driven by volume growth.

*Gross Margin, Costs, and Expenses*

The following table summarizes our gross margin, costs, and expenses:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2025** | **2024** | **Percent Change** |
| Gross margin | **$ 54,127** | $ 36,625 | 48 |
| Gross margin as a percent of revenue | **83.0 %** | 81.3 % | |
| Research and development | **$ 13,337** | $ 10,991 | 21 |
| Marketing, selling, and administrative | **11,094** | 8,594 | 29 |
| Acquired in-process research and development | **2,910** | 3,280 | (11) |
| Income taxes | **5,091** | 2,090 | 144 |
| Effective tax rate | **19.8 %** | 16.5 % | |

Gross margin as a percent of revenue in 2025 increased 1.7 percentage points compared with 2024, primarily driven by favorable product mix and improved cost of production, partially offset by lower realized prices.

Research and development expenses increased 21 percent in 2025, primarily driven by continued investments in our early and late-stage portfolio.

Marketing, selling, and administrative expenses increased 29 percent in 2025, primarily driven by promotional efforts supporting ongoing and planned launches.

Acquired in-process research and development (IPR&D) charges recognized in 2025 were primarily related to the acquisitions of Scorpion Therapeutics, Inc.'s (Scorpion) PI3Kα inhibitor program STX-478 and of SiteOne Therapeutics, Inc. (SiteOne). Acquired IPR&D charges recognized in 2024 were primarily related to the acquisition of Morphic Holding, Inc. (Morphic). See Note 4 to the consolidated financial statements for additional information.

Our effective tax rate was 19.8 percent in 2025 compared with an effective tax rate of 16.5 percent in 2024, primarily driven by unfavorable impacts related to the jurisdictional mix of earnings and U.S. tax law changes in 2025 relative to 2024. The effective tax rates for both periods were unfavorably impacted by non-deductible acquired IPR&D charges, with a larger impact occurring in 2024. See Note 14 to the consolidated financial statements for additional information.

**Operating Results—2024**

For a discussion of our results of operations pertaining to 2024 and 2023 see Item 7, "Management's Discussion and Analysis of Results of Operations and Financial Condition" in our Annual Report on Form 10-K for the year ended December 31, 2024.

**FINANCIAL CONDITION AND LIQUIDITY**

We believe our available cash and cash equivalents, together with our ability to generate operating cash flow and our access to short-term and long-term borrowings, are sufficient to fund our existing and planned capital requirements, which include:

- working capital requirements, including related to employee payroll and benefits, clinical trials, manufacturing materials, and taxes;
- capital expenditures;
- share repurchases and dividends;
- repayment of outstanding short-term and long-term borrowings;
- milestone and royalty payments; and
- potential business development activities, including acquisitions, collaborations, investments, and licensing arrangements.

Our management continuously evaluates our liquidity and capital resources, including our access to external capital, to ensure we can adequately and efficiently finance our capital requirements. As of December 31, 2025, our material cash requirements primarily related to purchases of goods and services to produce our products and conduct our operations, income tax payments, capital expenditures, dividends, milestone and royalty payments, business development activities, share repurchases and repayment of outstanding borrowings (see Notes 14, 3, 4, 13, and 11 to the consolidated financial statements). We anticipate our cash requirements related to ordinary course purchases of goods and services will be consistent with our past levels relative to revenues.

Capital expenditures were $7.8 billion during 2025, compared to $5.1 billion in 2024. We are making investments in global facilities to manufacture existing and future products. These investments, and other capital investments that support our operations, have increased our capital expenditures and will result in meaningfully higher capital expenditures in the near term.

As we expand our manufacturing capacity in order to meet existing and expected demand of our medicines, we have entered, and expect to continue to enter, into various agreements for contract manufacturing and for supply of materials. Executed agreements related to our medicines in development could, under certain circumstances, require us to pay up to approximately $10 billion if we do not purchase specified amounts of goods or services over the durations of the agreements, which are generally up to 8 years.

Cash and cash equivalents increased to $7.3 billion as of December 31, 2025, compared with $3.3 billion at December 31, 2024. Net cash provided by operating activities increased to $16.8 billion in 2025, compared with $8.8 billion in 2024. Refer to the consolidated statements of cash flows for additional information on the significant sources and uses of cash for the years ended December 31, 2025 and 2024.

In addition to our cash and cash equivalents, we held total investments of $2.9 billion and $3.4 billion as of December 31, 2025 and 2024, respectively. As of December 31, 2025, we had approximately $902 million of unfunded commitments to invest in venture capital funds, which we anticipate will be paid over a period of up to 10 years. See Note 7 to the consolidated financial statements for additional information.

We paid $3.0 billion in 2025 for acquired IPR&D primarily related to the acquisitions of Scorpion's PI3Kα inhibitor program STX-478 and of SiteOne. We paid $3.3 billion in 2024 for acquired IPR&D primarily related to the acquisition of Morphic. See Note 4 to the consolidated financial statements for additional information.

As part of our business development activities in 2026, we have entered into acquisition agreements, subject to closing conditions. Potential amounts payable at closing for these pending acquisitions would be less than $3 billion.

As of December 31, 2025, total debt was $42.5 billion, an increase of $8.9 billion compared with $33.6 billion at December 31, 2024. See Note 11 to the consolidated financial statements for additional information.

As of December 31, 2025, we had a total of $10.1 billion of unused committed bank credit facilities, $10.0 billion of which is available to support our commercial paper program. See Note 11 to the consolidated financial statements for additional information. We believe that amounts accessible through existing commercial paper markets should be adequate to fund short-term borrowing needs.

Dividends of $6.00 per share and $5.20 per share were paid in 2025 and 2024, respectively. The quarterly dividend was increased to $1.73 per share effective for the dividend to be paid in the first quarter of 2026, resulting in an indicated annual rate for 2026 of $6.92 per share.

In 2025, we repurchased $4.1 billion of shares under our $15.0 billion share repurchase program that our board authorized in December 2024. As of December 31, 2025, we had $10.9 billion remaining under this program. See Note 13 to the consolidated financial statements for additional information.

Both domestically and abroad, we monitor the potential impacts of the economic environment and international tension and conflicts; the creditworthiness of our wholesalers and other customers, including foreign government-backed agencies and suppliers; the uncertain impact of healthcare legislation; and various international government funding levels.

In the normal course of business, our operations are exposed to fluctuations in interest rates, currency values, and fair values of equity securities. These fluctuations impact the costs of financing, investing, and operating our business. We seek to address a portion of these risks through a controlled program of risk management that includes the use of derivative financial instruments. The objective of this risk management program is to limit the impact on earnings of fluctuations in interest and currency exchange rates. All derivative activities are for purposes other than trading.

Our primary interest rate risk exposure results from changes in short-term U.S. dollar interest rates. In an effort to manage interest-rate exposures, we may enter into derivative contracts to achieve an acceptable balance between fixed- and floating-rate debt or to reduce cash flow variability from changes in interest rates as part of anticipated debt issuances. Based on our overall interest rate exposure at December 31, 2025 and 2024, including derivatives and other interest rate risk-sensitive instruments, a hypothetical 10 percent change in interest rates applied to the fair value of the instruments as of December 31, 2025 and 2024, respectively, would not have a material impact on earnings, cash flows, or fair values of interest rate risk-sensitive instruments over a one-year period.

Our foreign currency risk exposure results from fluctuating currency exchange rates, primarily the U.S. dollar against the euro, Japanese yen, Chinese yuan, and British pound sterling. We face foreign currency exchange exposures when we enter into transactions arising from subsidiary trade and loan payables and receivables denominated in foreign currencies. We also face currency exposure that arises from translating the results of our global operations to the U.S. dollar at exchange rates that have fluctuated from the beginning of the period. We in some cases enter into foreign currency forward or option derivative contracts to reduce the effect of fluctuating currency exchange rates. Our corporate risk-management policy outlines the minimum and maximum hedge coverage of such exposures. Gains and losses on these derivative contracts offset, in part, the impact of currency fluctuations on the existing assets and liabilities. We periodically analyze the fair values of the outstanding foreign currency derivative contracts to determine their sensitivity to changes in foreign exchange rates. As of December 31, 2025 and 2024, a hypothetical 10 percent change in currency exchange rates (primarily against the U.S. dollar) applied to the fair values of our outstanding foreign currency derivative contracts and the underlying assets and liabilities would not have a material impact on earnings, cash flows, or financial position over a one-year period.

Our fair value risk exposure relates primarily to our public equity investments and to our equity investments that do not have readily determinable fair values. As of December 31, 2025 and 2024, a hypothetical 10 percent change in fair value of the equity instruments would not have a material impact on earnings, cash flows, or financial position over a one-year period.

We have no off-balance sheet arrangements that have a material current effect or that are reasonably likely to have a material future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources. We acquire and collaborate on potential products still in development and enter into research and development arrangements with third parties that often require milestone and royalty payments to the third-party contingent upon the occurrence of certain future events linked to the success of the asset in development. Milestone payments may be required contingent upon the successful achievement of an important point in the development life cycle of the pharmaceutical product (e.g., approval for marketing by the appropriate regulatory agency or upon the achievement of certain sales levels). If required by the arrangement, we may make royalty payments based upon a percentage of the sales of the product in the event that regulatory approval for marketing is obtained.

Individually, these arrangements are generally not material in any one annual reporting period. However, if milestones for multiple products covered by these arrangements were reached in the same reporting period, the aggregate expense or aggregate milestone payments made could be material to our results of operations or cash flows, respectively, in that period. See Note 3 to the consolidated financial statements for additional information. These arrangements often give us the discretion to unilaterally terminate development of the product, which would allow us to avoid making the contingent payments; however, we are unlikely to cease development if the compound successfully achieves milestone objectives. We view these payments as positive because they signify that the product is successfully moving through development and is now generating or is more likely to generate cash flows from sales of products.

## APPLICATION OF CRITICAL ACCOUNTING ESTIMATES

In preparing our financial statements in accordance with accounting principles generally accepted in the U.S., we must often make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, expenses, and related disclosures. Some of those judgments can be subjective and complex, and consequently actual results could differ from those estimates. For any given individual estimate or assumption we make, it is possible that other people applying reasonable judgment to the same facts and circumstances could develop different estimates. We believe that, given current facts and circumstances, it is unlikely that applying any such other reasonable judgment would cause a material adverse effect on our consolidated results of operations, financial position, or liquidity for the periods presented in this Annual Report on Form 10-K. Our most critical accounting estimates have been discussed with our audit committee and are described below.

### Revenue Recognition and Sales Rebate, Discount, and Return Accruals

*Background and Uncertainties*

We recognize revenue primarily from two different types of contracts, product sales to customers (net product revenue) and collaborations and other arrangements. For product sales to customers, provisions for rebates, discounts, and returns are established in the same period the related product sales are recognized. Contracts with direct and indirect customers may provide for various rebates and discounts, which we estimate as a reduction of net product revenue at the time we recognize a sale to a direct customer. Significant judgments are required in making these estimates. The largest of our sales rebate and discount amounts include rebates associated with sales covered by managed care, Medicare, Medicaid, and chargeback programs, as well as reductions in revenue related to our patient assistance programs, in the U.S. In determining the appropriate accrual amount, we consider our historical payments for these programs by product as a percentage of our historical sales, any significant changes in sales trends, an evaluation of the current contracts for these programs, the percentage of our products that are sold via these programs, and our product pricing. Since there is a timing lag between the product sale and the settlement of accruals related to these programs, our net product revenue may incorporate revisions of accruals for several periods.

Refer to Note 2 to the consolidated financial statements for further information on revenue recognition and sales return, rebate, and discount accruals.

Revenue recognized from collaborations and other arrangements includes our share of profits from the collaborations, as well as royalties, upfront and milestone payments we receive under these types of contracts.

*Financial Statement Impact*

We believe that our accruals for sales rebates, discounts, and returns are reasonable and appropriate based on current facts and circumstances. Our rebate and discount liabilities are included in sales rebates and discounts on our consolidated balance sheet. Our sales return liability is included in other current liabilities and other noncurrent liabilities on our consolidated balance sheet. As of December 31, 2025, a 5 percent change in our consolidated sales return, rebate, and discount liability would result in a change in revenue of approximately $897 million.

The portion of our consolidated sales rebate, discount, and return liability balances resulting from sales of our products in the U.S. was approximately 87 percent and 90 percent as of December 31, 2025 and 2024, respectively.

The following represents a roll-forward of our most significant U.S. sales rebate, discount, and return liability balances, including managed care, Medicare, Medicaid, chargeback, and patient assistance programs:

| | 2025 | 2024 |
|---|---|---|
| Sales rebate, discount, and return liabilities, beginning of year | **$ 10,313** | $ 10,668 |
| Reduction of net sales[1] | **62,135** | 41,452 |
| Cash payments | **(57,299)** | (41,807) |
| Sales rebate, discount, and return liabilities, end of year | **$ 15,148** | $ 10,313 |

[1] Adjustments of the estimates for these rebates, discounts, and returns to actual results were less than 2 percent of consolidated revenue for each of the years presented.

**Litigation Liabilities and Other Contingencies**

*Background and Uncertainties*

Litigation liabilities and other contingencies are, by their nature, uncertain and based upon complex judgments and probabilities. The factors we consider in developing our litigation liability reserves and other contingent liability amounts include the merits and jurisdiction of the litigation, the nature and the number of other similar current and past matters, the nature of the product and the current assessment of the science subject to the litigation, as applicable, and the likelihood of settlement and current state of settlement discussions, if any. In addition, we accrue for certain product liability claims incurred but not filed to the extent we can formulate a reasonable estimate of their costs based primarily on historical claims experience and data regarding product usage.

We also consider the insurance coverage we have to diminish the exposure for periods covered by insurance. In assessing our insurance coverage, we consider the policy coverage limits and exclusions, the potential for denial of coverage by the insurance company, the financial condition of the insurers, and the possibility of and length of time for collection. The ability to insure against such exposures is limited, and due to a very restrictive market for liability insurance we are predominantly self-insured for liability losses for all our currently and previously marketed products. In addition to insurance coverage, we consider any third-party indemnification to which we are entitled or under which we are obligated. With respect to our third-party indemnification rights, these considerations include the nature of the indemnification, the financial condition of the indemnifying party, and the possibility of and length of time for collection.

The litigation accruals and environmental liabilities and the related estimated insurance recoverables are reflected on a gross basis as liabilities and assets, respectively, on our consolidated balance sheets.

**Acquisitions**

*Background and Uncertainties*

To determine whether acquisitions or licensing transactions should be accounted for as a business combination or as an asset acquisition, we make certain judgments, which include assessing whether the acquired set of activities and assets would meet the definition of a business under the relevant accounting rules.

If the acquired set of activities and assets meets the definition of a business, assets acquired and liabilities assumed are required to be recorded at their respective fair values on our consolidated balance sheet as of the acquisition date. The excess of the purchase price over the fair value of the acquired net assets, where applicable, is recorded as goodwill. If the acquired set of activities and assets does not meet the definition of a business, the transaction is recorded as an acquisition of assets and, therefore, any acquired IPR&D that does not have an alternative future use is charged to acquired IPR&D on our consolidated statement of operations at the acquisition date, and goodwill is not recorded. See Note 4 to the consolidated financial statements for additional information.

The judgments made in determining estimated fair values assigned to assets acquired and liabilities assumed in a business combination, as well as estimated asset lives, can materially affect our consolidated results of operations. The fair values of intangible assets, including acquired IPR&D, are determined using information available near the acquisition date based on estimates and assumptions that are deemed reasonable by management. Significant estimates and assumptions include, but are not limited to, probability of technical success, revenue projections, and discount rate. Depending on the facts and circumstances, we may deem it necessary to engage an independent valuation expert to assist in valuing significant assets and liabilities.

The fair values of identifiable intangible assets are primarily determined using the "income method," as described in Note 8 to the consolidated financial statements.

The fair value of any contingent consideration liability that results from a business combination is primarily determined using a discounted cash flow analysis. Estimating the fair value of contingent consideration requires the use of significant estimates and judgments, including, but not limited to, probability of technical success, timing of the potential milestone event, and the discount rate.

*Financial Statement Impact*

As of December 31, 2025, a 5 percent change in the contingent consideration liabilities would not result in a material impact on earnings or financial position.

**Impairment of Indefinite-Lived and Long-Lived Assets**

*Background and Uncertainties*

We review the carrying value of long-lived assets (both intangible and tangible) for potential impairment whenever events or changes in circumstances indicate the carrying value of an asset (or asset group) may not be recoverable. We identify impairment by comparing the projected undiscounted cash flows to be generated by the asset (or asset group) to its carrying value. If an impairment is identified, a loss is recorded equal to the excess of the asset's net book value over its fair value, and the cost basis is adjusted.

Goodwill and indefinite-lived intangible assets are reviewed for impairment at least annually, or more frequently if impairment indicators are present, by first assessing qualitative factors to determine whether it is more likely than not that the fair value of the asset is less than its carrying amount. If we conclude it is more likely than not that the fair value is less than the carrying amount, a quantitative test that compares the fair value of the intangible asset to its carrying value is performed to determine the amount of any impairment.

Several methods may be used to determine the estimated fair value of long-lived assets, all of which require multiple assumptions. When determining the fair value of indefinite-lived acquired IPR&D as well as the fair value of finite-lived intangible assets for impairment testing purposes, we utilize the "income method," as described in Note 8 to the consolidated financial statements.

For acquired IPR&D assets, the risk of failure has been factored into the fair value measure and there can be no certainty that these assets ultimately will yield a successful product, as discussed previously in "—Executive Overview—Clinical Development Pipeline." The nature of the pharmaceutical business is high-risk and requires that we invest in a large number of projects to maintain a successful portfolio of approved products. As such, it is likely that some acquired IPR&D assets will become impaired in the future.

Estimates of future cash flows, based on what we believe to be reasonable and supportable assumptions and projections, require management's judgment. Actual results could vary materially from these estimates.

**Income Taxes**

*Background and Uncertainties*

We file tax returns based upon our interpretation of tax laws and regulations, and we record estimates in our financial statements based upon these interpretations at the applicable tax rates in the jurisdictions in which we operate. Our tax returns are routinely subject to examination by taxing authorities, which could result in future tax, interest, and penalty assessments. Inherent uncertainties also exist in estimates of many tax positions due to the complexity of tax laws. We recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained upon examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than 50 percent likelihood of being realized upon ultimate resolution. The amount of unrecognized tax benefits is adjusted for changes in facts and circumstances such as changes to existing tax law, the issuance of regulations by taxing authorities, new information obtained during a tax examination, or resolution of a tax examination. We believe our estimates for uncertain tax positions are both appropriate and sufficient to pay assessments that may result from examinations of our tax returns; however, given the uncertainty of positions that could be taken by taxing authorities during the examinations of our tax returns, the ultimate outcome of any tax matters may result in liabilities that are greater than amounts accrued. We recognize both accrued interest and penalties related to unrecognized tax benefits in income tax expense.

We have recorded valuation allowances against certain of our deferred tax assets, primarily those that have been generated from net operating losses, tax credits, and other tax carryforwards in certain taxing jurisdictions, when the amount of future taxable income is unlikely to support their utilization.

*Financial Statement Impact*

As of December 31, 2025, a 5 percent change in the amount of uncertain tax positions and the valuation allowance would result in a change in net income of $160 million and $61 million, respectively.

**LEGAL AND REGULATORY MATTERS**

Information relating to certain legal proceedings can be found in Note 16 to the consolidated financial statements and is incorporated here by reference.

***Item 7A. Quantitative and Qualitative Disclosures About Market Risk***

You can find quantitative and qualitative disclosures about market risk (e.g., interest rate risk) at Item 7, "Management's Discussion and Analysis - Financial Condition and Liquidity." That information is incorporated by reference herein.

***Item 8. Financial Statements and Supplementary Data***

**Consolidated Statements of Operations**
**ELI LILLY AND COMPANY AND SUBSIDIARIES**
**(Dollars and shares in millions, except per-share data)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2025** | **2024** | **2023** |
| Revenue | **$ 65,179** | $ 45,043 | $ 34,124 |
| Costs, expenses, and other: | | | |
| Cost of sales | **11,052** | 8,418 | 7,082 |
| Research and development | **13,337** | 10,991 | 9,313 |
| Marketing, selling, and administrative | **11,094** | 8,594 | 7,404 |
| Acquired in-process research and development | **2,910** | 3,280 | 3,800 |
| Asset impairment, restructuring, and other special charges | **484** | 861 | 68 |
| Other—net, (income) expense | **571** | 219 | (97) |
| | **39,448** | 32,363 | 27,570 |
| Income before income taxes | **25,731** | 12,680 | 6,554 |
| Income taxes | **5,091** | 2,090 | 1,314 |
| Net income | **$ 20,640** | $ 10,590 | $ 5,240 |
| | | | |
| Earnings per share: | | | |
| Basic | **$ 23.00** | $ 11.76 | $ 5.82 |
| Diluted | **$ 22.95** | $ 11.71 | $ 5.80 |
| | | | |
| Shares used in calculation of earnings per share: | | | |
| Basic | **897.3** | 900.6 | 900.2 |
| Diluted | **899.3** | 904.1 | 903.3 |

See notes to consolidated financial statements.

**Consolidated Statements of Comprehensive Income**
**ELI LILLY AND COMPANY AND SUBSIDIARIES**
**(Dollars in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2025** | **2024** | **2023** |
| Net income | **$ 20,640** | $ 10,590 | $ 5,240 |
| Other comprehensive income (loss), net of taxes: | | | |
| Foreign currency translation | **1,241** | (571) | 55 |
| Retirement benefit plans | **192** | 519 | (635) |
| Other | **9** | 57 | 98 |
| Total other comprehensive income (loss) | **1,442** | 5 | (482) |
| Comprehensive income | **$ 22,082** | $ 10,595 | $ 4,758 |

See notes to consolidated financial statements.

## Consolidated Balance Sheets
## ELI LILLY AND COMPANY AND SUBSIDIARIES
**(Dollars and shares in millions)**

| | December 31, | | | |
|---|---|---|---|---|
| | | **2025** | | **2024** |
| **Assets** | | | | |
| *Current Assets* | | | | |
| Cash and cash equivalents | **$** | **7,268** | $ | 3,268 |
| Accounts receivable | | **17,760** | | 11,006 |
| Other receivables | | **2,395** | | 2,270 |
| Inventories | | **13,744** | | 7,589 |
| Prepaid expenses | | **14,315** | | 8,341 |
| Other current assets | | **147** | | 266 |
| Total current assets | | **55,629** | | 32,740 |
| *Noncurrent Assets* | | | | |
| Investments | | **2,802** | | 3,216 |
| Goodwill | | **5,898** | | 5,770 |
| Other intangibles, net | | **6,521** | | 6,166 |
| Deferred tax assets | | **9,959** | | 8,001 |
| Property and equipment, net | | **24,675** | | 17,102 |
| Other noncurrent assets | | **6,992** | | 5,720 |
| Total assets | **$** | **112,476** | $ | 78,715 |
| **Liabilities and Equity** | | | | |
| *Current Liabilities* | | | | |
| Short-term borrowings and current maturities of long-term debt | **$** | **1,635** | $ | 5,117 |
| Accounts payable | | **5,379** | | 3,229 |
| Employee compensation | | **2,375** | | 2,094 |
| Sales rebates and discounts | | **17,382** | | 11,539 |
| Other current liabilities | | **8,457** | | 6,397 |
| Total current liabilities | | **35,228** | | 28,376 |
| *Noncurrent Liabilities* | | | | |
| Long-term debt | | **40,868** | | 28,527 |
| Long-term income taxes payable | | **5,875** | | 4,061 |
| Other noncurrent liabilities | | **3,970** | | 3,479 |
| Total noncurrent liabilities | | **50,713** | | 36,067 |
| *Commitments and Contingencies* | | | | |
| *Equity* | | | | |
| Common stock—no par value<br>Authorized shares: 3,200.0<br>Issued shares: **944.8 (2025)** and 947.9 (2024) | | **590** | | 592 |
| Additional paid-in capital | | **7,346** | | 7,439 |
| Retained earnings | | **24,470** | | 13,545 |
| Employee benefit trust | | **(3,013)** | | (3,013) |
| Accumulated other comprehensive loss | | **(2,880)** | | (4,322) |
| Other equity | | **22** | | 31 |
| Total equity | | **26,535** | | 14,272 |
| Total liabilities and equity | **$** | **112,476** | $ | 78,715 |

See notes to consolidated financial statements.

## Consolidated Statements of Shareholders' Equity
## ELI LILLY AND COMPANY AND SUBSIDIARIES
**(Dollars and shares in millions, except per-share data)**

| | Common Stock | | Additional Paid-in Capital | Retained Earnings | Employee Benefit Trust | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at January 1, 2023 | 950.6 | $ 594 | $ 6,921 | $ 10,043 | $ (3,013) | $ (3,845) |
| Net income | | | | 5,240 | | |
| Other comprehensive loss, net of tax | | | | | | (482) |
| Cash dividends declared per share: $4.69 | | | | (4,221) | | |
| Purchases of common stock | (2.3) | (1) | | (749) | | |
| Issuance of stock under employee stock plans, net | 1.5 | 1 | (300) | | | |
| Stock-based compensation | | | 629 | | | |
| Other | | | | (1) | | |
| Balance at December 31, 2023 | 949.8 | 594 | 7,250 | 10,312 | (3,013) | (4,327) |
| Net income | | | | 10,590 | | |
| Other comprehensive income, net of tax | | | | | | 5 |
| Cash dividends declared per share: $5.40 | | | | (4,857) | | |
| Purchases of common stock | (3.0) | (2) | | (2,498) | | |
| Issuance of stock under employee stock plans, net | 1.1 | — | (457) | | | |
| Stock-based compensation | | | 646 | | | |
| Other | | | | (2) | | |
| Balance at December 31, 2024 | 947.9 | 592 | 7,439 | 13,545 | (3,013) | (4,322) |
| Net income | | | | **20,640** | | |
| Other comprehensive income, net of tax | | | | | | **1,442** |
| Cash dividends declared per share: $6.23 | | | | **(5,586)** | | |
| Purchases of common stock | **(4.8)** | **(3)** | | **(4,105)** | | |
| Issuance of stock under employee stock plans, net | **1.7** | **1** | **(719)** | | | |
| Stock-based compensation | | | **626** | | | |
| Other | | | | **(24)** | | |
| Balance at December 31, 2025 | **944.8** | **$ 590** | **$ 7,346** | **$ 24,470** | **$ (3,013)** | **$ (2,880)** |

See notes to consolidated financial statements.

**Consolidated Statements of Cash Flows**
**ELI LILLY AND COMPANY AND SUBSIDIARIES**
**(Dollars in millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2025** | **2024** | **2023** |
| **Cash Flows from Operating Activities** | | | |
| Net income | **$ 20,640** | $ 10,590 | $ 5,240 |
| **Adjustments to Reconcile Net Income to Cash Flows from Operating Activities:** | | | |
| Depreciation and amortization | **1,997** | 1,767 | 1,527 |
| Change in deferred income taxes | **(1,707)** | (2,683) | (2,341) |
| Stock-based compensation expense | **626** | 646 | 629 |
| Gains on sale of product rights | **(180)** | (224) | (1,879) |
| Acquired in-process research and development | **2,910** | 3,280 | 3,800 |
| Other operating activities, net | **620** | 826 | 319 |
| Other changes in operating assets and liabilities, net of acquisitions and divestitures: | | | |
| Receivables—(increase) decrease | **(7,000)** | (2,155) | (2,451) |
| Inventories—(increase) decrease | **(4,671)** | (2,507) | (1,425) |
| Prepaid expenses and other assets—(increase) decrease | **(6,609)** | (3,331) | (3,453) |
| Accounts payable and other liabilities—increase (decrease) | **10,187** | 2,609 | 4,274 |
| **Net Cash Provided by Operating Activities** | **16,813** | 8,818 | 4,240 |
| **Cash Flows from Investing Activities** | | | |
| Purchases of property and equipment | **(7,841)** | (5,058) | (3,448) |
| Proceeds from sales of and distributions from noncurrent investments | **964** | 374 | 508 |
| Purchases of noncurrent investments | **(645)** | (677) | (731) |
| Proceeds from sale of product rights | **218** | 601 | 1,604 |
| Purchases of in-process research and development | **(3,008)** | (3,346) | (3,944) |
| Cash paid for acquisitions, net of cash acquired | **(661)** | (948) | (1,044) |
| Other investing activities, net | **1** | (248) | (98) |
| **Net Cash Used for Investing Activities** | **(10,972)** | (9,302) | (7,153) |
| **Cash Flows from Financing Activities** | | | |
| Dividends paid | **(5,384)** | (4,680) | (4,069) |
| Net change in short-term borrowings | **(4,338)** | (1,852) | 4,691 |
| Proceeds from issuance of long-term debt | **13,167** | 11,417 | 3,959 |
| Repayments of long-term debt | **(778)** | (664) | — |
| Purchases of common stock | **(4,108)** | (2,500) | (750) |
| Other financing activities, net | **(772)** | (491) | (335) |
| **Net Cash Provided by (Used for) Financing Activities** | **(2,213)** | 1,230 | 3,496 |
| Effect of exchange rate changes on cash and cash equivalents | **372** | (297) | 169 |
| Net increase in cash and cash equivalents | **4,000** | 449 | 752 |
| Cash and cash equivalents at beginning of year | **3,268** | 2,819 | 2,067 |
| **Cash and Cash Equivalents at End of Year** | **$ 7,268** | $ 3,268 | $ 2,819 |

See notes to consolidated financial statements.

## Note 1: Summary of Significant Accounting Policies and Implementation of New Financial Accounting Standards

### Basis of Presentation

The accompanying consolidated financial statements include Eli Lilly and Company and all subsidiaries and have been prepared in accordance with accounting principles generally accepted in the United States (GAAP). We consider majority voting interests, as well as effective economic or other control over an entity when deciding whether or not to consolidate an entity. We generally do not have control by means other than voting interests. All intercompany balances and transactions have been eliminated.

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, expenses, and related disclosures at the date of the financial statements and during the reporting period. Actual results could differ from those estimates. We issued our financial statements by filing them with the Securities and Exchange Commission (SEC) and have evaluated subsequent events up to the time of the filing of this Annual Report on Form 10-K.

We operate as a single operating segment engaged in the discovery, development, manufacturing, marketing, and sales of pharmaceutical products worldwide. A global research and development organization and a supply chain organization are responsible for the discovery, development, manufacturing, and supply of our products. Our commercial organizations market, distribute, and sell the products. The business is also supported by global corporate staff functions. See Note 17 for additional information.

### Research and Development Expenses and Acquired IPR&D

Research and development costs are expensed as incurred. Research and development costs consist of expenses incurred in performing research and development activities, including but not limited to, compensation and benefits, facilities and overhead expense, clinical trial expense and fees paid to contract research organizations.

Acquired IPR&D includes the initial costs and development milestones incurred related to externally developed IPR&D projects, acquired directly in a transaction other than a business combination, that do not have an alternative future use. Development milestones are milestone payment obligations that are incurred prior to regulatory approval of the compound and are expensed when the event triggering an obligation to pay the milestone occurs.

### Earnings Per Share (EPS)

All per-share amounts, unless otherwise stated in the notes to the consolidated financial statements, are presented on a diluted basis. We calculate basic EPS based on the weighted-average number of common shares outstanding plus the effect of incremental shares from potential participating securities. We calculate diluted EPS based on the weighted-average number of common shares outstanding plus the effect of incremental shares from our stock-based compensation programs.

### Foreign Currency Translation

Operations in our subsidiaries outside the U.S. are recorded in the functional currency of each subsidiary which is determined by a review of the environment where each subsidiary primarily generates and expends cash. The results of operations for our subsidiaries outside the U.S. are translated from functional currencies into U.S. dollars using the weighted-average currency rate for the period. Assets and liabilities are translated using the period end exchange rates. The U.S. dollar effects that arise from translating the net assets of these subsidiaries are recorded in other comprehensive income (loss).

### Advertising Expenses

Costs associated with advertising are expensed as incurred and are generally included in marketing, selling, and administrative expenses. Global advertising expenses, comprised primarily of online marketing and television advertising, totaled $2.9 billion, $1.4 billion, and $1.1 billion in 2025, 2024, and 2023, respectively, which were less than 5 percent of revenue each year.

**Other Significant Accounting Policies**

Our other significant accounting policies are described in the remaining appropriate notes to the consolidated financial statements.

**Reclassifications**

Certain reclassifications have been made to prior periods in the consolidated financial statements and accompanying notes to conform with the current presentation.

**Implementation of New Financial Accounting Standards**

Effective January 1, 2025, we prospectively adopted Accounting Standards Update (ASU) 2023-09, *Income Taxes (Topic 740): Improvements to Income Tax Disclosures*, which requires incremental disaggregation pertaining to the effective tax rate reconciliation and income taxes paid. See Note 14 for the income tax disclosures as required by Topic 740, as amended by ASU 2023-09.

ASU 2024-03, *Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses,* requires disaggregation of specific expense categories in the notes to the financial statements and a qualitative description of the remaining expense amounts not separately disaggregated. This standard is effective for annual reporting periods beginning after December 15, 2026, and requires prospective application with the option to apply it retrospectively. We intend to adopt this standard in our Annual Report on Form 10-K for the year ending December 31, 2027. We are currently evaluating the potential impact of adopting this standard on our disclosures.

**Note 2: Revenue**

The following table summarizes our revenue recognized in our consolidated statements of operations:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Net product revenue | **$ 60,958** | $ 40,748 | $ 28,814 |
| Collaboration and other revenue | **4,221** | 4,295 | 5,310 |
| Revenue | **$ 65,179** | $ 45,043 | $ 34,124 |

We recognize revenue primarily from two different types of contracts, product sales to customers (net product revenue) and collaborations and other arrangements. Revenue recognized from collaborations and other arrangements includes our share of profits from the collaborations, as well as royalties, upfront and milestone payments we receive under these types of contracts. See Note 3 for additional information related to our collaborations and other arrangements. Collaboration and other revenue disclosed above includes the revenue resulting from our collaboration with Boehringer Ingelheim, as well as the sale of product rights. Substantially all of the remainder of collaboration and other revenue is related to contracts accounted for as contracts with customers.

**Net Product Revenue**

Revenue from sales of products is recognized at the point where the customer obtains control of the goods and we satisfy our performance obligation, which generally is at the time we ship the product to the customer. Payment terms differ by jurisdiction and customer, but payment terms in most of our major jurisdictions typically range from 30 to 70 days from date of shipment. Provisions for rebates, discounts, and returns are established in the same period the related product sales are recognized. We generally ship product shortly after orders are received; therefore, we generally only have a few days of orders received but not yet shipped at the end of any reporting period. Shipping and handling activities are considered to be fulfillment activities and are not considered to be a separate performance obligation. We exclude from the measurement of the transaction price all taxes assessed by a governmental authority that are imposed on our sales of product and collected from a customer.

Most of our products are sold to wholesalers that serve pharmacies, physicians and other healthcare professionals, and hospitals. For the years ended December 31, 2025, 2024, and 2023, our three largest wholesalers each accounted for between 16 percent and 24 percent of consolidated revenue. Further, they each accounted for between 20 percent and 29 percent of accounts receivable as of December 31, 2025 and 2024. As of December 31, 2025 and 2024, our allowance for doubtful accounts was not material.

Significant judgments must be made in determining the transaction price for our sales of products related to anticipated rebates, discounts, and returns. The following describe the most significant of these judgments:

*Sales Rebates and Discounts - Background and Uncertainties*

- We initially invoice our customers at contractual list prices. Contracts with direct and indirect customers may provide for various rebates and discounts, which we estimate as a reduction of product revenue at the time we recognize a sale to a direct customer. We estimate these accruals using an expected value approach. Since there is often a timing lag between the product sale and the settlement of accruals relating to these programs, our net product revenue may incorporate revisions of accruals for several periods.
- In the U.S., the largest of our sales rebate and discount amounts include rebates associated with sales covered by managed care, Medicare, Medicaid, and chargeback programs, as well as reductions in revenue related to our patient assistance programs. In determining the appropriate accrual amount, we consider our historical payments for these programs by product as a percentage of our historical sales, any significant changes in sales trends, an evaluation of the current contracts for these programs, the percentage of our products that are sold via these programs, and our product pricing.
- Most of our rebates outside the U.S. are contractual or legislatively mandated. Contractual rebates are generally provided as part of reimbursement programs for products. Government rebates are generally based on the anticipated budget for pharmaceutical payments in the country.

*Sales Returns - Background and Uncertainties*

- When product sales occur, to determine the appropriate transaction price for our sales, we estimate a reserve for future product returns related to those sales using an expected value approach. This estimate is based on several factors, including: historical return rates, expiration date by product, estimated levels of inventory in the wholesale and retail channels, patent exclusivity, product recalls and discontinuations, or a changing competitive environment. We record the return amounts as a deduction to arrive at our net product revenue. Actual U.S. product returns have been less than 1 percent of our U.S. revenue during each of the past three years.

*Adjustments to Revenue*

Adjustments to revenue recognized as a result of changes in estimates for our most significant U.S. sales returns, rebates, and discounts liability balances for products shipped in previous periods were less than 1 percent, 3 percent, and 1 percent of U.S. revenue during the years ended December 31, 2025, 2024, and 2023, respectively.

**Collaboration and Other Arrangements**

We recognize several types of revenue from our collaborations and other arrangements, which we discuss in general terms immediately below and more specifically in Note 3 for each of our significant collaborations and other arrangements. Our collaborations and other arrangements are evaluated to determine if the arrangements in their entirety, or contain aspects that, are contracts with customers.

Royalty revenue from licensees and certain of our collaboration partners, which is based on sales to third parties of licensed products and technology, is recorded when the third-party sale occurs and the performance obligation to which some or all of the royalty has been allocated has been satisfied (or partially satisfied). This royalty revenue is included in collaboration and other revenue.

The net gain or loss related to the sale of rights of a product is included in collaboration and other revenue when control of the asset transfers to the other party. For arrangements that involve variable consideration where we have sold intellectual property, we recognize revenue based on estimates of the amount of consideration we believe we will be entitled to receive from the other party, but only to the extent a significant reversal in the amount of revenue recognized is not probable of occurring when the uncertainties associated with the variable consideration are subsequently resolved. Significant judgments must be made in determining the transaction price for our sales of intellectual property. Because of the risk that products in development will not receive regulatory approval, we generally do not recognize any contingent payments that would be due to us upon or after regulatory approval.

**Disaggregation of Revenue**

The following table summarizes revenue, including net product revenue and collaboration and other revenue, by product:

| | U.S. | | | Outside U.S. | | |
|---|---|---|---|---|---|---|
| | **2025** | **2024** | **2023** | **2025** | **2024** | **2023** |
| Cardiometabolic Health: | | | | | | |
| *Mounjaro* | **$ 13,651** | $ 8,950 | $ 4,834 | **$ 9,315** | $ 2,590 | $ 329 |
| *Zepbound*[(1)] | **13,484** | 4,926 | 176 | **58** | — | — |
| *Trulicity* | **2,914** | 3,694 | 5,433 | **1,362** | 1,560 | 1,699 |
| *Jardiance*[(2)] | **1,582** | 1,598 | 1,600 | **1,849** | 1,743 | 1,144 |
| *Other cardiometabolic health* | **2,233** | 2,682 | 2,738 | **1,773** | 1,778 | 1,715 |
| Total cardiometabolic health | **33,864** | 21,850 | 14,781 | **14,357** | 7,671 | 4,887 |
| | | | | | | |
| Oncology: | | | | | | |
| *Verzenio* | **3,464** | 3,421 | 2,509 | **2,259** | 1,886 | 1,354 |
| *Other oncology* | **1,888** | 1,615 | 1,288 | **1,765** | 1,831 | 1,507 |
| Total oncology | **5,352** | 5,036 | 3,797 | **4,024** | 3,717 | 2,861 |
| | | | | | | |
| Immunology: | | | | | | |
| *Taltz* | **2,333** | 2,152 | 1,832 | **1,230** | 1,108 | 928 |
| *Other immunology* | **631** | 306 | 226 | **1,053** | 827 | 812 |
| Total immunology | **2,964** | 2,458 | 2,058 | **2,283** | 1,935 | 1,740 |
| | | | | | | |
| Neuroscience | **997** | 780 | 696 | **394** | 694 | 2,183 |
| | | | | | | |
| Other | **304** | 251 | 459 | **639** | 652 | 663 |
| | | | | | | |
| Revenue | **$ 43,481** | $ 30,375 | $ 21,791 | **$ 21,698** | $ 14,668 | $ 12,333 |

(1) Tirzepatide is marketed for obesity under the brand name Zepbound in Canada, Japan, and the U.S.
(2) Jardiance revenue includes Glyxambi, Synjardy, and Trijardy XR.

The following table summarizes revenue by geographical area:

| | **2025** | **2024** | **2023** |
|---|---|---|---|
| Revenue[(1)]: | | | |
| U.S. | **$ 43,481** | $ 30,375 | $ 21,791 |
| Europe | **11,558** | 6,921 | 6,175 |
| Japan | **2,132** | 1,815 | 1,673 |
| China | **1,951** | 1,660 | 1,540 |
| Rest of world | **6,057** | 4,271 | 2,946 |
| Revenue | **$ 65,179** | $ 45,043 | $ 34,124 |

(1) Revenue is attributed to the countries based on the location of the customer or other party.

**Note 3: Collaborations and Other Arrangements**

We often enter into collaborative and other arrangements to develop and commercialize drug candidates or to sell the rights of a product. See Note 2 for a discussion of our recognition of revenue from our collaborations and other arrangements.

Collaborative activities may include research and development, marketing and selling, manufacturing, and distribution for which we may receive from or pay to the collaboration partner expense reimbursements. Operating expenses for costs incurred pursuant to these arrangements are reported in their respective expense line item, net of any payments due to or reimbursements due from our collaboration partners, with such reimbursements being recognized at the time the party becomes obligated to pay. Each arrangement is unique in nature, and our more significant arrangements are discussed below.

**Boehringer Ingelheim Collaboration**

We and Boehringer Ingelheim have a global agreement to jointly develop and commercialize a portfolio of compounds. Boehringer Ingelheim's Jardiance product family, which includes Glyxambi, Synjardy, and Trijardy XR, is the significant product family included in the collaboration.

For the Jardiance product family in the most significant markets, which remains in the collaboration through December 31, 2028, we receive a share of net sales depending on performance of the product, which we recognize as collaboration and other revenue. The following table summarizes our revenue recognized:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Jardiance | **$ 3,432** | $ 3,341 | $ 2,745 |

In 2025 and 2024, we and Boehringer Ingelheim entered into amendments to our collaboration to adjust commercialization responsibilities for the Jardiance product family in certain markets, resulting in our recognition of one-time benefits of $370 million and $300 million as Jardiance revenue during the years ended December 31, 2025 and 2024, respectively.

During the year ended December 31, 2025, we recognized a $200 million sales-based milestone for Jardiance. As of December 31, 2025, we have the right to receive up to $910 million in potential sales-based milestones related to the Jardiance product family in certain markets in 2026.

**Ebglyss**

We have a license agreement with F. Hoffmann-La Roche Ltd and Genentech, Inc. (collectively, Roche), which provides us the worldwide development and commercialization rights to lebrikizumab, which is branded and trademarked as Ebglyss. Roche receives tiered royalty payments on worldwide net sales ranging in percentages from high single digits to high teens, which we recognize as cost of sales. As of December 31, 2025, Roche is eligible to receive additional payments from us, including up to $975 million in potential sales-based milestones.

We have a license agreement with Almirall, S.A. (Almirall), under which Almirall licensed the rights to develop and commercialize Ebglyss, for the treatment or prevention of dermatology indications, including, but not limited to, atopic dermatitis in Europe. We receive tiered royalty payments on net sales in Europe ranging in percentages from low double digits to low twenties, which we recognize as collaboration and other revenue. As of December 31, 2025, we are eligible to receive additional payments up to $1.2 billion in a series of sales-based milestones.

**Orforglipron**

We have a license agreement with Chugai Pharmaceutical Co., Ltd (Chugai), which provides us with the worldwide development and commercialization rights to orforglipron. In addition to milestone payment rights which are not material, Chugai has the right to receive tiered royalty payments on future worldwide net sales from mid single digits to low teens if the product is successfully commercialized.

**Divestitures**

In 2023, we sold the rights for the olanzapine portfolio, including Zyprexa, a neuroscience product, to Cheplapharm Arzneimittel GmbH, a European company. During the year ended December 31, 2023, we recognized $1.4 billion in revenue primarily related to the net gain on the sale of rights for the olanzapine portfolio.

In 2023, we sold the rights for Baqsimi, a cardiometabolic health product, to Amphastar Pharmaceuticals, Inc. During the year ended December 31, 2023, we recognized $579 million in revenue primarily related to the net gain on the sale of rights for Baqsimi. As of December 31, 2025, we are eligible to receive payments of up to $450 million in a series of sales-based milestones.

**Note 4: Acquisitions**

We engage in various forms of business development activities to enhance or refine our product pipeline, including acquisitions, collaborations, investments, and licensing arrangements. In connection with these arrangements, our partners may be entitled to future royalties and/or commercial milestones based on sales if the products are approved for commercialization and/or milestones based on the successful progress of compounds through the development process. We account for each arrangement as either a business combination or an asset acquisition in accordance with GAAP.

**Business Combinations**

When an acquisition met the definition of a business under GAAP, the assets acquired and liabilities assumed were recorded at their respective fair values as of the acquisition date in our consolidated financial statements. The determination of estimated fair value required management to make significant estimates and assumptions. The excess of the purchase price over the fair value of the acquired net assets was recorded as goodwill. The results of operations of the acquisition are included in our consolidated financial statements from the date of acquisition.

*Verve Acquisition*

*Overview of Transaction*

In July 2025, we acquired all shares of Verve Therapeutics, Inc. (Verve) for a purchase price of $10.50 per share in cash (or an aggregate of $549 million, net of cash acquired), plus one non-tradeable contingent value right (CVR) per share that entitles the holder to receive up to an additional $3.00 per share (or an aggregate of up to approximately $300 million) payable, subject to certain terms and conditions, upon the achievement of a certain specified milestone. Verve is developing genetic medicines for cardiovascular disease.

*Assets Acquired and Liabilities Assumed*

Our access to information was limited prior to this acquisition. As a consequence, we are in the process of determining fair values and tax bases of the assets acquired and liabilities assumed, including the identification and valuation of intangible assets and tax exposures. The final determination of these amounts will be completed as soon as possible but no later than one year from the acquisition date. The final determination may result in asset and liability fair values and tax bases that differ from the preliminary estimates and require changes to the preliminary amounts recognized.

The following table summarizes the preliminary amounts recognized for assets acquired and liabilities assumed as of the acquisition date:

| Estimated Fair Value at July 25, 2025 | | |
|---|---|---|
| Cash | $ | 389 |
| Acquired IPR&D[(1)] | | 608 |
| Goodwill[(2)] | | 127 |
| Other assets and liabilities, net | | 39 |
| Acquisition date fair value of consideration transferred | | 1,163 |
| Less: | | |
| Cash acquired | | (389) |
| Fair value of CVR liability | | (177) |
| Fair value of equity interest in Verve held before the business combination | | (48) |
| Cash paid, net of cash acquired | $ | 549 |

[(1)] Acquired IPR&D intangibles primarily relate to VERVE-102 (PCSK9 Editor).
[(2)] The goodwill recognized from this acquisition is primarily attributable to future unidentified projects and products and the assembled workforce for Verve, which is not deductible for tax purposes.

*Manufacturing Facility Acquisition*

*Overview of Transaction*

In May 2024, we acquired NexPharm Parent HoldCo, LLC and Isopro Holdings, LLC, which together own the assets of a manufacturing site in Wisconsin, for a purchase price of $925 million, net of cash acquired. The facility expands our global parenteral (injectable) product manufacturing network.

*Assets Acquired and Liabilities Assumed*

In connection with this acquisition, we recognized $817 million of goodwill, which is primarily attributable to the synergies between the manufacturing capabilities of the site and our products as well as the assembled workforce of the site and is deductible for tax purposes, as well as $109 million of property and equipment.

*POINT Acquisition*

*Overview of Transaction*

In December 2023, we acquired all shares of POINT Biopharma Global Inc. (POINT) for a purchase price of $12.50 per share in cash (or an aggregate of $1.0 billion, net of cash acquired). POINT has capabilities in radiopharmaceutical discovery, development, and manufacturing efforts, as well as clinical and pre-clinical radioligand therapies in development for the treatment of cancer.

*Assets Acquired and Liabilities Assumed*

The following table summarizes the amounts recognized for assets acquired and liabilities assumed as of the acquisition date:

| Estimated Fair Value at December 27, 2023 | | |
|---|---|---|
| Cash | $ | 303 |
| Acquired IPR&D | | 196 |
| Goodwill[(1)] | | 854 |
| Other assets and liabilities, net | | (14) |
| Acquisition date fair value of consideration transferred | | 1,339 |
| Less: | | |
| Cash acquired | | (303) |
| Cash paid, net of cash acquired | $ | 1,036 |

[(1)] The goodwill recognized from this acquisition is primarily attributable to the radiopharmaceutical discovery, development, and manufacturing capabilities and the assembled workforce for POINT, which is not deductible for tax purposes.

**Asset Acquisitions**

Upon each asset acquisition, the cost allocated to acquired IPR&D was immediately expensed as acquired IPR&D if the compound had no alternative future use. Milestone payment obligations incurred prior to regulatory approval of the compound were expensed as acquired IPR&D when the event triggering an obligation to pay the milestone occurred. We recognized acquired IPR&D charges of $2.9 billion, $3.3 billion, and $3.8 billion for the years ended December 31, 2025, 2024, and 2023, respectively. The following table summarizes our significant acquired IPR&D charges during 2025, 2024, and 2023.

| Counterparty | Compound, Therapy, or Asset | Acquisition Month | Phase of Development[(1)] | Acquired IPR&D Charge |
|---|---|---|---|---|
| SiteOne | STC-004, Nav1.8 inhibitor for the treatment of pain | July 2025 | Phase 1 | **$ 494** |
| Scorpion | STX-478, PI3Kα inhibitor for the treatment of breast cancer and other advanced solid tumors | March 2025 | Phase 1 | **1,412** |
| | | | | |
| Morphic | MORF-057, inhibitor of α4β7 integrin for the treatment of inflammatory bowel disease | August 2024 | Phase 2 | 2,549 |
| | | | | |
| DICE Therapeutics, Inc. (DICE) | DC-806, an oral IL-17 inhibitor for the treatment of chronic diseases in immunology[(2)] | August 2023 | Phase 2 | 1,916 |
| Versanis Bio, Inc. (Versanis) | Bimagrumab, a monoclonal antibody for the treatment of people living with obesity and obesity-related complications | August 2023 | Phase 2 | 604 |
| Emergence Therapeutics AG (Emergence) | ETx-22, a Nectin-4 antibody-drug conjugate for the treatment of urothelial cancer | August 2023 | Pre-clinical | 407 |

[(1)] The phase of development presented is as of the date of the arrangement and represents the phase of development of the most advanced asset acquired, where applicable.
[(2)] In 2024, we discontinued development of this molecule in favor of another molecule in development.

**Note 5: Asset Impairment, Restructuring, and Other Special Charges**

Asset impairment, restructuring, and other special charges were $484 million, $861 million, and $68 million for the years ended December 31, 2025, 2024, and 2023, respectively.

Asset impairment, restructuring, and other special charges recognized during the year ended December 31, 2025 were primarily related to a litigation charge and acquisition and integration costs associated with the acquisition of Verve. Asset impairment, restructuring, and other special charges recognized during the year ended December 31, 2024 were primarily related to a litigation charge and an intangible asset impairment for Vitrakvi, driven by expected commercial projections.

See Note 4 for additional information related to our acquisition of Verve and Note 16 for additional information related to litigation charges.

**Note 6: Inventories**

We use the last-in, first-out (LIFO) method for the majority of our inventories located in the continental U.S., which results in a better matching of costs and revenues. Other inventories are valued by the first-in, first-out (FIFO) method. FIFO cost approximates current replacement cost. Inventories measured using LIFO must be valued at the lower of cost or market. Inventories measured using FIFO must be valued at the lower of cost or net realizable value.

Inventories at December 31 consisted of the following:

| | 2025 | 2024 |
|---|---|---|
| Finished products | **$ 1,931** | $ 1,221 |
| Work in process | **8,183** | 3,979 |
| Raw materials and supplies | **3,587** | 2,326 |
| Total (approximates replacement cost) | **13,701** | 7,526 |
| Increase to LIFO cost | **43** | 63 |
| Inventories | **$ 13,744** | $ 7,589 |

Inventories valued under the LIFO method comprised $5.8 billion and $2.7 billion of total inventories at December 31, 2025 and 2024, respectively.

When we believe that future commercialization is probable and the future economic benefit is expected to be realized, we capitalize pre-launch inventory prior to regulatory approval. A number of factors are considered, including the current status in the regulatory approval process, potential impediments to the approval process such as safety or efficacy, viability of commercialization, and marketplace trends. Pre-launch inventories capitalized as of December 31, 2025 were $1.5 billion, primarily related to orforglipron.

**Note 7: Financial Instruments**

**Investments in Equity and Debt Securities**

Our equity investments are accounted for using three different methods depending on the type of equity investment:

- Investments in companies over which we have significant influence but not a controlling interest are accounted for using the equity method, with our share of earnings or losses reported in other-net, (income) expense.
- For equity investments that do not have readily determinable fair values, we measure these investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for the identical or similar investment of the same issuer. Any change in recorded value is recorded in other-net, (income) expense.
- Our public equity investments are measured and carried at fair value. Any change in fair value is recognized in other-net, (income) expense.

We record our available-for-sale debt securities at fair value, with changes in fair value reported as a component of accumulated other comprehensive income (loss).

*Fair Value of Investments*

The following table summarizes certain fair value information at December 31, 2025 and 2024 for investment assets measured at fair value on a recurring basis, as well as the carrying amount and amortized cost of certain other investments:

| | Carrying Amount | Cost | Fair Value Measurements Using: Quoted Prices in Active Markets for Identical Assets (Level 1) | Fair Value Measurements Using: Significant Other Observable Inputs (Level 2) | Fair Value Measurements Using: Significant Unobservable Inputs (Level 3) | Fair Value |
|---|---|---|---|---|---|---|
| **December 31, 2025** | | | | | | |
| Cash equivalents[1] | **$ 4,392** | **$ 4,392** | **$ 4,392** | **$ —** | **$ —** | **$ 4,392** |
| Short-term investments: | | | | | | |
| Available-for-sale debt securities[2] | **$ 16** | **$ 16** | **$ 9** | **$ 7** | **$ —** | **$ 16** |
| Other securities | **89** | **89** | **—** | **12** | **78** | **89** |
| Short-term investments | **$ 105** | | | | | |
| Noncurrent investments: | | | | | | |
| Available-for-sale debt securities[2] | **$ 360** | **$ 368** | **$ 69** | **$ 291** | **$ —** | **$ 360** |
| Other securities | **85** | **54** | **—** | **2** | **83** | **85** |
| Marketable equity securities | **223** | **292** | **223** | **—** | **—** | **223** |
| Equity investments without readily determinable fair values[3] | **846** | | | | | |
| Equity method investments[3] | **1,288** | | | | | |
| Noncurrent investments | **$ 2,802** | | | | | |
| **December 31, 2024** | | | | | | |
| Cash equivalents[1] | $ 1,507 | $ 1,507 | $ 1,494 | $ 13 | $ — | $ 1,507 |
| Short-term investments: | | | | | | |
| Available-for-sale debt securities[2] | $ 95 | $ 95 | $ 29 | $ 66 | $ — | $ 95 |
| Other securities | 60 | 60 | — | 17 | 43 | 60 |
| Short-term investments | $ 155 | | | | | |
| Noncurrent investments: | | | | | | |
| Available-for-sale debt securities[2] | $ 573 | $ 616 | $ 140 | $ 433 | $ — | $ 573 |
| Other securities | 150 | 103 | — | 6 | 144 | 150 |
| Marketable equity securities | 486 | 495 | 486 | — | — | 486 |
| Equity investments without readily determinable fair values[3] | 864 | | | | | |
| Equity method investments[3] | 1,143 | | | | | |
| Noncurrent investments | $ 3,216 | | | | | |

(1) We consider all highly liquid investments with a maturity of three months or less from the date of purchase to be cash equivalents. The cost of these investments approximates fair value.
(2) For available-for-sale debt securities, amounts disclosed represent the securities' amortized cost.
(3) Fair value disclosures are not applicable for equity method investments and investments accounted for under the measurement alternative for equity investments.

We determine our Level 1 and Level 2 fair value measurements based on a market approach using quoted market values, significant other observable inputs for identical or comparable assets or liabilities, or discounted cash flow analyses. Level 3 fair value measurements for other investment securities are determined using unobservable inputs, including the investments' cost adjusted for impairments and price changes from orderly transactions. Fair values are not readily available for certain equity investments measured under the measurement alternative.

**Debt**

*Fair Value of Debt*

The following table summarizes the carrying amount and fair value using Level 2 inputs for our short-term and long-term debt as of December 31:

| | 2025 | | 2024 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Short-term commercial paper borrowings | **$ —** | **$ —** | $ 4,338 | $ 4,319 |
| Long-term debt, including current portion | **42,503** | **39,799** | 29,307 | 26,249 |

**Risk Management and Related Financial Instruments**

To manage foreign currency and interest rate risk, we may enter into derivative instruments intended to offset losses and gains on the assets, liabilities, and transactions being hedged. Such instruments are entered into in accordance with documented corporate risk-management policies. Management reviews the correlation and effectiveness of our derivatives on a quarterly basis. Derivative instruments are recorded at fair value, with gains and losses recognized as follows:

- For derivative instruments designated as fair value hedges, gains and losses are recognized in earnings to offset the respective losses and gains recognized on the underlying exposure.
- For derivative instruments designated as cash flow hedges, gains and losses are reported as a component of accumulated other comprehensive income (loss) and reclassified into earnings as an offset in the same period the hedged transaction affects earnings.
- For derivative and non-derivative instruments designated as net investment hedges, gains and losses are reported as a component of accumulated other comprehensive income (loss) and reclassified into earnings upon the sale or substantial liquidation of our net investments.
- For derivative contracts not designated as hedging instruments, gains and losses are recognized in earnings to offset the respective losses and gains recognized on the underlying exposure.

Cash settlements of our derivative instruments are classified as operating activities in our consolidated statements of cash flows.

*Foreign Currency Risk*

As a global company, we face foreign currency risk exposure from fluctuating currency exchange rates, primarily the U.S. dollar against the euro, Japanese yen, Chinese yuan, and British pound sterling. We manage foreign currency risk primarily through the use of foreign currency debt and foreign currency forward contracts. Our foreign currency-denominated notes designated as accounting hedges had carrying amounts of $6.0 billion and $5.3 billion as of December 31, 2025 and 2024, respectively. Below summarizes the aggregate outstanding notional amounts of our foreign currency forward contracts in U.S. dollar equivalent as of December 31:

| | 2025 | | 2024 | |
|---|---|---|---|---|
| | Purchase | Sell | Purchase | Sell |
| Designated as accounting hedges | **$ 67** | **$ —** | $ 8,909 | $ — |
| Not designated as accounting hedges | **14,281** | **9,264** | 8,755 | 8,848 |

Forward contracts generally have maturities not exceeding 12 months.

*Interest Rate Risk*

In the normal course of business, our operations are exposed to fluctuations in interest rates which can vary the costs of financing, investing, and operating. Our primary interest-rate risk exposure results from changes in short-term U.S. dollar interest rates. In an effort to manage interest-rate exposures, we may enter into derivative contracts to achieve an acceptable balance between fixed- and floating-rate debt or to reduce cash flow variability from changes in interest rates as part of anticipated debt issuances. For 2025, 2024, and 2023, the impact of our interest rate contracts on our consolidated financial statements was not material.

*Credit Risk*

Financial instruments that potentially subject us to credit risk include the following:

- Trade receivables: Wholesale distributors of our products account for a substantial portion of our trade receivables; collateral is generally not required. We seek to mitigate the risk through our ongoing credit-review procedures and insurance.
- Interest-bearing investments: In accordance with documented corporate risk-management policies, we monitor the amount of credit exposure to any one issuer based on credit rating of our counterparty.
- Derivatives: In accordance with documented corporate risk-management policies, we monitor the amount of credit exposure to any one counterparty based on the credit rating of our counterparty.

The majority of our cash is held by a few major financial institutions that have been identified as Global Systemically Important Banks (G-SIBs) by the Financial Stability Board. G-SIBs are subject to rigorous regulatory testing and oversight and must meet certain capital requirements. We monitor our exposures with these institutions and do not expect any of these institutions to fail to meet their obligations.

*Impact of Significant Risk Management Programs on the Financial Statements*

The following table summarizes the effects of significant risk-management programs:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Recognized in other–net, (income) expense: | | | |
| Foreign currency forward contracts not designated as accounting hedges | **$ 489** | $ 288 | $ 26 |
| Recognized in other comprehensive income (loss): | | | |
| Foreign currency-denominated notes: | | | |
| Designated as accounting hedges | **(690)** | 338 | (220) |
| Foreign currency forward contracts: | | | |
| Designated as accounting hedges | **(643)** | 343 | (107) |

The following table summarizes the fair value of assets and liabilities on a gross basis for significant risk-management programs using Level 2 inputs as of December 31:

| | 2025 | 2024 |
|---|---|---|
| Foreign currency forward contracts: | | |
| Designated as accounting hedges: | | |
| Other receivables | **$ —** | $ 297 |
| Not designated as accounting hedges: | | |
| Other receivables | **39** | 40 |
| Other current liabilities | **(329)** | (93) |

**Note 8: Goodwill and Other Intangibles**

**Goodwill**

Goodwill results from excess consideration in a business combination over the fair value of identifiable net assets acquired. Goodwill is not amortized but is reviewed for impairment at least annually, or more frequently if impairment indicators are present, by first assessing qualitative factors to determine whether it is more likely than not that the fair value is less than its carrying amount. If we conclude it is more likely than not that the fair value is less than the carrying amount, a quantitative test that compares the fair value to its carrying value is performed to determine the amount of any impairment. The change in goodwill during 2025 was primarily related to our acquisition of Verve. See Note 4 for additional information.

No impairments occurred with respect to the carrying value of goodwill for the years ended December 31, 2025, 2024, and 2023.

**Other Intangibles**

The components of intangible assets other than goodwill at December 31 were as follows:

| | 2025 | | | 2024 | | |
|---|---|---|---|---|---|---|
| | Carrying Amount, Gross | Accumulated Amortization | Carrying Amount, Net | Carrying Amount, Gross | Accumulated Amortization | Carrying Amount, Net |
| Finite-lived intangible assets: | | | | | | |
| Marketed products | **$ 7,916** | **$ (2,963)** | **$ 4,952** | $ 8,090 | $ (2,822) | $ 5,269 |
| Indefinite-lived intangible assets: | | | | | | |
| Acquired IPR&D | **1,569** | **—** | **1,569** | 898 | — | 898 |
| Other intangibles | **$ 9,485** | **$ (2,963)** | **$ 6,521** | $ 8,988 | $ (2,822) | $ 6,166 |

Marketed products consist primarily of the amortized cost of the rights to assets acquired in business combinations and approved for marketing in a significant global jurisdiction (U.S., Europe, and Japan) and capitalized milestone payments. For transactions other than a business combination, we capitalize milestone payments incurred at or after the product has obtained regulatory approval for marketing.

Acquired IPR&D consists of the fair values of acquired IPR&D projects acquired in business combinations, adjusted for subsequent impairments, if any. The costs of acquired IPR&D projects acquired directly in a transaction other than a business combination are capitalized as other intangible assets if the projects have an alternative future use; otherwise, they are expensed immediately. See Note 4 for significant acquired IPR&D projects that had no alternative future use.

Several methods may be used to determine the estimated fair value of other intangibles acquired in a business combination. We utilize the "income method," which is a Level 3 fair value measurement and applies a probability weighting that considers the risk of development and commercialization to the estimated future net cash flows that are derived from projected revenues and estimated costs. These projections are based on factors such as relevant market size, patent protection, historical pricing of similar products, analyst expectations, and expected industry trends. The estimated future net cash flows are then discounted to the present value using an appropriate discount rate. This analysis is performed for each asset independently. The acquired IPR&D assets are treated as indefinite-lived intangible assets until completion or abandonment of the projects, at which time the assets are tested for impairment and amortized over the remaining useful life or written off, as appropriate.

Indefinite-lived intangible assets are reviewed for impairment at least annually, or more frequently if impairment indicators are present, by first assessing qualitative factors to determine whether it is more likely than not that the fair value of the asset is less than its carrying amount. If we conclude it is more likely than not that the fair value is less than the carrying amount, a quantitative test that compares the fair value of the intangible asset to its carrying value is performed to determine the amount of any impairment. Finite-lived intangible assets are reviewed for impairment when an indicator of impairment is present. When required, a comparison of fair value to the carrying amount of assets is performed to determine the amount of any impairment. When determining the fair value of indefinite-lived acquired IPR&D as well as the fair value of finite-lived intangible assets for impairment testing purposes, we utilize the "income method" discussed above.

Intangible assets with finite lives are capitalized and are amortized primarily to cost of sales over their estimated useful lives, ranging from one to 20 years. As of December 31, 2025, the remaining weighted-average amortization period for finite-lived intangible assets was approximately 11 years.

Amortization expense related to finite-lived intangible assets was as follows:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Amortization expense | **$ 488** | $ 553 | $ 506 |

The estimated amortization expense for each of the next five years associated with our finite-lived intangible assets as of December 31, 2025 is as follows:

| | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|
| Estimated amortization expense | $ 488 | $ 486 | $ 480 | $ 466 | $ 432 |

**Note 9: Property and Equipment**

Property and equipment is stated on the basis of cost. Provisions for depreciation of buildings and equipment are computed generally by the straight-line method at rates based on their estimated useful lives (12 to 50 years for buildings and three to 25 years for equipment). We review the carrying value of long-lived assets for potential impairment on a periodic basis and whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable. Impairment is determined by comparing projected undiscounted cash flows to be generated by the asset to its carrying value. If an impairment is identified, a loss is recorded equal to the excess of the asset's net book value over its fair value, and the cost basis is adjusted.

At December 31, property and equipment consisted of the following:

| | 2025 | 2024 |
|---|---|---|
| Land | **$ 647** | $ 382 |
| Buildings | **10,088** | 8,807 |
| Equipment | **13,486** | 11,458 |
| Construction in progress | **13,013** | 8,245 |
| | **37,235** | 28,891 |
| Less accumulated depreciation | **(12,560)** | (11,789) |
| Property and equipment, net | **$ 24,675** | $ 17,102 |

Depreciation expense related to property and equipment was as follows:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Depreciation expense | **$ 1,314** | $ 1,058 | $ 902 |

The following table summarizes long-lived assets by geographical area:

| | 2025 | 2024 |
|---|---|---|
| Long-lived assets[(1)]: | | |
| U.S. and Puerto Rico | **$ 18,764** | $ 13,402 |
| Ireland | **4,321** | 3,205 |
| Rest of world | **3,516** | 2,159 |
| Long-lived assets | **$ 26,601** | $ 18,765 |

[(1)] Long-lived assets consist of property and equipment, net, operating lease assets, and unamortized computer software costs.

**Note 10: Leases**

We primarily have leases for corporate offices, research and development facilities, vehicles, and equipment. Information related to operating leases as of December 31 was as follows:

| | 2025 | 2024 | Balance Sheet Classification |
|---|---|---|---|
| Operating lease right-of-use assets | **$ 1,260** | $ 1,050 | Other noncurrent assets |
| Operating lease liabilities, current portion | **222** | 176 | Other current liabilities |
| Operating lease liabilities, noncurrent portion | **1,140** | 971 | Other noncurrent liabilities |
| Weighted-average remaining lease term | **8 years** | 9 years | |
| Weighted-average discount rate | **4.7 %** | 4.6 % | |

We determine the lease term by assuming the exercise of any renewal and/or early-termination options that are reasonably assured. We generally use our incremental borrowing rate in determining the present value of lease payments.

**Note 11: Borrowings**

Debt at December 31 consisted of the following:

| | Stated Interest Rate | 2025 | 2024 |
|---|---|---|---|
| Long-term notes: | | | |
| Notes due 2025 | 2.750% - 7.125% | **$ —** | $ 778 |
| Notes due 2026 | 1.625% - 5.000% | **1,632** | 1,529 |
| Notes due 2027 | 3.100% - 5.500% | **2,516** | 2,516 |
| Notes due 2028 | 0.450% - 4.550%[1] | **3,256** | 442 |
| Notes due 2029 | 0.420% - 4.500% | **3,077** | 3,076 |
| Notes due 2030 | 2.125% - 4.750% | **2,132** | 779 |
| Notes due 2031 - 2040 | 0.500% - 6.770% | **11,582** | 6,166 |
| Notes due 2041 - 2050 | 0.970% - 4.650% | **4,543** | 4,381 |
| Notes due 2051 - 2060 | 1.125% - 5.550% | **8,280** | 5,961 |
| Notes due 2061 - 2070 | 1.375% - 5.650% | **5,824** | 3,977 |
| Other long term debt and adjustments | | **(339)** | (298) |
| Short-term commercial paper borrowings | | **—** | 4,338 |
| Total debt | | **42,503** | 33,644 |
| Less current portion | | **(1,635)** | (5,117) |
| Long-term debt | | **$ 40,868** | $ 28,527 |

[1] Included in the 2028 tranche is $750 million of floating-rate notes issued in August 2025, with interest reset and paid quarterly using the Secured Overnight Financing Rate (SOFR) plus .530 percent.

The weighted-average effective borrowing rate on short-term commercial paper borrowings was 4.61 percent at December 31, 2024.

At December 31, 2025, we had $10.1 billion of unused committed bank credit facilities, which consisted primarily of a $4.0 billion credit facility that expires in December 2029 and a $6.0 billion 364-day facility that expires in August 2026, both of which are available to support our commercial paper program.

Below are the details of our issuances of long-term debt for the periods presented, from which the cash proceeds were used for business development activities and general business purposes, including the repayment of commercial paper:

| Date of Issuance | | Amount | Maturity | Stated Interest Rate |
|---|---|---|---|---|
| August 2025 | $ | **6,750** | 2028-2065 | 4.000%-5.650%[1] |
| February 2025 | | **6,500** | 2028-2065 | 4.550%-5.600% |
| August 2024 | | 5,000 | 2027-2064 | 4.150%-5.200% |
| February 2024 | | 6,500 | 2027-2064 | 4.500%-5.100% |
| February 2023 | | 4,000 | 2026-2063 | 4.700%-5.000% |

[1] Included in the 2028 tranche is $750 million of floating-rate notes, with interest reset and paid quarterly using SOFR plus .530 percent.

The following table summarizes information related to interest on borrowings, net of capitalized interest:

| | | 2025 | | 2024 | | 2023 |
|---|---|---|---|---|---|---|
| Interest expense on borrowings | $ | **895** | $ | 781 | $ | 486 |
| Cash payments for interest on borrowings | | **633** | | 578 | | 404 |

**Note 12: Stock-Based Compensation**

Our stock-based compensation expense includes restricted stock units (RSUs), relative value awards (RVAs), shareholder value awards (SVAs), and performance awards (PAs). We recognize the fair value of stock-based compensation as expense over the requisite service period of the individual grantees, which generally equals the vesting period. Stock-based compensation expense was as follows:

| | | 2025 | | 2024 | | 2023 |
|---|---|---|---|---|---|---|
| Stock-based compensation expense | $ | **626** | $ | 646 | $ | 629 |

As of December 31, 2025, the total estimated remaining unrecognized compensation cost of $554 million was primarily related to 2.3 million of nonvested RSUs and will be amortized over the weighted-average remaining requisite service period of 21 months. We provide newly issued shares of our common stock to satisfy the issuance of shares under our stock-based compensation awards. At December 31, 2025, stock-based compensation awards may be granted under the 2002 Lilly Stock Plan for not more than 42.4 million additional shares.

RSUs are granted to certain employees with a vesting period of typically three years. RSU shares are accounted for at fair value based upon the closing stock price on the date of grant.

RVAs are granted to officers and management. The number of shares actually issued, if any, varies depending on the growth of our stock price at the end of the three-year vesting period compared to our peers. We measure the fair value of the RVA unit on the grant date using a Monte Carlo simulation model.

SVAs have been granted to officers and management. The number of shares actually issued, if any, varies depending on our stock price at the end of the three-year vesting period compared to pre-established target stock prices. We measure the fair value of the SVA unit on the grant date using a Monte Carlo simulation model.

PAs were granted to officers and management prior to 2024, as we discontinued the program. The number of PA shares actually issued varied depending on the achievement of certain pre-established earnings-per-share targets over a two-year period. PA shares were accounted for at fair value based upon the closing stock price on the date of grant.

The following table summarizes the weighted-average grant date fair value per share:

| | | 2025 | | 2024 | | 2023 |
|---|---|---|---|---|---|---|
| RSUs | $ | **844.85** | $ | 749.74 | $ | 339.30 |
| RVAs | | **1,154.90** | | 1,106.40 | | 397.95 |
| SVAs | | **1,056.09** | | 1,030.87 | | 349.63 |
| PAs | | | | | | 335.86 |

For RVAs and SVAs, the Monte Carlo simulation model utilizes multiple input variables that determine the probability of satisfying the market condition stipulated in the award grant and calculates the fair value of the award. Expected volatilities utilized in the model are based on implied volatilities from traded options on our stock, historical volatility of our stock price, historical volatility of our peers' stock price for RVAs, and other factors. Similarly, the dividend yield is based on historical experience and our estimate of future dividend yields. The risk-free interest rate is derived from the U.S. Treasury yield curve in effect at the time of grant.

The following table summarizes the assumptions used in determining the weighted-average grant date fair value for the RVAs and SVAs:

| | RVAs | | | SVAs | | |
|---|---|---|---|---|---|---|
| | **2025** | **2024** | **2023** | **2025** | **2024** | **2023** |
| Expected dividend yield | **0.70 %** | 0.70 % | 1.07 % | **0.70 %** | 0.70 % | 1.07 % |
| Risk-free interest rate | **4.21** | 4.26 | 4.08 | **4.21** | 4.26 | 4.08 |
| Volatility | **29.10** | 27.69 | 31.25 | **31.54** | 28.64 | 29.87 |

**Note 13: Shareholders' Equity**

In 2025, 2024, and 2023, we repurchased $4.1 billion, $2.5 billion, and $750 million, respectively, of shares associated with our share repurchase programs. As of December 31, 2025, we had $10.9 billion remaining under our $15.0 billion share repurchase program authorized in December 2024. We retire shares once we repurchase them.

We have 5 million authorized shares of preferred stock. As of December 31, 2025 and 2024, no preferred stock was issued.

We have an employee benefit trust that held 50 million shares of our common stock at both December 31, 2025 and 2024, to provide a source of funds to assist us in meeting our obligations under various employee benefit plans. The cost basis of the shares held in the trust was $3.0 billion at both December 31, 2025 and 2024, and is shown as a reduction of shareholders' equity. Any dividend transactions between us and the trust are eliminated. Stock held by the trust is not considered outstanding in the computation of EPS. The assets of the trust were not used to fund any of our obligations under these employee benefit plans during the years ended December 31, 2025, 2024, and 2023.

The following table summarizes the activity related to each component of accumulated other comprehensive income (loss):

| | Foreign Currency Translation[1] | Retirement Benefit Plans | Other | Accumulated Other Comprehensive Loss |
|---|---|---|---|---|
| Beginning balance at January 1, 2023 | $ (1,874) | $ (2,062) | $ 91 | $ (3,845) |
| Other comprehensive income (loss) | 55 | (635) | 98 | (482) |
| Balance at December 31, 2023 | (1,819) | (2,697) | 189 | (4,327) |
| Other comprehensive income (loss) | (571) | 519 | 57 | 5 |
| Balance at December 31, 2024 | (2,390) | (2,179) | 246 | (4,322) |
| Other comprehensive income (loss) | **1,241** | **192** | **9** | **1,442** |
| Ending balance at December 31, 2025 | **$ (1,149)** | **$ (1,987)** | **$ 255** | **$ (2,880)** |

[1] Includes the impact of foreign currency transactions designated as net investment hedges. See Note 7 for additional information.

Where our ownership of consolidated subsidiaries is less than 100 percent, the noncontrolling shareholders' interests are reflected in other equity as of December 31, 2025 and 2024 and are not material to our consolidated financial statements.

**Note 14: Income Taxes**

Deferred taxes are recognized for the future tax effects of temporary differences between financial and income tax reporting based on enacted tax laws and rates. Deferred taxes related to global intangible low-taxed income (GILTI) are also recognized for the future tax effects of temporary differences.

We recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position, based on its technical merits, will be sustained upon examination by the taxing authority. The tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than 50 percent likelihood of being realized upon ultimate resolution.

Following is the composition of income tax expense:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Current: | | | |
| Domestic | **$ 4,639** | $ 3,343 | $ 3,042 |
| Foreign | **2,159** | 1,430 | 613 |
| Total current tax expense | **6,798** | 4,773 | 3,655 |
| Deferred: | | | |
| Domestic | **(1,149)** | (2,210) | (2,375) |
| Foreign | **(558)** | (473) | 34 |
| Total deferred tax benefit | **(1,707)** | (2,683) | (2,341) |
| Income taxes | **$ 5,091** | $ 2,090 | $ 1,314 |

Cash payments of U.S. federal, state, and foreign income taxes, net of refunds, were as follows:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Cash payments of income taxes[(1)] | **$ 10,814** | $ 6,562 | $ 5,559 |

[(1)] 2025 included U.S. federal cash payments of $3.3 billion and cash payments to Ireland of $6.6 billion.

Cash payments of income taxes increased $4.3 billion in 2025 compared with 2024, driven primarily by a $4.2 billion increase in Ireland resulting from higher production activity to meet growing global demand for our medicines and a prior year tax payment. U.S. federal cash payments decreased from $3.8 billion in 2024 to $3.3 billion in 2025, driven primarily by immediate deductibility of U.S. research and development expenses, a prior year tax refund, and accelerated depreciation on U.S. capital investments, partially offset by higher U.S. income. Refer to the composition of income tax expense above regarding current income tax expense on current-year income.

At December 31, 2025 and 2024, prepaid expenses included prepaid taxes of $12.9 billion and $7.1 billion, respectively. Prepaid taxes largely reflect taxes paid on intercompany profit not yet recognized, primarily related to Ireland.

As of December 31, 2025, we have long-term income taxes payables of $1.1 billion that we expect to pay in 2027 and $4.8 billion that we cannot reasonably estimate the timing of future cash outflows.

Following is a reconciliation of the consolidated income tax expense applying the U.S. federal statutory rate to income before income taxes to the reported consolidated income tax expense for 2025:

| | 2025 | |
|---|---|---|
| | Amount[(1)] | Percent |
| U.S. federal statutory tax rate | $ 5,404 | 21.0 % |
| Foreign tax effects: | | |
| Ireland | | |
| Statutory tax rate difference between Ireland and the U.S. | (346) | (1.3)% |
| Other | 269 | 1.0 % |
| Other foreign jurisdictions | (53) | (0.2)% |
| Effect of cross-border tax laws[(2)] | | |
| Foreign-derived intangible income | (334) | (1.3)% |
| Other | (149) | (0.5)% |
| Tax credits | (327) | (1.3)% |
| Nontaxable or nondeductible items: | | |
| Non-deductible acquired IPR&D[(3)] | 442 | 1.7 % |
| Other | (121) | (0.5)% |
| Other adjustments[(4)] | 306 | 1.2 % |
| Income taxes | $ 5,091 | 19.8 % |

(1) Unrecognized tax benefits related to the current year are presented on a net basis in the category where the tax position is presented.
(2) The effect of cross-border tax laws includes the tax effects of both the cross-border tax and the related foreign tax credit allowed.
(3) Non-deductible acquired IPR&D was primarily related to the acquisitions of Scorpion and SiteOne in 2025. See Note 4 for additional information related to acquisitions.
(4) Other adjustments include individually immaterial amounts for effects of changes in tax laws or rates enacted in the current period, changes in unrecognized tax benefits related to prior years, state and local income tax, and changes in valuation allowances.

Our effective tax rate was 19.8 percent in 2025 compared with an effective tax rate of 16.5 percent in 2024, primarily driven by unfavorable impacts related to the jurisdictional mix of earnings and U.S. tax law changes (OBBBA) in 2025. The effective tax rates for both periods were unfavorably impacted by non-deductible acquired IPR&D charges, with a larger impact occurring in 2024.

In July 2025, the OBBBA, which implemented certain U.S. tax law changes, was enacted into law. The OBBBA modified and made permanent several provisions of the Tax Cuts and Jobs Act, including reductions in scheduled increases for the rate of taxation of foreign income, immediate deductibility of U.S. research and development expenses, and reinstatement of 100 percent bonus depreciation for capital assets.

Following is a reconciliation of the consolidated income tax expense applying the U.S. federal statutory rate to income before income taxes to the reported consolidated income tax expense for 2024 and 2023:

| | 2024 | 2023 |
|---|---|---|
| Income tax at the U.S. federal statutory tax rate | $ 2,663 | $ 1,377 |
| Non-deductible acquired IPR&D[(1)] | 566 | 677 |
| Foreign-derived intangible income | (307) | (237) |
| International operations, including Puerto Rico[(2)] | (302) | (187) |
| General business credits | (291) | (258) |
| Other | (239) | (58) |
| Income taxes | $ 2,090 | $ 1,314 |

(1) Non-deductible acquired IPR&D was primarily related to the acquisitions of Morphic in 2024, and DICE, Versanis, and Emergence in 2023. See Note 4 for additional information related to acquisitions.
(2) Includes the impact of GILTI tax and other U.S. taxation of foreign income.

Domestic and Puerto Rican companies contributed approximately 54 percent, 20 percent, and 14 percent for the years ended December 31, 2025, 2024, and 2023, respectively, to consolidated income before income taxes.

Significant components of our deferred tax assets and liabilities as of December 31 were as follows:

| | 2025 | 2024 |
|---|---|---|
| Deferred tax assets: | | |
| Capitalized research and development | **$ 4,518** | $ 4,599 |
| Sales rebates and discounts | **2,779** | 1,776 |
| Correlative tax adjustments | **2,392** | 1,604 |
| Purchases of intangible assets | **1,721** | 1,781 |
| Tax loss and other tax carryforwards | **911** | 587 |
| Inventories | **711** | — |
| Tax credit carryforwards | **649** | 577 |
| Compensation and benefits | **556** | 565 |
| Foreign tax redeterminations | **367** | 335 |
| Other | **1,004** | 599 |
| Total gross deferred tax assets | **15,608** | 12,423 |
| Valuation allowances | **(1,223)** | (964) |
| Total deferred tax assets | **14,385** | 11,459 |
| Deferred tax liabilities: | | |
| Earnings of foreign subsidiaries | **(1,291)** | (773) |
| Intangibles | **(1,258)** | (1,176) |
| Property and equipment | **(907)** | (558) |
| Prepaid employee benefits | **(707)** | (611) |
| Other | **(381)** | (414) |
| Total deferred tax liabilities | **(4,544)** | (3,532) |
| Deferred tax assets, net | **$ 9,841** | $ 7,927 |

The deferred tax asset and related valuation allowance amounts for U.S. federal, international, and state net operating losses and tax credits shown above have been reduced for differences between financial reporting and tax return filings.

At December 31, 2025, based on filed tax returns we have tax credit carryforwards and carrybacks of $1.4 billion available to reduce future income taxes; $253 million will expire if unused. The remaining portion of the tax credit carryforwards are fully reserved and primarily related to state tax credits of $899 million.

At December 31, 2025, based on filed tax returns we have net operating losses and other carryforwards for U.S. federal and international tax purposes of $2.9 billion available to reduce future income taxes; $1.6 billion will never expire. The remaining portion of the U.S. federal and international net operating losses and other carryforwards are substantially reserved. Deferred tax assets related to state net operating losses and other carryforwards of $357 million are fully reserved as of December 31, 2025.

Substantially all of the unremitted earnings of our foreign subsidiaries are considered not to be indefinitely reinvested for continued use in our foreign operations. At December 31, 2025 and 2024, we accrued an immaterial amount of U.S. federal tax, foreign withholding taxes, and state income tax that would be owed upon future distributions of unremitted earnings of our foreign subsidiaries that are not indefinitely reinvested. For the amount considered to be indefinitely reinvested, it is not practicable to determine the amount of the related deferred income tax liability due to the complexities in the tax laws and assumptions we would have to make.

Following is a reconciliation of the beginning and ending amount of gross unrecognized tax benefits:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Beginning balance at January 1 | **$ 3,976** | $ 3,395 | $ 2,987 |
| Additions based on tax positions related to the current year | **1,020** | 694 | 364 |
| Other adjustments[1] | **86** | (113) | 44 |
| Ending balance at December 31 | **$ 5,082** | $ 3,976 | $ 3,395 |

[1] Other adjustments include individually immaterial changes related to prior-year positions, settlements, lapses of statutes of limitation, and foreign currency translation impacts.

The total amount of unrecognized tax benefits that, if recognized, would affect our effective tax rate was $3.2 billion and $2.6 billion at December 31, 2025 and 2024, respectively.

We file U.S. federal, foreign, and various state and local income tax returns. We are no longer subject to U.S. federal income tax examination for years before 2016. In most major foreign and state jurisdictions, we are no longer subject to income tax examination for years before 2015.

The U.S. examination of tax years 2019-2021 remains ongoing. For tax years 2016-2018, we are pursuing competent authority assistance through the Mutual Agreement Procedure (MAP) process for the pricing of certain intercompany transactions. The resolution of both examination periods will likely extend beyond the next 12 months.

Interest and penalties related to unrecognized tax benefits are recognized in income tax expense and were not material for the years ended December 31, 2025, 2024, and 2023. Our accrued interest and penalties related to unrecognized tax benefits were $798 million and $594 million at December 31, 2025 and 2024, respectively.

**Note 15: Retirement Benefits**

We use a measurement date of December 31 to determine the change in benefit obligation, change in plan assets, funded status, and amounts recognized in the consolidated balance sheets at December 31 for our defined benefit pension and retiree health benefit plans, which were as follows:

| | Defined Benefit Pension Plans | | Retiree Health Benefit Plans | |
|---|---|---|---|---|
| | **2025** | **2024** | **2025** | **2024** |
| Change in benefit obligation: | | | | |
| Benefit obligation at beginning of year | **$ 13,415** | $ 14,258 | **$ 1,223** | $ 1,310 |
| Service cost | **324** | 339 | **33** | 35 |
| Interest cost | **697** | 662 | **64** | 62 |
| Actuarial (gain) loss | **232** | (1,084) | **33** | (97) |
| Benefits paid | **(661)** | (634) | **(88)** | (82) |
| Foreign currency exchange rate changes and other adjustments | **255** | (125) | **9** | (6) |
| Benefit obligation at end of year | **14,262** | 13,415 | **1,274** | 1,223 |
| Change in plan assets: | | | | |
| Fair value of plan assets at beginning of year | **13,658** | 13,709 | **2,566** | 2,580 |
| Actual return on plan assets | **1,456** | 583 | **283** | 59 |
| Employer contribution | **119** | 115 | **14** | 9 |
| Benefits paid | **(661)** | (634) | **(88)** | (82) |
| Foreign currency exchange rate changes and other adjustments | **248** | (115) | **—** | — |
| Fair value of plan assets at end of year | **14,820** | 13,658 | **2,775** | 2,566 |
| Funded status | **558** | 243 | **1,501** | 1,343 |
| Unrecognized net actuarial loss | **2,499** | 2,663 | **87** | 149 |
| Unrecognized prior service (benefit) cost | **2** | 4 | **(4)** | (4) |
| Net amount recognized | **$ 3,059** | $ 2,910 | **$ 1,584** | $ 1,489 |

| | | | | |
|---|---|---|---|---|
| Amounts recognized in the consolidated balance sheets consisted of: | | | | |
| Other noncurrent assets | **$ 1,857** | $ 1,482 | **$ 1,656** | $ 1,485 |
| Other current liabilities | **(73)** | (71) | **(9)** | (8) |
| Other noncurrent liabilities | **(1,226)** | (1,167) | **(146)** | (133) |
| Accumulated other comprehensive loss | **2,501** | 2,667 | **83** | 146 |
| Net amount recognized | **$ 3,059** | $ 2,910 | **$ 1,584** | $ 1,489 |

The unrecognized net actuarial loss has not yet been recognized in net periodic pension costs and was included in accumulated other comprehensive loss at December 31, 2025 and 2024. Unrecognized net actuarial loss for the U.S. and Puerto Rico defined benefit pension and retiree health benefit plans is amortized over the average remaining service period of active employees in the plan. The amortization of actuarial (gains) losses for U.S. and Puerto Rico defined benefit pension plans are determined by using a 10% corridor of the greater of the market related value of assets or the projected benefit obligations.

The $898 million increase in benefit obligation in 2025 was primarily driven by service and interest costs in excess of benefit payments. The $930 million decrease in benefit obligation in 2024 was primarily driven by increases in the discount rates primarily reflected in actuarial (gain) loss.

The following represents our weighted-average assumptions:

| | Defined Benefit Pension Plans | | | Retiree Health Benefit Plans | | |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2023 | 2025 | 2024 | 2023 |
| Weighted-average assumptions used to determine net periodic benefit costs: | | | | | | |
| Discount rate | **5.5 %** | 4.8 % | 5.1 % | **5.7 %** | 5.0 % | 5.2 % |
| Rate of compensation increase | **4.0** | 4.3 | 4.3 | | | |
| Expected return on plan assets | **7.9** | 8.1 | 8.1 | **7.0** | 7.3 | 7.3 |
| Weighted-average assumptions used to determine benefit obligation as of December 31: | | | | | | |
| Discount rate | **5.5** | 5.5 | 4.8 | **5.5** | 5.7 | 5.0 |
| Rate of compensation increase | **4.0** | 4.0 | 4.3 | | | |

We annually evaluate the expected return on plan assets in our defined benefit pension and retiree health benefit plans. In evaluating the expected return on plan assets, we consider many factors, with a primary analysis of current and projected market conditions; asset returns and asset allocations; and the views of leading financial advisers and economists. In U.S. and Puerto Rico, the expected return on plan assets uses a market-related value of assets. For U.S. dollar denominated investment grade debt securities and derivatives, the market-related value of assets is the actual fair value. For all other asset categories, the market-related value of assets uses a method that recognizes investment gains and losses arising from the difference between expected and actual returns on plan assets over a five-year period.

We may also review our historical assumptions compared with actual results, as well as the assumptions and trend rates utilized by similar plans, where applicable.

Expected benefit payments, which reflect expected future service, are as follows:

| | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 - 2035 |
|---|---|---|---|---|---|---|
| Defined benefit pension plans | $ 720 | $ 746 | $ 770 | $ 803 | $ 838 | $ 4,711 |
| Retiree health benefit plans | 95 | 96 | 96 | 97 | 97 | 488 |

Amounts relating to defined benefit pension plans with projected benefit obligations in excess of plan assets were as follows at December 31:

| | 2025 | 2024 |
|---|---|---|
| Projected benefit obligation | **$ 2,360** | $ 2,297 |
| Fair value of plan assets | **1,061** | 1,058 |

Amounts relating to defined benefit pension plans and retiree health benefit plans with accumulated benefit obligations in excess of plan assets were as follows at December 31:

| | Defined Benefit Pension Plans | | Retiree Health Benefit Plans | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| Accumulated benefit obligation | **$ 1,810** | $ 1,656 | **$ 155** | $ 142 |
| Fair value of plan assets | **702** | 595 | **—** | — |

The total accumulated benefit obligation for our defined benefit pension plans was $13.0 billion and $12.2 billion at December 31, 2025 and 2024, respectively.

Net periodic (benefit) cost included the following components:

| | Defined Benefit Pension Plans | | | Retiree Health Benefit Plans | | |
|---|---|---|---|---|---|---|
| | **2025** | **2024** | **2023** | **2025** | **2024** | **2023** |
| Components of net periodic (benefit) cost: | | | | | | |
| Service cost | **$ 324** | $ 339 | $ 290 | **$ 33** | $ 35 | $ 32 |
| Interest cost | **697** | 662 | 648 | **64** | 62 | 61 |
| Expected return on plan assets | **(1,086)** | (1,112) | (1,055) | **(185)** | (192) | (182) |
| Amortization of prior service (benefit) cost | **2** | 2 | 2 | **—** | (6) | (53) |
| Recognized actuarial (gain) loss | **76** | 125 | 122 | **(4)** | (3) | (6) |
| Net periodic (benefit) cost | **$ 13** | $ 15 | $ 8 | **$ (92)** | $ (103) | $ (148) |

The following represents the amounts recognized in other comprehensive income (loss) for the years ended December 31:

| | Defined Benefit Pension Plans | | | Retiree Health Benefit Plans | | |
|---|---|---|---|---|---|---|
| | **2025** | **2024** | **2023** | **2025** | **2024** | **2023** |
| Actuarial gain (loss) arising during period | **$ 138** | $ 555 | $ (764) | **$ 65** | $ (37) | $ (50) |
| Amortization of net actuarial (gain) loss included in net income | **76** | 125 | 122 | **(4)** | (3) | (6) |
| Foreign currency exchange rate changes and other | **(48)** | 18 | (27) | **1** | (6) | (52) |
| Total other comprehensive income (loss) during period | **$ 166** | $ 697 | $ (669) | **$ 62** | $ (46) | $ (108) |

**Benefit Plan Investments**

Our benefit plan investment policies are set with specific consideration of return and risk requirements in relationship to the respective liabilities. U.S. and Puerto Rico plans represent approximately 85 percent of our global investments. Given the long-term nature of our liabilities, these plans have the flexibility to manage an above-average degree of risk in the asset portfolios. At the investment-policy level, there are no specifically prohibited investments. However, within individual investment manager mandates, restrictions and limitations are contractually set to align with our investment objectives, ensure risk control, and limit concentrations.

We manage our portfolio to minimize concentration of risk by allocating funds within asset categories. In addition, within a category we use different managers with various management objectives to eliminate any significant concentration of risk. Our global benefit plans may enter into contractual arrangements (derivatives) to implement the local investment policy or manage particular portfolio risks.

The defined benefit pension and retiree health benefit plan allocation for the U.S. and Puerto Rico currently comprises approximately 85 percent growth investments and 15 percent fixed-income investments. The growth investment allocation encompasses public equity securities, hedge funds, private equity-like investments, and real estate. These portfolio allocations are intended to reduce overall risk by providing diversification, while seeking moderate to high returns over the long term.

*Public equity securities* - Securities are well diversified and invested in U.S. and international companies across various asset managers and styles.

*Fixed-income investments* - These investments primarily consist of fixed-income securities in U.S. treasuries and agencies, emerging market debt obligations, corporate bonds, bank loans, mortgage-backed securities, commercial mortgage-backed obligations, and any related repurchase agreements.

*Hedge funds* - Our hedge fund investments are made through limited partnership interests in fund-of-funds structures and directly into hedge funds. Plan holdings in hedge funds are valued based on net asset values (NAVs) calculated by each fund or general partner, as applicable, and we have the ability to redeem these investments at NAV.

*Private equity-like investments* - Private equity-like investments are made through long-term partnerships or joint ventures with limited liquidity and typical fund lives of 10 to 15 years. Underlying investments include venture capital, buyout, special situations, private debt, and private real estate. These investments are made both directly into funds and through fund-of-funds structures to ensure broad diversification across management styles and asset types. Plan holdings in private equity-like investments are valued using partnership-reported values, adjusted for known cash flows and significant events through the reporting date. Valuation inputs include underlying NAVs, discounted cash flow analyses, and comparable market data, with adjustments for currency, credit, liquidity, and other risks as applicable. The majority of these partnerships provide annual audited financial statements confirming compliance with fair valuation procedures consistent with applicable accounting standards.

*Real estate* - Real estate investments in registered investment companies that trade on an exchange are classified as Level 1 on the fair value hierarchy. Real estate investments in funds measured at fair value on the basis of NAV provided by the fund manager are classified as such. These NAVs are developed with inputs including discounted cash flow, independent appraisal, and market comparable analyses.

*Other assets* - Other assets include cash and cash equivalents and mark-to-market value of derivatives.

The cash value of the trust-owned insurance contract is primarily invested in investment-grade publicly traded equity and fixed-income securities.

Other than hedge funds, private equity-like investments, and a portion of the real estate holdings, which are discussed above, we determine fair values based on a market approach using quoted market values, significant other observable inputs for identical or comparable assets or liabilities, or discounted cash flow analyses.

The fair values of our defined benefit pension plan assets by asset category were as follows:

| | | Fair Value Measurements Using | | | |
|---|---|---|---|---|---|
| | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Investments Valued at Net Asset Value[(1)] |
| **As of December 31, 2025** | | | | | |
| Public equity securities | **$ 4,277** | **$ 1,179** | **$ 403** | **$ —** | **$ 2,695** |
| Fixed-income investments | **2,083** | **55** | **1,517** | **—** | **511** |
| Hedge funds | **3,240** | **—** | **—** | **—** | **3,240** |
| Private equity-like investments | **3,927** | **—** | **—** | **6** | **3,921** |
| Real estate | **460** | **312** | **—** | **—** | **148** |
| Other assets | **833** | **49** | **103** | **—** | **681** |
| Total | **$ 14,820** | **$ 1,595** | **$ 2,023** | **$ 6** | **$ 11,196** |
| **As of December 31, 2024** | | | | | |
| Public equity securities | $ 3,423 | $ 1,056 | $ 337 | $ — | $ 2,030 |
| Fixed-income investments | 2,023 | 42 | 1,556 | — | 425 |
| Hedge funds | 3,058 | — | — | — | 3,058 |
| Private equity-like investments | 3,931 | — | — | 9 | 3,922 |
| Real estate | 451 | 301 | — | — | 150 |
| Other assets | 773 | 10 | 26 | — | 737 |
| Total | $ 13,658 | $ 1,409 | $ 1,919 | $ 9 | $ 10,321 |

(1) Certain investments that are measured at fair value using the NAV per share (or its equivalent) as a practical expedient have not been classified in the fair value hierarchy.

The fair values of our retiree health plan assets by asset category were as follows:

| | | Fair Value Measurements Using | | | |
|---|---|---|---|---|---|
| | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Investments Valued at Net Asset Value[(1)] |
| **As of December 31, 2025** | | | | | |
| Public equity securities | **$ 383** | **$ 114** | **$ —** | **$ —** | **$ 269** |
| Fixed-income investments | **77** | **—** | **46** | **—** | **31** |
| Hedge funds | **314** | **—** | **—** | **—** | **314** |
| Private equity-like investments | **363** | **—** | **—** | **1** | **362** |
| Cash value of trust owned insurance contract | **1,529** | **—** | **1,529** | **—** | **—** |
| Real estate | **30** | **30** | **—** | **—** | **—** |
| Other assets | **79** | **12** | **2** | **—** | **65** |
| Total | **$ 2,775** | **$ 156** | **$ 1,577** | **$ 1** | **$ 1,041** |
| **As of December 31, 2024** | | | | | |
| Public equity securities | $ 288 | $ 98 | $ — | $ — | $ 190 |
| Fixed-income investments | 89 | — | 63 | — | 26 |
| Hedge funds | 285 | — | — | — | 285 |
| Private equity-like investments | 346 | — | — | 1 | 345 |
| Cash value of trust owned insurance contract | 1,465 | — | 1,465 | — | — |
| Real estate | 28 | 28 | — | — | — |
| Other assets | 64 | 4 | (7) | — | 68 |
| Total | $ 2,566 | $ 130 | $ 1,521 | $ 1 | $ 914 |

(1) Certain investments that are measured at fair value using the NAV per share (or its equivalent) as a practical expedient have not been classified in the fair value hierarchy.

**Note 16: Contingencies**

We are and may become involved in various lawsuits, claims, government investigations and other legal proceedings that arise from time to time in the course of our business, including patent, environmental, commercial, contractual, licensing, employment, health and safety, consumer protection, pricing, access, consumer, sales and marketing, product liability, insurance, antitrust, securities, and regulatory compliance matters, among others. Such matters may involve inquiries from or disputes with various types of parties, including governments, regulatory agencies, competitors, customers, suppliers, service providers, licensees, employees, or shareholders, among others. We cannot predict the final outcome of these proceedings, and while we intend to vigorously prosecute or defend our position as appropriate, there can be no assurance that we will be successful or obtain any requested relief. Matters often develop over a long period of time, and expectations can change as a result of new findings, rulings, appeals, settlements, legal or regulatory changes, or other factors. From time to time we may discontinue or settle and compromise matters as appropriate in our best interest.

Legal proceedings that we believe are significant or could become significant or material are described below. For proceedings in which we are named as defendants, unless otherwise noted, we cannot reasonably estimate the maximum potential exposure or the range of possible loss in excess of amounts accrued; however, we believe that the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity, but could possibly be material to our consolidated results of operations in any one accounting period.

Litigation accruals and environmental liabilities and any related estimated insurance recoverables are reflected on a gross basis as liabilities and assets, respectively, on our consolidated balance sheets. We accrue for estimated exposures to the extent they are both probable and reasonably estimable based on the then available information. We accrue for certain unfiled product liability claims to the extent we can formulate a reasonable estimate of their exposure. We estimate these exposures based primarily on historical claims experience and data regarding product usage. Legal defense costs expected to be incurred in connection with significant liability loss contingencies are accrued when both probable and reasonably estimable.

Because of the nature of pharmaceutical products, it is possible that we could become subject to large numbers of additional product liability and related claims in the future. Due to a very restrictive market for litigation liability insurance, we are predominantly self-insured for litigation liability losses for all our currently and previously marketed products.

**Patent Matters**

In the course of our business, we are subject to actions and proceedings by third parties that seek to challenge, invalidate, or circumvent our patents and patent applications relating to our products, product candidates, and technologies, including the matter described below.

*Emgality Patent Litigation*

In September 2018, Teva Pharmaceuticals International GmbH and Teva Pharmaceuticals USA, Inc. (collectively, Teva) filed a complaint in the U.S. District Court for the District of Massachusetts alleging that Lilly's launch and continued sales of Emgality infringed various claims in three Teva patents. In November 2022, following a trial, a jury returned a verdict in favor of Teva. In September 2023, the trial court overruled the jury verdict, found all asserted claims invalid, and entered judgment in Lilly's favor. In October 2023, Teva appealed to the U.S. Court of Appeals for the Federal Circuit. The appeal is pending.

**Environmental Matters**

*Superfund Matters*

Under the Comprehensive Environmental Response, Compensation, and Liability Act, commonly known as "Superfund," we have been designated as one of several potentially responsible parties with respect to the cleanup of fewer than 10 sites. Under Superfund, each responsible party may be jointly and severally liable for the entire amount of the cleanup.

*Brazil Litigation – Cosmopolis Facility*

*Labor Attorney Litigation*

In March 2008, the state Labor Public Attorney (LPA) filed a public civil action against Eli Lilly do Brasil Limitada (Lilly Brasil) in the Labor Court of Paulinia, State of Sao Paulo, alleging harm to employees and former employees from alleged exposure to soil and groundwater contaminants at a former manufacturing facility in Cosmopolis, operated by the company between 1977 and 2003. In May 2014, the trial court ruled against Lilly Brasil, ordering several remedial and compensatory actions, including health coverage for a class of individuals and certain of their children, and imposing a liquidated award. In December 2025, the superior labor court (TST) significantly reduced the liquidated award. Further appeals are possible.

In July 2019, at the LPA's request, the trial court ordered a freeze of certain of Lilly Brasil's immovable property, which amount was reduced on Lilly's appeal. Both parties have appealed this order to the TST.

The trial court is currently assessing the status of Lilly Brasil's compliance with the obligations as to the land.

*Former Employee Litigation*

Various former employees have filed related claims against Lilly Brasil in the trial court. These lawsuits are at various stages in the litigation process.

**Pricing Matters**

*340B Litigation and Investigations*

In January 2021, we filed a lawsuit in the U.S. District Court for the Southern District of Indiana against the U.S. Department of HHS, the Secretary of HHS, the HRSA, and the Administrator of HRSA. The lawsuit challenges HHS's December 2020 advisory opinion that the 340B program requires drug manufacturers to deliver discounts to all contract pharmacies, as well as HHS's December 2020 administrative dispute resolution (ADR) regulations. It seeks declaratory, injunctive, and other related relief. In March 2021, the court preliminarily enjoined the government's use of the ADR process as to us. In May 2021, we amended the complaint to add claims related to a May 2021 letter from HRSA asserting that Lilly's contract pharmacy policy violated the 340B statute. In October 2021, the court granted in part and denied in part the parties' cross-motions for summary judgment. Both parties appealed to the U.S. Court of Appeals for the Seventh Circuit. The appeal remains pending.

We have been named in various ADR petitions, filed between 2021 and 2024, seeking declaratory, injunctive, and/or monetary relief related to the 340B program. In light of the preliminary injunction order described above, these petitions are being held in abeyance as to us.

In July 2021, Mosaic Health, Inc. filed a putative class action lawsuit in the U.S. District Court for the Western District of New York against us, Sanofi-Aventis U.S., LLC, Novo Nordisk Inc., and AstraZeneca Pharmaceuticals LP, alleging antitrust and unjust enrichment claims related to the defendants' 340B programs. In October 2021, an amended complaint added Central Virginia Health Services, Inc. as a plaintiff. After the district court dismissed the case for failure to state a claim, the U.S. Court of Appeals for the Second Circuit reversed. In the second half of 2025, the Second Circuit denied our petitions for rehearing. This matter is ongoing.

We have multiple other challenges against HHS and related parties related to interpretations and actions under the 340B program.

*Insulin Pricing Litigation*

Since 2017, various plaintiffs, including consumers, states and state attorneys general, counties, municipalities, Native American tribes, school districts, wholesalers, third-party payers, and others, have filed lawsuits, including putative class actions, against us, other manufacturers, pharmacy benefit managers, and others, relating to the pricing of insulin medications, and in some cases other diabetes medications, and rebates paid by manufacturers to pharmacy benefit managers. The complaints in the various lawsuits assert a variety of claims, including among others consumer protection, unfair or deceptive trade practices, fraud, false advertising, unjust enrichment, civil conspiracy, racketeering, antitrust, and unfair competition claims. Most cases have been coordinated or consolidated for pretrial proceedings in a multidistrict litigation (MDL) pending in the U.S. District Court for the District of New Jersey. The lawsuits are at various stages in the litigation process.

The MDL court has issued various case management and other orders, including but not limited to orders establishing separate tracks for state attorney general claims, putative class actions, and non-class suits by self-funded payers; orders dismissing certain claims; and an order setting a constructive notice date of January 14, 2021 for statute of limitations purposes.

In January 2022, the Michigan attorney general filed a petition in Michigan state court seeking authorization to investigate Lilly for potential violations of the Michigan Consumer Protection Act (MCPA), along with a complaint seeking a declaratory judgment that the state has authority to investigate Lilly's sale of insulin under the MCPA. The court authorized the proposed investigation and the issuance of civil investigative subpoenas. In April 2022, however, the parties entered into a stipulation providing that the state will not issue any civil investigative subpoena to us under the MCPA until the declaratory judgment action is resolved, and in July 2022, the court dismissed the case in its entirety. In June 2023, the Michigan Court of Appeals affirmed the judgment in our favor. The state's appeal to the Michigan Supreme Court remains pending.

Lilly entered into settlement agreements with New York and Minnesota to resolve allegations relating to insulin pricing in 2023 and 2024, respectively. These agreements involved no monetary payments and no admission of wrongdoing or liability.

*Insulin and Other Pricing Investigations*

We have been subject to various investigations and received subpoenas, civil investigative demands, information requests, interrogatories, and other inquiries from various governmental entities related to pricing issues, including the pricing and sale of insulin medications, and in some instances certain other diabetes medications, and/or calculations of average manufacturer price and best price. These include subpoenas, civil investigative demands, or information requests from the U.S. Department of Justice, the U.S. Federal Trade Commission, and attorneys general from various states and the District of Columbia.

To the extent the foregoing governmental entities have not filed lawsuits, we are cooperating with the various investigations, subpoenas, and inquiries.

*Average Manufacturer Price Litigation*

In November 2014, a relator filed a qui tam action in the U.S. District Court for the Northern District of Illinois against us and Takeda Pharmaceuticals America, Inc. The relator's complaint alleges that the defendants should have treated certain credits from distributors as retroactive price increases and included such increases in calculating average manufacturer prices. In August 2022, following a trial, the jury returned a verdict in favor of the relator. In September 2025, the U.S. Court of Appeals for the Seventh Circuit affirmed and we recognized a charge related to the matter. In December 2025, the Seventh Circuit denied our petition for rehearing en banc. We are assessing next steps.

**Other Matters**

*Actos Litigation*

We, along with Takeda Chemical Industries, Ltd. and Takeda affiliates (collectively, Takeda), are named in a third-party payer class action in the U.S. District Court for the Central District of California. The plaintiffs allege that bladder cancer risk was concealed from them and claim that as a result they and a proposed class of third-party payers are entitled to recover money paid for Actos prescriptions. Our agreement with Takeda calls for Takeda to defend and indemnify us against losses and expenses with respect to U.S. litigation arising out of the manufacture, use, or sale of Actos and other related expenses in accordance with the terms of the agreement. In May 2023, the district court granted class certification. In June 2025, the U.S. Court of Appeals for the Ninth Circuit denied our appeal of the class certification order, and in August 2025 it denied our petition for rehearing en banc. In November 2025, we and Takeda filed a petition for certiorari to the U.S. Supreme Court.

*Mounjaro, Trulicity, and Zepbound Product Liability Litigation*

Since August 2023, various plaintiffs have filed lawsuits against us, Novo Nordisk A/S, and other related entities, alleging injuries following purported use of incretin medicines, including Mounjaro, Trulicity, and Zepbound. The complaints assert a variety of claims and generally seek damages and/or other relief. Most of these lawsuits have been coordinated or consolidated for pretrial proceedings in two federal MDLs: one focused on alleged gastrointestinal injuries, and the other relating to claims of non-arteritic anterior ischemic optic neuropathy (NAION). Both MDLs are pending in the U.S. District Court for the Eastern District of Pennsylvania. There are also cases pending in various other federal and state courts. In addition to the cases in the United States, there are two class action petitions in Israel, as well as a class action petition in Quebec, Canada.

*Health Choice Alliance*

In October 2019, a relator filed a *qui tam* lawsuit against us in Texas state court asserting claims under the Texas Medicaid Fraud Prevention Act (TMFPA) based on allegations about certain patient support programs related to three of our products. The relator sought to recover the value of payments by the Texas Medicaid Program for these products, as well as civil penalties and other relief. In August 2025, the relator purported to dismiss the first lawsuit and filed a second lawsuit in a different Texas state court adding the State of Texas as a party and expanding claims under the TMFPA to fifteen of our products. We are opposing the relator's purported dismissal of the first lawsuit.

*Research Corporation Technologies, Inc.*

In April 2016, Research Corporation Technologies, Inc. (RCT) filed a lawsuit against us in the U.S. District Court for the District of Arizona asserting damages claims for breach of contract, unjust enrichment, and conversion related to processes used to manufacture certain products, including Humalog and Humulin. In October 2021, the court issued a summary judgment decision in favor of RCT on certain issues, including with respect to a disputed royalty. In July 2024, we reached a confidential agreement with RCT that requires different payments based on various litigation outcomes as determined on appeal. The settlement agreement is not an admission of liability or fault and is subject to conditions. Pursuant to the agreement, the court entered final judgment, Lilly filed a notice of appeal to the U.S. Court of Appeals for the Ninth Circuit, and Lilly made an initial payment under the agreement. Lilly's appeal remains pending. The remaining amount payable under the agreement, if any, should not have a material impact on our financial position, liquidity or results of operations.

**Note 17: Segment Information**

We operate as a single reportable segment engaged in the discovery, development, manufacturing, marketing, and sales of pharmaceutical products worldwide. A global research and development organization and a supply chain organization are responsible for the discovery, development, manufacturing, and supply of our products. Our commercial organizations market, distribute, and sell the products. The business is also supported by global corporate staff functions. Our determination that we operate as a single segment is consistent with the nature of our operations and the financial information regularly reviewed by the chief executive officer, in his capacity as the chief operating decision maker (CODM), for the purposes of evaluating performance, allocating resources, setting incentive compensation targets, and planning and forecasting for future periods.

Our purpose is to unite caring with discovery to create medicines that make life better for people around the world. Our long-term success is significantly dependent on our ability to research and develop innovative medicines. The CODM uses consolidated net income to assess performance of our company, ensuring that we are investing in future research and development while efficiently delivering products to patients. The CODM allocates research and development resources based upon several factors, including the likelihood of technical success, unmet medical needs, and the viability of commercial success. A significant component of the CODM's decision-making process is to ensure a balanced investment in our research and development portfolio to drive near-term success and sustain for the long-term.

The following table summarizes information for our single reportable segment, including significant segment expenses:

| | 2025 | 2024 | 2023 |
|---|---|---|---|
| Revenue | **$ 65,179** | $ 45,043 | $ 34,124 |
| Less: | | | |
| Cost of sales | **11,052** | 8,418 | 7,082 |
| Early-stage research and development[(1)] | **4,881** | 3,917 | 3,093 |
| Late-stage research and development[(1)] | **8,456** | 7,074 | 6,221 |
| Marketing, selling, and administrative | **11,094** | 8,594 | 7,404 |
| Acquired in-process research and development | **2,910** | 3,280 | 3,800 |
| Other segment items[(2)] | **6,146** | 3,170 | 1,285 |
| Net income | **$ 20,640** | $ 10,590 | $ 5,240 |
| Expenditures for long-lived assets[(3)] | **$ 8,672** | $ 5,561 | $ 3,830 |

(1) Early-stage research and development primarily includes costs incurred from discovery through Phase 2 clinical trials. Late-stage research and development primarily includes costs incurred from Phase 3 clinical trials.

(2) Other segment items primarily include income taxes and asset impairment, restructuring, and other special charges.

(3) Includes expenditures for property and equipment and computer software costs.

# *Management's Reports*

**Management's Report for Financial Statements—Eli Lilly and Company and Subsidiaries**

Management of Eli Lilly and Company and subsidiaries is responsible for the accuracy, integrity, and fair presentation of the financial statements. The statements have been prepared in accordance with generally accepted accounting principles in the United States and include amounts based on judgments and estimates by management. In management's opinion, the consolidated financial statements present fairly our financial position, results of operations, and cash flows.

In addition to the system of internal accounting controls, we maintain a code of conduct (known as "*The Red Book"*) that applies to all employees worldwide, requiring proper overall business conduct, avoidance of conflicts of interest, compliance with laws, and confidentiality of proprietary information. All employees must take training annually on *The Red Book* and are required to report suspected violations. A hotline number is available on our lilly.com website and on the internal LillyNow website to enable reporting of suspected violations anonymously. Employees who report suspected violations are protected from discrimination or retaliation by the company. In addition to *The Red Book*, the chief executive officer and all financial management must sign a financial code of ethics, which further reinforces their ethical and fiduciary responsibilities.

The consolidated financial statements have been audited by Ernst & Young LLP, an independent registered public accounting firm (PCAOB ID: 42). Their responsibility is to examine our consolidated financial statements in accordance with generally accepted auditing standards of the Public Company Accounting Oversight Board (United States). Ernst & Young's opinion with respect to the fairness of the presentation of the statements is included in Item 8 of our Annual Report on Form 10-K. Ernst & Young reports directly to the audit committee of the board of directors.

Our audit committee includes four nonemployee members of the board of directors, all of whom are independent from our company. The committee charter, which is available on our website, outlines the members' roles and responsibilities. It is the audit committee's responsibility to appoint an independent registered public accounting firm subject to shareholder ratification, pre-approve both audit and non-audit services performed by the independent registered public accounting firm, and review the reports submitted by the firm. The audit committee meets several times during the year with management, the internal auditors, and the independent public accounting firm to discuss audit activities, internal controls, and financial reporting matters, including reviews of our externally published financial results. The internal auditors and the independent registered public accounting firm have full and free access to the committee.

We are dedicated to ensuring that we maintain the high standards of financial accounting and reporting that we have established. We are committed to providing financial information that is transparent, timely, complete, relevant, and accurate. Our culture demands integrity and an unyielding commitment to strong internal practices and policies. Finally, we have the highest confidence in our financial reporting, our underlying system of internal controls, and our people, who are objective in their responsibilities, operate under a code of conduct and are subject to the highest level of ethical standards.

**Management's Report on Internal Control Over Financial Reporting—Eli Lilly and Company and Subsidiaries**

Management of Eli Lilly and Company and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. We have global financial policies that govern critical areas, including internal controls, financial accounting and reporting, fiduciary accountability, and safeguarding of corporate assets. Our internal accounting control systems are designed to provide reasonable assurance that assets are safeguarded, that transactions are executed in accordance with management's authorization and are properly recorded, and that accounting records are adequate for preparation of financial statements and other financial information. A staff of internal auditors regularly monitors, on a worldwide basis, the adequacy and effectiveness of internal accounting controls. The general auditor reports directly to the audit committee of the board of directors.

We conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in "Internal Control—Integrated Framework" (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Based on our evaluation under this framework, we concluded that our internal control over financial reporting was effective as of December 31, 2025. However, because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The effectiveness of internal control over financial reporting as of December 31, 2025 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their attestation report, which appears herein. Their responsibility is to evaluate whether internal control over financial reporting was designed and operating effectively.

| | |
|---|---|
| David Ricks<br>*Chair, President, and Chief Executive Officer* | Lucas Montarce<br>*Executive Vice President and Chief Financial Officer* |

February 12, 2026

# *Report of Independent Registered Public Accounting Firm*

To the Shareholders and the Board of Directors of Eli Lilly and Company

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Eli Lilly and Company and subsidiaries (the Company) as of December 31, 2025 and 2024, the related consolidated statements of operations, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2025, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2025 and 2024, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2025, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2025, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 12, 2026, expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing separate opinions on the critical audit matter or on the accounts or disclosures to which it relates.

***Medicaid, Managed Care, and Medicare sales rebate accruals***

| | |
|---|---|
| *Description of the Matter* | As described in Note 2 to the consolidated financial statements under the caption "Net Product Revenue," the Company establishes provisions for sales rebate and discounts in the same period as the related sales occur. At December 31, 2025, the Company had $17,382 million in sales rebate and discount accruals. A large portion of these accruals are rebates associated with sales in the United States for which payment for purchase of the product is covered by Medicaid, Managed Care, and Medicare.<br><br>Auditing the Medicaid, Managed Care, and Medicare sales rebate and discount accruals is challenging because of the subjectivity of certain assumptions required to estimate the rebate liabilities. In calculating the appropriate accrual amount, the Company considers historical Medicaid, Managed Care, and Medicare rebate payments by product as a percentage of their historical sales as well as any significant changes in sales trends, the lag in payment timing, changes in rebate contracts, an evaluation of the current Medicaid and Medicare laws and interpretations, the percentage of products that are sold via Medicaid, Managed Care, and Medicare, and product pricing. Given variability in prescription drug costs and variability in prescription data, historical rebate information may not be predictive for management to estimate the rebate accrual and thus, management supplements its historical data analysis with qualitative adjustments based upon current expectations, particularly for select products which contribute the largest portion of the Company's revenue. |
| *How We Addressed the Matter in Our Audit* | We tested the Company's controls addressing the identified risks of material misstatement related to the valuation of the sales rebate and discount liabilities. This included testing controls over management's review of the significant assumptions used to calculate the Medicaid, Managed Care, and Medicare rebate liabilities, including the significant assumptions discussed above. This testing also included management's control to compare actual activity to estimated activity and controls to ensure the data used to evaluate the significant assumptions was complete and accurate.<br><br>Our audit procedures included, among others, evaluating for reasonableness the significant assumptions in light of economic trends, product profiles, and other regulatory factors. Our testing involved assessing the historical accuracy of management's estimates by comparing actual activity to previous estimates and performing analytical procedures to evaluate the completeness of the reserves. Additionally, our procedures included reviewing a sample of contracts, testing a sample of rebate payments and testing the underlying data used in management's evaluation. For Medicaid, we involved our professionals with an understanding of the statutory reimbursement requirements to assess the consistency of the Company's calculation methodologies with the applicable government regulations and policy. |

/s/ Ernst & Young LLP

We have served as the Company's auditor since 1940.

Indianapolis, Indiana

February 12, 2026

# *Report of Independent Registered Public Accounting Firm*

To the Shareholders and the Board of Directors of Eli Lilly and Company

**Opinion on Internal Control Over Financial Reporting**

We have audited Eli Lilly and Company and subsidiaries' internal control over financial reporting as of December 31, 2025, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Eli Lilly and Company and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2025, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2025 and 2024, the related consolidated statements of operations, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2025, and the related notes and our report dated February 12, 2026, expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Indianapolis, Indiana

February 12, 2026

### *Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

None.

### *Item 9A. Controls and Procedures*

**Evaluation of Disclosure Controls and Procedures**

Under applicable Securities and Exchange Commission (SEC) regulations, management of a reporting company, with the participation of the principal executive officer and principal financial officer, must periodically evaluate the company's "disclosure controls and procedures," which are defined generally as controls and other procedures designed to ensure that information required to be disclosed by the reporting company in its periodic reports filed with the SEC (such as this Form 10-K) is recorded, processed, summarized, and reported on a timely basis.

Our management, with the participation of David Ricks, president and chief executive officer, and Lucas Montarce, executive vice president and chief financial officer, evaluated our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of December 31, 2025, and concluded that they were effective.

**Management's Report on Internal Control over Financial Reporting**

Mr. Ricks and Mr. Montarce provided a report on behalf of management on our internal control over financial reporting, in which management concluded that the company's internal control over financial reporting is effective at December 31, 2025 based on the framework in "Internal Control—Integrated Framework" (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States. Due to the inherent limitations, no evaluation over internal control can provide absolute assurance that no material misstatements or fraud exist.

In addition, Ernst & Young LLP, the company's independent registered public accounting firm, issued an attestation report on the company's internal control over financial reporting as of December 31, 2025.

See Item 8 for the full text of management's report and Ernst & Young's attestation report.

**Changes in Internal Control over Financial Reporting**

During the fourth quarter of 2025, there were no changes in our internal control over financial reporting that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *Item 9B. Other Information*

During the three months ended December 31, 2025, none of our directors or officers adopted or terminated a "Rule 10b5-1 trading arrangement" or "non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408 of Regulation S-K.

### *Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections*

Not applicable.

# Part III

### *Item 10. Directors, Executive Officers, and Corporate Governance*

**Directors and Executive Officers**

Information relating to our board of directors is found in our Definitive Proxy Statement, to be dated on or about March 20, 2026 (Proxy Statement), under "Governance - How We Build an Effective Board" and is incorporated in this Annual Report on Form 10-K by reference.

Information relating to our insider trading policy and processes is found in our Proxy Statement under "Ownership of Company Stock - Common Stock Ownership by Directors and Executive Officers" and is incorporated in this Annual Report on Form 10-K by reference.

Information relating to our executive officers is found at Item 1, "Business - Executive Officers of the Company" and is incorporated by reference herein.

**Code of Ethics**

Information relating to our code of ethics is found in our Proxy Statement under "Governance - How We Operate an Effective Board - Governance Practices - Board Oversight - Key Areas of Oversight by the Board and Its Committees - Governance - Code of Ethics" and is incorporated in this Annual Report on Form 10-K by reference.

**Corporate Governance**

Information about the procedures by which shareholders can recommend nominees to our board of directors is found in our Proxy Statement under "Governance - How We Build an Effective Board - Director Nominations - Shareholder Director Candidates" and is incorporated in this Annual Report on Form 10-K by reference.

The board of directors has appointed an audit committee consisting entirely of independent directors in accordance with applicable Securities and Exchange Commission and New York Stock Exchange requirements for audit committees. Information about our audit committee is found in our Proxy Statement under "Governance - How We Operate an Effective Board - Board Structure - Meetings of the Board and Its Committees - Committees of the Board - Audit Committee" and is incorporated in this Annual Report on Form 10-K by reference.

**Section 16(a) Reporting Compliance**

Information about our compliance with Section 16(a) is found in our Proxy Statement under "Ownership of Company Stock - Delinquent Section 16(a) Reports" and is incorporated in this Annual Report on Form 10-K by reference.

### *Item 11. Executive Compensation*

Information on director compensation, executive compensation, and talent and compensation committee matters can be found in the Proxy Statement under "Governance - How We Build an Effective Board - Director Compensation," "- How We Operate an Effective Board - Board Structure - Meetings of the Board and Its Committees - Committees of the Board - Talent and Compensation Committee," "Compensation - Compensation Discussion and Analysis," "- Talent and Compensation Committee Matters," and "- Executive Compensation." Such information is incorporated in this Annual Report on Form 10-K by reference.

### *Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

**Security Ownership of Certain Beneficial Owners and Management**

Information relating to ownership of the company's common stock by management and by persons known by the company to be the beneficial owners of more than five percent of the outstanding shares of common stock is found in the Proxy Statement under "Ownership of Company Stock" and incorporated in this Annual Report on Form 10-K by reference.

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table presents information as of December 31, 2025 regarding the company's compensation plans under which shares of the company's common stock have been authorized for issuance.

| Plan category | (a) Number of securities to be issued upon exercise of outstanding options, warrants, and rights [(1)] | (b) Weighted-average exercise price of outstanding options, warrants, and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | $ — | 42,396,427 |
| Equity compensation plan not approved by security holders | — | — | — |
| Total | — | — | 42,396,427 |

(1) 3,484,792 shares are underlying outstanding equity awards.

### *Item 13. Certain Relationships and Related Transactions, and Director Independence*

**Related Person Transactions**

Information relating to the policies and procedures for approval of related person transactions by our board of directors can be found in the Proxy Statement under "Governance - How We Operate an Effective Board - Board Alignment - Conflicts of Interest and Transactions with Related Persons." Such information is incorporated in this Annual Report on Form 10-K by reference.

**Director Independence**

Information relating to director independence can be found in the Proxy Statement under "Governance - How We Build an Effective Board - Director Qualifications - Independence" and is incorporated in this Annual Report on Form 10-K by reference.

### *Item 14. Principal Accountant Fees and Services*

Information related to the fees and services of our principal independent accountants, Ernst & Young LLP, can be found in the Proxy Statement under "Audit Matters - Item 3. Ratification of the Appointment of the Independent Auditor - Services Performed by the Independent Auditor" and "- Independent Auditor Fees." Such information is incorporated in this Annual Report on Form 10-K by reference.

### *Item 15. Exhibits and Financial Statement Schedules*

**(a)1. Financial Statements**

The following consolidated financial statements of the company and its subsidiaries are found at Item 8:

- Consolidated Statements of Operations—Years Ended December 31, 2025, 2024, and 2023
- Consolidated Statements of Comprehensive Income—Years Ended December 31, 2025, 2024, and 2023
- Consolidated Balance Sheets—December 31, 2025 and 2024
- Consolidated Statements of Shareholders' Equity—Years Ended December 31, 2025, 2024, and 2023
- Consolidated Statements of Cash Flows—Years Ended December 31, 2025, 2024, and 2023
- Notes to Consolidated Financial Statements

**(a)2. Financial Statement Schedules**

The consolidated financial statement schedules of the company and its subsidiaries have been omitted because they are not required, are inapplicable, or are adequately explained in the financial statements.

Financial statements of interests of 50 percent or less, which are accounted for by the equity method, have been omitted because they do not, considered in the aggregate as a single subsidiary, constitute a significant subsidiary.

**(a)3. Exhibits**

The following documents are filed as part of this Annual Report on Form 10-K:

| Exhibit | Description |
|---|---|
| 3.1 | Amended Articles of Incorporation, incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed on May 4, 2022 |
| 3.2 | Bylaws, as amended, incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K filed on May 4, 2022 |
| 4.1 | Indenture, dated February 1, 1991, between the Company and Deutsche Bank Trust Company Americas, as successor trustee to Citibank, N.A., as Trustee, incorporated by reference to Exhibit 4.1 to the Company's Registration Statement on Form S-3, Registration No. 333-186979 |
| 4.2 | Tripartite Agreement, dated September 13, 2007, appointing Deutsche Bank Trust Company Americas as Successor Trustee under the Indenture listed in Exhibit 4.1, incorporated by reference to Exhibit 4.2 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008 |
| 4.3 | Description of the Company's Common Stock, incorporated by reference to Exhibit 4.3 to the Company's Annual Report on Form 10-K for the year ended December 31, 2023 |
| 4.4 | Description of the Company's 1.625% Notes due 2026 and 2.125% Notes due 2030, incorporated by reference to Exhibit 4.4 to the Company's Annual Report on Form 10-K for the year ended December 31, 2019 |
| 4.5 | Description of the Company's 6.77% Notes due 2036, incorporated by reference to Exhibit 4.5 to the Company's Annual Report on Form 10-K for the year ended December 31, 2019 |
| 4.6 | Description of the Company's 0.625% Notes due 2031 and 1.700% Notes due 2049, incorporated by reference to Exhibit 4.7 to the Company's Annual Report on Form 10-K for the year ended December 31, 2019 |
| 4.7 | Description of the Company's 0.500% Notes due 2033, 1.125% Notes due 2051, and 1.375% Notes due 2061, incorporated by reference to Exhibit 4.8 to the Company's Annual Report on Form 10-K for the year ended December 31, 2021 |
| 4.8 | Description of the Company's 1.625% Notes due 2043, incorporated by reference to Exhibit 4.9 to the Company's Annual Report on Form 10-K for the year ended December 31, 2021 |

| | |
|---|---|
| 10.1 | Amended and Restated 2002 Lilly Stock Plan(1), incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2024 |
| 10.2 | Form of Performance Award under the 2002 Lilly Stock Plan(1), incorporated by reference to Exhibit 10.2 to the Company's Annual Report on Form 10-K for the year ended December 31, 2022 |
| 10.3 | Form of Revenue Growth Award under the 2002 Lilly Stock Plan(1)* |
| 10.4 | Form of Relative Value Award under the 2002 Lilly Stock Plan(1)* |
| 10.5 | Form of Restricted Stock Unit Award under the 2002 Lilly Stock Plan(1)* |
| 10.6 | Form of Non-Compete Payment Agreement(1), incorporated by reference to Exhibit 10.5 to the Company's Annual Report on Form 10-K for the year ended December 31, 2022 |
| 10.7 | The Lilly Deferred Compensation Plan, as amended(1), incorporated by reference to Exhibit 10.7 to the Company's Annual Report on Form 10-K for the year ended December 31, 2024 |
| 10.8 | The Lilly Directors' Deferral Plan, as amended(1), incorporated by reference to Exhibit 10.8 to the Company's Annual Report on Form 10-K for the year ended December 31, 2024 |
| 10.9 | The Eli Lilly and Company Bonus Plan, as amended(1), incorporated by reference to Exhibit 10.14 to the Company's Annual Report on Form 10-K for the year ended December 31, 2020 |
| 10.10 | 2007 Change in Control Severance Pay Plan for Select Employees, as amended(1), incorporated by reference to Exhibit 10.10 to the Company's Annual Report on Form 10-K for the year ended December 31, 2023 |
| 19 | Eli Lilly Insider Trading Policy* |
| 21 | List of Subsidiaries* |
| 23 | Consent of Independent Registered Public Accounting Firm* |
| 24 | Power of Attorney* |
| 31.1 | Rule 13a-14(a) Certification of David Ricks, Chair, President, and Chief Executive Officer* |
| 31.2 | Rule 13a-14(a) Certification of Lucas Montarce, Executive Vice President and Chief Financial Officer* |
| 32 | Section 1350 Certification* |
| 97 | Executive Compensation Recovery Policy, incorporated by reference to Exhibit 97 to the Company's Annual Report on Form 10-K for the year ended December 31, 2023 |
| 101 | Interactive Data File* |
| 104 | Cover Page Interactive Data File (formatted in Inline XBRL and contained in Exhibit 101)* |

(1) Indicates management contract or compensatory plan.
* Filed herewith.

Long-term debt instruments under which the total amount of securities authorized does not exceed 10 percent of our consolidated assets are not filed as exhibits to this Annual Report. We will furnish a copy of these agreements to the Securities and Exchange Commission upon request.

### *Item 16. Form 10-K Summary*

Not applicable.

**Signatures**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

*Eli Lilly and Company*

*By* /s/ David Ricks
*David Ricks*
Chair, President, and Chief Executive Officer

February 12, 2026

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on February 12, 2026 by the following persons on behalf of the Registrant and in the capacities indicated.

| Signature | Title |
|---|---|
| /s/ David Ricks<br>DAVID RICKS | Chair, President, and Chief Executive Officer (principal executive officer) |
| /s/ Lucas Montarce<br>LUCAS MONTARCE | Executive Vice President and Chief Financial Officer (principal financial officer) |
| /s/ Donald Zakrowski<br>DONALD ZAKROWSKI | Senior Vice President, Finance, and Chief Accounting Officer (principal accounting officer) |
| *<br>RALPH ALVAREZ | Director |
| *<br>KATHERINE BAICKER, Ph.D. | Director |
| *<br>CAROLYN BERTOZZI, Ph.D. | Director |
| *<br>ERIK FYRWALD | Director |
| *<br>MARY LYNNE HEDLEY, Ph.D. | Director |
| *<br>JAMERE JACKSON | Director |
| *<br>KIMBERLY JOHNSON | Director |
| *<br>WILLIAM KAELIN, JR., M.D. | Director |
| *<br>JUAN LUCIANO | Director |
| *<br>JON MOELLER | Director |
| *<br>GABRIELLE SULZBERGER | Director |

*By /s/ Lucas Montarce
LUCAS MONTARCE
As Attorney-in-Fact

Exhibit 10.3 Form of Revenue Growth Award under the 2002 Lilly Stock Plan

# Eli Lilly and Company
# Revenue Growth Award Agreement
## *(for Executives and Executive Officers)*

This Revenue Growth Award has been granted on [•] ("Grant Date") by Eli Lilly and Company, an Indiana corporation, with its principal offices in Indianapolis, Indiana ("Lilly" or the "Company"), to the Eligible Individual who has received this Revenue Growth Award Agreement (the "Grantee").

| | |
|---|---|
| **Grantee:** | [•] |
| **Units Granted:** | [•] |
| **Grant Date:** | [•] |
| **Performance Period:** | [•] |

**Lilly Revenue Performance Levels:**
[•]

Table of Contents


| | | |
|---|---|---|
| Section 1. | Grant of Revenue Growth Award | 3 |
| Section 2. | Vesting | 3 |
| Section 3. | Impact of Certain Employment Status Changes | 3 |
| Section 4. | Change in Control | 5 |
| Section 5. | Settlement | 6 |
| Section 6. | Rights of the Grantee | 7 |
| Section 7. | Prohibition Against Transfer | 8 |
| Section 8. | Responsibility for Taxes | 8 |
| Section 9. | Section 409A Compliance | 10 |
| Section 10. | Grantee’s Acknowledgment | 10 |
| Section 11. | Data Privacy | 12 |
| Section 12. | Restrictive Covenants and Remedies | 13 |
| Section 13. | Additional Terms and Conditions | 24 |
| Section 14. | Governing Law and Choice of Venue | 24 |
| Section 15. | Miscellaneous Provisions | 25 |
| Section 16. | Compensation Recovery | 26 |
| Section 17. | Award Subject to Acknowledgement of Acceptance | 27 |

## Section 1. Grant of Revenue Growth Award

Eli Lilly and Company, an Indiana corporation ("Lilly" or the "Company"), has granted to the Eligible Individual who has received this Revenue Growth Award Agreement (the "Grantee") a Performance-Based Award (the "Revenue Growth Award" or the "Award") with respect to the target number of shares of Lilly Common Stock (the "Shares") set forth on the first page of this document and available by logging on to the Company's stock plan administrator's website at http://mystock.lilly.com (the "Target Number of Shares").

The Award is made pursuant to and subject to the terms and conditions set forth in the Amended and Restated 2002 Lilly Stock Plan (the "Plan") and to the terms and conditions set forth in this Revenue Growth Award Agreement, including all appendices, exhibits and addenda hereto (the "Award Agreement"). In the event of any conflict between the terms of the Plan and this Award Agreement, the terms of the Plan shall govern except with respect to the provisions described in Section 12 below and Section 5(b) below (in which case, the terms of the Award Agreement shall govern).

Any capitalized terms used but not defined in this Award Agreement shall have the meanings set forth in the Plan.

## Section 2. Vesting

As soon as reasonably practicable following the end of the Performance Period, the Committee shall determine the number of Shares that are eligible to vest which shall be equal to the product of (i) the Target Number of Shares, multiplied by (ii) the Percent of Target, where:

a. "Percent of Target" shall mean the percentage set forth in the Lilly Revenue Performance Levels table on the first page of this document representing the attainment level of the Lilly Cumulative Revenue measured against the performance goal attainment levels set forth in the table.

b. "Lilly Cumulative Revenue" shall mean the cumulative Revenue for the three-year Performance Period, as determined and certified by the Committee.

c. "Revenue" shall mean revenue generated by the Company, as reported in the Company's audited consolidated financial statements for each fiscal year in the Performance Period in accordance with accounting principles currently applicable in the United States ("U.S. GAAP"), adjusted to the extent deemed appropriate by the Committee.

In the event the Grantee's Service is terminated prior to the end of the Performance Period for any reason or in any circumstance other than as described in Sections 3 or 4 below, the Award shall be forfeited.

## Section 3. Impact of Certain Employment Status Changes

Unless the Committee determines, in its sole discretion, that such treatment is not advisable after consideration of Applicable Laws, the number of Shares that are eligible to vest upon a change in employment status of the Grantee during the Performance Period will be as follows:

a. Retirement; Death. Except as otherwise provided below (including Section 12), in the event the Grantee's Service is terminated (i) on or following the Retirement Vesting Date (A) due to the Grantee's Retirement or (B) due to the Grantee's Qualifying Termination (as defined below) on a date that the Grantee is eligible for Retirement, or (ii) due to the Grantee's death, the number of Shares eligible to vest shall be the number determined in accordance with Section 2 above. For the avoidance of any doubt, the Award shall be forfeited in the event the Grantee's Service is terminated prior to the Retirement Vesting Date due to the Grantee's Retirement.

"Retirement" means retirement as a "retiree," which is a person who is (A) a retired employee under The Lilly Retirement Plan; (B) a retired employee under the retirement plan or program of an Affiliate; (C) a retired employee under a retirement program specifically approved by the Committee; (D) required to retire under local law, to the extent authorized by the Company to address such local requirements or (E) otherwise determined to be a retired employee in the sole discretion of the Company. A Grantee who has not received a year-end individual performance rating and (i) is on final written warning (or equivalent as determined by the Committee) for unsatisfactory performance and elects to retire in lieu of a termination of employment; or (ii) elects to retire in lieu of termination of employment because of an immediately terminable offense (e.g., absence of three days without notice, insubordination, violation of substance abuse policy, possession of firearms, misconduct) will not be considered to have terminated due to Retirement as described herein.

"Retirement Vesting Date" means, if the Grantee is not an Executive Officer, the date that is on or following July 31 immediately following the commencement of the Performance Period and, if the Grantee is an Executive Officer, the date that is on or following December 31 immediately following the commencement of the Performance Period.

"Executive Officer" means a Grantee who is designated an Executive Officer of the Company as of the Grant Date.

b. Qualifying Termination. Except as otherwise provided in Section 3(a), in the event the Grantee's employment is subject to a Qualifying Termination (as defined below), the number of Shares eligible to vest shall be the number determined in accordance with Section 2 above, reduced proportionally for the portion of the total days during the Performance Period in which the Grantee was not in active Service.

For purposes of this Award Agreement, a "Qualifying Termination" means the termination of the Grantee's Service under any one of the following circumstances:

i. due to a plant closing or reduction in workforce (as defined below);

ii. as a result of the Grantee's failure to locate a position within the Company or an Affiliate following the placement of the Grantee on reallocation,

including reallocation due to the Grantee's inability to continue to work due to medical reasons, in the United States (or equivalent as determined by the Committee).

"Plant closing" means the closing of a plant site or other corporate location that directly results in termination of the Grantee's Service.

"Reduction in workforce" means the elimination of a work group, functional or business unit or other broadly applicable reduction in job positions that directly results in termination of the Grantee's Service.

c. Misconduct. The Committee may, in its sole discretion, cancel this Revenue Growth Award or reduce the number of Shares eligible to vest, prorated according to time or other measure as determined appropriate by the Committee, if during any portion of the Performance Period the Grantee is subject to disciplinary action for Misconduct pursuant to and as such term is defined under the Eli Lilly and Company Executive Compensation Recovery Policy, effective October 2, 2023, as may be amended, restated, or superseded from time to time.

The Committee's determination as to whether (1) a transfer of employment between Lilly and an Affiliate or between Affiliates constitutes a termination of Service, (2) the Grantee's Service has been terminated by reason of Retirement, (3) the Grantee is eligible for Retirement, (4) the Grantee's Service has been terminated as a direct result of either a plant closing or a reduction in force, and (5) the Grantee's Service has been terminated as a result of the failure to locate a position within the Company or an Affiliate following reallocation or medical reassignment shall be final and binding on the Grantee.

## Section 4. Change in Control

The provisions of Section 13.2 of the Plan apply to this Award with the following modifications:

a. The only Change in Control event that shall result in a benefit under this Section 4 shall be the consummation of a merger, share exchange, or consolidation of the Company, as defined in Section 2.6(c) of the Plan (a "Transaction").

b. In the event the Award is converted, assumed, substituted, continued or replaced by a successor or surviving corporation, or a parent or subsidiary thereof, in connection with a Transaction, any Fractional Share issued under this Award shall vest automatically and be payable in cash unless otherwise determined by the Committee, in its sole discretion.

c. In the event of a Transaction that occurs prior to the last day of the Performance Period, the Grantee will be credited with an award of Restricted Stock Units equal to the number of Shares eligible to vest, calculated in a manner consistent with Section 2, but the Lilly Cumulative Revenue shall be equal to the value of Shares established for the consideration to be paid to holders of Shares in the Transaction (the "Credited RSU Award"). The Credited RSU Award shall be eligible to vest on the last day of the Performance Period, subject to the Grantee's

continued Service through the last day of the Performance Period, except as provided below:

i. In the event the Credited RSU Award is not converted, assumed, substituted, continued or replaced by a successor or surviving corporation, or a parent or subsidiary thereof, in connection with a Transaction, then immediately prior to the Transaction, the Credited RSU Award shall vest automatically in full.

ii. In the event the Credited RSU Award is converted, assumed, substituted, continued or replaced by a successor or surviving corporation, or a parent or subsidiary thereof, in connection with the Transaction and the Grantee is subject to a Covered Termination (as defined below) prior to the end of the Performance Period, then immediately as of the date of the Covered Termination, the Credited RSU Award shall vest automatically in full.

For purposes of this Award Agreement, "Covered Termination" shall mean a termination of Service as described in Section 3(b), Grantee's termination of Service without Cause or the Grantee's resignation for Good Reason. "Cause" and "Good Reason" shall have the meanings ascribed to them in the Eli Lilly and Company 2007 Change in Control Severance Pay Plan for Select Employees as may be amended, restated, or superseded from time to time.

d. If the Grantee is entitled to receive stock of the acquiring entity or successor to the Company as a result of the application of this Section 4, then references to Shares in this Award Agreement shall be read to mean stock of the successor or surviving corporation, or a parent or subsidiary thereof, as and when applicable.

## Section 5. Settlement

a. Except as provided below, the Award shall be paid to the Grantee as soon as practicable, but in no event later than sixty (60) days, following the last day of the Performance Period.

b. Notwithstanding anything in this Award Agreement to the contrary, Grantee agrees and covenants that if, at any time that the Award remains unsettled, Lilly determines that Grantee engaged in any activity that violates Section 12.b or that would have violated Section 12.b. had Grantee engaged in such activity during the Restricted Period (as such term is defined in Section 12.b), Grantee shall automatically forfeit any rights Grantee may have with respect to the Award as of the date of such determination, including any right to receive a payment under the Award.

c. If the Award vests pursuant to Section 4(c)(i), the Award shall be paid to the Grantee immediately prior to the Transaction, provided that if the Award is considered an item of non-qualified deferred compensation subject to Section 409A of the Code ("NQ Deferred Compensation") and the Transaction does not constitute a "change in control event," within the meaning of the U.S. Treasury Regulations (a "409A CIC"), then the Award shall be paid in cash (calculated

based on the value of the Shares established for the consideration to be paid to holders of Shares in the Transaction) on the earliest of (i) the date that the Grantee experiences a "separation from service" within the meaning of Section 409A of the Code (a "Section 409A Separation"), provided that if the Grantee is a "specified employee" within the meaning of Section 409A of the Code as of the date of the Section 409A Separation, the Award shall instead be paid on the first day following the six (6) month anniversary of the Grantee's Section 409A Separation (the "409A Delayed Payment Date"), (ii) the date of the Grantee's death and (iii) the date set forth in Section 5(a) above.

d. If the Award vests pursuant to Section 4(c)(ii), the Award shall be paid to the Grantee as soon as practicable, but in no event later than sixty (60) days, following the date the Grantee is subject to a Covered Termination, provided that if the Award is NQ Deferred Compensation (and further provided that the Transaction constitutes a 409A CIC), (i) the Award shall be paid within sixty (60) days following the date the Grantee experiences a Section 409A Separation, and (ii) if the Grantee is a "specified employee" within the meaning of Section 409A of the Code as of the date of the Section 409A Separation, the Award shall instead be paid on the earliest of (1) the 409A Delayed Payment Date and (2) the date of the Grantee's death.

e. At the time of settlement, Lilly shall issue or transfer Shares to the Grantee that became vested (including, in the interest of clarity, a Fractional Share). Notwithstanding the foregoing, a Fractional Share may be paid in cash or rounded to the extent provided in any appendix attached hereto (the "Appendix") for the Grantee's country or to the extent otherwise determined by the Committee in its sole discretion. For purposes of this Award, references to "issue" or variations of such term shall instead mean "allocate" when used in the context of Fractional Shares.

f. In the event of the death of the Grantee, the payments described above shall be made to the successor of the Grantee.

## Section 6. Rights of the Grantee

a. <u>No Shareholder Rights</u>. The Revenue Growth Award does not entitle the Grantee to any rights of a shareholder of Lilly until such time as the Revenue Growth Award is settled and Shares are issued or transferred to the Grantee. In the event a Fractional Share is issued, the Grantee shall have the rights of a shareholder to receive dividends payable with respect to a Share and, unless otherwise provided by the Committee, the right to vote, in each case, that is proportionate to the interest the Fractional Share bears to a whole Share.

b. <u>No Trust; Grantee's Rights Unsecured.</u> Neither this Award Agreement nor any action in accordance with this Award Agreement shall be construed to create a trust of any kind. The right of the Grantee to receive a payment pursuant to this Award Agreement shall be an unsecured claim against the general assets of the Company.

Section 7. Prohibition Against Transfer

a. Awards. The right of a Grantee to receive payments under this Award may not be transferred except to a duly appointed guardian of the estate of the Grantee or to a successor of the Grantee by will or the applicable laws of descent and distribution and then only subject to the provisions of this Award Agreement. A Grantee may not assign, sell, pledge, or otherwise transfer this Award or the rights thereunder to which he or she may be entitled hereunder prior to transfer or payment thereof to the Grantee, and any such attempted assignment, sale, pledge or transfer shall be void.

b. Fractional Shares. Any Fractional Share issued to the Grantee shall remain in the Grantee's account at the Company's broker until the disposition of the Fractional Share and shall not become transferrable to another broker unless and until any Fractional Shares issued to the Grantee aggregate to a whole Share.

Section 8. Responsibility for Taxes

a. Regardless of any action Lilly and/or the Employer takes with respect to any or all income tax (including federal, state, local and non-U.S. tax), social insurance, payroll tax, fringe benefits tax, payment on account or other tax related items related to the Grantee's participation in the Plan and legally applicable to the Grantee ("Tax Related Items"), the Grantee acknowledges that the ultimate liability for all Tax Related Items is and remains the Grantee's responsibility and may exceed the amount actually withheld by Lilly or the Employer. The Grantee further acknowledges that Lilly and the Employer (i) make no representations or undertakings regarding the treatment of any Tax Related Items in connection with any aspect of the Award, including the grant of the Revenue Growth Award, the vesting of the Revenue Growth Award, the transfer and issuance of any Shares and/or Fractional Shares, the receipt of any cash payment pursuant to the Award, the receipt of any dividends (including any dividends that are reinvested in additional Shares) and the sale or other disposition of any Shares and/or Fractional Shares acquired pursuant to this Award; and (ii) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Award to reduce or eliminate the Grantee's liability for Tax Related Items or achieve any particular tax result. Furthermore, if the Grantee becomes subject to Tax Related Items in more than one jurisdiction, the Grantee acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax Related Items in more than one jurisdiction.

b. In connection with the applicable taxable or tax withholding event, as applicable, the Grantee shall pay or make adequate arrangements satisfactory to Lilly and/or the Employer to satisfy all Tax Related Items.

    i. If the Revenue Growth Award is paid to the Grantee in cash in lieu of Shares and/or Fractional Shares, the Grantee authorizes the Company and/or the Employer, or their respective agents, at their discretion, to

satisfy any obligation for Tax Related Items by withholding from the cash amount paid to the Grantee pursuant to the Award or from the Grantee's wages or other cash compensation paid to the Grantee by the Company and/or the Employer.

ii. If the Revenue Growth Award is paid to the Grantee in Shares and/or Fractional Shares and the Grantee is not subject to the short-swing profit rules of Section 16(b) of the Exchange Act, the Grantee authorizes Lilly and/or the Employer, or their respective agents, at their discretion, to (A) withhold from the Grantee's wages or other cash compensation paid to the Grantee by the Company and/or the Employer, (B) arrange for the sale of Shares and/or Fractional Shares to be issued upon settlement of the Award (on the Grantee's behalf and at the Grantee's direction pursuant to this authorization or such other authorization as the Grantee may be required to provide to Lilly or its designated broker in order for such sale to be effectuated) and withhold from the proceeds of such sale, (C) withhold in Shares and/or Fractional Shares otherwise issuable to the Grantee pursuant to this Award, and/or (D) apply any other method of withholding determined by the Company and, to the extent required by Applicable Laws or the Plan, approved by the Committee.

iii. If the Revenue Growth Award is paid to the Grantee in Shares and/or Fractional Shares and the Grantee is subject to the short-swing profit rules of Section 16(b) of the Exchange Act, Lilly will withhold in Shares and Fractional Shares otherwise issuable to the Grantee pursuant to this Award, unless the use of such withholding method is prevented by Applicable Laws or has materially adverse accounting or tax consequences, in which case the withholding obligation for Tax Related Items may be satisfied by one or a combination of the methods set forth in Section 8(b)(ii)(A) and (B) above.

c. Depending on the withholding method, Lilly and/or the Employer may withhold or account for Tax Related Items by considering applicable statutory or other withholding rates, including minimum or maximum rates in the jurisdiction(s) applicable to the Grantee. In the event of over-withholding, the Grantee may receive a refund of any over-withheld amount in cash (without interest and without entitlement to the equivalent amount in Shares). If the obligation for Tax Related Items is satisfied by withholding Shares, for tax purposes, the Grantee will be deemed to have been issued the full number of Shares and/or Fractional Shares to which he or she is entitled pursuant to this Award, notwithstanding that a number of Shares and/or Fractional Shares are withheld to satisfy the obligation for Tax Related Items.

d. Lilly may refuse to deliver Shares and/or Fractional Shares or any cash payment to the Grantee if the Grantee fails to comply with the Grantee's obligation in connection with the Tax Related Items as described in this Section 8.

e. For purposes of this Section 8, references to the withholding or sale of a Share shall also mean the withholding or sale of any portion that is less than a whole Share, to the extent applicable.

## Section 9. Section 409A Compliance

To the extent applicable, it is intended that this Award comply with the requirements of Section 409A of the U.S. Internal Revenue Code of 1986, as amended and the Treasury Regulations and other guidance issued thereunder ("Section 409A") and this Award shall be interpreted and applied by the Committee in a manner consistent with this intent in order to avoid the imposition of any additional tax under Section 409A.

## Section 10. Grantee's Acknowledgment

In accepting this Award, the Grantee acknowledges, understands and agrees that:

a. the Plan is established voluntarily by Lilly, it is discretionary in nature and it may be modified, amended, suspended or terminated by Lilly at any time, as provided in the Plan;

b. the Award is voluntary and occasional and does not create any contractual or other right to receive future Performance-Based Awards, or benefits in lieu thereof, even if Performance-Based Awards have been granted in the past;

c. all decisions with respect to future Performance-Based Awards or other awards, if any, will be at the sole discretion of the Committee;

d. the Grantee's participation in the Plan is voluntary;

e. the Award is not intended to replace any pension rights or compensation;

f. the Award is not part of normal or expected compensation for any purpose, including but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, holiday pay, leave pay, pension or welfare or retirement benefits or similar mandatory payments;

g. unless otherwise agreed with Lilly, the Award is not granted as consideration for, or in connection with, the service the Grantee may provide as a director of an Affiliate;

h. neither the Award nor any provision of this Award Agreement, the Plan or the policies adopted pursuant to the Plan, confer upon the Grantee any right with respect to employment or continuation of current employment, and in the event that the Grantee is not an employee of Lilly or any subsidiary of Lilly, the Award shall not be interpreted to form an employment contract or relationship with Lilly or any Affiliate;

i. the future value of the underlying Shares and other amounts that may be acquired pursuant to this Award is unknown, indeterminable and cannot be predicted with certainty;

j. no claim or entitlement to compensation or damages shall arise from forfeiture of the Award or recoupment of any Shares and other amounts that may be acquired pursuant to this Award acquired under the Plan or proceeds therefrom resulting from (i) the application of a clawback policy described in Section 16 of this Award Agreement or required by law, (ii) the application of Section 5(b) of this Award Agreement, (iii) the application of any of the remedies described in Section 12 of this Award Agreement, or (iv) the Grantee ceasing to provide employment or other services to Lilly or the Employer (for any reason whatsoever, whether or not later found to be invalid or in breach of local labor laws in the jurisdiction where the Grantee is employed or the terms of Grantee's employment agreement, if any);

k. for purposes of the Award, the Grantee's employment will be considered terminated as of the date he or she is no longer actively providing services to the Company or an Affiliate and the Grantee's right, if any, to earn and be paid any portion of the Award after such termination of employment or services (regardless of the reason for such termination and whether or not such termination is later found to be invalid or in breach of employment laws in the jurisdiction where the Grantee is employed or the terms of the Grantee's employment agreement, if any) will be measured by the date the Grantee ceases to actively provide services and will not be extended by any notice period (e.g., active service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where the Grantee is employed or the terms of the Grantee's employment agreement, if any); the Committee shall have the exclusive discretion to determine when the Grantee is no longer actively providing services for purposes of the Award (including whether the Grantee may still be considered to be actively providing services while on a leave of absence) in accordance with Section 409A;

l. unless otherwise provided in the Plan or by the Committee in its discretion, the Award and the benefits evidenced by this Award Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the Shares and other amounts that may be acquired pursuant to this Award;

m. the Grantee is solely responsible for investigating and complying with any laws applicable to him or her in connection with the Award;

n. the Company has communicated share ownership guidelines that apply to the Grantee, and the Grantee understands and agrees that those guidelines may impact any Shares subject to, or issued pursuant to the Award; and

o. neither the Company, the Employer nor any Affiliate shall be liable for any foreign exchange rate fluctuation between the Grantee's local currency and the United States Dollar that may affect the value of the Award or any amounts due to the Grantee pursuant to the settlement of the Award or the subsequent sale of any Shares and other amounts that may be acquired pursuant to this Award acquired upon settlement.

Section 11. Data Privacy

a. *<u>Data Collection and Usage</u>. The Company and the Employer may collect, process and use certain personal information about the Grantee, and persons closely associated with the Grantee, including, but not limited to, the Grantee's name, home address and telephone number, email address, date of birth, social insurance number, passport or other identification number (e.g., resident registration number), salary, nationality, job title, any shares of stock or directorships held in the Company, details of all Revenue Growth Awards or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding in the Grantee's favor ("Data"), for the purposes of implementing, administering and managing the Plan. The legal basis, where required, for the processing of Data is the Grantee's consent. Where required under applicable laws, Data may also be disclosed to certain securities or other regulatory authorities where the Company's securities are listed or traded or regulatory filings are made and the legal basis, where required, for such disclosure are the applicable laws.*

b. *<u>Stock Plan Administration Service Providers</u>. The Company transfers Data to Morgan Stanley's E*TRADE Financial Corporate Services, Inc. and/or its affiliated companies ("E*TRADE"), an independent service provider, which is assisting the Company with the implementation, administration and management of the Plan. In the future, the Company may select a different service provider and share Data with such other provider serving in a similar manner. The Grantee may be asked to agree on separate terms and data processing practices with the service provider, with such agreement being a condition to the ability to participate in the Plan. The Company may also transfer Data to KPMG, an independent service provider, which is also assisting the Company with certain aspects of the implementation, administration and management of the Plan. In the future, the Company may select a different service provider and share Data with such other provider serving in a similar manner.*

c. *<u>International Data Transfers</u>. The Company and its service providers are based in the United States. The Grantee's country or jurisdiction may have different data privacy laws and protections than the United States. The Company's legal basis, where required, for the transfer of Data is Grantee's consent.*

d. *<u>Data Retention</u>. The Company will hold and use the Data only as long as is necessary to implement, administer and manage the Grantee's participation in the Plan, or as required to comply with legal or regulatory obligations, including under tax and security laws.*

e. *<u>Voluntariness and Consequences of Consent Denial or Withdrawal</u>. Participation in the Plan is voluntary and the Grantee is providing the consents herein on a purely voluntary basis. If the Grantee does not consent, or if the Grantee later seeks to revoke the Grantee's consent, the Grantee's salary from or employment and career with the Employer will not be affected; the only consequence of refusing or withdrawing the Grantee's consent is that the Company would not be*

Case 1:26-cv-00616-SM-TSM Document 5-4 Filed 07/27/26 Page 119 of 210

*able to grant this Award or other awards to the Grantee or administer or maintain such awards.*

*f.* *Data Subject Rights. The Grantee understands that data subject rights regarding the processing of Data vary depending on applicable laws and that, depending on where the Grantee is based and subject to the conditions set out in such applicable laws, the Grantee may have, without limitation, the right to (i) inquire whether and what kind of Data the Company holds about the Grantee and how it is processed, and to access or request copies of such Data, (ii) request the correction or supplementation of Data about the Grantee that is inaccurate, incomplete or out-of-date in light of the purposes underlying the processing, (iii) obtain the erasure of Data no longer necessary for the purposes underlying the processing, (iv) request the Company to restrict the processing of the Grantee's Data in certain situations where the Grantee feels its processing is inappropriate, (v) object, in certain circumstances, to the processing of Data for legitimate interests, and to (vi) request portability of the Grantee's Data that the Grantee has actively or passively provided to the Company or the Employer (which does not include data derived or inferred from the collected data), where the processing of such Data is based on consent or the Grantee's employment and is carried out by automated means. In case of concerns, the Grantee understands that he or she may also have the right to lodge a complaint with the competent local data protection authority. Further, to receive clarification of, or to exercise any of, the Grantee's rights, the Grantee understands that he or she should contact his or her local human resources representative.*

*g.* *Declaration of Consent. By accepting the Award and indicating consent via the Company's online acceptance procedure, the Grantee is declaring that he or she agrees with the data processing practices described herein and consents to the collection, processing and use of Data by the Company and the transfer of Data to the recipients mentioned above, including recipients located in countries which do not adduce an adequate level of protection from a European (or other non-U.S.) data protection law perspective, for the purposes described above.*

## Section 12. Restrictive Covenants and Remedies

This Section 12 is entered into by Lilly (which for purposes of Section 12 includes any of its Affiliates[1] to which Grantee provides (or has provided) services during Grantee's employment) and Grantee as of the date of Grantee's acceptance of this Award. This Section 12 is not applicable if the Grantee is working and/or residing in Canada or otherwise where impermissible under applicable law. However, conduct involving misappropriation of Lilly trade secrets or confidential information will remain prohibited as provided in the Grantee's Employee Confidentiality and Invention Agreement and nothing in this Award Agreement shall be construed to limit or eliminate any rights or remedies Lilly

[1] For purposes of this Section 12, "Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, Eli Lilly and Company or Lilly USA, LLC.

would have against Grantee under trade secret law, unfair competition law, or other applicable laws.

In consideration of the Grantee's receipt of the Award from Lilly, and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantee and Lilly hereby agree as follows:

a. Confidential Information.

(i) Grantee understands and agrees that Grantee's employment by Lilly creates a relationship of confidence and trust with respect to any information or materials of a confidential, non-public or proprietary nature that have been or may be made, created or discovered by Grantee or that have been or will be disclosed to Grantee in relation to the business of Lilly, or its direct or indirect parents, subsidiaries or Affiliates (together with Lilly, the "Lilly Group Companies"), or any of their respective predecessors, or any entity, business or assets acquired in whole or in part by any of the Lilly Group Companies (each, an "Acquired Company"), or any Protected Contact, or any other person with whom the Lilly Group Companies agrees to hold such information or materials in confidence (the "Confidential Information"). For the avoidance of doubt, any information developed by an Acquired Company will be considered "Confidential Information" if it meets the definition of that term herein regardless of whether the Confidential Information was developed by the Acquired Company prior to or after the acquisition by Lilly. Without limitation as to the forms that Confidential Information may take, Grantee acknowledges and agrees that Confidential Information may be contained in tangible material such as writings, drawings, samples, electronic media, or computer programs, or may be in the nature of unwritten knowledge or know-how. Confidential Information includes, but is not limited to, information concerning the Lilly Group Companies' inventions, marketing plans, products, designs, processes, services, research data, prototypes, specimens, test protocols, laboratory notebooks, business strategies, financial information, forecasts, personnel information, contract information, Protected Contacts, business pursuits and other information that is not generally known outside the Lilly Group Companies and from which the Lilly Group Companies could derive economic value, including any such information to which Grantee had access prior to agreeing to the terms of this Section 12. Notwithstanding the foregoing, it is understood that Confidential Information does not include information that is generally known in the trade or industry through no breach of this Section 12 or other act or omission by Grantee or any other person with confidentiality obligations to the Lilly Group Companies, or information arising from Grantee's general training, knowledge, skill or experience.

(ii) At all times, both during Grantee's employment and during the Confidentiality Restricted Period (as defined herein) after the end of

Grantee's employment with Lilly for any reason, and to the fullest extent permitted by law, Grantee agrees to keep and hold all Confidential Information in strict confidence and trust. Grantee will not use or disclose any Confidential Information without the prior written consent of Lilly in each instance, except in the good faith performance of Grantee's duties as an employee of Lilly for the benefit of Lilly. For purposes of this Section 12, "Confidentiality Restricted Period" shall mean: (i) five (5) years following the end of Grantee's employment with Lilly for any reason if the item of Confidential Information at issue does not constitute a trade secret under applicable law; and (ii) if the item of Confidential Information at issue constitutes a trade secret under applicable law, the longer of (A) five (5) years following the end of Grantee's employment with Lilly for any reason, and (B) for so long as such item of Confidential Information at issue continues to constitute a trade secret.

(iii) Grantee understands and agrees that all Confidential Information, and all other documents, supplies, equipment and other physical property furnished to Grantee by Lilly, produced by Grantee or others in connection with Grantee's employment, or otherwise pertaining to Grantee's work with Lilly or any of the Lilly Group Companies (collectively, "Lilly Property") will be and remain the sole property of Lilly. Upon the end of Grantee's employment with Lilly for any reason, Grantee agrees to promptly deliver to Lilly all Confidential Information and all other Lilly Property, and Grantee will not take with Grantee or retain in any form any documents or materials or copies containing any Confidential Information, excepting only Grantee's personal copies of records of Grantee's employment or compensation with Lilly.

b. Non-Competition. Except as may be modified for Grantee as described in subsection 12.i., Grantee agrees that during Grantee's employment with Lilly and for twelve (12) months immediately following the end of Grantee's employment (regardless of reason) (the "Restricted Period"), Grantee will not directly or indirectly, anywhere in or with respect to the United States or any other country in which Lilly operates or conducts business as of the end of Grantee's employment (the "Restricted Territory"), work for, advise, manage, act as an agent, employee or consultant for, or otherwise provide any services, in each case in a Competitively-Sensitive Capacity (as defined herein), to any person or entity engaged in research, development, production, sale, or distribution of a product or service competitive with or substantially similar to any product or service in research, development or design, or manufactured, produced, sold, or distributed by Lilly (each such person or entity, a "Competitor").

For purposes of this Section 12, "Competitively-Sensitive Capacity" means: (i) the same or similar capacity or function in which Grantee worked for Lilly at any time during the two (2) years immediately preceding the end of Grantee's employment;

(ii) any officer, director, executive or senior management capacity or function; (iii) any research or development capacity or function; (iv) any sales management or business development management capacity or function; (v) any ownership capacity (except Grantee may own as a passive investment up to 2% of any publicly traded securities); or (vi) any other capacity or function in which the trade secrets or other Confidential Information of Lilly or any of the Lilly Group Companies to which Grantee had access during the two (2) years immediately preceding the end of Grantee's employment, if used or disclosed by Grantee, would enable a Competitor to unfairly compete with Lilly. For purposes of clarity, if a Competitor has multiple divisions, lines or segments, some of which are not competitive with the business of Lilly, nothing in this Section 12 will prohibit Grantee from being employed by, working for or assisting only that division, line or segment of such Competitor that is not competitive with (or planned to be competitive with) the business of Lilly, provided Grantee is not involved in a Competitively-Sensitive Capacity in the research, development, production, sale or distribution of any product or service competitive with or substantially similar to any product or service in research, development or design, or manufactured, produced, sold, or distributed by Lilly.

In accordance with American Bar Association Model Rule 5.6, this subsection 12.b. shall be inapplicable following the end of Grantee's employment if: (i) during Grantee's employment with Lilly, Grantee primarily performed services for Lilly as a licensed attorney, and (ii) Grantee provides legal services as a licensed attorney to a company other than Lilly.

c. Non-Interference with Protected Contacts. Except as may be modified for Grantee as described in subsection 12.i., Grantee agrees that, during the Restricted Period, Grantee will not directly or indirectly, anywhere in or with respect to the Restricted Territory, solicit, urge, divert, induce, or seek to induce any Protected Contact to: (a) terminate their relationship with, or representation of, Lilly or any of the Lilly Group Companies; (b) cancel, withdraw, reduce, limit or in any manner to adversely modify any such person's business with, or representation of, Lilly or any of the Lilly Group Companies; or (c) enter into a relationship, represent, or provide services to a Competitor.

For purposes of this Section 12, "Protected Contact" means any independent contractor, subcontractor, business partner, distributor, broker, consultant, sales representative, customer, vendor, supplier or any other person with which Lilly or any of the Lilly Group Companies has a business relationship and (i) with which Grantee had material interaction during Grantee's employment with Lilly, or (ii) about which Grantee had access to Confidential Information during Grantee's employment with Lilly.

d. Non-Solicitation of Employees. Grantee agrees that, during the Restricted Period, Grantee will not, directly or indirectly solicit, urge, divert, induce, or seek to induce any Protected Employee of Lilly to: (a) terminate or adversely modify their

relationship with Lilly or any of the Lilly Group Companies; or (b) enter into a relationship, represent, or provide services to a Competitor.

For purposes of this Section 12, "Protected Employee" means any employee of Lilly or any of the Lilly Group Companies that has or has had access to Confidential Information and: (i) with whom Grantee had material interaction during Grantee's employment with Lilly; or (ii) about whom Grantee had access to Confidential Information during Grantee's employment with Lilly.

e. Reasonableness of Restrictions. Grantee acknowledges and agrees that during the course of Grantee's employment with Lilly, Grantee will be provided access to and will become intimately familiar with trade secrets and other Confidential Information key to Lilly's (and the Lilly Group Companies') unique competitive advantage. Grantee also acknowledges and agrees that Lilly's (and the Lilly Group Companies') trade secrets and other Confidential Information will retain continuing vitality throughout and beyond the Restricted Period. And Grantee acknowledges and agrees that, should Grantee's employment with Lilly end for any reason and, during the Restricted Period, Grantee works in a Competitively-Sensitive Capacity with a Competitor, it would be highly likely, if not inevitable, that Grantee would rely on trade secrets or other Confidential Information of Lilly or the Lilly Group Companies in the course of Grantee's work, either consciously or subconsciously, thereby irreparably harming Lilly and the Lilly Group Companies. For these and other reasons, Grantee agrees that the restrictions in this Section 12 are reasonable and necessary to protect the legitimate business interests of Lilly and the Lilly Group Companies and do so by creating a specific amount of time after Grantee's employment ends during which Grantee will not be able to engage or prepare to engage in the activities restricted in this Section 12. Grantee and Lilly further acknowledge and agree that Lilly and the Lilly Group Companies conduct business throughout the Restricted Territory and the geographic scope of the foregoing covenants is reasonable and necessary given, among other things, that: (a) absent such restrictions, Grantee could utilize Lilly's (or Lilly Group Companies) trade secrets and other Confidential Information and unfairly compete with Lilly in the Restricted Territory from virtually anywhere in the world; and (b) such scope is the only way for Lilly and the Lilly Group Companies adequately to protect its trade secrets and other Confidential Information.

f. Remedies. Grantee acknowledges that a breach by Grantee of this Section 12 will give rise to irreparable injury to Lilly and money damages will not be adequate relief for such injury. As a result, Grantee agrees that Lilly (including any third-party beneficiary) will be entitled to obtain equitable or injunctive relief without having to post any bond or other security to restrain or prohibit any such breach or threatened breach, in addition to any other remedies which may be available, including the recovery of monetary damages from Grantee. If Lilly determines that Grantee has violated any applicable provisions of this Section 12, in addition to injunctive relief and damages, Grantee agrees and covenants that: (i)Grantee will automatically forfeit any rights Grantee may have with respect to this Award as well as any equity grant (of any form or type) awarded after the date Grantee

accepts this Award Agreement, including any right to continue to be eligible to vest or receive a payment under such equity awards; and (ii) if Grantee was an Executive Officer during Grantee's employment, and is entitled to receive benefits under The Lilly Excess Benefits Plan-Retirement (the "SERP"), Grantee will forfeit 60 months of payment under the SERP (whether payment has commenced at the time of breach or commences in the future). Further, Grantee acknowledges that Lilly and the Lilly Group Companies reserve all other rights and remedies available at law or in equity. In addition, in the event Grantee violates any of the restrictive covenants contained herein, the Restricted Period or Confidentiality Restricted Period (as applicable) for the violated restrictive covenants will automatically be extended by the length of time during which Grantee was in violation of such restrictive covenants.

g. Notification Requirements. During the Restricted Period, Grantee acknowledges and agrees to notify Lilly of the name, job title, job duties and location of Grantee's next employer or any other person or entity for which Grantee otherwise will be working or providing services. This notification to Lilly is necessary to ensure adherence to Grantee's post-employment obligations and to protect Lilly trade secrets and confidential information from improper disclosure. During the Restricted Period or Confidentiality Restricted Period, Grantee will provide a copy of Grantee's post-employment obligations under this Section 12 to each subsequent employer and to each other person or entity for which Grantee otherwise will be working or providing services, in each case prior to commencing employment with or providing any services to such employer, person or entity. Grantee also authorizes Lilly to notify third parties, including any actual or potential employers and Protected Contacts, of the terms of this Section 12 and Grantee's obligations hereunder, by providing a copy of this Section 12 or otherwise.

h. Government Agencies; Permitted Disclosures. Notwithstanding anything in this Section 12 to the contrary, Grantee understands that Grantee may report possible violations of law or regulation to any governmental agency or entity, or make other disclosures that are protected under law or regulation. Grantee also understands that nothing in this Section 12 requires Grantee to obtain prior authorization from Lilly to make any such reports or disclosures or to notify Lilly that you have made such reports or disclosures. Nor shall anything in this Section 12 impede Grantee from discussing or disclosing in good faith information about unlawful acts in the workplace, such as harassment (including sexual harassment), discrimination, sexual assault, or any other conduct Grantee has reason to believe in good faith is unlawful, or from exercising any rights Grantee may have under Section 7 of the National Labor Relations Act. Grantee further understands that Grantee may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing

is made under seal. Without prior written authorization of Lilly, however, Grantee is not authorized to disclose to any third party (including any government official or any attorney Grantee may retain) any communication that is covered by the attorney-client privilege of Lilly or any of the Lilly Group Companies.

i. State Law Considerations. Grantee and Lilly intend for this Section 12 to comply with all applicable state laws and that this Section 12 should be read and construed consistent with this shared intention. As such, Grantee and Lilly agree that this Section 12 is hereby modified as set forth in this subsection 12.i. to the extent Grantee primarily is employed by and primarily provide services to Lilly in one of the states identified in this subsection 12.i. as of the dates described below.

(i) If, as of the date on which Grantee receives this Award Agreement, Grantee primarily is employed by and primarily provide services to Lilly in a state identified in this subsection 12.i.(i), the following shall apply:

A. *Colorado.* Grantee acknowledges receipt of a separate notice attached to this Award Agreement as “Appendix for Colorado Employees” that Lilly has provided to Grantee contemporaneously with this Award Agreement, which identifies this Award Agreement by name, states that this Award Agreement contains covenants not to compete that could restrict Grantee’s options for subsequent employment following the end of Grantee’s employment with Lilly, and directs Grantee to the specific sections of this Award Agreement containing such covenants.

B. *District of Columbia.* Grantee is advised of the following notice: “The District’s Ban on Non-Compete Agreements Amendment Act of 2020 limits the use of non-compete agreements. It allows employers to request non-compete agreements from highly compensated employees, as that term is defined in the Ban on Non-Compete Agreements Amendment Act of 2020, under certain conditions. Lilly has determined that Grantee is a highly compensated employee. For more information about the Ban on Non-Compete Agreements Amendment Act of 2020, contact the District of Columbia Department of Employment Services (DOES).”

C. *Washington.* Subsection 12.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 12.j.(viii): “*Choice of Law; Jurisdiction*. This Section 12 will be interpreted and enforced in accordance with the laws of the State of Washington, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Washington. Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in

Washington; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Washington."

(ii) If, as of the date on which Grantee's employment with Lilly ends, Grantee primarily is employed by and primarily provide services to Lilly in a state identified in this subsection 12.i.(ii), the following shall apply:

A. *California.* The "Restricted Period," for purposes of subsections 12.b. and 12.c., means during the period of Grantee's employment with Lilly (and not, for the avoidance of doubt, for any period following the end of Grantee's employment with Lilly), notwithstanding any other provision of Section 12 to the contrary.

B. *Colorado.* Subsection 12.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 12.j.(v): "*Choice of Law; Jurisdiction*. This Section 12 will be interpreted and enforced in accordance with the laws of the State of Colorado, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Colorado. Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Colorado; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Colorado."

C. *Massachusetts*.

1. Subsection 12.b. shall not apply during the Restricted Period following the end of Grantee's employment with Lilly if Grantee's employment with Lilly ended as a result of a termination of Grantee's employment by Lilly without cause or in a layoff.

2. Subsection 12.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 12.j.(v): "*Choice of Law; Jurisdiction*. This Section 12 will be interpreted and enforced in accordance with the laws of the State of Massachusetts, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Massachusetts. Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be

commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Massachusetts; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Massachusetts.

D. *Minnesota, North Dakota, or Oklahoma.* The "Restricted Period," for purposes of subsection 12.b., means during the period of Grantee's employment with Lilly (and not, for the avoidance of doubt, for any period following the end of Grantee's employment with Lilly), notwithstanding any other provision of Section 12 to the contrary.

E. *Nevada*.

1. Subsection 12.b. shall not apply during the Restricted Period following the end of Grantee's employment with Lilly if Grantee's employment with Lilly ended as a result of a reduction of force, reorganization or similar restructuring.

2. The following sentence shall be added to the end of subsection 12.b.: "Nothing in this subsection 12.b. shall restrict Grantee from providing a service to a customer or client of Lilly if (i) Grantee does not solicit the customer or client, (ii) the customer or client voluntarily chose to leave and seek services from Grantee, and (iii) Grantee is otherwise in full compliance with the terms and conditions of this Section 12 (including subsection 12.b. hereof)."

F. *Virginia*. The following sentence shall be added to the end of subsection 12.c.: "Nothing in this subsection 12.c. shall restrict Grantee from providing a service to a customer or client of Lilly if Grantee does not initiate contact with or solicit the customer or client."

G. *Washington*.

1. Subsection 12.b. shall not apply during the Restricted Period following the end of Grantee's employment with Lilly if Grantee's employment with Lilly ended as a result of a layoff.

2. Subsection 12.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 12.j.(viii): "*Choice of Law; Jurisdiction*. This Section 12 will be interpreted and enforced in accordance with the laws of the State of Washington, without giving effect to any choice-of-

law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Washington. Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Washington; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Washington."

j. Other Provisions.

(i) *Successors and Assigns; Third Party Beneficiaries*. This Section 12 shall bind and inure to the benefit of and be enforceable by Lilly, the Lilly Group Companies and Grantee and their respective successors and assigns; provided, Grantee's rights and obligations under this Section 12 may not be assigned or delegated. Grantee acknowledges and agrees that any Lilly Group Company is an intended third-party beneficiary of Section 12 of this Award Agreement, which may be enforced by Lilly or any such Lilly Group Company, either singularly or jointly.

(ii) *Reformation; Severability*. Grantee and Lilly acknowledge and agree that if any particular covenant or provision is determined by a court to be unreasonable or unenforceable in any respect, including the time period, geographic area, or scope of activity covered by any restrictive covenant, such covenant or provision will be reformed or modified so that such covenant or provision will have the closest effect permitted by applicable law to the original form and will be given effect and enforced as so reformed or modified, or, if such reformation or modification is not possible, such covenant or provision will be removed from this Section 12. In either case, this Section 12 shall be interpreted, even if reformed or modified, to achieve the full intent expressed, and the other provisions of this Section 12 will remain in force and unmodified and will be enforced as written. Any court interpreting any restrictive covenant provision of this Section 12 will, if necessary, reform or modify any such provision to make it enforceable under applicable law.

(iii) *Entire Agreement*. This Section 12 embodies the complete agreement and understanding among the parties hereto and supersedes and preempts any prior understandings, discussions, agreements or representations by or among the parties hereto, written or oral, which may have related to the subject matter hereof. Notwithstanding the foregoing, this Section 12 is intended to, among other things, supplement (and not supersede) all applicable statutes protecting trade secrets and the duties Grantee owes to Lilly or any of the Lilly Group Companies under the common law, as well as any other written non-competition, non-solicitation, or confidentiality

Case 1:26-cv-00616-SM-TSM Document 5-4 Filed 07/27/26 Page 129 of 210

provisions that Grantee agreed to in the past, including those in Grantee's Employee Confidentiality and Invention Agreement and any Non-Compete Payment Agreement entered into between Grantee and Lilly (collectively, "Prior Agreements"), each of which remains in full force and effect, or that Grantee agrees to in writing in the future. To the extent of conflict between this Section 12 and any Prior Agreement, this Section 12 shall control.

(iv) *Amendment and Waiver*. This Section 12 may be amended, and any provision of this Section 12 may be waived, only by a written agreement executed and delivered by Lilly and Grantee. No course of dealing between or among the parties hereto shall be deemed effective to modify, amend or discharge any part of this Section 12 or any rights or obligations of any party hereto under or by reason of this Section 12.

(v) *Choice of Law*. Except as may be modified for Grantee as described in subsection 12.i. of this Award Agreement, this Section 12 will be interpreted and enforced in accordance with the laws of the State of Indiana, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Indiana. Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Indianapolis, Indiana; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Indianapolis, Indiana.

(vi) *Acknowledgements*. Grantee acknowledges and agrees that Grantee has been given at least fourteen (14) calendar days (or, if longer, ten (10) business days) from the date of Grantee's receipt of this Award Agreement (the "Consideration Period") to consider its terms. Grantee represents and warrants that, if Grantee accepts this Award Agreement before the expiration of the Consideration Period, Grantee has done so knowingly and voluntarily. Grantee also acknowledges and agrees that Grantee has read, understands and agrees with this Section 12, and that Grantee will faithfully comply with each term of this Section 12. Grantee further acknowledges that Grantee has been advised by Lilly to consult with an attorney before agreeing to this Section 12, and has had the opportunity to do so if desired.

(vii) *Declaration of Consent*. By accepting this Award and indicating consent via the Company's online acceptance procedure, Grantee is declaring that he or she agrees to this Section 12. No party hereto shall raise the use of the online acceptance procedure that any signature or document was transmitted or communicated through the use of an electronic device as a defense to the formation of a contract, and each such party forever waives any such defense.

## Section 13. Additional Terms and Conditions

a. Country-Specific Conditions. The Award shall be subject to any special terms and conditions set forth in any Appendix to this Award Agreement for the Grantee's country. Moreover, if the Grantee relocates to one of the countries included in the Appendix, the special terms and conditions for such country will apply to the Grantee, to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. The Appendix constitutes part of this Award Agreement.

b. Insider Trading / Market Abuse Laws. The Grantee may be subject to insider trading restrictions and/or market abuse laws in applicable jurisdictions, including but not limited to the United States and the Grantee's country of residence, which may affect the Grantee's ability to directly or indirectly, for the Grantee or for a third party, acquire or sell, or attempt to sell, or otherwise dispose of Shares and/or Fractional Shares or rights to acquire Shares and/or Fractional Shares (e.g., the Revenue Growth Award) under the Plan during such times as the Grantee is considered to have "inside information" regarding the Company (as determined under the laws or regulations in the applicable jurisdictions). Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under any applicable Company insider trading policy. The Grantee acknowledges that it is his or her responsibility to comply with any applicable restrictions, and the Grantee should consult with his or her personal legal advisor on this matter.

c. Imposition of Other Requirements. The Company reserves the right to impose other requirements on the Award and any Shares and/or other amounts acquired pursuant to this Award under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Grantee to execute any additional agreements or undertakings that may be necessary to accomplish the foregoing. Without limitation to the foregoing, the Grantee agrees that the Revenue Growth Award and any benefits or proceeds the Grantee may receive hereunder shall be subject to forfeiture and/or repayment to the Company to the extent required to comply with any requirements imposed under Applicable Laws, any compensation recovery policy of the Company that reflects the provisions of Applicable Laws, or to the extent provided in any agreement between Grantee and the Company.

## Section 14. Governing Law and Choice of Venue

The validity, construction, and enforcement of this Award Agreement shall be governed by the laws of the State of Indiana, U.S.A. without regard to laws that might cause other law to govern under applicable principles of conflict of laws or cause the application of substantive law of any jurisdiction other than Indiana. For purposes of litigating any dispute that arises

under this Award Agreement, the parties hereby submit to and consent to the jurisdiction and venue of the State of Indiana, and agree that such litigation shall be conducted exclusively in the courts having appropriate subject matter jurisdiction in Marion County, Indiana, or the federal courts for the United States for the Southern District of Indiana, and no other courts, where this Award is granted and/or to be performed.

## Section 15. Miscellaneous Provisions

a. Notices and Electronic Delivery and Participation. Any notice to be given by the Grantee or successor Grantee shall be in writing, and any notice shall be deemed to have been given or made only upon receipt thereof by the Corporate Secretary of Lilly at Lilly Corporate Center, Indianapolis, Indiana 46285, U.S.A. Any notice or communication by Lilly in writing shall be deemed to have been given in the case of the Grantee if mailed or delivered to the Grantee at any address specified in writing to Lilly by the Grantee and, in the case of any successor Grantee, at the address specified in writing to Lilly by the successor Grantee. In addition, Lilly may, in its sole discretion, decide to deliver any documents related to the Award and participation in the Plan by electronic means or request the Grantee's consent to participate in the Plan by electronic means. By accepting this Award, the Grantee hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by Lilly or a third party designated by Lilly.

b. Language. The Grantee acknowledges that he or she is proficient in the English language, or has consulted with an advisor who is sufficiently proficient in English, so as to allow the Grantee to understand the terms and conditions of this Award Agreement. If the Grantee has received this Award Agreement or any other document related to the Plan translated into a language other than English and if the meaning of the translated version is different from the English version, the English version will control.

c. Waiver. The waiver by Lilly of any provision of this Award Agreement at any time or for any purpose shall not operate as or be construed to be a waiver of the same or any other provision of this Award Agreement at any subsequent time or for any other purpose.

d. Severability and Section Headings. If one or more of the provisions of this Award Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and the invalid, illegal or unenforceable provisions shall be deemed null and void; however, to the extent permissible by law, any provisions which could be deemed null and void shall first be construed, interpreted or revised retroactively to permit this Award Agreement to be construed so as to foster the intent of this Award Agreement and the Plan.

The section headings in this Award Agreement are for convenience of reference only and shall not be deemed a part of, or germane to, the interpretation or construction of this instrument.

e. No Advice Regarding Grant. Lilly is not providing any tax, legal or financial advice, nor is Lilly making any recommendations regarding the Grantee's participation in the Plan or the Grantee's acquisition or sale of the underlying Shares and/or other amounts acquired pursuant to this Award. The Grantee should consult with his or her own personal tax, legal and financial advisors regarding the Grantee's participation in the Plan before taking any action related to the Plan.

Section 16. Compensation Recovery

a. The Grantee agrees that this Award and any Shares or any other benefits or proceeds therefrom that the Grantee may receive hereunder shall be subject to forfeiture and/or repayment to the Company pursuant to any recovery, recoupment, "clawback" or similar policy of the Company that is in effect as of the Grant Date, including but not limited to the Eli Lilly and Company Executive Compensation Recovery Policy, effective October 2, 2023, as may be amended, restated, or superseded from time to time (with the provisions contained in such policy deemed incorporated into this Award Agreement without the Grantee's additional or separate consent).

b. At any time during the three years following the date on which the number of Shares eligible to vest under this Award has been determined under Section 2 above, the Company reserves the right to and, in appropriate cases, will seek restitution of all or part of any Shares that have been issued or cash that has been paid pursuant to this Award if:

i. (A) the number of Shares or the amount of the cash payment was calculated based, directly or indirectly, upon the achievement of financial results that were subsequently the subject of a restatement of all or a portion of the Company's financial statements, (B) the Grantee engaged in intentional misconduct that caused or partially caused the need for such a restatement; and (C) the number of Shares or the amount of cash payment that would have been issued or paid to the Grantee had the financial results been properly reported would have been lower than the number of Shares actually issued or the amount of cash actually paid; or

ii. the Grantee has been determined to have committed a material violation of law or Company policy or to have failed to properly manage or monitor the conduct of an employee who has committed a material violation of law or Company policy whereby, in either case, such misconduct causes significant harm to the Company.

Furthermore, in the event the number of Shares issued or cash paid pursuant to this Award is determined to have been based on materially inaccurate financial statements or other Company performance measures or on calculation errors (without any misconduct on the part of the Grantee), the Company reserves the right to and, in appropriate cases, will (A) seek restitution of the Shares or cash paid pursuant to this Award to the extent that the number of Shares issued or the

amount paid exceeded the number of Shares that would have been issued or the amount that would have been paid had the inaccuracy or error not occurred, or (B) issue additional Shares or make additional payment to the extent that the number of Shares issued or the amount paid was less than the correct amount.

c. For purposes of the foregoing, the Grantee expressly and explicitly authorizes the Company to issue instructions, on the Grantee's behalf, to any brokerage firm and/or third-party administrator engaged by the Company to hold any Shares and other amounts acquired pursuant to this Award to re-convey, transfer or otherwise return such Shares and/or other amounts acquired pursuant to this Award to the Company upon the Company's enforcement of this Section 16.

d. This Section 16 is not intended to limit the Company's power to take such action as it deems necessary to remedy any misconduct, prevent its reoccurrence and, if appropriate, based on all relevant facts and circumstances, punish the wrongdoer in a manner it deems appropriate.

## Section 17. Award Subject to Acknowledgement of Acceptance

Notwithstanding any provisions of this Award Agreement, the Award is subject to acknowledgement of acceptance by the Grantee on or before [•], through the website of E*TRADE, the Company's stock plan administrator. If the Grantee does not acknowledge acceptance of the Award on or before [•], the Award will be cancelled, subject to the Committee's discretion for unforeseen circumstances.

IN WITNESS WHEREOF, Lilly has caused this Award Agreement to be executed in Indianapolis, Indiana, by its proper officer.

ELI LILLY AND COMPANY

By: ___________________________

# Appendix

# Eli Lilly and Company
# Amended and Restated 2002 Lilly Stock Plan
# Revenue Growth Award Agreement

This Appendix includes special terms and conditions applicable to the Grantee's country and the State of Colorado. These terms and conditions supplement or replace (as indicated) the terms and conditions set forth in the Award Agreement to which it is attached. If the Grantee is a citizen or resident of a country other than the one in which the Grantee is currently working and/or residing (or is considered as such for local law purposes), or if the Grantee transfers employment or residency to a different country after the Award is granted, Lilly will, in its discretion, determine the extent to which the terms and conditions herein will apply. This Appendix also includes other information relevant to the Award.

Unless otherwise defined herein, the terms defined in the Plan or the Award Agreement, as applicable, shall have the same meanings in this Appendix. Notwithstanding the foregoing, for purposes of this Appendix, "Share" shall mean a share of Common Stock and shall include any Fractional Share.

There are no special terms and conditions or information for the following countries:

Belgium

Germany

India

Japan

United States

However, the Grantee should be aware that he or she may be required to take certain steps to comply with Applicable Laws in the Grantee's country in connection with the Award. For example, exchange control, foreign asset and/or account and/or other tax reporting obligations may apply to the Grantee upon receipt of the Award or the Shares subject to the Award or upon the sale of Shares. *For more information regarding such obligations, the Grantee should refer to the Country-Specific Tax Supplement for the Grantee's country, if any*. *The Grantee should also consult with his or her own personal tax and legal advisors to determine what, if any, obligations exist with respect to the Award and/or the acquisition or sale of Shares. Neither the Company nor the Employer is responsible for any failure on the part of the Grantee to be aware of or comply with Applicable Laws.*

Exhibit 10.4 Form of Relative Value Award Under the 2002 Lilly Stock Plan

# Eli Lilly and Company
# Relative Value Award Agreement

This Relative Value Award has been granted on [•] ("Grant Date") by Eli Lilly and Company, an Indiana corporation, with its principal offices in Indianapolis, Indiana ("Lilly" or the "Company"), to the Eligible Individual who has received this Relative Value Award Agreement (the "Grantee").

| | |
|---|---|
| **Grantee:** | [•] |
| **Units Granted:** | [•] |
| **Grant Date:** | [•] |
| **Performance Period:** | [•] |

Lilly Relative Total Shareholder Return Performance Levels:
**[•]**

## Table of Contents


| | | |
|---|---|---|
| Section 1. | Grant of Relative Value Award | 3 |
| Section 2. | Vesting | 3 |
| Section 3. | Impact of Certain Employment Status Changes | 5 |
| Section 4. | Change in Control | 6 |
| Section 5. | Settlement | 8 |
| Section 6. | Rights of the Grantee | 9 |
| Section 7. | Prohibition Against Transfer | 9 |
| Section 8. | Responsibility for Taxes | 10 |
| Section 9. | Section 409A Compliance | 11 |
| Section 10. | Grantee’s Acknowledgment | 11 |
| Section 11. | Data Privacy | 13 |
| Section 12. | Restrictive Covenants and Remedies | 15 |
| Section 13. | Additional Terms and Conditions | 25 |
| Section 14. | Governing Law and Choice of Venue | 26 |
| Section 15. | Miscellaneous Provisions | 26 |
| Section 16. | Compensation Recovery | 27 |
| Section 17. | Award Subject to Acknowledgement of Acceptance | 28 |

Section 1. Grant of Relative Value Award

Eli Lilly and Company, an Indiana corporation ("Lilly" or the "Company"), has granted to the Eligible Individual who has received this Relative Value Award Agreement (the "Grantee") a Performance-Based Award (the "Relative Value Award" or the "Award") with respect to the target number of shares of Lilly Common Stock (the "Shares") set forth on the first page of this document and available by logging on to the Company's stock plan administrator's website at http://mystock.lilly.com (the "Target Number of Shares").

The Award is made pursuant to and subject to the terms and conditions set forth in the Amended and Restated 2002 Lilly Stock Plan (the "Plan") and to the terms and conditions set forth in this Relative Value Award Agreement, including all appendices, exhibits and addenda hereto (the "Award Agreement"). In the event of any conflict between the terms of the Plan and this Award Agreement, the terms of the Plan shall govern except with respect to the provisions described in Section 12 below and Section 5.b. (in which case, the terms of the Award Agreement shall govern).

Any capitalized terms used but not defined in this Award Agreement shall have the meanings set forth in the Plan.

Section 2. Vesting

As soon as reasonably practicable following the end of the Performance Period, the Committee shall determine the number of Shares that are eligible to vest which shall be equal to the product of (i) the Target Number of Shares, multiplied by (ii) the Payout Multiple, subject to a maximum number of Shares that shall in no event exceed the Payout Cap, where:

a. "Performance Levels Table" shall mean the Lilly Relative Total Shareholder Return Performance Levels table set forth on the first page of this document.

b. "Payout Cap" shall mean the value equal to four times the Fair Market Value of the Target Number of Shares on the Grant Date. If the resulting value of Shares eligible to vest, determined by multiplying the number of Shares eligible to vest by the Fair Market Value of Shares on the last day of the Performance Period, exceeds the Payout Cap, the Payout Multiple will be reduced to the degree necessary for the value of the resulting number of Shares eligible to vest to equal the Payout Cap, with allowance for rounding practices consistent with standard administration of the Award. For the avoidance of doubt, the Payout Cap shall in no event be interpreted or construed to restrict the Committee's authority to exercise its discretion to reduce the number of Shares eligible to vest below the number otherwise determined pursuant this Section 2.

c. "Payout Multiple" shall mean the payout multiple set forth in the Performance Levels Table, representing the attainment level of Lilly's rTSR, measured against the

performance goal attainment levels set forth in the Performance Levels Table, subject to the following reduction.

In the event Lilly's TSR for the Performance Period is negative (and without regard to the TSR attainment level of the Peer Group) and the Payout Multiple exceeds 100%, the Payout Multiple shall be reduced to the greater of (i) 100% or (ii) the Payout Multiple based on the rTSR attainment level that would have otherwise been determined in accordance with the Performance Levels Table without regard to the reduction contemplated under this sentence, reduced by 25%. For the avoidance of doubt, if the Payout Multiple is equal to or less than 100%, the Payout Multiple shall not be subject to the adjustment contemplated under the preceding sentence.

d. "Final Lilly Stock Price" shall mean the average of the closing price of a share of Lilly Common Stock on the New York Stock Exchange for each trading day in the last 20 trading days of the Performance Period, rounded to the nearest cent.

e. "Total Shareholder Return" or "TSR" shall mean the quotient of (i) the Final Lilly Stock Price or Final Peer Stock Price, as applicable, minus the corresponding Beginning Stock Price, including the impact of Dividend reinvestment on each ex-dividend date, if any, paid by the applicable issuer during the Performance Period, divided by (ii) the corresponding Beginning Stock Price.

The stock prices and cash dividend payments reflected in the calculation of TSR shall be adjusted to reflect stock splits during the Performance Period and dividends shall be assumed to be reinvested in the relevant issuer's shares for purposes of the calculation of TSR.

f. "Relative Total Shareholder Return" or "rTSR" shall mean the comparison between Lilly's TSR and the TSR of the Peer Group over the Performance Period, measured as the absolute percentage point difference in the performance of the Company's TSR compared to the Peer Group's median TSR.

g. "Beginning Stock Price" shall mean the average closing price of a share of Lilly Common Stock on the New York Stock Exchange or a share of each Peer Group company's stock, as applicable, for each trading day in the first 20 trading days beginning with the Grant Date, rounded to the nearest cent.

h. "Final Peer Stock Price" shall mean the average of the closing price of a share of each Peer Group company's stock, on Nasdaq, the New York Stock Exchange, or other market where an independent share price can be determined, for each trading day of the last 20 trading days of the Performance Period, rounded to the nearest cent.

i. "Dividend" shall mean ordinary or extraordinary cash dividends paid by Lilly or a Peer Group company to its shareholders of record at any time during the Performance Period.

j. "Peer Group" shall mean all companies identified and most recently approved by the Committee as a member of the Company's peer group in effect for the purpose of

this Award as of the Grant Date. Companies that are members of the Peer Group at the beginning of the Performance Period that subsequently cease to be traded on a market where an independent share price can be determined shall be excluded from the Peer Group.

In the event the Grantee's Service is terminated prior to the end of the Performance Period for any reason or in any circumstance other than as described in Sections 3 or 4 below, the Award shall be forfeited.

## Section 3. Impact of Certain Employment Status Changes

Unless the Committee determines, in its sole discretion, that such treatment is not advisable after consideration of Applicable Laws, the number of Shares that are eligible to vest upon a change in employment status of the Grantee during the Performance Period will be as follows:

a. <u>Retirement; Death</u>. Except as otherwise provided below (including Section 12), in the event the Grantee's Service is terminated (i) on or following the Retirement Vesting Date (A) due to the Grantee's Retirement or (B) due to the Grantee's Qualifying Termination (as defined below) on a date that the Grantee is eligible for Retirement, or (ii) due to the Grantee's death, the number of Shares eligible to vest shall be the number determined in accordance with Section 2 above. For the avoidance of any doubt, the Award shall be forfeited in the event the Grantee's Service is terminated prior to the Retirement Vesting Date due to the Grantee's Retirement.

"Retirement" means retirement as a "retiree," which is a person who is (A) a retired employee under The Lilly Retirement Plan; (B) a retired employee under the retirement plan or program of an Affiliate; (C) a retired employee under a retirement program specifically approved by the Committee; (D) required to retire under local law, to the extent authorized by the Company to address such local requirements or (E) otherwise determined to be a retired employee in the sole discretion of the Company. A Grantee who has not received a year-end individual performance rating and (i) is on final written warning (or equivalent as determined by the Committee) for unsatisfactory performance and elects to retire in lieu of a termination of employment; or (ii) elects to retire in lieu of termination of employment because of an immediately terminable offense (e.g., absence of three days without notice, insubordination, violation of substance abuse policy, possession of firearms, misconduct) will not be considered to have terminated due to Retirement as described herein.

"Retirement Vesting Date" means, if the Grantee is not an Executive Officer, the date that is on or following July 31 immediately following the commencement of the Performance Period and, if the Grantee is an Executive Officer, the date that is on or following December 31 immediately following the commencement of the Performance Period.

"Executive Officer" means a Grantee who is designated an Executive Officer of the Company as of the Grant Date.

b. Qualifying Termination. Except as otherwise provided in section 3(a), in the event the Grantee's employment is subject to a Qualifying Termination (as defined below), the number of Shares eligible to vest shall be the number determined in accordance with Section 2 above, reduced proportionally for the portion of the total days during the Performance Period in which the Grantee was not in active Service.

For purposes of this Award Agreement, a "Qualifying Termination" means the termination of the Grantee's Service under any one of the following circumstances:

i. due to a plant closing or reduction in workforce (as defined below);

ii. as a result of the Grantee's failure to locate a position within the Company or an Affiliate following the placement of the Grantee on reallocation, including reallocation due to the Grantee's inability to continue to work due to medical reasons, in the United States (or equivalent as determined by the Committee).

"Plant closing" means the closing of a plant site or other corporate location that directly results in termination of the Grantee's Service.

"Reduction in workforce" means the elimination of a work group, functional or business unit or other broadly applicable reduction in job positions that directly results in termination of the Grantee's Service.

c. Misconduct. The Committee may, in its sole discretion, cancel this Relative Value Award or reduce the number of Shares eligible to vest, prorated according to time or other measure as determined appropriate by the Committee, if, during any portion of the Performance Period, the Grantee is subject to disciplinary action for Misconduct pursuant to and as such term is defined under the Eli Lilly and Company Executive Compensation Recovery Policy, effective October 2, 2023, as may be amended, restated, or superseded from time to time.

The Committee's determination as to whether (1) a transfer of employment between Lilly and an Affiliate or between Affiliates constitutes a termination of Service, (2) the Grantee's Service has been terminated by reason of Retirement, (3) the Grantee is eligible for Retirement, (4) the Grantee's Service has been terminated as a direct result of either a plant closing or a reduction in force, and (5) the Grantee's Service has been terminated as a result of the failure to locate a position within the Company or an Affiliate following reallocation or medical reassignment, shall be final and binding on the Grantee.

## Section 4. Change in Control

The provisions of Section 13.2 of the Plan apply to this Award with the following modifications:

a. The only Change in Control event that shall result in a benefit under this Section 4 shall be the consummation of a merger, share exchange, or consolidation of the Company, as defined in Section 2.6(c) of the Plan (a "Transaction").

b. In the event the Award is converted, assumed, substituted, continued or replaced by a successor or surviving corporation, or a parent or subsidiary thereof, in connection with a Transaction, any Fractional Share issued under this Award shall vest automatically and be payable in cash unless otherwise determined by the Committee, in its sole discretion.

c. In the event of a Transaction that occurs prior to the last day of the Performance Period, the Grantee will be credited with an award of Restricted Stock Units equal to the number of Shares eligible to vest, calculated in a manner consistent with Section 2, but the Final Lilly Stock Price shall be equal to the value of Shares established for the consideration to be paid to holders of Shares in the Transaction and the Final Peer Stock Price shall be equal to the closing price of a share of each Peer Group company's stock, on Nasdaq, the New York Stock Exchange, or other market where an independent share price can be determined, on the date the Transaction closes (or if such day is not a trading date, the first trading date immediately preceding such date) (the "Credited RSU Award"). The Credited RSU Award shall be eligible to vest on the last day of the Performance Period, subject to the Grantee's continued Service through the last day of the Performance Period, except as provided below:

i. In the event the Credited RSU Award is not converted, assumed, substituted, continued or replaced by a successor or surviving corporation, or a parent or subsidiary thereof, in connection with a Transaction, then immediately prior to the Transaction, the Credited RSU Award shall vest automatically in full.

ii. In the event the Credited RSU Award is converted, assumed, substituted, continued or replaced by a successor or surviving corporation, or a parent or subsidiary thereof, in connection with the Transaction and the Grantee is subject to a Covered Termination (as defined below) prior to the end of the Performance Period, then immediately as of the date of the Covered Termination, the Credited RSU Award shall vest automatically in full.

For purposes of this Award Agreement, "Covered Termination" shall mean a termination of Service as described in Sections 3(b), Grantee's termination of Service without Cause or the Grantee's resignation for Good Reason. "Cause" and "Good Reason" shall have the meanings ascribed to them in the Eli Lilly and Company 2007 Change in Control Severance Pay Plan for Select Employees as may be amended, restated, or superseded from time to time.

d. If the Grantee is entitled to receive stock of the acquiring entity or successor to the Company as a result of the application of this Section 4, then references to Shares in this Award Agreement shall be read to mean stock of the successor or surviving corporation, or a parent or subsidiary thereof, as and when applicable.

Section 5. Settlement

a. Except as provided below, the Award shall be paid to the Grantee as soon as practicable, but in no event later than sixty (60) days, following the last day of the Performance Period.

b. Notwithstanding anything in this Award Agreement to the contrary, Grantee agrees and covenants that if, at any time that the Award remains unsettled, Lilly determines that Grantee engaged in any activity that violates Section 12.b or that would have violated Section 12.b. had Grantee engaged in such activity during the Restricted Period (as such term is defined in Section 12.b), Grantee shall automatically forfeit any rights Grantee may have with respect to the Award as of the date of such determination, including any right to receive a payment under the Award.

c. If the Award vests pursuant to Section 4(c)(i), the Award shall be paid to the Grantee immediately prior to the Transaction, provided that if the Award is considered an item of non-qualified deferred compensation subject to Section 409A of the Code ("NQ Deferred Compensation") and the Transaction does not constitute a "change in control event," within the meaning of the U.S. Treasury Regulations (a "409A CIC"), then the Award shall be paid in cash (calculated based on the value of the Shares established for the consideration to be paid to holders of Shares in the Transaction) on the earliest of (i) the date that the Grantee experiences a "separation from service" within the meaning of Section 409A of the Code (a "Section 409A Separation"), provided that if the Grantee is a "specified employee" within the meaning of Section 409A of the Code as of the date of the Section 409A Separation , the Award shall instead be paid on the first day following the six (6) month anniversary of the Grantee's Section 409A Separation (the "409A Delayed Payment Date"), (ii) the date of the Grantee's death and (iii) the date set forth in Section 5(a) above.

d. If the Award vests pursuant to Section 4(c)(ii), the Award shall be paid to the Grantee as soon as practicable, but in no event later than sixty (60) days, following the date the Grantee is subject to a Covered Termination, provided that if the Award is NQ Deferred Compensation (and further provided that the Transaction constitutes a 409A CIC), (i) the Award shall be paid within sixty (60) days following the date the Grantee experiences a Section 409A Separation, and (ii) if the Grantee is a "specified employee" within the meaning of Section 409A of the Code as of the date of the Section 409A Separation, the Award shall instead be paid on the earliest of (1) the 409A Delayed Payment Date and (2) the date of the Grantee's death.

e. At the time of settlement, Lilly shall issue or transfer Shares to the Grantee that became vested (including, in the interest of clarity, a Fractional Share). Notwithstanding the foregoing, a Fractional Share may be paid in cash or rounded to the extent provided in any appendix attached hereto (the "Appendix") for the Grantee's country or to the extent otherwise determined by the Committee in its sole

discretion. For purposes of this Award, references to "issue" or variations of such term shall instead mean "allocate" when used in the context of Fractional Shares.

f. In the event of the death of the Grantee, the payments described above shall be made to the successor of the Grantee.

Section 6. Rights of the Grantee

a. No Shareholder Rights. The Relative Value Award does not entitle the Grantee to any rights of a shareholder of Lilly until such time as the Relative Value Award is settled and Shares are issued or transferred to the Grantee. In the event a Fractional Share is issued, the Grantee shall have the rights of a shareholder to receive dividends payable with respect to a Share and, unless otherwise provided by the Committee, the right to vote, in each case, that is proportionate to the interest the Fractional Share bears to a whole Share.

b. No Trust; Grantee's Rights Unsecured. Neither this Award Agreement nor any action in accordance with this Award Agreement shall be construed to create a trust of any kind. The right of the Grantee to receive a payment pursuant to this Award Agreement shall be an unsecured claim against the general assets of the Company.

Section 7. Prohibition Against Transfer

a. Awards. The right of a Grantee to receive payments under this Award may not be transferred except to a duly appointed guardian of the estate of the Grantee or to a successor of the Grantee by will or the applicable laws of descent and distribution and then only subject to the provisions of this Award Agreement. A Grantee may not assign, sell, pledge, or otherwise transfer this Award or the rights thereunder to which he or she may be entitled hereunder prior to transfer or payment thereof to the Grantee, and any such attempted assignment, sale, pledge or transfer shall be void.

b. Holding Period for Shares. Notwithstanding any other provision of this Award Agreement, any Shares issued or transferred to the Grantee upon settlement shall be subject to a mandatory holding period of twelve (12) months, if the Grantee is an Executive Officer, and six (6) months, if the Grantee is not an Executive Officer, in each case, commencing as of the last day of the Performance Period (as applicable, the "Holding Period"). During the Holding Period, the Grantee shall not sell, transfer, assign, pledge, or otherwise dispose of any such Shares, except as may be required by law or as may be approved by the Committee, as determined in its sole discretion.

c. Fractional Shares. Any Fractional Share issued to the Grantee shall remain in the Grantee's account at the Company's broker until the disposition of the Fractional Share and shall not become transferrable to another broker unless and until any Fractional Shares issued to the Grantee aggregate to a whole Share.

Section 8. Responsibility for Taxes

a. Regardless of any action Lilly and/or the Employer takes with respect to any or all income tax (including federal, state, local and non-U.S. tax), social insurance, payroll tax, fringe benefits tax, payment on account or other tax related items related to the Grantee's participation in the Plan and legally applicable to the Grantee ("Tax Related Items"), the Grantee acknowledges that the ultimate liability for all Tax Related Items is and remains the Grantee's responsibility and may exceed the amount actually withheld by Lilly or the Employer. The Grantee further acknowledges that Lilly and the Employer (i) make no representations or undertakings regarding the treatment of any Tax Related Items in connection with any aspect of the Award, including the grant of the Relative Value Award, the vesting of the Relative Value Award, the transfer and issuance of any Shares and/or Fractional Shares, the receipt of any cash payment pursuant to the Award, the receipt of any dividends (including any dividends that are reinvested in additional Shares) and the sale or other disposition of any Shares and/or Fractional Shares acquired pursuant to this Award; and (ii) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Award to reduce or eliminate the Grantee's liability for Tax Related Items or achieve any particular tax result. Furthermore, if the Grantee becomes subject to Tax Related Items in more than one jurisdiction, the Grantee acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax Related Items in more than one jurisdiction.

b. In connection with the applicable taxable or tax withholding event, as applicable, the Grantee shall pay or make adequate arrangements satisfactory to Lilly and/or the Employer to satisfy all Tax Related Items.

    i. If the Relative Value Award is paid to the Grantee in cash in lieu of Shares and/or Fractional Shares, the Grantee authorizes the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any obligation for Tax Related Items by withholding from the cash amount paid to the Grantee pursuant to the Award or from the Grantee's wages or other cash compensation paid to the Grantee by the Company and/or the Employer.

    ii. If the Relative Value Award is paid to the Grantee in Shares and/or Fractional Shares and the Grantee is not subject to the short-swing profit rules of Section 16(b) of the Exchange Act, the Grantee authorizes Lilly and/or the Employer, or their respective agents, at their discretion, to (A) withhold from the Grantee's wages or other cash compensation paid to the Grantee by the Company and/or the Employer, (B) arrange for the sale of Shares and/or Fractional Shares to be issued upon settlement of the Award (on the Grantee's behalf and at the Grantee's direction pursuant to this authorization or such other authorization as the Grantee may be required to provide to Lilly or its designated broker in order for such sale to be effectuated) and withhold from the proceeds of such sale, (C) withhold in Shares and/or Fractional

Shares otherwise issuable to the Grantee pursuant to this Award, and/or (D) apply any other method of withholding determined by the Company and, to the extent required by Applicable Laws or the Plan, approved by the Committee.

iii. If the Relative Value Award is paid to the Grantee in Shares and/or Fractional Shares and the Grantee is subject to the short-swing profit rules of Section 16(b) of the Exchange Act, Lilly will withhold in Shares and Fractional Shares otherwise issuable to the Grantee pursuant to this Award, unless the use of such withholding method is prevented by Applicable Laws or has materially adverse accounting or tax consequences, in which case the withholding obligation for Tax Related Items may be satisfied by one or a combination of the methods set forth in Section 8(b)(ii)(A) and (B) above.

c. Depending on the withholding method, Lilly and/or the Employer may withhold or account for Tax Related Items by considering applicable statutory or other withholding rates, including minimum or maximum rates in the jurisdiction(s) applicable to the Grantee. In the event of over-withholding, the Grantee may receive a refund of any over-withheld amount in cash (without interest and without entitlement to the equivalent amount in Shares). If the obligation for Tax Related Items is satisfied by withholding Shares, for tax purposes, the Grantee will be deemed to have been issued the full number of Shares and/or Fractional Shares to which he or she is entitled pursuant to this Award, notwithstanding that a number of Shares and/or Fractional Shares are withheld to satisfy the obligation for Tax Related Items.

d. Lilly may refuse to deliver Shares and/or Fractional Shares or any cash payment to the Grantee if the Grantee fails to comply with the Grantee's obligation in connection with the Tax Related Items as described in this Section 8.

e. For purposes of this Section 8, references to the withholding or sale of a Share shall also mean the withholding or sale of any portion that is less than a whole Share, to the extent applicable.

## Section 9. Section 409A Compliance

To the extent applicable, it is intended that this Award comply with the requirements of Section 409A of the U.S. Internal Revenue Code of 1986, as amended and the Treasury Regulations and other guidance issued thereunder ("Section 409A") and this Award shall be interpreted and applied by the Committee in a manner consistent with this intent in order to avoid the imposition of any additional tax under Section 409A.

## Section 10. Grantee's Acknowledgment

In accepting this Award, the Grantee acknowledges, understands and agrees that:

a. the Plan is established voluntarily by Lilly, it is discretionary in nature and it may be modified, amended, suspended or terminated by Lilly at any time, as provided in the Plan;

b. the Award is voluntary and occasional and does not create any contractual or other right to receive future Performance-Based Awards, or benefits in lieu thereof, even if Performance-Based Awards have been granted in the past;

c. all decisions with respect to future Performance-Based Awards or other awards, if any, will be at the sole discretion of the Committee;

d. the Grantee's participation in the Plan is voluntary;

e. the Award is not intended to replace any pension rights or compensation;

f. the Award is not part of normal or expected compensation for any purpose, including but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, holiday pay, leave pay, pension or welfare or retirement benefits or similar mandatory payments;

g. unless otherwise agreed with Lilly, the Award is not granted as consideration for, or in connection with, the service the Grantee may provide as a director of an Affiliate;

h. neither the Award nor any provision of this Award Agreement, the Plan or the policies adopted pursuant to the Plan, confer upon the Grantee any right with respect to employment or continuation of current employment, and in the event that the Grantee is not an employee of Lilly or any subsidiary of Lilly, the Award shall not be interpreted to form an employment contract or relationship with Lilly or any Affiliate;

i. the future value of the underlying Shares and other amounts that may be acquired pursuant to this Award is unknown, indeterminable and cannot be predicted with certainty;

j. no claim or entitlement to compensation or damages shall arise from forfeiture of the Award or recoupment of any Shares and other amounts that may be acquired pursuant to this Award acquired under the Plan or proceeds therefrom resulting from (i) the application of a clawback policy described in Section 16 of this Award Agreement or required by law, (ii) the application of Section 5(b) of this Award Agreement, (iii) the application of any of the remedies described in Section 12 of this Award Agreement, or (iv) the Grantee ceasing to provide employment or other services to Lilly or the Employer (for any reason whatsoever, whether or not later found to be invalid or in breach of local labor laws in the jurisdiction where the Grantee is employed or the terms of Grantee's employment agreement, if any);

k. for purposes of the Award, the Grantee's employment will be considered terminated as of the date he or she is no longer actively providing services to the Company or an Affiliate and the Grantee's right, if any, to earn and be paid any portion of the Award after such termination of employment or services (regardless of the reason for such termination and whether or not such termination is later found to be invalid or in

breach of employment laws in the jurisdiction where the Grantee is employed or the terms of the Grantee's employment agreement, if any) will be measured by the date the Grantee ceases to actively provide services and will not be extended by any notice period (e.g., active service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where the Grantee is employed or the terms of the Grantee's employment agreement, if any); the Committee shall have the exclusive discretion to determine when the Grantee is no longer actively providing services for purposes of the Award (including whether the Grantee may still be considered to be actively providing services while on a leave of absence) in accordance with Section 409A;

l. unless otherwise provided in the Plan or by the Committee in its discretion, the Award and the benefits evidenced by this Award Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the Shares and other amounts that may be acquired pursuant to this Award;

m. the Company has communicated share ownership guidelines that apply to the Grantee, and the Grantee understands and agrees that those guidelines may impact any Shares subject to, or issued pursuant to, the Award;

n. the Grantee is solely responsible for investigating and complying with any laws applicable to him or her in connection with the Award; and

o. neither the Company, the Employer nor any Affiliate shall be liable for any foreign exchange rate fluctuation between the Grantee's local currency and the United States Dollar that may affect the value of the Award or any amounts due to the Grantee pursuant to the settlement of the Award or the subsequent sale of any Shares and other amounts that may be acquired pursuant to this Award acquired upon settlement.

Section 11. Data Privacy

*a. Data Collection and Usage. The Company and the Employer may collect, process and use certain personal information about the Grantee, and persons closely associated with the Grantee, including, but not limited to, the Grantee's name, home address and telephone number, email address, date of birth, social insurance number, passport or other identification number (e.g., resident registration number), salary, nationality, job title, any shares of stock or directorships held in the Company, details of all Relative Value Awards or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding in the Grantee's favor ("Data"), for the purposes of implementing, administering and managing the Plan. The legal basis, where required, for the processing of Data is the Grantee's consent. Where required under applicable laws, Data may also be disclosed to certain securities or other regulatory authorities where the Company's securities are*

*listed or traded or regulatory filings are made and the legal basis, where required, for such disclosure are the applicable laws.*

*b. <u>Stock Plan Administration Service Providers</u>. The Company transfers Data to Morgan Stanley's E*TRADE Financial Corporate Services, Inc. and/or its affiliated companies ("E*TRADE"), an independent service provider, which is assisting the Company with the implementation, administration and management of the Plan. In the future, the Company may select a different service provider and share Data with such other provider serving in a similar manner. The Grantee may be asked to agree on separate terms and data processing practices with the service provider, with such agreement being a condition to the ability to participate in the Plan. The Company may also transfer Data to KPMG, an independent service provider, which is also assisting the Company with certain aspects of the implementation, administration and management of the Plan. In the future, the Company may select a different service provider and share Data with such other provider serving in a similar manner.*

*c. <u>International Data Transfers</u>. The Company and its service providers are based in the United States. The Grantee's country or jurisdiction may have different data privacy laws and protections than the United States. The Company's legal basis, where required, for the transfer of Data is Grantee's consent.*

*d. <u>Data Retention</u>. The Company will hold and use the Data only as long as is necessary to implement, administer and manage the Grantee's participation in the Plan, or as required to comply with legal or regulatory obligations, including under tax and security laws.*

*e. <u>Voluntariness and Consequences of Consent Denial or Withdrawal</u>. Participation in the Plan is voluntary and the Grantee is providing the consents herein on a purely voluntary basis. If the Grantee does not consent, or if the Grantee later seeks to revoke the Grantee's consent, the Grantee's salary from or employment and career with the Employer will not be affected; the only consequence of refusing or withdrawing the Grantee's consent is that the Company would not be able to grant this Award or other awards to the Grantee or administer or maintain such awards.*

*f. <u>Data Subject Rights</u>. The Grantee understands that data subject rights regarding the processing of Data vary depending on applicable laws and that, depending on where the Grantee is based and subject to the conditions set out in such applicable laws, the Grantee may have, without limitation, the right to (i) inquire whether and what kind of Data the Company holds about the Grantee and how it is processed, and to access or request copies of such Data, (ii) request the correction or supplementation of Data about the Grantee that is inaccurate, incomplete or out-of-date in light of the purposes underlying the processing, (iii) obtain the erasure of Data no longer necessary for the purposes underlying the processing, (iv) request the Company to restrict the processing of the Grantee's Data in certain situations where the Grantee feels its processing is inappropriate, (v) object, in certain circumstances, to the processing of Data for legitimate interests, and to (vi) request portability of the*

*Grantee's Data that the Grantee has actively or passively provided to the Company or the Employer (which does not include data derived or inferred from the collected data), where the processing of such Data is based on consent or the Grantee's employment and is carried out by automated means. In case of concerns, the Grantee understands that he or she may also have the right to lodge a complaint with the competent local data protection authority. Further, to receive clarification of, or to exercise any of, the Grantee's rights, the Grantee understands that he or she should contact his or her local human resources representative.*

g. *Declaration of Consent. By accepting the Award and indicating consent via the Company's online acceptance procedure, the Grantee is declaring that he or she agrees with the data processing practices described herein and consents to the collection, processing and use of Data by the Company and the transfer of Data to the recipients mentioned above, including recipients located in countries which do not adduce an adequate level of protection from a European (or other non-U.S.) data protection law perspective, for the purposes described above.*

## Section 12. Restrictive Covenants and Remedies

This Section 12 is entered into by Lilly (which for purposes of Section 12 includes any of its Affiliates[1] to which Grantee provides (or has provided) services during Grantee's employment) and Grantee as of the date of Grantee's acceptance of this Award. This Section 12 is not applicable if the Grantee is working and/or residing in Canada or otherwise where impermissible under applicable law. However, conduct involving misappropriation of Lilly trade secrets or confidential information will remain prohibited as provided in the Grantee's Employee Confidentiality and Invention Agreement and nothing in this Award Agreement shall be construed to limit or eliminate any rights or remedies Lilly would have against Grantee under trade secret law, unfair competition law, or other applicable laws.

In consideration of the Grantee's receipt of the Award from Lilly, and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantee and Lilly hereby agree as follows:

a. Confidential Information.

i. Grantee understands and agrees that Grantee's employment by Lilly creates a relationship of confidence and trust with respect to any information or materials of a confidential, non-public or proprietary nature that have been or may be made, created or discovered by Grantee or that have been or will be disclosed to Grantee in relation to the business of Lilly, or its direct or indirect parents, subsidiaries or Affiliates (together with Lilly, the "Lilly Group Companies"), or any of their respective predecessors, or any entity, business or assets acquired in whole or in part by any of the Lilly Group Companies (each, an "Acquired Company"), or any Protected Contact, or any other person with whom the Lilly Group Companies agrees to hold such information

[1] For purposes of this Section 12, "Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, Eli Lilly and Company or Lilly USA, LLC.

or materials in confidence (the “Confidential Information”). For the avoidance of doubt, any information developed by an Acquired Company will be considered “Confidential Information” if it meets the definition of that term herein regardless of whether the Confidential Information was developed by the Acquired Company prior to or after the acquisition by Lilly. Without limitation as to the forms that Confidential Information may take, Grantee acknowledges and agrees that Confidential Information may be contained in tangible material such as writings, drawings, samples, electronic media, or computer programs, or may be in the nature of unwritten knowledge or know-how. Confidential Information includes, but is not limited to, information concerning the Lilly Group Companies’ inventions, marketing plans, products, designs, processes, services, research data, prototypes, specimens, test protocols, laboratory notebooks, business strategies, financial information, forecasts, personnel information, contract information, Protected Contacts, business pursuits and other information that is not generally known outside the Lilly Group Companies and from which the Lilly Group Companies could derive economic value, including any such information to which Grantee had access prior to agreeing to the terms of this Section 12. Notwithstanding the foregoing, it is understood that Confidential Information does not include information that is generally known in the trade or industry through no breach of this Section 12 or other act or omission by Grantee or any other person with confidentiality obligations to the Lilly Group Companies, or information arising from Grantee’s general training, knowledge, skill or experience.

ii. At all times, both during Grantee’s employment and during the Confidentiality Restricted Period (as defined herein) after the end of Grantee’s employment with Lilly for any reason, and to the fullest extent permitted by law, Grantee agrees to keep and hold all Confidential Information in strict confidence and trust. Grantee will not use or disclose any Confidential Information without the prior written consent of Lilly in each instance, except in the good faith performance of Grantee’s duties as an employee of Lilly for the benefit of Lilly. For purposes of this Section 12, “Confidentiality Restricted Period” shall mean: (i) five (5) years following the end of Grantee’s employment with Lilly for any reason if the item of Confidential Information at issue does not constitute a trade secret under applicable law; and (ii) if the item of Confidential Information at issue constitutes a trade secret under applicable law, the longer of (A) five (5) years following the end of Grantee’s employment with Lilly for any reason, and (B) for so long as such item of Confidential Information at issue continues to constitute a trade secret.

iii. Grantee understands and agrees that all Confidential Information, and all other documents, supplies, equipment and other physical property furnished

to Grantee by Lilly, produced by Grantee or others in connection with Grantee's employment, or otherwise pertaining to Grantee's work with Lilly or any of the Lilly Group Companies (collectively, "Lilly Property") will be and remain the sole property of Lilly. Upon the end of Grantee's employment with Lilly for any reason, Grantee agrees to promptly deliver to Lilly all Confidential Information and all other Lilly Property, and Grantee will not take with Grantee or retain in any form any documents or materials or copies containing any Confidential Information, excepting only Grantee's personal copies of records of Grantee's employment or compensation with Lilly.

b. Non-Competition. Except as may be modified for Grantee as described in subsection 12.i., Grantee agrees that during Grantee's employment with Lilly and for twelve (12) months immediately following the end of Grantee's employment (regardless of reason) (the "Restricted Period"), Grantee will not directly or indirectly, anywhere in or with respect to the United States or any other country in which Lilly operates or conducts business as of the end of Grantee's employment (the "Restricted Territory"), work for, advise, manage, act as an agent, employee or consultant for, or otherwise provide any services, in each case in a Competitively-Sensitive Capacity (as defined herein), to any person or entity engaged in research, development, production, sale, or distribution of a product or service competitive with or substantially similar to any product or service in research, development or design, or manufactured, produced, sold, or distributed by Lilly (each such person or entity, a "Competitor").

For purposes of this Section 12, "Competitively-Sensitive Capacity" means: (i) the same or similar capacity or function in which Grantee worked for Lilly at any time during the two (2) years immediately preceding the end of Grantee's employment; (ii) any officer, director, executive or senior management capacity or function; (iii) any research or development capacity or function; (iv) any sales management or business development management capacity or function; (v) any ownership capacity (except Grantee may own as a passive investment up to 2% of any publicly traded securities); or (vi) any other capacity or function in which the trade secrets or other Confidential Information of Lilly or any of the Lilly Group Companies to which Grantee had access during the two (2) years immediately preceding the end of Grantee's employment, if used or disclosed by Grantee, would enable a Competitor to unfairly compete with Lilly. For purposes of clarity, if a Competitor has multiple divisions, lines or segments, some of which are not competitive with the business of Lilly, nothing in this Section 12 will prohibit Grantee from being employed by, working for or assisting only that division, line or segment of such Competitor that is not competitive with (or planned to be competitive with) the business of Lilly, provided Grantee is not involved in a Competitively-Sensitive Capacity in the research, development, production, sale or distribution of any product or service competitive with or substantially similar to any product or service in research, development or design, or manufactured, produced, sold, or distributed by Lilly.

In accordance with American Bar Association Model Rule 5.6, this subsection 12.b. shall be inapplicable following the end of Grantee's employment if: (i) during Grantee's employment with Lilly, Grantee primarily performed services for Lilly as a licensed attorney, and (ii) Grantee provides legal services as a licensed attorney to a company other than Lilly.

c. Non-Interference with Protected Contacts. Except as may be modified for Grantee as described in subsection 12.i., Grantee agrees that, during the Restricted Period, Grantee will not directly or indirectly, anywhere in or with respect to the Restricted Territory, solicit, urge, divert, induce, or seek to induce any Protected Contact to: (a) terminate their relationship with, or representation of, Lilly or any of the Lilly Group Companies; (b) cancel, withdraw, reduce, limit or in any manner to adversely modify any such person's business with, or representation of, Lilly or any of the Lilly Group Companies; or (c) enter into a relationship, represent, or provide services to a Competitor.

For purposes of this Section 12, "Protected Contact" means any independent contractor, subcontractor, business partner, distributor, broker, consultant, sales representative, customer, vendor, supplier or any other person with which Lilly or any of the Lilly Group Companies has a business relationship and (i) with which Grantee had material interaction during Grantee's employment with Lilly, or (ii) about which Grantee had access to Confidential Information during Grantee's employment with Lilly.

d. Non-Solicitation of Employees. Grantee agrees that, during the Restricted Period, Grantee will not, directly or indirectly solicit, urge, divert, induce, or seek to induce any Protected Employee of Lilly to: (a) terminate or adversely modify their relationship with Lilly or any of the Lilly Group Companies; or (b) enter into a relationship, represent, or provide services to a Competitor.

For purposes of this Section 12, "Protected Employee" means any employee of Lilly or any of the Lilly Group Companies that has or has had access to Confidential Information and: (i) with whom Grantee had material interaction during Grantee's employment with Lilly; or (ii) about whom Grantee had access to Confidential Information during Grantee's employment with Lilly.

e. Reasonableness of Restrictions. Grantee acknowledges and agrees that during the course of Grantee's employment with Lilly, Grantee will be provided access to and will become intimately familiar with trade secrets and other Confidential Information key to Lilly's (and the Lilly Group Companies') unique competitive advantage. Grantee also acknowledges and agrees that Lilly's (and the Lilly Group Companies') trade secrets and other Confidential Information will retain continuing vitality throughout and beyond the Restricted Period. And Grantee acknowledges and agrees that, should Grantee's employment with Lilly end for any reason and, during the Restricted Period, Grantee works in a Competitively-Sensitive Capacity with a Competitor, it would be highly likely, if not inevitable, that Grantee would rely on trade secrets or other Confidential Information of Lilly or the Lilly Group Companies

in the course of Grantee's work, either consciously or subconsciously, thereby irreparably harming Lilly and the Lilly Group Companies. For these and other reasons, Grantee agrees that the restrictions in this Section 12 are reasonable and necessary to protect the legitimate business interests of Lilly and the Lilly Group Companies and do so by creating a specific amount of time after Grantee's employment ends during which Grantee will not be able to engage or prepare to engage in the activities restricted in this Section 12. Grantee and Lilly further acknowledge and agree that Lilly and the Lilly Group Companies conduct business throughout the Restricted Territory and the geographic scope of the foregoing covenants is reasonable and necessary given, among other things, that: (a) absent such restrictions, Grantee could utilize Lilly's (or Lilly Group Companies) trade secrets and other Confidential Information and unfairly compete with Lilly in the Restricted Territory from virtually anywhere in the world; and (b) such scope is the only way for Lilly and the Lilly Group Companies adequately to protect its trade secrets and other Confidential Information.

f. Remedies. Grantee acknowledges that a breach by Grantee of this Section 12 will give rise to irreparable injury to Lilly and money damages will not be adequate relief for such injury. As a result, Grantee agrees that Lilly (including any third-party beneficiary) will be entitled to obtain equitable or injunctive relief without having to post any bond or other security to restrain or prohibit any such breach or threatened breach, in addition to any other remedies which may be available, including the recovery of monetary damages from Grantee. If Lilly determines that Grantee has violated any applicable provisions of this Section 12, in addition to injunctive relief and damages, Grantee agrees and covenants that: (i)Grantee will automatically forfeit any rights Grantee may have with respect to this Award as well as any equity grant (of any form or type) awarded after the date Grantee accepts this Award Agreement, including any right to continue to be eligible to vest or receive a payment under such equity awards; and (ii) if Grantee was an Executive Officer during Grantee's employment, and is entitled to receive benefits under The Lilly Excess Benefits Plan-Retirement (the "SERP"), Grantee will forfeit 60 months of payment under the SERP (whether payment has commenced at the time of breach or commences in the future). Further, Grantee acknowledges that Lilly and the Lilly Group Companies reserve all other rights and remedies available at law or in equity. In addition, in the event Grantee violates any of the restrictive covenants contained herein, the Restricted Period or Confidentiality Restricted Period (as applicable) for the violated restrictive covenants will automatically be extended by the length of time during which Grantee was in violation of such restrictive covenants.

g. Notification Requirements. During the Restricted Period, Grantee acknowledges and agrees to notify Lilly of the name, job title, job duties and location of Grantee's next employer or any other person or entity for which Grantee otherwise will be working or providing services. This notification to Lilly is necessary to ensure adherence to Grantee's post-employment obligations and to protect Lilly trade secrets and confidential information from improper disclosure. During the Restricted

Period or Confidentiality Restricted Period, Grantee will provide a copy of Grantee's post-employment obligations under this Section 12 to each subsequent employer and to each other person or entity for which Grantee otherwise will be working or providing services, in each case prior to commencing employment with or providing any services to such employer, person or entity. Grantee also authorizes Lilly to notify third parties, including any actual or potential employers and Protected Contacts, of the terms of this Section 12 and Grantee's obligations hereunder, by providing a copy of this Section 12 or otherwise.

h. Government Agencies; Permitted Disclosures. Notwithstanding anything in this Section 12 to the contrary, Grantee understands that Grantee may report possible violations of law or regulation to any governmental agency or entity, or make other disclosures that are protected under law or regulation. Grantee also understands that nothing in this Section 12 requires Grantee to obtain prior authorization from Lilly to make any such reports or disclosures or to notify Lilly that you have made such reports or disclosures. Nor shall anything in this Section 12 impede Grantee from discussing or disclosing in good faith information about unlawful acts in the workplace, such as harassment (including sexual harassment), discrimination, sexual assault, or any other conduct Grantee has reason to believe in good faith is unlawful, or from exercising any rights Grantee may have under Section 7 of the National Labor Relations Act. Grantee further understands that Grantee may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Without prior written authorization of Lilly, however, Grantee is not authorized to disclose to any third party (including any government official or any attorney Grantee may retain) any communication that is covered by the attorney-client privilege of Lilly or any of the Lilly Group Companies.

i. State Law Considerations. Grantee and Lilly intend for this Section 12 to comply with all applicable state laws and that this Section 12 should be read and construed consistent with this shared intention. As such, Grantee and Lilly agree that this Section 12 is hereby modified as set forth in this subsection 12.i. to the extent Grantee primarily is employed by and primarily provide services to Lilly in one of the states identified in this subsection 12.i. as of the dates described below.

i. If, as of the date on which Grantee receives this Award Agreement, Grantee primarily is employed by and primarily provide services to Lilly in a state identified in this subsection 12.i.(i), the following shall apply:

A. *Colorado.* Grantee acknowledges receipt of a separate notice attached to this Award Agreement as "Appendix for Colorado Employees" that Lilly has provided to Grantee contemporaneously with this Award Agreement, which

identifies this Award Agreement by name, states that this Award Agreement contains covenants not to compete that could restrict Grantee's options for subsequent employment following the end of Grantee's employment with Lilly, and directs Grantee to the specific sections of this Award Agreement containing such covenants.

B. *District of Columbia.* Grantee is advised of the following notice: "The District's Ban on Non-Compete Agreements Amendment Act of 2020 limits the use of non-compete agreements. It allows employers to request non-compete agreements from highly compensated employees, as that term is defined in the Ban on Non-Compete Agreements Amendment Act of 2020, under certain conditions. Lilly has determined that Grantee is a highly compensated employee. For more information about the Ban on Non-Compete Agreements Amendment Act of 2020, contact the District of Columbia Department of Employment Services (DOES)."

C. *Washington.* Subsection 12.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 12.j.(viii): "*Choice of Law; Jurisdiction*. This Section 12 will be interpreted and enforced in accordance with the laws of the State of Washington, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Washington. Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Washington; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Washington."

ii. If, as of the date on which Grantee's employment with Lilly ends, Grantee primarily is employed by and primarily provide services to Lilly in a state identified in this subsection 12.i.(ii), the following shall apply:

A. *California.* The "Restricted Period," for purposes of subsections 12.b. and 12.c., means during the period of Grantee's employment with Lilly (and not, for the avoidance of doubt, for any period following the end of Grantee's employment with Lilly), notwithstanding any other provision of Section 12 to the contrary.

B. *Colorado.* Subsection 12.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 12.j.(v): "*Choice of Law; Jurisdiction*. This Section 12 will be interpreted and enforced in accordance with the laws of the State of Colorado, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Colorado.

Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Colorado; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Colorado."

C. *Massachusetts*.

1. Subsection 12.b. shall not apply during the Restricted Period following the end of Grantee's employment with Lilly if Grantee's employment with Lilly ended as a result of a termination of Grantee's employment by Lilly without cause or in a layoff.

2. Subsection 12.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 12.j.(v): "*Choice of Law; Jurisdiction*. This Section 12 will be interpreted and enforced in accordance with the laws of the State of Massachusetts, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Massachusetts. Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Massachusetts; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Massachusetts.

D. *Minnesota, North Dakota, or Oklahoma.* The "Restricted Period," for purposes of subsection 12.b., means during the period of Grantee's employment with Lilly (and not, for the avoidance of doubt, for any period following the end of Grantee's employment with Lilly), notwithstanding any other provision of Section 12 to the contrary.

E. *Nevada*.

1. Subsection 12.b. shall not apply during the Restricted Period following the end of Grantee's employment with Lilly if Grantee's employment with Lilly ended as a result of a reduction of force, reorganization or similar restructuring.

2. The following sentence shall be added to the end of subsection 12.b.: "Nothing in this subsection 12.b. shall restrict Grantee from providing a service to a customer or client of Lilly if (i) Grantee

does not solicit the customer or client, (ii) the customer or client voluntarily chose to leave and seek services from Grantee, and (iii) Grantee is otherwise in full compliance with the terms and conditions of this Section 12 (including subsection 12.b. hereof)."

F. *Virginia*. The following sentence shall be added to the end of subsection 12.c.: "Nothing in this subsection 12.c. shall restrict Grantee from providing a service to a customer or client of Lilly if Grantee does not initiate contact with or solicit the customer or client."

G. *Washington*.

1. Subsection 12.b. shall not apply during the Restricted Period following the end of Grantee's employment with Lilly if Grantee's employment with Lilly ended as a result of a layoff.

2. Subsection 12.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 12.j.(viii): "*Choice of Law; Jurisdiction*. This Section 12 will be interpreted and enforced in accordance with the laws of the State of Washington, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Washington. Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Washington; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Washington."

j. <u>Other Provisions.</u>

i. *Successors and Assigns; Third Party Beneficiaries*. This Section 12 shall bind and inure to the benefit of and be enforceable by Lilly, the Lilly Group Companies and Grantee and their respective successors and assigns; provided, Grantee's rights and obligations under this Section 12 may not be assigned or delegated. Grantee acknowledges and agrees that any Lilly Group Company is an intended third-party beneficiary of Section 12 of this Award Agreement, which may be enforced by Lilly or any such Lilly Group Company, either singularly or jointly.

ii. *Reformation; Severability*. Grantee and Lilly acknowledge and agree that if any particular covenant or provision is determined by a court to be unreasonable or unenforceable in any respect, including the time period, geographic area, or scope of activity covered by any restrictive covenant, such covenant or provision will be reformed or modified so that such covenant or provision will have the closest effect permitted by applicable law to the original form and will be given

effect and enforced as so reformed or modified, or, if such reformation or modification is not possible, such covenant or provision will be removed from this Section 12. In either case, this Section 12 shall be interpreted, even if reformed or modified, to achieve the full intent expressed, and the other provisions of this Section 12 will remain in force and unmodified and will be enforced as written. Any court interpreting any restrictive covenant provision of this Section 12 will, if necessary, reform or modify any such provision to make it enforceable under applicable law.

iii. *Entire Agreement*. This Section 12 embodies the complete agreement and understanding among the parties hereto and supersedes and preempts any prior understandings, discussions, agreements or representations by or among the parties hereto, written or oral, which may have related to the subject matter hereof. Notwithstanding the foregoing, this Section 12 is intended to, among other things, supplement (and not supersede) all applicable statutes protecting trade secrets and the duties Grantee owes to Lilly or any of the Lilly Group Companies under the common law, as well as any other written non-competition, non-solicitation, or confidentiality provisions that Grantee agreed to in the past, including those in Grantee's Employee Confidentiality and Invention Agreement and any Non-Compete Payment Agreement entered into between Grantee and Lilly (collectively, "Prior Agreements"), each of which remains in full force and effect, or that Grantee agrees to in writing in the future. To the extent of conflict between this Section 12 and any Prior Agreement, this Section 12 shall control.

iv. *Amendment and Waiver*. This Section 12 may be amended, and any provision of this Section 12 may be waived, only by a written agreement executed and delivered by Lilly and Grantee. No course of dealing between or among the parties hereto shall be deemed effective to modify, amend or discharge any part of this Section 12 or any rights or obligations of any party hereto under or by reason of this Section 12.

v. *Choice of Law*. Except as may be modified for Grantee as described in subsection 12.i. of this Award Agreement, this Section 12 will be interpreted and enforced in accordance with the laws of the State of Indiana, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Indiana. Grantee and Lilly agree that any legal action arising out of or relating to this Section 12 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Indianapolis, Indiana; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Indianapolis, Indiana.

vi. *Acknowledgements*. Grantee acknowledges and agrees that Grantee has been given at least fourteen (14) calendar days (or, if longer, ten (10) business days) from the date of Grantee's receipt of this Award Agreement (the "Consideration

Period") to consider its terms. Grantee represents and warrants that, if Grantee accepts this Award Agreement before the expiration of the Consideration Period, Grantee has done so knowingly and voluntarily. Grantee also acknowledges and agrees that Grantee has read, understands and agrees with this Section 12, and that Grantee will faithfully comply with each term of this Section 12. Grantee further acknowledges that Grantee has been advised by Lilly to consult with an attorney before agreeing to this Section 12, and has had the opportunity to do so if desired.

vii. *Declaration of Consent*. By accepting this Award and indicating consent via the Company's online acceptance procedure, Grantee is declaring that he or she agrees to this Section 12. No party hereto shall raise the use of the online acceptance procedure that any signature or document was transmitted or communicated through the use of an electronic device as a defense to the formation of a contract, and each such party forever waives any such defense.

Section 13. Additional Terms and Conditions

a. Country-Specific Conditions. The Award shall be subject to any special terms and conditions set forth in any Appendix to this Award Agreement for the Grantee's country. Moreover, if the Grantee relocates to one of the countries included in the Appendix, the special terms and conditions for such country will apply to the Grantee, to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. The Appendix constitutes part of this Award Agreement.

b. Insider Trading / Market Abuse Laws. The Grantee may be subject to insider trading restrictions and/or market abuse laws in applicable jurisdictions, including but not limited to the United States and the Grantee's country of residence, which may affect the Grantee's ability to directly or indirectly, for the Grantee or for a third party, acquire or sell, or attempt to sell, or otherwise dispose of Shares and/or Fractional Shares or rights to acquire Shares and/or Fractional Shares (e.g., the Relative Value Award) under the Plan during such times as the Grantee is considered to have "inside information" regarding the Company (as determined under the laws or regulations in the applicable jurisdictions). Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under any applicable Company insider trading policy. The Grantee acknowledges that it is his or her responsibility to comply with any applicable restrictions, and the Grantee should consult with his or her personal legal advisor on this matter.

c. Imposition of Other Requirements. The Company reserves the right to impose other requirements on the Award and any Shares and/or other amounts acquired pursuant to this Award under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Grantee to execute any additional agreements or undertakings that may be necessary to

accomplish the foregoing. Without limitation to the foregoing, the Grantee agrees that the Relative Value Award and any benefits or proceeds the Grantee may receive hereunder shall be subject to forfeiture and/or repayment to the Company to the extent required to comply with any requirements imposed under Applicable Laws, any compensation recovery policy of the Company that reflects the provisions of Applicable Laws, or to the extent provided in any agreement between Grantee and the Company.

## Section 14. Governing Law and Choice of Venue

The validity, construction, and enforcement of this Award Agreement shall be governed by the laws of the State of Indiana, U.S.A. without regard to laws that might cause other law to govern under applicable principles of conflict of laws or cause the application of substantive law of any jurisdiction other than Indiana. For purposes of litigating any dispute that arises under this Award Agreement, the parties hereby submit to and consent to the jurisdiction and venue of the State of Indiana, and agree that such litigation shall be conducted exclusively in the courts having appropriate subject matter jurisdiction in Marion County, Indiana, or the federal courts for the United States for the Southern District of Indiana, and no other courts, where this Award is granted and/or to be performed.

## Section 15. Miscellaneous Provisions

a. Notices and Electronic Delivery and Participation. Any notice to be given by the Grantee or successor Grantee shall be in writing, and any notice shall be deemed to have been given or made only upon receipt thereof by the Corporate Secretary of Lilly at Lilly Corporate Center, Indianapolis, Indiana 46285, U.S.A. Any notice or communication by Lilly in writing shall be deemed to have been given in the case of the Grantee if mailed or delivered to the Grantee at any address specified in writing to Lilly by the Grantee and, in the case of any successor Grantee, at the address specified in writing to Lilly by the successor Grantee. In addition, Lilly may, in its sole discretion, decide to deliver any documents related to the Award and participation in the Plan by electronic means or request the Grantee's consent to participate in the Plan by electronic means. By accepting this Award, the Grantee hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by Lilly or a third party designated by Lilly.

b. Language. The Grantee acknowledges that he or she is proficient in the English language, or has consulted with an advisor who is sufficiently proficient in English, so as to allow the Grantee to understand the terms and conditions of this Award Agreement. If the Grantee has received this Award Agreement or any other document related to the Plan translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control.

c. Waiver. The waiver by Lilly of any provision of this Award Agreement at any time or for any purpose shall not operate as or be construed to be a waiver of the same or any other provision of this Award Agreement at any subsequent time or for any other purpose.

d. Severability and Section Headings. If one or more of the provisions of this Award Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and the invalid, illegal or unenforceable provisions shall be deemed null and void; however, to the extent permissible by law, any provisions which could be deemed null and void shall first be construed, interpreted or revised retroactively to permit this Award Agreement to be construed so as to foster the intent of this Award Agreement and the Plan.

The section headings in this Award Agreement are for convenience of reference only and shall not be deemed a part of, or germane to, the interpretation or construction of this instrument.

e. No Advice Regarding Grant. Lilly is not providing any tax, legal or financial advice, nor is Lilly making any recommendations regarding the Grantee's participation in the Plan or the Grantee's acquisition or sale of the underlying Shares and/or other amounts acquired pursuant to this Award. The Grantee should consult with his or her own personal tax, legal and financial advisors regarding the Grantee's participation in the Plan before taking any action related to the Plan.

## Section 16. Compensation Recovery

a. The Grantee agrees that this Award and any Shares or any other benefits or proceeds therefrom that the Grantee may receive hereunder shall be subject to forfeiture and/or repayment to the Company pursuant to any recovery, recoupment, "clawback" or similar policy of the Company that is in effect as of the Grant Date, including but not limited to the Eli Lilly and Company Executive Compensation Recovery Policy, effective October 2, 2023, as may be amended, restated, or superseded from time to time (with the provisions contained in such policy deemed incorporated into this Award Agreement without the Grantee's additional or separate consent).

b. At any time during the three years following the date on which the number of Shares eligible to vest under this Award has been determined under Section 2 above, the Company reserves the right to and, in appropriate cases, will seek restitution of all or part of any Shares that have been issued or cash that has been paid pursuant to this Award if:

   i. (A) the number of Shares or the amount of the cash payment was calculated based, directly or indirectly, upon the achievement of financial results that were subsequently the subject of a restatement of all or a portion of the Company's financial statements, (B) the Grantee engaged in intentional misconduct that

caused or partially caused the need for such a restatement; and (C) the number of Shares or the amount of cash payment that would have been issued or paid to the Grantee had the financial results been properly reported would have been lower than the number of Shares actually issued or the amount of cash actually paid; or

ii. the Grantee has been determined to have committed a material violation of law or Company policy or to have failed to properly manage or monitor the conduct of an employee who has committed a material violation of law or Company policy whereby, in either case, such misconduct causes significant harm to the Company.

Furthermore, in the event the number of Shares issued or cash paid pursuant to this Award is determined to have been based on materially inaccurate financial statements or other Company performance measures or on calculation errors (without any misconduct on the part of the Grantee), the Company reserves the right to and, in appropriate cases, will (A) seek restitution of the Shares or cash paid pursuant to this Award to the extent that the number of Shares issued or the amount paid exceeded the number of Shares that would have been issued or the amount that would have been paid had the inaccuracy or error not occurred, or (B) issue additional Shares or make additional payment to the extent that the number of Shares issued or the amount paid was less than the correct amount.

c. For purposes of the foregoing, the Grantee expressly and explicitly authorizes the Company to issue instructions, on the Grantee's behalf, to any brokerage firm and/or third-party administrator engaged by the Company to hold any Shares and other amounts acquired pursuant to this Award to re-convey, transfer or otherwise return such Shares and/or other amounts acquired pursuant to this Award to the Company upon the Company's enforcement of this Section 16.

d. This Section 16 is not intended to limit the Company's power to take such action as it deems necessary to remedy any misconduct, prevent its reoccurrence and, if appropriate, based on all relevant facts and circumstances, punish the wrongdoer in a manner it deems appropriate.

## Section 17. Award Subject to Acknowledgement of Acceptance

Notwithstanding any provisions of this Award Agreement, the Award is subject to acknowledgement of acceptance by the Grantee on or before [•], through the website of E*TRADE, the Company's stock plan administrator. If the Grantee does not acknowledge acceptance of the Award on or before [•], the Award will be cancelled, subject to the Committee's discretion for unforeseen circumstances.

IN WITNESS WHEREOF, Lilly has caused this Award Agreement to be executed in Indianapolis, Indiana, by its proper officer.

ELI LILLY AND COMPANY

By: ___________________________

# Appendix

# Eli Lilly and Company
# Amended and Restated 2002 Lilly Stock Plan
# Relative Value Award Agreement

This Appendix includes special terms and conditions applicable to the Grantee's country and the State of Colorado. These terms and conditions supplement or replace (as indicated) the terms and conditions set forth in the Award Agreement to which it is attached. If the Grantee is a citizen or resident of a country other than the one in which the Grantee is currently working and/or residing (or is considered as such for local law purposes), or if the Grantee transfers employment or residency to a different country after the Award is granted, Lilly will, in its discretion, determine the extent to which the terms and conditions herein will apply. This Appendix also includes other information relevant to the Award.

Unless otherwise defined herein, the terms defined in the Plan or the Award Agreement, as applicable, shall have the same meanings in this Appendix. Notwithstanding the foregoing, for purposes of this Appendix, "Share" shall mean a share of Common Stock and shall include any Fractional Share.

There are no special terms and conditions or information for the following countries:

Belgium

Germany

India

Japan

United States

However, the Grantee should be aware that he or she may be required to take certain steps to comply with Applicable Laws in the Grantee's country in connection with the Award. For example, exchange control, foreign asset and/or account and/or other tax reporting obligations may apply to the Grantee upon receipt of the Award or the Shares subject to the Award or upon the sale of Shares. *For more information regarding such obligations, the Grantee should refer to the Country-Specific Tax Supplement for the Grantee's country, if any. The Grantee should also consult with his or her own personal tax and legal advisors to determine what, if any, obligations exist with respect to the Award and/or the acquisition or sale of Shares. Neither the Company nor the Employer is responsible for any failure on the part of the Grantee to be aware of or comply with Applicable Laws.*

Exhibit 10.5 Form of Restricted Stock Unit Award under the 2002 Lilly Stock Plan

# Eli Lilly and Company
# Restricted Stock Unit Award Agreement
## *(for Executives and Executive Officers)*

This Restricted Stock Unit Award has been granted on [•] ("Grant Date") by Eli Lilly and Company, an Indiana corporation, with its principal offices in Indianapolis, Indiana ("Lilly" or the "Company"), to the Eligible Individual who has received this Restricted Stock Unit Award Agreement (the "Grantee").

| | |
|---|---|
| **Grantee:** | [•] |
| **Units Granted:** | [•] |
| **Grant Date:** | [•] |
| **Vesting Date:** | [•]<br>(except as otherwise provided in this Restricted Stock Unit Award Agreement) |

## Table of Contents


| | | |
|---|---|---|
| Section 1. | Grant of Restricted Stock Units | 3 |
| Section 2. | Vesting | 3 |
| Section 3. | Change in Control | 4 |
| Section 4. | Settlement | 5 |
| Section 5. | Rights of the Grantee | 6 |
| Section 6. | Prohibition Against Transfer | 6 |
| Section 7. | Responsibility for Taxes | 7 |
| Section 8. | Section 409A Compliance | 9 |
| Section 9. | Grantee's Acknowledgement | 9 |
| Section 10. | Data Privacy | 11 |
| Section 11. | Restrictive Covenants and Remedies | 13 |
| Section 12. | Additional Terms and Conditions | 24 |
| Section 13. | Governing Law and Choice of Venue | 25 |
| Section 14. | Miscellaneous Provisions | 25 |
| Section 15. | Compensation Recovery | 27 |
| Section 16. | Award Subject to Acknowledgement of Acceptance | 28 |

## Section 1. Grant of Restricted Stock Units

Eli Lilly and Company, an Indiana corporation ("Lilly" or the "Company"), has granted to the Eligible Individual who has received this Restricted Stock Unit Award Agreement (the "Grantee") an award of restricted stock units (the "Restricted Stock Units" or the "Award") with respect to the number of shares of Lilly Common Stock (the "Shares") set forth on the first page of this document and available by logging on to the Company's stock plan administrator's website at http://mystock.lilly.com.

The Award is made pursuant to and subject to the terms and conditions set forth in the Amended and Restated 2002 Lilly Stock Plan (the "Plan") and to the terms and conditions set forth in this Restricted Stock Unit Award Agreement, including all appendices, exhibits and addenda hereto (the "Award Agreement"). In the event of any conflict between the terms of the Plan and this Award Agreement, the terms of the Plan shall govern except with respect to the provisions described in Section 11 below (in which case, the terms of the Award Agreement shall govern).

Any capitalized terms used but not defined in this Award Agreement shall have the meanings set forth in the Plan.

## Section 2. Vesting

a. For purposes of the vesting provisions set forth in Section 2 of this Award Agreement, the following definitions will apply:

   i. "Qualifying Termination" means the termination of the Grantee's Service under any one of the following circumstances:

      A. due to a plant closing or reduction in workforce (as defined below);

      B. as a result of the Grantee's failure to locate a position within the Company or an Affiliate following the placement of the Grantee on reallocation, including reallocation due to the Grantee's inability to continue to work due to medical reasons, in the United States (or equivalent as determined by the Committee).

   "Plant closing" means the closing of a plant site or other corporate location that directly results in termination of the Grantee's Service.

   "Reduction in workforce" means the elimination of a work group, functional or business unit or other broadly applicable reduction in job positions that directly results in termination of the Grantee's Service.

b. The Award shall vest at the close of business in Indianapolis, Indiana, U.S.A. on the earliest of the following dates (each, a "Vesting Date"):

i. [•], provided the Grantee is still in active Service on the Vesting Date, subject to any alternative date(s) set forth in any appendix attached hereto (the "Appendix"), or

ii. the date the Grantee's Service is terminated due to the Grantee's death, or

iii. the date the Grantee is subject to a Qualifying Termination, in which case the number of Restricted Stock Units that shall vest shall be reduced proportionally for the portion of the total days between the Grant Date and the Vesting Date specified in 2(b)(i) that the Grantee was not in active Service.

The Committee's and/or the Company's determination as to whether (A) the Grantee's Service has been terminated as a direct result of either a plant closing or a reduction in workforce, (B) the Grantee's Service has been terminated as a result of the failure to locate a position within the Company or an Affiliate following reallocation, including medical reassignment, and (C) a transfer of employment between Lilly and an Affiliate or between Affiliates constitutes a termination of Service shall be final and binding on the Grantee.

c. In the event the Grantee's Service with the Company or an Affiliate is terminated prior to a Vesting Date for any reason or in any circumstance other than those specified in Sections 2(b)(ii) or 2(b)(iii), any unvested portion of the Award will be forfeited.

d. The Committee may, at its discretion, cancel the Award or reduce the number of Restricted Stock Units and any accrued Dividend Equivalent Rights, prorated according to time or other measure as deemed appropriate by the Committee, if at any time prior to the Vesting Date, the Grantee is subject to disciplinary action for Misconduct pursuant to and as such term is defined under the Eli Lilly and Company Executive Compensation Recovery Policy, effective October 2, 2023, as may be amended, restated, or superseded from time to time.

## Section 3. Change in Control

The provisions of Section 13.2 of the Plan apply to this Award with the following modifications:

a. The only Change in Control event that shall result in a benefit under this Section 3 shall be the consummation of a merger, share exchange, or consolidation of the Company, as defined in Section 2.6(c) of the Plan (a "Transaction").

b. In the event the Award is converted, assumed, substituted, continued or replaced by a successor or surviving corporation, or a parent or subsidiary thereof, in connection with a Transaction, any Fractional Share issued under this Award shall vest automatically and be payable in cash unless otherwise determined by the Committee, in its sole discretion.

c. In the event the Award is not converted, assumed, substituted, continued or replaced by a successor or surviving corporation, or a parent or subsidiary thereof, in connection with a Transaction, then immediately prior to the Transaction, the Award shall vest automatically in full.

d. In the event the Award is converted, assumed, substituted, continued or replaced by a successor or surviving corporation, or a parent or subsidiary thereof, in connection with a Transaction and the Grantee is subject to a Covered Termination (as defined below) prior to any applicable Vesting Date, the Award shall vest automatically in full.

For purposes of this provision, "Covered Termination" shall mean a termination of Service as described in Sections 2(b)(ii) and 2(b)(iii), Grantee's termination without Cause or the Grantee's resignation for Good Reason. "Cause" and "Good Reason" shall have the meanings ascribed to them in the Eli Lilly and Company 2007 Change in Control Severance Pay Plan for Select Employees, as amended, restated, or superseded from time to time.

e. If the Grantee is entitled to receive stock of the acquiring entity or successor to the Company as a result of the application of this Section 3, then references to Shares in this Award Agreement shall be read to mean stock of the successor or surviving corporation, or a parent or subsidiary thereof, as and when applicable.

## Section 4. Settlement

a. Except as provided below, the Award shall be paid to the Grantee as soon as practicable and generally within sixty (60) days following the applicable Vesting Date, or, if earlier, a vesting event contemplated under the Section 3 above.

b. At the time of settlement, Lilly shall issue or transfer Shares to the Grantee that became vested (including, in the interest of clarity, a Fractional Share). Notwithstanding the foregoing, a Fractional Share may be paid in cash or rounded to the extent provided in the Appendix for the Grantee's country or to the extent otherwise determined by the Committee in its sole discretion. For purposes of this Award, references to "issue" or variations of such term shall instead mean "allocate" when used in the context of Fractional Shares.

c. In the event of the death of the Grantee, the payments described above shall be made to the successor of the Grantee.

Section 5. Rights of the Grantee

a. No Shareholder Rights. The Restricted Stock Units do not entitle the Grantee to any rights of a shareholder of Lilly until such time as the Restricted Stock Units vest and Shares are issued or transferred to the Grantee. In the event a Fractional Share is issued, the Grantee shall have the rights of a shareholder to receive dividends payable with respect to a Share and, unless otherwise provided by the Committee, the right to vote, in each case, that are proportionate to the interest the Fractional Share bears to a whole Share.

b. Dividend Equivalent Rights. As long as the Grantee holds Restricted Stock Units granted pursuant to this Award, the Company shall accrue for the Grantee, on each date that the Company pays a cash dividend to holders of Company Shares, Dividend Equivalent Rights equal to the total number of Restricted Stock Units credited to the Grantee under this Award multiplied by the dollar amount of the cash dividend paid per Share by the Company on such date. Dividend Equivalent Rights shall accrue in an account denominated in U.S. dollars and shall not accrue interest or other credits prior to being paid. A report showing the accrued Dividend Equivalent Rights shall be sent to the Grantee periodically, as determined by the Company. The accrued Dividend Equivalent Rights shall be subject to the same vesting conditions as the Restricted Stock Units to which the Dividend Equivalent Rights relate, and the Dividend Equivalent Rights shall be forfeited in the event that the Restricted Stock Units with respect to which such Dividend Equivalent Rights were credited are forfeited. Following the applicable Vesting Date, Lilly shall pay to the Grantee in cash all accrued Dividend Equivalent Rights in accordance with Section 4 above.

c. No Trust; Grantee's Rights Unsecured. Neither this Award Agreement nor any action in accordance with this Award Agreement shall be construed to create a trust of any kind. The right of the Grantee to receive a payment pursuant to this Award Agreement shall be an unsecured claim against the general assets of the Company.

Section 6. Prohibition Against Transfer

a. Awards. The right of a Grantee to receive payments under this Award may not be transferred except to a duly appointed guardian of the estate of the Grantee or to a successor of the Grantee by will or the applicable laws of descent and distribution and then only subject to the provisions of this Award Agreement. A Grantee may not assign, sell, pledge, or otherwise transfer this Award or the rights thereunder to which he or she may be entitled

hereunder prior to transfer or payment thereof to the Grantee, and any such attempted assignment, sale, pledge or transfer shall be void.

b. Fractional Shares. Any Fractional Share issued to the Grantee shall remain in the Grantee's account at the Company's broker until the disposition of the Fractional Share and shall not become transferrable to another broker unless and until any Fractional Shares issued to the Grantee aggregate to a whole Share.

Section 7. Responsibility for Taxes

a. Regardless of any action Lilly and/or the Grantee's Employer takes with respect to any or all income tax (including federal, state, local and non-U.S. tax), social insurance, payroll tax, fringe benefits tax, payment on account or other tax related items related to the Grantee's participation in the Plan and legally applicable to the Grantee ("Tax Related Items"), the Grantee acknowledges that the ultimate liability for all Tax Related Items is and remains the Grantee's responsibility and may exceed the amount actually withheld by Lilly or the Employer. The Grantee further acknowledges that Lilly and the Employer (i) make no representations or undertakings regarding the treatment of any Tax Related Items in connection with any aspect of the Award, including the grant of the Restricted Stock Units, the accrual of Dividend Equivalent Rights, the vesting of the Restricted Stock Units and the lapse of restrictions, the transfer and issuance of any Shares and/or Fractional Shares, the receipt of any cash payment pursuant to the Award and/or Dividend Equivalent Rights, the receipt of any dividends (including any dividends that are reinvested in additional Shares) and the sale or other disposition of any Shares and/or Fractional Shares acquired pursuant to this Award; and (ii) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Award to reduce or eliminate the Grantee's liability for Tax Related Items or achieve any particular tax result. Furthermore, if the Grantee becomes subject to Tax Related Items in more than one jurisdiction, the Grantee acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax Related Items in more than one jurisdiction.

b. In connection with the applicable taxable or tax withholding event, as applicable, the Grantee shall pay or make adequate arrangements satisfactory to Lilly and/or the Employer to satisfy all Tax Related Items.

i. In the case of Dividend Equivalent Rights paid to the Grantee and if the Restricted Stock Units are paid to the Grantee in cash in lieu of Shares and/or Fractional Shares, the Grantee authorizes the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any obligation for Tax Related Items by withholding from the cash amount paid to the Grantee pursuant to the

Award or from the Grantee's wages or other cash compensation paid to the Grantee by the Company and/or the Employer.

ii. If the Restricted Stock Units are paid to the Grantee in Shares and/or Fractional Shares and the Grantee is not subject to the short-swing profit rules of Section 16(b) of the Exchange Act, the Grantee authorizes Lilly and/or the Employer, or their respective agents, at their discretion, to (A) withhold from the Grantee's wages or other cash compensation paid to the Grantee by the Company and/or the Employer, (B) arrange for the sale of Shares and/or Fractional Shares to be issued upon settlement of the Award (on the Grantee's behalf and at the Grantee's direction pursuant to this authorization or such other authorization as the Grantee may be required to provide to Lilly or its designated broker in order for such sale to be effectuated) and withhold from the proceeds of such sale, (C) withhold in Shares and/or Fractional Shares otherwise issuable to the Grantee pursuant to this Award, and/or (D) apply any other method of withholding determined by the Company and, to the extent required by Applicable Laws or the Plan, approved by the Committee.

iii. If the Restricted Stock Units are paid to the Grantee in Shares and/or Fractional Shares and the Grantee is subject to the short-swing profit rules of Section 16(b) of the Exchange Act, Lilly will withhold in Shares and Fractional Shares otherwise issuable to the Grantee pursuant to this Award, unless the use of such withholding method is prevented by Applicable Laws or has materially adverse accounting or tax consequences, in which case the withholding obligation for Tax Related Items may be satisfied by one or a combination of the methods set forth in Section 7(b)(ii)(A) and (B) above.

c. Depending on the withholding method, Lilly and/or the Employer may withhold or account for Tax Related Items by considering applicable statutory or other withholding rates, including minimum or maximum rates in the jurisdiction(s) applicable to the Grantee, in which case the Grantee may receive a refund of any over-withheld amount in cash (without interest and without entitlement to the equivalent amount in Shares). If the obligation for Tax Related Items is satisfied by withholding Shares, for tax purposes, the Grantee will be deemed to have been issued the full number of Shares and/or Fractional Shares to which he or she is entitled pursuant to this Award, notwithstanding that a number of Shares and/or Fractional Shares are withheld to satisfy the obligation for Tax Related Items.

d. Lilly may refuse to deliver Shares and/or Fractional Shares or any cash payment to the Grantee if the Grantee fails to comply with the Grantee's

obligation in connection with the Tax Related Items as described in this Section 7.

e. For purposes of this Section 7, references to the withholding or sale of a Share shall also mean the withholding or sale of any portion that is less than a whole Share, to the extent applicable.

## Section 8. Section 409A Compliance

To the extent applicable, it is intended that this Award comply with the requirements of Section 409A of the U.S. Internal Revenue Code of 1986, as amended and the Treasury Regulations and other guidance issued thereunder ("Section 409A") and this Award shall be interpreted and applied by the Committee in a manner consistent with this intent in order to avoid the imposition of any additional tax under Section 409A.

## Section 9. Grantee's Acknowledgement

In accepting this Award, the Grantee acknowledges, understands and agrees that:

a. the Plan is established voluntarily by Lilly, it is discretionary in nature and it may be modified, amended, suspended or terminated by Lilly at any time, as provided in the Plan;

b. the Award is voluntary and occasional and does not create any contractual or other right to receive future awards of Restricted Stock Units and/or Dividend Equivalent Rights, or benefits in lieu thereof, even if Restricted Stock Units and/or Dividend Equivalent Rights have been granted in the past;

c. all decisions with respect to future awards of Restricted Stock Units, Dividend Equivalent Rights or other awards, if any, will be at the sole discretion of the Committee;

d. the Grantee's participation in the Plan is voluntary;

e. the Award is not intended to replace any pension rights or compensation;

f. the Award is not part of normal or expected compensation for any purpose, including but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, holiday pay, leave pay, pension or welfare or retirement benefits or similar mandatory payments;

g. unless otherwise agreed with Lilly, the Award is not granted as consideration for, or in connection with, the service the Grantee may provide as a director of an Affiliate;

h. neither the Award nor any provision of this Award Agreement, the Plan or the policies adopted pursuant to the Plan, confer upon the Grantee any right with respect to employment or continuation of current employment, and in the event that the Grantee is not an employee of Lilly or any subsidiary of Lilly, the Award shall not be interpreted to form an employment contract or relationship with Lilly or any Affiliate;

i. the future value of the underlying Shares and other amounts that may be acquired pursuant to this Award is unknown, indeterminable and cannot be predicted with certainty;

j. no claim or entitlement to compensation or damages shall arise from forfeiture of the Award or recoupment of any Shares and other amounts that may be acquired pursuant to this Award acquired under the Plan or proceeds therefrom resulting from (i) the application of a clawback policy described in Section 15 of this Award Agreement or required by law, (ii) application of any of the remedies described in Section 11 of this Award Agreement or (iii) the Grantee ceasing to provide employment or other services to Lilly or the Employer (for any reason whatsoever, whether or not later found to be invalid or in breach of local labor laws in the jurisdiction where the Grantee is employed or the terms of Grantee's employment agreement, if any);

k. for purposes of the Award, the Grantee's employment will be considered terminated as of the date he or she is no longer actively providing services to the Company or an Affiliate and the Grantee's right, if any, to earn and be paid any portion of the Award after such termination of employment or services (regardless of the reason for such termination and whether or not such termination is later found to be invalid or in breach of employment laws in the jurisdiction where the Grantee is employed or the terms of the Grantee's employment agreement, if any) will be measured by the date the Grantee ceases to actively provide services and will not be extended by any notice period (e.g., active service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where the Grantee is employed or the terms of the Grantee's employment agreement, if any); the Committee shall have the exclusive discretion to determine when the Grantee is no longer actively providing services for purposes of the Award (including whether the Grantee may still be considered to be actively providing services while on a leave of absence);

l. to the extent applicable to the Grantee, the Company has communicated share ownership guidelines that apply to the Grantee, and the Grantee understands and agrees that those guidelines may impact any Shares subject to, or issued pursuant to, the Award;

m. the Grantee is solely responsible for investigating and complying with any laws applicable to him or her in connection with the Award;

n. to the extent applicable to the Grantee, the Company has communicated share ownership guidelines that apply to the Grantee, and the Grantee understands and agrees that those guidelines may impact any Shares subject to, or issued pursuant to, the Award;

o. unless otherwise provided in the Plan or by the Committee in its discretion, the Award and the benefits evidenced by this Award Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the Shares and other amounts that may be acquired pursuant to this Award; and

p. neither the Company, the Employer nor any Affiliate shall be liable for any foreign exchange rate fluctuation between the Grantee's local currency and the United States Dollar that may affect the value of the Award or any amounts due to the Grantee pursuant to the settlement of the Award or the subsequent sale of any Shares and other amounts that may be acquired pursuant to this Award acquired upon settlement.

Section 10. Data Privacy

*a. <u>Data Collection and Usage</u>. The Company and the Employer may collect, process and use certain personal information about the Grantee, and persons closely associated with the Grantee, including, but not limited to, the Grantee's name, home address and telephone number, email address, date of birth, social insurance number, passport or other identification number (e.g., resident registration number), salary, nationality, job title, any shares of stock or directorships held in the Company, details of all Restricted Stock Units or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding in the Grantee's favor ("Data"), for the purposes of implementing, administering and managing the Plan. The legal basis, where required, for the processing of Data is the Grantee's consent. Where required under applicable law, Data may also be disclosed to certain securities or other regulatory authorities where the Company's securities are listed or traded or regulatory filings are made and the legal basis, where required, for such disclosure are the applicable laws.*

*b. <u>Stock Plan Administration Service Providers</u>. The Company transfers Data to Morgan Stanley's E*TRADE Financial Corporate Services, Inc. and/or its affiliated companies ("E*TRADE"), an independent service provider, which is assisting the Company with the implementation, administration and management of the Plan. In the future, the Company may select a different service provider and share Data with such other provider serving in a similar*

*manner. The Grantee may be asked to agree on separate terms and data processing practices with the service provider, with such agreement being a condition to the ability to participate in the Plan. The Company may also transfer Data to KPMG, an independent service provider, which is also assisting the Company with certain aspects of the implementation, administration and management of the Plan. In the future, the Company may select a different service provider and share Data with such other provider serving in a similar manner.*

c. *International Data Transfers. The Company and its service providers are based in the United States. The Grantee's country or jurisdiction may have different data privacy laws and protections than the United States. The Company's legal basis, where required, for the transfer of Data is Grantee's consent.*

d. *Data Retention. The Company will hold and use the Data only as long as is necessary to implement, administer and manage the Grantee's participation in the Plan, or as required to comply with legal or regulatory obligations, including under tax and security laws.*

e. *Voluntariness and Consequences of Consent Denial or Withdrawal. Participation in the Plan is voluntary and the Grantee is providing the consents herein on a purely voluntary basis. If the Grantee does not consent, or if the Grantee later seeks to revoke the Grantee's consent, the Grantee's salary from or employment and career with the Employer will not be affected; the only consequence of refusing or withdrawing the Grantee's consent is that the Company would not be able to grant this Award or other awards to the Grantee or administer or maintain such awards.*

f. *Data Subject Rights. The Grantee understands that data subject rights regarding the processing of Data vary depending on applicable laws and that, depending on where the Grantee is based and subject to the conditions set out in such applicable laws, the Grantee may have, without limitation, the right to (i) inquire whether and what kind of Data the Company holds about the Grantee and how it is processed, and to access or request copies of such Data, (ii) request the correction or supplementation of Data about the Grantee that is inaccurate, incomplete or out-of-date in light of the purposes underlying the processing, (iii) obtain the erasure of Data no longer necessary for the purposes underlying the processing, (iv) request the Company to restrict the processing of the Grantee's Data in certain situations where the Grantee feels its processing is inappropriate, (v) object, in certain circumstances, to the processing of Data for legitimate interests, and to (vi) request portability of the Grantee's Data that the Grantee has actively or passively provided to the Company or the Employer (which does not include data derived or inferred from the collected data), where the processing of*

*such Data is based on consent or the Grantee's employment and is carried out by automated means. In case of concerns, the Grantee understands that he or she may also have the right to lodge a complaint with the competent local data protection authority. Further, to receive clarification of, or to exercise any of, the Grantee's rights, the Grantee understands that he or she should contact his or her local human resources representative.*

*g. Declaration of Consent. By accepting the Award and indicating consent via the Company's online acceptance procedure, the Grantee is declaring that he or she agrees with the data processing practices described herein and consents to the collection, processing and use of Data by the Company and the transfer of Data to the recipients mentioned above, including recipients located in countries which do not offer an adequate level of protection from a European (or other non-U.S.) data protection law perspective, for the purposes described above.*

## Section 11. Restrictive Covenants and Remedies

This Section 11 is entered into by Lilly (which for purposes of Section 11 includes any of its Affiliates[1] to which Grantee provides (or has provided) services during Grantee's employment) and Grantee as of the date of Grantee's acceptance of this Award. This Section 11 is not applicable if the Grantee is working and/or residing in Canada or otherwise where impermissible under applicable law. However, conduct involving misappropriation of Lilly trade secrets or confidential information will remain prohibited as provided in the Grantee's Employee Confidentiality and Invention Agreement and nothing in this Award Agreement shall be construed to limit or eliminate any rights or remedies Lilly would have against Grantee under trade secret law, unfair competition law, or other applicable laws.

In consideration of the Grantee's receipt of the Award from Lilly, and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantee and Lilly hereby agree as follows:

a. Confidential Information.

i. Grantee understands and agrees that Grantee's employment by Lilly creates a relationship of confidence and trust with respect to any information or materials of a confidential, non-public or proprietary nature that have been or may be made, created or discovered by Grantee or that have been or will be disclosed to Grantee in relation to the business of Lilly, or its direct or indirect parents, subsidiaries or Affiliates (together with Lilly, the "Lilly Group Companies"), or any of their respective predecessors, or any entity, business or assets

[1] For purposes of this Section 11, "Affiliate" means any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, Eli Lilly and Company or Lilly USA, LLC.

acquired in whole or in part by any of the Lilly Group Companies (each, an "Acquired Company"), or any Protected Contact, or any other person with whom the Lilly Group Companies agrees to hold such information or materials in confidence (the "Confidential Information"). For the avoidance of doubt, any information developed by an Acquired Company will be considered "Confidential Information" if it meets the definition of that term herein regardless of whether the Confidential Information was developed by the Acquired Company prior to or after the acquisition by Lilly. Without limitation as to the forms that Confidential Information may take, Grantee acknowledges and agrees that Confidential Information may be contained in tangible material such as writings, drawings, samples, electronic media, or computer programs, or may be in the nature of unwritten knowledge or know-how. Confidential Information includes, but is not limited to, information concerning the Lilly Group Companies' inventions, marketing plans, products, designs, processes, services, research data, prototypes, specimens, test protocols, laboratory notebooks, business strategies, financial information, forecasts, personnel information, contract information, Protected Contacts, business pursuits and other information that is not generally known outside the Lilly Group Companies and from which the Lilly Group Companies could derive economic value, including any such information to which Grantee had access prior to agreeing to the terms of this Section 11. Notwithstanding the foregoing, it is understood that Confidential Information does not include information that is generally known in the trade or industry through no breach of this Section 11 or other act or omission by Grantee or any other person with confidentiality obligations to the Lilly Group Companies, or information arising from Grantee's general training, knowledge, skill or experience.

ii. At all times, both during Grantee's employment and during the Confidentiality Restricted Period (as defined herein) after the end of Grantee's employment with Lilly for any reason, and to the fullest extent permitted by law, Grantee agrees to keep and hold all Confidential Information in strict confidence and trust. Grantee will not use or disclose any Confidential Information without the prior written consent of Lilly in each instance, except in the good faith performance of Grantee's duties as an employee of Lilly for the benefit of Lilly. For purposes of this Section 11, "Confidentiality Restricted Period" shall mean: (i) five (5) years following the end of Grantee's employment with Lilly for any reason if the item of Confidential Information at issue does not constitute a trade secret under applicable law; and (ii) if the item of Confidential Information at issue constitutes a trade secret under applicable law, the longer of (A) five (5) years following the end of Grantee's employment with Lilly for any reason, and (B) for so long as

such item of Confidential Information at issue continues to constitute a trade secret.

iii. Grantee understands and agrees that all Confidential Information, and all other documents, supplies, equipment and other physical property furnished to Grantee by Lilly, produced by Grantee or others in connection with Grantee's employment, or otherwise pertaining to Grantee's work with Lilly or any of the Lilly Group Companies (collectively, "Lilly Property") will be and remain the sole property of Lilly. Upon the end of Grantee's employment with Lilly for any reason, Grantee agrees to promptly deliver to Lilly all Confidential Information and all other Lilly Property, and Grantee will not take with Grantee or retain in any form any documents or materials or copies containing any Confidential Information, excepting only Grantee's personal copies of records of Grantee's employment or compensation with Lilly.

b. Non-Competition. Except as may be modified for Grantee as described in subsection 11.i., Grantee agrees that during Grantee's employment with Lilly and for twelve (12) months immediately following the end of Grantee's employment (regardless of reason) (the "Restricted Period"), Grantee will not directly or indirectly, anywhere in or with respect to the United States or any other country in which Lilly operates or conducts business as of the end of Grantee's employment (the "Restricted Territory"), work for, advise, manage, act as an agent, employee or consultant for, or otherwise provide any services, in each case in a Competitively-Sensitive Capacity (as defined herein), to any person or entity engaged in research, development, production, sale, or distribution of a product or service competitive with or substantially similar to any product or service in research, development or design, or manufactured, produced, sold, or distributed by Lilly (each such person or entity, a "Competitor").

For purposes of this Section 11, "Competitively-Sensitive Capacity" means: (i) the same or similar capacity or function in which Grantee worked for Lilly at any time during the two (2) years immediately preceding the end of Grantee's employment; (ii) any officer, director, executive or senior management capacity or function; (iii) any research or development capacity or function; (iv) any sales management or business development management capacity or function; (v) any ownership capacity (except Grantee may own as a passive investment up to 2% of any publicly traded securities); or (vi) any other capacity or function in which the trade secrets or other Confidential Information of Lilly or any of the Lilly Group Companies to which Grantee had access during the two (2) years immediately preceding the end of Grantee's employment, if used or disclosed by Grantee, would enable a Competitor to unfairly compete with Lilly. For purposes of clarity, if a Competitor has multiple divisions, lines or segments, some of which are

not competitive with the business of Lilly, nothing in this Section 11 will prohibit Grantee from being employed by, working for or assisting only that division, line or segment of such Competitor that is not competitive with (or planned to be competitive with) the business of Lilly, provided Grantee is not involved in a Competitively-Sensitive Capacity in the research, development, production, sale or distribution of any product or service competitive with or substantially similar to any product or service in research, development or design, or manufactured, produced, sold, or distributed by Lilly.

In accordance with American Bar Association Model Rule 5.6, this subsection 11.b. shall be inapplicable following the end of Grantee's employment if: (i) during Grantee's employment with Lilly, Grantee primarily performed services for Lilly as a licensed attorney, and (ii) Grantee provides legal services as a licensed attorney to a company other than Lilly.

c. Non-Interference with Protected Contacts. Except as may be modified for Grantee as described in subsection 11.i., Grantee agrees that, during the Restricted Period, Grantee will not directly or indirectly, anywhere in or with respect to the Restricted Territory, solicit, urge, divert, induce, or seek to induce any Protected Contact to: (a) terminate their relationship with, or representation of, Lilly or any of the Lilly Group Companies; (b) cancel, withdraw, reduce, limit or in any manner to adversely modify any such person's business with, or representation of, Lilly or any of the Lilly Group Companies; or (c) enter into a relationship, represent, or provide services to a Competitor.

For purposes of this Section 11, "Protected Contact" means any independent contractor, subcontractor, business partner, distributor, broker, consultant, sales representative, customer, vendor, supplier or any other person with which Lilly or any of the Lilly Group Companies has a business relationship and (i) with which Grantee had material interaction during Grantee's employment with Lilly, or (ii) about which Grantee had access to Confidential Information during Grantee's employment with Lilly.

d. Non-Solicitation of Employees. Grantee agrees that, during the Restricted Period, Grantee will not, directly or indirectly solicit, urge, divert, induce, or seek to induce any Protected Employee of Lilly to: (a) terminate or adversely modify their relationship with Lilly or any of the Lilly Group Companies; or (b) enter into a relationship, represent, or provide services to a Competitor.

For purposes of this Section 11, "Protected Employee" means any employee of Lilly or any of the Lilly Group Companies that has or has had access to Confidential Information and: (i) with whom Grantee had material interaction

during Grantee's employment with Lilly; or (ii) about whom Grantee had access to Confidential Information during Grantee's employment with Lilly.

e. Reasonableness of Restrictions. Grantee acknowledges and agrees that during the course of Grantee's employment with Lilly, Grantee will be provided access to and will become intimately familiar with trade secrets and other Confidential Information key to Lilly's (and the Lilly Group Companies') unique competitive advantage. Grantee also acknowledges and agrees that Lilly's (and the Lilly Group Companies') trade secrets and other Confidential Information will retain continuing vitality throughout and beyond the Restricted Period. And Grantee acknowledges and agrees that, should Grantee's employment with Lilly end for any reason and, during the Restricted Period, Grantee works in a Competitively-Sensitive Capacity with a Competitor, it would be highly likely, if not inevitable, that Grantee would rely on trade secrets or other Confidential Information of Lilly or the Lilly Group Companies in the course of Grantee's work, either consciously or subconsciously, thereby irreparably harming Lilly and the Lilly Group Companies. For these and other reasons, Grantee agrees that the restrictions in this Section 11 are reasonable and necessary to protect the legitimate business interests of Lilly and the Lilly Group Companies and do so by creating a specific amount of time after Grantee's employment ends during which Grantee will not be able to engage or prepare to engage in the activities restricted in this Section 11. Grantee and Lilly further acknowledge and agree that Lilly and the Lilly Group Companies conduct business throughout the Restricted Territory and the geographic scope of the foregoing covenants is reasonable and necessary given, among other things, that: (a) absent such restrictions, Grantee could utilize Lilly's (or Lilly Group Companies) trade secrets and other Confidential Information and unfairly compete with Lilly in the Restricted Territory from virtually anywhere in the world; and (b) such scope is the only way for Lilly and the Lilly Group Companies adequately to protect its trade secrets and other Confidential Information.

f. Remedies. Grantee acknowledges that a breach by Grantee of this Section 11 will give rise to irreparable injury to Lilly and money damages will not be adequate relief for such injury. As a result, Grantee agrees that Lilly (including any third-party beneficiary) will be entitled to obtain equitable or injunctive relief without having to post any bond or other security to restrain or prohibit any such breach or threatened breach, in addition to any other remedies which may be available, including the recovery of monetary damages from Grantee. If Lilly determines that Grantee has violated any applicable provisions of this Section 11, in addition to injunctive relief and damages, Grantee agrees and covenants that: (i)Grantee will automatically forfeit any rights Grantee may have with respect to this Award as well as any equity grant (of any form or type) awarded after the date Grantee accepts

this Award Agreement, including any right to continue to be eligible to vest or receive a payment under such equity awards; and (ii) if Grantee was designated an Executive Officer of Lilly during Grantee's employment, and is entitled to receive benefits under The Lilly Excess Benefits Plan-Retirement (the "SERP"), Grantee will forfeit 60 months of payment under the SERP (whether payment has commenced at the time of breach or commences in the future). Further, Grantee acknowledges that Lilly and the Lilly Group Companies reserve all other rights and remedies available at law or in equity. In addition, in the event Grantee violates any of the restrictive covenants contained herein, the Restricted Period or Confidentiality Restricted Period (as applicable) for the violated restrictive covenants will automatically be extended by the length of time during which Grantee was in violation of such restrictive covenants.

g. Notification Requirements. During the Restricted Period, Grantee acknowledges and agrees to notify Lilly of the name, job title, job duties and location of Grantee's next employer or any other person or entity for which Grantee otherwise will be working or providing services. This notification to Lilly is necessary to ensure adherence to Grantee's post-employment obligations and to protect Lilly trade secrets and confidential information from improper disclosure. During the Restricted Period or Confidentiality Restricted Period, Grantee will provide a copy of Grantee's post-employment obligations under this Section 11 to each subsequent employer and to each other person or entity for which Grantee otherwise will be working or providing services, in each case prior to commencing employment with or providing any services to such employer, person or entity. Grantee also authorizes Lilly to notify third parties, including any actual or potential employers and Protected Contacts, of the terms of this Section 11 and Grantee's obligations hereunder, by providing a copy of this Section 11 or otherwise.

h. Government Agencies; Permitted Disclosures. Notwithstanding anything in this Section 11 to the contrary, Grantee understands that Grantee may report possible violations of law or regulation to any governmental agency or entity, or make other disclosures that are protected under law or regulation. Grantee also understands that nothing in this Section 11 requires Grantee to obtain prior authorization from Lilly to make any such reports or disclosures or to notify Lilly that you have made such reports or disclosures. Nor shall anything in this Section 11 impede Grantee from discussing or disclosing in good faith information about unlawful acts in the workplace, such as harassment (including sexual harassment), discrimination, sexual assault, or any other conduct Grantee has reason to believe in good faith is unlawful, or from exercising any rights Grantee may have under Section 7 of the National Labor Relations Act. Grantee further understands that Grantee may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (a) in confidence to a federal,

state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Without prior written authorization of Lilly, however, Grantee is not authorized to disclose to any third party (including any government official or any attorney Grantee may retain) any communication that is covered by the attorney-client privilege of Lilly or any of the Lilly Group Companies.

i. State Law Considerations. Grantee and Lilly intend for this Section 11 to comply with all applicable state laws and that this Section 11 should be read and construed consistent with this shared intention. As such, Grantee and Lilly agree that this Section 11 is hereby modified as set forth in this subsection 11.i. to the extent Grantee primarily is employed by and primarily provide services to Lilly in one of the states identified in this subsection 11.i. as of the dates described below.

   i. If, as of the date on which Grantee receives this Award Agreement, Grantee primarily is employed by and primarily provide services to Lilly in a state identified in this subsection 11.i.(i), the following shall apply:

      A. *Colorado.* Grantee acknowledges receipt of a separate notice attached to this Award Agreement as "Appendix for Colorado Employees" that Lilly has provided to Grantee contemporaneously with this Award Agreement, which identifies this Award Agreement by name, states that this Award Agreement contains covenants not to compete that could restrict Grantee's options for subsequent employment following the end of Grantee's employment with Lilly, and directs Grantee to the specific sections of this Award Agreement containing such covenants.

      B. *District of Columbia.* Grantee is advised of the following notice: "The District's Ban on Non-Compete Agreements Amendment Act of 2020 limits the use of non-compete agreements. It allows employers to request non-compete agreements from highly compensated employees, as that term is defined in the Ban on Non-Compete Agreements Amendment Act of 2020, under certain conditions. Lilly has determined that Grantee is a highly compensated employee. For more information about the Ban on Non-Compete Agreements Amendment Act of 2020, contact the District of Columbia Department of Employment Services (DOES)."

C. *Washington.* Subsection 11.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 11.j.(viii): "*Choice of Law; Jurisdiction*. This Section 11 will be interpreted and enforced in accordance with the laws of the State of Washington, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Washington. Grantee and Lilly agree that any legal action arising out of or relating to this Section 11 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Washington; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Washington."

ii. If, as of the date on which Grantee's employment with Lilly ends, Grantee primarily is employed by and primarily provide services to Lilly in a state identified in this subsection 11.i.(ii), the following shall apply:

A. *California.* The "Restricted Period," for purposes of subsections 11.b. and 11.c., means during the period of Grantee's employment with Lilly (and not, for the avoidance of doubt, for any period following the end of Grantee's employment with Lilly), notwithstanding any other provision of Section 11 to the contrary.

B. *Colorado.* Subsection 11.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 11.j.(v): "*Choice of Law; Jurisdiction*. This Section 11 will be interpreted and enforced in accordance with the laws of the State of Colorado, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Colorado. Grantee and Lilly agree that any legal action arising out of or relating to this Section 11 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Colorado; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Colorado."

C. *Massachusetts*.

1. Subsection 11.b. shall not apply during the Restricted Period following the end of Grantee's employment with Lilly if Grantee's employment with Lilly ended as a result of a

termination of Grantee's employment by Lilly without cause or in a layoff.

2. Subsection 11.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 11.j.(v): "*Choice of Law; Jurisdiction*. This Section 11 will be interpreted and enforced in accordance with the laws of the State of Massachusetts, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Massachusetts. Grantee and Lilly agree that any legal action arising out of or relating to this Section 11 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Massachusetts; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Massachusetts.

D. *Minnesota, North Dakota, or Oklahoma.* The "Restricted Period," for purposes of subsection 11.b., means during the period of Grantee's employment with Lilly (and not, for the avoidance of doubt, for any period following the end of Grantee's employment with Lilly), notwithstanding any other provision of Section 11 to the contrary.

E. *Nevada*.

1. Subsection 11.b. shall not apply during the Restricted Period following the end of Grantee's employment with Lilly if Grantee's employment with Lilly ended as a result of a reduction of force, reorganization or similar restructuring.

2. The following sentence shall be added to the end of subsection 11.b.: "Nothing in this subsection 11.b. shall restrict Grantee from providing a service to a customer or client of Lilly if (i) Grantee does not solicit the customer or client, (ii) the customer or client voluntarily chose to leave and seek services from Grantee, and (iii) Grantee is otherwise in full compliance with the terms and conditions of this Section 11 (including subsection 11.b. hereof)."

F. *Virginia*. The following sentence shall be added to the end of subsection 11.c.: "Nothing in this subsection 11.c. shall restrict

Grantee from providing a service to a customer or client of Lilly if Grantee does not initiate contact with or solicit the customer or client."

G. *Washington*.

1. Subsection 11.b. shall not apply during the Restricted Period following the end of Grantee's employment with Lilly if Grantee's employment with Lilly ended as a result of a layoff.

2. Subsection 11.j.(v) shall not apply to Grantee, and the following language is substituted as a new subsection 11.j.(viii): "*Choice of Law; Jurisdiction*. This Section 11 will be interpreted and enforced in accordance with the laws of the State of Washington, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Washington. Grantee and Lilly agree that any legal action arising out of or relating to this Section 11 will be commenced and maintained exclusively before any state or federal court having appropriate subject matter jurisdiction located in Washington; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Washington."

j. <u>Other Provisions.</u>

(i) *Successors and Assigns; Third Party Beneficiaries*. This Section 11 shall bind and inure to the benefit of and be enforceable by Lilly, the Lilly Group Companies and Grantee and their respective successors and assigns; provided, Grantee's rights and obligations under this Section 11 may not be assigned or delegated. Grantee acknowledges and agrees that any Lilly Group Company is an intended third-party beneficiary of Section 11 of this Award Agreement, which may be enforced by Lilly or any such Lilly Group Company, either singularly or jointly.

(ii) *Reformation; Severability*. Grantee and Lilly acknowledge and agree that if any particular covenant or provision is determined by a court to be unreasonable or unenforceable in any respect, including the time

period, geographic area, or scope of activity covered by any restrictive covenant, such covenant or provision will be reformed or modified so that such covenant or provision will have the closest effect permitted by applicable law to the original form and will be given effect and enforced as so reformed or modified, or, if such reformation or modification is not possible, such covenant or provision will be removed from this Section 11. In either case, this Section 11 shall be interpreted, even if reformed or modified, to achieve the full intent expressed, and the other provisions of this Section 11 will remain in force and unmodified and will be enforced as written. Any court interpreting any restrictive covenant provision of this Section 11 will, if necessary, reform or modify any such provision to make it enforceable under applicable law.

(iii) *Entire Agreement*. This Section 11 embodies the complete agreement and understanding among the parties hereto and supersedes and preempts any prior understandings, discussions, agreements or representations by or among the parties hereto, written or oral, which may have related to the subject matter hereof. Notwithstanding the foregoing, this Section 11 is intended to, among other things, supplement (and not supersede) all applicable statutes protecting trade secrets and the duties Grantee owes to Lilly or any of the Lilly Group Companies under the common law, as well as any other written non-competition, non-solicitation, or confidentiality provisions that Grantee agreed to in the past, including those in Grantee's Employee Confidentiality and Invention Agreement and any Non-Compete Payment Agreement entered into between Grantee and Lilly (collectively, "Prior Agreements"), each of which remains in full force and effect, or that Grantee agrees to in writing in the future. To the extent of conflict between this Section 11 and any Prior Agreement, this Section 11 shall control.

(iv) *Amendment and Waiver*. This Section 11 may be amended, and any provision of this Section 11 may be waived, only by a written agreement executed and delivered by Lilly and Grantee. No course of dealing between or among the parties hereto shall be deemed effective to modify, amend or discharge any part of this Section 11 or any rights or obligations of any party hereto under or by reason of this Section 11.

(v) *Choice of Law*. Except as may be modified for Grantee as described in subsection 11.i. of this Award Agreement, this Section 11 will be interpreted and enforced in accordance with the laws of the State of Indiana, without giving effect to any choice-of-law or conflict-of-law principle that would cause the application of the substantive law of any jurisdiction other than Indiana. Grantee and Lilly agree that any legal action arising out of or relating to this Section 11 will be commenced and maintained exclusively before any state or federal court having

appropriate subject matter jurisdiction located in Indianapolis, Indiana; further, with respect to any such legal action, Grantee and Lilly hereby irrevocably consent and submit to the personal jurisdiction and venue of such courts located in Indianapolis, Indiana.

(vi) *Acknowledgements*. Grantee acknowledges and agrees that Grantee has been given at least fourteen (14) calendar days (or, if longer, ten (10) business days) from the date of Grantee's receipt of this Award Agreement (the "Consideration Period") to consider its terms. Grantee represents and warrants that, if Grantee accepts this Award Agreement before the expiration of the Consideration Period, Grantee has done so knowingly and voluntarily. Grantee also acknowledges and agrees that Grantee has read, understands and agrees with this Section 11, and that Grantee will faithfully comply with each term of this Section 11. Grantee further acknowledges that Grantee has been advised by Lilly to consult with an attorney before agreeing to this Section 11, and has had the opportunity to do so if desired.

(vii) *Declaration of Consent*. By accepting this Award and indicating consent via the Company's online acceptance procedure, Grantee is declaring that he or she agrees to this Section 11. No party hereto shall raise the use of the online acceptance procedure that any signature or document was transmitted or communicated through the use of an electronic device as a defense to the formation of a contract, and each such party forever waives any such defense.

## Section 12. Additional Terms and Conditions

a. Country-Specific Conditions. The Award shall be subject to any special terms and conditions set forth in any Appendix to this Award Agreement for the Grantee's country. Moreover, if the Grantee relocates to one of the countries included in the Appendix, the special terms and conditions for such country will apply to the Grantee, to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. The Appendix constitutes part of this Award Agreement.

b. Insider Trading/Market Abuse Laws. The Grantee may be subject to insider trading restrictions and/or market abuse laws in applicable jurisdictions, including but not limited to the United States and the Grantee's country of residence, which may affect the Grantee's ability to directly or indirectly, for the Grantee or for a third party, acquire or sell, or attempt to sell, or otherwise dispose of Shares and/or Fractional Shares or rights to acquire Shares and/or Fractional Shares (e.g., Restricted Stock Units) under the Plan during such times as the Grantee is considered to have "inside information" regarding the Company (as determined under the laws or

regulations in the applicable jurisdictions). Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under any applicable Company insider trading policy. The Grantee acknowledges that it is his or her responsibility to comply with any applicable restrictions, and the Grantee should consult with his or her personal legal advisor on this matter.

c. Imposition of Other Requirements. The Company reserves the right to impose other requirements on the Award and any Shares and/or other amounts acquired pursuant to this Award under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Grantee to execute any additional agreements or undertakings that may be necessary to accomplish the foregoing. Without limitation to the foregoing, the Grantee agrees that the Restricted Stock Unit Award and any benefits or proceeds the Grantee may receive hereunder shall be subject to forfeiture and/or repayment to the Company to the extent required to comply with any requirements imposed under Applicable Laws, any compensation recovery policy of the Company that reflects the provisions of Applicable Laws, or to the extent provided in any agreement between Grantee and the Company.

## Section 13. Governing Law and Choice of Venue

The validity, construction, and enforcement of this Award Agreement shall be governed by the laws of the State of Indiana, U.S.A. without regard to laws that might cause other law to govern under applicable principles of conflict of laws or cause the application of substantive law of any jurisdiction other than Indiana. For purposes of litigating any dispute that arises under this Award Agreement, the parties hereby submit to and consent to the jurisdiction and venue of the State of Indiana, and agree that such litigation shall be conducted exclusively in the courts having appropriate subject matter jurisdiction in Marion County, Indiana, or the federal courts for the United States for the Southern District of Indiana, and no other courts, where this Award is granted and/or to be performed.

## Section 14. Miscellaneous Provisions

a. Notices and Electronic Delivery and Participation. Any notice to be given by the Grantee or successor Grantee shall be in writing, and any notice shall be deemed to have been given or made only upon receipt thereof by the Corporate Secretary of Lilly at Lilly Corporate Center, Indianapolis, Indiana 46285, U.S.A. Any notice or communication by Lilly in writing shall be deemed to have been given in the case of the Grantee if mailed or delivered to the Grantee at any address specified in writing to Lilly by the Grantee and, in the case of any successor Grantee, at the address specified in writing to Lilly by the successor Grantee. In addition, Lilly may, in its sole discretion,

decide to deliver any documents related to the Award and participation in the Plan by electronic means or request the Grantee's consent to participate in the Plan by electronic means. By accepting this Award, the Grantee hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by Lilly or a third party designated by Lilly.

b. Language. The Grantee acknowledges that he or she is proficient in the English language, or has consulted with an advisor who is sufficiently proficient in English, so as to allow the Grantee to understand the terms and conditions of this Award Agreement. If the Grantee has received this Award Agreement or any other document related to the Plan translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control.

c. Waiver. The waiver by Lilly of any provision of this Award Agreement at any time or for any purpose shall not operate as or be construed to be a waiver of the same or any other provision of this Award Agreement at any subsequent time or for any other purpose.

d. Severability and Section Headings. If one or more of the provisions of this Award Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and the invalid, illegal or unenforceable provisions shall be deemed null and void; however, to the extent permissible by law, any provisions which could be deemed null and void shall first be construed, interpreted or revised retroactively to permit this Award Agreement to be construed so as to foster the intent of this Award Agreement and the Plan.

The section headings in this Award Agreement are for convenience of reference only and shall not be deemed a part of, or germane to, the interpretation or construction of this instrument.

e. No Advice Regarding Grant. Lilly is not providing any tax, legal or financial advice, nor is Lilly making any recommendations regarding the Grantee's participation in the Plan or the Grantee's acquisition or sale of the underlying Shares and/or other amounts acquired pursuant to this Award. The Grantee should consult with his or her own personal tax, legal and financial advisors regarding the Grantee's participation in the Plan before taking any action related to the Plan.

Section 15. Compensation Recovery

a. The Grantee agrees that this Award and any Shares or any other benefits or proceeds therefrom that the Grantee may receive hereunder shall be subject to forfeiture and/or repayment to the Company pursuant to (i) any recovery, recoupment, “clawback” or similar policy of the Company that is in effect as of the Grant Date and applicable to the Grantee, including but not limited to the Eli Lilly and Company Executive Compensation Recovery Policy, effective October 2, 2023, and (ii) any other such policy adopted by the Company after the Grant Date, to the extent required to comply with any requirements imposed under Applicable Laws and/or the rules and regulations of the securities exchange or inter-dealer quotation system on which the Shares are listed or quoted, or in the event of fraud, misconduct, violation of law or wrongdoing, in each case, as may be amended, restated, or superseded from time to time (with the provisions contained in such policy deemed incorporated into this Award Agreement without the Grantee’s additional or separate consent).

b. At any time during the three years following the date on which the number of Shares eligible to vest under this Award has been determined under Section 2 above, the Company reserves the right to and, in appropriate cases, will seek restitution of all or part of any Shares that have been issued or cash that has been paid pursuant to this Award if:

   i. (A) the number of Shares or the amount of the cash payment was calculated based, directly or indirectly, upon the achievement of financial results that were subsequently the subject of a restatement of all or a portion of the Company’s financial statements, (B) the Grantee engaged in intentional misconduct that caused or partially caused the need for such a restatement; and (C) the number of Shares or the amount of cash payment that would have been issued or paid to the Grantee had the financial results been properly reported would have been lower than the number of Shares actually issued or the amount of cash actually paid; or

   ii. the Grantee has been determined to have committed a material violation of law or Company policy or to have failed to properly manage or monitor the conduct of an employee who has committed a material violation of law or Company policy whereby, in either case, such misconduct causes significant harm to the Company.

Furthermore, in the event the number of Shares issued or cash paid pursuant to this Award is determined to have been based on materially inaccurate financial statements or other Company performance measures or

on calculation errors (without any misconduct on the part of the Grantee), the Company reserves the right to and, in appropriate cases, will (A) seek restitution of the Shares or cash paid pursuant to this Award to the extent that the number of Shares issued or the amount paid exceeded the number of Shares that would have been issued or the amount that would have been paid had the inaccuracy or error not occurred, or (B) issue additional Shares or make additional payment to the extent that the number of Shares issued or the amount paid was less than the correct amount.

c. For purposes of the foregoing, the Grantee expressly and explicitly authorizes the Company to issue instructions, on the Grantee's behalf, to any brokerage firm and/or third-party administrator engaged by the Company to hold any Shares and other amounts acquired pursuant to this Award to re-convey, transfer or otherwise return such Shares and/or other amounts acquired pursuant to this Award to the Company upon the Company's enforcement of this Section 15.

d. This Section 15 is not intended to limit the Company's power to take such action as it deems necessary to remedy any misconduct, prevent its reoccurrence and, if appropriate, based on all relevant facts and circumstances, punish the wrongdoer in a manner it deems appropriate

## Section 16. Award Subject to Acknowledgement of Acceptance

Notwithstanding any provisions of this Award Agreement, the Award is subject to acknowledgement of acceptance by the Grantee on or before [•], through the website of E*TRADE, the Company's stock plan administrator. If the Grantee does not acknowledge acceptance of the Award on or before [•], the Award will be cancelled, subject to the Committee's discretion for unforeseen circumstances.

IN WITNESS WHEREOF, Lilly has caused this Award Agreement to be executed in Indianapolis, Indiana, by its proper officer.

ELI LILLY AND COMPANY

By: ___________________________

# Appendix

# Eli Lilly and Company
# Amended and Restated 2002 Lilly Stock Plan
# Restricted Stock Unit Award Agreement
# (for Executive Officers and Executives)

This Appendix includes special terms and conditions applicable to the Grantee's country. These terms and conditions supplement or replace (as indicated) the terms and conditions set forth in the Award Agreement to which it is attached. If the Grantee is a citizen or resident of a country other than the one in which the Grantee is currently working and/or residing (or is considered as such for local law purposes), or if the Grantee transfers employment or residency to a different country after the Award is granted, Lilly will, in its discretion, determine the extent to which the terms and conditions herein will apply. This Appendix also includes other information relevant to the Award.

Unless otherwise defined herein, the terms defined in the Plan or the Award Agreement, as applicable, shall have the same meanings in this Appendix. Notwithstanding the foregoing, for purposes of this Appendix, "Share" shall mean a share of Common Stock and shall include any Fractional Share.

There are no special terms and conditions or information for the following countries:

Belgium

Germany

India

Japan

United State

However, the Grantee should be aware that he or she may be required to take certain steps to comply with Applicable Laws in the Grantee's country in connection with the Award. For example, exchange control, foreign asset and/or account and/or other tax reporting obligations may apply to the Grantee upon receipt of the Award or the Shares subject to the Award or upon the sale of Shares. *For more information regarding such obligations, the Grantee should refer to the Country-Specific Tax Supplement for the Grantee's country, if any*. *The Grantee should also consult with his or her own personal tax and legal advisors to determine what, if any, obligations exist with respect to the Award and/or the acquisition or sale of Shares. Neither the Company nor the Employer is responsible for any failure on the part of the Grantee to be aware of or comply with Applicable Laws.*

**Exhibit 19 — Eli Lilly Insider Trading Policy**

**This Policy Applies To:**

Directors, officers or employees of Eli Lilly and Company or its subsidiaries ("Lilly").

Any family members who live in the same home with you (including a spouse, child, stepchildren, grandchildren, parents, stepparents, grandparents, siblings, and in-laws) and/or is financially dependent on you or whose transactions in Lilly Securities are directed by you or subject to your influence or control.

Any entities that you influence or control, including any corporations, partnerships or trusts.

It is your responsibility to make sure that your family members and controlled entities comply with this policy. Lilly may also determine, in its sole discretion, that other persons should be subject to this policy, such as contractors or consultants who have access to material nonpublic information.

**General Requirements**

You must not use—or help others use—confidential information that you learn through your work to trade in the stock market or make other investment decisions. Doing so is prohibited by law and this Insider Trading Policy"). This includes profiting or avoiding losses when trading Eli Lilly and Company stock or other securities issued by Eli Lilly and Company like bonds or options ("Lilly Securities"). This policy goes beyond legal requirements, and Lilly may determine that specific conduct violates this Policy even if it does not violate the law. It is important to Lilly and you to avoid even the appearance of impropriety.

**Insider Trading Prohibitions**

The following actions violate this policy:

Lilly Securities. Except as expressly allowed by this policy, directly or indirectly purchase, sell, gift, or otherwise engage in any transactions involving any Lilly Securities (i) during any applicable blackout period, as described below, or (ii) while in possession of material non-public information.

Other Company Securities. Directly or indirectly purchase, sell, gift, or otherwise engage in any transactions involving the securities of another company with which Lilly has a relationship, either existing or proposed (such as a research, collaboration, or alliance partner, a supplier, a customer, or a company with which Lilly may be considering a transaction (collectively referred to as a business partner)), while in possession of material, non-public information about such business partner obtained in the course of your work for Lilly.

Tipping. Recommend to other persons or entities that they transact in Lilly Securities or securities of any business partner on the basis of material non-public information, or disclose material non-public information to anyone who may trade while aware of such information.

In addition, you are prohibited from assisting anyone engaged in the above activities.

**Confidentiality of Material Non-Public Information**

You have a duty to maintain the confidentiality of material non-public information, including keeping such information secure. You may only disclose material non-public information in accordance with Lilly policies to other employees and external parties who need to know it to perform their jobs and have an obligation to maintain its confidentiality.

**What is Material Information?**

Information is considered “material” if a reasonable investor would consider that information important in making a decision to buy, hold, or sell securities. Any information that could be expected to affect a company’s stock price, whether it is positive or negative, quantitative or qualitative, should be considered material. While it is not possible to define all categories of material information, some examples of information that ordinarily would be regarded as material are:

Financial results, including financial guidance or adjustments to financial disclosures;

Significant mergers, acquisitions, tender offers, joint ventures, or investments;

Changes in senior management or board composition;

Significant litigation or government investigations or intellectual property developments;

Certain product development milestones such as major clinical or open-label trial results;

FDA approvals or other major regulatory actions; and

Significant cybersecurity incidents.

**When is Information Non-Public?**

Information is considered “non-public” if it has not been widely disseminated to the general public, such as through a press release or in documents filed with the Securities and Exchange Commission. The circulation of rumors, even if accurate or reported in the media, does not constitute public dissemination.

Once information is widely disseminated, it is necessary to afford the investing public with sufficient time to absorb the information. As a general rule, information should not

be considered fully absorbed by the marketplace until one full trading day has passed after the information is publicly released. For example, if Lilly announces its quarterly earnings before trading begins on a Wednesday, the first time you can buy or sell Lilly Securities is the opening of the market on Thursday (assuming you are not aware of other material non-public information at that time).

**What Other Transactions are Prohibited?**

Because there is a heightened legal risk and/or appearance of improper or inappropriate conduct, you may not engage in the following:

- "sell short" Lilly Securities;
- trade in publicly traded options known as "puts" and "calls" involving Lilly Securities;
- engage in hedging transactions in Lilly Securities (such as prepaid variable forward contracts, equity swaps, collars or exchange funds);
- hold, or trade on, Lilly Securities in margin accounts;
- pledge Lilly Securities as collateral for any loans;
- engage in short sales or buy or sell puts or calls on the securities of a significant business partner; or
- place standing and limit orders with a broker to buy or sell Lilly Securities that have a duration in excess of three business days.

Other Transactions

The prohibition on trading set forth above does not apply to the transactions listed below, except as specifically noted in the paragraphs below. Please note, however, that individuals required to comply with Lilly's Pre-Clearance Policy must seek pre-clearance as applicable:

- <u>Mutual Funds or Broad-Based Indices</u>. Interests in mutual funds or similar broad-based indices, provided they are not concentrated in Lilly Securities or the securities of other pharmaceutical companies.
- <u>Compensation-Related Vesting/Exercises</u>. The (i) vesting of restricted stock or settlement of performance stock units, including the automatic deduction of shares by Lilly from your account for tax withholding or (ii) exercise of Lilly stock options when the exercise price and any related taxes are paid in cash or satisfied through share withholding; provided, however, that any open-market sale of shares (whether of vested shares or cashless option exercises) remains subject to this policy.
- <u>Transfer without Ownership Change</u>. Transfers of securities that do not change beneficial ownership, such as to an inter vivos trust where you remain the sole beneficiary.

Dividend Reinvestment Plan. Automatic reinvestment of dividends under a dividend reinvestment plan. However, the initial election to participate in the plan, changes to participation levels in the plan, as well as the sale of Lilly Securities purchased pursuant to the plan remain subject to this policy.

401(k) Plan. Purchases of Lilly Securities through regular payroll contributions to a Lilly 401(k) plan. However, this policy does apply to other transactions involving the Lilly stock fund within your 401(k) (e.g., changes in contribution allocations to the Lilly stock fund within your 401(k).

In addition, you may utilize a 10b5-1 Plan to effect certain transactions. Rule 10b5-1 under the Exchange Act provides a defense from insider trading liability provided that you enter into a qualifying plan. If the plan meets the requirements of Rule 10b5-1, transactions in Lilly Securities may occur even when the person who has entered into the plan later becomes aware of material nonpublic information. If you enter into a 10b5-1 plan, your plan must comply with Lilly's 10b5-1 Plan Transactions Policy.

**Blackout Periods.**

Lilly Directors, executive officers and any employees who have been identified by the Office of the Corporate Secretary as designated insiders (including their family members or controlled entities, as described above) ("**Designated Insiders**") may not conduct any transactions involving Lilly Securities during Lilly's regularly scheduled quarterly blackout periods. Designated Insiders generally include Lilly Directors, executive officers, employees with access to SAP/COR, M4/P6+ Finance employees, and certain key employees involved in the quarterly earnings process identified by the Office of the Corporate Secretary.

Lilly's quarterly blackout periods generally start on the 15th of the last month of the first, second, and third quarters and on December 1st of the fourth quarter, and end one full trading day following Lilly's issuance of its quarterly earnings release. The exact dates will vary each year, but for illustrative purposes, they will be approximately:

March 15 to April 28
June 15 to August 4
September 15 to October 28
December 1 to January 30

In addition, Lilly may from time to time impose additional, event-specific blackout periods related to matters that may be considered material. The existence of an event-specific blackout period will not be announced to the company as a whole and should not be communicated to any other individuals.

Even if you have not been notified that you are a Designated Insider or subject to an event-specific blackout period, you are still prohibited from trading if you are aware of material non-public information.

**What are the Consequences of Violating this Policy?**

Insider trading violations are pursued vigorously by authorities around the world. The penalties for unlawful insider trading or tipping are severe and can include repayment of profits gained or losses avoided, significant fines, and imprisonment. In addition, failure to comply with this policy may result in company-imposed sanctions, up to and including dismissal for cause. Lilly may alert appropriate authorities as it deems appropriate.

Remember, anyone scrutinizing your transactions will be doing so after the fact, with the benefit of hindsight. As a practical matter, before engaging in any transaction, you should carefully consider how enforcement authorities and others might view the transaction in hindsight.

**Post-Lilly Employment Transactions:**

If you are in possession of material non-public information when you leave Lilly, you may not trade in Lilly Securities until that information has become public or is no longer material.

In addition, if you are subject to a quarterly or event-specific trading restriction under this policy at the time you cease to be affiliated with Lilly, you are expected to abide by the applicable trading restrictions until at least the end of the applicable trading restriction.

**Pre-Clearance Policy and Rule 10b5-1 Plan Transactions Policy:**

Certain Lilly employees are also subject to the *Pre-Clearance Policy* and the *Rule 10b5-1 Plan Transactions Policy*. Lilly's directors, executive officers and Chief Accounting Officer remain subject to the Pre-Clearance Policy for six months following the termination of their service to Lilly.

**Individual Responsibility**

You are responsible for making sure that you comply with this policy and for making sure that any family members or controlled entities also comply with this policy. In all cases, the responsibility for determining whether you are possession of material non-public information rests with you, and any action on the part of Lilly or Lilly's legal counsel does not in any way constitute legal advice or insulate you from liability under applicable securities laws.

If you have any questions about this Trading Procedure, its application to any proposed transaction, or whether information constitutes material non-public information, you may obtain additional guidance from the Office of the Corporate Secretary, reachable at CSO_Trading_Procedure@lists.lilly.com.

| | |
|---|---|
| Owner: | Executive Vice President, General Counsel and Secretary |
| Approver: | Policy Subcommittee |

**Exhibit 21 — List of Subsidiaries & Affiliates**

**The following are subsidiaries and affiliated companies of Eli Lilly and Company at December 31, 2025. Certain subsidiaries have been omitted as they are not significant in the aggregate.**

| | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Adverum Biotechnologies, Inc. | Delaware |
| Adverum NC, LLC | Delaware |
| Akouos, Inc. | Delaware |
| Alnara Pharmaceuticals, Inc. | Delaware |
| Annapurna Therapeutics, Ltd. | Ireland |
| Aparito Espanya S.L. | Spain |
| Aparito Limited | United Kingdom |
| Aparito LLC | Delaware |
| ARMO Biosciences, Inc. | Delaware |
| Avalanche Australia Pty Ltd. | Australia |
| Avid Radiopharmaceuticals, Inc. | Delaware |
| CoLucid Pharmaceuticals, Inc. | Delaware |
| Compania Farmaceutica Eli Lilly de Centro America S.A. | Guatemala |
| CPD 4, Inc. | Delaware |
| Dermira, Inc. | Delaware |
| DICE Alpha Inc. | Delaware |
| DICE Molecules SV, Inc. | Delaware |
| DICE Therapeutics, Inc. | Delaware |
| Disarm Therapeutics Inc. | Delaware |
| Dista Ilac Ticaret Limited Sirketi | Turkey |
| Dista, S.A. | Spain |
| Dista-Produtos Quimicos & Farmaceuticos, LDA | Portugal |
| ELC EHS, LLC | Indiana |
| ELCO Dominicana S.R.L. | Dominican Republic |
| ELCO for Trading and Marketing, S.A.E. | Egypt |
| ELCO Insurance Company Limited | Bermuda |
| ELCO Management, Inc. | Delaware |
| ELGO Insurance Company Limited | Bermuda |
| Eli Lilly (Malaysia) Sdn. Bhd. | Malaysia |
| Eli Lilly (Philippines), Incorporated | Philippines |
| Eli Lilly (S.A.) (Proprietary) Limited | South Africa |
| Eli Lilly (Singapore) Pte. Ltd. | Singapore |
| Eli Lilly (Suisse) S.A. | Switzerland |
| Eli Lilly and Company (India) Pvt. Ltd. | India |
| Eli Lilly and Company (Ireland) Limited | Ireland |
| Eli Lilly and Company (N.Z.) Limited | New Zealand |
| Eli Lilly and Company (Taiwan), Inc. | Taiwan |
| Eli Lilly and Company Limited | United Kingdom |
| Eli Lilly Asia Pacific SSC Sdn Bhd | Malaysia |
| Eli Lilly Asia, Inc. | Delaware |
| Eli Lilly Australia Pty. Limited | Australia |

| | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Eli Lilly Benelux S.A. | Belgium |
| Eli Lilly B-H d.o.o. | Bosnia |
| Eli Lilly Bienes y Servicios S. de R.L. de C.V. | Mexico |
| Eli Lilly Canada Inc. | Canada |
| Eli Lilly Clinical Diagnostics Laboratory LLC | Indiana |
| Eli Lilly Cork Limited | Ireland |
| Eli Lilly CR s.r.o. | Czech Republic |
| Eli Lilly Danmark A/S | Denmark |
| Eli Lilly de Costa Rica, S.R.L. | Costa Rica |
| Eli Lilly do Brasil Limitada | Brazil |
| Eli Lilly Drug Store LLC | United Arab Emirates |
| Eli Lilly Egypt for Trading Company S.A.E. | Egypt |
| Eli Lilly European Clinical Trial Services S.A. | Belgium |
| Eli Lilly Export S.A. | Switzerland |
| Eli Lilly farmacevtska druzba, d.o.o. | Slovenia |
| Eli Lilly Finance, S.A. | Switzerland |
| Eli Lilly Ges.m.b.H. | Austria |
| Eli Lilly Group Limited | United Kingdom |
| Eli Lilly Hrvatska d.o.o. | Croatia |
| Eli Lilly Interamerica Inc., y Compania Limitada | Chile |
| Eli Lilly Interamerica, Inc. | Indiana |
| Eli Lilly International Corporation | Indiana |
| Eli Lilly Ireland Holdings Limited | Ireland |
| Eli Lilly Israel Ltd. | Israel |
| Eli Lilly Italia S.p.A. | Italy |
| Eli Lilly Japan K.K. | Japan |
| Eli Lilly Kinsale Limited | Ireland |
| Eli Lilly Nederland B.V. | Netherlands |
| Eli Lilly Norge A.S. | Norway |
| Eli Lilly Pakistan (Pvt.) Ltd. | Pakistan |
| Eli Lilly Polska Sp. z.o.o. (Ltd.) | Poland |
| Eli Lilly Regional Operations GmbH | Austria |
| Eli Lilly Romania S.R.L. | Romania |
| Eli Lilly S.A. | Switzerland |
| Eli Lilly Saudi Arabia Limited | Saudi Arabia |
| Eli Lilly Services India Private Limited | India |
| Eli Lilly Services Peru S.A.C | Peru |
| Eli Lilly Slovakia s.r.o. | Slovakia |
| Eli Lilly Sweden AB | Sweden |
| Eli Lilly Vostok S.A. | Switzerland |
| Eli Lilly y Compania de Mexico, S.A. de C.V. | Mexico |
| Eli Lilly y Compania de Venezuela, S.A. | Venezuela |
| Emergence Therapeutics France SAS | France |
| Glycostasis, Inc. | Delaware |
| Greenfield-Produtos Farmaceuticos, Lda. | Portugal |

| | State or Jurisdiction of Incorporation or Organization |
|---|---|
| ICOS Corporation | Washington |
| ImClone LLC | Delaware |
| ImClone Systems Holdings, Inc. | Delaware |
| Irisfarma S.A. | Spain |
| Isopro Holdings LLC | Delaware |
| LDH I Corporation | Delaware |
| LDH II Corporation | Delaware |
| LDH III Corporation | Delaware |
| LDH IV Corporation | Delaware |
| LDH V 2023 Corporation | Delaware |
| LDH VI Corporation | Delaware |
| LDH VII Corporation | Delaware |
| LDH VIII Corporation | Delaware |
| Lilly (Beijing) Medical Tech Innovation Co., Ltd. | China |
| Lilly (Shanghai) Management Co., Ltd. | China |
| Lilly Asia Ventures Fund I, L.P. | Cayman Islands |
| Lilly Asia Ventures Fund II, L.P. | Cayman Islands |
| Lilly Asian Ventures Fund III, L.P. | Cayman Islands |
| Lilly Cayman Holdings | Cayman Islands |
| Lilly Centre for Clinical Pharmacology PTE. LTD. | Singapore |
| Lilly China Research and Development Co., Ltd | China |
| Lilly del Caribe, Inc. | Cayman Islands |
| Lilly Deutschland GmbH | Germany |
| Lilly France S.A.S. | France |
| Lilly Global Nederland Holdings B.V. | Netherlands |
| Lilly Global Services, Inc. | Indiana |
| Lilly Holding GmbH | Germany |
| Lilly Holdings B.V. | Netherlands |
| Lilly Hungaria KFT | Hungary |
| Lilly Ilac Ticaret Limited Sirketi | Turkey |
| Lilly Japan Financing G.K. | Japan |
| Lilly Korea Ltd. | Korea |
| Lilly Lebanon Advanced Therapies LLC | Indiana |
| Lilly Nederland Finance B.V. | Netherlands |
| Lilly Nederland Holding B.V. | Netherlands |
| Lilly Pharma Ltd. | Russia |
| Lilly Portugal - Produtos Farmaceuticos, Lda. | Portugal |
| Lilly S.A. | Spain |
| Lilly Suzhou Pharmaceutical Co. Ltd. | China |
| Lilly Trading Co. LTD | China |
| Lilly USA, LLC | Indiana |
| Lilly Ventures Fund I LLC | Delaware |
| LillyDirect Pharmacy, LLC | Delaware |
| Loxo Oncology, Inc. | Delaware |
| Mablink Bioscience S.A.S. | France |

| | State or Jurisdiction of Incorporation or Organization |
|---|---|
| Manet Holdings LLC | Delaware |
| Morphic Holding, Inc. | Delaware |
| Morphic Therapeutic UK Ltd. | United Kingdom |
| Morphic Therapeutic, Inc. | Delaware |
| NexPharm Parent Holdco, LLC | Delaware |
| OY Eli Lilly Finland AB | Finland |
| Pandinus MSC, Inc. | Massachusetts |
| Petra Pharma Corporation | Delaware |
| Pharmaserve-Lilly S.A.C.I. | Greece |
| Point Biopharma Corp. | Canada |
| Point Biopharma Global Inc. | Delaware |
| Point Biopharma Inc. | Delaware |
| Point Biopharma USA Inc. | Delaware |
| Prevail Therapeutics Inc. | Delaware |
| Protomer Technologies, Inc. | Delaware |
| Scorpion Therapeutics, Inc. | Delaware |
| SGX Pharmaceuticals, Inc. | Delaware |
| Sigilon Therapeutics Inc. | Delaware |
| SiteOne Therapeutics, Inc. | Delaware |
| Spaly Bioquimica, S.A. | Spain |
| UAB Eli Lilly Lietuva | Lithuania |
| Valquifarma, S.A. | Spain |
| Versanis Bio Australia PTY LTD | Australia |
| Versanis Bio, Inc. | Delaware |
| Verve Therapeutics, Inc. | Delaware |
| Victoria Holdco Corp. | Delaware |
| Vitalfarma - Produtos Farmaceuticos, Lda. | Portugal |

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statements (Form S-3 ASR No. 333-285052; and Form S-8 Nos. 333-104057, 333-172422, 333-258801, and 333-258803) of Eli Lilly and Company and in the related Prospectus of our reports dated February 12, 2026, with respect to the consolidated financial statements of Eli Lilly and Company and subsidiaries, and the effectiveness of internal control over financial reporting of Eli Lilly and Company and subsidiaries, included in this Annual Report (Form 10-K) for the year ended December 31, 2025.

/s/ Ernst & Young LLP

Indianapolis, Indiana

February 12, 2026

**Exhibit 24**

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Anat Hakim, Lucas Montarce, and Donald Zakrowski, and each of them, his or her true and lawful attorneys-in-fact and agents, each acting alone, with full power of substitution and resubstitution, to sign, execute and file with the Securities and Exchange Commission (or any other governmental or regulatory authority), for us and in our names in the capacities indicated below, an Annual Report on Form 10-K for the year ended December 31, 2025 for Eli Lilly and Company, and any and all amendments thereto, with all exhibits and any and all documents required to be filed with respect thereto, granting unto said attorneys-in-fact and agents and each of them, full power and authority to do and to perform each and every act and thing necessary or desirable to be done in and about the premises in order to effectuate the same as fully to all intents and purposes as he or she might or could do if personally present, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have executed this Power of Attorney to be effective as of February 10, 2026.

| Signature | Title |
|---|---|
| /s/ Ralph Alvarez<br>RALPH ALVAREZ | Director |
| /s/ Katherine Baicker, Ph.D.<br>KATHERINE BAICKER, Ph.D. | Director |
| /s/ Carolyn Bertozzi, Ph.D.<br>CAROLYN BERTOZZI, Ph.D. | Director |
| /s/ Erik Fyrwald<br>ERIK FYRWALD | Director |
| /s/ Mary Lynne Hedley, Ph.D.<br>MARY LYNNE HEDLEY, Ph.D. | Director |
| /s/ Jamere Jackson<br>JAMERE JACKSON | Director |
| /s/ Kimberly Johnson<br>KIMBERLY JOHNSON | Director |
| /s/ William Kaelin, Jr., M.D.<br>WILLIAM KAELIN, JR., M.D. | Director |
| /s/ Juan Luciano<br>JUAN LUCIANO | Director |
| /s/ Jon Moeller<br>JON MOELLER | Director |
| /s/ Gabrielle Sulzberger<br>GABRIELLE SULZBERGER | Director |

**EXHIBIT 31.1 Rule 13a-14(a) Certification of David Ricks, Chair, President, and Chief Executive Officer**

**CERTIFICATIONS**

I, David Ricks, Chair, President, and Chief Executive Officer, certify that:

1. I have reviewed this report on Form 10-K of Eli Lilly and Company;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and
    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 12, 2026

By: /s/ David Ricks
David Ricks
Chair, President, and Chief Executive Officer

**EXHIBIT 31.2 Rule 13a-14(a) Certification of Lucas Montarce, Executive Vice President and Chief Financial Officer**

**CERTIFICATIONS**

I, Lucas Montarce, Executive Vice President and Chief Financial Officer, certify that:

1. I have reviewed this report on Form 10-K of Eli Lilly and Company;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and
    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 12, 2026

By: /s/ Lucas Montarce

Lucas Montarce
Executive Vice President and Chief Financial Officer

**EXHIBIT 32 Section 1350 Certification**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of Eli Lilly and Company, an Indiana corporation (the Company), does hereby certify that, to the best of their knowledge:

The Annual Report on Form 10-K for the year ended December 31, 2025 (the Form 10-K) of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 12, 2026

/s/ David Ricks
David Ricks
Chair, President, and Chief Executive Officer

Date: February 12, 2026

/s/ Lucas Montarce
Lucas Montarce
Executive Vice President and
Chief Financial Officer