**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

MARY HITCHCOCK MEMORIAL HOSPITAL,

Plaintiff,

v.

ELI LILLY AND COMPANY,

Defendant.

Case No. 1:26-cv-00616

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**INTRODUCTION** ..... **1**

**BACKGROUND** ..... **5**

A. Legal Background ..... 5

B. Factual Background ..... 11

**ARGUMENT** ..... **15**

I. MHMH Cannot Establish Irreparable Harm For Claims Entirely About Purported Money Damages ..... 16

II. MHMH Is Unlikely To Succeed on the Merits ..... 20

A. *Astra* Bars MHMH's Claims. ..... 20

B. Section 340B Preempts MHMH's Claims. ..... 24

1. MHMH's Claims Conflict with Federal Law. ..... 24

2. MHMH's Claims Intrude Into an Exclusively Federal Field Created by Congress. ..... 28

3. The Intergovernmental Immunity Doctrine Bars MHMH's Claims. ..... 30

C. MHMH's Claims Are Unlikely to Succeed on Their Own Terms. ..... 31

1. MHMH's Vermont Law Claim Does Not Apply in New Hampshire (Count I). ..... 31

2. MHMH Fails to Clearly Show a Violation of New Hampshire's Consumer Protection Act (Count II). ..... 33

3. MHMH's Contract Claims (Counts III and IV) Fail to Allege an Enforceable Contract or Any Breach. ..... 38

4. MHMH Has Not Clearly Shown Any Unjust Enrichment (Count V). ..... 40

III. The Balance of the Equities And The Public Interest Do Not Favor An Injunction. ..... 41

IV. No Injunction Could Issue Without a Bond. ..... 44

**CONCLUSION** ..... **45**

**CERTIFICATE OF SERVICE** ..... **47**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Drummond*,
808 F. Supp. 3d 1266 (W.D. Okla. 2025) .......... 7, 8, 27, 39, 42, 43

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*,
957 F. Supp. 1308 (S.D.N.Y. 1997) .......... 35

*ACAS Acquisitions (Precitech) Inc. v. Hobert*,
923 A.2d 1076 (N.H. 2007) .......... 36

*AIDS Healthcare Found. v. Apexus, LLC*,
2024 WL 3886974 (9th Cir. Aug. 21, 2024) .......... 22

*American Hospital Ass'n v. HHS*,
2021 WL 616323 (N.D. Cal. Feb. 17, 2021) .......... 21, 22

*Archdiocese of San Salvador v. FM Int'l, LLC*,
2006 WL 437493 (D.N.H. Feb. 23, 2006) .......... 35

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 24, 25, 26, 29

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) .......... *passim*

*Barrows v. Boles*,
687 A.2d 979 (N.H. 1996) .......... 37

*Benisek v. Lamone*,
585 U.S. 155 (2018) .......... 20

*Bigelow v. Virginia*,
421 U.S. 809 (1975) .......... 32

*In re Blaisdell*,
261 A.3d 306 (N.H. 2021) .......... 32

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) .......... 34

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*,
996 F.3d 37 (1st Cir. 2021) .......... 20

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*,
622 F.3d 36 (1st Cir. 2010) ....................15, 16

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ....................24, 25

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ....................16

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
48 F.3d 618 (1st Cir. 1995) ....................17

*Cohen v. Bos. Sci. Corp.*,
725 F. Supp. 3d 144 (D.N.H. 2024) ....................35

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ....................25

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S. 212 (2022) ....................5

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) ....................3

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) (per curiam) ....................18

*DiCroce v. McNeil Nutritionals, LLC*,
82 F.4th 35 (1st Cir. 2023) ....................25

*Eli Lilly & Co. v. Kennedy*,
2025 WL 1423630 (D.D.C. Apr. 18, 2025) ....................3, 8

*Eli Lilly & Co. v. U.S. Dep't of Health & Hum. Servs.*,
2021 WL 5039566 (S.D. Ind. Oct. 29, 2021) ....................10

*Emseal Joint Sys., Ltd. v. Schul Int'l Co., LLC*,
2018 WL 3733939 (D.N.H. Aug. 6, 2018) ....................25

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ....................29

*Est. of Mortner v. Thompson*,
182 A.3d 1260 (N.H. 2018) ....................41

*Estes v. ECMC Group, Inc.*,
565 F. Supp. 3d 289 (D.N.H. 2020) ....................37

*Fat Bullies Farm, LLC v. Devenport*,
164 A.3d 990 (N.H. 2017) ....................................................33, 37, 38

*Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc.*,
2012 WL 27917 (D.N.H. Jan. 5, 2012)....................................................39

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000)....................................................25

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*,
925 F.2d 6 (1st Cir. 1991)....................................................44

*J & M Lumber & Const. Co. v. Smyjunas*,
20 A.3d 947 (N.H. 2011) ....................................................40

*Kelton v. Hollis Ranch, LLC*,
927 A.2d 1243 (N.H. 2007) ....................................................34

*In re Klein*,
648 B.R. 228 (Bankr. D. Neb. 2022) ....................................................42

*Landor v. Louisiana Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026)....................................................27

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
469 U.S. 256 (1985)....................................................26

*M'Culloch v. Maryland*,
17 U.S. 316 (1819)....................................................30

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
367 F.3d 68 (1st Cir. 2004)....................................................16, 18

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (per curiam)....................................................3

*Me. Forest Prods. Council v. Cormier*,
51 F.4th 1 (1st Cir. 2022)....................................................24, 26

*Morales v. Hanks*,
2025 WL 337591 (D.N.H. Jan. 30, 2025)....................................................16

*Nat'l Head Start Ass'n v. Dep't of Health & Hum. Servs.*,
297 F. Supp. 2d 242 (D.D.C. 2004)....................................................42

*New York Life Ins. Co. v. Head*,
234 U.S. 149 (1914)....................................................32

*Kerwin ex rel NLRB v. Trinity Health Grand Haven Hosp.*,
174 F.4th 942 (6th Cir. 2026) ....................20

*Novartis Pharms. Corp. v. Espinosa*,
2021 WL 5161783 (D.D.C. Nov. 5, 2021) ....................8, 9, 28

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024).................... *passim*

*PCS Wireless LLC v. A to Z Wireless Sols. Inc.*,
841 F. Supp. 2d 649 (E.D.N.Y. 2012) ....................35

*PhRMA v. Morrisey*,
760 F. Supp. 3d 439 (S.D. W. Va. 2025)....................27, 39

*R&G Props., Inc. v. Column Fin., Inc.*,
968 A.2d 286 (Vt. 2008)....................32

*Sampson v. Murray*,
415 U.S. 61 (1974)....................16, 17

*Sagebrush Health Servs. v. Amgen Inc.*,
2026 WL 1030817 (C.D. Cal. Apr. 15, 2026) ....................21, 23, 24

*San Francisco Real Est. Invs. v. Real Est. Inv. Tr. of Am.*,
692 F.2d 814 (1st Cir. 1982)....................18

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) ....................2, 10, 31, 39

*Schneidewind v. ANR Pipeline Co.*,
485 U.S. 293 (1988)....................30

*Smith v. F.W. Morse & Co.*,
76 F.3d 413 (1st Cir. 1996)....................39

*SPGGC, LLC v. Ayotte*,
443 F. Supp. 2d 197 (D.N.H. 2006)....................28

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024)....................3, 15, 42

*State v. Biden*,
10 F.4th 538 (5th Cir. 2021) ....................18

*State v. Priceline.com, Inc.*,
206 A.3d 333 (N.H. 2019) ....................33, 36

*SW Indus., Inc. v. Aetna Cas. & Sur. Co.*,
646 F. Supp. 819 (D.R.I. 1986)....................16

*Syncom Indus., Inc. v. Wood*,
920 A.2d 1178 (N.H. 2007)....................38

*U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*,
889 F.2d 1327 (4th Cir. 1989)....................42

*In re TelexFree Sec. Litig.*,
2021 WL 11604879 (D. Mass. Apr. 21, 2021)....................17

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affs.*,
60 F.3d 867 (1st Cir. 1995)....................43

*Thomas v. Warden, FCI Berlin*,
596 F. Supp. 3d 331 (D.N.H. 2022)....................16

*Trump v. CASA*,
606 U.S. 831 (2025)....................44

*United States v. Isler*,
429 F.3d 19 (1st Cir. 2005)....................19, 20

*United States v. Washington*,
596 U.S. 832 (2022)....................30

*U.S. ex rel. Adventist Health Sys. of W. v. AbbVie Inc.*,
169 F.4th 1137 (9th Cir. 2026)....................23, 24

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
645 F.3d 26 (1st Cir. 2011)....................3

*Winter v. Nat'l Res. Def. Council*,
555 U.S. 7 (2008)....................17, 42

*Wreal, LLC v. Amazon.com, Inc.*,
840 F.3d 1244 (11th Cir. 2016)....................16

**Constitutional Provisions and Statutes**

U.S. Const. art. VI, cl. 2....................24

42 U.S.C. § 256b.................... *passim*

N.H. Rev. Stat. Ann. § 358-A:2....................33, 34, 35

N.H. Rev. Stat. Ann. § 382-A:2-201....................39

Vt. Stat. Ann. § 4682 ....................31

Vt. Stat. Ann. § 4684(a) ....................32, 33

**Rules**

Fed. R. Civ. P. 9(b) ....................35

Fed. R. Civ. P. 65(c) ....................44

**Regulations and Legislative Material**

42 C.F.R. § 10.21(a)(1) ....................6, 7, 26, 29

59 Fed. Reg. 25,110 (May 13, 1994) ....................2, 35

61 Fed. Reg. 65,406 (Dec. 12, 1996) ....................7, 27, 29, 43

85 Fed. Reg. 80,632 (Dec. 14, 2020) ....................6

89 Fed. Reg. 28,643 (Apr. 19, 2024) ....................6

91 Fed. Reg. 35,989 (June 15, 2026) ....................11

91 Fed. Reg. 48,883 (Aug. 3, 2026).................... *passim*

Centers for Medicare and Medicaid Services, Medicare Drug Pricing Negotiation Final Guidance (Sept. 30, 2025), https://tinyurl.com/CMSFinalGuidance ....................10

H.R. Rep. No. 102-384, pt. II (1992) ....................5

N.H. S. Journal, 169th N.H. Gen. Ct. 147 (Mar. 6, 2025) ....................36

S.B. 253, 169th N.H. Gen. Ct. (2025) ....................36

**Treatises**

Restatement (Second) of Contracts § 33(1) (Am. L. Inst. 1981) ....................38

## INTRODUCTION

Mary Hitchcock Memorial Hospital, a billion-dollar enterprise affiliated with one of the nation's wealthiest private universities, seeks to use *state law* to force Lilly to sell its medicines at *federally mandated* discounts on terms that MHMH prefers. It makes this request for extraordinary relief without showing any imminent, irreparable harm, and without a clear showing of likely success on the merits. The Motion should be denied.

MHMH's complaint centers on the federal 340B program—a federal drug-discount program that the Secretary of Health and Human Services ("HHS") testified "has become a boondoggle" rife with abuse.[1] The 340B program is a creation of federal statute, 42 U.S.C. § 256b. It requires manufacturers that want their medicines to be reimbursed under Medicare and Medicaid to enter into an agreement with HHS. Under these agreements, manufacturers must "offer" their medicines to certain specified providers designated by Congress ("covered entities") at federally mandated reduced prices, sometimes as little as a penny. 42 U.S.C. § 256b(a)(1). Congress wanted these 340B discounts to help needy patients. But federal law does not require covered entities (including MHMH) to pass on discounts to patients, so they typically charge patients and their insurers the *full* price of the medicine, pocketing the "spread" as profit. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 457 (D.C. Cir. 2024). That arbitrage opportunity unsurprisingly has led to "exponential growth" of the 340B program. Notice Regarding 340B Rebate Model Pilot Program, 91 Fed. Reg. 48,883, 48,886-87 (Aug. 3, 2026). It has ballooned from a "few" safety-net providers to "large hospital systems and extensive networks," *id.*, with $100 billion in annual 340B purchases, making it the second largest federal drug program. HRSA, *2025 340B Covered Entity*

[1] *Hearing on the Fiscal Year 2027 HHS Budget Before the H. Comm. on Energy & Commerce*, 119th Cong. at 1:20:59-1:22:55 (YouTube Apr. 21, 2026) (testimony of Robert F. Kennedy, Jr., Secretary of Health and Human Services), https://tinyurl.com/4rcvk2st.

