**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| MARY HITCHCOCK MEMORIAL HOSPITAL,<br><br>Plaintiff,<br><br>v.<br><br>ELI LILLY AND COMPANY,<br><br>Defendant. | Case No. 1:26-cv-00616 |

**<u>DECLARATION OF DEREK ASAY</u>**

I, Derek L. Asay, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief. I am over the age of 18 years old. All of the facts set forth below are based on my personal knowledge. If called as a witness, I could and would testify to the facts below.

**Background on Lilly**

1. I am Senior Vice President, Government Strategy and Federal Accounts, at Eli Lilly and Company ("Lilly"). Through my work, I am familiar with the administration of Lilly's 340B policies, processes, and payments.

2. Lilly is a medicine company turning science into healing to make life better for people around the world. It has been pioneering life-changing discoveries for 150 years, and today its medicines help tens of millions of people across the globe. Harnessing the power of biotechnology, chemistry and genetic medicine, Lilly scientists are urgently advancing new discoveries to solve some of the world's most significant health challenges: redefining diabetes care; treating obesity and curtailing its most devastating long-term effects; advancing the fight

against Alzheimer's disease; providing solutions to some of the most debilitating immune system disorders; and transforming the most difficult-to-treat cancers into manageable diseases.

**Lilly's Participation in the 340B Program**

3. Lilly participates in the federal 340B Drug Pricing Program, 42 U.S.C. § 256b ("340 Program").

4. Lilly participates in that program via a Pharmaceutical Pricing Agreement with the United States Department of Health and Human Services. Lilly and the Department of Health and Human Services are the only parties to that agreement. A true and correct copy of (a) the most recent version of the Pharmaceutical Pricing Agreement, executed in June of 2014, and (b) two accompanying addenda to the PPA executed by these parties in June and August 2018, is attached as **Exhibit A** to this declaration**.**

5. As shown in these documents, the PPA sets forth the statutory requirement to make an offer to sell covered outpatient drugs to eligible healthcare providers ("Covered Entities") at a reduced price (the "ceiling price" or "Section 340B price").

6. Apart from any terms set by Lilly, the 340B Program itself prohibits duplicate discounts. Under this prohibition, Covered Entities cannot cause Medicaid to ask Lilly for a Medicaid rebate on dispenses of 340B-priced drugs. The 340B Program also prohibits Covered Entities from selling or transferring a 340B-priced drug to a person who is not its patient, a practice commonly called "diversion."

7. However, in practice, duplicate discounts in the 340B Program—the second largest federal drug program—are a well-known, widespread problem, as even the federal government has observed. From its own review of claims data and audits—processes I discuss further below—Lilly has identified numerous instances of duplicate Medicaid discounts.

8. Some of the problems with duplicate discounts arise from increased operational complexity. Covered Entities have grown in size and sophistication since the start of the 340B program. Many have also turned to "contract pharmacy" arrangements, where external for-profit commercial pharmacies can make purchases at 340B prices. In practice, such pharmacies commonly intermingle 340B and non-340B drugs, using a complex replenishment system and specialized software to classify purchases after the fact as 340B purchases.

9. Incentives like these have also given rise to a cottage industry of 340B consultants and third-party administrators, which assist Covered Entities in maximizing revenue from the 340B program in exchange for a portion of the 340B spread (*i.e.*, the difference between the 340B price and the reimbursement paid by an insurer).

10. As discussed further below, Lilly's own audits of Covered Entities have indicated that "covered entities have limited controls in place to prevent duplicate discounts with Medicaid managed care," and that such limited controls often go unexplored by HRSA. I understand that HRSA today does not audit for duplicate discounts with managed Medicaid care. A true and accurate copy of a December 2024 letter describing these issues, and necessary responses, is attached as **Exhibit B** to this declaration.

**Lilly's Longstanding Claims-Data Requirement For 340B Pricing**

11. Because Lilly had uncovered abuse of the 340B program, including diversion and duplicate discounting, Lilly and other manufacturers began imposing transparency-focused conditions on their offer to sell 340B medicines in 2020.

