# Exhibit H

# EXHIBIT 6

**Eli Lilly and Company**

Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1.317.276.2000
www.lilly.com

June 1, 2026

The Honorable Thomas J. Engels
Administrator, Health Resources and Services Administration
U.S. Department of Health and Human Services
5600 Fishers Lane
Rockville, MD 20852

**RE:** ***Lilly's In-House Claims Data Requirement—Upcoming Action***

Dear Administrator Engels:

Today, Lilly is taking another crucial step to root out the fraud, waste, and abuse in the 340B program that harms employers, state and federal governments, and patients. Four months ago, Lilly expanded its long-standing 340B claims-data-collection requirement, so that covered entities give Lilly the same de-identified claims data for in-house pharmacy dispenses that they already collect and send to others every day. That data is necessary to identify unlawful duplicate discounts, audit covered entities, initiate HRSA's dispute-resolution process, and comply with obligations under the Inflation Reduction Act. Lilly gave covered entities a generous two-month runway to prepare for this change, sent two rounds of follow-up reminder letters to these covered entities, and individually contacted some of those entities who had not submitted any claims data. A large majority of covered entities accepted Lilly's offer and submitted data without incident. A minority of entities—led by the country's largest and best-resourced hospitals and organized through their trade associations—continues to refuse to submit data and are recycling the same pretextual objections. After sending multiple reminders and warnings, Lilly is notifying an initial set of covered entities that they have five business days to accept Lilly's 340B offer by submitting claims data. If they do not, Lilly will instruct its wholesalers that those entities are no longer eligible for 340B pricing until they submit the outstanding data. Lilly intends to follow the same course for additional covered entities in the weeks ahead.

Lilly takes this step reluctantly. For months, Lilly worked tirelessly to avoid this outcome and resolve any legitimate concerns. But Lilly cannot allow a coordinated holdout—orchestrated by powerful hospital trade groups that oppose 340B transparency in any form—to defeat a lawful, modest integrity measure that is essential to ending what Secretary Kennedy has described as the 340B "boondoggle."[1] The data Lilly is collecting are the same data covered entities already transmit every

[1] *Hearing Before the H. Comm. on Energy & Commerce*, 119th Cong. at 1:20:59–1:22:28 (Apr. 21, 2026) (Testimony of Sec. Robert F. Kennedy, Jr.), https://tinyurl.com/4rcvk2st.

day to commercial insurers, to Medicare, and to Medicaid. Two federal courts of appeals have confirmed that a manufacturer may impose conditions of this kind, and HRSA itself has held for more than three decades that a manufacturer may "request standard information" as a condition of the 340B offer.[2]

## I. The Overwhelming Majority of Covered Entities Are Complying Without Issue.

What the courts and HRSA have confirmed as a matter of law, the covered entities have confirmed in practice: Lilly's condition is both lawful and easily met. Approximately 70 percent of covered entities purchasing Lilly medicines—totaling approximately 2,350 distinct entities—have submitted in-house claims data, and Lilly has now received nearly 800,000 in-house claims since January 1, 2026. Compliance spans the full range of covered entity types: 80 percent of community health centers have submitted, as have 85 percent of STD clinics, 75 percent of HRSA-funded health centers, two-thirds of critical-access hospitals, and substantial majorities of federally qualified health centers and other smaller entity types. If submitting standard, de-identified claims data were truly burdensome, unlawful, or operationally infeasible, thousands of covered entities—including many with far fewer resources than the holdouts—could not be doing it without complaint. But they are.

Now even hospitals' own trade associations have admitted the same thing—that the data can be supplied. The American Hospital Association (AHA)—which maintained for months that supplying claims data would be unlawful and unduly burdensome—has proposed that covered entities furnish the very same data, but through a government-administered "clearinghouse."[3] That proposal is telling. Contrary to the position it pressed for months, the AHA's proposal concedes that the data Lilly seeks are already collected and can lawfully be supplied. Its objection, in the end, is not that supplying the data is too burdensome, but that it would rather not supply the data to Lilly—even as its members continue to receive millions of dollars in reduced-price medicine.

These facts confirm what Lilly has said from the start: submitting claims data is a modest, reasonable, easy-to-meet 340B transparency measure. Covered entities already collect and transmit claims data across systems in order to place each new replenishment order. And they must collect and maintain claims data to ensure they are complying with their 340B obligations. When confronted with these facts, the holdouts have offered no meaningful response.

## II. Lilly Has Given Covered Entities Every Opportunity to Accept its Offer.

For the determined minority that has refused, Lilly has gone to extraordinary lengths to get their cooperation. On January 15, 2026, Lilly notified every covered entity—by email and/or U.S. mail—that its long-standing claims-data condition would extend to in-house pharmacy dispenses occurring on or after February 1, and that data would need to be submitted 45- or 60-days later. That notice gave covered entities a full two months to prepare. When some entities failed to submit data,

[2] 59 Fed. Reg. 25,110, 25,114 (May 13, 1994).

[3] Letter from Richard J. Pollack, President & CEO, Am. Hosp. Ass'n, to David A. Ricks, Chair & CEO, Eli Lilly & Co. (May 13, 2026), https://www.aha.org/lettercomment/2026-05-13-aha-urges-lilly-drop-340b-claims-data-policy-proposes-neutral-clearinghouse.

