**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

MARY HITCHCOCK MEMORIAL HOSPITAL;

*Plaintiff,*

v.

ELI LILLY AND COMPANY;

*Defendant.*

Civil Case No. 1:26-cv-00616

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**Table of Contents**

**Page**

I. Introduction ........ 1
II. MHMH Seeks Injunctive Relief to Prohibit Enforcement of Unconscionable Terms. ........ 2
III. Irreparable Harm to MHMH is Not Purely Economic, Speculative, or Self-Inflicted. ........ 3
IV. MHMH Is Likely To Succeed on the Merits. ........ 5
A. ***Astra* Does Not Bar MHMH's State-Law Claims** ........ 5
B. **MHMH's State-Law Claims Are Not Preempted** ........ 8
i. There is No "Obstacle" Preemption. ........ 9
ii. MHMH's Claims Are Not Field Preempted. ........ 12
C. **The Intergovernmental Immunity Doctrine Does Not Bar MHMH's Claims** ........ 14
D. **MHMH's Claims Are Likely to Succeed** ........ 14
i. Lilly's Policy Violates Vermont Law. ........ 14
ii. Lilly's Conduct is Quintessential Rascality and Otherwise Meets the Elements of the NH CPA. ........ 15
1. Lilly Unlawfully Increased the Price of its Drugs. ........ 16
2. Lilly's "Modest Transparency Condition" Is Coercion Dressed as Compliance. ........ 16
3. Lilly's Conduct Offends Public Policy and Causes Substantial Harm to MHMH. ........ 18
4. Lilly's "Minimal Burden" Arguments are Belied by the Record. . 19
5. Lilly's Rule 9(b) Defense Fails. ........ 21
iii. Lilly Breached Its Contractual Obligations to MHMH. ........ 21
iv. Lilly Is Unjustly Enriched at MHMH's Expense. ........ 22
V. The Balance of Equities and Public Interest Favor MHMH. ........ 23
VI. No Bond is Required. ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AbbVie Inc. v. Jackley*,
No. 3:25-CV-03006-RAL, 2026 WL 2280929 (D.S.D. Aug. 7, 2026) .................................... 14

*AbbVie Inc. v. Skrmetti*,
No. 3:25-cv-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) .................................... 11

*AbbVie, Inc. v. Fitch*,
152 F.4th 635 (5th Cir. 2025) .................................... 8, 12, 13

*AbbVie, Inc. v. Murrill*,
180 F.4th 747 (5th Cir. 2026) .................................... 8, 9, 12, 13

*AIDS Healthcare Foundation v. Apexus, LLC*,
No. 23-55425, 2024 WL 3886974 (9th Cir. Aug. 21, 2024) .................................... 7

*Am. Hosp. Ass'n v. HHS*,
No. 4:20-cv-08806-YGR, 2021 WL 616323 (N.D. Cal. Feb. 17, 2021) .................................... 7

*Arizona v. United States*,
567 U.S. 387 (2012) .................................... 9

*Arthur D. Little Int'l, Inc. v. Dooyang Corp.*,
979 F. Supp. 919 (D. Mass. 1997) .................................... 17

*Astra USA, Inc. v. Santa Clara Cnty, Cal.*,
563 U.S. 110 (2011) .................................... *passim*

*AstraZeneca Pharms. LP v. Frey*,
No. 1:25-cv-00495-JCN, 2026 WL 2145194 (D. Me. July 27, 2026) .................................... 8

*AstraZeneca Pharms. LP v. Harris, et al.*,
No. 4:24-cv-00268-KGB (D. Ark. Sept. 29, 2026) .................................... 9

*AstraZeneca Pharms. LP v. Lopez*,
No. 25-00369 MWJS-WRP, 2026 WL 497141 (D. Haw. Feb. 23, 2026) .................................... 14

*AstraZeneca Pharms. LP v. Weiser*,
No. 25-cv-02685-PAB-STV, 2025 WL 3653161 (D. Colo. Dec. 17, 2025) .................................... 10

*Bauer v. Elrich*,
8 F.4th 291 (4th Cir. 2021) .................................... 8

*Bible v. United Student Aid Funds, Inc.*,
799 F.3d 633 (7th Cir. 2015) ....................7

*Braintree Lab'ys., Inc. v. Citigroup Glob. Mkts. Inc.*,
622 F.3d 36 (1st Cir. 2010) ....................2

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ....................10

*Capron v. Off. of Att'y Gen. of Massachusetts*,
944 F.3d 9 (1st Cir. 2019) ....................12

*Chroniak v. Golden Inv. Corp.*,
983 F.2d 1140 (1st Cir. 1993) ....................17, 21

*Crowley v. Loc. No. 82, Furniture & Piano Moving*,
679 F.2d 978 (1st Cir. 1982) ....................24

*Dartmouth-Hitchcock Clinic v. Toumpas*,
No. 11-CV-358-SM, 2012 WL 748575 (D.N.H. Mar. 2, 2012) ....................25

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ....................4

*DiCroce v. McNeil Nutritionals, LLC*,
82 F.4th 35 (1st Cir. 2023) ....................10

*Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*,
488 F.3d 11 (1st Cir. 2007) ....................23

*Estes v. ECMC Grp., Inc.*,
565 F. Supp. 3d 289 (D.N.H. 2020) ....................18

*Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*,
968 F.2d 1463 (1st Cir. 1992) ....................22

*Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc.*,
No. 09-CV-405-JL, 2012 WL 27917 (D.N.H. Jan. 5, 2012) ....................17

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016) ....................13

*Landor v. Louisiana Dep't of Corr. & Pub. Safety*,
609 U.S. 59 (2026) ....................9

*Massachusetts v. Nat'l Institutes of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025) ....................2

*Mosaic Health, Inc. v. Sanofi-Aventis U.S, LLC*,
156 F.4th 68 (2d Cir. 2025) .......................................................................................7

*Novartis Pharms. Corp. v. Brown*,
No. 3:26-cv-05302-DGE, 2026 WL 1660347 (W.D. Wash. June 9, 2026) ............................14

*Novartis Pharms. Corp. v. Frey*,
No. 1:25-cv-00407-JCN, 2025 WL 2813787 (D. Me. Sept. 23, 2025).............................11, 13

*Novartis Pharms. Corp. v. Hanaway*,
180 F.4th 1097 (8th Cir. 2026).....................................................................................8

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024).....................................................................................11

*PC Connection, Inc. v. Int'l Bus. Machines Corp.*,
687 F. Supp. 3d 227 (D.N.H. 2023) ..............................................................................21

*PC Connection, Inc. v. Sillich*,
673 F. Supp. 3d 131 (D.N.H. 2023) ..............................................................................4

*Pharm. Rsch. & Mfrs. of Am. v. Frey*,
No. 1:25-CV-00469-JCN, 2026 WL 184504 (D. Me. Jan. 23, 2026)......................................14

*Pharm. Rsch. & Mfrs. of Am. v. Julie Arel*,
No. 2:25-CV-00600, 2026 WL 2937940 (D. Vt. Sept. 30, 2026)................................... *passim*

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
95 F.4th 1136 (8th Cir. 2024) ........................................................................... 8, 12, 13

*Pharm. Soc. of State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.*,
50 F.3d 1168 (2d Cir. 1995) .......................................................................................25

*PhRMA v. Neronha*,
No. 26-1039, 2026 WL 527776 (1st Cir. Feb. 25, 2026).......................................................11

*PhRMA v. Weiser*,
No. 1:25-cv-02437-RMR-STV, 2026 WL 2582197 (D. Colo. Sept. 1, 2026) ...........................8