*Purchases*, https://tinyurl.com/340BPurchases. As a result, "program integrity [is] a growing risk." 91 Fed. Reg. at 48,887.

The mutation from limited safety-net program to "boondoggle" led numerous manufacturers to add common-sense terms and conditions to their 340B federal-pricing offers. Lilly's 340B offer includes a basic transparency condition: To accept the offer for sales at the federal 340B discount, covered entities must provide a limited set of claims data. Claims data do not identify any patients, but show basic information about a prescription (for example, what medicine was dispensed, in what volume, on what date) that healthcare providers collect and submit to other third parties—including state Medicaid agencies and private insurers—to obtain payments and reimbursements. Asay Decl. ¶¶ 15-16, 36-39, 47; Taddei-Allen Decl. ("TA Decl.") ¶¶ 14, 20-42. Covered entities already routinely collect this information. *Id.* Lilly simply conditions its federal 340B offer on receiving some of the same data so it can ensure discounts are not duplicated, and ultimately comply with other competing federal obligations.

Two federal courts of appeals have upheld such "reasonable conditions"—including claims-data conditions—on federal 340B offers. *Novartis*, 102 F.4th at 461; *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023).[2] Since those cases, Lilly has regularly disclosed to HHS the terms of its federal 340B offers. Far from objecting to Lilly's terms and conditions, HHS *affirmatively adopted the same requirement* in the related context of HHS's 340B rebate pilot program—mandating covered entities provide the same claims data (and more) for participating manufacturers. TA Decl. ¶¶ 30-35, 40. Indeed, HHS has explained for *decades* that manufacturers may request "standard information" like claims data from covered entities, *Novartis*, 102 F.4th at 463 (quoting 59 Fed. Reg. 25,110, 25,114 (May 13, 1994)). And the agency has reiterated in recent

[2] All emphases added, alterations adopted, and quotations and citations omitted unless noted.

litigation that manufacturers can "requir[e] covered entities to submit" claims data through their offers for 340B pricing. *See, e.g.*, Defs' Reply in Support of Cross-Mot. for Summ. J. at 12, *Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630 (D.D.C. Apr. 18, 2025) (No. 24-cv-3220), ECF No. 47. In other words, federal courts and the agency responsible for administering the 340B program agree that offer conditions like Lilly's are lawful.

Unsurprisingly, most covered entities have accepted Lilly's offer by submitting the basic information requested. MHMH has not. Instead, it asks this Court for "extraordinary and drastic" emergency relief, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam), that would overrule two federal courts and the federal agency overseeing the 340B program by enjoining Lilly from conditioning its offer on receipt of claims data. But "[a] preliminary injunction is not a shortcut to the merits." *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 197 (3d Cir. 2024). It is reserved for the rare case in which intervention "is essential" to prevent imminent irreparable harm for a plaintiff likely to succeed on the merits. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). This case fails on every prong.

To start, MHMH fails to make a "clear showing" of imminent "irreparable harm." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). MHMH's complaint is entirely about money: It wants the discounted federal 340B price but without Lilly's terms. Even if Lilly's terms were improper (they are not), MHMH's harm is merely the price difference (in HHS's parlance, an overcharge), which is money damages, not irreparable harm. Last year, MHMH took in $2.6 billion in revenue, with $152 million in profit, and most recently reported over a billion dollars in net assets. *See infra* n.15. MHMH offers no credible evidence that the money it claims is at stake here—up to $4.7 million over a year if refusing Lilly's terms (less than two-tenths of one percent

of its annual revenue)—would be ruinous to pay. Thomasset Decl. ¶ 66. And the much lower cost of *compliance* is trivial: even accepting MHMH's inflated estimate, it means hiring a *single* new employee to comply with Lilly's terms. Damages are plainly an adequate remedy.

Given the complete lack of irreparable harm, this Court need not even reach the merits. But MHMH's smorgasbord of state law claims also are destined to fail. Crucially, MHMH cannot use this lawsuit to enforce the 340B statute: "[S]uits to enforce § 340B" federal-pricing requirements "are incompatible with the [340B] statutory regime," as any enforcement belongs with HHS, "[n]o matter the clothing" of the cause of action. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113-14 (2011). And the U.S. Constitution's Supremacy Clause preempts MHMH's effort to use state law to interfere with the exclusively federal 340B program in multiple other ways. But even on their own terms, MHMH's claims strain credulity. MHMH seeks to import facially-inapplicable Vermont law into New Hampshire—despite the New Hampshire legislature expressly rejecting the very same claims-data prohibition MHMH relies on. And MHMH asserts Lilly and MHMH (both sophisticated, billion-dollar companies) somehow agreed to an amorphous oral contract—without providing any specifics on when, where, and how that contract was entered into. Compl. ¶¶ 65-66, 243-44. These claims are not even plausible, much less likely to succeed on the merits.

At bottom, Lilly adopted a modest transparency condition that is consistent with federal law, involves information that MHMH is required to maintain and routinely uses for payment and compliance purposes, tracks what HHS has allowed for decades and now requires in a closely related context, and is needed for Lilly to comply with its own federal obligations. MHMH, by contrast, seeks extraordinary relief, asking this Court to use state law to regulate a federal program—governed exclusively by federal law and a federal contract between Lilly and HHS—to obtain money from Lilly while avoiding basic transparency. The equities and the merits point

in one direction. The motion for a preliminary injunction should be denied.

## BACKGROUND

### A. Legal Background

***The 340B Program.*** Lilly's transparency condition grows out of the careful administrative structure Congress established in the 340B statute; the long-standing and well-documented abuses the federal government and others have identified in its uncontrolled expansion; efforts to increase transparency to avoid those abuses; and courts' approval of such measures.

Before Section 340B's enactment, Lilly and many other medicine manufacturers voluntarily sold reduced-price medicines to entities serving needy populations, expecting that those patients would benefit from those discounts. Sayeh Nikpay et al., *Stretching Scarce Authorizing Legislation as Far as Possible: A Legislative History of the 340B Drug Pricing Program*, Milbank Q. (May 20, 2026), https://doi.org/10.1111/1468-0009.70090. In 1990, Congress created the Medicaid Drug Rebate Program ("MDRP"), which entitled Medicaid to purchase medicines at the "best price" in the market. *Id.* Because sales to some safety-net providers were the lowest price available, they were manufacturers' "best price" and increased their Medicaid liability, resulting in many manufacturers discontinuing the discounts they had offered before. *See id.* To solve that problem, Congress enacted Section 340B, 42 U.S.C. § 256b, which not only exempted such sales from the Medicaid "best price" calculation, but mandated reductions to a very limited group of federally-designated medical providers as a condition for manufacturers to participate in Medicaid and Medicare Part B. H.R. Rep. No. 102-384, pt. II, at 12 (1992). Thus, manufacturers participating in these programs must enter into a "Pharmaceutical Pricing Agreement" ("PPA") with HHS. As with other Spending Clause legislation, in return for federal benefits, manufacturers "agree to comply with federally imposed conditions"—no less, but no more. *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022). The PPA expressly

delineates manufacturers' 340B obligations as a matter of federal law. Specifically, as a condition of the agreement with HHS, manufacturers "offer" covered medicines to federally designated "covered entities" at a federally determined "ceiling price." 42 U.S.C. § 256b(a)(1).

Critically, Congress also imposed important limitations on covered entities to ensure program integrity, and made clear that a facility is only eligible to become (and remain) a covered entity if it "meets the requirements described." 42 U.S.C. § 256b(a)(4), (5)(A)-(B). Among these requirements for continued eligibility, Section 340B "prohibits covered entities from receiving the section 340B discount on drugs also subject to a Medicaid rebate," i.e., duplicate discounts. *Novartis*, 102 F.4th at 456 (quoting 42 U.S.C. § 256b(a)(5)(A)(i)). It also "prohibits 'diversion,' which occurs when covered entities 'resell or otherwise transfer the drug to a person who is not [its] patient.'" *Id.* (quoting 42 U.S.C. § 256b(a)(5)(B)).

Given these requirements and limitations, and the competing interests between covered entities and manufacturers, disputes are inevitable. In 2010, Congress directed the Secretary of HHS to develop formal procedures for the resolution of disputes between manufacturers and covered entities. 42 U.S.C. § 256b(d)(3)(A). Pursuant to that direction, the Health Resources and Services Administration ("HRSA"), a unit of HHS, set up a comprehensive Administrative Dispute Resolution ("ADR") scheme for 340B disputes—including specifically disputes about "overcharges" (i.e., claims by a covered entity that it has been improperly denied the federal 340B price). Administrative Dispute Resolution, 85 Fed. Reg. 80,632, 80,632-33 (Dec. 14, 2020). Covered entities *must* bring any "overcharge" claims in ADR, including (according to HRSA) "claims that a manufacturer has limited [their] ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1); *see* Administrative Dispute Resolution, 89 Fed. Reg. 28,643, 28,649 (Apr. 19, 2024); HRSA, *340B ADR Decision Summaries*,

https://tinyurl.com/4mw8sysj (adjudicating overcharge claims). Manufacturers can also use ADR to bring duplicate discount and diversion claims. 42 C.F.R. § 10.21(a)(2). But before doing so, HRSA requires manufacturers to audit covered entities, which requires providing "documentation" establishing "reasonable cause" to suspect a covered entity's non-compliance with the 340B statute. Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996).[3]

***The Growth—and Abuse—of the 340B Program.*** At its inception, the 340B program "operated as a relatively simple pricing requirement" with "limited participants and relatively simple distribution arrangements," 91 Fed. Reg. at 48,886—a far cry from the $147 billion in 340B medicines purchased in 2024.[4] Initially, covered entities often "maintained separate physical inventories of 340B drugs for eligible patients" apart from market-price drugs for "ineligible patients." 91 Fed. Reg. at 48,885. Covered entities would generally verify a given prescription's eligibility for 340B pricing when dispensed and fill eligible prescriptions using their 340B-specific inventories, thereby ensuring compliance with Section 340B's prohibitions against both duplicate discounting and diversion. *See id.* at 48,886. The 340B program's modest scale and simple mechanics made avoiding duplicate discounts and diversion relatively straightforward. *See id.*

But every 340B sale presents a revenue-generating opportunity: Covered entities could buy

---

[3] HRSA has authority to audit both covered entities and manufacturers. 42 U.S.C. §§ 256b(a)(5)(C), (d)(1)(B)(v). Manufacturers likewise may audit covered entities (and must do so, as a precursor to filing in ADR); however, manufacturers must show "reasonable cause" for an audit—a requirement that inevitably often "require[s]" claims data. *See AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1278 (W.D. Okla. 2025) ("claims data, as far as the Court can tell, would be *the* way to detect possible diversion or double-dipping on discounts"); *see* Asay Decl. ¶ 14.

[4] *See* Rory Martin & Harish Karne, IQVIA, *The Size and Growth of the 340B Program in 2024*, at 2 (May 6, 2025), https://perma.cc/HT9A-JZAH ("IQVIA Report"); Alliance for Integrity and Reform of 340B, *The Impact of Growth in 340B Contract Pharmacy Arrangements—Six Years Later*, at 8 (Oct. 2020), https://tinyurl.com/3hf8252h.

340B medicines at substantial discounts but charge standard prices to patients and their insurers (e.g., private insurers, state Medicaid, and federal Medicare) and just "pocket the difference." *AbbVie Inc.*, 808 F. Supp. 3d at 1270. Covered entities partnered with for-profit entities, including commercial pharmacies like Walgreens and CVS (acting as "contract pharmacies," distinct from covered-entity in-house pharmacies), to design new ways to maximize profit from federal 340B pricing. *Novartis*, 102 F.4th at 457. Because covered entities and their for-profit partners "divvy up the spread between the discounted price and the higher reimbursement rate," each "has a financial incentive to catalog as many prescriptions as possible" as 340B eligible—including from patients in far-flung places like, in MHMH's case, in Texas and Florida. *Id.*; Asay Decl. ¶ 55.