12. Such conditions included a requirement to provide manufacturers with claims data for dispenses of 340B drugs.

13. Claims data are standard information for a particular transaction—such as the provider ID and the date of service—that help determine whether that transaction qualifies for 340B pricing, and whether it overlaps with other federally required price concessions.

14. Claims data is critically important to Lilly's ability to detect potential violations of the 340B Program, like duplicate discounting and diversion. Further, claims data is necessary to provide the evidence needed to establish the reasonable cause that the Health Resources and Services Administration (HRSA) treats as required to access the statutory audit process and audit Covered Entities. If Lilly is unable to obtain that data, it will be substantially more difficult, if not impossible, for Lilly to initiate audits.

15. The collection and sharing of claims data is not novel for Covered Entities. Prior to the manufacturers adopting their transparency policies, Covered Entities were already collecting and submitting claims data to other entities for payment—Medicare Part D plans, state Medicaid agencies, and private insurance companies, as well as pharmacy benefit managers when necessary to facilitate payment.

16. Such other entities in the pharmaceutical supply and reimbursement chain often must provide that claims data to Lilly as part of the normal documentation of claims. For example, state Medicaid agencies have long provided to Lilly the claims data they receive to substantiate payment requests. Pharmacy benefit managers likewise provide the claims data they receive to Lilly to substantiate payment requests. In short, it is the norm, not the exception, for claims data to be provided to substantiate requests for payments or discounts.

17. Lilly announced its initial claims-data offer term to Covered Entities on December 16, 2021. A true and correct copy of this letter is attached as **Exhibit C** to this declaration.

18. Lilly explained that, as a condition of its offer to sell at 340B prices, that it would permit Covered Entities to use any number of contract pharmacies if "the covered entity agrees to provide, and does provide on an ongoing basis, claims-level data associated with such contract pharmacy orders." Ex. C. Lilly explained that its offer required the submission of "minimal, de-identified claims data sufficient to allow Lilly to monitor diversion and duplicate discounts and promote program integrity." *Id.*

19. Covered Entities choosing to use contract pharmacies generally complied with Lilly's new offer terms without issue.

20. Lilly's December 2021 offer required Covered Entities to submit their claims data through Lilly's third-party provider, Second Sight Solutions, and its 340B ESP Platform. Lilly has used this provider and platform without interruption for all collection of Covered Entity claims data since that time.

21. At all times from Lilly's initial offer to today, Second Sight Solutions has had in place terms of use committing to maintaining the data in a de-identified manner, such that no actual protected health information is collected, and the information cannot be combined with other data sets by Lilly to reveal a patient's identity.

22. Second Sight Solutions' terms of use provide that Covered Entities only agree to share the data for the purpose of de-duplication (and evaluating compliance with the terms, such as by making sure that the fields are being shared). The terms of use do not allow manufacturers to use the data for marketing, lobbying, resale, or other unspecified purposes. A true and correct copy of Second Sight Solutions' terms of use, downloaded on September 12, 2026, are attached as **Exhibit D** to this Declaration.

23. On November 6, 2023, Lilly sent an update letter relating to issues with its existing policy to Covered Entities. A true and correct copy of that letter is attached as **Exhibit E** to this declaration.

24. That letter explained that, after implementing its new claims-data requirement, Lilly discovered numerous problems with Covered Entities' use of unlimited contract pharmacies, including problems uncovered by this claims data.

25. Those problems included: "thousands of duplicate Medicaid discounts"; "hundreds of instances where multiple covered entities sought replenishment on the same unit of 340B product"; "refusal to investigate Medicaid duplicate discount data" and "[u]nderreporting of claim-level data." Ex. E.