Lilly followed up by letter in March, and again in April. In early May, Lilly individually contacted the fifty largest holdouts, expressly invited them to identify their concerns, and offered live discussions to work through any legitimate issues. Each of the covered entities receiving notice today has been contacted multiple times since January.

The reactions were telling. The vast majority of covered entities refused to engage with Lilly in good faith. Of the fifty entities Lilly individually contacted, eleven did not respond at all. Two others sent letters declining a meeting using identical language—down to the same closing sentence: "we see no reason to meet with Lilly to discuss this further, and we look forward to Lilly's reversal of this illegal and unsupported policy." And of the thirteen entities that did meet with Lilly, twelve would only do so with outside counsel present. On calls, the covered entities' lawyers used the time to demand "clarifications" from Lilly while refusing to make any commitments of their own.

## III. The Largest Hospitals Are Orchestrating a Coordinated Boycott.

The pattern of non-compliance tells its own story. The holdouts are not small clinics struggling with a technical lift; they are the largest and most sophisticated participants in the 340B program. Disproportionate-share hospitals are withholding data at substantially greater rates than community health centers, federally qualified health centers, STD clinics, and critical-access hospitals. In fact, ten covered entities—all major disproportionate-share hospitals—have submitted zero claims despite earning between ***$8 million and $16 million*** in 340B profits on Lilly's medicines since the requirement took effect.

As Lilly previously explained, the boycott was organized through the same hospital trade associations that have repeatedly run this play against federal transparency initiatives—against the 340B rebate pilot last fall, against CMS's Outpatient Prospective Payment System drug acquisition cost survey this spring, and now against Lilly. Covered entities have admitted as much in their own words. One senior pharmacy executive alleged that Lilly was "doing just fine economically and is just trying to figure out how to shut down the program," and described "multiple conversations" with peers about "ways to actively move patients off of Lilly therapies in favor of competitor products as soon as possible." Another said her colleagues at other covered entities were strategizing about how to "switch therapies that patients are taking . . . in order to create a change in market share resulting in significant losses for Lilly." A third said his hospital's 340B steering committee had simply concluded that it "do[es] not believe [it] should have to comply."

## IV. The Holdouts' Objections Are Pretextual.

The objections themselves do not survive scrutiny, and cannot excuse entities from submitting the required data. The principal complaint Lilly hears from boycotting entities' outside counsel is that submitting claims data would violate the Health Insurance Portability and Accountability Act (HIPAA). In twelve of the thirteen meetings Lilly held with holdouts—all with the same law firm, no less—that was the threshold objection. The argument is not serious. The data covered entities upload

to Lilly's vendor are de-identified before submission.[4] Neither Lilly nor its vendor can identify any patient from them. And some of the very same covered entities raising the HIPAA objection have, for years, transmitted the same de-identified data through the same vendor in connection with contract-pharmacy replenishment orders. If their position were correct, they would be admitting to widespread, longstanding privacy violations.

The boycotters' refusal to answer basic follow-up questions belies their true intent. When Lilly has asked whether they would submit data if their HIPAA concerns were satisfied, their counsel answered, in nearly every instance, that they "could not answer that question at this time." When Lilly has pointed out that an entity is currently submitting the identical data for contract-pharmacy dispenses, counsel have declared contract pharmacies "not the topic" of the call. That is not the conduct of entities with genuine privacy concerns. It is the conduct of entities using a pretextual legal argument to stall. The fallback complaints—operational burden, data-system harmonization—fare no better. The same entities already collect and transmit this data every day to commercial insurers, Medicare, and Medicaid in order to be paid; they are already required to maintain auditable records to demonstrate their 340B compliance; and thousands of their peers—including less resourced entities—are submitting data without incident.

## V. The Holdouts Have Rejected Lilly's 340B Offer.

Lilly cannot allow a coordinated holdout to defeat a lawful, modest, and necessary integrity measure that two federal courts of appeals and HRSA itself have endorsed.[5] The D.C. Circuit considered a materially identical claims-data condition, rejected the very arguments the boycotters now press, and observed that "the burden of providing the claims data is 'minimal.'"[6] The Third Circuit's decision supports the same conclusion.[7] A covered entity that refuses Lilly's standard, lawful condition has rejected Lilly's offer. The notices being sent today simply confirm that fact. Lilly remains willing to engage in good faith with any covered entity prepared to accept our offer.

Sincerely,



Josh O'Harra
Senior Vice President, Deputy General Counsel and
Head of Global Public Policy
Eli Lilly and Company

cc: Chantelle Britton, Director, Office of Pharmacy Affairs

---

[4] Frequently Asked Questions (FAQs), 340B ESP (2026), https://help.340besp.com/en/articles/14482537-frequently-asked-questions-faqs#h_2b2d0863da.

[5] *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 703 (3d Cir. 2023); *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 462–63 (D.C. Cir. 2024); 59 Fed. Reg. 25,110, 25,114 (May 13, 1994).

[6] *Novartis*, 102 F.4th at 463.

[7] *Sanofi*, 58 F.4th at 703–04, 706.