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996)...........................................................................................4

*Rucker v. Lee Holding Co.*,
471 F.3d 6 (1st Cir. 2006)...........................................................................................18

*Sagebrush Health Servs. v. Amgen Inc.*,
No. 2:26-CV-00466-MCS-PVC, 2026 WL 1030817 (C.D. Cal. Apr. 15, 2026).......................7

*San Francisco Real Est. Invs. v. Real Est. Inv. Tr. of Am.*,
692 F.2d 814 (1st Cir. 1982) .......... 5

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health and Hum. Servs.*,
58 F.4th 696 (3d Cir. 2023) .......... 11, 13

*SpecialtyCare, Inc. v. Meritain Health, Inc.*,
No. CV 25-198-MN, 2026 WL 353259 (D. Del. Feb. 9, 2026) .......... 8

*State v. Biden*,
10 F.4th 538 (5th Cir. 2021) .......... 5

*Trone Health Servs., Inc. v. Express Scripts Holding Co.*,
974 F.3d 845 (8th Cir. 2020) .......... 7, 22

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 15

*US Cargo Direct, Inc. v. PNC Bank, N.A.*,
No. 22 C 3925, 2023 WL 374298 (N.D. Ill. Jan. 24, 2023) .......... 7

*W Holding Co. v. AIG Ins. Co.-Puerto Rico*,
748 F.3d 377 (1st Cir. 2014) .......... 2

*Wigod v. Wells Fargo Bank, N.A.*,
673 F.3d 547 (7th Cir. 2012) .......... 7

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
827 F.3d 201 (1st Cir. 2016) .......... 2

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 23, 24

**State Cases**

*Anthony's Pier Four, Inc. v. HBC Assocs.*,
411 Mass. 451 (1991) .......... 17

*Brzica v. Trs. of Dartmouth Coll.*,
147 N.H. 443 (2002) .......... 19

*Centronics Corp. v. Genicom Corp.*,
132 N.H. 133 (1989) .......... 22

*H1 Lincoln, Inc. v. S. Washington St., LLC*,
489 Mass. 1 (2022) .......... 17

*LaChance v. U.S. Smokeless Tobacco Co.*,
156 N.H. 88 (2007) .......... 21

*Livingston v. 18 Mile Point Drive, Ltd.*,
158 N.H. 619 (2009) .......... 22

*R & G Props., Inc. v. Column Fin., Inc.*,
184 Vt. 494 (2008) .......... 15

*Royer v. State Dep't of Emp. Sec.*,
118 N.H. 673 (1978) .......... 18

*State v. Moran*,
151 N.H. 450 (2004) .......... 18, 19

**Federal Statutes**

42 U.S.C. § 256b .......... *passim*

**State Statutes**

NH RSA 358-A:2 .......... 16

NH RSA 382-A:2 .......... 21, 22

Vt. Stat. Ann. § 4681 .......... 8

Vt. Stat. Ann. § 4682 .......... 6, 18

Vt. Stat. Ann. § 4684 .......... 14

**Rules**

Fed. R. Civ. P. 8(a) .......... 21

Fed. R. Civ. P. 9(b) .......... 21

Fed. R. Civ. P. 65(c) .......... 24, 25

**Regulations**

42 C.F.R. § 10.21 .......... 10

89 Fed. Reg. 28643-01 .......... 9, 11

91 Fed. Reg. 48883-01 .......... 20

**Other Authorities**

H.R. Rep. No. 102-384 (1992) .......... 19, 23

*Emory Univ. Hosp. Midtown v. Novartis Pharms. Corp.* (HRSA June 9, 2025) .......... 10

*Univ. of Wash. Med. Ctr. v. Novartis Pharms. Corp.* (HRSA Nov. 20, 2025)...............................10

## I. Introduction[1]

This case is about corporate coercion. Lilly leverages its monopoly power over life-saving medications to force a nonprofit, rural, safety-net hospital to surrender patient medical claims data on terms no reasonable entity could accept—then retaliates when the hospital refuses. Lilly's Opposition does not defend that conduct. It asks this Court to look away.

This case is not about whether covered entities should provide claims data. It is about whether Lilly may condition congressionally-mandated pricing on Terms that grant a private equity-owned vendor a perpetual, worldwide, sublicensable license over patient data, cap aggregate liability at $100, permit unilateral retroactive amendment, and shift all de-identification risk to MHMH. HRSA's Pilot Program requires none of this. That 2,800 covered entities capitulated proves only the effectiveness of Lilly's coercion, not the legality of the Terms.

Lilly's threshold defenses fail. MHMH does not seek to enforce the 340B statute; it brings independent state-law claims that *Astra* does not bar and that multiple circuit courts have held are not preempted. Nor is Lilly a federal contractor entitled to intergovernmental immunity.

On the merits, Lilly's conduct is quintessential rascality. At least sixteen states prohibit this exact conduct. Lilly already has statutory audit rights to police "Duplicate Discounts;" the Terms reveal its true aim: commercial data harvesting as a private toll on statutory benefits.

The harm to MHMH is neither speculative nor self-inflicted. Lilly's Policy costs MHMH millions of dollars annually in lost 340B savings and upfront medication cost increases, translating directly into cuts to clinical programs, charity care, and services for underserved patients.[2] Lilly's

[1] Capitalized terms used herein shall have the meaning as defined in MHMH's Memorandum of Law in Support of its Motion for Preliminary Injunction (the "Motion").

[2] On September 15, 2026, Dartmouth Health system announced, "elimination of select programs" and staff reductions including the elimination of 124 employee positions and the cancellation of 303 open positions, citing increased drug costs. *See* Newsroom, *Dartmouth Health announces staff reductions* (Sept. 15, 2026), https://www.dartmouth-

suggestion that MHMH could avoid this harm by "complying" proves the point: the "choice" to capitulate or be punished is coercion, not consent. The equities tip decisively against a trillion-dollar manufacturer abusing its leverage in the context of a program Congress designed to help safety-net hospitals stretch scarce resources.

## II. MHMH Seeks Injunctive Relief to Prohibit Enforcement of Unconscionable Terms.

Lilly mischaracterizes the requested injunction, which is prohibitory, not mandatory. MHMH seeks to restore the status quo—the uncontested years-long course of dealing under which Lilly offered covered outpatient drugs at the 340B Ceiling Price without any medical claims data submission requirement or the Terms. *See Braintree Lab'ys., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 40-41 n.5 (1st Cir. 2010) (prohibitory injunction preserves the status quo, defined as "the last uncontested status which preceded the pending controversy"). Enjoining enforcement of the Policy and the Terms against MHMH would restore—not disrupt—this longstanding arrangement. *See Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026) (granting preliminary and permanent injunctive relief barring NIH from "tak[ing] any steps to implement, apply, or enforce" new guidance imposing a reimbursement restriction in contravention of longstanding negotiated-rate framework on which institutions had long relied). Even if the Court were to treat the injunction as mandatory, the same four-factor test governs. *W Holding Co. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014). "The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Braintree*, 622 F.3d at 41. MHMH meets the preliminary injunction standard regardless of which label is applied.

---

health.org/news/article/dartmouth-health-announces-staff-reductions. The Court may take judicial notice of press releases. *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016).

Lilly's contention that MHMH delayed conflates two distinct policies. MHMH challenges the January 2026 Policy requiring the submission of medical claims data on unconscionable Terms, a policy that was enforced shortly before MHMH filed suit. The November 2023 policy regarding contract pharmacies is not at issue on this Motion. There is no delay.