Unsurprisingly, the 340B program mutated into what the HHS Secretary characterizes as a "boondoggle." *Supra* n.1. From 2010 to 2019 alone, as a direct result of this arbitrage opportunity, "the number of contract pharmacies participating in the program increased from about 1,300 to 23,000." *Novartis*, 102 F.4th at 457. And from 2010 to 2026, the 340B program went from a $6.6 billion program to over a $100 billion program, becoming the second largest federal drug program, 91 Fed. Reg. at 48,884; CBO, Growth in the 340B Drug Pricing Program 1 (Sept. 2025), https://tinyurl.com/4sbzysjd, with "widely documented" "'unlawful diversion and duplicate discounts,'" *Eli Lilly & Co.*, 2025 WL 1423630, at *12; *see* U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 35-39 (2018) (noting program violations), https://tinyurl.com/y2chfjmm. "[M]ultiple reports by Congress and governmental agencies not[e] the exponential growth of the Program; the difficulty of enforcing the prohibition on duplicate discounts; and concerns surrounding diversion." 91 Fed. Reg. at 48,887; *see Novartis Pharms. Corp. v. Espinosa*, 2021 WL 5161783, at *9 (D.D.C. Nov. 5, 2021) (noting "legitimate concerns" and "credible evidence"

by manufacturers regarding increased "potential for fraud"). It is now "difficult to ensure that discounted purchases are accurately matched to qualifying patients" to avoid "diversion"; it is more likely "that the same transaction could be counted toward both a 340B discount and a Medicaid rebate" as "expressly prohibit[ed]" by Section 340B. *Id.* at 48,886.

Covered entities and their for-profit partners are raking in the rewards. In 2022, the five largest contract pharmacies alone—including CVS and Walgreens—"earn[ed] about $3.2 billion in gross profits from 340B."[5] According to one study, about 16 percent of *all* 340B "revenue" currently goes to for-profit third parties.[6] When 340B savings are not funneled to for-profit third parties, they disproportionately go to the largest, best-resourced U.S. hospitals that purchase 80% of 340B medicines—not small providers serving needy patients.[7]

***Court-Approved Transparency Measures.*** In response to these widespread abuses, manufacturers began including modest conditions on their 340B offers to reduce abuse and increase transparency, such as limiting contract pharmacies and requiring certain claims-level data for contract pharmacy dispenses. *See Novartis*, 102 F.4th at 458. Claims data are standard (and straightforward) information collected with a prescription, such as the healthcare provider's identification number (the same for every claim), the medicine quantity, and the date of dispense. 91 Fed. Reg. at 48,894; *see* TA Decl. ¶¶ 18, 40-41. These data are critical to "ensuring program integrity, duplicate discount prevention, and coordination across federal pricing programs,

---

[5] Laura Joszt, *340B, Biosimilars, and More in the Future of Specialty Pharmacy* (May 4, 2022), https://bit.ly/399OKhD.

[6] Minn. Dep't of Health, *340B Covered Entity Report: Report to the Legislature*, at 9 (Nov. 25, 2024), https://perma.cc/9ZZP-X36D; *see also* Staff of S. Comm. on Health, Educ., Lab. & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program*, at 26 (2025) (noting one third-party administrator made $1.6 *billion* between 2019-2023).

[7] HRSA, *2025 340B Covered Entity Purchases*, https://tinyurl.com/340BPurchases; Adam J. Fein, *The 340B Program Hit $100 Billion in 2025: Has It Become Too Big to Reform?*, Drug Channels (July 15, 2026), https://tinyurl.com/4779dc8s.

including the [Medicare Drug Price Negotiation Program] and Medicaid rebate programs." 91 Fed. Reg. at 48,896. [8]

Courts of appeals have unanimously approved claims data requirements as "reasonable conditions" on manufacturers' offers. *Novartis*, 102 F.4th at 461; *Sanofi*, 58 F.4th at 703. The D.C. Circuit explained that "the burden of providing the claims data is 'minimal,'" and held that "340B does not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs to covered entities." *Novartis*, 102 F.4th at 463-64. Since these decisions, HRSA has consistently rejected ADR challenges to claims-data conditions as unlawful "[o]vercharges." HRSA, *340B ADR Decision Summaries*, https://tinyurl.com/4mw8sysj; *see, e.g.*, Rice Decl. Ex. 1 (*Emory Univ. Hosp. Midtown v. Novartis Pharms. Corp.* (HRSA Nov. 20, 2025)) at 1 (denying "overcharge" complaint and upholding manufacturer policy "requiring the [covered entity] to upload claims data to 340B ESP as a condition of receiving 340B discounts"); *id.* Ex. 2 (*Univ. of Wash. Med. Ctr. v. Novartis Pharms. Corp.* (HRSA June 9, 2025)) at 1 (denying "overcharge" complaint and allowing manufacturer to continue "imposing its own integrity program data-sharing requirements upon covered entities").[9]

Most recently, HRSA expressly endorsed requiring claims data, announcing that covered

[8] The Inflation Reduction Act sets forth a set of price regulations for certain drugs that HRSA has recognized "creat[e] the potential for a new category of duplicate discounts." 91 Fed. Reg. at 48,887. The structure relevantly requires manufacturers to (a) determine if a given prescription is subject to a specific price requirement (called the "maximum fair price") and (b) charge that "maximum fair price" rather than the 340B price when the 340B price is higher—a determination that necessarily requires claims data. Centers for Medicare and Medicaid Services, Medicare Drug Pricing Negotiation Final Guidance (Sept. 30, 2025), https://tinyurl.com/CMSFinalGuidance, at §§ 40.4.3, 90, and pp. 238-40; *see* TA Decl. ¶ 31 & n.44.

[9] Although HRSA took the position before these decisions that Lilly's original contract pharmacy policy (which did not address claims data) violated the 340B statute, a court vacated that position. *Eli Lilly & Co. v. U.S. Dep't of Health & Hum. Servs.*, 2021 WL 5039566, at *25 (S.D. Ind. Oct. 29, 2021).

entities must submit *the same claims data required by Lilly* (and more) in its new 340B rebate model. 91 Fed. Reg. 48,883; TA Decl. ¶¶ 39-40 (comparing Lilly and HRSA requirements). In its announcement, HRSA explained that claims data serves an important purpose because "program integrity [is] a growing risk." 91 Fed. Reg. at 48,887. The agency emphasized that there is minimal burden on covered entities, as the required data/data fields are "already generated and maintained in the ordinary course of pharmacy and medical billing" and "already exchanged through existing payer, [third-party administrator], or contract pharmacy relationships." *Id.* at 48,896; *accord* TA Decl. ¶¶ 40-41. Submitting claims data only requires a handful of additional "hours" per week, Agency Information Collection Activities, 91 Fed. Reg. 35,989, 35,990 (June 15, 2026), and any "burden" is "justified by the importance of ensuring program integrity, duplicate discount prevention" and cross-program coordination, 91 Fed. Reg. at 48,896. HRSA also refuted purported privacy concerns, explaining that the data sharing does not run afoul of any privacy law because, among other reasons, the data does not include "direct patient identifiers." *Id.* at 48,897.

**B. Factual Background**

Since December 2021, Lilly has required covered entities to submit claims data for 340B dispenses made through contract pharmacies, which "allow[s] Lilly to monitor diversion and duplicate discounts and promote program integrity." Asay Decl. ¶ 18.[10] Lilly has used Second Sight, and its 340B ESP platform, to receive claims data for the past five years. *Id.* ¶ 20; *see* Rice Decl. Ex. 1 (HRSA ADR refusing complaint as to policy using 340B ESP). As discussed further below, Lilly has required a handful of routine fields, including the relevant dates of prescription and service, medicine quantities, and identifying numbers relating not to patient characteristics but the details of the prescription (like the National Drug Code for the medicine). Asay Decl. ¶¶ 36-

[10] Before December 2021, Lilly had implemented a policy limiting covered entities to a single pharmacy, with no claims data requirement for 340B purchase orders. Asay Decl. Ex. C.

37 (summarizing fields); TA Decl. ¶ 40 (comparing with payer requirements). Though minimal in scope, that data has permitted Lilly "to identify countless instances of Medicaid duplicate discounts, [and] instances where multiple covered entities sought [discounts] on the same unit …, and to produce the evidence required by HRSA to initiate audits." Pl.'s Ex. 2 at 1.

Since 2021, most covered entities have complied with Lilly's federal 340B offer conditions without issue, regularly submitting claims data for contract-pharmacy dispenses without identifying any meaningful administrative burden, concerns over the data's security, or concerns over the anonymity of patient information. Asay Decl. ¶¶ 19, 41, 52. And with good reason—as explained, the federal government recently rejected such concerns. 91 Fed. Reg. at 48,897. For over a year, MHMH *itself* uploaded the claims data it now refuses, to obtain 340B pricing for its contract pharmacies. Asay Decl. ¶ 52. Between July 2022 and November 2023, MHMH submitted around 17,000 claims with data to Lilly, relating to over 180 contract pharmacies. *Id.* ¶¶ 53-54. These claims included the same data fields Lilly now requires from in-house pharmacies. *Id.* ¶ 56.

Since November 2023, Lilly limited its federal 340B offer to a single pharmacy location. *Id.* ¶¶ 26-27. This replicates the longtime status quo of the 340B program: For most of its existence, covered entities could partner with only "one contract pharmacy." *Novartis*, 102 F.4th at 463. Thus, covered entities with their own in-house pharmacy (like MHMH) generally have only been permitted to use that pharmacy for purchasing Lilly's medicines at the federal 340B price; MHMH has complied with that offer condition for over two years. Asay Decl. ¶ 57.[11]

In January 2026, Lilly announced it would extend its long-standing claims data condition to in-house dispenses. Pl.'s Ex. 2 at 1. Under Lilly's condition, covered entities provide the same

[11] Covered entities without an in-house pharmacy may designate a single outside contract pharmacy to purchase 340B-priced drugs (and submit claims data). Asay Decl. ¶¶ 26-27.

data to the same vendor (Second Sight Solutions) using the same platform (340B ESP) covered entities used for years, only now they provide the data for all 340B dispenses, not just those through outside pharmacies. *Id.* at 1-2. Medical claims data (i.e., for medicine administered to a patient by a physician in an outpatient setting), involve slightly different (but overlapping) information from pharmacy claims data (i.e., for medicine dispensed through the hospital's pharmacy) to be used to identify duplicates. In both instances, the data are standard information that covered entities maintain and submit to obtain payment, including under Medicare and Medicaid. TA Decl. ¶¶ 39-42; Asay Decl. ¶¶ 15-16. In either instance, no more than ten pieces of information are required (only seven for pharmacy claims). Asay Decl. ¶¶ 36-37. And in both cases, Lilly does not ask for *any* data beyond the data to be required in HRSA's rebate program, TA Decl. ¶¶ 39-41, and does not collect information that would identify a patient. Asay Decl. ¶¶ 21-22. In fact, the HRSA rebate program requires *more* data fields than Lilly requires. TA Decl. ¶ 41.

Lilly kept HRSA apprised on this federal-pricing offer condition over months of its implementation and compliance rates, and providing extensive prior notice and explanations of Lilly's intent to start enforcing the terms of its offer condition against entities that continued to withhold claims data. Asay Decl. ¶¶ 46-49. The vast majority of covered entities accepted Lilly's offer and continue purchasing 340B-priced medicines from Lilly without issue. Asay Decl. ¶ 40. Indeed, approximately 80 percent of covered entities purchasing Lilly medicines—totaling approximately 2,800 entities—have submitted in-house claims data. *Id.; see* Pl.'s Ex. 6 at 2 (compliance as of July 2026). Compliance spans the full range of covered entities: "80 percent of community health centers have submitted, as have 85 percent of STD clinics, 75 percent of HRSA-funded health centers, two-thirds of critical-access hospitals, and substantial majorities of federally qualified health centers and other smaller entity types." Pl.'s Ex. 6 at 2. Only a small minority have

expressed any objection to Lilly's offer. Asay Decl. ¶¶ 40-42. As Lilly explained to HRSA, "[t]he holdouts are not small clinics struggling with a technical lift; they are the largest and most sophisticated participants in the 340B program," orchestrating a coordinated boycott. Pl.'s Ex. 6 at 3. MHMH is part of that boycott, despite having provided Lilly the same data for years when it used multiple contract pharmacies. Asay Decl. ¶¶ 53-54. Yet, like all healthcare providers, MHMH and its in-house pharmacy must regularly submit claims data to Pharmacy Benefit Managers, Medicare Part D plans, state Medicaid agencies, and private insurance companies to receive payments. TA Decl. ¶¶ 26-28.