26. Lilly concluded that it was "no longer feasible" "to monitor and pursue corrective action" for these issues. *Id.* Thus, effective November 16, 2023, Lilly reinstated its prior requirements limiting 340B pricing to in-house pharmacies, contract pharmacies wholly owned by the Covered Entity, and—for Covered Entities that lacked an in-house pharmacy—one designated contract pharmacy location. *Id.* (noting an exception for penny-priced insulin pursuant to other terms).

27. On June 19, 2024, Lilly sent a follow-up letter to covered entities outlining additional steps required to address ongoing compliance and duplication problems. Ex. B. Lilly explained that Covered Entities permitted to have a single designated contract pharmacy would be required, as part of Lilly's offer terms, to supply claims data from contract-pharmacy transactions. Again, Lilly explained that this required the provision "on an ongoing basis, [of] claims-level data associated with such contract pharmacy orders to 340B ESP™," Second Sight Solutions' platform. *Id.* Lilly also explained that while 340B pricing would remain available to purchases for in-house

pharmacies or, for Covered Entities without an in-house pharmacy, one designated contract pharmacy, its terms would no longer include a separate exception allowing 340B pricing through wholly-owned contract pharmacies. *Id.* Lilly explained that it was necessary to address ongoing compliance issues, "limited controls in place to prevent duplicate discounts," and an absence of relevant HRSA oversight. *Id.*

28. While application of the November 2023 and June 2024 requirements have varied across state jurisdictions, these requirements have applied in New Hampshire at all times since their announcement.

**Lilly's In-House Claims-Data Requirement**

29. In January of 2026, Lilly extended its longstanding claims-data submission requirement to in-house pharmacies. A true and accurate copy of a January 15, 2026 letter stating that requirement is attached as **Exhibit F**, and is also attached to the Thomasset Declaration as Exhibit 2.

30. In that letter, Lilly explained that its review of contract pharmacy claims data had both allowed Lilly to identify impermissible duplicate discounts and provided Lilly with the data necessary to initiate audits under HRSA guidance. Ex. F.

31. Lilly explained that "[i]n order to help identify the full universe of duplicate discounts and other program abuses, preserve our ability to initiate audits, and expand transparency even further, effective for dispenses on or after February 1, 2026, [Lilly] will require covered entities to submit CLD [*i.e.*, claims-level data] for **all** 340B dispenses, including in-house pharmacy dispensing." *Id.*

32. Lilly's announcement also included instructions for how to enroll in the 340B ESP™ platform, and contract information for additional help with the process. *Id.* Lilly noted that once enrollment is complete, "the claims upload process takes about 5 minutes." *Id.*

33. Lilly assured 340B covered entities that it would "continue to offer all covered entities its 340B medicines at or below the 340B ceiling price, consistent with the 340B statute, as long as the covered entity provides the minimal, standard business information outlined in this notice." *Id.* However, "[f]ailure to provide timely, complete, and accurate data for all products dispensed at 340B ceiling prices may result in loss of access to pricing until such time as the outstanding data is provided." *Id.*

34. The in-house claims-data requirement took effect February 1, 2026. *Id.* While the letter noted that the current claims-data requirement varies by jurisdiction, it has at all times since its announcement applied in New Hampshire. *Id.*

35. The claims-data requirement includes different, but overlapping, data sets for pharmacy claims, where the medicine is dispensed to the patient for the patient's self-administration, and medical claims, where the provider is administering the medicine to the patient and billing the insurer for the cost of the medicine and the cost of administration.