## III. Irreparable Harm to MHMH is Not Purely Economic, Speculative, or Self-Inflicted.

Lilly dismisses MHMH's approximated annualized overcharges as "less than two-tenths of one percent" of MHMH's revenue. Opp. at 3. But MHMH is not a for-profit enterprise that can absorb losses by reducing shareholder returns. It is a not-for-profit, rural, DSH hospital and sole community hospital operating New Hampshire's only Level 1 trauma center, only accredited children's hospital, and only NCI-designated comprehensive cancer center. Thomasset Decl. ¶¶ 4-10. In fiscal year 2025, MHMH provided $339.9 million in net community benefits, including $16.6 million in charity care, $30.2 million in subsidized health services, and $204.8 million in absorbed Medicaid losses. *Id.* ¶ 11. Millions of dollars in annualized lost 340B-related savings translates directly into curtailed clinical programs, reduced charity care, and diminished services to underserved populations-including adolescent psychiatric patients. *Id.* ¶¶ 15, 18, 68. Reduced 340B savings impairs MHMH's ability to provide patient financial assistance and are "likely to increase medication nonadherence, disease progression, avoidable emergency department utilization, preventable hospitalizations, and poorer clinical outcomes among MHMH's most vulnerable patient populations." *Id.* ¶ 72. Once patient care programs are scaled back, the clinical continuity, staff expertise, patient outcomes, and community relationships lost in the interim cannot be restored by an end-of-case monetary award.

Lilly's Policy also causes irreparable harm through compelled disclosure of sensitive patient claims data under unconscionable Terms. The Policy requires MHMH to pull medical

claims data directly from its electronic medical record system and license it to Lilly's private-equity owned vendor, Second Sight, while shifting all risk of de-identification failure to MHMH. Thomasset Decl. ¶¶ 32-35; *see* Section IV.D.ii.2, *infra*. The risk of re-identification is not hypothetical. Second Sight's own expert determination acknowledges that manufacturers can re-identify the data after submission. Am. Compl. ¶ 165. "The risk of disclosure of confidential information constitutes irreparable harm." *PC Connection, Inc. v. Sillich*, 673 F. Supp. 3d 131, 137-38 (D.N.H. 2023). Disclosure once made cannot be undone, and the resulting damage to patient trust and institutional reputation would be harm no monetary award can remedy. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (injury to goodwill and reputation "often held to be irreparable").

Lilly cites *Dep't of Educ. v. California*, 604 U.S. 650 (2025), for the proposition that financial resources defeat irreparable harm, but that case turned on the plaintiffs' specific representation that they had "the financial wherewithal to keep their programs running" during litigation. *Id.* at 652. The Dartmouth Health system of which MHMH is the "primary revenue engine" has publicly reported a $63.5 million deficit, with rising medication costs as a contributing factor. Thomasset Decl. ¶¶ 16-17. Moreover, MHMH operates under bond covenants that constrain its financial discretion. Loss of 340B pricing "could cause MHMH's days-cash-on-hand to drop low enough to risk violating bond covenants, with consequences including mandatory consultant call-in, credit-rating downgrade, increased borrowing costs, and potential facility closures." *Id.* ¶ 71. A nonprofit hospital operating under bond covenants amid a system-wide deficit is not analogously situated to plaintiffs with discretionary general-fund reserves.

Lilly's fallback is that MHMH's harm is "self-inflicted" because MHMH "can comply" with the claims-data condition. Opp. at 18-19. This conflates a voluntary commercial choice with

coerced capitulation to unlawful demands. The self-inflicted harm doctrine applies where a plaintiff's own voluntary decisions proximately cause the alleged injury, not where the "choice" is itself the product of the defendant's unlawful conduct. *See San Francisco Real Est. Invs. v. Real Est. Inv. Tr. of Am.*, 692 F.2d 814, 818 (1st Cir. 1982) (finding harm "self-inflicted" where it stemmed from a strategic business decision entirely within the plaintiff's control). MHMH's "choice" is not whether to check a box on a form, but whether to surrender its patients' medical claims data on the unconscionable Terms. Thomasset Decl. ¶ 32-33. A defendant cannot immunize itself from injunctive relief simply by offering the plaintiff an unconscionable exit.

Lilly, not MHMH, created these conditions: it unilaterally imposed the Policy in January 2026 and cut off access to the 340B Ceiling Price when MHMH objected to the unconscionable Terms. MHMH's refusal to accept terms it alleges are unlawful is not the kind of voluntary commercial decision *San Francisco Real Est. Invs.* contemplated. Nor does *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021), a Fifth Circuit case involving government plaintiffs with broad policy discretion, apply to a nonprofit hospital resisting coercive conditions imposed by a private monopoly supplier.

## IV. MHMH Is Likely To Succeed on the Merits.

### A. *Astra* Does Not Bar MHMH's State-Law Claims.

Lilly claims immunity from all liability for conduct relating to the 340B program. This exaggerates *Astra* and mischaracterizes MHMH's claims.

*Astra* held that covered entities cannot enforce statutory rights under 340B by suing manufacturers as third-party beneficiaries to the Pharmaceutical Pricing Agreement ("PPA") with the Department of Health and Human Services ("HHS"). *Astra USA, Inc. v. Santa Clara Cnty, Cal.*, 563 U.S. 110, 113 (2011). As the Court explained, the PPAs "simply incorporate statutory

obligations," "contain no negotiable terms," and "serve as the means by which the manufacturers opt into [340B]." *Id.* at 118. Because "the statutory and contractual obligations" "are one and the same," "[t]he absence of a private right to enforce [340B] would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the [PPAs] instead." *Id.*

MHMH's claims are different. MHMH does not seek to enforce the 340B statute or sue under Lilly's PPA. Its claims arise under independent sources of law with independent elements of proof, including state consumer protection statutes, contract law, and equity. The crux of MHMH's claims is that Lilly used coercive bargaining power to impose a Policy unlawfully conditioning access to the Ceiling Price on surrender of medical claims data to a private-equity owned vendor on unconscionable Terms. The fact that Lilly's retaliation results in an overcharge does not convert this case into a 340B pricing dispute or absolve Lilly of liability for its own commercial conduct violating state law.

Lilly and its amici[3] manufacture a false dilemma: that MHMH's claims must either arise under 340B (and be barred by *Astra*) or arise independently of 340B (and lack a factual predicate). This framing conflates the factual backdrop of MHMH's claims with their legal basis. Section 340B explains why Lilly has leverage, but it does not supply MHMH's causes of action, and MHMH need not prove that Lilly violated Section 340B to prevail on any of them. Lilly's requirement that MHMH submit claims data is a *per se* violation of 18 Vt. Stat. Ann. § 4682. Lilly engaged in unfair methods of competition in *how* it made an offer under 340B—exploiting its

[3] The proposed amicus briefs filed by the Washington Legal Foundation, Model N, and Pharmaceutical Research and Manufacturers of America ("PhRMA") repackage Lilly's arguments without addressing the Terms. Model N operates a platform through which Covered Entities may submit claims data, and therefore has a direct financial interest in the expansion of the claims data ecosystem. PhRMA is a pharmaceutical industry lobbying organization that has a direct interest in the outcome. None of the briefs confronts MHMH's central contention: that Lilly may not condition statutory pricing on unconscionable terms governing how data are submitted.

bargaining power to impose unfavorable Terms on a nonprofit rural safety-net hospital. And Lilly breached its contract by refusing to perform unless MHMH agreed to the Policy and Terms.