Lilly repeatedly followed up with MHMH requesting submission and providing resources to assist with technical issues. Asay Decl. ¶ 59; *e.g.*, Pl.'s Exs. 2, 4; *contra* Pl's Br. in Supp. of Mot. for Prelim. Inj. ("Br.") at 11 (claiming policy is "pretext"). Based on MHMH's refusal to accept the claims-data condition of Lilly's 340B pricing offer, Lilly sent a "Final Notice" with a final deadline for compliance, as well as answers to questions its representative raised about the required data. Pl.'s Ex. 7 at 2-3 (explaining that the data could be lawfully shared). MHMH asserted that it needed more time to "properly evaluate the terms of Lilly's 'offer'" but then flatly stated that it "objects to Lilly's unilateral attempt to impose" what it described as "unlawful conditions on the 340B program." Pl.'s. Ex. 8 at 2-3.[12] Because MHMH rejected Lilly's 340B offer, Lilly discontinued sales at the 340B price for MHMH, pending its acceptance of the offer. Lilly continues to sell medicines to MHMH, just without the federal discount. Asay Decl. ¶ 66.

Now, MHMH seeks to recover what it calls unlawful "*overcharges* above the statutory

[12] MHMH's complaint about Lilly's responses, Br. 14-15, is not well-taken. MHMH never sought to meaningfully engage on implementation, as opposed to simply repeating its objections, including pretextual concerns over privacy that HHS has rejected. *See* 91 Fed. Reg. at 48,897-98.

340B Ceiling price" for Lilly's medicines. *E.g.*, Compl. ¶ 249.[13] MHMH represents that it "formally complained" to HRSA on July 2 and July 27, 2026. Br. 16 n.9. But HRSA has taken no action against Lilly and HRSA itself has endorsed claims data submission in its 340B rebate program. MHMH has not pursued ADR with HRSA. Rather, it filed suit here and seeks an immediate injunction *under state law* forcing Lilly to sell medicine at the *federally-discounted 340B price* on the terms and conditions MHMH prefers, rather than the terms Lilly has offered.[14]

## ARGUMENT

A preliminary injunction is an "extraordinary equitable remedy that is never awarded as of right" and "merely … preserve[s] the relative positions of the parties until a trial on the merits[.]" *Starbucks*, 602 U.S. at 345. A plaintiff "must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Id.* at 346.

MHMH faces an even higher standard because it does not seek "merely to preserve the relative positions of the parties" and the existing status quo. *Id.* at 345. It seeks "a mandatory preliminary injunction" that "requires affirmative action by [Lilly] in advance of trial," *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 40-41 (1st Cir. 2010), including an order requiring Lilly to (1) affirmatively sell its medicines to MHMH at the *federal* discounted price (the federal "Ceiling Price") without MHMH being required to comply with Lilly's 340B offer terms

[13] Of note, MHMH brings this complaint despite its own documented problems with *both* diversion and duplicate discounts. After a 2021 audit, MHMH was forced to terminate certain ineligible facilities from the 340B program before HRSA took action to terminate them. HRSA, *Program Integrity*: FY21 Audit Results (Oct. 28, 2024), https://www.hrsa.gov/opa/program-integrity/fy-21-audit-results. There is also evidence that MHMH repeatedly claimed discounts in violation of the duplicate-discount prohibition. Rice Decl. Ex. 3 (Compl. at ¶ 59, *Johnson & Johnson Health Care Sys. v. Becerra*, No. 1:24-cv-3188 (D.D.C. Nov. 12, 2024)).

[14] As addressed below, MHMH also seems to demand (without argument) that the injunction require federal 340B pricing at all pharmacy locations of MHMH's choosing, implicating Lilly's *years-old* condition on the use of a single pharmacy location. Asay Decl. ¶¶ 26-27.

or *any* terms "not expressly authorized by" statute, and (2) "disgorge the monies it has obtained since July 2, 2026" as alleged "overcharges" (the difference between the federal ceiling and standard medicine prices). Proposed Order re Prelim. Inj. ("Proposed Order") at 2. Directing such affirmative action is "disfavor[ed]" and requires "an even stronger showing of entitlement to relief than is typically required." *Thomas v. Warden, FCI Berlin*, 596 F. Supp. 3d 331, 337 (D.N.H. 2022). On each factor, MHMH falls well short of the clear showing required for a status-quo-preserving preliminary injunction, let alone the "heightened standard for a mandatory injunction." *Morales v. Hanks*, 2025 WL 337591, at *2 (D.N.H. Jan. 30, 2025).

## I. MHMH CANNOT ESTABLISH IRREPARABLE HARM FOR CLAIMS ENTIRELY ABOUT PURPORTED MONEY DAMAGES.

Irreparable harm is "the essential prerequisite to equitable relief." *Braintree*, 622 F.3d at 41. To establish irreparable injury, a plaintiff must clearly establish that money damages are inadequate to remedy some harm that has a "realistic prospect" of "*immediate[ly]*" occurring. *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73-74 (1st Cir. 2004). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Nor is "conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). The plaintiff must establish real, "imminent" harm since "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (collecting citations). Further, "mandatory" injunctions are "particularly disfavored when," as here, "their effect would be to grant the ultimate relief sought[.]" *SW Indus., Inc. v. Aetna Cas. & Sur. Co.*, 646 F. Supp. 819, 823 (D.R.I. 1986) (collecting cases).

MHMH's alleged harm is, in its own words, "economic"—loss of "discounted pricing." Br. 34-35. MHMH argues that, by refusing to simply comply with Lilly's condition, it will "*overpay*[] by at least $4.7 million" across a year of purchases. Thomasset Decl. ¶ 66. It therefore seeks "disgorge[ment] [of] monies" and an order requiring Lilly to unconditionally sell MHMH medicines at the federal "statutory 340B 'Ceiling Price'"—the ultimate relief sought. Proposed Order at 2. But MHMH is not irreparably harmed by "the temporary loss of income" that can "ultimately … be recovered" after judgment in the ordinary course. *Sampson*, 415 U.S. at 90; *see CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995).

MHMH is therefore forced to assert that, by refusing to accept Lilly's offer terms, paying market price "*may* impact MHMH's ability to continue to offer various services to patients" and "*could* cause [its] days-cash-on-hand to drop low enough to risk violating bond covenants." Thomasset Decl. ¶¶ 68, 71; *see* Br. 2 (stating the "diversion of resources *could* result in the secession of service lines"); Br. 36 (MHMH "*may* be forced to scale back or eliminate services.").

That argument is entirely speculative, as demonstrated by MHMH's repeated use of the conditional words "could" and "may." It is well established that "a possibility of irreparable harm" is insufficient to support an injunction. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008); *see, e.g.*, *In re TelexFree Sec. Litig.*, 2021 WL 11604879, at *7 (D. Mass. Apr. 21, 2021) (insufficient that "irreparable harm 'may' occur"). MHMH—a prestigious academic hospital affiliated with one of the nation's wealthiest private universities—provides no concrete reason to believe that its ability to serve its patients or comply with bond covenants actually *will* be harmed by a $4.7 million difference over a year. Thomasset Decl. ¶ 66. Indeed, MHMH omits any details that would even allow *assessment* of such claims: any description of these unidentified bond covenants, when any such covenants would be breached, or MHMH's daily cash on hand available

to address debts or unexpected expenses. That last omission is for good reason: Last year, MHMH made over $2.6 *billion* in revenue, had $1.3 *billion* in net assets after deducting total liabilities, and generated $152 million in profit.[15] So MHMH's own estimates describe, at best, a 3% profit loss, and barely 0.18% of annual revenue. A movant with the "financial wherewithal to keep [its] programs running" as a case proceeds cannot assert it may "decline to keep the programs operating" and thus rely on "irreparable harm … of [its] own making." *Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025) (per curiam). Nor can a "claimed threat" without a "realistic prospect" of irreparable harm "warrant … a prophylactic injunction." *Matos*, 367 F.3d at 73.[16]

More importantly, even if MHMH's "imaginings" were true, *Matos*, 367 F.3d at 73, they would not establish irreparable harm. MHMH can avoid them by simply complying with Lilly's claims-data condition for far less than $4.7 million, and then seek recovery for that cost if it ultimately prevails. Thus, MHMH's entire irreparable-harm argument assumes without explanation that it *cannot* comply with the offer terms. But MHMH *can* comply and does not argue otherwise—with good reason, given the overwhelming majority of covered entities (including those with far less revenue and profit than MHMH) provide the same data, just as *MHMH* once did. Asay Decl. ¶¶ 40-41, 53-54. Any claimed harm is therefore "self-inflicted." *San Francisco Real Est. Invs. v. Real Est. Inv. Tr. of Am.*, 692 F.2d 814, 818 (1st Cir. 1982); *see State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (collecting cases). Moreover, the federal government itself will

---

[15] *See* Nonprofit Explorer, ProPublica, https://tinyurl.com/bddr7t7f; *id.* at https://tinyurl.com/4r96krna (populating with IRS data); *see also id.* at https://tinyurl.com/3k4e4mpw (copy of audit reporting similar figures). Even MHMH's reference to its parent health system's deficit in one quarter concedes that MHMH is financially strong. Br. 9 (MHMH is Dartmouth Health's "primary revenue engine").

[16] While MHMH characterizes its operations by specific charitable programs, many of those efforts—like $16.6 million in charity care—constitute under 1% of its annual billions in operating revenue. *Compare* Br. 8 with ProPublica, *supra* n.15 (copy of MHMH audit) at 3, 8-9.

require MHMH to provide the same "claims-level data" (and more) if MHMH continues buying medicines covered by the federal 340B rebate program. 91 Fed. Reg. at 48,890; TA Decl. ¶¶ 30-35, 39-42. Thus, MHMH's purported need for any additional manpower would exist *even without* Lilly's offer terms. TA Decl. ¶¶ 39-40 (noting it is "highly unlikely" that an additional full-time employee could be required, given "overlap" with other requirements).

In any event, because MHMH can restore discounted pricing (and avoid any alleged overcharge) merely by providing the required claims data, MHMH has the burden to show irreparable harm from compliance costs during this litigation. But it does not attempt even to quantify these costs, and what it does say *undermines* its claims to irreparable harm. MHMH states that it would need to "hir[e] at least one additional salaried and benefit-eligible employee" to provide the requested data. Thomasset Decl. ¶ 37. Even if MHMH could substantiate that cost, *contra* TA Decl. ¶¶ 39-40, it is a small fraction of $4.7 million a year and *de minimis* compared to MHMH's $2.6 billion in annual revenue. As HRSA itself concluded, the minimal effort required to provide claims data does not threaten any meaningful harm. 91 Fed. Reg. at 48,890.[17] MHMH's failure to provide any cognizable, non-speculative evidence of harm—let alone irreparable harm—dooms its entire motion.

Finally, while MHMH's *proposed order* (not its brief) appears to prohibit *any* limits on MHMH's contract-pharmacy use, Proposed Order at 2, that request is not supported by argument

[17] Mr. Thomasset's declaration asserts that sharing claims data would "expose MHMH to risk and liability for data privacy and security issues." Thomasset Decl. ¶¶ 33, 51. Not so. HRSA recently explained that submitting claims data *does not* risk any privacy liability. *See* 91 Fed. Reg. at 48,897-98. And MHMH itself does not appear to consider this a legitimate concern—in addition to the myriad claims data it provides other third parties daily, MHMH submitted around *seventeen thousand* claims to Lilly, never suggesting that it was continuously violating any privacy statute. Asay Decl. ¶ 54. In any event, MHMH does not argue such risks pose irreparable harm, and is precluded from doing so now. *See United States v. Isler*, 429 F.3d 19, 24 n.3 (1st Cir. 2005).

and is plainly forfeited. *United States v. Isler*, 429 F.3d 19, 24 n.3 (1st Cir. 2005). Nor could MHMH make an irreparable harm claim as to policies it has complied with for years, or show "reasonable diligence" in its challenge. *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).[18]

## II. MHMH IS UNLIKELY TO SUCCEED ON THE MERITS.

While the Court need go no further to deny the injunction, MHMH also cannot show a likelihood of success on the merits. *First*, the Supremacy Clause and the Supreme Court's *Astra* decision—controlling law MHMH does not even cite—bar its claims. *Second*, each of MHMH's claims fails to state a claim, let alone establish a clear entitlement to relief.

### A. *Astra* Bars MHMH's Claims.

*Astra* held that covered entities cannot bring "suits to enforce § 340B" "no matter the clothing in which [they] dress their claims." 563 U.S. at 113-14. Here, MHMH's claims each rest on a supposed "refusal to provide 340B pricing," Compl. ¶ 19—the heartland of what Congress assigned to HHS to exclusively enforce, as a manufacturer's obligation to even make a federal 340B offer stems entirely from its agreement with HHS. Thus, MHMH's suit is "in essence a suit to enforce the [340B] statute itself," *Astra*, 563 U.S. at 118, and cannot prevail.