36. Lilly's claims-data terms for pharmacy claims require submission of the following required data fields, with additional optional fields as noted:

| Required | Optional |
|---|---|
| 1. Contracted Entity ID | 1. Wholesaler Invoice Number |
| 2. Date of Service | 2. Ship to Date |
| 3. Date Prescribed | 3. Ship to Location |
| 4. NDC | 4. 340B Account Number |
| 5. Quantity | 5. Product Serialization Number |
| 6. Rx Number | 6. Fill Number |
| 7. Service Provider ID | |

37. Lilly's claims-data terms for medical claims require submission of the following required data fields, with additional optional fields as noted:

| Required | Optional |
|---|---|
| 1. 340B ID | 1. HCPCS Code Modifier |
| 2. Claim Number | 2. Rendering Physician ID |
| 3. Claim Line Number | 3. Wholesaler Invoice Number |
| 4. Date of Service | |
| 5. Health Plan Name | |
| 6. Health Plan ID | |
| 7. NDC-11 | |
| 8. Quantity | |
| 9. Service Provider ID | |
| 10. HCPCS Code **OR** Unit of Measure | |

38. Lilly uses this claims data to avoid diversion, duplicate discounts, and to prepare the information needed to satisfy the government's standard for seeking audits when required.

39. By contrast, and consistent with Second Sight Solutions' terms, Lilly does not use this de-identified data for marketing purposes, nor could it be reasonably used for such purposes. Lilly also does not sell licenses to the data, or use the data for lobbying materials, for materials to influence healthcare providers, or to avoid playing claims to covered entities.

40. A large majority of covered entities accepted Lilly's offer with the updated claims-data condition and have submitted claims-data for in-house pharmacies without issues. Over 2,800 distinct entities submitted over 800,000 in-house pharmacy claims between January 1 and August 31, 2026. Many of those submissions came from small, often-under-resourced covered entities like community health centers, STD clinics, HRSA-funded health centers, critical access hospitals, and federally qualified health centers.

41. These covered entities' broad compliance is consistent with past practice, as covered entities have generally complied with the earlier versions of the claims-data requirements. The vast majority of covered entities have not contended that Lilly's claims-data requirement would impose an administrative burden or present any patient privacy concerns. After all, covered entities already share this deidentified data with other relevant third parties to obtain payment.

42. A small minority of covered entities refuse to submit the claims data Lilly needs to ensure the 340B program's integrity. Many of these covered entities are among the most well-resourced and sophisticated 340B program participants.

43. Lilly repeatedly reached out to numerous covered entities, advising them of the need to submit claims data if they desired to continue to purchase medicines at the 340B ceiling price and "strongly urg[ing]" them to submit claims data. A true and accurate copy of one such communication is attached as **Exhibit G** to this declaration, and is also attached to the Thomasset Declaration as Exhibit 4. Lilly also directed covered entities to contact information to Second Sight Solutions if technical "registration [or] upload assistance" was needed, to ensure compliance without undue technical obstacles. Ex. G.

44. Lilly's goal is to achieve compliance from covered entities and avoid interruption to 340B pricing without sacrificing Lilly's access to basic information.

45. Any claim that Lilly's requirement is a pretext to remove 340B pricing is false, as evidenced both by the fact of overwhelming compliance, and Lilly's extensive follow-up with covered entities over many months to facilitate compliance prior to any adverse action.

46. Lilly has also kept HRSA informed throughout its efforts to implement its expansion of its claims-data requirement to in-house pharmacies.

47. On January 27, 2026, Lilly wrote HRSA in response to complaints by wealthy, sophisticated hospitals and their trade association about Lilly's requirement. Lilly explained that the "modest" data "that Lilly seeks is 'standard information' that decades-old HRSA guidance requires all pharmacies (in-house or contract) to maintain and routinely must be provided to insurers and other third parties." Lilly also noted that two federal courts of appeals had "squarely held that the 340B statute permits manufacturers to place reasonable conditions on their 340B offers—including conditions that require the submission of *exactly* this kind of claims data." And Lilly explained that this data is necessary to dispute duplicate discounts and initiate audits.

48. Lilly continued to follow up with HRSA directly to advise them of the status of compliance with Lilly's requirement among covered entities, flagging that a minority of covered entities had declined to accept the updated terms of Lilly's offer.