Where state-law duties exist independently of a federal statute, courts permit state-law claims to proceed alongside federal regulatory schemes. *See, e.g., Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574-77 (7th Cir. 2012) (allowing consumer protection claims in HAMP context); *US Cargo Direct, Inc. v. PNC Bank, N.A.*, No. 22 C 3925, 2023 WL 374298, at *3-4 (N.D. Ill. Jan. 24, 2023) (allowing state breach of contract claims for PPP loan administration); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 654-55 (7th Cir. 2015) (lack of private right under Higher Education Act does not preclude state law claims); *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 850-53 (8th Cir. 2020) (allowing breach of contract claim for HIPAA violations despite no private right of action); *accord Mosaic Health, Inc. v. Sanofi-Aventis U.S, LLC*, 156 F.4th 68, 78-79 (2d Cir. 2025) (Sherman Act claim independent of 340B).

MHMH's claims are unlike those in Lilly's cited cases, each of which involved claims wholly rooted in the 340B program. *Sagebrush Health Servs. v. Amgen Inc.*, No. 2:26-CV-00466-MCS-PVC, 2026 WL 1030817, at *1 (C.D. Cal. Apr. 15, 2026), involved a plaintiff seeking to force recognition of its covered-entity status—a right based solely in 340B. *Am. Hosp. Ass'n v. HHS*, No. 4:20-cv-08806-YGR, 2021 WL 616323, at *5 n.10 (N.D. Cal. Feb. 17, 2021), sought to compel "generalized enforcement of the statutory scheme by HHS." *AIDS Healthcare Foundation v. Apexus, LLC*, No. 23-55425, 2024 WL 3886974 (9th Cir. Aug. 21, 2024), found the plaintiff could not sue as an intended beneficiary to Apexus's agreement with HRSA—again, a PPA-based theory *Astra* forecloses.[4]

[4] Nor are MHMH's claims comparable to cases applying *Astra* outside the 340B context because MHMH alleges that Lilly's imposition of the Policy and Terms violate state law independent of a violation of Section 340B. *Cf.*

If Lilly's position were correct, manufacturers could engage in fraud, deception, and breach of contract with impunity in the 340B context simply by invoking *Astra*. MHMH seeks an order enjoining Lilly from enforcing the Policy and Terms and return of amounts already overpaid. This is not 340B enforcement; it is state-law relief for commercial misconduct.

**B. MHMH's State-Law Claims Are Not Preempted.**

Lilly's preemption arguments fail for the same reason its *Astra* argument fails: MHMH's claims arise from state law independent of Section 340B. *See* Section IV.A, *supra*. To the extent Lilly argues 18 Vt. Stat. Ann. § 4681 is preempted, that argument has been rejected. *Pharm. Rsch. & Mfrs. of Am. v. Julie Arel*, No. 2:25-CV-00600, 2026 WL 2937940, at *4–8 (D. Vt. Sept. 30, 2026) (no field or conflict preemption). The court held that "Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field," and that 18 Vt. Stat. Ann. § 4681 does not create any conflict regarding access to claims data because manufacturers may participate in the HRSA audit process. *Id*.

Numerous circuit and district courts have also rejected preemption challenges to nearly identical statutes. *See, e.g., Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1141-44 (8th Cir. 2024); *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 645-468 (5th Cir. 2025); *AbbVie, Inc. v. Murrill*, 180 F.4th 747, 757-62 (5th Cir. 2026); *Novartis Pharms. Corp. v. Hanaway*, 180 F.4th 1097, 1111-13 (8th Cir. 2026); *AstraZeneca Pharms. LP v. Frey*, 1:25-cv-00495-JCN, 2026 WL 2145194, at *5-13 (D. Me. July 27, 2026); *PhRMA v. Weiser*, 1:25-cv-02437-RMR-STV, 2026 WL 2582197,

---

*SpecialtyCare, Inc. v. Meritain Health, Inc.*, No. CV 25-198-MN, 2026 WL 353259, at *5 (D. Del. Feb. 9, 2026) (dismissing claims on *Astra* grounds where the plaintiff's state-law claims were "one and the same" as their claims under the FAA and Delaware Revised Uniform Arbitration Act); *Bauer v. Elrich*, 8 F.4th 291, 300 (4th Cir. 2021) (dismissing claims on *Astra* grounds where "[t]he essence of the plaintiffs' claim, and their sole theory of wrongdoing, is that the County defendants' implementation of the EARP violated Section 1621").

at *5-6 (D. Colo. Sept. 1, 2026); *AstraZeneca Pharms. LP v. Harris, et al.,* No. 4:24-cv-00268-KGB (D. Ark. Sept. 29, 2026) (order on summary judgment).

**i. There is No "Obstacle" Preemption.**

*First*, Lilly's obstacle-preemption argument misstates the doctrine. State laws are preempted "when they stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 391 (2012) (citation omitted). Ironically, it is *Lilly's* conduct, not MHMH's state-law claims, that obstructs Congress's purpose in enacting the 340B program, yet Lilly attempts to shoehorn this doctrine into this case. *Arizona* involved a state law proscribing conduct already prohibited by federal law. *Id.* at 400. None of Lilly's cases preempt well-recognized state causes of action merely because the underlying conduct involves federal programs.

Lilly's reliance on *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 609 U.S. 59 (2026), is misplaced. *Landor* addressed whether states could impose additional restrictions on federal spending recipients beyond what Congress authorized. *Id*. at 79. MHMH does not seek to impose new conditions on Lilly's participation in 340B. MHMH's state-law claims target Lilly's commercial conduct in the marketplace, not the terms of Lilly's PPA with HHS.

*Second*, MHMH's claims do not circumvent congressional intent because they fall outside HRSA's jurisdiction. Section 340B empowers HRSA to adjudicate disputes over pricing, overcharges, duplicate discounting, and diversion. *See* 42 U.S.C. § 256b(d)(3); 89 Fed. Reg. 28643, Subpart C. It does not grant HRSA exclusive authority over all disputes between manufacturers and covered entities. This "framing presents a false conflict." *Murrill*, 180 F.4th at 760. MHMH's claims address Lilly's use of bargaining power to impose the unconscionable Terms—conduct separate from any pricing or overcharge dispute.

MHMH does not claim that Lilly "limited" its ability to purchase drugs at the 340B ceiling price within the meaning of 42 C.F.R. § 10.21. MHMH complains that Lilly leveraged its power asymmetry to condition the Ceiling Price on unconscionable terms requiring disclosure of medical claims data without appropriate privacy safeguards and with broad data use rights. HRSA has not adjudicated the types of unfair and deceptive practices MHMH raises. The HRSA decisions Lilly cites both dealt with contract-pharmacy policies, not the type and scope of medical claims data requested here, and neither addressed the Terms MHMH challenges. *See* Rice Decl., Ex. 1, *Emory Univ. Hosp. Midtown v. Novartis Pharms. Corp.* (HRSA Nov. 20, 2025); Ex. 2, *Univ. of Wash. Med. Ctr. v. Novartis Pharms. Corp.* (HRSA June 9, 2025).

Lilly's reliance on *Buckman* and *DiCroce* is misplaced. Both cases found that violation of the FDCA was a "critical element" of the plaintiffs' claims, with "no other grounds on which [the] claims could survive." *DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35, 41 (1st Cir. 2023); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (2001). Those claims existed "solely by virtue of an FDCA infraction." *DiCroce*, 82 F.4th at 40-41. MHMH's claims do not depend on proving a 340B violation.