*Astra* set out a clear rule that preempts and forecloses MHMH's claims: Private parties cannot assert claims that seek to enforce Section 340B's requirements. In *Astra*, Santa Clara County (which operated several 340B entities) sued various manufacturers, claiming they were improperly "charg[ing] more than the § 340B ceiling price." *Id.* The County claimed it was entitled

---

[18] As discussed above, Lilly's longstanding terms (a) limit the use of contract pharmacies to covered entities *without* in-house pharmacies and (b) require claims data from such contract pharmacies. MHMH has accepted the terms limiting external contract pharmacies for years, and before that, complied with the offer terms requiring claims data from such pharmacies. Asay Decl. ¶¶ 52-57. MHMH cannot demand emergency relief against either condition when it sat "on its … hands" for *years*. *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, 996 F.3d 37, 50 (1st Cir. 2021); *see Benisek*, 585 U.S. at 159; *Kerwin ex rel NLRB v. Trinity Health Grand Haven Hosp.*, 174 F.4th 942, 958 (6th Cir. 2026) (delay of at least "four months" cut against relief).

to 340B pricing and asserted breach-of-contract claims challenging the manufacturers' failure to provide the 340B discount. Third Amended Complaint at ¶¶ 28, 38, 41, 72-79, *Cnty. of Santa Clara v. Astra USA, Inc.*, No. 05-cv-3740 (N.D. Cal. Dec. 23, 2008), ECF No. 284.

The Supreme Court unanimously rejected the attempt to privately "enforce § 340B," recognizing the "incompatibility of private suits with the statute Congress enacted." *Astra*, 563 U.S. at 114, 121. The Court explained that Congress opted to "centralize[] enforcement in the [federal] government," "vest[ing] authority to oversee compliance with the 340B Program in HHS." *Id.* at 117, 119. It highlighted that Congress consciously chose *not* to provide "a private right to enforce the statutory ceiling-price obligations," "assign[ing] no auxiliary enforcement role to covered entities." *Id.* at 117-18. And it emphasized that private enforcement would "spawn a multitude of dispersed and uncoordinated lawsuits by 340B entities," and "conflicting adjudications" would "undermine [HRSA's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 120. MHMH's lawsuit creates the exact same issues, both in its entire theory and in asserting "overcharges" specifically. Compl. ¶¶ 234, 249. Congress sought to avoid this chaos by mandating a "formal dispute resolution procedure" within HHS, foreclosing any private suit on "overcharges and other violations of the discounted pricing requirements." *Astra*, 563 U.S. at 121-22.

In *Astra*'s wake, courts have repeatedly rebuffed private attempts such as MHMH's to enforce Section 340B through state law claims. In *Sagebrush Health Services v. Amgen Inc.*, the district court dismissed multiple claims (including unfair competition) "dressed … in the clothing of California law" as ultimately "rooted in Plaintiff's assertion that it is entitled to purchase drugs at 340B discounted prices." 2026 WL 1030817, at *1, *6 (C.D. Cal. Apr. 15, 2026). In *American Hospital Association v. HHS*, the district court dismissed Administrative Procedure Act claims that

sought relief "entirely premised on the enforcement of the 340B Program requirements." 2021 WL 616323, at *5 (N.D. Cal. Feb. 17, 2021). And in *AIDS Healthcare Foundation v. Apexus, LLC*, the Ninth Circuit rejected a covered entity's attempt to use California contract and unfair-competition claims to enforce an agreement between a manufacturer and HRSA. 2024 WL 3886974, at *2 (9th Cir. Aug. 21, 2024). The court explained that although the case was not quite "*Astra* redux," if allowed to proceed, it too would "undermine the government's efforts to administer both Medicaid and § 340B on a uniform, nationwide basis." *Id.* (brackets omitted).

For the same reasons, MHMH cannot succeed on the merits, and it cannot get an injunction. Each of MHMH's claims rests on its alleged entitlement to "the discounted 340B Ceiling Price" and its contention that Lilly has "terminat[ed] [its] access to the 340B Ceiling Price." Compl. ¶¶ 10, 14. In Count I, MHMH alleges that Lilly violates (inapplicable) Vermont law by "refus[ing] to offer MHMH the Ceiling Price." Compl. ¶ 219. In Count II, MHMH asserts unfair or deceptive practices all deriving from Lilly "no longer offering" the "340B Ceiling Price" despite representing that it would, which supposedly "*breache[d Lilly's] agreement with the federal government*." Compl. ¶¶ 228-29. In Counts III and IV, MHMH argues Lilly breached an unwritten, unsubstantiated contract between Lilly and MHMH by "fail[ing] to offer and provide [the] 340B ceiling pricing" and "fail[ing] to comply with" the statute and HRSA regulations, adding that "Lilly is obligated to offer" such pricing "consistent with 42 U.S.C. § 256b and HRSA guidance." Compl. ¶¶ 247, 252. In Count V, MHMH asserts "overpayments" based on sales "above the 340B Ceiling Price." Compl. ¶¶ 260-61. Each Count rests on the assertion that Lilly has unlawfully imposed "overcharges above the statutory Ceiling Price," Compl. ¶¶ 234, 249, rather than "340B discounted pricing," Br. 35. These disguised 340B claims are exactly what Congress exclusively

committed to HHS.[19]

MHMH's claimed harm and requested remedies likewise "confirm that [it] is in essence seeking to enforce the 340B Program." *Sagebrush*, 2026 WL 1030817, at *8. MHMH asserts that it "needs savings from the 340B [p]rogram" and describes how it allegedly uses its "340B savings" and "340B pricing." Br. 4, 36; Compl. ¶¶ 5, 12, 17, 20. And, on its telling, Lilly "cut off MHMH's access to the 'Ceiling Price' set by the federal 340B Drug Pricing Program" causing its injury by *overcharging* MHMH, in failing to provide federal 340B pricing. Br. 1; *see* Compl. ¶¶ 14-15, 17 (emphasis omitted). To remedy that supposed harm, MHMH seeks damages for its supposed "overcharges." *See* Compl. at p.48 (Prayer for Relief). MHMH also now seeks an injunction to ensure its "savings from the 340B [p]rogram" by compelling Lilly to offer "access to 340B pricing." Br. 36. This is *exactly* what *Astra* forbids. MHMH's remedies are directly "tied to its right to purchase drugs at 340B discounted prices," further showing that "its claims are actually a covert attempt to manufacture a private right of action to enforce the 340B Program." *Sagebrush*, 2026 WL 1030817, at *8. Congress "directed HRSA to create" ADR for the federal government to address precisely such claims in the first instance. *Astra*, 563 U.S. at 121-22.

MHMH argues that its claims can proceed because the Ninth Circuit "recently allowed claims under the False Claims Act … to proceed" where the plaintiff alleged manufacturers fraudulently inflated drug prices in violation of the 340B statute and thereby caused the government to wrongly make Medicaid, Medicare, and other payments. Br. 33 (citing *U.S. ex rel. Adventist Health Sys. of W. v. AbbVie Inc.*, 169 F.4th 1137, 1141 (9th Cir. 2026)). Not so. In

[19] There is no doubt MHMH is seeking to enforce a *federal* claim to 340B pricing, not some independent state-law right. *E.g.*, Compl. ¶¶ 94, 129, 193, 228-229. Indeed, MHMH's own allegations seek to establish *federal* violations—namely, that Lilly's offer "breache[s]" its 340B "agreement with the federal government" (the PPA) and violates regulations enforcing 340B, *see* Compl. ¶¶ 62-63, 109, 228-29, 247.

*Adventist*, the plaintiff was pursuing a *qui tam* action to recover money owed to the *federal government* for the federal government's *own* purported claims under federal law. 169 F.4th at 1143. Here, MHMH seeks relief solely for itself and solely "tied to its right to purchase drugs at 340B discounted prices"—the "private right of action" *Astra* forecloses. *Sagebrush*, 2026 WL 1030817, at *8 (distinguishing *Adventist*).

At bottom, just like the *Astra* plaintiff claimed "that the manufacturers charged [it] more than the § 340B ceiling price," 563 U.S. at 118-19, MHMH here claims that Lilly failed to "offer its products at the requisite 340B Ceiling Price." Compl. ¶ 129. Despite the "clothing" of state laws, this is "in essence a suit to enforce [§ 340B] itself," squarely within *Astra*'s prohibition "of dispersed … lawsuits by 340B entities." 563 U.S. at 114, 118-20.

**B. Section 340B Preempts MHMH's Claims.**

*Astra* forecloses this suit entirely. Moreover, its reasoning, as well as other precedents, demonstrate that the federal 340B law preempts MHMH's specific claims here. The U.S. Supreme Court has held that the Supremacy Clause's principle that federal law "shall be the supreme Law of the Land," U.S. Const. art. VI, cl. 2, requires that a state-law claim must give way when it conflicts with federal law or intrudes into an exclusively federal field. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). MHMH's claims do both.

**1. MHMH's Claims Conflict with Federal Law.**

MHMH's claims should be dismissed because they conflict with Section 340B. A state law is preempted when it stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Conflict or obstacle preemption occurs when a federal law "imposes restrictions or confers rights on private actors" and "a state law confers rights or imposes restrictions that conflict with the federal law." *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022). Both actions under enacted

state statutes and "state common-law tort action[s]" qualify as state law that may be preempted. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 865 (2000).

Here, MHMH's state law claims "frustrate" and "undermine[]" "the full purposes and objectives" of federal law in several ways. *Arizona*, 567 U.S. at 399, 402; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). *First*, the federal government has emphasized that allowing claims like MHMH's state-law consumer claims to proceed would undercut 340B's "unitary administrative and enforcement scheme." *Astra*, 563 U.S. at 120. As the Department of Justice recently explained, "'[f]ar from assisting HHS,' resort to state law remedies to resolve 340B disputes 'would undermine' Congress's intent to create a uniform system." Brief of the United States, *PhRMA v. Neronha*, No. 26-1039, 2026 WL 527776, at *15 (1st Cir. Feb. 25, 2026) ("U.S. Amicus Br."); *cf. Emseal Joint Sys., Ltd. v. Schul Int'l Co., LLC*, 2018 WL 3733939, at *3 (D.N.H. Aug. 6, 2018) (McAuliffe, J.) ("unjust enrichment" claim relating to "rights under federal patent law," and seeking "to enforce such rights under a common law guise" was "preempted").

*Second*, MHMH's claims would circumvent Congress's intent that Section 340B claims "be enforced exclusively by the Federal Government." *Buckman*, 531 U.S. at 352. When Congress empowers an agency to enforce federal law "consistently with the [agency's] judgment," competing state-law claims are preempted. *Id.* at 350. This rule applies where "the existence of the[] federal enactment[]" forms a "critical element" of the claim, *id.* at 353, including (as here) "unfair or deceptive trade practices" or "unjust enrichment" claims based on asserting that *federal* law is violated. *See DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35, 41 (1st Cir. 2023) (applying *Buckman*; rejecting claims connected with mislabeling under the Food, Drug, and Cosmetics Act).

Such claims are precisely what MHMH brings here. But "Congress placed the Secretary (acting through [his] designate, HRSA) in control of § 340B's drug-price prescriptions" and

"overcharge[]" disputes. *Astra*, 563 U.S. at 114; 42 U.S.C. § 256b(d)(3). Covered entities "claim[ing] that a manufacturer has limited [a] covered entity's ability to purchase covered outpatient drugs at or below the ceiling price" therefore must bring those claims to HRSA. 42 C.F.R. § 10.21(a)(1). Indeed, hospitals have filed complaints with HRSA to challenge manufacturers' conditions on their offers. *See* HRSA, *340B ADR Decision Summaries*, https://tinyurl.com/4mw8sysj. Allowing MHMH to end-run HRSA and "impose [state-law] penalties for the [alleged] federal offenses here would conflict with the careful framework Congress adopted." *Arizona*, 567 U.S. at 402. Certainly, it would "confer" both procedural and remedial "right[s]" denied under federal law, in conflict with the statutory scheme Congress carefully crafted. *Me. Forest Prods. Council*, 51 F.4th at 8.