49. Finally, in response to months of noncompliance and refusal to engage with Lilly in good faith, Lilly advised HRSA on June 1, 2026, that it would begin issuing final notices to covered entities and suspending their 340B pricing if they refused the terms of Lilly's offer to sell at 340B prices, including the requirement to submit claims data. A true and accurate copy of that letter is attached as **Exhibit H** to this declaration, and is also attached to the Thomasset Declaration as Exhibit 6.

50. At no point in these six months of correspondence did HRSA ever tell Lilly that it would be unlawful to require these offer terms.

**MHMH's Refusal to Accept Lilly's 340B Offer**

51. Mary Hitchcock Memorial Hospital ("MHMH") is a part of the Dartmouth Health system, a regional medical system, and is affiliated with Dartmouth College's Geisel School of Medicine. I understand that MHMH has claimed to be a 340B covered entity.

52. Like many covered entities, MHMH previously accepted Lilly's 340B offer with the contract-pharmacy claims-data condition.

53. From July 2022 to November 2023, MHMH uploaded claims data for Lilly to enable 340B pricing for its contract pharmacies.

54. MHMH submitted data for approximately 17,000 claims from 184 contract pharmacies, with about 95% of those claims being submitted by MHMH directly, with the remaining coming from third-party administrators.

55. While most contract pharmacies relating to claims were located in New Hampshire, Lilly also received claims relating to contract pharmacies in sixteen additional states. These states included not only border states such as Massachusetts and Vermont, but also geographically distant states such as Arizona, Texas, and Florida.

56. MHMH uploaded this claims data to Second Sight Solutions via its 340B ESP website. As noted, Second Sight Solutions is the same vendor used in the January 2026 claims-data requirement, and 340B ESP is the same website used in the January 2026 claims-data requirement. To the best of my knowledge, the pharmacy-benefit fields required by Lilly have also not changed since MHMH's prior submissions in 2022 and 2023.

57. Consistent with the requirements in Lilly's current offer for covered entities with in-house pharmacies, MHMH ceased using contract pharmacies after November 2023 for Lilly 340B purchases. Thus, MHMH had not used a contract pharmacy for Lilly drugs in New Hampshire, Vermont, or any other state for over two years prior to suing Lilly.

58. Despite its past history submitting claims data to Lilly, MHMH failed to begin submitting claims data in compliance with Lilly's offer terms when those terms were updated in Lilly's January 15, 2026 letter.

59. Lilly followed up with MHMH multiple times urging compliance, and sent MHMH a final notice dated June 17, 2026, urging MHMH to submit its outstanding claims data by June 24, 2026, to maintain access to 340B pricing. A true and accurate copy of that letter is attached as **Exhibit I** to this declaration, and is also attached to the Thomasset Declaration as Exhibit 7.

60. Nevertheless, MHMH still refused to submit claims data.

61. Based on MHMH's refusal to accept Lilly's offer, Lilly directed its wholesalers to suspend 340B pricing on Lilly's medicines to MHMH, effective July 1, 2026.

62. That suspension is intended to apply only until MHMH accepts the mandatory terms of Lilly's offer to sell at the 340B price.

63. Lilly's offer has not been withdrawn, and MHMH may accept Lilly's terms at any time, and subsequently make purchases at 340B prices.

64. Absent 340B pricing, MHMH is charged the ordinary market price for Lilly's medicines.

65. As explained above, the 340B price is set only by the PPA between Lilly and the United States Department of Health and Human Services. Lilly has no oral or written contract with MHMH that incorporates a separate agreement to the 340B ceiling price. Lilly has never negotiated terms with MHMH for any kind of separate agreement to the 340B ceiling price.

66. To date, MHMH has chosen not to accept the claims-data terms of Lilly's offer, and had thus chosen to pay normal, market price for Lilly's medicines since early July,

67. MHMH does so even though it could have, at all times, paid only the 340B ceiling price had it submitted claims data to Lilly, just as it already submits claims data to insurers on an ongoing basis, and just as it submitted claims data to Lilly just three years ago as to its contract pharmacy transactions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 16th day of September, 2026, at Indianapolis, IN.

Derek L. Asay