*Third*, MHMH's claims do not "thwart Section 340B's anti-abuse mechanisms." Lilly argues it needs medical claims data to meet the "reasonable cause" standard for initiating an audit. But Lilly participated in HRSA's audit framework for years without this data. Courts have found that "manufacturers have not demonstrated that the 'reasonable cause' standard is particularly burdensome, or that manufacturers cannot find reasonable cause to perform an audit without requiring claims-data." *Arel*, 2026 WL 2937940, at *7 (rejecting same conflict preemption argument in challenge to same Vermont statute); *see also AstraZeneca Pharms. LP v. Weiser*, No. 25-cv-02685-PAB-STV, 2025 WL 3653161, at *10 (D. Colo. Dec. 17, 2025) (citation omitted);

*Novartis Pharms. Corp. v. Frey*, No. 1:25-cv-00407-JCN, 2025 WL 2813787, at *12 (D. Me. Sept. 23, 2025). Lilly cannot identify any case where a manufacturer was denied an audit due to lack of claims data. *See* 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28643-01 ("In the last 5 years…HRSA has not denied a request for a manufacturer audit of a covered entity.")*; accord Frey*, 2025 WL 2813787, at *12; *AbbVie Inc. v. Skrmetti*, No. 3:25-cv-00519, 2025 WL 1805271, at *15 (M.D. Tenn. June 30, 2025).

*Johnson* and *Sanofi* do not support preemption. Those Administrative Procedures Act cases addressed whether HRSA had authority to prohibit manufacturers from imposing limits on the number of contract pharmacies a Covered Entity uses. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 458-59 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health and Hum. Servs.*, 58 F.4th 696, 703 (3d Cir. 2023). To the extent that *Johnson* addressed "claims data for contract-pharmacy orders," it did not address the scope of *medical* claims data at issue here, which Lilly admits is broader in scope than pharmacy claims data. *See* Asay Decl. ¶¶ 29-35. Nor do those cases empower Lilly to demand data on Terms granting expansive data rights to Lilly and Second Sight while shifting all privacy and cybersecurity risk to MHMH.

*Finally*, MHMH's claims do not change Lilly's incentives for participating in the 340B program. Participation in a federal program does not immunize Lilly from state law governing how it contracts with covered entities and conducts its business.[5]

[5] In support of this argument, Lilly relies heavily on an amicus brief from the Department of Justice ("DOJ") in a pending First Circuit case. Brief of the United States as Amicus Curiae in Support of Appellant, *PhRMA v. Neronha*, No. 26-1039, 2026 WL 527776, at *15 (1st Cir. Feb. 25, 2026). Argument in a brief carries no authoritative weight. Regardless, the brief says only that "[i]f the costs of participating in [Medicaid and 340B] outstrip the benefits, . . . rational manufacturers can be expected to withdraw from them." *Id.* at *16. It then cites Bausch Health's 2025 withdrawal from Medicaid and the 340B Program citing "legislative changes," without further explanation of what those changes were. *Id.* Lilly infers without basis that those "legislative changes" must have meant "state restrictions on offer conditions," Opp. at 26, but that is not what the brief says. Lilly repeatedly cites this brief to suggest the current federal administration's views on preemption in the 340B context are relevant. *Id.* at 25. They are not. That the current DOJ may take a political position on Section 340B cases says nothing about *Congress's* full purposes and objectives in enacting 340B. In any event, the brief that Lilly cites here simply cites to *Astra*, which did not involve

**ii. MHMH's Claims Are Not Field Preempted.**

Lilly cannot show Congress intended to occupy the field to the exclusion of state law. Absent an express preemption clause, such intent "can be inferred from [1] a framework of regulation 'so pervasive . . . that' it leaves 'no room for the States to supplement it' or [2] where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Capron v. Off. of Att'y Gen. of Massachusetts*, 944 F.3d 9, 21-22 (1st Cir. 2019) (citations omitted). Neither applies here.

*First*, multiple circuit courts have rejected field preemption, concluding that Section 340B's regulatory scheme "is not 'so pervasive . . . that Congress left no room for the States to supplement it.'" *McClain*, 95 F.4th at 1143 (citations omitted); *Murrill*, 180 F.4th at 759; *Fitch*, 152 F.4th at 646. The Supreme Court has cautioned courts to hesitate before inferring field preemption absent "complete ouster of state power." *Murrill*, 180 F.4th at 759; *see also Arel*, 2026 WL 2937940, at *4-5 (rejecting *Astra* argument because the "Supreme Court did not discuss preemption, 340B entities' use of contract pharmacies, or drug distribution systems.").

Lilly argues "federal law pervasively regulates every aspect of the 340B program." Opp. at 29. Not so. Section 340B "imposes ceilings on prices drug manufacturers may charge" to covered entities and "explicitly regulates several key matters: it caps the prices of covered drugs, 42 U.S.C. § 256b(a)(1), (a)(10); controls eligibility for 'covered entity' status, *id.* § 256b(a)(4); prohibits covered entities from claiming duplicate discounts and engaging in diversion, *id.* § 256b(a)(5)(A)-(B); enforces compliance with its caps and bars, *id.* § 256b(a)(5)(D), (d)(1)-(3); and

---

state-law consumer claims or the violation of a separate state statute as is the case here. *See* Brief of the United States, *PhRMA*, 2026 WL 527776, at *15.

governs distribution of discounted drugs to covered entities by manufacturers and third-party wholesalers, *id.* § 256b(a)(8).” *Fitch*, 152 F.4th at 646.

But Section 340B is “silent about delivery.” *Sanofi*, 58 F.4th at 703; *Johnson*, 102 F.4th at 460; *McClain*, 95 F.4th at 1143; *Fitch*, 152 F.4th at 646 (340B “regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution”). Because Section 340B “conspicuously *does not* regulate” these areas “in an otherwise comprehensive and detailed federal regulatory scheme,” they are “presumably left subject to the disposition provided by state law.” *Murrill*, 180 F.4th at 759; *see also Arel*, 2026 WL 2937940, at *4-5.

*Second*, there is no dominant federal interest in the areas regulated by MHMH’s claims. States have a long-recognized role in regulating commercial transactions and consumer protection. *Murrill*, 180 F.4th at 758 (“[p]ublic health and consumer protection fall squarely within a State’s historic police powers”); *Fitch*, 152 F.4th at 646; *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 325 (2016); *Arel*, 2026 WL 2937940, at *5. Lilly’s argument that “private lawsuits will undermine the ‘uniform system’” misses the point: MHMH’s claims regulate manufacturer conduct in the commercial marketplace, not the 340B Program itself. The “federal field” of Section 340B cannot encompass the entirety of commercial relationships between manufacturers and covered entities.

At bottom, “because 340B does not dictate many of the terms regarding manufacturers’ obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field.” *Frey*, 2025 WL 2813787, at *8; *see also Sanofi*, 58 F.4th at 704 (“[the 340B statute] imposes only a price term for drug sales to covered entities, leaving all other terms blank”). Gaps in Section 340B regarding distribution, the role of pharmacies, and the terms of manufacturers’ obligations indicate Congress did not intend to occupy the entire field. There is ample room for MHMH’s state-law claims.