Private enforcement, and with it the risk of liability outside the confines of the 340B program itself, fundamentally changes the bargain the federal government struck with Lilly in the PPA, under which Lilly makes 340B offers to covered entities. As the United States explained, that changes the incentives for participation, thwarting Congress's objective to encourage manufacturers to participate in and administer the 340B program. *See* U.S. Amicus Br., 2026 WL 527776, at *16-17 (enforcing state restrictions on offer conditions would raise "the costs of participation" in 340B, which can lead "rational manufacturers … to withdraw" from 340B). Thus, this suit to functionally enforce 340B "conflicts with the scheme Congress designed," as "enforcement authority … properly belongs to the federal government alone." *Id.* at *15.

Recognizing sole enforcement authority here is consistent with the general rule that Congress is the proper decisionmaker of "conditions on the receipt of federal funds" in spending-power contexts, *Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269-70 (1985) (rejecting state limitation). If states could add conditions to participation in federal spending

programs, that would destroy the principle that "conditions attached to federal funds … apply only to those who have knowingly and voluntarily agreed to them." *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026). Here, in entering a PPA with HHS alone, Lilly has not voluntarily agreed to the costs associated with a regime of private suits. And again, these costs risk harm to the federal government too, as they "risk disincentivizing Medicare and Medicaid participation" by raising "the costs of participating," and threatens "manufacturer withdrawal," undermining Congress's objectives. U.S. Amicus Br., 2026 WL 527776, at *16-17.

*Third*, prohibiting manufacturers from including claims-data conditions in their federal 340B offers conflicts with and thwarts Section 340B's anti-abuse mechanisms. Section 340B "prohibits covered entities from receiving the section 340B discount on drugs also subject to a Medicaid rebate." *Novartis*, 102 F.4th at 456 (citing 42 U.S.C. § 256b(a)(5)(A)(i)). It also "prohibits 'diversion,' which occurs when covered entities 'resell or otherwise transfer the drug to a person who is not a patient of the entity.'" *Id.* (quoting 42 U.S.C. § 256b(a)(5)(B)). The statute "effectuate[s]" those provisions by allowing manufacturers to audit covered entities. *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 452 (S.D. W. Va. 2025), *en banc review granted,* 147 F.4th 830; *see* 42 U.S.C. §256b(a)(5)(A)-(D). But a manufacturer may initiate an audit only on a showing of "reasonable cause." 61 Fed. Reg. at 65,409-10. Claims data is "necessary to support program integrity," 91 Fed. Reg. at 48,898, precisely because it allows manufacturers like Lilly to make that reasonable-cause showing. Asay Decl. ¶ 14. Lilly has itself received approval for audits by relying on claims data submitted under its longstanding offer terms. *Id.* ¶¶ 10, 30, and Ex. B. By contrast, prohibiting claims-data conditions "frustrates drug manufacturers' ability" to establish the reasonable cause needed "to start the very audit required to access" the federal ADR system. *PhRMA*, 760 F. Supp. 3d at 453; *see, e.g.*, *AbbVie Inc.*, 808 F. Supp. 3d at 1278 (state law

prohibiting requirement to share claims data "stands in direct conflict with the 340B Program's [ADR] mechanism" given "compelling" argument that "claims data is necessary to establish the reasonable cause required to trigger an audit"); *Novartis Pharms. Corp.*, 2021 WL 5161783, at *8 (noting as "convincing[]" that new "claims data conditions" on a 340B price offer "will enable [the manufacturer] to better utilize the anti-fraud audit and ADR procedures that Congress established."). So despite MHMH's claims, it is *MHMH* that is seeking to circumvent the ADR process by suing in court to block Lilly's modest conditions, rather than pursuing its overcharge claims with the agency, *contra* Compl. ¶ 62.

MHMH's flawed logic aside, the bottom line is that "state laws" or common-law actions that would "impose additional restrictions" on participation in the 340B program would "stand as an obstacle to the fulfillment of Congressional policies and goals." *See SPGGC, LLC v. Ayotte*, 443 F. Supp. 2d 197, 207 (D.N.H. 2006) (McAuliffe, J.) (National Bank Act preemption), *aff'd*, 488 F.3d 525 (1st Cir. 2007). Thus, all of MHMH's claims are conflict preempted.

**2. MHMH's Claims Intrude Into an Exclusively Federal Field Created by Congress.**

MHMH's claims are also field preempted. Here, Congress created the relevant "field" by enacting the 340B statute; there is no state-law backdrop of providing discounted pricing to congressionally-selected covered entities as a condition of participating in other federal programs. The 340B program is "unlike other federal health programs like Medicaid, which 'give[] the States substantial discretion' in determining how to operate a cooperative endeavor with the federal government." U.S. Amicus Brief, 2026 WL 527776, at *11 n.4. Yet MHMH would use state law to "regulate[] conduct in a field that Congress intended the Federal Government to occupy

exclusively"—indeed, a field the federal government exclusively created. *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). That attempt triggers two independent bases of field preemption.

*First*, field preemption occurs when the "scheme of federal regulation … [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* Here, federal law pervasively regulates every aspect of the 340B program—including pricing formulas, covered-entity eligibility, qualifying transactions, and dispute resolution. *See, e.g.*, 42 U.S.C. §§ 256b(a)(1)-(7), (b)(1), (d)(3)(A), (e); 42 C.F.R. §§ 10.20-25; 61 Fed. Reg. at 65,412. MHMH admits that HRSA has "established a comprehensive system" to hear disputes in the "[ADR] process as described in" the statute—even as it ignores that the process applies to disputes by manufacturers *or* covered entities. Compl. ¶ 97. Put simply, Congress gave HHS the "control rein" over 340B drug pricing enforcement, *Astra*, 563 U.S. at 120, and its regulatory framework leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399.

*Second*, the field of § 340B enforcement has a "federal interest … so dominant" that it can "be assumed to preclude enforcement of state laws on the same subject." *English*, 496 U.S. at 79. Congress not only created this entire program, it purposely "centralized [§ 340B] enforcement in the government," creating a "unitary administrative and enforcement scheme." *Astra*, 563 U.S. at 119-20. That makes sense. The obligations of manufacturers only arise from their *affirmative agreement* with the federal government under their PPAs. It is for HHS—the counterparty to that agreement—to assess compliance: 340B is intertwined with other important federal statutes, so as the Department of Justice has therefore consistently explained (both successfully in *Astra* and in ongoing suits today), private or state enforcement risks "undermin[ing] [HRSA]'s efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 120; *see* U.S. Amicus Br. at *14 (citing same; arguing that private lawsuits will undermine the

"uniform system" across statutory mandates). This is a field "where the federal interest … is sufficiently dominant" to infer Congress's "intent to occupy [the] field" it created "to the exclusion of state law." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988).

However the Court chooses to consider the issue, MHMH's claims arise entirely from a federal regime that provides for exclusive federal enforcement. MHMH cannot circumvent that carefully designed scheme in favor of contrived state-law causes of action. Multiple, overlapping preemption doctrines prohibit that gamesmanship and foreclose these claims.

**3. The Intergovernmental Immunity Doctrine Bars MHMH's Claims.**

If more were needed, principles of intergovernmental immunity foreclose enforcement of the proposed state law actions against Lilly because all the challenged conduct arises in the context of Lilly fulfilling its functions under its agreement with the federal government. Intergovernmental immunity establishes that "states have no power … to retard, impede, burden, or in any manner control the operations of" federal law. *M'Culloch v. Maryland*, 17 U.S. 316, 317 (1819). It follows that states may not "discriminate[] against the Federal Government or *those with whom it deals*," including by offering "less favorable 'treatment'" to federal contractors. *United States v. Washington*, 596 U.S. 832, 838-39 (2022).

Here, each of MHMH's claims take issue with *how* Lilly is performing its function under its PPA and would "impose[s]" obligations based on that federal relationship—which intergovernmental immunity forecloses. *Id.* at 838. Begin with MHMH's claim under Vermont law. While such law is inapplicable to dealings with New Hampshire entities (as explained below), it only applies to manufacturers participating in the 340B program, and only imposes obligations on *how* they participate in the 340B program. So enforcement here "impermissibly targets and discriminates against" Lilly for "participat[ing] in a federal program." U.S. Amicus Brief, 2026 WL 527776, at *12. The intergovernmental immunity doctrine likewise forecloses MHMH's effort

to interpret New Hampshire law to *implicitly* adopt the same burdens on manufacturers' contractual obligations with the federal government. Each theory depends entirely on the federal relationship between manufacturers and HHS, imposes additional burdens solely based on that relationship, and "treats manufacturers with 340B agreements worse than manufacturers who do not participate"—all contrary to the intergovernmental immunity doctrine. *Id.* at *13-14.

### C. MHMH's Claims Are Unlikely to Succeed on Their Own Terms.

Independent of preemption, each of MHMH's counts independently fail on their own terms. For the avoidance of doubt, Lilly understands MHMH's claims to turn on Lilly's claims-data condition for 340B federal pricing, which Lilly included in its offer for in-house purchases in January 2026. *See, e.g.*, Br. 1-2, 10-11, 13-14, 16, 19, 20, 24, 30-31.

MHMH's claims largely boil down to the incorrect claim that Lilly's claims-data condition violates the federal 340B statute, causing overcharges by imposing a condition MHMH does not like on Lilly's 340B offer. The 340B statute requires only that manufacturers make a "bona fide" offer to sell to covered entities at the 340B price. *Novartis*, 102 F.4th at 464. That is why two federal courts of appeals have already upheld "reasonable conditions"—including claims-data conditions—on these offers. *Id.*; *Sanofi*, 58 F.4th at 706. Pursuant to that precedent, and parallel government statements, *see* pp. 2-3, *supra*, Lilly's terms are lawful, and the predicate for nearly all of MHMH's claims (that Lilly violates 340B itself), thus, cannot be satisfied. But in any event, each claim fails under additional specific constraints on each state law claim.

#### 1. MHMH's Vermont Law Claim Does Not Apply in New Hampshire (Count I).

Count I relies on a state law that does not even apply to MHMH. MHMH invokes a *Vermont* law that generally prohibits manufacturers from requiring claims data "as a condition for allowing the acquisition of a 340B drug" by "a 340B contract pharmacy or a 340B covered entity." 18 Vt. Stat. Ann. § 4682; *see* Br. 19-20. But Lilly's 2026 terms only adjusted the requirements for

MHMH as to its in-house pharmacy, located in New Hampshire, and in-house dispenses, which only occur in New Hampshire. By its terms, Vermont law does not apply. Nor does MHMH explain how Lilly's 2026 terms could be relevant to its existing contract relationships in Vermont.

Beginning with MHMH's in-house pharmacy and in-house dispenses, Vermont law cannot possibly apply to activity in New Hampshire. Vermont law is governed by the presumption that "a statute which uses general words is to be construed as having no extraterritorial effect, unless it clearly indicates a different intention." *R&G Props., Inc. v. Column Fin., Inc.*, 968 A.2d 286, 299-300 (Vt. 2008). MHMH does not even attempt to identify some "different intention," and the text suggests the statute *does not* have any extraterritorial effect, specifically limiting its private right of action to suits for relief in Vermont Superior Court. 18 Vt. Stat. Ann. § 4684(a). Here, the *only* change in Lilly's 2026 claims-data condition extends to "*in-house pharmacy* dispensing"—which for MHMH, only includes dispenses *in New Hampshire* where MHMH is located. *See* Pl.'s Ex. 2 at 1. There is no indication that Vermont law applies to a condition on sales to a New Hampshire hospital for dispensing in New Hampshire.

Further, adopting such an argument would require an extraordinary and unprecedented expansion of state law with serious constitutional implications. *See, e.g.*, *New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond [its] jurisdiction" consistent with "the constitutional barriers" on which the federal government "depends."); *cf. Bigelow v. Virginia*, 421 U.S. 809, 824 (1975) (Virginia lacked "authority to regulate the services provided in New York," including "the standards of the New York hospitals and clinics"). MHMH provides no reason to wade into that constitutional thicket, much less in the extraordinary posture of a preliminary injunction. *See, e.g.*, *In re Blaisdell*, 261 A.3d 306, 313 (N.H. 2021) (courts should construe laws "to avoid" any "serious constitutional

problems … unless such construction is plainly contrary to [legislative] intent.”).

While MHMH states that it “servic[es] Vermont citizens through its Contract Pharmacy operations in that state,” Br. 19, that has nothing to do with MHMH’s in-house purchases and dispenses *in New Hampshire*. To the extent MHMH is complaining that it is unable to make purchases through contract pharmacies in Vermont, that argument comes far too late for preliminary injunctive relief and is forfeited regardless. MHMH has long acceded to Lilly’s terms (set forth in November 2023) limiting 340B pricing to purchases made from MHMH’s in-house pharmacy in New Hampshire. Asay Decl. ¶ 57. And MHMH’s brief makes no argument about these earlier 2023 terms, forfeiting any argument. In all events, purchases by or on behalf of *MHMH*—wherever made—would still be purchases by a *New Hampshire* entity, falling outside the text of the Vermont statute. *See* 18 Vt. Stat. Ann. § 4684(a).