**C. The Intergovernmental Immunity Doctrine Does Not Bar MHMH's Claims.**

Lilly claims immunity as a federal contractor. This fails. Lilly is not a federal contractor with whom the federal government "deals." *See AbbVie Inc. v. Jackley*, 3:25-CV-03006-RAL, 2026 WL 2280929, at *24 (D.S.D. Aug. 7, 2026) (340B Program does not "render drug manufacturers contractors of the federal government"); *Novartis Pharms. Corp. v. Brown*, No. 3:26-cv-05302-DGE, 2026 WL 1660347, at *9 (W.D. Wash. June 9, 2026); *Pharm. Rsch. & Mfrs. of Am. v. Frey*, No. 1:25-CV-00469-JCN, 2026 WL 184504, at *6 (D. Me. Jan. 23, 2026). Furthermore, enforcement does not discriminate against Lilly because the state laws "do[] not treat non-340B manufacturers better than 340B manufacturers." *Brown*, 2026 WL 1660347, at *10. Lilly is "not acting at the direction or instruction of the federal government"; it is "being regulated for its own conduct." *AstraZeneca Pharms. LP v. Lopez*, No. 25-00369 MWJS-WRP, 2026 WL 497141, at *15 (D. Haw. Feb. 23, 2026). Because the federal government has not instructed Lilly to impose the Policy and Terms, Lilly's actions are not compelled by the federal government and its private conduct is subject to state regulation.

**D. MHMH's Claims Are Likely to Succeed.**

**i. Lilly's Policy Violates Vermont Law.**

Lilly's response to Count I misapplies the facts and law. *First*, Vermont law applies to MHMH. The statute provides, "A 340B covered entity, 340B contract pharmacy, or other person injured by a manufacturer's or its agent's violation of this subchapter may bring an action." 18 Vt. Stat. Ann. § 4684(a). MHMH qualifies as a covered entity with Vermont licensed contract pharmacies injured by Lilly's unlawful policy. *See* Thomasset Decl. ¶¶ 5-6, 12-13.

*Second*, Lilly misstates its own Policy's scope. Lilly claims its "2026 terms only adjusted the requirements for MHMH as to its in-house pharmacy, located in New Hampshire, and in-house dispenses, which only occur in New Hampshire" Opp. at 31-32. But the Policy states: "effective

for dispenses on or after February 1, 2026, Eli Lilly and Company (Lilly) will require covered entities to submit CLD for ***all*** 340B dispenses, including in-house dispensing." *See* Thomasset Decl. ¶ 26, Ex. 2 (emphasis in original). Lilly reiterated this in its June 17, 2026 letter: "Lilly requires claims data for all 340B-priced product utilization, inclusive of both pharmacy and medical benefit dispenses." *Id.* ¶ 54, Ex. 7.

*Third*, MHMH does not seek extraterritorial effect. It asks this Court only to enforce Vermont law as applied to MHMH's 340B dispenses at Vermont-licensed contract pharmacies. *R & G Props., Inc. v. Column Fin., Inc.*, 184 Vt. 494 (2008), which Lilly cites, concerns whether the Vermont Legislature intended to "regulate out-of-state lending activity." *Id.* at 513. MHMH seeks only narrow relief for claims at its Vermont licensed contract pharmacies. This Court has authority to enjoin Lilly's wrongful conduct as applied to the parties. *See Trump v. CASA, Inc.*, 606 U.S. 831, 837 n.1 (2025) (distinguishing universal injunctions from "traditional, parties-only injunction[s]"). The Vermont statute provides that claims "may" be brought in Superior Court. It does not restrict where claims *must* be brought, nor does it bar MHMH from bringing this claim in this venue.

*Finally*, Lilly's waiver argument fails. The 2023 policy is not before this Court, and MHMH has not forfeited any arguments regarding Lilly's 2026 Policy. Vermont law applies to covered entities like MHMH who do business in Vermont through contract pharmacies.

**ii. Lilly's Conduct is Quintessential Rascality and Otherwise Meets the Elements of the NH CPA.**

Lilly calls its claims-data requirement a "modest transparency condition." Opp. at 4. It is nothing of the kind. Lilly exploits its monopoly position over life-saving medications to impose a "take-it-or-leave-it" ultimatum: surrender confidential medical claims data on unconscionable terms—including a perpetual license to create derivative works, a $100 liability cap, and unilateral

amendment rights—or lose access to congressionally mandated drug pricing. When MHMH refused, Lilly cut off 340B discounts. That is coercion, not transparency—precisely the conduct the CPA exists to remedy.

### 1. Lilly Unlawfully Increased the Price of its Drugs.

Lilly contends MHMH has failed to show competitive harm under RSA 358-A:2(XIV). But Lilly is the exclusive supplier of numerous critical medications for which no alternative exists, including Mounjaro, Zepbound, Verzenio, and Retevmo. Thomasset Decl. ¶¶ 21-22. By conditioning access to congressionally-mandated pricing on terms that extract commercially valuable data through a private intermediary, Lilly leverages monopoly power to impose conditions unavailable through arm's-length competition. The competitive harm is not that Lilly increased prices market-wide, but that it uses its position as sole supplier to extract concessions unrelated to the price or quality of its goods, thereby "otherwise harm[ing] competition" within the meaning of the statute. That the condition operates through data extraction rather than a price increase is immaterial: MHMH pays more or surrenders more value for the same drugs.

### 2. Lilly's "Modest Transparency Condition" Is Coercion Dressed as Compliance.

The Terms are unconscionable. They grant Second Sight a perpetual, irrevocable, sublicensable license to create derivative works from MHMH's patient claims data; permit review exceeding statutorily-prohibited Duplicate Discounts or Diversion; require MHMH to agree to "monitoring"; shift all data-security and privacy risk to MHMH; cap aggregate liability at $100; and permit unilateral modification of Terms. Thomasset Decl. ¶ 30, Ex. 3.

Lilly justifies its Policy as necessary to police Duplicate Discounts, but the Terms reveal that its invocation of generalized "program integrity" is pretext for commercial data harvesting. Preventing 340B diversion does not require MHMH to grant Second Sight a worldwide license to

create derivative works. The Terms define "Rebate Data" to include "commercial payer[]" rebates far exceeding statutorily-prohibited Duplicate Discounts. Thomasset Decl. Ex. 3. And Second Sight's FAQs state that the submitted data "may be used to identify duplicate…*commercial payer rebates* that are not eligible for reimbursement."[6] Lilly's true aim is to use MHMH's data to avoid paying commercial rebates under separately negotiated agreements.

Congress entrusted HRSA, not individual manufacturers, with 340B enforcement. *Astra*, 563 U.S. at 120. Lilly cannot commandeer that regulatory function to justify commercial coercion. Using a pretext as a mask for coercive conduct is unfair and deceptive. *See Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc.*, No. 09-CV-405-JL, 2012 WL 27917, at *9 (D.N.H. Jan. 5, 2012) (pretextual justification could constitute CPA violation); *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475 (1991) (use of discretionary contract right as pretext to force financial concessions violated c. 93A); *Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 979 F. Supp. 919, 925 (D. Mass. 1997), *aff'd*, 147 F.3d 47 (1st Cir. 1998) (defendant "used pretexts" to mask coercive conduct); and *H1 Lincoln, Inc. v. S. Washington St., LLC*, 489 Mass. 1, 3-4 (2022) ("pretextual contractual obligations designed to string along the plaintiffs and coerce" concessions violated c. 93A).

Meanwhile, Lilly publicly represented its "commitment to compliance" with 340B and assured "all covered entities" of continued pricing at or below the 340B Ceiling Price in its January 15, 2026 letter. Thomasset Decl. ¶¶ 25, 27, Exs. 1-2. A representation of unconditional compliance that omits the unauthorized conditions Lilly simultaneously imposes is misleading by omission. *See Chroniak v. Golden Inv. Corp.*, 983 F.2d 1140, 1145-46 (1st Cir. 1993). "[C]onduct in disregard of known contractual arrangements and intended to secure benefits for the breaching

[6] 340B ESP FAQs, FREQUENTLY ASKED QUESTIONS (FAQs), https://help.340besp.com/en/articles/14482537-frequently-asked-questions-faqs (last visited Sept. 30, 2026).

party constitutes an unfair act or practice." *State v. Moran*, 151 N.H. 450, 453 (2004) (citation omitted).