### 2. MHMH Fails to Clearly Show a Violation of New Hampshire’s Consumer Protection Act (Count II).

In Count II, MHMH alleges a violation of New Hampshire’s Consumer Protection Act (“CPA”), which prohibits “any unfair method of competition or any unfair or deceptive act or practice” that is either (1) expressly enumerated in the statute, or (2) meets the “rascality” test. N.H. Rev. Stat. Ann. § 358-A:2; *Fat Bullies Farm, LLC v. Devenport*, 164 A.3d 990, 995 (N.H. 2017). MHMH fails to state claim let alone show it is likely entitled to relief under either approach.

***Enumerated Conduct.*** The CPA “sets forth a list of [19] specific types of conduct that qualify as unfair or deceptive trade practices.” *State v. Priceline.com, Inc.*, 206 A.3d 333, 343 (N.H. 2019). MHMH invokes two: (1) anti-competitive “pricing” and (2) false advertising. N.H. Rev. Stat. Ann. § 358-A:2(V) (prohibiting misrepresentation of “sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities”), (XIV). MHMH provides no case law applying these provisions to conduct like Lilly’s, and Lilly’s in-house claims-data condition on its

federal 340B offers does not violate either prohibition.

*First*, MHMH does not explain how Lilly's condition "tends to create or maintain a monopoly, or otherwise harm[s] competition." N.H. Rev. Stat. Ann. § 358-A:2 (XIV). It only states Lilly has obtained access to "Medicaid and Medicare" patients "while avoiding the costs" of participating in those programs, i.e., the costs of complying with MHMH's view of the 340B statute. Br. 25. And it frames Lilly as putting MHMH to the choice of either complying with the allegedly "unlawful" claims-data condition or paying standard (i.e., market) rates for Lilly's drugs.

But nothing Lilly is doing is "unlawful" under the 340B program, as discussed above, and that alone is fatal to MHMH's theory. MHMH's allegations independently fail to make a connection to *competition*. MHMH's complaint is not that Lilly increased prices market-wide, nor that Lilly has affected market pricing, but rather that MHMH is not able to obtain special *discounted* pricing under a federal program because it is not willing to accept the terms of Lilly's offer. Br. 32. MHMH offers no cogent argument for how that could harm competition, let alone competent evidence to prove the point. Even assuming that the effect of Lilly's offer is to increase the price of its 340B drugs (it is not), a mere price increase does not tend to create or maintain a monopoly or otherwise harm competition. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) ("[A] reasonable finder of fact cannot infer monopoly power just from higher prices" for "heterogeneous product"). To the extent MHMH believes Lilly should lose access to Medicare or Medicaid, that underscores that this case is an improper end-run around HHS and the 340B statute, as the federal government's briefing elsewhere confirms. *See* U.S. Amicus Br., 2026 WL 527776, at *16-17.

*Second*, MHMH's false advertising theory is baseless. For one, a CPA false advertising claim requires evidence of the defendant's "knowledge or intent" to deceive. *Kelton v. Hollis*

*Ranch, LLC*, 927 A.2d 1243, 1246 (N.H. 2007); *see also Cohen v. Bos. Sci. Corp.*, 725 F. Supp. 3d 144, 152-53 (D.N.H. 2024) (summarizing cases requiring knowledge). Here, Lilly could not have been more open, honest, and transparent about what it was doing, defeating any claim that it was misleading, let alone that Lilly did not believe it was complying with the 340B statute. For *months*, Lilly issued multiple public letters, engaged in continued open outreach to covered entities, and repeatedly kept the regulator HRSA updated on its claims-data terms, the legal basis for such terms, and its intent to enforce same. Asay Decl. ¶¶ 29-50; Pl.'s Ex. 6. MHMH offers no evidence or argument that show that Lilly does not genuinely believe it complies with the 340B statute, merely exercising a long-recognized ability to seek "standard information" consistent with case law and federal guidance. *Novartis*, 102 F.4th at 463 (quoting 59 Fed. Reg. 25,110, 25,114 (May 13, 1994)); *see* Rice Decl. Ex. 1, 2 (HRSA administrative proceedings denying overcharge claims against claims-data requirements).

Regardless, MHMH fails to identify any misrepresentation as to "characteristics, … uses, [or] benefits" of Lilly's "goods" (or any other enumerated category). N.H. Rev. Stat. Ann. § 358-A:2(V). Under Rule 9(b), MHMH must "identify with specificity the statements it claims were misleading." *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1326 (S.D.N.Y. 1997); *see Archdiocese of San Salvador v. FM Int'l, LLC*, 2006 WL 437493 (D.N.H. Feb. 23, 2006) (applying Rule 9(b) to dismiss CPA claims); *PCS Wireless LLC v. A to Z Wireless Sols. Inc.*, 841 F. Supp. 2d 649, 654 (E.D.N.Y. 2012) (not "likelihood of success" on fraud claim when "particularity requirement" not met). MHMH identifies only the following statement in an SEC disclosure: "[W]e are required to provide ... reduced prices to private entities" classified as "340B covered." Br. 26 (quoting Thomasset Decl. ¶ 25). That statement, of course, is true, and Lilly *does* provide reduced prices to eligible entities that accept Lilly's 340B offer. That MHMH refuses to

accept the terms of Lilly's offer does not make that statement untrue. A dispute about how Lilly fulfills its federal obligations to HHS under its PPA does not show misrepresentation about the "characteristics, … uses, [or] benefits" of the "goods" (i.e., the actual medicines) that Lilly sells.

***Rascality Test***. MHMH also fails to show any entitlement to relief under the rascality test. Under that test, conduct violates the CPA if it "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce" and is "of the same type as" the categories "specifically delineated." *ACAS Acquisitions (Precitech) Inc. v. Hobert*, 923 A.2d 1076, 1094 (N.H. 2007). New Hampshire courts take "guidance" from a three-factor test applied by the Federal Trade Commission to assess whether conduct qualifies. *Id.* at 766. Those factors are:

> "[W]hether the practice: (1) 'without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness'; (2) 'is immoral, unethical, oppressive, or unscrupulous'; (3) 'causes substantial injury to consumers' (or competitors or other business people)."

*Priceline.com*, 206 A.3d at 343. No factor is met here.

*First*, Lilly's claims-data condition does not violate public policy—quite the opposite, for reasons the federal government itself has articulated. MHMH argues that Lilly violates *Vermont's* 340B law and potentially "similar laws" that a minority of states have passed. Br. 23. There is no reason that minority approach would dictate New Hampshire's public policy, when the Legislature considered—and *rejected*—a proposal to classify claims-data conditions as a deceptive trade practice. *See* S.B. 253, 169th N.H. Gen. Ct. (2025), https://tinyurl.com/4ct72avx; N.H. S. Journal, 169th N.H. Gen. Ct. 147 (Mar. 6, 2025), https://tinyurl.com/5ezwh6vz. MHMH provides no authority for such an extraordinary outsourcing of New Hampshire's own legislature's authority. If anything risks the public interest or shows rascality, it is MHMH's attempt to circumvent basic

transparency measures widely accepted by covered entities and endorsed by HRSA in analogous contexts. 91 Fed. Reg. at 48,896; Asay Decl. ¶¶ 40-41.

*Second*, MHMH fails to describe conduct that "is immoral, unethical, oppressive, or unscrupulous." *Fat Bullies Farm*, 164 A.3d at 996. MHMH argues that Lilly misrepresented its commitment to complying with the 340B statute and that it has unfairly forced MHMH to face a "'take-it-or-leave-it' offer." Br. 23-24. But again, there has been no knowing misrepresentation, and every indication to date is that Lilly's policy is not only lawful (per the federal courts of appeals), but necessary to ensure the integrity of the 340B program (per HRSA's requirement of the same data to ensure "program integrity," 91 Fed. Reg. at 48,896).

MHMH baldly asserts Lilly's goal is "pretextual," implying that Lilly does not seek it to curb 340B abuse but to "facilitate [its] marketing practices," "avoid paying valid claims, develop derivative data products for lobbying purposes, target and influence health care providers, and sell licenses to the data." Br. 13-14 & n.8. MHMH provides zero basis for that rank speculation beyond a declaration asserting "Lilly *could* use this data" for such purposes, Thomasset Decl. ¶ 41. Lilly does not use the data for such purposes—and never has. Asay Decl. ¶¶ 38-39. In fact, MHMH's authenticated exhibit shows those uses are already barred by Lilly's contractual agreement with its claims-data vendor. Pl.'s Ex. 3 at §§ 1.2, 1.3, 3.5. Rather, Lilly is requiring claims data for the same reasons as HRSA—to address "duplicate discounts," *Novartis*, 102 F.4th at 458, and provide necessary transparency. Asay Decl. ¶¶ 11-31. And even if MHMH had described "'selfish bargaining and business dealings,' such conduct w[ould] not be enough to justify" a CPA claim. *Estes v. ECMC Group, Inc.*, 565 F. Supp. 3d 289, 307 (D.N.H. 2020) (quoting *Barrows v. Boles*, 687 A.2d 979, 986 (N.H. 1996)). The CPA requires far clearer, and greater, rascality.

*Third*, as explained above, *see supra* Part I, MHMH has offered no evidence that MHMH

(or "consumers" or "competitors" or "businessmen") will face substantial injury from compliance with Lilly's policy. *Fat Bullies Farm*, 164 A.3d at 996. Rather, transparency will ultimately *benefit consumers*, from the reduced burden on government programs, including avoiding duplicate discounts, and lowering prices. *See* IQVIA Report, *supra* n. 4, at 1, 7 (efforts to "prevent duplicate discounts" may "slow 340B growth"; 340B expansion may "drive[] higher drug prices" when they "displace[] manufacturer rebates"). Further, given MHMH's existing obligations to provide claims data to others, Lilly's modest offer condition adds no meaningful burden. Asay Decl. ¶ 47.

### 3. MHMH's Contract Claims (Counts III and IV) Fail to Allege an Enforceable Contract or Any Breach.

MHMH's contract claims should be rejected out of hand, starting with the standard breach claim. According to MHMH, two companies with billions of dollars in revenue agreed to an amorphous "oral contract" under which Lilly either (i) agreed to comply with MHMH's interpretation of the 340B statute (and thus sell its medicines to MHMH at the 340B price without a claims-data condition), or (ii) forced MHMH to agree to a claims-data condition that is unconscionable. Br. 26-28. MHMH's statutory breach theory again depends on the incorrect premise that Lilly has violated the statute. MHMH's unconscionability argument is difficult to follow and ultimately baseless—unconscionability is a *defense*, but Lilly is not enforcing any contract against MHMH. Both claims depend on the predicate of an ethereal, nonexistent contract, which cannot support emergency injunctive relief, and fail several times over.

*First*, there was no oral contract and certainly no enforceable one. "[T]he terms of a contract must be definite in order to be enforceable." *Syncom Indus., Inc. v. Wood*, 920 A.2d 1178, 1187 (N.H. 2007); *see* Restatement (Second) of Contracts § 33(1) (Am. L. Inst. 1981) (terms must be "reasonably certain"). MHMH claims it "reasonably understood" that Lilly promised to comply with the 340B statute's requirements. Thomasset Decl. ¶ 20. But MHMH only offers "bits and

pieces of various" statements Lilly allegedly made about its 340B obligations and desire to comply with same, leading to a "patchwork" promise to comply with the law, which cannot establish a contract. *See Smith v. F.W. Morse & Co.*, 76 F.3d 413, 426 (1st Cir. 1996); Br. 28. Even if MHMH could establish some agreement on price, the purported agreement's other terms "are a mystery." *Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc.*, 2012 WL 27917, at *6 (D.N.H. Jan. 5, 2012) (rejecting purported oral contract that was not "reasonably clear" even if "some provisions can be discerned"). MHMH is silent as to what Lilly medicines it agreed to buy, as well as how much and when, or where the deliveries were to be made under this alleged contract.

Even if MHMH had sufficiently pled a plausible oral contract, a sale contract for goods of "$500 or more is not enforceable" under New Hampshire law unless "signed" in writing. N.H. Rev. Stat. Ann. § 382-A:2-201. Here, the specified payments are over that statutory threshold. *See* Thomasset Decl. ¶ 67 (stating purchase was made for $6,000 *over* the 340B price).