Lilly invokes *Estes v. ECMC Grp., Inc.*, 565 F. Supp. 3d 289, 307 (D.N.H. 2020), for the proposition that "selfish bargaining" is insufficient. But *Estes* involved a lender's failure to provide favorable terms in an arms-length negotiation. Lilly's conduct is categorically different because it uses monopoly power to deploy a data dragnet and deny congressionally-mandated pricing while misrepresenting its compliance. This is coercion, not selfish bargaining.

Taken together, Lilly's public assurances of compliance, followed by imposition of unauthorized conditions on unconscionable terms, backed by the retaliatory penalty of denied statutory discounts, are precisely the immoral, oppressive, and unscrupulous behavior the rascality test is designed to reach.

#### 3. Lilly's Conduct Offends Public Policy and Causes Substantial Harm to MHMH.

At least sixteen states have enacted laws prohibiting manufacturers from conditioning 340B pricing on claims-data submission, demonstrating a broad policy consensus that Lilly's exact conduct is the type of unfairness the CPA targets. *See* Motion at 23 n.10. Lilly's *per se* violation of Vermont law (18 Vt. Stat. Ann. § 4682(b)) is itself compelling evidence its conduct offends public policy.

The New Hampshire Legislature's rejection of "a proposal to classify claims-data conditions as a deceptive trade practice" is irrelevant. Opp. at 36. "The legislature expresses its will by enacting laws, not by failing to do so." *Royer v. State Dep't of Emp. Sec.*, 118 N.H. 673, 682 (1978) (Douglas, J., concurring) (citation omitted); *see also Rucker v. Lee Holding Co.*, 471 F.3d 6, 11 (1st Cir. 2006) ("[I]t is difficult to draw strong conclusions from Congress's failure to enact previous bills"). The CPA exists to address harmful practices not the subject of specific

statutory prohibitions. *See Brzica v. Trs. of Dartmouth Coll.*, 147 N.H. 443, 451 (2002) ("inquiry does not end with [the enumerated] list").

Lilly's repeated assertion that HRSA never objected to its Policy does not establish the Policy's legality. Regulatory silence carries no legal weight, particularly where HRSA has not been asked to evaluate the specific Terms at issue.[7] Lilly's letters to HRSA described the claims-data condition in general terms without disclosing the Terms.

**4. Lilly's "Minimal Burden" Arguments are Belied by the Record.**

Lilly contends MHMH has offered no evidence of substantial injury because compliance imposes only a "minimal burden." The harm is not merely administrative. It is the surrender of patient claims data to a counterparty with adverse financial interests on Terms that expose MHMH to unacceptable risk. These harms are distinct from the lost 340B savings—savings that would otherwise support patient care at New Hampshire's only Level 1 trauma center. Thomasset Decl. ¶¶ 66-73. This constitutes "substantial injury to consumers (or competitors or other business people)." *Moran*, 151 N.H. at 453 (citation omitted).

Lilly's own declarations concede that the January 2026 medical claims-data requirement goes beyond its prior contract-pharmacy policies, which required submission of more limited pharmacy-claims data. *See* Asay Decl. ¶¶ 29-35. The Policy now requires submission of medical claims data pulled directly from MHMH's electronic medical record system. Thomasset Decl. ¶ 35. Pharmacy claims, medical claims, 340B eligibility information, accumulation records, and site-of-care identifiers sit in different systems. *Id*. Compliance requires identifying Lilly transactions,

[7] Nor does Secretary Kennedy's characterization of the 340B program as a "boondoggle" justify Lilly's conduct. Opp. at 1. That statement comes from a politicized April 2026 budget hearing, not from any legislative history at the time the statute was enacted. The contemporaneous legislative history confirms that Congress designed the 340B program to "enable[] covered entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12 (1992). The current Secretary's political characterization cannot rewrite the statutory purpose Congress expressed at enactment.

determining which qualify as 340B, linking records across sources, and reconciling and validating data—burdens that Dr. Taddei-Allen does not quantify and that her opinion does not address. Her assertion that the data fields are "already mandated" conflates what fields exist with the burden of preparing and submitting them on an additional platform without commercially reasonable protections. This qualitative expansion materially increases the burden, risk, and intrusiveness of compliance.

Lilly argues compliance is trivial because the data fields overlap with existing billing criteria and will soon be required by HRSA's Pilot Program. Opp. at 10-11; Taddei-Allen Decl. ¶¶ 16, 39-41. But the Pilot Program—a limited regulatory experiment—does not begin until 2027 and does not require covered entities to submit broad medical claims data to manufacturers or agree to unconscionable Terms. *See* Notice Regarding 340B Rebate Model Pilot Program, 91 Fed. Reg. 48883-01.[8] It requires submission only for a limited universe of drugs and proceeds through notice-and-comment rulemaking with standardized fields, limited scope, and built-in safeguards. *Id*. Such requirements must go through proper regulatory channels with the appropriate protections—not be unilaterally imposed by a manufacturer's ultimatum.

Nor does Lilly's observation that approximately 80% of covered entities have submitted claims data validate the Terms.[9] A monopolist's take-it-or-leave-it demand coerces compliance precisely because the penalty for refusal is severe: loss of access to life-saving medications at congressionally mandated prices. Widespread capitulation to coercion is evidence of its effectiveness, not the reasonableness of the underlying Terms. Lilly's own data confirms that the

---

[8] The day this reply was filed, HRSA announced ten manufactures whose plans were selected for the Pilot Program – Lilly is not among them. *See* HRSA, 340B MODEL PILOT PROGRAM, https://www.hrsa.gov/opa/340b-model-pilot-program (last visited Oct. 1, 20216).

[9] According to HRSA, there are 15,249 registered Covered Entities as of April 1, 2026. *See* 91 Fed. Reg. 48883. Based on Lilly's own information, less than 20% of all Covered Entities have submitted claims data.

holdouts are disproportionately the largest and most sophisticated entities, those with enough resources to challenge unlawful conditions rather than simply accept them. Asay Decl. ¶ 42.

Lilly's privacy argument fares no better. Lilly cites HRSA's statement that claims-data submission does not risk privacy liability. Opp. at 19 n.17. But HRSA addressed only whether de-identified data sharing violates privacy law—not the broader Terms Second Sight imposes. Even leaving aside the unconscionable commercial terms that benefit both of Lilly and Second Sight, the medical claims data requirements create materially greater data-security risks than prior pharmacy-only claims data requirements, and the Terms shift all risk of de-identification failure to MHMH. Thomasset Decl. ¶ 33, 35.

**5. Lilly's Rule 9(b) Defense Fails.**

Rule 9(b) does not apply to MHMH's CPA claim. It applies only where the core allegations "sound[] in fraud." *PC Connection, Inc. v. Int'l Bus. Machines Corp.*, 687 F. Supp. 3d 227, 240 (D.N.H. 2023). The CPA is an equitable, "remedial statute" arguably governed by Rule 8(a). *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 97 (2007). Even if Rule 9(b) applies, MHMH has identified with particularity the misleading omissions in Lilly's 10-K representation and January 15, 2026 letter. *See Chroniak*, 983 F.2d at 1145.