*Second*, the central premise of MHMH's breach theory (like its other claims) is that Lilly has breached a non-existent contract by requesting data outside of an audit. But Lilly has not violated HRSA's Manufacturer Audit Guidelines. Br. 20. Rather, the "claims data is necessary" for Lilly "to establish the reasonable cause required to trigger an audit". *AbbVie*, 808 F. Supp. 3d at 1278; *see PhRMA*, 760 F. Supp. 3d at 452-53. And HRSA, which promulgated the cited guidance, has both condoned claims-data requirements and distinguished them from "audits." 91 Fed. Reg. at 48,890 ("HRSA does not believe that reliance solely on standardized claim identifiers, audits, or improved coordination between government programs would be sufficient to address duplicate discount risks."). Nor has Lilly violated the 340B statute by imposing "reasonable conditions" on its offer to sell medicines at the 340B price. *See, e.g.*, *Novartis*, 102 F.4th at 464; *Sanofi*, 58 F.4th at 706. Certainly, Lilly's statements that it "will continue to offer" 340B prices

for those who *accept* its conditions and its summary of what the statute requires do not constitute a breached promise. *Compare* Br. 28 *with* Pl.'s Ex. 2.

*Third*, MHMH's cases show unconscionability is a *defense*, Br. 27, but as just explained, Lilly is not seeking to enforce any contract *against MHMH*, as there is none to enforce.

All three of these problems apply equally to MHMH's implied-covenant claim, which never identifies what contract triggered the implied covenant of good faith and fair dealing. Implied covenant claims require an enforceable contract. *J & M Lumber & Const. Co. v. Smyjunas*, 20 A.3d 947, 957 (N.H. 2011) ("New Hampshire law has not recognized a claim for breach of the implied covenant of good faith and fair dealing outside of the contractual context."). Even if such a contract existed, MHMH's invocation of "unreasonable terms and conditions" that are "void" incorrectly interpret federal law and ignore that MHMH is not seeking to avoid a contract, but to *compel* preferred terms. Br. 29-30.

Even if there were somehow an enforceable, unwritten contract between Lilly and MHMH about 340B, MHMH disregards its own obligations—it must take the bitter with the sweet. To be eligible for 340B Ceiling Prices at *all*, a covered entity may not engage in "duplicate discount[ing]" by obtaining a 340B discount where a Medicaid rebate is claimed for the same drug. 42 U.S.C. § 256b(a)(5)(A). And it may not "resell or otherwise transfer" a 340B-priced drug beyond its patients. *Id.* § 256b(a)(5)(B); *see* 42 U.S.C. § 256b(a)(4). But MHMH has not even tried to show that it is in compliance with these requirements, and therefore eligible in the first place, as surely any contract between the parties would require. The 340B program is not a one-way street: MHMH cannot import the 340B program's requirements for manufacturers without addressing the other side of the coin. MHMH is unlikely to succeed on either purported contract claim.

**4. MHMH Has Not Clearly Shown Any Unjust Enrichment (Count V).**

Finally, MHMH is unlikely to prevail on its claim for unjust enrichment. Where, as here, a

plaintiff seeks to establish unjust enrichment as an independent claim, it must show either "wrongful acts" or "a benefit that would be unconscionable for him to retain"—usually, one that is "shockingly unjust or unfair," *Est. of Mortner v. Thompson*, 182 A.3d 1260, 1265-66 (N.H. 2018) (citations omitted). As has been discussed, Lilly has not committed any wrongful acts, but only set ordinary information-sharing terms that have survived court and administrative challenge. *See supra* n. 9-11. And asking MHMH to provide claims data that would permit some transparency into its 340B practices is hardly "shockingly unjust or unfair." MHMH's arguments simply recycle points raised in support of other claims. It impugns Lilly's motivations based on rank speculation (with no competent evidence), *see supra* II.C.2; it vaguely suggests a concern about patient privacy that HRSA itself has rejected and MHMH has not been concerned with previously, *see supra* p.12; it wrongly argues that a request for claims data is akin to an unapproved audit under HRSA's Manufacturer Audit Guidelines, *see supra* II.C.3 (distinguishing audits from claims data); and it repeats that Lilly is violating the 340B statute itself, *but see* Background at B.1 and II.C.2. Br. 31-33. These arguments are no more persuasive here than anywhere else.

Further, to show it is *likely* to prevail on its theory, MHMH would need to demonstrate that at all times it remained eligible for 340B pricing by not engaging in any diversion or duplicate discounting. 42 U.S.C. § 256b(a)(4), (5)(A)-(B). But MHMH has not even presented any such evidence of its ongoing compliance—no doubt because there is strong evidence to the contrary from, *e.g.*, HHS's own audits. *See supra* n.13. The "doctrine of unjust enrichment" is a doctrine in "equity," *Est. of Mortner*, 182 A.3d at 1265, and cannot be appropriate absent equitable behavior by MHMH. MHMH is unlikely to prevail on unjust enrichment.

## III. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST DO NOT FAVOR AN INJUNCTION.

To obtain an injunction, MHMH is also obliged to make a "clear showing" that both the

"public interest" and "balance of equities" favor its request. *Starbucks*, 602 U.S. at 345. In a government program, the public interest includes an interest in avoiding "fraud" and "abuse[s]." *See U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1334 n.25 (4th Cir. 1989) ("undisputed" that "public is clearly served by addressing fraud in government contracting" to recoup funds); *In re Klein*, 648 B.R. 228, 234-35 (Bankr. D. Neb. 2022) ("The public has an interest in making sure the SBA loan process is not abused[.]") Whether "the balance of equities tip[]" in favor of the plaintiff requires "consider[ing] the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 20, 24.

Here, "the public's interest in transparency" and protecting against abuse of the 340B program are "predominant." *Nat'l Head Start Ass'n v. Dep't of Health & Hum. Servs.*, 297 F. Supp. 2d 242, 251 (D.D.C. 2004) (no injunction against HHS survey; data served transparency, and plaintiff failed to show that alternative inappropriate use of data was "the only potential use of the information sought"). HRSA has clearly stated that the 340B program's "integrity" faces "growing risk," and is now seeking claims-level data to address that issue. 91 Fed. Reg. at 48,887. HHS's own "audits" have "identified diversion violations … [and] double-dipped discounts," *AbbVie*, 808 F. Supp. 3d at 1272, and the HHS Secretary has publicly stated the 340B program "has become a boondoggle," *supra* n.1. That is why HRSA has concluded that the "reasonable condition[]" of requiring the submission of claims data, *Novartis*, 102 F.4th at 461, is key to "ensuring program integrity" even if it imposes some administrative "burden." 91 Fed. Reg. at 48,896 (new rebate program). Further, strong evidence suggests MHMH has *already* disregarded 340B program obligations—with MHMH going so far as to "self-terminate[]" "ineligible offsite outpatient facilities from the 340B Program" before the federal government could do so—making claims data particularly important in this context. HRSA, *Program Integrity*, *supra* n.13. An entity seeking

equitable relief cannot have "unclean hands" relating to "the matter in which [it] seeks relief." *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affs.*, 60 F.3d 867, 880 (1st Cir. 1995). MHMH's eligibility to be considered a covered entity and receive 340B pricing is in dispute. 42 U.S.C. § 256b(a)(4), (5)(A)-(B). This is not just a defense for Lilly. For MHMH to prevail on any of its theories it needs to prove eligibility. But it has made no showing of compliance; rather, it seeks to *avoid* any inquiry into its eligibility. Should MHMH respond that only HRSA decides its eligibility, that just confirms Lilly's principal point: None of this dispute belongs in court. Neither the balance of equities nor the public interest warrant emergency relief under these circumstances.

Further, as to the balance of harms, MHMH fails to acknowledge the foreseeable harm to Lilly. MHMH's mandatory injunction would force Lilly to sell its drugs at the 340B discount price with almost *no* offer conditions, even though its merits claims relate only to *claims-data* conditions. *See* Proposed Order at 2 (enjoining any "restrict[ion]" on, or "interfer[ence] with," 340B pricing *or* "interfer[ence]" with contract pharmacies receiving 340B pricing). Of course, requiring Lilly to abandon conditions not even at issue here will impose substantial harm. And even if limited to claims data, MHMH's injunction would cause Lilly to bear the brunt of duplicate discounts without the ability to protect itself though HRSA's audit procedures. While MHMH asserts that "audits" can protect Lilly's interest, MHMH concedes that audits are unavailable under current regulations without "documentation" establishing "reasonable cause," 61 Fed. Reg. at 65,409-10, and it offers no plausible alternative for manufacturers to access ADR apart from claims data. *See AbbVie*, 808 F. Supp. 3d at 1278 (claims data is "*the* way to detect" issues).

This public interest and harm to Lilly plainly outweigh any harm to MHMH if no injunction issues. As explained, MHMH already routinely exchanges this information with others, and will have to submit this data when purchasing medications subject to HRSA's new program. 91 Fed.

Reg. at 48,890. So it is highly unlikely that MHMH will need to even hire one more full-time employee, *compare* Br. 16 *with* TA Decl. ¶ 40. But even if it did, that cannot plausibly "pose[] a serious threat to [MHMH's] financial stability" while awaiting judgment, Br. 36, in light of MHMH's recent $152 million in annual profit, *see supra* n.15.

In sum, none of the preliminary-injunction factors favor MHMH. For multiple, independent reasons, MHMH is not entitled to any relief, let alone emergency relief.

## IV. NO INJUNCTION COULD ISSUE WITHOUT A BOND.

Finally, MHMH concludes by arguing that if it obtains a preliminary injunction (and it should not), it should not be required to post a bond despite Federal Rule of Civil Procedure 65(c), which permits a preliminary injunction "only if" sufficient security is provided to pay the "costs and damages sustained" by a party later "found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see* Br. 37. That makes no sense here. The reason for that rule—that "a party injured by the erroneous … injunction 'has no action for damages in the absence of a bond'"—fully applies. *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 10 (1st Cir. 1991). If Lilly is later "found to have been wrongfully enjoined," Fed. R. Civ. P. 65(c), it will have no way to recover the difference between the 340B price and the standard rate it would have charged absent claims data. Per MHMH, the difference between those prices amounts to "at least $4.7 million" annually, Br. 16, which means MHMH must post a bond of at least that much, and more if adjudication in the ordinary course takes more than a year to progress.[20]

MHMH argues that there is an exception to the bond requirement because MHMH is seeking to enforce federal statutes, vaguely citing the act that enacted the 340B statute, and "Medicaid and Medicare statutes." Br. 37. But MHMH has no right to enforce those statutes here,

[20] To be clear, even if the Court determines that an injunction should issue, that injunction cannot provide relief to anyone beyond the parties to this suit. *See Trump v. CASA*, 606 U.S. 831 (2025).

as Congress did not include a private right of action in the 340B statute. Accepting MHMH's own characterization of its claim underscores why no preliminary injunction can issue *at all*. But to the extent any injunction were issued, MHMH must post a bond.

## CONCLUSION

The Court should deny MHMH's motion for a preliminary injunction.

Dated:

Respectfully submitted,

*/s/ James M. Campbell*

James M. Campbell, NH Bar #29054817
Jacob J. Lantry, *pro hac vice application forthcoming*
CAMPBELL CONROY & O'NEIL, P.C.
20 City Square, Suite 300
Boston, MA 02129
(617) 241-3000
jmcampbell@campbell-trial-lawyers.com
jlantry@campbell-trial-lawyers.com

John C. O'Quinn, P.C.
(*pro hac vice*; DC Bar #485936)
Megan McGlynn Butler
(*pro hac vice*; DC Bar #242410)
Chris Pagliarella
(*pro hac vice*; DC Bar #2773493)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: +1 202 389 5000
Facsimile: +1 202 389 5200
john.oquinn@kirkland.com
megan.butler@kirkland.com
chris.pagliarella@kirkland.com

J. Matthew Rice
(*pro hac vice*; TN Bar #040032)
KIRKLAND & ELLIS LLP
Symphony Place
150 3rd Avenue South, Suite 1220
Nashville, TN 37201
Telephone: +1 629 222 0100
Facsimile: +1 629 222 0101
matthew.rice@kirkland.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction was filed electronically on this 17th day of September, 2026, and will, therefore, be served electronically upon counsel for Plaintiff.

*/s/ James M. Campbell*
James M. Campbell, NH Bar #29054817