**iii. Lilly Breached Its Contractual Obligations to MHMH.**

For years, MHMH accepted Lilly's offer and purchased drugs at the 340B Ceiling Price. These are simple, identifiable terms confirmed by years of invoices and deliveries. At no point did Lilly condition its offer on patient-level claims data or attempt to strong-arm MHMH into accepting unconscionable Terms. These newly imposed conditions constitute material breaches.[10]

[10] Lilly's statute of frauds argument is a red herring. Pursuant to RSA 382-A:2-201(2), the requirement that a contract for the sale of goods for the price of $500 or more be "signed" is satisfied "if within a reasonable time a record in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents." The parties' ongoing commercial relationship, confirmed by years of invoices and deliveries, satisfies

Lilly dismisses MHMH's unconscionability argument because "unconscionability is a *defense*." Opp. at 38, 40. MHMH seeks to excise the unconscionable conditions from the parties' years-long arrangement—not to avoid a contract, but to preserve it. RSA 382-A:2-302(1) authorizes courts to sever unconscionable clauses while enforcing the remainder of a contract. *Cf. Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463, 1469 (1st Cir. 1992) (New Hampshire is "firmly in the 'partial enforcement' camp").

Additionally, a statute lacking a private right of action can still serve as the basis for a state-law breach claim. *See Trone*, 974 F.3d at 850-51. Lilly's statutory "offer" (a term Congress chose in 42 U.S.C. § 256b) includes an express promise to comply with 340B pricing laws. Lilly repeatedly represented that it is "committed to compliance with the 340B statute" and would "continue to offer all covered entities its 340B medicines at or below the 340B ceiling price." Thomasset Decl. ¶ 26-27, Ex. 2.

Lilly's unilateral imposition of unprecedented conditions on an established relationship, with no opportunity to negotiate, also violates the implied covenant of good faith and fair dealing. *See Livingston v. 18 Mile Point Drive, Ltd.*, 158 N.H. 619, 624 (2009) (covenant forbids "behavior inconsistent with the parties' agreed-upon common purpose and justified expectations."); *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 143-45 (1989) (abuse of discretion violates implied covenant).

**iv. Lilly Is Unjustly Enriched at MHMH's Expense.**

The same conduct supporting MHMH's CPA and contract claims satisfies the "wrongful acts" element of unjust enrichment. Lilly imposes unauthorized conditions on statutorily

---

the writing requirement through performance. Regardless, had Lilly provided the statutorily required 340B Ceiling Price, the contract for each drug purchase would be well under the $500 statute of frauds threshold, with many as low as one cent under the "Penny Pricing" scheme.

guaranteed pricing, extracts commercially valuable claims data on unconscionable Terms, and charges MHMH above the Ceiling Price when it refuses. Lilly pockets approximately millions of dollars in annual overcharges while retaining access to billions of dollars in the Medicare and Medicaid markets and—from complying covered entities—harvesting claims data it would otherwise have to purchase or would not be able to access readily. The result is shockingly unjust: Lilly profits at multiple angles of a scheme designed to circumvent a congressional program enacted to benefit safety-net providers.

## V. The Balance of Equities and Public Interest Favor MHMH.

The 340B program exists so covered entities can "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12 (1992). Lilly inverts this framework, reframing the public interest as "transparency" while wielding its monopoly power to impose the unconscionable Terms and punishing a nonprofit safety-net hospital for refusing to capitulate. MHMH is absorbing over $4 million in annual overcharges that threaten patient-care programs, community health services, and its charitable mission. Lilly has over $65 billion in annual revenue and a market capitalization exceeding one trillion dollars. The only "burden" the injunction places on Lilly is selling its medicines at the price Congress mandated. That is compliance, not harm. The "competing claims of injury" could not be more asymmetric. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Lilly's unclean hands argument fails. The doctrine applies only when the plaintiff's misconduct is "directly related to the merits of the controversy." *Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 488 F.3d 11, 15 (1st Cir. 2007). Lilly identifies no misconduct related to whether it may condition 340B pricing on MHMH's surrender of claims data under unconscionable terms. It

instead points to general 340B program growth, industry-wide compliance challenges, and a 2021 HRSA audit in which MHMH proactively self-terminated facilities no longer meeting eligibility criteria. Opp. at 15 n.13. However, MHMH has maintained its 340B eligibility throughout the relevant period without any HRSA finding of noncompliance. Thomasset Decl. ¶ 12. As for the *Johnson & Johnson* complaint Lilly cites, an allegation in a separate lawsuit not involving MHMH as a party and resulting in no finding against MHMH is not evidence of misconduct.

Lilly argues the injunction would deprive it of the ability to detect "Duplicate Discounts," but Lilly retains its audit right under 42 U.S.C. § 256b(a)(5)(C), its ability to report concerns to HRSA, and its access to ADR. *See* Section IV.B.i, *supra*. The public interest is served by holding manufacturers to the pricing Congress mandated—not by permitting them to extract commercially valuable data as a private toll on statutory benefits.

Lilly contends MHMH's proposed order is overbroad, but this Court has authority to "tailor" relief. *See Winter*, 555 U.S. at 11. MHMH has no objection to a narrowed order addressing only the claims-data condition in the 2026 Policy and unconscionable Terms. Lilly's suggestion that MHMH's financial resources diminish the equities misses the point. The question is whether equity permits a trillion-dollar manufacturer to use its unequal bargaining power to condition congressionally mandated pricing on unauthorized terms. Every dollar wrongfully diverted to Lilly is a dollar unavailable for patient care. The balance overwhelmingly favors MHMH.

**VI. No Bond is Required.**

Rule 65(c) vests courts with broad discretion to set security, including requiring no bond at all, and the First Circuit has long recognized that "no bond is required in suits to enforce important federal rights or 'public interests.'" *Crowley v. Loc. No. 82, Furniture & Piano Moving*, 679 F.2d 978, 1000 (1st Cir. 1982) (citation omitted) *rev'd on other grounds*, 467 U.S. 526 (1984);

*see also Pharm. Soc. of State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995); *Dartmouth-Hitchcock Clinic v. Toumpas*, No. 11-CV-358-SM, 2012 WL 748575, at *1 (D.N.H. Mar. 2, 2012). MHMH's independent state law causes of action vindicate the same public interests the 340B program serves. The exception turns on the nature of the interests at stake, not on whether the plaintiff asserts a federal private right of action.

Even if a bond were required, it should be set at zero because the injunction requires only that Lilly sell at the 340B Ceiling Price it is already obligated to offer. Fed. R. Civ. P. 65(c). The $4.7 million "loss" Lilly cites is MHMH's harm, not Lilly's. That figure is the premium Lilly extracts by conditioning statutory pricing on unauthorized terms—the very conduct MHMH challenges as unlawful. If any bond is required, it should be nominal given that MHMH vindicates significant public interests, Lilly suffers no harm from selling at statutory prices, and MHMH's nonprofit status and financial constraints weigh against a substantial bond.

Respectfully submitted,

**MARY HITCHCOCK MEMORIAL HOSPITAL**

By its attorneys,

Dated: October 1, 2026

By*: /s/ Morgan C. Nighan*
Morgan C. Nighan (Bar No. 21196)
NIXON PEABODY LLP
Exchange Place, 53 State Street
Boston, MA 02109
(617) 345-1031
mnighan@nixonpeabody.com

Nathan P. Warecki (Bar No. 20503)
Jonathan D. O'Neil (Bar No. 276336)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101

(603) 628-4000
nwarecki@nixonpeabody.com
joneil@nixonpeabody.com